**Exhibit 5**

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549
# FORM 10-K

(Mark One)

☒   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2019
or

☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period From To
Commission File Number: 001-38558



**TRICIDA, INC.**
(Exact name of registrant as specified in its charter)

| **Delaware** | **46-3372526** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**7000 Shoreline Court, Suite 201**
**South San Francisco, California 94080**
**(415) 429-7800**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common stock, par value $0.001 per share | TCDA | The Nasdaq Global Select Market |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ | Non-accelerated filer | ☐ |
|---|---|---|---|---|---|
| Smaller reporting company | ☐ | Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of June 28, 2019 (the last business day of the registrant's most recently completed second fiscal quarter), the aggregate market value of the common stock held by non-affiliates of the registrant was approximately $1.1 billion, based on the closing price of the common stock as reported on the Nasdaq Global Select Market on that date. Shares of common stock held by each person who is known to own 10% or more of the outstanding common stock have been excluded in that such persons may be deemed to be affiliates of the Company. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

On February 27, 2020, the registrant had 49,855,335 shares of common stock, par value $0.001 per share, outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Certain portions of the registrant's definitive proxy statement relating to the Company's Annual Meeting of Stockholders, to be filed with the Securities and Exchange Commission within 120 days of the registrant's fiscal year ended December 31, 2019, are incorporated by reference into Part III of this Annual Report on Form 10-K where indicated.

**PART I**

**ITEM 1. BUSINESS**

**Overview**

Our goal is to slow the progression of chronic kidney disease, or CKD, through the treatment of metabolic acidosis. We are a pharmaceutical company focused on the development and commercialization of our drug candidate, veverimer (also known as TRC101), a non-absorbed, orally-administered polymer designed to treat metabolic acidosis by binding and removing acid from the gastrointestinal, or GI, tract. Metabolic acidosis is a serious condition commonly caused by CKD and is believed to accelerate the progression of kidney deterioration. It can also lead to bone loss, muscle wasting and impaired physical function. Metabolic acidosis in patients with CKD is typically a chronic disease and, as such, requires long-term treatment to mitigate its deleterious consequences.

There are currently no FDA-approved therapies for treating chronic metabolic acidosis. We estimate that metabolic acidosis affects approximately 3 million patients with CKD in the United States, and we believe that treating metabolic acidosis and slowing the progression of CKD in patients with metabolic acidosis and CKD represents a significant unmet medical need and market opportunity.

Veverimer is an in-house discovered, new chemical entity. We have a broad intellectual property estate that we believe will provide patent protection for veverimer until at least 2034 in the United States, the European Union, Japan, China, India and certain other markets.

Tricida is led by a seasoned management team that includes the founder of Ilypsa, Inc. and Relypsa, Inc. Our management team has extensive experience in the development and commercialization of therapeutics, with deep expertise in developing polymers for the treatment of kidney-related diseases.

Metabolic acidosis observed in patients with CKD is most often caused by an imbalance in acid production relative to acid excretion. The human body generates acid every day through normal food intake and metabolism. Sources of acid include amino acids and nucleic acids from daily dietary intake and digestion of proteins. The daily load of nonvolatile acids from metabolic processes amounts to approximately 1 milliequivalent, or mEq, per kilogram, or kg, of body weight, or 50 to 100 mEq per day for adults. A healthy kidney excretes this acid daily, but in patients with CKD acid excretion is compromised, and as a result, acid accumulates in the body. Over time, a vicious cycle of worsening metabolic acidosis and accelerated progression of kidney disease can result.

Acid binding is a novel approach to treating metabolic acidosis without introducing deleterious counterions or metals. This approach mimics the physiologic response to acid removal seen with persistent vomiting or nasogastric suction that results in an elevated serum bicarbonate level. To achieve the desired effect of increasing serum bicarbonate with a convenient daily dose of less than 10 grams per day, an acid binding polymer should have an amine capacity to bind at least 5 mEq of proton/gram. Once protonated, the acid binding polymer needs to preserve the effect of the proton binding by not removing anions such as fatty and bile acids that represent precursors metabolized to bicarbonate in the blood. The complementary anion to be bound that ensures net acid removal from the GI tract is chloride, the smallest anion present in the GI tract.

Veverimer is a low-swelling, spherical polymer bead that is approximately 100 micrometers in diameter. It is a single, high molecular weight, crosslinked polyamine molecule. The size of veverimer prevents systemic absorption from the GI tract. The high degree of cross-linking within veverimer limits swelling and the overall volume in the GI tract, with the goal of facilitating good GI tolerability. The high amine content of veverimer provides proton binding capacity of approximately 10 mEq/gram of polymer. The size exclusion built into the three-dimensional structure of the polymer enables preferential binding of chloride versus larger inorganic and organic anions, including phosphate, citrate, fatty acids and bile acids. This size exclusion mechanism allows a majority of the binding capacity to be used for hydrochloric acid binding.

Our New Drug Application, or NDA, for veverimer as a chronic treatment for metabolic acidosis in patients with CKD, is currently under review by the U.S. Food and Drug Administration, or FDA, through the Accelerated Approval Program. The FDA has indicated that it is currently planning to hold a Cardiovascular and Renal Drugs Advisory Committee, or CRDAC, meeting to discuss the application. The FDA has assigned a Prescription Drug User Fee Act, or PDUFA, goal date of August 22, 2020 for the potential approval to market veverimer in the United States. We are currently conducting a confirmatory postmarketing trial, VALOR-CKD (also known as TRCA-303), as part of the Accelerated Approval Program.

Results from our positive Phase 3, 12-week efficacy trial, TRCA-301, and a follow-on 40-week extension trial, TRCA-301E, formed the primary clinical basis of our NDA submission. The Lancet published the results of the TRCA-301 trial in March 2019 and the results of the TRCA-301E trial in June 2019.

The TRCA-301 trial was a double-blind, placebo-controlled trial that randomized 217 patients with non-dialysis dependent CKD and metabolic acidosis. The trial met both its primary and secondary endpoints in a highly statistically significant manner (p<0.0001 for both the primary and secondary endpoints). Veverimer was well tolerated in our TRCA-301 trial. The primary endpoint of the trial measured improvements in serum bicarbonate levels in veverimer-treated patients versus placebo. Serum bicarbonate is a surrogate measure of metabolic acidosis and a persistent serum bicarbonate level below 22 mEq/L indicates metabolic acidosis. After 12 weeks of treatment, 59.2% of subjects in the veverimer-treated group, compared with 22.5% of subjects in the placebo group, had an increase in serum bicarbonate level of at least 4 mEq/L or achieved a serum bicarbonate level in the normal range of 22 to 29 mEq/L, which was the primary endpoint of the trial. The secondary endpoint of the trial, the least squares, or LS, mean change from baseline to week 12 in serum bicarbonate, was 4.42 mEq/L in the veverimer-treated group, compared with 1.78 mEq/L in the placebo group. The mean change in serum bicarbonate from baseline to week 12 was 4.5 mEq/L in the veverimer-treated group, compared with 1.7 mEq/L in the placebo group.

The TRCA-301E trial was a blinded, 40-week extension of the 12-week TRCA-301 trial. One hundred ninety-six subjects, consisting of 114 subjects in the veverimer group and 82 subjects in the placebo group, elected and were qualified to continue in the extension trial. The primary endpoint of the TRCA-301E trial was an assessment of the long-term safety profile of veverimer versus placebo. We observed fewer discontinuations, fewer serious adverse events and a comparable rate of GI adverse events on veverimer versus placebo. The trial further demonstrated that the effect of veverimer on increasing serum bicarbonate was sustained over one year. The differences between veverimer and placebo on the two endpoints related to serum bicarbonate increase were highly statistically significant compared to placebo in both the TRCA-301 trial and the TRCA-301E trial.

The statistical analysis plan for the TRCA-301E trial included a pre-specified comparison of the veverimer and placebo groups for the time to first occurrence of any event in the composite clinical endpoint of all-cause mortality, dialysis/renal replacement therapy or a confirmed ≥50% decline in eGFR, or DD50. Although the trial was not designed or powered to assess all-cause mortality or the progression of CKD outcomes, we nevertheless observed a 65% reduction in the annualized DD50 event rate for veverimer-treated subjects compared with subjects on placebo. Over the combined 52-week treatment period, the annualized DD50 incidence rate was 12.0% in the placebo group versus 4.2% in the veverimer group (p=0.0224). There were 7 confirmed eGFR reductions ≥50%, 4 deaths and 1 dialysis initiation that occurred in 10 of the 82 subjects on placebo versus 5 confirmed eGFR reductions of greater than or equal to 50%, 0 deaths and 1 dialysis initiation that occurred in 5 of the 124 subjects on veverimer.

Patients with CKD are often frail and have impaired physical function, and metabolic acidosis is one factor that has been implicated as a potential contributor. Metabolic acidosis has direct effects on skeletal muscle catabolism and bone demineralization. Two large retrospective cohort analyses found that low serum bicarbonate level was independently associated with adverse health outcomes related to physical functioning, such as gait speed, quadriceps strength, failure to thrive and fractures/falls (Abramowitz et al., 2011; Reaven et al., 2019). Prospective studies of patients with metabolic acidosis and CKD have shown that treatment of metabolic acidosis increased muscle mass (de Brito-Ashurst et al., 2009; Dubey et al., 2018) and improved muscle function (Abramowitz et al., 2013), and physical function related quality of life (de Brito-Ashurst et al., 2015).

We also assessed physical functioning both subjectively and objectively in our TRCA-301 and TRCA-301E studies. The subjective physical function endpoint examined the effect of treatment with veverimer on self-reported responses to the physical function subpart of the Kidney Disease and Quality of Life Short Form, or the KDQOL-SF, survey. This survey is a validated questionnaire for patients with kidney disease designed to assess health-related quality of life; the physical function subpart is based on activities of daily living. Subjects in the trial responded to 10 questions, each with a value of 10 points, resulting in a maximum score of 100 total points. After one year of treatment, there was no improvement in the placebo group, whose mean score decreased from a baseline score of 56 points to 55 points. However, subjects on veverimer had an 11-point improvement, on average, moving from a mean score of 53 points to 64 points (p<0.0001). The objective physical function endpoint examined the effect of treatment with veverimer on results of the Repeated Chair Stand Test. In this test, subjects were asked to stand up and sit down five times as quickly as possible, and the time for these five repetitions was recorded. At the end of one year of treatment, the average time for performing the Repeated Chair Stand Test decreased by 4.3 seconds on veverimer compared to 1.4 seconds on placebo compared to a baseline of 22 seconds and 21 seconds, on average, for the veverimer and placebo groups, respectively (p<0.0001).

4

**ITEM 1A. RISK FACTORS**

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks described below, together with the other information contained elsewhere in this Annual Report on Form 10-K, including Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Part II, Item 8. "Financial Statements," as well as our other filings with the Securities and Exchange Commission, or SEC, before deciding whether to invest in our common stock. The occurrence of any of the events or developments described below could materially and adversely affect our business, financial condition, results of operations, cash flows and prospects. In such an event, the market price of our common stock could decline, and you may lose all or part of your investment. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also impair our business operations.*

**Risks Related to Our Limited Operating History, Financial Condition and Capital Requirements**

***We have a limited operating history, have incurred significant losses in each year since our inception and anticipate that we will continue to incur significant losses for the foreseeable future. We have only one product candidate, veverimer (also known as TRC101), for which an NDA has been accepted for review by the FDA through the Accelerated Approval Program that is still in clinical trials and has no commercial sales, which, together with our limited operating history, makes it difficult to assess our future viability.***

We are a pharmaceutical company focused on the development and commercialization of our product candidate, veverimer, a non-absorbed, orally-administered polymer designed to treat metabolic acidosis in patients with chronic kidney disease, or CKD. We have only a limited operating history upon which you can evaluate our business and prospects. We are not profitable and have incurred significant losses in each year since our inception in 2013. Our net losses were $176.8 million, $102.8 million and $41.3 million for the years ended December 31, 2019, 2018 and 2017, respectively. As of December 31, 2019, we had an accumulated deficit of $369.0 million. Pharmaceutical product development is a highly speculative undertaking, entails substantial upfront capital expenditures and involves a substantial degree of risk, including the risk that a potential product candidate will fail to demonstrate adequate efficacy or an acceptable safety profile, gain regulatory approval and become commercially viable. We have limited experience and have not yet demonstrated an ability to successfully overcome many of the risks and uncertainties frequently encountered by companies in new and rapidly evolving fields, particularly in the pharmaceutical industry. To date, we have focused principally on developing our product candidate veverimer. We have no products approved for commercial sale and have not generated any revenue from product sales or other arrangements to date and neither will we for the foreseeable future. We continue to incur significant research and development and other expenses related to our ongoing operations. We expect to continue to incur losses for the foreseeable future, and we anticipate these losses will increase as we continue our development of, and seek regulatory approval for, veverimer, prepare for potential commercialization of veverimer and continue to operate as a public company and comply with legal, accounting and other regulatory requirements.

If veverimer is not successfully developed or commercialized, including because of a lack of capital, or if we do not generate enough revenue following marketing approval, we will not achieve profitability and our business may fail. Even if we achieve profitability in the future, we may not be able to sustain profitability in subsequent periods. We may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect our business. The size of our future net losses will depend, in part, on the rate of future growth of our expenses and our ability to generate revenue. Our prior losses, combined with expected future losses, have had and will continue to have an adverse effect on our stockholders' equity and working capital.

Further, the net losses we incur may fluctuate significantly from quarter to quarter and year to year, such that a period-to-period comparison of our results of operations may not be a good indication of our future performance.

***We will require substantial additional financing to achieve our goals, and a failure to obtain this necessary capital when needed on acceptable terms, or at all, could force us to delay, limit, reduce or terminate our product development, other operations or commercialization efforts of veverimer.***

We are currently advancing veverimer through clinical development. As of December 31, 2019, we had working capital of $273.0 million and cash, cash equivalents and investments of $355.0 million. We believe that we will continue to expend substantial resources for the foreseeable future as we continue clinical development, seek regulatory approval, and prepare for the commercialization of veverimer and develop any other product candidates we may choose to pursue in the future. These expenditures will include costs associated with research and development, sales and marketing, conducting nonclinical and clinical studies and trials, obtaining regulatory

42

approvals, and manufacturing and supply. In addition, other unanticipated costs may arise. Because the outcome of any clinical trial and the regulatory approval process is highly uncertain, we cannot reasonably estimate the actual amounts necessary to successfully complete the development, regulatory approval process and commercialization of veverimer.

We believe that our existing cash, cash equivalents and investments of $355.0 million and additional borrowings under our Loan and Security Agreement, or Term Loan, with Hercules Capital, Inc., or Hercules, will allow us to fund our operating plan through at least the next 12 months. However, we have based these estimates on assumptions that may prove to be wrong, and we could spend our available capital resources much faster than we currently expect or require more capital to fund our operations than we currently expect. Moreover, our operating plan may change as a result of many factors currently unknown to us, and we may need to seek additional funds sooner than planned, through public or private equity or debt financings or other sources, such as strategic collaborations. Such financing may result in dilution to stockholders, imposition of debt covenants and repayment obligations, or other restrictions that may affect our business. In addition, we may seek additional capital due to favorable market conditions or strategic considerations even if we believe we have sufficient funds for our current or future operating plans.

