# Exhibit 7

# UNITED STATES

## SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

# FORM 10-Q

☒  QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended June 30, 2020

or

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from to
Commission File Number: 001-38558



**TRICIDA, INC.**

(Exact name of registrant as specified in its charter)

| **Delaware** | **46-3372526** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**7000 Shoreline Court, Suite 201, South San Francisco, CA 94080**
(Address of principal executive offices, including zip code)

**(415) 429-7800**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act**

| **Title of each class** | **Trading Symbol(s)** | **Name of exchange on which registered** |
|---|---|---|
| Common stock, par value $0.001 per share | TCDA | The Nasdaq Global Select Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

On July 31, 2020, the registrant had 50,048,972 shares of common stock, par value $0.001 per share, outstanding.

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our condensed financial statements and related notes included elsewhere in this Quarterly Report on Form 10-Q. Some of the information contained in this discussion and analysis, including information with respect to our plans and strategy for our business, include forward-looking statements that involve risks and uncertainties. Investors in our securities should review Item 1A. "Risk Factors" for a discussion of important factors that could cause our actual results to differ materially from the results described in or implied by the forward-looking statements contained in the following discussion and analysis.*

**Overview**

Our goal is to slow the progression of chronic kidney disease, or CKD, through the treatment of metabolic acidosis. We are a pharmaceutical company focused on the development and commercialization of our drug candidate, veverimer (also known as TRC101), a non-absorbed, orally-administered polymer designed to treat metabolic acidosis by binding and removing acid from the gastrointestinal tract. Metabolic acidosis is a serious condition commonly caused by CKD and is believed to accelerate the progression of kidney deterioration. It can also lead to bone loss, muscle wasting and impaired physical function. Metabolic acidosis in patients with CKD is typically a chronic disease and, as such, requires long-term treatment to mitigate its deleterious consequences.

There are currently no FDA-approved therapies for treating chronic metabolic acidosis. We estimate that metabolic acidosis affects approximately 3 million patients with CKD in the United States, and we believe that treating metabolic acidosis and slowing the progression of CKD in patients with metabolic acidosis represents a significant unmet medical need and market opportunity.

Veverimer is an in-house discovered, new chemical entity. We have a broad intellectual property estate that we believe will provide patent protection for veverimer until at least 2034 in the United States, Australia, China, Hong Kong, India, Israel, Japan, Mexico, Russia and certain other markets, and at least 2035 in Europe.

Veverimer is a low-swelling, spherical polymer bead that is approximately 100 micrometers in diameter. It is a single, high molecular weight, crosslinked polyamine molecule. The size of veverimer prevents systemic absorption from the GI tract. The high degree of cross-linking within veverimer limits swelling and the overall volume in the GI tract, with the goal of facilitating good GI tolerability. The high amine content of veverimer provides proton binding capacity of approximately 10 mEq/gram of polymer. The size exclusion built into the three-dimensional structure of the polymer enables preferential binding of chloride versus larger inorganic and organic anions, including phosphate, citrate, fatty acids and bile acids. This size exclusion mechanism allows a majority of the binding capacity to be used for hydrochloric acid binding.

Our New Drug Application, or NDA, for veverimer as a chronic treatment for metabolic acidosis, is currently under review by the U.S. Food and Drug Administration, or FDA, through the Accelerated Approval Program. Results from our positive Phase 3, 12-week efficacy trial, TRCA-301, and a follow-on 40-week extension trial, TRCA-301E, formed the primary basis of our NDA submission. The TRCA-301 trial met both its primary and secondary endpoints in a highly statistically significant manner (p < 0.0001 for both the primary and secondary endpoints). The TRCA-301E trial met its primary and all secondary endpoints. The Lancet published the results of the TRCA-301 trial in March 2019 and the results of the TRCA-301E trial in June 2019.