The amount and timing of our future funding requirements will depend on many factors, including, but not limited to:

- the time and cost necessary to obtain regulatory approvals for veverimer and any future product candidates that we develop, in-license or acquire;

- our ability to obtain approval for veverimer through the Accelerated Approval Program;

- the costs of confirmatory postmarketing studies or trials for veverimer that could be required by regulatory agencies or that we might otherwise choose to conduct;

- the costs of obtaining commercial supplies of veverimer;

- our ability to successfully commercialize veverimer;

- the manufacturing, selling and marketing costs associated with veverimer, including the cost and timing of expanding our sales and marketing and medical affairs capabilities;

- the timing and costs related to the optimization and scale-up of our manufacturing processes for veverimer and commercial supply of veverimer;

- the amount and timing of sales, royalties and other revenue from veverimer, if approved, including the sales price and the availability of adequate third-party reimbursement;

- the costs of operating as a public company;

- the costs associated with any product recall that could occur;

- the emergence, approval, availability, perceived advantages, relative cost, relative safety and relative efficacy of alternative and competing products or treatments;

- the cash requirements of any future acquisitions or discovery of future product candidates, if any;

- the progress, timing, scope and costs of conducting our nonclinical and clinical studies and trials, including the ability to enroll patients in a timely manner for our confirmatory postmarketing trial, VALOR-CKD (also known as TRCA-303), or potential future nonclinical and clinical studies and trials;

- the costs of hiring and retaining personnel as we grow;

- the time and cost necessary to respond to technological and market developments; and

- the costs of preparing, filing, prosecuting, defending and enforcing any patent claims and other intellectual property rights, including litigation costs and the outcome of such litigation.

43

We cannot assure you that anticipated additional financing will be available to us on favorable terms, or at all. Our current Term Loan contains negative covenants that restrict our ability to obtain additional debt financing. Any future debt financing into which we enter may impose upon us covenants that restrict our operations, including limitations on our ability to incur liens or additional debt, pay dividends, redeem our stock, make certain investments and engage in certain merger, consolidation or asset sale transactions. Although we have been successful in obtaining financing through the issuance of our equity securities and debt financing, we cannot assure you that we will be able to do so in the future. If we are unable to raise additional capital to fund our clinical development and commercialization of veverimer, if approved, and other business activities, we could be forced to significantly delay, scale back or abandon one or more clinical development programs or commercialization efforts and curtail or cease our operations. In addition, our ability to achieve profitability or to respond to competitive pressures would be significantly limited.

**Risks Related to Our Business**

***We are dependent on the success of veverimer, our only product candidate. If we are unable to successfully develop, obtain regulatory approval for and commercialize veverimer, or experience significant delays in doing so, our business will be materially harmed.***

To date, we have invested all of our efforts and financial resources in the research and development of veverimer, which is our only product candidate, and our business and future success depends on our ability to successfully develop, obtain regulatory approval for, and commercialize veverimer. In May 2018, we completed our multicenter, randomized, double-blind, placebo-controlled, pivotal Phase 3 clinical trial for veverimer, known as TRCA-301. The TRCA-301 trial enrolled 217 patients with metabolic acidosis and CKD. Eligible subjects who completed the 12-week treatment period in our pivotal Phase 3 trial were invited to continue in our 40-week extension trial, TRCA-301E, and we completed the TRCA-301E trial in March 2019. While we believe that these trials successfully met their primary and secondary endpoints and are sufficient to support our NDA, we cannot assure you that the U.S. Food and Drug Administration, or FDA, or any foreign regulatory agency will approve veverimer for marketing.

We submitted our NDA for veverimer to the FDA in August 2019. We subsequently received the filing communication letter, also referred to as the Day 74 Letter, which stated that the NDA had been accepted for review by the FDA through the Accelerated Approval Program and that a user fee goal date of August 22, 2020 had been set under the Prescription Drug User Fee Act, or PDUFA. The FDA is not bound by, and has in the past missed, its PDUFA goal dates, and it is unknown whether the review of our NDA for veverimer will be completed by the PDUFA goal date designated in the Day 74 Letter or will be delayed. The Day 74 Letter also stated the FDA is currently planning to hold a Cardiovascular and Renal Drugs Advisory Committee, or CRDAC, meeting to discuss the NDA, which we believe would likely occur in the first half of 2020. While the FDA is not bound by the recommendation of the CRDAC, it considers such recommendations carefully when making decisions.

If, as anticipated, the FDA holds a CRDAC meeting, the CRDAC may recommend against approval or may recommend limitations, conditions or restrictions on the use of veverimer. The FDA may agree with some or all of those recommendations or impose its own limitations, conditions and restrictions on the use of veverimer. Furthermore, even if we obtain regulatory approval for veverimer, we need to continue to develop a commercial organization, or collaborate with a third party for the commercialization of veverimer, establish commercially viable pricing and obtain approval for coverage and adequate reimbursement from third parties, including government payers. If we are unable to successfully commercialize veverimer, we may not be able to generate sufficient revenue to continue our business.

Our near-term prospects, including our ability to finance our operations and generate revenue, will depend heavily on the successful development and commercialization of veverimer in the United States. Though we plan to engage in marketing approval discussions with foreign regulatory agencies in the future, we have not yet begun marketing approval discussions with any regulatory agency other than the FDA, and we are not currently seeking regulatory approval for veverimer outside the United States. The clinical and commercial success of veverimer will depend on a number of factors, including the following:

- our ability to demonstrate veverimer's safety and efficacy to the satisfaction of the FDA and/or foreign regulatory agencies;

- the timely reporting of our confirmatory postmarketing trial, known as the VALOR-CKD trial;

44

- whether we are required by the FDA and/or foreign regulatory agencies to conduct additional clinical trials prior to approval to market veverimer;

- the prevalence and severity of adverse side effects of veverimer in our ongoing and future clinical trials and commercial use, if approved;

- the timely receipt of necessary regulatory and marketing approvals from the FDA and foreign regulatory agencies for veverimer;

- our ability to obtain U.S. marketing approval for veverimer through the Accelerated Approval Program;

- our ability to successfully conduct our confirmatory postmarketing trial, VALOR-CKD, and confirm clinical benefit of veverimer, assuming veverimer is initially approved through the FDA's Accelerated Approval Program;

- our ability to successfully commercialize veverimer, if approved for marketing and sale by the FDA and/or foreign regulatory agencies;

- our ability to manufacture clinical trial and commercial quantities of veverimer drug substance and drug product and to develop and maintain commercially viable and validated manufacturing processes that are compliant with current good manufacturing practices, or cGMP, at a scale sufficient to meet anticipated demand and over time enable us to reduce our cost of manufacturing;

- achieving and maintaining compliance with all regulatory requirements applicable to veverimer;

- our success in educating physicians and patients about the potential benefits, risks, administration and use of veverimer;

- acceptance of veverimer as safe and effective by patients and the medical community;

- the availability, perceived advantages, relative cost, relative safety and relative efficacy of alternative and competing treatments;

- our ability to obtain and sustain an adequate level of reimbursement for veverimer by third-party payers;

- the effectiveness of our own or any future strategic collaborators' marketing, sales and distribution strategy and operations;

- our ability to continue to obtain protection for and to enforce our intellectual property rights in and to veverimer; and

- our ability to avoid and defend against third-party patent interference or patent infringement claims or similar proceedings with respect to our patent rights and patent infringement claims.

Many of these factors are beyond our control. Accordingly, we cannot assure you that we will ever be able to generate revenue through the sale of veverimer. If we are not successful in commercializing veverimer, or are significantly delayed in doing so, our business will be materially harmed.

***Our NDA for veverimer has been accepted for review by the FDA through the Accelerated Approval Program, but such program may not actually lead to a faster development or regulatory review or approval process. If we are unable to obtain approval of veverimer through the Accelerated Approval Program in the United States, we may be required to conduct additional nonclinical and clinical studies and trials beyond those that we currently contemplate, which could increase the expense of obtaining, reduce the likelihood of obtaining and/or delay the timing of obtaining, necessary marketing approval. Even if we receive approval from the FDA through the Accelerated Approval Program, if our confirmatory postmarketing trial does not verify clinical benefit, or if we do not comply with rigorous postmarketing requirements, the FDA may seek to withdraw the approval.***

Our NDA for veverimer has been accepted for review by the FDA through the Accelerated Approval Program based on the results of our Phase 1/2 trial, TRCA-101, our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial, TRCA-301E. For any approval to market a drug product, we must provide the FDA and foreign

regulatory agencies with clinical data that adequately demonstrate the safety and efficacy of the product for the indication applied for in the NDA or other respective regulatory filings. As described in the "Government Regulation" section, the Accelerated Approval Program is one of several approaches used by the FDA to make prescription drugs more rapidly available for the treatment of serious or life-threatening diseases. Section 506(c) of the Federal Food, Drug and Cosmetic Act, or FFDCA, provides that the FDA may grant accelerated approval to "a product for a serious or life-threatening condition upon a determination that the product has an effect on a surrogate endpoint that is reasonably likely to predict clinical benefit, or on a clinical endpoint that can be measured earlier than irreversible morbidity or mortality, that is reasonably likely to predict an effect on irreversible morbidity or mortality or other clinical benefit, taking into account the severity, rarity, or prevalence of the condition and the availability or lack of alternative treatments." Approval through the Accelerated Approval Program is subject, however, to the requirement that the applicant conduct additional postmarketing clinical trials to verify and describe the drug's clinical benefit, where there is uncertainty as to the relationship of the surrogate endpoint to the clinical benefit, or of the observed clinical endpoint to ultimate outcome. Typically, clinical benefit is verified when postmarketing clinical trials show that the drug provides a clinically meaningful positive therapeutic effect, that is, an effect on how a patient feels, functions, or survives. If such confirmatory postmarketing trial fails to confirm the drug's clinical profile or risks and benefits, the FDA may withdraw its approval of the drug.

The FDA has broad discretion with regard to approval through the Accelerated Approval Program, and even if we believe that the Accelerated Approval Program is appropriate for veverimer, we cannot assure you that the FDA will ultimately agree. Furthermore, even if we do obtain approval through the Accelerated Approval Program, we may not experience a faster development process, review or approval compared to conventional FDA procedures.

While our NDA is being reviewed through the Accelerated Approval Program, there can be no assurance that approval will be granted on a timely basis, or at all. For example, there can be no assurance that the FDA will ultimately agree that the results of our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial, TRCA-301E, and the design of our confirmatory postmarketing trial, VALOR-CKD, will be sufficient to support such approval. Additionally, the FDA could require us to conduct further studies or trials prior to granting approval of any type, including by determining that approval through the Accelerated Approval Program is not appropriate and that our pivotal Phase 3 clinical trial, TRCA-301, may not be used to support approval through the conventional pathway. We might not be able to fulfill the FDA's requirements in a timely manner, which would cause delays, or approval might not be granted because our submission is deemed incomplete by the FDA. There also can be no assurance that after subsequent FDA feedback we will continue to pursue approval through the Accelerated Approval Program. A failure to obtain approval through the Accelerated Approval Program could result in a longer time period to obtain approval of veverimer, could increase the cost of its development, could delay our ability to commercialize veverimer and could significantly harm our financial position and competitive position in the marketplace.

We submitted our NDA for veverimer to the FDA in August 2019. We subsequently received the filing communication letter, also referred to as the Day 74 Letter, which stated that the NDA had been accepted for review by the FDA through the Accelerated Approval Program, and that a PDUFA goal date had been set for August 22, 2020. The FDA is not bound by, and has in the past missed, its PDUFA goal dates, and it is unknown whether the review of our NDA filing for veverimer will be completed by the PDUFA goal date designated in the Day 74 Letter or will be delayed. The Day 74 Letter also stated that the FDA is currently planning to hold a CRDAC meeting to discuss the NDA, which we believe would likely occur in the first half of 2020. While the FDA is not bound by the recommendation of the CRDAC, it considers such recommendations carefully when making decisions.

Even if we receive approval for veverimer through the Accelerated Approval Program, we will be subject to rigorous postmarketing requirements, including the completion of our ongoing confirmatory postmarketing trial, VALOR-CKD, or such other confirmatory postmarketing trials as the FDA may require, to verify the clinical benefit of the product, and submission to the FDA of all promotional materials prior to their dissemination. The FDA could seek to withdraw the approval for multiple reasons, including if we fail to conduct any required confirmatory postmarketing trial with due diligence, our confirmatory postmarketing trial does not confirm the predicted clinical benefit, other evidence shows that the product is not safe or effective under the conditions of use, or we disseminate promotional materials that are found by the FDA to be false and misleading.

Any delay in obtaining, or inability to obtain, approval through the Accelerated Approval Program would delay or prevent commercialization of veverimer and would materially adversely affect our business, financial condition, results of operations, cash flows and prospects.

***We may be unable to obtain regulatory approval for veverimer under applicable regulatory requirements.***

46

To gain approval to market a drug product, regardless of whether it is through the Accelerated Approval Program or the conventional pathway, we must provide the FDA and foreign regulatory agencies with clinical data that adequately demonstrates the safety and efficacy of the product for the intended indication applied for in the NDA or other respective regulatory filing. Drug development is a long, expensive and uncertain process, and delay or failure can occur at any stage of any of our clinical trials. A number of companies in the pharmaceutical industry have suffered significant setbacks in clinical trials even after promising results in earlier nonclinical or clinical studies and trials. These setbacks have been caused by, among other things, nonclinical findings made while clinical trials were underway and safety or efficacy observations made in clinical trials, including previously unreported adverse events. Success in nonclinical testing and early clinical trials does not ensure that later clinical trials will be successful, and the results of clinical trials by other parties may not be indicative of the results in trials we may conduct. In addition, results from compassionate use or investigator-initiated research programs, if implemented, may not be confirmed in Company-sponsored trials and/or may negatively impact the prospects for marketing approval for veverimer.

Our business currently depends entirely on the successful development, regulatory approval and commercialization of our sole product candidate, veverimer. Our NDA to market veverimer is currently under review by the FDA through the Accelerated Approval Program. We may not receive marketing approval for veverimer even though we believe we achieved the primary and secondary endpoints in our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial, TRCA-301E. The FDA and other foreign regulatory agencies have substantial discretion in evaluating the results of our pivotal Phase 3 clinical trial, TRCA-301, our 40-week extension trial, TRCA-301E, and our earlier Phase 1/2 trial, TRCA-101. For example, notwithstanding our view to the contrary, the FDA may determine that the efficacy data and/or safety data from our Phase 1/2 trial, TRCA-101, our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial, TRCA-301E, do not support approval of our NDA for veverimer. Clinical data often are susceptible to varying interpretations and many companies that have believed that their products performed satisfactorily in clinical trials have nonetheless failed to obtain FDA approval for their products. The FDA or foreign regulatory agencies may disagree with our trial design and our interpretation of data from our Phase 1/2 trial, TRCA-101, our pivotal Phase 3 clinical trial, TRCA-301, our 40-week extension trial, TRCA-301E, or our nonclinical studies. Even though our NDA for veverimer has been accepted for review by the FDA through the Accelerated Approval Program based upon the FDA's review of the data contained within the submission, upon the FDA's review of the data from our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial, TRCA-301E, the FDA may request additional information from us, including data from additional clinical trials, and, ultimately, may not grant marketing approval for veverimer.

While there are comparable approval pathways outside the United States that are similar to the Accelerated Approval Program, we have not yet explored whether veverimer might qualify for such a program. Foreign regulatory authorities may determine that the results of our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial, TRCA-301E, and our earlier Phase 1/2 trial, TRCA-101, are not sufficient to support regulatory approval and may require us to complete additional clinical trials or other studies prior to submitting an application for approval.