The FDA assigned a Prescription Drug User Fee Act, or PDUFA, goal date of August 22, 2020 for the potential approval to market veverimer in the United States. We have been working cooperatively with the FDA on review matters related to our NDA. However, on July 14, 2020, we received a notification from the FDA stating that, as part of its ongoing review of our NDA, the FDA has identified deficiencies that preclude discussion of labeling and postmarketing requirements/commitments at this time. The FDA stated that the notification does not reflect a final decision on the information under review. The notification does not specify the deficiencies identified by the FDA. In our late cycle meeting with the FDA, held in May 2020, we addressed two substantive review issues that the FDA had raised in advance of the meeting, namely concerns related to the magnitude and durability of the treatment effect on the surrogate marker of serum bicarbonate demonstrated in the TRCA-301 and TRCA-301E trials and the applicability of data from the TRCA-301 and TRCA-301E trials to the U.S. population. At the late cycle meeting, we presented our rationale for why we believe our data addressed the substantive review issues raised by the FDA. Because the July 14th notification does not specify the deficiencies identified by the FDA, we cannot be certain what the identified deficiencies are or whether the deficiencies relate to the substantive review issues raised by the

21

FDA in connection with the late cycle meeting, or other matters. While we plan to work with the FDA to resolve the deficiencies referenced in the July 14, 2020 letter, we require additional information from the FDA before we can evaluate whether and how we will be able to address those deficiencies. We believe we are likely to receive that clarification in the form of a Complete Response Letter, or CRL. Consequently, at this time we do not believe we will receive approval to market veverimer in the United States by our PDUFA goal date of August 22, 2020, if at all.

We are currently conducting a confirmatory postmarketing trial, VALOR-CKD (also known as TRCA-303), as part of the Accelerated Approval Program. Together with our investigators, contract research organizations, or CROs, and other contract service providers, Tricida is assessing the potential impact of the COVID-19 pandemic on recruitment and retention of subjects in our confirmatory postmarketing trial, VALOR-CKD. At this time, safety monitoring activities, adjudication of endpoint events and provision of clinical trial supplies have not been materially affected by COVID-19. We have provided investigators additional guidance per general FDA and European Medicines Agency recommendations on clinical trial conduct during COVID-19 to ensure the confirmatory postmarketing trial is effectively conducted with the utmost attention to trial subject and investigator safety while maintaining compliance with applicable clinical trial regulations and minimizing risks to the trial's integrity. We will continue to monitor the potential impact that COVID-19 may have on recruitment and retention of subjects in our confirmatory postmarketing trial, VALOR-CKD.

At this time, we continue to plan for the potential commercial launch of veverimer upon approval. We have hired approximately 40 specialty account managers in key territories, which we believe will allow us to reach, either in person or remotely, 70% to 80% of the 5,000 highest-prescribing nephrologists in the United States. Depending on if and when we receive marketing approval, we may supplement these efforts by implementing an extensive digital campaign to extend the reach of our promotional efforts. As we gain an understanding of the effectiveness of our specialty account manager field force and our digital campaign during the initial stage of the commercial launch, we plan to evaluate and adjust commercial launch plans as appropriate, including the ultimate size of our field sales force, which previously anticipated the deployment of 80 to 85 specialty account managers. Our commercial leadership team and the majority of our 10 regional business directors have been hired to manage this process. We continue to interact with payers to discuss access to veverimer, if approved. Our commercial payer team has met with over 115 payers representing over 300 million lives. While some recent interactions have been converted to virtual meetings, in general, we do not believe the COVID-19 pandemic has affected our interactions with payers. We do not yet know the full impact that further discussions with the FDA or COVID-19 will have on the potential commercial launch of veverimer.

At this time, in light of our ongoing and currently scheduled manufacturing campaigns, we believe we have sufficient drug substance and drug product to supply the anticipated demand of our confirmatory postmarketing trial, VALOR-CKD. In addition, we believe scheduled manufacturing campaigns will provide sufficient drug substance and there is sufficient drug product manufacturing capacity available to supply our initial anticipated commercial demand. Future manufacturing campaigns will provide additional drug substance and drug product supply for both clinical and commercial purposes. Veverimer drug substance manufacturing is conducted for Tricida by Patheon Austria GmbH & Co KG, or Patheon, in their Linz, Austria facility. We are in regular communication with Patheon and PCI Pharma Services, our drug product manufacturer and, to our knowledge, there have not been business disruptions at these sites due to COVID-19, and the production of veverimer drug substance and drug product is ongoing as planned. At this time, we have not experienced any material disruption in the distribution network for veverimer, including the provision of raw materials, the shipping of drug substance and drug product and the provision of clinical trial supplies to trial participants.