***The denial of regulatory approval for veverimer could mean that we need to cease operations, and a delay in obtaining such approval could delay commercialization of veverimer and adversely impact our ability to generate revenue, our business and our results of operations.***

If we are not successful in commercializing veverimer, or are significantly delayed in doing so, our business will be materially harmed, and we may need to curtail or cease operations. We currently have no drug products approved for sale, and we may never obtain regulatory approval to market veverimer, either through FDA's Accelerated Approval Program or the conventional pathway. The research, testing, manufacturing, labeling, approval, sale, marketing and distribution of drug products are subject to extensive regulation by the FDA and other regulatory agencies in the United States and other countries, and such regulations differ from country to country. We are not permitted to market veverimer in the United States until we receive approval of our NDA from the FDA.

The FDA or any foreign regulatory agency can delay, limit or deny approval to market veverimer for many reasons, including:

- our inability to demonstrate to the satisfaction of the FDA or the applicable foreign regulatory agency that veverimer is safe and effective for the requested indication;

- our inability to gain agreement from the FDA that veverimer is appropriate for approval through FDA's Accelerated Approval Program;

47

- our inability to gain agreement from applicable foreign regulatory authorities that veverimer is appropriate for approval under applicable regulatory pathways;

- the FDA's or the applicable foreign regulatory agency's disagreement with the interpretation of data from nonclinical and clinical studies and trials;

- our inability to demonstrate that the clinical and other benefits of veverimer outweigh any safety or other perceived risks;

- our ability to enroll an adequate number of patients in our confirmatory postmarketing trial, VALOR-CKD, in a timely manner;

- the FDA's or the applicable foreign regulatory agency's requirement for additional nonclinical or clinical studies or trials;

- the FDA's or the applicable foreign regulatory agency's having differing requirements for the trial protocols used in our clinical trials;

- the FDA's or the applicable foreign regulatory agency's non-approval of the formulation, labeling and/or the specifications of veverimer;

- the anticipated CRDAC meeting resulting in a recommendation against approval for veverimer or a recommendation that the FDA require, as a condition of approval, modifications to existing, or additional, nonclinical studies or clinical trials, limitations on approved labeling or distribution and use restrictions;

- the FDA's or the applicable foreign regulatory agency's failure to accept the manufacturing processes or third-party manufacturers with which we contract; or

- the potential for approval policies or regulations of the FDA or the applicable foreign regulatory agencies to significantly change in a manner rendering our clinical data insufficient for approval.

Of the large number of drugs in development, only a small percentage successfully complete the FDA or other regulatory approval processes and are commercialized.

Even if we eventually complete clinical testing and receive approval of our NDA or foreign marketing authorization for veverimer, the FDA or the applicable foreign regulatory agency may grant approval contingent on the performance of costly additional clinical trials, which may be required after approval. The FDA or the applicable foreign regulatory agency may also approve veverimer for a more limited indication and/or a narrower patient population than we originally request, and the FDA or applicable foreign regulatory agency may not approve the labeling that we believe is necessary or desirable for the successful commercialization of veverimer. Any delay in obtaining, or inability to obtain, applicable regulatory approval would delay or prevent commercialization of veverimer and would materially adversely impact our business and prospects.

***Clinical drug development involves a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results. Failure can occur at any stage of clinical development. While our NDA for veverimer has been accepted for review by the FDA through the Accelerated Approval Program, we have not submitted similar marketing approval applications to comparable foreign authorities.***

Clinical testing is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure can occur at any time during the clinical trial process. The results of nonclinical and clinical studies and trials of our product candidate may not be predictive of the results of later-stage clinical trials. For example, the positive results generated to date in our Phase 1/2 trial, TRCA-101, our pivotal Phase 3 trial, TRCA-301, and our 40-week extension trial, TRCA-301E, for veverimer do not ensure that our ongoing postmarketing trial, VALOR-CKD, or other future clinical trials will demonstrate similar results. Product candidates in later stages of clinical trials may fail to show the desired safety and efficacy despite having progressed through nonclinical and clinical studies and trials. A number of companies in the pharmaceutical industry have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier studies and trials, and we cannot be certain that we will not face similar setbacks. Based upon negative or inconclusive results, we or any potential future collaborator may decide, or regulators may require us, to conduct additional nonclinical and clinical studies and trials. In addition, data obtained from trials and studies are susceptible to varying interpretations, and

48

regulators may not interpret our data as favorably as we do, which may delay, limit or prevent regulatory approval. Furthermore, we rely on contract research organizations, or CROs, and clinical trial sites to ensure the proper and timely conduct of our clinical trials and, while we have agreements governing their committed activities, we have limited influence over their actual performance. Even though we completed our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial, TRCA-301E, and even if any future clinical trials are completed, the results may not be sufficient to obtain regulatory approval, regardless of whether it is through the Accelerated Approval Program or the conventional pathway, for veverimer in the time frame we anticipate, or at all. Additional clinical trial results may inform our understanding of the safety and efficacy of veverimer and could impact the design and conduct of ongoing and future clinical trials.

For approval of veverimer through the Accelerated Approval Program, we are required to conduct a confirmatory postmarketing clinical trial. If the FDA is not satisfied that we are diligently conducting our confirmatory postmarketing trial, VALOR-CKD, it may affect the timing of the potential approval of our NDA for veverimer by the FDA through the Accelerated Approval Program. In addition, our confirmatory postmarketing trial, VALOR-CKD, may have a large dropout rate of participants, or a low event rate, which could add time, expense and risk to the completion of the trial and could affect the results of the trial.

In addition, we do not know whether future clinical trials, if any, will begin on time, need to be redesigned, enroll an adequate number of patients on time or be completed on schedule, if at all. Clinical trials can be delayed, terminated early or aborted for a variety of reasons, including delay or failure to:

- obtain regulatory approval to commence a trial, if applicable;

- reach agreement on acceptable terms with prospective CROs and clinical trial sites, the terms of which can be subject to extensive negotiation and may vary significantly among different CROs and trial sites;

- obtain ethics committee or institutional review board, or IRB, approval at each site;

- recruit suitable patients to participate in a trial and have such patients complete the clinical trial or return for post-treatment follow-up;

- ensure that clinical sites follow the trial protocol, comply with good clinical practices, or GCPs, and continue to participate in a clinical trial;

- address any patient safety concerns that arise during the course of a clinical trial;

- ensure that patients comply with and complete clinical trial protocol;

- achieve a sufficient level of endpoint events in the placebo group, if applicable;

- initiate or add a sufficient number of clinical trial sites;

- ensure that trial sites do not deviate from clinical trial protocol or drop out of a clinical trial;

- address any conflicts with new or existing laws or regulations;

- manufacture sufficient quantities of product candidate for use in clinical trials and ensure clinical trial material is provided to clinical sites in a timely manner; and

- obtain the statistical analysis plan to be used to evaluate the clinical trial data.

Patient enrollment is a significant factor in the conduct of clinical trials and is affected by many factors, including the size and nature of the patient population, the proximity of patients to clinical sites, the eligibility criteria for the trial, the design of the clinical trial, competing clinical trials and clinicians' and patients' perceptions as to the potential advantages of the drug being studied in relation to other available therapies, including any new drugs or treatments that may be approved for the indications we are investigating.

We could also encounter delays if a clinical trial is suspended or terminated by us, by the ethics committees or IRBs of the institutions in which such trials are being conducted, by an independent Safety Review Board, or SRB, for such trial or by the FDA or other regulatory agencies. Such parties may suspend or terminate a clinical trial due to a number of factors, including failure to conduct the clinical trial in accordance with regulatory requirements or our

clinical protocols, inspection of the clinical trial operations or trial site by the FDA or other regulatory agencies resulting in the imposition of a clinical hold, unforeseen safety issues or adverse side effects, failure to demonstrate a benefit from using a drug, changes in governmental regulations or administrative actions or lack of adequate funding to continue the clinical trial.

Further, conducting clinical trials in foreign countries presents additional risks that may delay completion of our clinical trials. These risks include the failure of physicians or enrolled patients in foreign countries to adhere to clinical protocol as a result of differences in healthcare services or cultural customs, managing additional administrative burdens associated with foreign regulatory schemes, as well as political and economic risks relevant to such foreign countries. In addition, the FDA may determine that clinical trial results obtained in foreign subjects do not represent the safety and efficacy of a product when administered in U.S. patients and are thus not supportive of our NDA approval in the United States.

If we experience delays in the start or completion of, or termination of, any clinical trial of our sole product candidate, veverimer, the commercial prospects of veverimer may be harmed, and our ability to generate product revenue from veverimer will be delayed. In addition, any delays in completing our clinical trials will increase our costs, slow down our veverimer development and approval process and jeopardize our ability to commence product sales and generate revenue. Any of these occurrences may significantly harm our business, financial condition and prospects. In addition, many of the factors that cause, or lead to, a delay in the commencement or completion of clinical trials may also ultimately lead to the denial of regulatory approval of veverimer.

***Results from completed human clinical trials may not be representative of the results that are obtained after approval, if obtained, and product launch.***

Human clinical trials are very complicated undertakings and working with patients with CKD is particularly difficult because of the serious nature of the disease and the comorbidities experienced by these patients. If we obtain FDA approval through the Accelerated Approval Program, safety risks not identified in our prior clinical trials may first appear after we obtain approval and commercialize veverimer. Any new postmarketing adverse events may significantly impact our ability to market veverimer and may require that we make changes to the product label that could adversely impact our commercialization efforts, recall some or all of the product, or discontinue commercialization of the product. Furthermore, if the confirmatory postmarketing trial, VALOR-CKD, fails to confirm veverimer's clinical profile or clinical benefits, the FDA may withdraw its approval of veverimer. Any of these events would materially harm our business.

***We have relied and continue to rely on third parties, particularly CROs, to conduct and complete our clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines, we may be unable to obtain regulatory approval for or commercialize veverimer, if approved.***

We do not have the ability to independently conduct clinical trials. We rely on medical institutions, clinical investigators, contract laboratories, collaborative partners and other third parties, such as CROs, to conduct clinical trials for veverimer. We rely on these third parties to conduct and complete our clinical trials according to GCPs and the study protocol, statistical analysis plan and other study-specific documents (for example, monitoring and blinding plans). Responsibilities of these third parties include, but are not limited to, monitoring of the study sites and ensuring that the study is conducted in compliance with International Council for Harmonization of Technical Requirements for Pharmaceuticals for Human Use, or ICH, guidelines and GCPs, the informed consent process, protocol-specified requirements, safety reporting requirements, data collection guidelines and all study-specific blinding procedures.

Our TRCA-301 trial was conducted at 37 sites and our 40-week extension trial, TRCA-301E, was conducted at 29 sites in the United States and Europe. Our confirmatory postmarketing trial, VALOR-CKD, is being conducted in a significantly greater number of countries and a significantly greater number of sites than our TRCA-301 and TRCA-301E trials. The third parties with whom we contract for execution of our clinical trials play a significant role in the conduct of these trials and the subsequent collection and analysis of data. However, these third parties are not our employees, and, except for contractual duties and obligations, we have limited ability to control the amount or timing of resources that they devote to our program. Although we rely on these third parties to conduct all of our clinical trials in accordance with a transfer of obligations, we remain responsible for ensuring that each of our clinical trials is conducted and its data analyzed in accordance with its protocol and statistical analysis plan. Moreover, the FDA and foreign regulatory agencies require us to comply with regulations and standards, including ICH guidelines and GCPs for conducting, monitoring, recording and reporting the results of clinical trials to ensure that the data and

50

results are scientifically credible and accurate, and that the trial subjects are adequately informed of the potential risks of participating in clinical trials.

In addition, the execution of clinical trials, and the subsequent compilation and analysis of the data produced, requires coordination among various parties. In order for these functions to be carried out effectively and efficiently, it is imperative that these parties communicate and coordinate with one another. Moreover, these third parties may also have relationships with other commercial entities, some of which may compete with us. These third parties may terminate their agreements with us upon as little as 30 days' prior written notice. Some of these agreements may also be terminated by such third parties under certain other circumstances, including our insolvency. If the third parties conducting our clinical trials do not perform their contractual duties or obligations, experience work stoppages, do not meet expected deadlines, terminate their agreements with us or need to be replaced, or if the quality or accuracy of the clinical data they obtain is compromised due to the intentional or inadvertent failure to adhere to our clinical trial protocols or GCPs, or for any other reason, we may need to enter into new arrangements with alternative third parties, which could be difficult, costly or impossible, and our clinical trials may be extended, delayed or terminated or may need to be repeated. The third parties upon whom we rely may be inspected by FDA or other regulatory authorities in relation to our, or to other, studies or trials. Such inspections may result in FDA or other regulatory authorities not accepting the data produced by the third party.

If any of the foregoing were to occur, we may not be able to obtain regulatory approval for or commercialize veverimer, which would have a material adverse effect on our business, results of operations and financial condition.

***We rely completely on third-party suppliers to manufacture our clinical drug supply of veverimer drug substance and drug product, and we intend to rely on third parties to produce commercial supply of veverimer drug substance and drug product, if approved.***

We do not currently have, nor do we plan to acquire, the infrastructure or internal capability to manufacture veverimer on a clinical or commercial scale. As such, we contract with third-party service providers to manufacture veverimer drug substance and drug product and to perform analytical testing services under cGMPs. Pharmaceutical manufacturing facilities are subject to inspection by the FDA and foreign regulatory agencies on a regular basis, before and after product approval.

We do not directly control, and are completely dependent on, our contract manufacturers for compliance with, applicable requirements including cGMP, for manufacture of both veverimer drug substance and drug product. If our contract manufacturers cannot successfully manufacture material that conforms to our specifications or they are unable to comply with the strict regulatory requirements of the FDA or foreign regulatory agencies, we will not be able to secure and/or maintain adequate supply of veverimer drug substance and drug product. In addition, we have no direct control over the ability of our contract manufacturers to maintain adequate quality control, quality assurance and qualified personnel. Furthermore, all of our contract manufacturers are engaged with other companies to supply and/or manufacture materials or products for such companies, which exposes our manufacturers to regulatory risks for the production of such other materials and products. As a result, failure to meet the regulatory requirements for the production of those materials and products may generally affect the regulatory clearance of our contract manufacturers' facilities. If our contract manufacturers' facilities fail to comply with the FDA or a comparable foreign regulatory agency requirement, we may need to find alternative manufacturing facilities for veverimer drug substance or drug product, which would negatively impact our ability to develop, obtain regulatory approval for, or commercialize veverimer, if approved, and materially adversely affect our financial condition.

***We currently depend on a single third-party supplier for the manufacture of veverimer drug substance, and any performance failure on the part of our supplier could delay the development and potential commercialization of veverimer.***

We cannot be certain that our drug substance supplier will continue to provide us with sufficient quantities of veverimer drug substance, or that our manufacturers will be able to produce sufficient quantities of drug product incorporating such drug substance, to satisfy our anticipated specifications and quality requirements, or that such quantities can be obtained at pricing necessary to sustain acceptable pharmaceutical margins. We believe that there are a limited number of experienced contract manufacturers in the world capable of manufacturing a polymeric drug substance such as veverimer. Our current dependence on a single supplier for our drug substance and the challenges we may face in obtaining adequate supply of veverimer drug substance involves several risks, including limited control over pricing, availability, quality and delivery schedules. Any supply interruption in veverimer drug substance or drug product could materially harm our ability to complete our development program or satisfy

commercial demand, if approved, until a new source of supply, if any, could be identified and qualified. We may be unable to find a sufficient alternative supply channel in a reasonable time or on commercially reasonable terms. Any performance failure on the part of our suppliers could delay the development and potential commercialization of veverimer, including limiting supplies necessary for clinical trials and regulatory approvals, which would have a material adverse effect on our business.