Tricida is led by a seasoned management team that includes the founder of Ilypsa, Inc. and Relypsa, Inc. Our management team has extensive experience in the development and commercialization of therapeutics, with deep expertise in developing polymers for the treatment of kidney-related diseases.

We have no products approved for marketing, and we have not generated any revenue from product sales or other arrangements. From our inception in 2013 through June 30, 2020, we have primarily funded our operations through the sale of $152.4 million of convertible preferred stock, net proceeds of $237.7 million from our initial public offering, or IPO, on July 2, 2018, net proceeds of $217.9 million from our underwritten public offering of common stock on April 8, 2019, net proceeds of $193.3 million from the issuance of Convertible Senior Notes on May 22, 2020 and net borrowing of $72.1 million after fees of $2.9 million under the Loan and Security Agreement, or Term Loan, entered into with Hercules Capital Inc., or Hercules, on February 28, 2018. We have incurred losses in each year since our inception in 2013. Our net losses were $58.2 million and $36.6 million for the three months ended June 30, 2020 and 2019, respectively, and $132.3 million and $74.5 million for the six months ended June 30, 2020

22

- the costs of operating as a public company;

- the costs associated with any product recall that could occur;

- the emergence, approval, availability, perceived advantages, relative cost, relative safety and relative efficacy of alternative and competing products or treatments;

- the cash requirements of any future acquisitions or discovery of future product candidates, if any;

- the progress, timing, scope and costs of conducting our nonclinical and clinical studies and trials, including the ability to enroll our confirmatory postmarketing trial, VALOR-CKD (also known as TRCA-303) in a timely manner, or potential future nonclinical and clinical studies and trials;

- the costs of hiring and retaining personnel as we grow;

- the time and cost necessary to respond to technological and market developments;

- the potential impact of pandemics, including the recent 2019 novel coronavirus disease, or COVID-19, caused by the severe acute respiratory coronavirus 2, or SARS-CoV-2, on the financial markets in general and on our business in particular; and

- the costs of preparing, filing, prosecuting, defending and enforcing any patent claims and other intellectual property rights, including litigation costs and the outcome of such litigation.

We cannot assure you that anticipated additional financing will be available to us on favorable terms, or at all. Our current Term Loan contains negative covenants that restrict our ability to obtain additional debt financing. Any future debt financing into which we enter may impose upon us covenants that restrict our operations, including limitations on our ability to incur liens or additional debt, pay dividends, redeem our stock, make certain investments and engage in certain merger, consolidation or asset sale transactions. Although we have been successful in obtaining financing through the issuance of our equity securities and debt financing, we cannot assure you that we will be able to do so in the future. If we are unable to raise additional capital to fund our clinical development and commercialization of veverimer, if approved, and other business activities, we could be forced to significantly delay, scale back or abandon one or more clinical development programs or commercialization efforts and curtail or cease our operations. In addition, our ability to achieve profitability or to respond to competitive pressures would be significantly limited.

**Risks Related to Our Business**

*We are dependent on the success of veverimer, our only product candidate. The FDA has notified us that it has identified deficiencies with our NDA. If we are unable to successfully develop, obtain regulatory approval for and commercialize veverimer, or experience significant delays in doing so, our business will be materially harmed.*

To date, we have invested all of our efforts and financial resources in the research and development of veverimer, which is our only product candidate, and our business and future success depends on our ability to successfully develop, obtain regulatory approval for, and commercialize veverimer. In May 2018, we completed our multicenter, randomized, double-blind, placebo-controlled, pivotal Phase 3 clinical trial for veverimer, known as TRCA-301. The TRCA-301 trial enrolled 217 subjects with metabolic acidosis and CKD. Eligible subjects who completed the 12-week treatment period in our pivotal Phase 3 trial were invited to continue in our 40-week extension trial, TRCA-301E, and we completed the TRCA-301E trial in March 2019. While we believe that these trials successfully met their primary and secondary endpoints and are sufficient to support our NDA, we cannot assure you that the U.S. Food and Drug Administration, or FDA, or any foreign regulatory agency will approve veverimer for marketing.