Moreover, our current supplier of drug substance may not have the capacity to manufacture veverimer drug substance in the quantities that we believe will be sufficient to meet anticipated market demand or to enable us to achieve the economies of scale necessary to reduce the manufacturing cost of veverimer drug substance. We entered into a commercial supply agreement with our current drug substance supplier and are engaging in discussions with a potential second supplier for commercial drug substance. Our long-term commitment under the commercial supply agreement to purchase veverimer drug substance could create a significant financial obligation. Negotiations with a potential second supplier may not lead to a definitive agreement on acceptable terms, or at all, which could have a material adverse effect on our business. Our business plan assumes that we are able to develop a supply chain with multiple suppliers and significantly decrease our cost of goods within the first several years of commercialization of veverimer, if approved, enabling us to achieve gross margins similar to those achieved by other companies with polymer-based drugs. If we are unable to reduce the manufacturing cost of veverimer drug substance, our financial results will suffer and our ability to achieve profitability will be significantly jeopardized. Outside of our current supplier, we currently do not have any agreements for the commercial production of veverimer drug substance. If our contract manufacturer for drug substance is unable to source, or we are unable to purchase, sufficient quantities of materials necessary for the production of veverimer drug substance, the ability of veverimer to reach its market potential or to be timely launched, would be delayed or suffer from a shortage in supply, which would impair our ability to generate revenue from the sale of veverimer. If there is a disruption to our contract manufacturers' or suppliers' relevant operations, we will have no other means of producing veverimer drug substance until they restore the affected facilities or we or they procure alternative manufacturing facilities. Additionally, any damage to or destruction of our contract manufacturers' or suppliers' facilities or equipment may significantly impair our ability to manufacture veverimer on a timely basis.

***While we are in the process of validating our two-step manufacturing process with our third-party supplier, any delay in validation, performance failure or time delay in further optimizing or scaling our two-step drug substance manufacturing process could materially adversely affect, delay or interrupt the execution of our confirmatory postmarketing trial, VALOR-CKD, and potentially impact the commercialization of veverimer, if approved.***

We believe we have sufficient drug substance for at least the next 12 months to supply the anticipated demand of our confirmatory postmarketing trial, VALOR-CKD, and anticipate we will have sufficient drug substance for at least the next 12 months to supply our initial anticipated commercial demand, if approved. The scale of the first step in our drug substance manufacturing process, step one, and the scale of the second step in our manufacturing process, step two, have been increased with our third-party supplier to the initial anticipated commercial batch sizes for each of the steps of approximately 640 and 700 kg, respectively. As compared to soluble, small organic molecule pharmaceuticals, insoluble, non-absorbed polymers are manufactured in larger batches to satisfy greater doses, e.g., gram quantities versus milligram or even microgram quantities per dose, which presents unique requirements both in terms of scale-up and process controls. Any difficulties experienced in the ongoing effort to further optimize and scale our drug substance manufacturing process could materially adversely affect or delay our ability to (i) meet regulatory process validation requirements to demonstrate that our manufacturing process is capable of consistently delivering quality product, or (ii) have sufficient quantities of veverimer drug product manufactured to successfully conduct our ongoing confirmatory postmarketing trial, VALOR-CKD, or (iii) have sufficient quantities of veverimer drug substance and drug product to supply commercial supply of veverimer, if approved, all of which would have a material adverse effect on our business and our prospects.

***If we fail to establish an effective distribution process for veverimer drug product, if approved, our business may be adversely affected.***

Once a product receives marketing approval, the manufacturing, distribution, processing, formulation, packaging, labeling, promotion and sale of pharmaceutical products are subject to extensive regulation by federal and state agencies, which are subject to change by the relevant federal, state and local agencies. For example, Title II of the Federal Drug Quality and Security Act of 2013, known as the Drug Supply Chain Security Act, or DSCSA, has imposed new "track and trace" requirements on the distribution of prescription drug products by manufacturers, distributors, and other entities in the drug supply chain. The DSCSA requires product identifiers (i.e.,

52

serialization) on prescription drug products in order to establish an electronic interoperable prescription product system to identify and trace certain prescription drugs distributed in the United States. These requirements (some of which are still being phased in) preempt state drug pedigree requirements.

We do not currently have the infrastructure necessary for distributing pharmaceutical products to patients and there is a risk that we may be unable to comply with the serialization requirements of the DSCSA within the necessary time frames. Furthermore, compliance with the DSCSA or any future federal or state electronic pedigree requirements may increase the Company's operational expenses and impose significant administrative burdens.

While we have entered into a contract with a third-party logistics company to warehouse veverimer and distribute it, the distribution network will require significant coordination with our sales, marketing, market access and finance teams. Failure to coordinate financial systems could negatively impact our ability to accurately report product revenue. If we are unable to effectively establish and manage a compliant distribution process, the commercial launch and sales of veverimer, if approved, will be delayed or severely compromised and our results of operations may be harmed.

***Even if veverimer obtains regulatory approval, it may never achieve market acceptance or commercial success, which will depend, in part, upon the degree of acceptance among physicians, patients, patient advocacy groups, third-party payers and the medical community.***

Even if we obtain FDA or other regulatory approvals, veverimer may not achieve market acceptance among physicians, patients, patient advocacy groups, third-party payers or the medical community, and may not be commercially successful. If approved, market acceptance of veverimer depends on a number of factors, including:

- the efficacy of the product as demonstrated in clinical trials;

- the prevalence and severity of any side effects and overall safety profile of the product;

- the clinical indications for which the product is approved;

- the potential and perceived advantages of veverimer over current options or future alternative treatments;

- the effectiveness of our commercial organization and distribution channels;

- the quality of our relationships with patient advocacy groups;

- the availability and sufficiency of third-party coverage and reimbursement;

- acceptance by physicians, major operators of clinics and patients of the product as a safe and effective chronic daily treatment and willingness of physicians to prescribe veverimer;

- the cost of treatment in relation to alternative treatments and willingness to pay for veverimer, if approved, on the part of patients;

- relative convenience and ease of administration of veverimer; and

- the availability of the product and our ability to meet market demand, including providing a reliable supply for long-term daily treatment.

Any failure by our product candidate, if it obtains regulatory approval, to achieve market acceptance or commercial success would adversely affect our results of operations.

***The incidence and prevalence of the target patient population for veverimer are based on estimates and third-party sources. If the market opportunity for veverimer is smaller than we estimate or if any approval that we obtain is based on a narrower definition of the patient population, our revenue and ability to achieve profitability might be materially and adversely affected.***

Periodically, we make estimates regarding the incidence and prevalence of target patient populations based on various third-party sources and internally generated analysis. These estimates may be inaccurate or based on imprecise data. For example, the total addressable market opportunity for veverimer will depend on, among other things, acceptance of veverimer by the medical community and patient access, drug pricing and reimbursement. The number of patients in the addressable markets may turn out to be lower than expected, patients may not be

53

otherwise amenable to treatment with veverimer, or new patients may become increasingly difficult to identify or gain access to, all of which may significantly harm our business, financial condition, results of operations and prospects.

***Veverimer, if approved, may face significant competition and our failure to effectively compete may prevent us from achieving significant market penetration.***

While we are not aware of any therapies approved by the FDA for the chronic treatment of metabolic acidosis and are not aware of any active clinical development programs other than ours for such a treatment in the United States, the pharmaceutical market is highly competitive and dynamic, and is characterized by rapid and substantial technological development and product innovations. Our veverimer development program may serve as a template for a fast follower to develop a competing product candidate. Furthermore, we expect veverimer to compete against non-approved options for increasing serum bicarbonate levels, including oral alkali supplementation such as sodium bicarbonate, sodium citrate or potassium citrate. Veverimer may not be able to compete effectively with existing non-approved options for increasing serum bicarbonate levels or new drugs that may be developed by competitors. The risk of competition is specifically important to us because veverimer is our only product candidate.

Our competitors may have materially greater financial, manufacturing, marketing, research and drug development resources than we do. Large pharmaceutical companies in particular, may have extensive expertise in nonclinical and clinical testing and in obtaining regulatory approvals for drugs. In addition, academic institutions, government agencies, and other public and private organizations conducting research may seek patent protection with respect to potentially competitive products or technologies. These organizations may also establish exclusive collaborative or licensing relationships with our competitors.

Failure to compete effectively against available options for raising serum bicarbonate levels or in the future with new products would materially harm our business, financial condition and results of our operations.

***We currently have limited sales or marketing capabilities. If we are unable to establish effective sales and marketing capabilities or if we are unable to enter into agreements with third parties to commercialize veverimer, we may not be able to effectively generate product revenue.***

We currently have limited sales or marketing capabilities. In order to commercialize veverimer, if approved, we must build marketing and sales capabilities or make arrangements with third parties to perform these services, and we may not be successful in doing so. If veverimer is approved by the FDA, we plan to initially commercialize it in the United States by deploying an 80- to 90-person specialty sales force targeting that subset of nephrologists most focused on treating patients with CKD. Building the requisite sales, marketing and distribution capabilities will be expensive and time-consuming and will require significant attention of our leadership team to manage. Any failure or delay in the development of our sales, marketing or distribution capabilities would adversely impact the commercialization of our product. The competition for talented individuals experienced in selling and marketing pharmaceutical products is intense, and we cannot assure you that we can assemble an effective team. Additionally, we may choose to collaborate, either globally or on a territory-by-territory basis, with third parties on the commercialization of veverimer. If we are unable to enter into such arrangements on acceptable terms or at all, we may not be able to successfully commercialize veverimer if and when it receives regulatory approval or any such commercialization may experience delays or limitations.

We may be subject to additional risks related to operating in foreign countries either ourselves or through a third-party, including:

- differing regulatory requirements in foreign countries;

- unexpected changes in tariffs, trade barriers, price and exchange controls and other regulatory requirements;

- economic weakness, including inflation or political instability in particular foreign economies and markets;

- compliance with tax, employment, immigration and labor laws for employees living or traveling abroad;

- foreign taxes, including withholding of payroll taxes;

- foreign currency fluctuations, which could result in increased operating expenses and reduced revenue, and other obligations incident to doing business in another country;

54

- difficulties staffing and managing foreign operations;

- workforce uncertainty in countries where labor unrest is more common than in the United States;

- potential liability under the Foreign Corrupt Practices Act of 1977 or comparable foreign regulations;

- challenges enforcing our contractual and intellectual property rights, especially in those foreign countries that do not respect and protect intellectual property rights to the same extent as the United States;

- production shortages resulting from any events affecting raw material supply or manufacturing capabilities abroad; and

- business interruptions resulting from geopolitical actions, including war and terrorism, or health crises.

*Our clinical development program may not uncover all possible adverse events that patients who take veverimer may experience. The number of subjects exposed to veverimer treatment and the average exposure time in the clinical development program may be inadequate to detect adverse events, or chance findings, that may only be detected once veverimer is administered to more patients and for greater periods of time.*

Clinical trials, by their nature, utilize a sample of the potential patient population. However, with a limited number of subjects and limited duration of exposure, we cannot be fully assured that veverimer has no serious or severe side effects, and any such side effects may only be uncovered with a significantly larger number of patients exposed to the drug candidate. It is possible that ongoing and future clinical trials, as well as reports received from compassionate use or investigator-initiated research programs, or veverimer used commercially, if approved, may identify safety concerns.

Although we have monitored the subjects in our trials for certain safety concerns and we have not seen evidence of significant safety concerns in our clinical trials to date, patients treated with veverimer may experience adverse reactions. The most commonly reported adverse effects experienced by more patients on veverimer than placebo in the TRCA-101, TRCA-301 and TRCA-301E trials combined were mild to moderate diarrhea and flatulence. It is possible that the FDA may ask for additional data regarding such matters. In addition, patients with CKD often experience significant and frequent comorbidities and are being treated with other medications. Although *in vitro* studies and human drug-drug interaction, or DDI, studies available to date indicate that veverimer does not interact with medications commonly used by patients with CKD, if significant DDIs occur in the future, veverimer may no longer be compatible with some of the medications used to treat patients with CKD. If safety problems occur or are identified after veverimer reaches the market, the FDA may require that we amend the labeling of veverimer, recall veverimer, or even withdraw approval for veverimer.

*The FDA may not agree that the safety of veverimer has been sufficiently characterized by the amount and quality of data provided from our clinical development program.*

The NDA safety database for new drugs intended for chronic use in non-life-threatening conditions typically includes at least 1,500 individuals, with at least 100 patients exposed to the drug for a minimum of one year (Guideline for Industry ICH-E1A: *The Extent of Population Exposure to Assess Clinical Safety: For Drugs Intended for Long-term Treatment of Non-Life-Threatening Conditions*). At the time of submitting our NDA, the veverimer safety database was significantly smaller than the guidance suggests. Given the toxicology study results and clinical safety profile observed to date for veverimer, as well as the non-absorbed nature of the drug, we believe our proposed safety database was adequate for the filing of the veverimer NDA and its review through the Accelerated Approval Program. However, we cannot assure you that the FDA will agree with our proposal. If they require additional safety data in our NDA, this could have a material adverse effect on our expected clinical and regulatory timelines, business, prospects, financial condition and results of operations.

*Our product candidate, veverimer, may cause undesirable side effects or have other properties that could delay or prevent its regulatory approval, reduce the commercial attractiveness of a prescribing label or result in significant negative consequences following regulatory approval, if approved.*

Clinical studies of veverimer could reveal a high and unacceptable incidence and severity of undesirable and currently unknown side effects. Undesirable side effects could adversely affect patient enrollment in clinical studies, cause us or regulatory authorities to interrupt, delay or halt clinical studies or result in the delay, denial or withdrawal of regulatory approval by the FDA, the European Medicines Agency, or EMA, or other global regulatory authorities.

55

Undesirable side effects also could result in regulatory authorities mandating additional clinical testing prior to approval, postmarketing testing following approval, the implementation of risk minimization measures or a more restrictive prescribing label for a product, which, in turn, could limit the market acceptance of the product by physicians and consumers.

Drug-related side effects could result in potential product liability claims, especially if they were not included in the consent forms for clinical trials, including trials conducted under compassionate use or investigator-initiated research programs, or were not included in the warnings of any FDA-approved labeling. We currently carry product liability insurance covering use in our clinical trials in the amount of $20.0 million in the aggregate; however, we may not be able to maintain insurance coverage at a reasonable cost or in sufficient amounts if liability and legal costs exceed the threshold limited. A successful product liability claim or series of claims brought against us could cause our stock price to decline and, if judgments exceed our insurance coverage, could adversely affect our results of operations, business and financial condition, and commercial reputation. In addition, regardless of merit or eventual outcome, product liability claims may result in impairment of our business reputation, withdrawal of clinical study participants, increased costs due to related litigation, distraction of management's attention from our primary business, initiation of investigations by regulators or other governmental entities, monetary awards to patients or other claimants, the inability to commercialize veverimer and decreased demand for our product, if approved for marketing.

Additionally, if veverimer receives regulatory approval, and we or others later identify undesirable side effects or unanticipated adverse events caused by such product, a number of potentially significant negative consequences could result, including but not limited to:

- the requirement of additional warnings on the prescribing label;

- the withdrawal of approvals by regulatory authorities;

- the requirement of a risk evaluation and mitigation strategy plan, which could include a medication guide outlining the risks of such side effects for distribution to patients, a communication plan for healthcare providers and/or other elements to assure safe use;

- litigation and the potential to be held liable for harm caused to patients; and

- an adverse effect on our reputation.

Any of these events could prevent us from achieving or maintaining market acceptance of veverimer and could significantly harm our business, results of operations, financial condition and prospects.