The FDA assigned a Prescription Drug User Fee Act, or PDUFA, goal date of August 22, 2020 for the potential approval to market veverimer in the United States. We have been working cooperatively with the FDA on review matters related to our NDA. However, on July 14, 2020, we received a notification from the FDA stating that, as part of its ongoing review of the Company's NDA, the FDA has identified deficiencies that preclude discussion of labeling and postmarketing requirements/commitments at this time. The FDA stated that the notification does not reflect a final decision on the information under review. The notification does not specify the deficiencies identified by the FDA. In our late cycle meeting with the FDA, held in May 2020, we addressed two substantive review issues

36

that the FDA had raised in advance of the meeting, namely concerns related to the magnitude and durability of the treatment effect on the surrogate marker of serum bicarbonate demonstrated in the TRCA-301 and TRCA-301E trials and the applicability of data from the TRCA-301 and TRCA-301E trials to the U.S. population. At the late cycle meeting, we presented our rationale for why we believe our data addressed the substantive review issues raised by the FDA. Because the July 14th notification does not specify the deficiencies identified by the FDA, we cannot be certain what the identified deficiencies are or whether the deficiencies relate to the substantive review issues raised by the FDA in connection with the late cycle meeting, or other matters. While the Company plans to work with the FDA to resolve the deficiencies referenced in the July 14, 2020 letter, we require additional information from the FDA before we can evaluate whether and how we will be able to address those deficiencies. We believe we are likely to receive that clarification in the form of a Complete Response Letter, or CRL. Consequently, at this time we do not believe we will receive approval to market veverimer in the United States by our PDUFA goal date of August 22, 2020, if at all.

Furthermore, even if we obtain regulatory approval for veverimer, we need to continue to develop a commercial organization, or collaborate with a third party for the commercialization of veverimer, establish commercially viable pricing and obtain approval for coverage and adequate reimbursement from third parties, including government payers. If we are unable to successfully commercialize veverimer, we may not be able to generate sufficient revenue to continue our business.

Our near-term prospects, including our ability to finance our operations and generate revenue, will depend heavily on the successful development and commercialization of veverimer in the United States. Though we plan to engage in marketing approval discussions with foreign regulatory agencies in the future, we have not yet begun marketing approval discussions with any regulatory agency other than the FDA, and we are not currently seeking regulatory approval for veverimer outside the United States. The clinical and commercial success of veverimer will depend on a number of factors, including the following:

- our ability to demonstrate veverimer's safety and efficacy to the satisfaction of the FDA and/or foreign regulatory agencies;

- the timely reporting of our confirmatory postmarketing trial, known as the VALOR-CKD trial;

- whether we are required by the FDA and/or foreign regulatory agencies to conduct additional clinical trials prior to or after approval to market veverimer;

- the prevalence and severity of adverse side effects of veverimer in our ongoing and future clinical trials and commercial use, if approved;

- the timely receipt of necessary regulatory and marketing approvals from the FDA and/or foreign regulatory agencies for veverimer;

- our ability to obtain U.S. marketing approval for veverimer through the Accelerated Approval Program, including our ability to address any deficiencies identified by the FDA;

- our ability to successfully conduct our confirmatory postmarketing trial, VALOR-CKD, and confirm clinical benefit of veverimer, assuming veverimer is initially approved through the FDA's Accelerated Approval Program;

- our ability to successfully commercialize veverimer, if approved for marketing and sale by the FDA and/or foreign regulatory agencies;

- our ability to manufacture clinical trial and commercial quantities of veverimer drug substance and drug product and to develop and maintain commercially viable and validated manufacturing processes that are compliant with current good manufacturing practices, or cGMP, at a scale sufficient to meet anticipated demand and over time enable us to reduce our cost of manufacturing;

- achieving and maintaining compliance with all regulatory requirements applicable to veverimer;

- our success in educating physicians and patients about the potential benefits, risks, administration and use of veverimer;

- acceptance of veverimer as safe and effective by patients and the medical community;

37

- the availability, perceived advantages, relative cost, relative safety and relative efficacy of alternative and competing treatments;

- our ability to obtain and sustain an adequate level of reimbursement for veverimer by third-party payers;

- the effectiveness of our own or any future strategic collaborators' marketing, sales and distribution strategy and operations;

- our ability to continue to obtain protection for and to enforce our intellectual property rights in and to veverimer;

- the impact of pandemics, such as COVID-19, on our business; and

- our ability to avoid and defend against third-party patent interference or patent infringement claims or similar proceedings with respect to our patent rights and patent infringement claims.