***We will need to significantly increase the size of our organization, and we may experience difficulties in managing growth.***

As of December 31, 2019, we had 119 full-time employees. We will need to continue to expand our managerial, operational, finance and other resources in order to manage our operations, regulatory filings, manufacturing and supply activities, clinical trials, marketing and commercialization activities for veverimer. Our management, personnel, systems and facilities currently in place may not be adequate to support this future growth. Our need to effectively execute our growth strategy requires that we:

- expand our general and administrative, medical affairs and sales and marketing organizations;

- identify, recruit, retain, incentivize and integrate additional employees;

- manage our internal development efforts effectively while carrying out our contractual obligations to third parties; and

- continue to improve our operational, legal, financial and management controls, reporting systems and procedures.

Our future financial performance and our ability to successfully develop and commercialize veverimer will depend, in part, on our ability to effectively manage any future growth. Our management will have to dedicate a significant amount of its attention to managing these growth activities. In addition, we expect to incur additional costs in hiring, training and retaining such additional personnel.

56

If we are not able to effectively expand our organization by hiring new employees and expanding our groups of consultants and contractors, we may not be able to successfully execute the tasks necessary to further develop and commercialize our product candidate and, accordingly, may not achieve our research, development and commercialization goals.

***If we fail to attract and keep senior management, we may be unable to successfully develop veverimer, conduct our clinical trials and commercialize veverimer, if approved.***

Our success depends in part on our continued ability to attract, retain and motivate highly qualified personnel. In particular, we are highly dependent upon our experienced senior management. The loss of services of any of these individuals or our inability to attract and retain additional qualified personnel could delay or prevent the successful development of our product, completion of our planned clinical trials or the commercialization of veverimer. Although we have entered into employment agreements with our senior management team, these agreements do not provide for a fixed term of service. Any of our employees could leave our employment at any time, with or without notice.

Although we have not historically experienced unique difficulties attracting and retaining qualified employees, we could experience such problems in the future. For example, competition for qualified personnel in the biotechnology and pharmaceuticals field is intense due to the limited number of individuals who possess the skills and experience required by our industry. We will need to hire additional personnel as we expand our clinical development and commercial activities. We may not be able to attract and retain quality personnel on acceptable terms, or at all. In addition, to the extent we hire personnel from competitors, we may be subject to allegations that they have been improperly solicited or that they have divulged proprietary or other confidential information, or that their former employers own their research output.

We may hire part-time employees or use consultants. As a result, certain of our employees, officers, directors or consultants may not devote all of their time to our business, and may from time to time serve as employees, officers, directors and consultants of other companies.

***Our employees, independent contractors, consultants, commercial partners and vendors may engage in misconduct or other improper activities, including noncompliance with regulatory standards and requirements.***

We are exposed to the risk of fraud or other illegal activity by our employees, independent contractors, consultants, commercial partners and vendors. We have adopted a code of business conduct and ethics, but it is not always possible to identify and deter employee misconduct, and the precautions we take to detect and prevent inappropriate conduct may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from misconduct or other failure to be in compliance with applicable laws or regulations.

Misconduct by our employees, independent contractors, consultants, commercial partners and vendors could include intentional failures to comply with FDA or international regulations, provide accurate information to the FDA or other international regulatory bodies, comply with manufacturing standards, comply with federal and state healthcare fraud and abuse laws and regulations, report financial information or data timely, completely and accurately or disclose unauthorized activities to us. In particular, sales, marketing and business arrangements in the healthcare industry are subject to extensive laws and regulations intended to prevent fraud, kickbacks, self-dealing and other abusive practices. These laws and regulations may restrict or prohibit a wide range of pricing, discounting, marketing and promotion, sales commission, customer incentive programs and other business arrangements. Misconduct by third parties could also involve the improper use of information obtained in the course of clinical trials.

If our operations are found to be in violation of any of the laws described above or any other governmental regulations that may apply to us, we may be subject to significant civil, criminal and administrative penalties, damages, fines, disgorgement, individual imprisonment, possible exclusion from government-funded healthcare programs, such as Medicare and Medicaid, additional integrity oversight and reporting obligations, contractual damages, reputational harm, diminished profits and future earnings and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations.

***If we seek and obtain approval to commercialize veverimer outside of the United States, a variety of risks associated with international operations could materially adversely affect our business.***

If veverimer is approved for commercialization outside the United States, we may enter into agreements with third parties to market veverimer outside the United States. We expect that we will be subject to additional risks related to entering into these international business relationships, including:

- different regulatory requirements for drug approvals in foreign countries;

- differing U.S. and foreign drug import and export rules;

- reduced protection for intellectual property rights in foreign countries;

- unexpected changes in tariffs, trade barriers and regulatory requirements;

- different reimbursement systems, and different competitive drugs indicated to treat metabolic acidosis;

- economic weakness, including inflation, or political instability in particular foreign economies and markets;

- compliance with tax, employment, immigration and labor laws for employees living or traveling abroad;

- foreign taxes, including withholding of payroll taxes;

- foreign currency fluctuations, which could result in increased operating expenses and reduced revenue, and other obligations incident to doing business in another country;

- workforce uncertainty in countries where labor unrest is more common than in the United States;

- production shortages resulting from any events affecting raw material supply or manufacturing capabilities abroad;

- potential liability resulting from development work conducted by these distributors; and

- business interruptions resulting from geopolitical actions, including war and terrorism, natural disasters, or national, regional, or global healthcare crises.

***Our Term Loan contains restrictions that limit our flexibility in operating our business.***

Our Term Loan with Hercules contains various covenants that limit our ability to engage in specified types of transactions without obtaining prior consent from our lenders. These covenants limit our ability to, among other things:

- use all of our cash;

- create, incur, assume, guarantee or be or remain liable with respect to any indebtedness;

- prepay any indebtedness;

- subject our assets that serve as collateral under the loan agreement, our intellectual property and all other property and assets used in our business to any lien or legal process;

- acquire, own or make investments;

- repurchase or redeem shares of our capital stock;

- declare or pay any cash dividends or make any other cash distributions;

- lend money to our employees, officers or directors, or guarantee such loans;

- waive, release or forgive indebtedness owed by our employees, officers or directors;

- voluntarily or involuntarily transfer, sell, lease, license, lend or convey our assets;

- merge or consolidate with another business organization;

- change our corporate name, legal form or jurisdiction of formation;

- suffer a change in control;

- relocate our chief executive office or principal place of business; and

- maintain deposit accounts or securities accounts without account control agreements in place.

The covenants in our Term Loan may limit our ability to take certain actions and, in the event that we breach one or more covenants, the agent may, and at the direction of the lenders will, declare an event of default and require that we immediately repay all amounts outstanding, plus penalties and interest, terminate their commitments to extend further credit and foreclose on the collateral granted to them to secure such indebtedness. The exercise of remedies by the lenders would have a material adverse effect on our business, operating results and financial condition.

***Our debt obligations expose us to risks that could adversely affect our business, operating results, overall financial condition and may result in further dilution to our stockholders.***

Our Term Loan with Hercules obligates us to make certain interest and principal payments. Our ability to make payments on this indebtedness depends on our ability to generate cash in the future. We expect to experience negative cash flow for the foreseeable future as we fund our operations and capital expenditures. There can be no assurance we will be in a position to repay this indebtedness when due or obtain extensions to the maturity date. We anticipate that we will need to secure additional funding to repay these obligations when due. We cannot guarantee that future financing will be available in sufficient amounts or on terms acceptable to us, if at all. If that additional funding involves the sale of equity securities or convertible securities, it would result in the issuance of additional shares of our capital stock, which would result in dilution to our stockholders.

This level of debt could have an adverse impact on our business or operations. For example, it could:

- limit our flexibility in planning for the development, clinical testing, approval and marketing of veverimer;

- place us at a competitive disadvantage compared to any of our competitors that are less leveraged than we are;

- increase our vulnerability to both general and industry-specific adverse economic conditions; and

- limit our ability to obtain additional funds.

***We will continue to incur significant costs as a result of operating as a public company, and our management will continue to devote substantial time to new compliance initiatives. We may fail to comply with the rules that apply to public companies, including Section 404 of the Sarbanes-Oxley Act of 2002, which could result in sanctions or other penalties that would harm our business.***

We will continue to incur significant legal, accounting and other expenses as a public company, including costs resulting from public company reporting obligations under the Securities Exchange Act of 1934, as amended, or the Exchange Act, and regulations regarding corporate governance practices. Until December 31, 2018, we were eligible for reduced reporting and disclosure requirements as an "emerging growth company." We are no longer an "emerging growth company" and, accordingly, we are required to comply with several supplemental requirements that will necessitate additional resources and management time and expense. The listing requirements of The Nasdaq Global Select Market require that we satisfy certain corporate governance requirements relating to director independence, distributing annual and interim reports, stockholder meetings, approvals and voting, soliciting proxies, conflicts of interest and a code of conduct. Our management and other personnel devote and will need to continue to devote a substantial amount of time to ensure that we comply with all of these requirements. Moreover, the reporting requirements, rules and regulations have increased our legal and financial compliance costs and will continue to make some activities more time consuming and costly. Any changes we make to comply with these obligations may not be sufficient to allow us to satisfy our obligations as a public company on a timely basis, or at all. These reporting requirements, rules and regulations, coupled with the increase in potential litigation exposure associated with being a public company, could also make it more difficult for us to attract and retain qualified persons to serve on our board of directors or board committees or to serve as executive officers, or to obtain certain types of insurance, including directors' and officers' insurance, on acceptable terms.

In addition, we implemented an enterprise resource planning, or ERP, system for our company. An ERP system is intended to combine and streamline the management of our financial, accounting, human resources, sales and

59

marketing and other functions, enabling us to manage operations and track performance more effectively. The ongoing process improvements of our ERP system may result in substantial costs. Additionally, in the future, we may be limited in our ability to convert any business that we acquire to the ERP. Any disruptions or difficulties in using an ERP system could adversely affect our controls and harm our business, including our ability to forecast or make sales and collect our receivables. Moreover, such disruption or difficulties could result in unanticipated costs and diversion of management attention.

Additionally, the Sarbanes-Oxley Act requires, among other things, that we maintain effective internal controls for financial reporting and disclosure controls and procedures. In particular, we are required to perform system and process evaluation and testing of our internal controls over financial reporting to allow management to report on the effectiveness of our internal controls over financial reporting, as required by Section 404(a) of the Sarbanes-Oxley Act. We are now also subject to the compliance requirements of Section 404(b) of the Sarbanes-Oxley Act, which has resulted in us incurring substantial expenses and expending significant management efforts to comply with the Act, which we will continue. We currently have only a limited internal audit group, and we will need to hire additional accounting and financial staff with appropriate public company experience and technical accounting knowledge. If we are not able to comply with the requirements of Section 404(b) or if we identify or our independent registered public accounting firm identifies deficiencies in our internal controls over financial reporting that are deemed to be material weaknesses, the market price of our stock could decline and we could be subject to sanctions or investigations by NASDAQ, the SEC, or other regulatory authorities, which would require additional financial and management resources.

***Any collaboration arrangements that we may enter into in the future may not be successful, which could adversely affect our ability to develop and commercialize veverimer.***

We may seek to establish collaboration or similar agreements with one or more established biotechnology, pharmaceutical or specialty pharmaceutical companies to support the development, regulatory approval and commercialization of veverimer outside of the United States and we may seek similar arrangements for the development or commercialization of veverimer in the United States. We may enter into these arrangements on a selective basis depending on the merits of retaining commercialization rights for ourselves as compared to entering into selective collaboration arrangements with leading pharmaceutical or biotechnology companies for veverimer, both in the United States and internationally. We will face, to the extent that we decide to enter into collaboration agreements, significant competition in seeking appropriate collaborators. Moreover, collaboration arrangements are complex and time consuming to negotiate, document and implement. We may not be successful in our efforts to establish and implement collaborations or other alternative arrangements should we so chose to enter into such arrangements. The terms of any collaborations or other arrangements that we may establish may not be favorable to us.

Any future collaborations that we enter into may not be successful. The success of our collaboration arrangements will depend heavily on the efforts and activities of our collaborators. Collaborators generally have significant discretion in determining the efforts and resources that they will apply to these collaborations.

Disagreements between parties to a collaboration arrangement regarding clinical development and commercialization matters can lead to delays in the development process or commercializing the applicable product candidate and, in some cases, termination of the collaboration arrangement. These disagreements can be difficult to resolve if neither of the parties has final decision-making authority.

Collaborations with pharmaceutical or biotechnology companies and other third parties often are terminated or allowed to expire by the other party. If we were to enter into any collaboration agreements, any such termination or expiration would adversely affect us financially and could harm our business reputation.

***If we engage in acquisitions, we will incur a variety of costs and we may never realize the anticipated benefits of such acquisitions.***

Although we currently have no intent to do so, we may attempt to acquire businesses, technologies, services, products or product candidates that we believe are a strategic fit with our business. If we do undertake any acquisitions, the process of integrating an acquired business, technology, service, products or product candidates into our business may result in unforeseen operating difficulties and expenditures, including diversion of resources and management's attention from our core business. In addition, we may fail to retain key executives and employees of the companies we acquire, which may reduce the value of the acquisition or give rise to additional integration costs. Future acquisitions could result in additional issuances of equity securities that would dilute the

60

ownership of existing stockholders. Future acquisitions could also result in the incurrence of debt, contingent liabilities or the amortization of expenses related to other intangible assets, any of which could adversely affect our operating results. In addition, we may fail to realize the anticipated benefits of any acquisition.

***Our business involves the use of hazardous materials and we and our third-party manufacturers and suppliers must comply with environmental laws and regulations, which can be expensive and restrict how we do business.***

Our research and development activities and our third-party manufacturers' and suppliers' activities involve the controlled storage, use and disposal of hazardous materials, including the components of veverimer and other hazardous compounds. We and our manufacturers and suppliers are subject to laws and regulations governing the use, manufacture, storage, handling and disposal of these hazardous materials. In some cases, these hazardous materials and various wastes resulting from their use are stored at our and our manufacturers' facilities pending their use and disposal. We cannot eliminate the risk of contamination, which could cause an interruption of our commercialization efforts, research and development efforts and business operations, environmental damage resulting in costly clean-up and liabilities under applicable laws and regulations governing the use, storage, handling and disposal of these materials and specified waste products. Although we believe that the safety procedures utilized by us and our third-party manufacturers for handling and disposing of these materials generally comply with the standards prescribed by these laws and regulations, we cannot guarantee that this is the case or eliminate the risk of accidental contamination or injury from these materials. In such an event, we may be held liable for any resulting damages and such liability could exceed our resources and state or federal or other applicable agencies may curtail our use of certain materials and/or interrupt our business operations. Furthermore, environmental laws and regulations are complex, change frequently and have tended to become more stringent. We cannot predict the impact of such changes and cannot be certain of our future compliance. We do not currently carry biological or hazardous waste insurance coverage.

***Unfavorable global economic conditions could adversely affect our business, financial condition or results of operations.***

Our results of operations could be adversely affected by general conditions in the global economy and in the global financial markets. The recent global financial crisis caused extreme volatility and disruptions in the capital and credit markets. A severe or prolonged economic downturn, such as the recent global financial crisis, could result in a variety of risks to our business, including reduced ability to raise additional capital when needed on acceptable terms, if at all. A weak or declining economy as well as unexpected changes in tariffs or trade barriers could also strain our suppliers, possibly resulting in supply disruption or increased prices. It may also harm our ability to attract and retain collaboration partners or customers. Additionally, currency fluctuations may affect our ability to successfully market and sell veverimer in markets outside of the United States. Any of the foregoing could harm our business and we cannot anticipate all of the ways in which the current or future economic climate and financial market conditions could adversely impact our business.