Many of these factors are beyond our control. Accordingly, we cannot assure you that we will ever be able to generate revenue through the sale of veverimer. If we are not successful in commercializing veverimer, or are significantly delayed in doing so, our business will be materially harmed.

***Our NDA for veverimer has been accepted for review by the FDA through the Accelerated Approval Program, but such program may not actually lead to a faster development or regulatory review or approval process. The FDA has notified us that it has identified deficiencies with our NDA. If we are unable to obtain approval of veverimer through the Accelerated Approval Program in the United States, we may be required to conduct additional nonclinical and clinical studies and trials beyond those that we currently contemplate, which could increase the expense of obtaining, reduce the likelihood of obtaining and/or delay the timing of obtaining, necessary marketing approval. Even if we receive approval from the FDA through the Accelerated Approval Program, if our confirmatory postmarketing trial does not verify clinical benefit, or if we do not comply with rigorous postmarketing requirements, the FDA may seek to withdraw the approval.***

Our NDA for veverimer has been accepted for review by the FDA through the Accelerated Approval Program based on the results of our Phase 1/2 trial, TRCA-101, our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial, TRCA-301E. For any approval to market a drug product, we must provide the FDA and foreign regulatory agencies with clinical data that adequately demonstrate the safety and efficacy of the product for the indication applied for in the NDA or other respective regulatory filings. As described in the "Government Regulation" section, the Accelerated Approval Program is one of several approaches used by the FDA to make prescription drugs more rapidly available for the treatment of serious or life-threatening diseases. Section 506(c) of the Federal Food, Drug and Cosmetic Act, or FFDCA, provides that the FDA may grant accelerated approval to "a product for a serious or life-threatening condition upon a determination that the product has an effect on a surrogate endpoint that is reasonably likely to predict clinical benefit, or on a clinical endpoint that can be measured earlier than irreversible morbidity or mortality, that is reasonably likely to predict an effect on irreversible morbidity or mortality or other clinical benefit, taking into account the severity, rarity, or prevalence of the condition and the availability or lack of alternative treatments." Approval through the Accelerated Approval Program is subject, however, to the requirement that the applicant conduct additional postmarketing clinical trials to verify and describe the drug's clinical benefit, where there is uncertainty as to the relationship of the surrogate endpoint to the clinical benefit, or of the observed clinical endpoint to ultimate outcome. Typically, clinical benefit is verified when postmarketing clinical trials show that the drug provides a clinically meaningful positive therapeutic effect, that is, an effect on how a patient feels, functions, or survives. If such confirmatory postmarketing trial fails to confirm the drug's clinical profile or risks and benefits, the FDA may withdraw its approval of the drug.

The FDA has broad discretion with regard to approval through the Accelerated Approval Program, and even if we believe that the Accelerated Approval Program is appropriate for veverimer, we cannot assure you that the FDA will ultimately agree. Furthermore, even if we do obtain approval through the Accelerated Approval Program, we may not experience a faster development process, review or approval compared to conventional FDA procedures.

While our NDA is being reviewed through the Accelerated Approval Program, there can be no assurance that approval will be granted on a timely basis, or at all. For example, there can be no assurance that the FDA will ultimately agree that the results of our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial, TRCA-301E, and the design and size of our confirmatory postmarketing trial, VALOR-CKD, will be sufficient to support such approval. Additionally, the FDA could require us to conduct further studies or trials prior to granting

38

approval of any type, including by determining that approval through the Accelerated Approval Program is not appropriate and that our pivotal Phase 3 clinical trial, TRCA-301, may not be used to support approval through the conventional pathway. We might not be able to fulfill the FDA's requirements in a timely manner, which would cause delays, or approval might not be granted because our submission is deemed incomplete by the FDA. There also can be no assurance that after subsequent FDA feedback we will continue to pursue approval through the Accelerated Approval Program. A failure to obtain approval through the Accelerated Approval Program could result in a longer time period to obtain approval of veverimer, could increase the cost of its development, could delay our ability to commercialize veverimer and could significantly harm our financial position and competitive position in the marketplace.