***We or the third parties upon whom we depend may be adversely affected by earthquakes or other natural disasters and our business continuity and disaster recovery plans may not adequately protect us from a serious disaster.***

Our corporate headquarters and other facilities are located in the San Francisco Bay Area, which in the past has experienced severe earthquakes. We do not carry earthquake insurance. Earthquakes or other natural disasters could severely disrupt our operations, and have a material adverse effect on our business, results of operations, financial condition and prospects.

If a natural disaster, power outage or other event occurred that prevented us from using all or a significant portion of our headquarters, that damaged critical infrastructure, such as our enterprise financial systems or manufacturing resource planning and enterprise quality systems, or that otherwise disrupted operations, it may be difficult or, in certain cases, impossible for us to continue our business for a substantial period of time. The disaster recovery and business continuity plans we have in place currently are limited and are unlikely to prove adequate in the event of a serious disaster or similar event. We may incur substantial expenses as a result of the limited nature of our disaster recovery and business continuity plans, which, particularly when taken together with our lack of earthquake insurance, could have a material adverse effect on our business.

61

Furthermore, integral parties in our supply chain may operate from single sites, increasing their vulnerability to natural disasters or other sudden, unforeseen and severe adverse events. If such an event were to affect our supply chain, it could have a material adverse effect on our business.

***Our internal computer systems, or those of our CROs or other contractors or consultants, may fail or suffer security breaches, which could result in material disruptions to our drug development programs.***

Despite the implementation of security measures, our internal computer systems and those of our CROs and other contractors and consultants regularly must defend against cybersecurity or other business continuity risks, and are vulnerable to damage from computer viruses, cyber attacks, industrial espionage, other unauthorized access, natural disasters, terrorism, war and telecommunication and electrical failures. Such events could cause interruptions to our operations and result in material disruptions to our drug development programs. For example, the compromise, corruption, loss or theft of clinical trial data from completed or ongoing clinical trials for our product candidate could result in delays in our regulatory approval efforts and significantly increase our costs to recover or reproduce the data. To the extent that any disruption or security breach were to result in a compromise, corruption, loss or theft of or other damage to our data or applications, or inappropriate disclosure of confidential or proprietary information, we could incur liability and significant costs in remediating the incident, complying with regulatory requirements and defending against claims. Such events could also adversely affect our competitive position, our reputation could be harmed and the further development of our product candidate could be delayed.

***We are subject to evolving privacy and data protection laws, including the EU GDPR, and the new California Consumer Protection Act, or CCPA. If we fail to comply with existing or future data protection regulations, our business, financial condition, results of operations and prospects may be materially adversely affected.***

By virtue of our clinical trial activities in Europe, we are also subject to European data protection laws, including GDPR (as implemented by EU Member States and the UK). The GDPR which came into effect on May 25, 2018, establishes requirements applicable to the processing of personal data (i.e., data which identifies an individual or from which an individual is identifiable), affords various data protection rights to individuals (e.g., the right to erasure of personal data) and imposes potential penalties for serious breaches of up to 4.0% annual worldwide turnover or €20 million, whichever is greater. Individuals (e.g., study subjects) also have a right to compensation for financial or non-financial losses (e.g., distress). There may be circumstances under which a failure to comply with the GDPR, or the exercise of individual rights under the GDPR, would limit our ability to utilize clinical trial data collected on study subjects. The GDPR imposes additional responsibility and liability in relation to our processing of personal data. This may be onerous and materially adversely affect our business, financial condition, results of operations and prospects.

In addition, the interpretation and application of consumer, health-related and data protection laws in the United States, Europe and elsewhere are often uncertain, contradictory and in flux. It is possible that these laws may be interpreted and applied in a manner that is inconsistent with our practices. If so, this could result in government-imposed fines or orders requiring that we change our practices, which could adversely affect our business. In addition, we are subject to various state laws, including the California Consumer Privacy Act, or CCPA, which went into effect on January 1, 2020. The CCPA now, among other things, requires covered companies to provide disclosures to California consumers concerning the collection and sale of personal information, and gives such consumers certain qualified privacy rights, including the right to opt-out of certain sales of personal information. Amendments to the CCPA have been made since its enactment, implementing regulations are not yet finalized, certain provisions of the law will sunset at the end of 2020, and it remains unclear what, if any, further amendments will be made to this legislation or how it will be interpreted. Similarly, we are following the development of new data laws in Washington State, in Washington D.C., and around the country. We cannot yet predict the impact of the CCPA or other potential new laws on our business or operations, but it may require us to modify our data processing practices and policies and to incur substantial costs and expenses in an effort to comply.

**Risks Related to Government Regulation**

***The regulatory approval process is highly uncertain and we may not obtain approval through the Accelerated Approval Program or the conventional pathway, as required for the commercialization of veverimer.***

The research, testing, manufacturing, labeling, approval, selling, import, export, pricing and reimbursement, marketing and distribution of drug products are subject to extensive regulation by the FDA and other regulatory

agencies in the United States and other countries, which regulations differ from country to country. Neither we nor any future collaboration partner is permitted to market veverimer in the United States until we receive approval of our NDA from the FDA. We have not obtained marketing approval for veverimer anywhere in the world. Obtaining regulatory approval of our NDA, even through the Accelerated Approval Program, can be a lengthy, expensive and uncertain process. In addition, failure to comply with FDA and other applicable U.S. and foreign regulatory requirements may subject us to administrative or judicially imposed sanctions or other actions, including:

- warning letters;

- civil and criminal penalties;

- injunctions;

- withdrawal of regulatory approval of products;

- product seizure or detention;

- product recalls;

- total or partial suspension of production; and

- refusal to approve pending NDAs or supplements to approved NDAs, or foreign regulatory equivalents.

Prior to obtaining approval to commercialize a drug candidate in the United States or abroad, we or our collaborators must demonstrate with substantial evidence from well-controlled clinical trials, and to the satisfaction of the FDA or other foreign regulatory agencies, that such drug candidates are safe and effective for their intended uses. The number of nonclinical and clinical studies and trials that will be required for FDA approval varies depending on the drug candidate, the disease or condition that the drug candidate is designed to address, and the regulations applicable to any particular drug candidate. We are seeking approval for veverimer through the FDA's Accelerated Approval Program, which would allow us to demonstrate an effect on a surrogate endpoint that is reasonably likely to predict veverimer's clinical benefit, but we will be subject to rigorous postmarketing requirements, including the completion of one or more confirmatory postmarketing trials to verify the clinical benefit of veverimer. If the FDA is not satisfied that we are diligently conducting our confirmatory postmarketing trial, VALOR-CKD, it may affect the timing of the potential approval of veverimer by the FDA. If we are unable to obtain approval through the Accelerated Approval Program, we will have to pursue a conventional approval pathway for veverimer. In addition, in such case, the FDA could determine that our pivotal Phase 3 clinical trial, TRCA-301, may not be sufficient to support approval through the conventional pathway. Results from nonclinical and clinical trials and studies can be interpreted in different ways. Even if we believe the nonclinical or clinical data for our drug candidate is promising, such data may not be sufficient to support approval by the FDA and other regulatory agencies. Administering drug candidates to humans may produce undesirable side effects, which could interrupt, delay or halt clinical trials and result in the FDA or other regulatory agencies denying approval of a drug candidate for any or all targeted indications.

Both accelerated and conventional regulatory approval pathways of an NDA or NDA supplement are not guaranteed, and the approval process is expensive and may take several years. The FDA also has substantial discretion in the approval process and we may encounter matters with the FDA that require us to expend additional time and resources and delay or prevent the approval of our product candidate. For example, the FDA may require us to conduct additional studies or trials for veverimer either prior to approval or postmarketing, such as additional drug-drug interaction studies or safety or efficacy studies or trials, or it may object to elements of our clinical development program such as the number of subjects enrolled in our current clinical trials from the United States. Despite the time and expense exerted, failure can occur at any stage. The FDA can delay, limit or deny approval of a drug candidate for many reasons, including, but not limited to, the following:

- a drug candidate may not be deemed safe or effective;

- the FDA might not approve our trial design and analysis plan;

- the FDA may not find the data from nonclinical and clinical studies and trials sufficient;

- clinical inspection(s) by the FDA or other regulatory authorities may result in unacceptable findings that could negatively impact approval of veverimer;

63

- the FDA might not accept or deem acceptable a third-party manufacturers' processes or facilities; or

- the FDA may change its approval policies or adopt new regulations.

If veverimer fails to demonstrate safety and efficacy in clinical trials or does not gain regulatory approval, our business and results of operations will be materially and adversely harmed. Additionally, if the FDA requires that we conduct additional clinical trials, places limitations on veverimer in our label, delays approval to market veverimer or limits the use of veverimer, our business and results of operations may be harmed.

***We have initiated and are enrolling subjects in our confirmatory postmarketing trial, VALOR-CKD. The VALOR-CKD trial design may be impacted by clinical data generated while the VALOR-CKD trial is ongoing, including data that may affect key assumptions regarding sample size, endpoints, duration or the underlying standard of care, in which case we may be required to modify our planned clinical trials, or conduct additional clinical trials.***

If clinical data generated while the VALOR-CKD trial is ongoing, including data that may affect key assumptions regarding sample size, endpoints, duration or the underlying standard of care, impacts the VALOR-CKD trial design, we may be required to modify our planned clinical trials, or conduct additional clinical trials, before we can obtain regulatory approval from the FDA or comparable foreign authorities, and any such modification or additional trial could have a material adverse effect on our expected clinical and regulatory timelines, business, prospects, financial condition and results of operations.

***Because we are developing a product candidate for the treatment of a disease or condition on the basis of an unvalidated surrogate endpoint, there are increased risks that the FDA or other regulatory authorities may find that our clinical program provides insufficient evidence of clinical benefit, may have difficulty analyzing and interpreting the results of our clinical program, and may delay or refuse to approve veverimer.***

There are no FDA-approved therapies for the chronic treatment of patients with metabolic acidosis and CKD. In addition, we are not aware of any chronic therapeutic agent that has previously been approved by the FDA on the basis of a clinical trial that used serum bicarbonate level as the primary endpoint. We have engaged in discussions with the FDA regarding the design of our pivotal Phase 3 clinical trial, TRCA-301, and whether the use of serum bicarbonate as a surrogate endpoint is reasonably likely to predict clinical benefit. However, the FDA has discretion at any time, including during our NDA review, to determine whether there is support for the use of serum bicarbonate as a surrogate endpoint.

Key issues with our endpoint include uncertainty about the degree of change from baseline serum bicarbonate that will translate into improved clinical outcomes, the population in which such change is expected to translate into improved clinical outcomes, and the need for data supporting a causal relationship between serum bicarbonate concentration and clinical outcomes. As a result, we cannot be certain that FDA will ultimately conclude that the design and results of our pivotal Phase 3 clinical trial, TRCA-301, which uses changes from baseline in serum bicarbonate level as the primary endpoint, and our 40-week extension study, TRCA-301E, or that the design of the VALOR-CKD trial, will be sufficient for approval of veverimer.

Moreover, even if the FDA does find that changes from baseline in serum bicarbonate are sufficiently likely to predict clinical benefit for patients, the FDA may not agree that we have achieved the primary endpoint in our pivotal Phase 3 clinical trial, TRCA-301, to the magnitude or to the degree of statistical significance required by the FDA. Further, even if those requirements are satisfied, the FDA also could give overriding weight to inconsistent or otherwise confounding results on other efficacy endpoints or other results of the trial, including results on secondary and exploratory endpoints. The FDA also weighs the benefits of a product against its risks and the FDA may view the efficacy results in the context of safety as not being supportive of regulatory approval. Regulatory authorities in other countries may take similar positions.

***We are conducting and may in the future conduct clinical trials for our product candidate, veverimer, outside the United States and the FDA may not accept data from such trials.***

Although the FDA may accept data from clinical trials conducted outside the United States in support of safety and efficacy claims for veverimer, this is subject to certain conditions. For example, such foreign clinical trials should be conducted in accordance with GCPs, including review and approval by an independent ethics committee and obtaining the informed consent from subjects of the clinical trials. The foreign clinical data should also be applicable to the U.S. population and U.S. medical practice. Other factors that may affect the acceptance of foreign clinical

data include differences in clinical conditions, study populations or regulatory requirements between the United States and the foreign country.

We conducted the TRCA-101, TRCA-301 and TRCA-301E trials, and are conducting the VALOR-CKD trial with majority enrollment outside the United States and may, in the future, conduct clinical trials of our product candidates outside the United States. The FDA may not accept such foreign clinical data, and in such event, we may be required to re-conduct the relevant clinical trials within the United States, which would be costly and time-consuming, and which could have a material and adverse effect on our ability to carry out our business plans.

***Even if we receive regulatory approval for veverimer, we will be subject to ongoing regulatory obligations and continued regulatory review, which may result in significant additional expense. Additionally, veverimer, if approved, could be subject to labeling and other restrictions and market withdrawal, and we may be subject to penalties if we fail to comply with regulatory requirements or experience unanticipated problems with veverimer.***

Even if a drug is approved by the FDA and/or foreign regulatory agencies, regulatory agencies may still impose significant restrictions on a product's indicated uses or marketing or impose various ongoing requirements. Furthermore, any new legislation addressing drug safety issues could result in delays or increased costs to assure compliance. In addition, if a drug receives approval through the FDA's Accelerated Approval Program, it will be subject to special postmarketing requirements, including the completion of confirmatory postmarketing clinical trials to verify the clinical benefit of the product, and submission to the FDA of all promotional materials prior to their dissemination. The FDA could seek to withdraw the approval for multiple reasons, including if we fail to conduct any required confirmatory postmarketing trial with due diligence, a confirmatory postmarketing trial does not confirm the predicted clinical benefit, other evidence shows that the product is not safe or effective under the conditions of use, or we disseminate promotional materials that are found by the FDA to be false and misleading.

If veverimer receives approval through the Accelerated Approval Program, it will be subject to ongoing regulatory requirements for conducting postmarketing clinical studies and trials, labeling, packaging, storage, advertising, promotion, sampling, record-keeping and submission of safety and other post-market information, including both federal and state requirements in the United States. In addition, manufacturers and manufacturers' facilities are required to comply with extensive FDA requirements, including ensuring that quality control and manufacturing procedures conform to cGMP. As such, we and our contract manufacturers are subject to continual review and periodic inspections to assess compliance with cGMP. Accordingly, we must conduct the confirmatory postmarketing trial in a diligent manner and we and others with whom we work must continue to expend time, money, and effort in all areas of regulatory compliance, including manufacturing, production, and quality control. We will also be required to report certain adverse reactions and production problems, if any, to the FDA, and to comply with requirements concerning advertising and promotion for veverimer. Promotional communications with respect to prescription drugs are subject to a variety of legal and regulatory restrictions and must be consistent with the information in the product's approved label. As such, we may not promote veverimer for indications or uses for which it does not have FDA approval.

If veverimer receives approval through the Accelerated Approval Program but we fail to conduct the required confirmatory postmarketing trials with due diligence or such postmarketing trials fail to confirm veverimer's clinical profile or risks and benefits, the FDA may withdraw its approval. If a regulatory agency discovers previously unknown problems with veverimer, such as adverse events of unanticipated severity or frequency, or problems with the facility where the product is manufactured, or disagrees with the promotion, marketing, or labeling of a product, the regulatory agency may impose restrictions on the product or us, including requiring withdrawal of the product from the market. If we fail to comply with applicable regulatory requirements, a regulatory agency or enforcement authority may:

- issue warning letters;

- impose civil or criminal penalties;

- suspend regulatory approval;

- suspend any of our ongoing clinical trials;

- refuse to approve pending applications or supplements to approved applications submitted by us;

65

- impose restrictions on our operations, including closing our contract manufacturers' facilities; or

- seize or detain products or require a product recall.