The FDA assigned a Prescription Drug User Fee Act, or PDUFA, goal date of August 22, 2020 for the potential approval to market veverimer in the United States. We have been working cooperatively with the FDA on review matters related to our NDA. However, on July 14, 2020, we received a notification from the FDA stating that, as part of its ongoing review of the Company's NDA, the FDA has identified deficiencies that preclude discussion of labeling and postmarketing requirements/commitments at this time. The FDA stated that the notification does not reflect a final decision on the information under review. The notification does not specify the deficiencies identified by the FDA. In our late cycle meeting with the FDA, held in May 2020, we addressed two substantive review issues that the FDA had raised in advance of the meeting, namely concerns related to the magnitude and durability of the treatment effect on the surrogate marker of serum bicarbonate demonstrated in the TRCA-301 and TRCA-301E trials and the applicability of data from the TRCA-301 and TRCA-301E trials to the U.S. population. At the late cycle meeting, we presented our rationale for why we believe our data addressed the substantive review issues raised by the FDA. Because the July 14th notification does not specify the deficiencies identified by the FDA, we cannot be certain what the identified deficiencies are or whether the deficiencies relate to the substantive review issues raised by the FDA in connection with the late cycle meeting, or other matters. While the Company plans to work with the FDA to resolve the deficiencies referenced in the July 14, 2020 letter, we require additional information from the FDA before we can evaluate whether and how we will be able to address those deficiencies. We believe we are likely to receive that clarification in the form of a Complete Response Letter, or CRL. Consequently, at this time we do not believe we will receive approval to market veverimer in the United States by our PDUFA goal date of August 22, 2020, if at all.

Even if we receive approval for veverimer through the Accelerated Approval Program, we will be subject to rigorous postmarketing requirements, including the completion of our ongoing confirmatory postmarketing trial, VALOR-CKD, or such other postmarketing trials as the FDA may require, to verify the clinical benefit of the product, and submission to the FDA of all promotional materials prior to their dissemination. The FDA could seek to withdraw the approval for multiple reasons, including if we fail to conduct any required postmarketing trial with due diligence, our confirmatory postmarketing trial does not confirm the predicted clinical benefit, other evidence shows that the product is not safe or effective under the conditions of use, or we disseminate promotional materials that are found by the FDA to be false and misleading.

Any delay in obtaining, or inability to obtain, approval through the Accelerated Approval Program would delay or prevent commercialization of veverimer and would materially adversely affect our business, financial condition, results of operations, cash flows and prospects.

***We may be unable to obtain regulatory approval for veverimer under applicable regulatory requirements.***

To gain approval to market a drug product, regardless of whether it is through the Accelerated Approval Program or the conventional pathway, we must provide the FDA and foreign regulatory agencies with clinical data that adequately demonstrates the safety and efficacy of the product for the intended indication applied for in the NDA or other respective regulatory filing. On July 14, 2020, we received a notification from the FDA stating that, as part of its ongoing review of the Company's NDA, the FDA has identified deficiencies that preclude discussion of labeling and postmarketing requirements/commitments at this time. The FDA stated that the notification does not reflect a final decision on the information under review. The notification does not specify the deficiencies identified by the FDA. Drug development is a long, expensive and uncertain process, and delay or failure can occur at any stage of any of our clinical trials. A number of companies in the pharmaceutical industry have suffered significant setbacks in clinical trials even after promising results in earlier nonclinical or clinical studies and trials. These setbacks have been caused by, among other things, nonclinical findings made while clinical trials were underway and safety or efficacy observations made in clinical trials, including previously unreported adverse events. Success in nonclinical testing and early clinical trials does not ensure that later clinical trials will be successful, and the results of clinical trials by other parties may not be indicative of the results in trials we may conduct. In addition,

39

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: August 6, 2020

TRICIDA, INC.

By:    /s/ Gerrit Klaerner, Ph.D.
       Gerrit Klaerner, Ph.D.
       Chief Executive Officer and President
       *(Principal Executive Officer)*

By:    /s/ Geoffrey M. Parker
       Geoffrey M. Parker
       Chief Financial Officer and Executive Vice President
       *(Principal Financial Officer)*

By:    /s/ Marc Cobo
       Marc Cobo
       Senior Vice President of Finance and Chief Accounting Officer
       *(Principal Accounting Officer)*

84