Any government investigation of alleged violations of law could require us to expend significant time and resources in response and could generate negative publicity. Any failure to comply with ongoing regulatory requirements may significantly and adversely affect our ability to commercialize and generate revenue from veverimer. If regulatory sanctions are applied or if regulatory approval is withdrawn, the value of our company and our operating results will be adversely affected. Additionally, if we are unable to generate revenue from the sale of veverimer our potential for achieving profitability will be diminished and the capital necessary to fund our operations will be increased.

The regulatory requirements and policies may change, and additional government regulations may be enacted for which we may also be required to comply. We cannot predict the likelihood, nature or extent of government regulation that may arise from future legislation or administrative action, either in the United States or in other countries. If we or any future collaboration partner are not able to maintain regulatory compliance, we or such collaboration partner, as applicable, may face government enforcement action and our business will suffer.

***We are seeking regulatory approval to market veverimer for the treatment of metabolic acidosis and slowing of kidney disease progression in patients with metabolic acidosis and CKD and, unless we seek regulatory approval for additional indications, we will be prohibited from marketing veverimer for other indications.***

We are seeking FDA approval to market veverimer for the treatment of metabolic acidosis and slowing of kidney disease progression in patients with metabolic acidosis and CKD, but we cannot be certain what indication and what labeling language will be approved for veverimer, if approved, until our NDA is reviewed and potentially as late as approval. If veverimer is approved through the Accelerated Approval Program, the indications and usage section of the label is likely to include a statement that clinical benefit of veverimer has not yet been established and that continued approval may be contingent upon demonstration of clinical benefit in a confirmatory postmarketing trial. The FDA strictly regulates the promotional claims that may be made about prescription products, and veverimer may not be promoted for uses that are not approved by the FDA as reflected in its approved labeling. Under applicable regulations, promoting uses that are not reflected in the FDA-approved labeling, referred to as "off-label" marketing, is prohibited. If we are found to have promoted such off-label uses, we may become subject to significant liability.

***If we fail to comply or are found to have failed to comply with FDA and other laws and regulations related to the promotion of veverimer for unapproved uses, we could be subject to criminal penalties, substantial fines or other sanctions and damage awards.***

The regulations relating to the promotion of products for unapproved uses are complex and subject to substantial interpretation by the FDA and other government agencies. If we receive marketing approval for veverimer, physicians may nevertheless prescribe it to their patients in a manner that is inconsistent with the approved label. We intend to implement compliance and training programs designed to ensure that our sales and marketing practices comply with applicable laws and regulations. Notwithstanding these programs, the FDA or other government agencies may allege or find that our practices constitute prohibited promotion of veverimer for unapproved uses. We also cannot be sure that our employees or contracted agents will comply with company policies and applicable regulations regarding the promotion of products for unapproved uses.

Over the past several years, a significant number of pharmaceutical and biotechnology companies have been the target of inquiries and investigations by various federal and state regulatory, investigative, prosecutorial and administrative entities in connection with the promotion of products for unapproved uses and other sales practices, including the Department of Justice and various U.S. Attorneys' Offices, the Office of Inspector General of the Department of Health and Human Services, the FDA, the Federal Trade Commission and various state Attorneys General offices. These investigations have alleged violations of various federal and state laws and regulations, including claims asserting antitrust violations, violations of the FFDCA, the federal civil False Claims Act, or FCA, the Prescription Drug Marketing Act, the criminal Anti-Kickback Statute, and other alleged violations in connection with the promotion of products for unapproved uses and government reimbursement (e.g. Medicare and/or Medicaid). Many of these investigations originate as "*qui tam*" actions under the FCA. Under the FCA, any individual can bring a claim on behalf of the government alleging that a person or entity has presented a false claim, or caused a false claim to be submitted, to the government for payment. The person bringing a qui tam suit is entitled

66

to a share of any recovery or settlement. *Qui tam* suits, also commonly referred to as "whistleblower suits," are often brought by current or former employees. In a *qui tam* suit, the government must decide whether to intervene and prosecute the case. If it declines, the individual may pursue the case alone.

If the FDA or any other governmental agency initiates an enforcement action against us or if we are the subject of a *qui tam* suit and it is determined that we violated prohibitions relating to the promotion of products for unapproved uses, or other applicable prohibitions, we could be subject to substantial civil or criminal fines or damage awards and other sanctions such as consent decrees and corporate integrity agreements pursuant to which our activities would be subject to ongoing scrutiny and monitoring to ensure compliance with applicable laws and regulations. Individuals can also be subject to imprisonment, and we can be excluded from participating in federal health care programs, such as Medicare and Medicaid, which means our products may not be reimbursed by federal healthcare programs and other entities that participate in federal healthcare programs cannot contract with us. Any such exclusions, fines, awards or other sanctions would have an adverse effect on our revenue, business, financial prospects and reputation.

***If approved, veverimer may cause or contribute to adverse medical events that we are required to report to regulatory agencies and if we fail to do so we could be subject to sanctions that would materially harm our business.***

The most commonly reported adverse effects experienced by more patients on veverimer than placebo in the TRCA-101, TRCA-301 and TRCA-301E trials combined were mild to moderate diarrhea and flatulence. If we are successful in commercializing veverimer, FDA and most foreign regulatory agency regulations require that we report certain information about adverse medical events if the product may have caused or contributed to those adverse events. The timing of our obligation to report would be triggered by the date we become aware of the adverse event as well as the nature of the event. We may fail to report adverse events we become aware of within the prescribed timeframe. We may also fail to appreciate that we have become aware of a reportable adverse event, especially if it is not reported to us as an adverse event or if it is an adverse event that is unexpected or removed in time from the use of veverimer. If we fail to comply with our reporting obligations, the FDA or a foreign regulatory agency could take action, including criminal prosecution, the imposition of civil monetary penalties, and seizure of our products.

***If third-party manufacturers fail to comply with manufacturing regulations, our financial results and financial condition will be adversely affected.***

Before commercial distribution of veverimer, contract manufacturers may be inspected to determine acceptability by FDA or foreign regulatory agencies for their manufacturing facilities, processes and quality systems, as part of the NDA approval. In addition, pharmaceutical manufacturing facilities are subject to inspection by the FDA and foreign regulatory agencies on a regular basis, before and after product approval. Due to the complexity of the processes used to manufacture pharmaceutical products and product candidates, any potential third-party manufacturer may be unable to continue to pass or initially pass federal, state or international regulatory inspections in a cost-effective manner.

If a third-party manufacturer with whom we contract is unable to comply with manufacturing regulations, veverimer may not be approved, or we may be subject to fines, unanticipated compliance expenses, recall or seizure of our products, total or partial suspension of production and/or enforcement actions, including injunctions, and criminal or civil prosecution. These possible sanctions would adversely affect our financial results and financial condition.

***We are seeking regulatory approval to market veverimer in the United States. If we want to expand the geographies in which we may market veverimer, we will need to obtain additional regulatory approvals.***

We are seeking regulatory approval for veverimer in the United States. In the future, we may attempt to develop and seek regulatory approval to promote and commercialize veverimer outside of the United States. In order to obtain such approvals, we may be required to conduct additional clinical trials or studies to support our applications, which would be time consuming and expensive, and may produce results that do not result in regulatory approvals. Further, we will have to expend substantial time and resources in order to establish the commercial infrastructure or pursue a collaboration arrangement that would be necessary to promote and commercialize veverimer outside of the United States. If we do not obtain regulatory approvals for veverimer in foreign jurisdictions, our ability to expand our business outside the United States will be severely limited.

67

***Our failure to obtain regulatory approvals in foreign jurisdictions for veverimer would prevent us from marketing our products internationally.***

In order to market any product in the European Economic Area, or EEA (which is composed of the 27 Member States of the European Union plus Norway, Iceland and Liechtenstein), and many other foreign jurisdictions, separate regulatory approvals are required. In the EEA, medicinal products can only be commercialized after obtaining a Marketing Authorization. Before granting a Marketing Authorization, the competent agencies of the Member States of the EEA make an assessment of the risk-benefit balance of the product on the basis of scientific criteria concerning its quality, safety and efficacy.

It is unclear exactly how the United Kingdom's exit of the European Union may affect the recognition of European-wide marketing authorizations by the United Kingdom, as this will be dependent on the outcome of ongoing negotiations between the European Union and the United Kingdom during the transition period which is expected to terminate on December 31, 2020.

The approval procedures vary among countries and can involve additional nonclinical and clinical testing, and the time required to obtain approval may differ from that required to obtain FDA approval. Clinical trials conducted in one country may not be accepted by regulatory agencies in other countries. Approval by the FDA does not ensure approval by regulatory agencies in other countries, and approval by one or more foreign regulatory agencies does not ensure approval by regulatory agencies in other foreign countries or by the FDA. However, a failure or delay in obtaining regulatory approval in one country may have a negative effect on the regulatory process in others. The foreign regulatory approval process may include all of the risks associated with obtaining FDA approval. We may not be able to file for regulatory approvals or to do so on a timely basis, and, even if we do file, we may not receive necessary approvals to commercialize veverimer in any market. If we do not obtain regulatory approvals for veverimer in foreign jurisdictions, our ability to expand our business outside the United States will be severely limited.

***We may be subject to healthcare laws, regulation and enforcement; our failure to comply with these laws or regulations, or our potential involvement in enforcement activities, could have a material adverse effect on our results of operations and financial conditions.***

Although we do not currently have any products on the market, we are subject to a variety of regulatory requirements, including healthcare statutory and regulatory requirements and enforcement by the U.S. federal and state governments and the foreign governments of the countries in which we conduct our business. Even though we are not in a position to make patient referrals and do not bill Medicare, Medicaid, or other government or commercial third-party payers, the federal and state healthcare fraud and abuse laws and regulations may be applicable to our business. The healthcare regulatory laws that affect our current and future operations include, among others:

- the federal Anti-Kickback Statute, which is a criminal law that prohibits, among other things, any person from knowingly and willfully soliciting, receiving, offering or paying remuneration, directly or indirectly, in cash or in kind, to induce or reward referrals, purchases, orders, or arranging for or recommending the purchase, order, or referral of any item or service for which payment may be made in whole or in part by a federal healthcare program, such as the Medicare and Medicaid programs. The term "remuneration" has been broadly interpreted to include anything of value. The Patient Protection and Affordable Care Act, or PPACA, among other things, amended the intent requirement of the federal Anti-Kickback Statute, so that a person or entity no longer needs to have actual knowledge of this statute or specific intent to violate it. The Anti-Kickback Statute has been interpreted to apply to arrangements between pharmaceutical manufacturers on the one hand and individuals, such as prescribers, patients, purchasers, and formulary managers on the other the other hand. A conviction for violation of the Anti-Kickback Statute results in criminal fines and requires mandatory exclusion from participation in federal health care programs. Although there are a number of statutory exceptions and regulatory safe harbors to the federal Anti-Kickback Statute that protect certain common, industry practices from prosecution, the exceptions and safe harbors are drawn narrowly, and arrangements may be subject to scrutiny or penalty if they do not fully satisfy all elements of an available exception or safe harbor. The Anti-Kickback Statute safe harbors, including, among others, the discount safe harbor, are the subject of possible reform. Any changes to the safe harbors may impact how we contract with customers in the future and impact our future pricing strategies with payers;

68

- federal civil and criminal false claims laws and civil monetary penalty laws, such as the FCA, which imposes significant penalties and can be enforced by private citizens through civil qui tam (or "whistleblower") actions, prohibits individuals or entities from, among other things, knowingly presenting, or causing to be presented claims to the government that are false or fraudulent, or knowingly making, using or causing to be made or used a false record or statement material to a false or fraudulent claim to avoid, decrease or conceal an obligation to pay money to the federal government. FCA liability is potentially significant in the healthcare industry because the statute provides for treble damages and mandatory penalties of $11,181 to $22,363 per false claim or statement for penalties assessed after January 29, 2018, with respect to violations occurring after November 2, 2015. For example, among other things, pharmaceutical companies have been prosecuted under the FCA in connection with their alleged off-label promotion of drugs, purportedly concealing price concessions in the pricing information submitted to the government for government price reporting purposes (e.g., under the Medicaid Drug Rebate Program), and allegedly providing free product to customers with the expectation that the customers would bill federal health care programs for the product. In addition, the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the FCA. As a result of a modification made by the Fraud Enforcement and Recovery Act of 2009, a claim includes "any request or demand" for money or property presented to the U.S. government. Manufacturers can be held liable under the FCA even when they do not submit claims directly to government payers if they are deemed to "cause" the submission of false or fraudulent claims. Criminal prosecution is also possible for making or presenting a false or fraudulent claim to the federal government;

- the federal Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, or HITECH, and its implementing regulations, or collectively, HIPAA, which imposes privacy, security and breach reporting obligations with respect to individually identifiable health information upon entities subject to the law, such as health plans, healthcare clearinghouses and healthcare providers and their respective business associates that perform services for them that involve individually identifiable health information. HITECH also created tiers of civil monetary penalties, amended HIPAA to make civil and criminal penalties directly applicable to business associates, and gave state attorneys general new authority to file civil actions for damages or injunctions in U.S. federal courts to enforce the federal HIPAA laws and seek attorneys' fees and costs associated with pursuing federal civil actions;

- under the HIPAA criminal federal healthcare fraud statute, it is a crime to knowingly and willfully execute, or attempt to execute, a scheme or artifice to defraud any health care benefit program or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services;

- U.S. and European reporting requirements detailing interactions with and payments to healthcare providers, such as the U.S. federal Physician Payments Sunshine Act, which requires, among others, "applicable manufacturers" of drugs, devices, biologics and medical supplies reimbursed under Medicare, Medicaid, or the Children's Health Insurance Program to annually report to the Department of Health and Human Services, Centers for Medicare and Medicaid Services, information related to payments and other transfers of value provided to "covered recipients." The term covered recipients includes U.S.-licensed physicians and teaching hospitals, and, for reports submitted on or after January 1, 2022, physician assistants, nurse practitioners, clinical nurse specialists, certified nurse anesthetists, and certified nurse-midwives. In addition, several U.S. states and localities have enacted legislation requiring pharmaceutical companies to establish marketing compliance programs, file periodic reports, and/or make periodic public disclosures on sales, marketing, pricing, clinical trials, and other activities. Failure to submit required information may result in civil monetary penalties; and

- state and foreign laws that require pharmaceutical companies to implement compliance programs, comply with the pharmaceutical industry's voluntary compliance guidelines and the relevant compliance guidance promulgated by the federal government, foreign governments or governmental bodies, or to track and report gifts, compensation and other remuneration provided to physicians and other health care providers, and several recently passed state laws that require disclosures to state agencies and/or commercial purchasers with respect to certain price increases that exceed a certain level as identified in the relevant statutes; and

69

- state law equivalents of each of the above federal laws, such as the Anti-Kickback Statute and FCA which may apply to items or services reimbursed by any third-party payers, including commercial insurers (i.e., so-called "all-payor anti-kickback laws"), as well as state laws that govern the privacy and security of health information or personally identifiable information in certain circumstances, including state health information privacy and data breach notification laws which govern the collection, use, disclosure, and protection of health-related and other personal information, many of which differ from each other in significant ways and often are not pre-empted by HIPAA, thus requiring additional compliance efforts.

In addition, the approval and commercialization of veverimer outside the United States will also likely subject us to foreign equivalents of the healthcare laws mentioned above, among other foreign laws. Any action against us for violation of these laws, even if we successfully defend against it, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business.

In addition, federal and state governments are active in regulating payments made by manufacturers to physicians. Some states mandate implementation of compliance programs and/or the tracking and reporting of gifts, compensation, and other remuneration to physicians. The evolving enforcement environment and the need to build and maintain robust and expandable systems to comply with multiple jurisdictions with different compliance and/or reporting requirements increases the possibility that a healthcare company may run afoul of one or more of the requirements.

Ensuring that our business arrangements with third parties comply with applicable healthcare laws and regulations will likely be costly. If our operations are found to be in violation of any of the laws described above or any other governmental laws and regulations that apply to us, we may be subject to penalties, including civil, administrative and criminal penalties, damages, and fines; the curtailment or restructuring of our operations; contractual damages; disgorgement; reputational harm; additional oversight and reporting obligations pursuant to a corporate integrity agreement or similar agreement to resolve allegations of non-compliance with these laws; exclusion from participation in federal and state healthcare programs; and individual imprisonment, any of which could adversely affect our ability to market veverimer, if approved, and adversely impact our financial results. The risk of our being found in violation of these laws is increased by the fact that many of them have not been fully interpreted by the applicable regulatory agencies or the courts, and their provisions are open to a variety of interpretations.

***Legislative or regulatory FDA reforms in the United States may make it more difficult and costly for us to obtain regulatory clearance or approval of veverimer and to produce, market and distribute our products after clearance or approval is obtained.***

From time to time, legislation is drafted and introduced in Congress that could significantly change the statutory provisions governing the regulatory clearance or approval, manufacture, and marketing of regulated products or the reimbursement thereof. In addition, FDA regulations and guidance are often revised or reinterpreted by the FDA in ways that may significantly affect our business and our products. Any new regulations or revisions or reinterpretations of existing regulations may impose additional costs or lengthen review times of veverimer. We cannot determine what effect changes in regulations, statutes, legal interpretation or policies, when and if promulgated, enacted or adopted may have on our business in the future. Such changes could, among other things, require:

- additional clinical trials to be conducted prior to obtaining approval;

- changes to manufacturing methods;

- recall, replacement, or discontinuance of veverimer; and

- additional record keeping.

Each of these would likely entail substantial time and cost and could materially harm our business and our financial results. In addition, delays in receipt of or failure to receive regulatory clearances or approvals would harm our business, financial condition and results of operations.

Further, the United States and some foreign jurisdictions have enacted or are considering a number of legislative and regulatory proposals to change the healthcare system in ways that could affect our ability to sell our products, if approved, and profitably. Among policy makers and payers in the United States and elsewhere, there is

70

significant interest in promoting changes in healthcare systems with the stated goals of containing healthcare costs, improving quality and expanding access.

In the United States, the pharmaceutical industry has been a particular focus of these efforts and has been significantly affected by major legislative initiatives, including the PPACA, which contains provisions that may potentially reduce the profitability of products, including, for example, increased rebates for products sold to Medicaid programs, extension of Medicaid rebates to Medicaid managed care plans, mandatory discounts for certain Medicare Part D beneficiaries and annual fees based on pharmaceutical companies' share of sales to federal health care programs. There have been ongoing judicial and Congressional challenges to the PPACA, as well as efforts by the Trump administration to repeal or replace certain aspects of the PPACA. Since January 2017, President Trump has signed at least two Executive Orders and other directives designed to delay the implementation of certain provisions of the PPACA or otherwise circumvent some of the requirements for health insurance mandated by the PPACA. While Congress has not passed comprehensive repeal legislation, two bills affecting the implementation of certain taxes under the PPACA have been signed into law, including the repeal, effective January 1, 2019, of the tax-based shared responsibility payment imposed by the PPACA on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate." Although two courts have ruled that this repeal renders the individual mandate unconstitutional, this decision is subject to further appeal and the courts are continuing to assess whether this means that the PPACA as a whole is unconstitutional. Additionally, on January 22, 2018, President Trump signed a continuing resolution on appropriations for fiscal year 2018 that delayed the implementation of certain fees mandated by the PPACA, including the so-called "Cadillac" tax on certain high cost employer-sponsored insurance plans, the annual fee imposed on certain health insurance providers based on market share, and the medical device excise tax on non-exempt medical devices. Moreover, the Bipartisan Budget Act of 2018, among other things, amends the PPACA, effective January 1, 2019, to increase from 50% to 70% the point-of-sale discount to eligible beneficiaries during their coverage gap period that is owed by pharmaceutical manufacturers who participate in Medicare Part D and to close the coverage gap in most Medicare drug plans, commonly referred to as the "donut hole." In the future, there may be additional challenges and amendments to the PPACA. It remains to be seen precisely what new legislation will provide, when it will be enacted, and what impact it will have on the availability of healthcare and containing or lowering the cost of healthcare, including the cost of pharmaceutical products.

Additionally, there has been increasing legislative and enforcement interest in the United States with respect to drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries and proposed and enacted federal and state legislation designed to, among other things, lower drug pricing, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drugs. While any proposed measures will require authorization through additional legislation to become effective, Congress and the Trump administration have each indicated that it will continue to seek new legislative and/or administrative measures to control drug costs. At the state level, legislatures are increasingly passing legislation and implementing regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing. The implementation of cost containment measures or other healthcare reforms may prevent us from being able to generate revenue, attain profitability, or commercialize veverimer and those for which we may receive regulatory approval in the future.

***If we fail to obtain and sustain an adequate level of coverage and reimbursement for veverimer by third-party payers, sales would be adversely affected.***

While we expect patients who have metabolic acidosis and CKD to need chronic treatment, we anticipate that most patients will rely on coverage and reimbursement by a third-party payer, such as Medicare, Medicaid or a private health insurer, to pay for such treatment. There will be no commercially viable market for veverimer without coverage and reimbursement from third-party payers. Additionally, even if we obtain third-party payer coverage and reimbursement for veverimer, if the level of coverage and reimbursement is below our expectations, or if reimbursement requires stringent prior authorization or other forms of utilization management, our revenue and gross margins will be adversely affected.

Obtaining coverage and reimbursement for a product from a government or other third-party payer can be an expensive and time-consuming process that could require us to provide supporting scientific, clinical and cost effectiveness data for the use of our products to the payer. We cannot be certain if and when we will obtain

71

coverage to allow us to sell veverimer, if approved, into our target markets. Even if we do obtain coverage, third-party payers, carefully review and increasingly question the coverage of, and challenge the prices charged for, drugs. Reimbursement rates from third-party payers vary depending on the payer, the insurance plan and other factors. A current trend in the United States health care industry is toward cost containment. Large public and private payers, managed care organizations, group purchasing organizations and similar organizations are exerting increasing influence on decisions regarding the use of, and reimbursement levels for, particular treatments. Such third-party payers, including Medicare, are questioning the coverage of, and challenging the prices charged for medical products and services, and many third-party payers limit coverage of, or reimbursement for, newly approved health care products.

In addition, there may be significant delays in obtaining such coverage and reimbursement for newly approved products, and coverage may be more limited than the purposes for which the product is approved by the FDA or comparable foreign regulatory authorities. Moreover, eligibility for coverage and reimbursement does not imply that a product will be paid for in all cases or at a rate that covers our costs, including research, development, intellectual property, manufacture, sale and distribution expenses.

Interim reimbursement levels for new products, if applicable, may also not be sufficient to cover our costs and may not be made permanent. Reimbursement rates may vary according to the use of the product and the clinical setting in which it is used, may be based on reimbursement levels already set for lower cost products and may be incorporated into existing payments for other services. Net prices for products may be reduced by mandatory discounts or rebates required by government healthcare programs or private payers, by any future laws limiting drug prices and by any future relaxation of laws that presently restrict imports of product from countries where they may be sold at lower prices than in the United States.

Coverage and reimbursement by a third-party payer may depend upon a number of factors, including the third-party payer's determination that use of a product is:

- a covered benefit under its health plan;

- safe, effective and medically necessary;

- appropriate for the specific patient;

- cost-effective; and

- neither experimental nor investigational.

We cannot be sure that coverage and reimbursement will be available for veverimer and, if coverage and reimbursement are available, what the level of reimbursement will be. Our inability to promptly obtain coverage and adequate reimbursement rates from both government-funded and private payers for any approved products that we develop could have a material adverse effect on our operating results, our ability to raise capital needed to commercialize products and our overall financial condition.

Reimbursement may impact the demand for, and the price of, veverimer, if approved. Assuming we obtain coverage for veverimer by a third-party payer, the resulting reimbursement payment rates may not be adequate or may require co-payments that patients find unacceptably high. Although we may be able to provide co-pay assistance to some patients with commercial healthcare insurance, some commercial health insurance plans limit how this assistance may count towards a patient's deductible and other cost-sharing requirements. Patients who are prescribed medications for the treatment of their conditions, and their prescribing physicians, generally rely on third-party payers to reimburse all or part of the costs associated with those medications. Patients are unlikely to use veverimer unless coverage is provided and reimbursement is adequate to cover all or a significant portion of the cost of veverimer. Therefore, coverage and adequate reimbursement is critical to new product acceptance. Coverage decisions may depend upon clinical and economic standards that disfavor new products when more established or lower cost therapeutic alternatives are already available or subsequently become available.

We expect to experience pricing pressures in connection with the sale of our product candidate due to the trend toward managed healthcare, the increasing influence of health maintenance organizations, and recent legislative proposals. The downward pressure on healthcare costs in general, particularly prescription medicines, medical devices and surgical procedures and other treatments, has become very intense. As a result, increasingly high barriers are being erected to the successful commercialization of new products. Further, the adoption and

72

implementation of any future governmental cost containment or other health reform initiative may result in additional downward pressure on the price that we may receive for veverimer, if approved.

These cost-control initiatives could decrease the price we might establish for veverimer, which could result in product revenue being lower than anticipated. The pricing, coverage and reimbursement of veverimer, if approved, must be adequate to support a commercial infrastructure. If the price for veverimer decreases or if governmental and other third-party payers do not provide adequate coverage and reimbursement levels, our revenue and prospects for profitability will suffer. Reimbursement systems in international markets vary significantly by country and by region, and reimbursement approvals must be obtained on a country-by-country basis.

Outside the United States, international operations are generally subject to extensive governmental price controls and market regulations, and we believe the increasing emphasis on cost-containment initiatives in Europe, Canada, China and other countries will put pressure on the pricing and usage of veverimer. In many countries, the prices of medical products are subject to varying price control mechanisms as part of national health systems. Other countries allow companies to fix their own prices for medicinal products but monitor and control company profits. Additional foreign price controls or other changes in pricing regulation could restrict the amount that we are able to charge for veverimer, if approved. Accordingly, in markets outside the United States, the reimbursement for veverimer compared with the United States and may be insufficient to generate commercially reasonable revenue and profits.

***We are subject to U.S. and certain foreign export and import controls, sanctions, embargoes, anti-corruption laws, and anti-money laundering laws and regulations. Compliance with these legal standards could impair our ability to compete in domestic and international markets. We can face criminal liability and other serious consequences for violations which can harm our business.***

We are subject to export control and import laws and regulations, including the U.S. Export Administration Regulations, U.S. Customs regulations, various economic and trade sanctions regulations administered by the U.S. Treasury Department's Office of Foreign Assets Controls, the U.S. Foreign Corrupt Practices Act of 1977, as amended, the United States domestic bribery statute contained in 18 U.S.C. § 201, the United States Travel Act, the USA PATRIOT Act, and other state and national anti-bribery and anti-money laundering laws in the countries in which we conduct activities. Anti-corruption laws are interpreted broadly and prohibit companies and their employees, agents, contractors, and other partners from authorizing, promising, offering, or providing, directly or indirectly, improper payments or anything else of value to recipients in the public or private sector. We may engage third parties for clinical trials outside of the United States, to sell veverimer abroad once we enter a commercialization phase, and/or to obtain necessary permits, licenses, patent registrations, and other regulatory approvals. We have direct or indirect interactions with officials and employees of government agencies or government-affiliated hospitals, universities, and other organizations. We can be held liable for the corrupt or other illegal activities of our employees, agents, contractors, and other partners, even if we do not explicitly authorize or have actual knowledge of such activities. Any violations of the laws and regulations described above may result in substantial civil and criminal fines and penalties, imprisonment, the loss of export or import privileges, debarment, tax reassessments, breach of contract and fraud litigation, reputational harm, and other consequences.

**Risks Related to Intellectual Property**

***We may become subject to claims alleging infringement of third parties' patents or proprietary rights and/or claims seeking to invalidate our patents, which would be costly, time consuming and, if successfully asserted against us, delay or prevent the development and commercialization of veverimer.***

Our success depends in part on our ability to develop, manufacture, market and sell veverimer, if approved, and use our proprietary technologies without alleged or actual infringement, misappropriation or other violation of the patents and other intellectual property rights of third parties. There have been many lawsuits and other proceedings asserting patents and other intellectual property rights in the pharmaceutical and biotechnology industries. We cannot assure you that veverimer will not infringe existing or future third-party patents. Because patent applications can take many years to issue and may be confidential for 18 months or more after filing, there may be applications now pending of which we are unaware and which may later result in issued patents that we may infringe by commercializing veverimer. There may also be issued patents or pending patent applications that we are aware of, but that we think are irrelevant to veverimer, which may ultimately be found to be infringed by the manufacture, sale, or use of veverimer. Moreover, we may face claims from non-practicing entities that have no relevant product revenue and against whom our own patent portfolio may thus have no deterrent effect. In addition, veverimer has a complex structure that makes it difficult to conduct a thorough search and review of all potentially relevant third-

73

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

TRICIDA, INC.

Dated: March 2, 2020

TRICIDA, INC.

By:    /s/ Gerrit Klaerner

Name: Gerrit Klaerner, Ph.D.
Title: Chief Executive Officer and President

134

**SIGNATURES AND POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Gerrit Klaerner and Geoffrey M. Parker, jointly and severally, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite or necessary to be done in and about the premises hereby ratifying and confirming all that said attorneys-in-fact and agents, or his or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| SIGNATURE | | DATE |
|---|---|---|
| /s/ Gerrit Klaerner<br><br>Gerrit Klaerner, Ph.D. | Chief Executive Officer,<br>President and Director<br>(Principal Executive Officer) | March 2, 2020 |
| /s/ Geoffrey M. Parker<br><br>Geoffrey M. Parker | Chief Financial Officer and Executive Vice President<br>(Principal Financial Officer) | March 2, 2020 |
| /s/ Steffen Pietzke<br><br>Steffen Pietzke | Senior Vice President of Finance<br>and Chief Accounting Officer<br>(Principal Accounting Officer) | March 2, 2020 |
| /s/ Klaus Veitinger<br>Klaus Veitinger, M.D., Ph.D., M.B.A. | Chairman of the Board of Directors | March 2, 2020 |
| /s/ Robert J. Alpern<br><br>Robert J. Alpern, M.D. | Director | March 2, 2020 |
| /s/ David Bonita<br><br>David Bonita, M.D. | Director | March 2, 2020 |
| /s/ Sandra I. Coufal<br><br>Sandra I. Coufal, M.D. | Director | March 2, 2020 |
| /s/ Kathryn Falberg<br><br>Kathryn Falberg | Director | March 2, 2020 |
| /s/ David Hirsch<br><br>David Hirsch, M.D., Ph.D. | Director | March 2, 2020 |