Jeffrey C. Block, *pro hac vice*
Jacob A. Walker (SBN 271217)
Michael D. Gaines, *pro hac vice*
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jake@blockleviton.com
jeff@blockleviton.com
michael@blockleviton.com

Whitney Street (SBN 223870)
**BLOCK & LEVITON LLP**
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 968-1852 phone
whitney@blockleviton.com

*Attorneys for Lead Plaintiff Jeffrey M. Fiore and the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL PARDI, *Individually and on Behalf of All Others Similarly Situated,*<br><br>Plaintiff,<br><br>v.<br><br>TRICIDA, INC. and GERRITT KLAERNER,<br><br>Defendants. | Case No. 5:21-cv-00076-LHK<br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>**Class Action**<br><br>Hon. Lucy H. Koh<br><br>Date: December 9, 2021<br>Time: 1:30 p.m.<br>Courtroom 8, 4th Floor |

# TABLE OF CONTENTS

I.   INTRODUCTION.................................................................................................................1

II.  FACTS .........................................................................................................................5

III. ARGUMENT...................................................................................................................7

   A.  Pleading Standards .................................................................................................7

   B.  Defendants Made False Statements and Omitted Material Facts.........................8

      1.  Defendants Misleadingly Identified the
          Location of Foreign Trial Sites as Being in "Europe"......................................8

      2.  Defendants Risk Disclosures Concerning the
          FDA's Acceptance of Foreign Data Were False and Misleading...................11

      3.  Defendants Falsely and Misleadingly Described the
          TRCA-301/TRCA-301E Trial as "Multicenter," Which is a
          Term of Art Under the Circumstances............................................................12

      4.  Klaerner Made Two Misleading Statements Concerning
          Veverimer's Prospects for FDA Approval During a June 12, 2019 Presentation ..........14

      5.  Defendants Falsely Represented the
          Anticipated Sample Size for the VALOR-CKD Trial to be 1,600 Patients....................16

      6.  Klaerner Made False and Misleading Statements
          Concerning the State of FDA Review and the FDA's Reasons for
          Evaluating the FDA Without Convening an Advisory Committee ................19

   C.  Defendants Knew or Recklessly Disregarded the Truth
       When Making the Alleged False and Misleading Statements.............................22

IV.  CONCLUSION ...............................................................................................................25

**TABLE OF AUTHORITIES**

**Cases**

*Azar v. Yelp*,
No. 18-cv-400-EMC, 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018)......................................24

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
No. 19-CV-06361-RS, 2020 WL 4569846 (N.D. Cal. 2020)..........................................3, 9, 10

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ......................................................................................passim

*Durning v. First Boston Corp.*,
815 F.2d 1265 (9th Cir. 1987) ...............................................................................................9

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019)..................................................................................21

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) .................................................................................................9

*In re Amylin Pharm., Inc. Sec. Litig.*,
No. 01CV1455, 2003 WL 21500525 (S.D. Cal. May 1, 2003)..........................................8, 25

*In re Apple, Inc. Sec. Litig.*,
No. 19-cv-2033-YGR, 2020 WL 2857397 (N.D. Cal. June 2, 2020)......................................24

*In re CenturyLink Sales Practices and Sec. Litig.*,
MDL No. 17-2795, 2019 WL 3431600 (D. Minn. July 30, 2019)..........................................23

*In re Iso Ray Inc. Sec. Litig.*,
189 F. Supp. 3d 1057 (E.D. Wash 2016)..................................................................................9

*In re Keyspan Corp. Securities Litigation*,
383 F. Supp.2d 358 (E.D.N.Y. 2003)....................................................................................10

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011)..............................................................................20, 24

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) .................................................................................................7

*Junge v. Geron Corp.*,
No. C 20-00547 WHA, 2021 WL 1375960 (N.D. Cal. Apr. 12, 2021) ........................12, 20, 25

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .......................................................................................passim

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ...........................................................................................................7

*Mehta v. Ocular Therapeutix, Inc.*,
    955 F.3d 194 (1st Cir. 2020)...........................................................................................13

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ..............................................................................9, 10, 14

*Oregon Emp's Retirement Fund v. Apollo Grp. Inc.*,
    774, F.3d 598 (9th Cir. 2014) ........................................................................................10

*Provenz v. Miller,*
    102 F.3d 1478 (9th Cir. 1996) ......................................................................................2, 9

*S.E.C. v. Todd*,
    642 F.3d 1207 (9th Cir. 2011) .........................................................................................9

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) .........................................................................................25

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
    485 F. Supp. 3d 1113 (N.D. Cal. 2020)........................................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .........................................................................................................7

*Turner Ins. Agency, Inc. v. Farmland Partners Inc.*,
    No. 18-CV-02104-DME-NYW, 2019 WL 2521834 (D. Colo. June 18, 2019) .........10

*Yanek v. Staar Surgical Co.*,
    388 F. Supp. 2d 1110 (C.D. Cal. 2005)........................................................................11

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .........................................................................................18

**Statutes**

15 U.S.C. § 78u-4(b)(1).............................................................................................................7

## I.  INTRODUCTION

Tricida, Inc. has one developmental drug candidate: veverimer, which is intended to slow the progression of chronic kidney disease ("CKD") through the treatment of metabolic acidosis. ¶25.[1] Tricida reported positive clinical trial results from its Phase 3 trial of veverimer in early June 2018. ¶¶6, 26. On the strength of these positive results, on June 28, 2018, Tricida went public, selling over $255 million of its common stock in an initial public offering. ¶¶7, 28. Investors were therefore acutely focused on the prospects for Tricida to obtain approval from the Food and Drug Administration to commercialize veverimer. But as alleged in the FAC, Tricida and its founder and CEO, Gerritt Klaerner, made false and misleading statements and omitted key facts concerning Tricida's Phase 3 clinical trial for veverimer, and thereby misrepresented the prospects that the FDA would approve Tricida's New Drug Application and misled investors.

**Misrepresentations Concerning Patient Concentration at a Single Trial Site.** Tricida conducted a single pivotal Phase 3 trial (TRCA-301) for veverimer. FDA guidance on single trial studies is clear: to support a claim of effectiveness a single study must consist of a "large multicenter study in which (1) no single study site provided an unusually large fraction of the patients and (2) no single investigator or site was disproportionally responsible for the favorable effect seen." ¶12. Single trial studies are therefore given stricter scrutiny by the FDA. ¶12. Yet, here, an unusually large fraction of the patients came from a single trial site which was disproportionately responsible for the favorable effects seen. ¶9. Thus, Tricida and Klaerner were materially misleading when they discussed the trial results and the "multicenter" trial sites because the data supporting the results were skewed and unlikely to pass muster with the FDA.

Defendants do not dispute that they failed to inform investors that a single trial site was disproportionally responsible for the favorable Phase 3 trial results. Instead, they mistakenly contend that because they never represented the trial sites were equally weighted, they had no obligation to reveal anything else about the trial sites or the data supporting the so-called positive

---

[1] Refences to "¶_" are to the First Amended Complaint for Violations of the Federal Securities Laws, ECF No. 72.

results. This contention is meritless because by labelling the trials as "multicenter," Defendants mispresented the credibility of the single study trial data and the prospects for FDA approval.

**Misrepresentations Concerning the Trial Site Locations.** Tricida disclosed that its clinical trials were conducted "at 47 trial sites in the United States and Europe." It informed investors that "foreign clinical data should also be applicable to the U.S. population and U.S. medical practice," and warned that "[t]he FDA may not accept such foreign clinical data." ¶8. But all of the trial sites were in *Eastern* Europe and not a single trial was conducted in *Western* Europe. *Eastern* Europe does not have a renal patient population or renal medical practice that the FDA considers to be applicable to the U.S., particularly with respect to CKD treatment, so the majority of the trial data was inapplicable in the U.S. ¶11. Defendants' representations that the trials were conducted in "Europe" were misleading, as they failed to inform investors of the crucial distinction between Eastern and Western Europe for clinical data measuring CDK. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (an omission is misleading where it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists.")

**Defendants' Premature "Truth on the Market" Defense.** Defendants disingenuously contend that Tricida "repeatedly disclosed" the location of the Phase 3 trial sites and that all the European trial sites were in Eastern Europe. There is no dispute that this "repeated disclosure" was not made in any filing Tricida made with the Securities and Exchange Commission. Defendants do not point to a single stock market analyst report or any widely-circulated news story or publication to support their claim of full "disclosure." Instead, Defendants point to two articles from the subscription only publication, *The Lancet*, for their claim of full disclosure. They also point to the website clinicaltrials.gov, which lists the locations of the trial sites. But "before the 'truth-on-the-market' doctrine can be applied, the defendants must prove that the information that was withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations. The defendants bear a heavy burden of proof." *Provenz v. Miller,* 102 F.3d 1478, 1492-93 (9th Cir. 1996). Here, Defendants make no showing that information from *The*

*Lancet* or clinicaltrials.gov entered the market with "a degree of intensity and credibility sufficient to effectively counterbalance" their misleading statements. *See Bos. Ret. Sys. v. Uber Techs., Inc.*, No. 19-CV-06361-RS, 2020 WL 4569846, at *6 (N.D. Cal. 2020) (Defendants have a "heavy burden of demonstrating" that a "truth on the market defense is available" on a 12(b)(6) motion as "investors are not generally required to look beyond a given document to discover what is true and what is not.") Indeed, Defendants' blithely claim these two sources created a "public record[2]" establishing that investors knew the concealed facts. *See* Defs' Mot. Dismiss 16, ECF No. 76 (hereinafter "Defs' Br."). Defendants do not come close to meeting their "heavy burden" supporting dismissal.

Plus, even if the Court were to accept that the locations of the trial sites were in the market, none of this information provided investors with the critical fact: how many patients were registered at which trial sites. Even if investors knew the locations of the trial sites investors were still misled by not knowing that the majority of the data underlying TRAC-301 came from trial sites that the FDA considered inapplicable to the U.S. patient population and medical practice.

**Misrepresentations Regarding the VALOR-CKD Study.** In its June 2018 IPO, Tricida said it "anticipate[d] … enroll[ing] approximately 1,900 to 2,100 subjects in the run-in portion of the [VALOR-CKD] trial to randomize 1,400 to 1,600 subjects," Hemmendinger Decl., Ex. 1, at 66, ECF No. 78-1 (ECF pagination), but that it needed "to obtain the FDA's agreement" for the design of the study. ¶28. Tricida also publicly committed to not filing its NDA until after the VALOR-CKD study was nearly fully enrolled. ¶28. In its 2018 10-K, filed March 29, 2019, Tricida said it was going forward with the VALOR-CKD study after having "interactions" with the FDA

---

[2] As we discuss, this Court should not take judicial notice of either *The Lancet* articles or clinicaltrial.gov. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) "[W]e note a concerning pattern in securities cases like this one: exploiting these procedures [judicial notice or incorporation by reference] to defeat what would otherwise constitute adequately stated claims at the pleading stage." Here, Defendants submit *The Lancet* and clinicaltrial.gov and ask the Court to take judicial notice of them to establish that the stock market knew this information. These articles and the website cannot establish that this information was "in the market" and fully reflected in Tricida' stock price. Any such request is improper and premature.

OPPOSITION TO MOTION TO DISMISS
No. 5:21-cv-00076-LHK

3

about the trial. ¶71. The first challenged statement about the VALOR-CKD trial is the one made on March 29, 2019. According to CW1, who was hired in October 2018 to work on recruiting patients for the study, Tricida set an internal target of recruiting 4,000 patients for the VALOR-CKD study. ¶72. When CW1 left Tricida in June 2019, he said Tricida was struggling to recruit patients and establish trial sites. ¶29. But Tricida submitted its NDA for veverimer in August 2019 and announced in a November 14, 2019 press release that "nearly 95%" of the "targeted sites [were] open for enrollment," Hemmendinger Decl., Ex. 3, at 10, ECF No. 78-3, even though the VALOR-CKD study was still under-enrolled, and therefore underpowered. By filing the NDA and stating Tricida had opened 95% of the necessary trial sites, Defendants misrepresented that the NDA was complete. Indeed, the FDA rejected the NDA because, among other reasons, the VALOR-CKD study was underpowered. ¶44. So, Tricida either reached agreement with the FDA on the study design and did not meet the agreed randomization figures, or never actually reached agreement with the FDA, contrary to its public representations.

**Misrepresentations About FDA Discussions in May 2020.** On August 6, 2020, Tricida filed its Second Quarter 10-Q in which it admitted, "[i]n our late cycle meeting with the FDA held in May 2020, we addressed two substantive review issues that the FDA had raised in advance of the meeting, namely concerns relating to the magnitude and durability of the treatment effect on the surrogate marker … and the applicability of the data from the TRCA-301 and TRCA-301E trials to the U.S. population." ¶102. Tricida admitted that given the magnitude of these issues, it would likely receive a Complete Response Letter. ¶102. Yet, in his statements on May 7, 2020, Klaerner failed to reveal the serious issues raised by the FDA. He simply stated that "we took the opportunity to address outstanding review issues" and further misled investors by proclaiming "we remain confident that our submission meets the standard for approval" despite knowing the FDA's concerns. ¶101. While Defendants point to the July 15, 2020 letter received from the FDA as the basis for their updated disclosure in their 2Q 10-Q, *see* Defs' Br. 25-26, Defendants' suggestion that they learned the bad FDA news after May 7 is baseless. Tricida itself stated that the July 15 letter "notification does not specify the deficiencies identified by the FDA." ¶18. Plus, Klaerner's claim on May 7 that the AdComm meeting was cancelled, "in part," due to Covid, was also

misleading as he failed to reveal the real reasons for the cancellation: the serious "concerns" raised by the FDA in the late-cycle meeting.

Defendants' additional contention that Klaerner "disclosed the purportedly concealed facts" on May 7 is specious. The "concealed facts" were the FDA's concerns that the NDA's measure of efficacy did not support approval and that the data came predominantly from Eastern European trial sites and were "strongly influenced by a single site."

**Scienter.** Defendants' scienter can be readily inferred. Defendants knowingly, or in reckless disregard, withheld material information from investors about the veracity of its single study for veverimer and knew, or recklessly disregarded, that trial results predominantly from Eastern Europe would likely not support FDA approval. Based on the so-called positive trial results, Tricida was able to raise close to a half billion dollars from investors, and Klaerner pocketed over $10 million in his own stock sales. Plus, the more plausible (and at least as equal) inference is that Defendants misrepresented the risks and prospects for FDA approval, raised close to $500 million from investors, and now have a war chest—of other people's money—with which to redo their trials the right way.

## II. FACTS

Tricida's lead investigational drug candidate, veverimer (TRC101), is intended to slow the progression of chronic kidney disease ("CKD") through the treatment of metabolic acidosis. ¶25. The Company sought FDA approval of veverimer through the FDA's Accelerated Drug Application ("ADA") program, under which Phase 3 trials must demonstrate clinical efficacy by achieving a predetermined surrogate endpoint (here, blood bicarbonate level); actual clinical efficacy must thereafter be demonstrated through a confirmatory postmarketing trial. ¶25.

Prior to issuing stock to the public, on June 5, 2018, Tricida issued a press release announcing that it had completed the only Phase 3 trial (TRCA-301) for veverimer in May 2018 and that 194 of the 217 trial patients agreed to be enrolled in a 40-week extension trial (TRCA-301E). ¶26. The press release touted that TRCA-301 "met both its primary and secondary endpoints in a statistically significant manner." ¶26.

Tricida capitalized on the positive Phase 3 trial results with an IPO on June 28, 2018, raising $255.6 million through the sale of 13,455,000 shares of its common stock to the class. ¶¶7, 28. Without the $255.6 million raised in the IPO, Tricida would have run out of money by the end of 2018: the Company's cash, cash equivalents, and investments totaled only $243.4 million at the end of 2018, meaning most (if not all) of its cash came from the IPO. ¶33. And this $243 million was only enough to fund the Company into 2021, through "the [anticipated] initial commercial launch period for TRC101," meaning there was not enough cash to fully commercialize the drug even if Tricida managed a flawless accelerated approval of veverimer. ¶33. So, on April 8, 2019, Tricida sold an additional 6.44 million shares of common stock for over $231 million in a secondary stock offering. ¶¶15, 33.

Beginning with a July 15, 2020 press release, Tricida began to slowly reveal the truth about veverimer in piecemeal fashion, the whole of which it did not disclose for another seven months. On July 15, 2020, Tricida revealed that the FDA "had identified deficiencies that preclude discussion of labeling and postmarketing requirements/commitments at this time." ¶¶36, 109. Although Tricida stated that the notification did not "specify the deficiencies identified by the FDA," Tricida knew which deficiencies the FDA had referenced—they were the same deficiencies discussed in the May 2020 late cycle meeting. ¶¶37, 111. Tricida's stock price fell $10.56 per share in response to this news. ¶110.[3]

On August 24, 2020, Tricida issued a press release announcing that the Company received a CRL from the FDA for its veverimer NDA. ¶112. Tricida's stock price fell 23.64% on this news. ¶113. On October 29, 2020, Tricida's stock price fell another 47% on the news that the FDA would not accept solely "serum bicarbonate data for determination of efficacy." ¶130. On December 8, 2020, the stock price fell another 17% on the news that the FDA was, in essence, requiring new clinical trials. ¶131. On February 25, 2021, Tricida revealed it had "received an Appeal Denied Letter (ADL), from the Office of New Drugs (OND) of the FDA in response to its Formal Dispute Resolution Request (FDRR) submitted in December 2020." ¶120. The press release disclosing the

---

[3] Klaerner sold 24,000 shares between May 1, 2020 and July 15, 2020 (before the stock price fell on July 15th) avoiding over $240,000 in lost value.

ADL revealed for the first time the FDA's "concerns that are particularly relevant in an NDA supported by a single registration trial": the trial results were "strongly influenced by a single site," and "the majority of sites for the TRCA-301/TRCA-301E trial" were in Eastern Europe, "where differences in patient management … might affect the treatment response to veverimer," rendering questionable "the applicability to a U.S. patient population." ¶120. Tricida's stock price fell 30% on this news.

## III. ARGUMENT

### A. Pleading Standards

Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, … state with particularity all facts on which that belief is formed." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012) (quoting 15 U.S.C. § 78u-4(b)(1)). The complaint also must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)(A). A strong inference of scienter is one that "a reasonable person would deem … cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The inference "need not be irrefutable … or even the 'most plausible of competing inferences.'" *Id.* Although the allegations of scienter must be particular, the Court's inquiry is holistic: "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Rigel Pharms.*, 697 F.3d at 883 (quoting *Tellabs*, 551 U.S. at 322-23). Even under the PSLRA, in an action alleging violations of 10(b), courts must "accept all factual allegations in the complaint as true." *Tellabs*, 551 U.S. at 322.

Sections §10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011), but an omission is misleading where it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006. Thus, "[a]

OPPOSITION TO MOTION TO DISMISS
No. 5:21-cv-00076-LHK

7

company seeking FDA approval of a new drug clearly is not under any obligation to disclose every single issue raised throughout the process. However, if the FDA expresses significant concerns regarding the sufficiency of the trials, the company cannot make affirmative representations regarding the completeness or sufficiency of the trials without full disclosure." *In re Amylin Pharm., Inc. Sec. Litig.*, No. 01CV1455, 2003 WL 21500525, at *8 (S.D. Cal. May 1, 2003).

**B.      Defendants Made False Statements and Omitted Material Facts**

**1.      Defendants Misleadingly Identified the Location of Foreign Trial Sites as Being in "Europe"**

In every Tricida SEC filing, beginning with the Registration Statement and Prospectus filed for the IPO and ending with the 1Q20 10-Q filed on May 8, 2020, Tricida repeated the misleading statement that TRCA-301/TRCA-301E was conducted at sites "in the United States and Europe." *E.g.*, ¶¶58, 63, 106. Revealing that the trial sites were in "Europe" but failing to reveal that *all* the European sites were in *Eastern* Europe was misleading because the representation of the Eastern European trial sites as generally being in "Europe" "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006. Given the medical condition at issue—CKD—the distinction between Eastern and Western Europe is crucial. *See* ¶56. Significant differences in the "Eastern European nephrology community" elevated the risk that trial participants would not be sufficiently representative of the U.S. patient population and U.S. medical practices for the FDA to accept the results of the TRCA-301/TRCA-301E trial. ¶56. Yet the use of the more general term "Europe" misled investors. ¶56.

Defendants argue, however, that these statements were not misleading because (1) the location of the trial sites was publicly disclosed in two issues of the paid subscription service *The Lancet* and on clinicialtrials.gov and (2) the Ninth Circuit rejects omission claims premised upon incompleteness. *See* Defs' Br. 14-17. Both contentions are meritless.

Defendants' first argument is a premature truth-on-the-market defense. "[B]efore the 'truth-on-the-market' doctrine can be applied, the defendants must prove that the information withheld or misrepresented was 'transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided

representations. The defendants bear a heavy burden." *Provenz*, 102 F.3d at 1492-93. Here, Defendants' claim the withheld or misrepresented information – that all the trials were conducted in *Eastern* Europe - was otherwise publicly available, a classic truth-on-the-market defense. Courts generally find this defense "is not available at the motion to dismiss stage," because it is "a method of refuting an alleged misrepresentation's materiality"—a "mixed question of law and fact."[4] *Uber*, 2020 WL 4569846, at *6 (citations and internal quotation marks omitted). *The Lancet* is not widely distributed in the public domain—it is a paid-subscription-based medical science journal.[5] Faced with nearly identical circumstances, the court in In *In re Iso Ray Inc. Securities Litigation* denied a motion to dismiss, refusing to find information was in the market where that information was provided in a study that "could not be accessed without the payment of a $35.95 subscription fee." 189 F. Supp. 3d 1057, 1073-74 (E.D. Wash 2016).

Similarly, the information available on clinicaltrials.gov, though publicly available, is not publicized or disseminated; it must be affirmatively sought out by someone who knows to look for it and can connect the dots.[6] That is not enough. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 502 (9th Cir. 1992) (grant of summary judgment reversed as industry analysts who noted problems with a new printer did not, as a matter of law, establish the information was known to investors.) Moreover, "investors are not generally required to look beyond a given document to discover what is true and what is not." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008); *see also In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1114 (9th Cir. 1989) ("Ordinarily, omissions by

---

[4] "Accordingly, resolving an issue as a matter of law is only appropriate when the adequacy of the disclosure is 'so obvious that reasonable minds [could] not differ." *S.E.C. v. Todd*, 642 F.3d 1207, 1221 (9th Cir. 2011) (quoting *Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987)).
[5] Defendants' inappropriately request that the Court take judicial notice of the March 8, 2019 and June 24, 2019 articles from *The Lancet*, which are offered as exhibits 18 and 19 to their Request for Judicial Notice, ECF No. 77, for the purpose of demonstrating that investors knew this information contradicted or explained Defendants' misleading SEC statements on this subject. The Court should not find that these pieces of information were known to stock market investors *and* counterbalanced Defendants' misleading statements. *See Khoja*, 899 F.3d at 998.
[6] Again, Defendants' inappropriately request that the Court take judicial notice of information from the website clinicaltrials.gov, offered as exhibits 20-24 to their Request for Judicial Notice, ECF No. 77, for the purpose of demonstrating that investors knew this information contradicted or explained Defendants' misleading SEC statements on this subject. *See supra* n.6.

corporate insiders are not rendered immaterial by the fact that the omitted facts are otherwise available to the public."); *Uber*, 2020 WL 4569846, at *5-6 (considering Uber's arguments that the allegedly omitted information had been disclosed in the registration statement but declining to rule on Uber's arguments that the omitted information was "adequately disclosed in the press coverage about Uber leading up to the IPO" because it was a premature "truth-on-the-market defense"); *Turner Ins. Agency, Inc. v. Farmland Partners Inc.*, No. 18-CV-02104-DME-NYW, 2019 WL 2521834, at *7 (D. Colo. June 18, 2019) (holding that "[a]n ordinary market observer may not have recognized" the undisclosed, nuanced connections between loan recipients and the defendant company later revealed by a reporter's review of publicly available deed and trust land records).

The cases cited by Defendants—*Oregon Employees Retirement Fund v. Apollo Group Inc.*, 774, F.3d 598, 607 (9th Cir. 2014) and *In re Keyspan Corp. Securities Litigation*, 383 F. Supp.2d 358, 377 (E.D.N.Y. 2003)—only serve to bolster Plaintiff's position. In both cases, the purportedly concealed information was disclosed in the company's own SEC filings, which both cases emphasize as central to their conclusion. Moreover, those cases dealt with claims premised upon plain omissions of information—that a for-profit university had a marketing system focused on recruiting as many students as possible (*Apollo Group*), and that a future merger would subject company to new regulatory regime (*Keyspan*)—not, as here, affirmatively misleading statements.[7] The availability of some information about the TRCA301/TRCA-301E trial locations in *The Lancet* and on clinicaltrials.gov does not cure Defendants' misleading statements.

Defendants' second argument relies on a conclusory mischaracterization of Plaintiff's allegations. Plaintiff does not make an incompleteness claim—*i.e.*, that the statements "in the United States and Europe" was misleading simply because there was more information about the trial sites that Defendants could have disclosed, *see, e.g.*, *Brody*, 280 F.3d at 1006 ("But [plaintiffs] err when they argue that in order for a statement not to be misleading, 'once a disclosure is made,

---

[7] Put another way, the term "Europe" is misleading despite being literally true. *See Miller*, 519 F.3d at 886 ("[S]tatements literally true on their face may nonetheless be misleading when considered in context.").

there is a duty to make it complete and accurate.'")—rather, Plaintiff alleges that the statement itself is misleading because it creates an impression of a state of affairs that materially differs from the truth. *Id.* The term "Europe" encompasses both Eastern Europe and Western Europe. Thus, the statements that the TRCA-301/TRCA-301E trial was conducted in "Europe" created the impression that at least *some* of the trial sites were in Western Europe, where patients and medical practice is more akin to the U.S. ¶56. In fact, *all* the trials in "Europe" were in *Eastern* Europe. This artificially inflated the likelihood that FDA would find the trial results inapplicable to the U.S. population and U.S. medical practice. *Cf. Khoja*, 899 F.3d at 1012-13 (finding that the statement "the USPTO published the patent" failed to inform investors about Orexigen's role in publishing the patent, giving "the false impression that [Orexigen] played no role in revealing" interim analysis results (which were contained in the patent), in violation of a data access plan).

### 2. Defendants Risk Disclosures Concerning the FDA's Acceptance of Foreign Data Were False and Misleading

In every Tricida SEC filing, beginning with the Registration Statement and Prospectus filed for the IPO and ending with the 1Q20 10-Q filed on May 8, 2020, Tricida repeated false and misleading risk disclosures cautioning, (1) "The foreign clinical data should also be applicable to the U.S. population and U.S. medical practice;" (2) "We conducted the TRCA-301 trial and are conducting the TRCA-301E trial with majority enrollment outside the United States and may, in the future, conduct clinical trials of our product candidates outside the United States;" and (3) "The FDA may not accept such foreign clinical data…." *E.g.*, ¶¶60, 65, 108.

*First*, these risk disclosures were too generalized to disclaim the specific risk at issue: that the majority TRCA-301/TRCA-301E trial enrollment was in Eastern Europe, where CKD patients are much more likely than otherwise to yield data inapplicable to the U.S. population and medical practice. *See Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1123 (C.D. Cal. 2005) (refusing to apply the PSLRA's safe harbor provision to statements that could apply to "literally any issues subject to FDA regulation"). Indeed, all foreign data is not considered equal in the eyes of the FDA. As explained *supra*, Eastern Europe presented meaningfully greater risks of inapplicability than did Western Europe. ¶57.

***Second***, the general nature of these risk disclosures rendered them misleading. By disclaiming only against the risk that the FDA may not accept foreign data if deemed inapplicable to the U.S. population and medical practice, Tricida created the impression that this generalized risk—that the FDA could, in theory, reject foreign data used in TRCA-301/TRCA-301E—was the risk investors should be aware of. The actual risk present was far more specific, concrete, and severe: Tricida's phase 3 study and its extension had mostly enrolled patients specifically from Eastern Europe—a patient population that the FDA does not consider to be representative of the U.S. population when it comes to CKD. ¶57. Here, of course, Defendants knew the study results were heavily dependent on patients from *Eastern* Europe, rendering their risk disclosures misleading. *See Junge v. Geron Corp.*, No. C 20-00547 WHA, 2021 WL 1375960, at *6 (N.D. Cal. Apr. 12, 2021) (warning investors that "complete and partial remission may not be seen" in clinical trial results "was misleading" where "defendants knew the final study results.").

Defendants offer nothing more than the conclusory assertion that Plaintiffs' contentions are "obviously wrong" because Tricida "consistently disclosed" that a majority of its Phase 3 trial sites were located in Eastern Europe. Defs' Br. 17. But, even *assuming arguendo,* that Defendants did "consistently disclose" that the majority of the Phase 3 trial sites were located in Eastern Europe—which they did not—this information still does not provide the critical facts about where the patient population (and therefore most of the data) was concentrated: a *single* trial site located in Eastern Europe.

### 3. Defendants Falsely and Misleadingly Described the TRCA-301/TRCA-301E Trial as "Multicenter," Which is a Term of Art Under the Circumstances

In every Tricida SEC filing, beginning with the Registration Statement and Prospectus filed for the IPO and ending with the 1Q20 10-Q filed on May 8, 2020, Tricida repeated the false and misleading risk statement that the TRCA-301/TRCA-301E trial was a "multicenter" study. *E.g.*, ¶¶58, 63, 106. Tricida conducted just a single Phase 3 trial to support the NDA for veverimer. "Multicenter," as used in the context of a single study capable of demonstrating efficacy does not simply mean a study conducted at multiple site locations. Rather, it is effectively a term of art: a study across multiple trial sites "in which (1) no single study site provided an unusually large

fraction of the patients and (2) no single investigator or site was disproportionately responsible for the favorable effect seen." ¶57; *cf. Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d 194, 210 (1st Cir. 2020) (noting that "fully developed," as describing a biopharmaceutical manufacturing process, is a "term of art" considered by the FDA to mean the process "has surpassed the concept or piloting stage but must still be tested and validated to determine whether it works as intended and meets necessary standards"). If a single study site is overly responsible for patient enrollment or the favorable effect seen in the results, the study's credibility is significantly diminished. ¶57. And the less credible the study, the less likely the chances for FDA approval. ¶57. This is especially so where only a single study supports an NDA. ¶57. ("FDA guidance makes clear that "[a] conclusion based on two persuasive studies will always be more secure than a conclusion based on a single, comparably persuasive study.").

Defendants offer the readily dismissed argument that Tricida's statements were "demonstrably true" because "37 [sic] sites enrolled patients in TRCA-301 and 29 sites enrolled patients in TRCA-301E," "Tricida did not say or suggest that the sites enrolled patients on a proportional basis[] or were equally responsible for favorable results," and "Defendants did not have a duty to go further and disclose the precise enrollment figures for each site." Defs' Br. 18. But as explained above, "multicenter," as used by Tricida, is a term of art. It means more than simply enrollment at multiple sites. While Tricida did not have a duty to specifically disclose the precise enrollment figures for each site, labelling the trial as a multicenter trial, and noting there were 47 such trial sites, without more, was misleading. *Khoja*, 899 F.3d at 1009 ("[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that won't mislead investors, including disclosing adverse information that cuts against the positive information.") (alterations omitted).

Defendants knew the results of the TRCA-301E trial before speaking about them in the June 5, 2018 press release and June 28, 2018 registration statement and prospectus. ¶57. Indeed, those documents discuss the trial results. ¶¶26, 54, 78. By labeling the TRCA-301/TRCA-301E trial "multicenter," Tricida gave the false and misleading impression that the FDA would find it credible because no single study site was responsible for an unusually large fraction of either the

trial subjects or the favorable effect seen. In fact, the TRCA-301/TRCA-301E trial results were "strongly influenced by a single site." ¶120. The resulting non-credibility of the TRCA-301/TRCA-301E study posed a significant obstacle to the success of the veverimer NDA because it relied upon a single Phase 3 trial to demonstrate efficacy. ¶57. Indeed, it was one of two reasons the FDA noted in its late-cycle meeting which led to the issuance of the CRL. Accordingly, the description of the TRCA-301/TRCA-301E trial as "multicenter" deflated the Company's risk profile by falsely conveying that no such obstacle to FDA approval was present. ¶57.

### 4. Klaerner Made Two Misleading Statements Concerning Veverimer's Prospects for FDA Approval During a June 12, 2019 Presentation

Klaerner made false and misleading statements while speaking at the Goldman Sachs Global Healthcare Conference on June 12, 2019; two of them concerned Veverimer's prospects for FDA approval. ¶79. The first statement misleadingly suggested that FDA approval through the ADA—at least given the state of developments for veverimer—was easier or more likely than if the veverimer NDA had proceeded along the standard approval path: "And when you fast-forward in all the work that we've done, from a discovery to an early development, to a late stage development, agreeing with FDA, an accelerated approval path, you -- all you expect to do is to show a surrogate effect, and then you have a post-marketing commitment that ultimately then, you confirm that, that surrogate is going to translate. Now we found ourselves with 1-year safety extension data that showed clinical benefit."¶78.

Defendants argue that the statement cannot be misleading because it is composed of literally true statements. But the Ninth Circuit has repeatedly "recognized that statements literally true on their face … can become, through their context and manner of presentation, devices which mislead investors." *Miller*, 519 F.3d at 886 (citations and internal quotation marks omitted). "For that reason, the disclosure required by the security laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Id.* The inquiry is what the "ordinary investor" would think had been conveyed. *Id.*

Here, the context resulting from the combination of sentences created the impression that because Defendants were proceeding along the ADA with veverimer, the majority of the hurdles

in the way of FDA approval had already been cleared: they already moved through early development and late-stage development and reached "agree[ment] with FDA." ¶78. To bring the drug to market, "all you expect to do is to show a surrogate effect." ¶78. But Tricida already had "1-year safety extension data that showed clinical benefit" from TRCA-301E. ¶78. So, what Klaerner communicated to investors is that they can be assured Tricida will succeed in demonstrating surrogate effect because that is "all you expect to do" under the ADA, and Tricida had already demonstrated actual clinical benefit in the Phase 3 extension study. A reasonable investor would have interpreted Klaerner's words to imply that Tricida had excellent prospects for FDA approval of veverimer because of all the work the Company had already done, the "agree[ment] with FDA," the "1-year safety extension data that showed clinical benefit," and the fact that veverimer was to be submitted under the ADA. Accordingly, Klaerner's first statement "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exists." *Brody,* 280 F.3d at 1006 .

The second statement misleadingly portrayed the fact that the veverimer NDA was supported by only a single pivotal Phase 3 trial as an impressive accomplishment to be lauded, *i.e.*, a strength of the submission: "We have the ability to submit our NDA with just one pivotal trial that shows a surrogate effect, and we've completed that." ¶78. Again, while this statement was literally true—any NDA for a drug candidate on the ADA can be submitted with just one pivotal trial—the manner in which the statement is presented is misleading. He said "*we have the ability*"—something unique to Tricida—"to submit our NDA with *just one pivotal trial*"—fewer trials than others need to submit with their NDAs. A reasonable investor would have interpreted Klaerner's words to imply that Tricida was uniquely able to submit the veverimer NDA with a single pivotal trial, which was a strength, improving the perceived likelihood of FDA approval. Accordingly, Klaerner's second statement also portrayed a Company risk profile quite different from the one that actually existed.

### 5. Defendants Falsely Represented the Anticipated Sample Size for the VALOR-CKD Trial to be 1,600 Patients

In Tricida's 2018 Form 10-K, the Registration Statement and Prospectus filed for the secondary offering, the 1Q19 10-Q, the 3Q19 10-Q, the 2019 10-K, and during the June 12, 2019 Goldman Sachs Global Healthcare Conference, Defendants repeated the false and misleading statement that the VALOR-CKD trial's finalized protocol included "an anticipated sample size of approximately 1,600 subjects." ¶¶70, 75, 78, 92, 97.

There is no dispute that in denying the NDA, the FDA found that the VALOR-CKD trial "is underpowered to detect the [predicted] effect size." ¶¶44, 72, 120. Tricida, however, publicly committed to "obtain[ing] the FDA's agreement and final[izing] the design of our confirmatory postmarketing trial, VALOR-CKD, and completely enroll[ing] … VALOR-CKD, prior to the submission of an NDA." ¶¶28, 72-73.

Tricida submitted its NDA for veverimer in August 2019, ¶35, and represented that "nearly 95%" of the "targeted sites [were] open for enrollment." Hemmendinger Decl., Ex. 3, at 10, ECF No. 78-3. By the time the NDA was submitted, however, the VALOR-CKD trial was not nearly "completely enrolled." CW1 was employed as a clinical trial assistant by Tricida from October 2018 through June 2019. His responsibilities included working with PRA Health Sciences to recruit patients for Tricida's clinical trial. ¶29. Clearly, CW1 was in a position to know how many patients Tricida needed to recruit and how many had already been recruited as that was his job. Tricida struggled to recruit patients and had not even recruited half of the necessary trial subjects and related target sites by June 2019, mere months before the planned NDA submission.[8] ¶¶29, 72. Klaerner was intimately aware of the under recruitment as evidenced by his "scream[ing]" at PRA for failing to recruit enough patients for the VALOR-CKD trial in June 2019. ¶¶29, 73. Therefore, Tricida prematurely submitted the NDA and misled investors that the VALOR-CKD trial was adequately enrolled as of August 2019.

Plus, Tricida either obtained FDA approval of the VALOR-CKD trial design but failed to adhere to the agreement, or never obtained such approval but hoped the FDA would be convinced

---

[8] And Tricida had begun enrolling the VALOR-CKD trial in the fourth quarter of 2018, when CW1 began working at Tricida. ¶29

after the fact. ¶30. Indeed, in its 2018 Form 10-K Tricida stated it had "multiple interactions with the FDA" regarding the VALOR-CKD trial and then represented that the trials would begin with "randomizing approximately 1,600 patients." Tellingly, Tricida did not say it reached agreement with the FDA on the trial design. Either way, Defendants lied to investors about the true anticipated number of randomized patients necessary for the VALOR-CKD trial to adequately confirm clinical efficacy. ¶¶72-73. If the FDA had approved the trial, then Tricida failed to live up to the agreement; or, no agreement was ever reached, which is why the FDA found that the VALOR-CKD trial was "underpowered."

Defendants make much ado about the distinction between trial *enrollment* and trial *randomization* numbers, *see* Defs' Br. 22, but Tricida explained in the June 28, 2018 IPO Prospectus that the Company would have to "enroll approximately 1,900 to 2,100 subjects in the run-in portion" of the VALOR-CKD trial "to randomize" 1,400 to 1,600 subjects. Hemmendinger Decl., Ex. 1, at 66, ECF No. 78-1 (ECF pagination). If enrolling 1,900 to 2,100 patients corresponds to randomizing 1,400 to 1,600 subjects, then enrolling 4,000 patients corresponds to randomizing roughly double the 1,600 subjects Tricida publicly stated. There is clear correlation between patients enrolled and subjects randomized that supports CW 1's statements and Plaintiff's claims. Defendants' argument ignores this correlation and the inferences that flow from it.

Defendants also baldly assert that Plaintiff's allegations amount to "second-guessing" Tricida's trial design and mere fraud by hindsight.[9] *See* Defs' Br. 21, 23. Of course, these

---

[9] Defendants also posit that Plaintiff's narrative that Tricida truthfully anticipated randomizing 1,400-1,600 subjects in June 2018, switched to an internal target of 4,000 subjects by March 2019 while struggling with enrollment, and then switched back to a 1,600-patient randomization target lacks merit. Defs' Br. 22-23. But this is not what the FAC alleges. In the June 2018 IPO, Tricida said it "*anticipate[d]* a sample size of 1,400 to 1,600 patients" but that it had to "obtain the FDA's agreement and finalize the design" of the trial. ¶28. It was *after* the June IPO that CW 1 began to work at Tricida, October 2018, and it is more than plausible that after meeting with the FDA, Tricida knew that it needed to recruit 4,000 patients to achieve the necessary randomization for the VALOR-CKD trials. In its year-end 2018 10-K, filed on March 29, 2019, Tricida does not say it "reach agreement with the FDA" on the patient size, merely that it had "interactions" with the FDA. It is certainly plausible, and reasonable, to infer that the FDA informed Tricida – after the June 2018 IPO - that it needed to recruit 4,000 patients to adequately power the study, so that by March 29, 2019, Tricida's statements were false and misleading.

mischaracterizations conveniently ignore the FAC's well-plead allegations. Plaintiff's contention is not that the 1,600 subject figure is false simply because the FDA found the VALOR-CKD trial to be underpowered. And Plaintiff does not assert that Tricida was wrong in determining that 1,600 randomized subjects was adequate to power the VALOR-CKD trial. Rather, Plaintiff's contention is that the 1,600 subject figure is false because, by March 2019 (when Defendants made the first challenged statements concerning the 1,600 subject figure in the 2018 10-K), Defendants had internally set a target of enrolling 4,000 patients, which corresponded to randomizing roughly double the 1,600 subjects stated.[10] ¶¶28, 72-73. This target was set after the June 2018 IPO disclosure and after Tricida's meeting with the FDA. Differences of opinion are nowhere to be found here. Plaintiff alleges that based on CW1's statements, Defendants misrepresented the anticipated enrollment and randomization numbers. That misrepresentation was material as the FDA rejected the NDA because the trial was underpowered.

Finally, Defendants attack the sufficiency of information provided to establish CW1's personal knowledge of the substance contained within his statements. *See* Defs' Br. 22. To satisfy the PSLRA's pleading requirements, a confidential witness "must be described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). To determine whether the complaint "provide[s] an adequate basis" for determining the witnesses have personal knowledge of the events they report, "we look to the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.* (citations and internal quotation marks omitted). The FAC easily establishes the basis

---

[10] Defendants also argue that because it is possible to adjust the power of a trial through changing inputs other than the number of randomized subjects, Plaintiff has somehow failed to connect the dots between VALOR-CKD's patient enrollment numbers and the FDA's conclusion that the trial was underpowered. Defs' Br. 24. These theoretical musings ignore the standard of review on a motion to dismiss, in which Plaintiff's allegations are accepted as true and theoretical alternatives on a motion to dismiss do not undermine the valid explanation alleged. Plus, if all that Tricida needed to do to in order to achieve a validly powered study was change the inputs, one would expect them to have done this.

for CW1's personal knowledge as CW1's job was completely focused on working with PRA, the contracted CRO, to open and approve global trial sites for VALOR-CKD, *i.e.*, the act of recruiting trial subjects. ¶29. Moreover, CW1 attended meetings with Klaerner and others where the subject was the progress (or lack thereof) of VALOR-CKD patient enrollment. ¶29.

Defendants do not assess the information about CW1 and assert that it fails to establish CW1's personal knowledge about Tricida's patient recruitment target for VALOR-CKD. Rather, Defendants merely suggest that CW1 could have provided additional information about "the origin of [the 4,000 patients] number, how or by whom it was calculated, by whom it was used, or for what purpose." Defs' Br. 22. This request for granularity misses the point: CW1 knew *how many* patients needed to be recruited and had not been as of June 2019. It was not his job to determine the number, just to help recruit patients to meet it. CW1's reliable statements, in conjunction with other well-plead allegations, establish the falsity of the identified statements concerning the anticipated 1,600 randomized subjects for VALOR-CKD.

### 6. Klaerner Made False and Misleading Statements Concerning the State of FDA Review and the FDA's Reasons for Evaluating the FDA Without Convening an Advisory Committee

Klaerner made two false and misleading statements during a call on May 7, 2020 about Tricida's interactions with the FDA at a "late-cycle meeting" held earlier that month. During the call, Klaerner said,

> In our late-cycle meeting with the FDA held in May 2020, the FDA indicated it currently does not plan to hold an AdCom to discuss veverimer due in part to the logistical challenges posed by COVID-19. In our late-cycle meeting with FDA, we took the opportunity to address outstanding review issues. We presented our data and rationale as to why we think we very much satisfied the requirements for initial approval …. while the FDA continues its review, we remain confident that our submission meets the standard for approval through the Accelerated Approval Program.

¶101.

The statement about the Company's interactions with the FDA and Tricida's future prospects portrayed a state of affairs very different from what actually existed. *Brody*, 280 F.3d at 1006. As revealed in Tricida's 2Q20 10-Q, filed August 6, 2020, the review issues raised by the

FDA during the May 2020 late-cycle meeting (which had been "raised in advance of the meeting") were the agency's "concerns related to the magnitude and durability of the treatment effect on the surrogate marker of serum bicarbonate demonstrated in the TRCA-301 and TRCA-301E trials and the applicability of data from the TRCA-301 and TRCA-301E trials to the U.S. population." ¶102. These issues were significant enough for Tricida to conclude that it was likely to receive a CRL for the veverimer NDA[11]. ¶102.

Yet on May 7, 2020, when Klaerner stated, "we took the opportunity to address outstanding review issues," he failed to reveal what those review issues were or the need to address them at all. Those review issues were the basis for the Company to conclude it would receive a CRL regarding its NDA, rendering Klaerner's statement that "we remain confident that our submission meets the standard for approval through the Accelerated Approval Program" false and misleading. ¶101. "[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that won't mislead investors, including disclosing adverse information that cuts against the positive information." *Khoja*, 899 F.3d at 1009 (alterations omitted); *see also Junge*, 2021 WL 1375960, at *1 ("[T]he amended complaint adequately alleges that Geron should have disclosed the bad news when it touted the good and that the failure to do so was misleading."). Klaener purported to inform investors what was discussed with the FDA about review issues to further along the NDA process —the good news—without also revealing the bad news: the FDA had "concerns" with Tricida's clinical data and the NDA. Given the FDA's reported concerns— which led Tricida to understand that it would receive a CRL—it was misleading to fail to reveal those concerns.[12] *See In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 811 (C.D. Cal. 2011) ("When the FDA tells a company about the problems with a product, and the company nonetheless

---

[11] Defendants' suggestion that Tricida came to the conclusion about receiving a CRL based on a July 15, 2020 letter from the FDA is meritless as, when it received the July 15 letter, Tricida admitted that it did "not specify the deficiencies identified by the FDA." ¶36.

[12] Indeed, Plaintiff's argument is not, as Defendants suggest, that Defendants failed to share the details of FDA communications between May 7, 2020 and August 6, 2020, *see* Defs' Br. 25-26, but that the August 6, 2020 statement reveals Klaerner made misleading statements on May 7, 2020 about what had transpired leading up to and during the late-cycle meeting. Defendants' reliance upon caselaw for the general proposition that a company need not disclose the details of each and every communication with the FDA is therefore inapposite.

continues to make confident statements about the product, courts have inferred scienter and falsity."). Moreover, the May 7, 2020, statement made no mention of the late-cycle meeting's discussion of the FDA's concerns that the TRCA-301/TRCA-301E trial data was not applicable to the U.S. population. As Plaintiff has established, this was an issue Defendants had been well aware of since at least June 2018, and it proved to be part of the FDA's basis for rejecting the veverimer NDA. ¶102. A reasonable investor would have understood Klaerner's May 7, 2020 statement to imply that veverimer's prospects for FDA approval were materially better than actually existed at the time.

The statement about the FDA's reasons for cancelling the AdCom is also materially misleading. It gave the misleading impression that the AdCom had been cancelled purely for reasons unrelated to the merits of the NDA submission. Klaerner's carefully chosen language— "due in part"—makes clear that there were other reasons for the FDA cancelling the AdCom, but he does not elaborate.[13] Again, the 2Q20 10-Q revealed that Tricida understood the review issues discussed at the May 2020 late-cycle meeting to be so significant that the FDA would likely issue a CRL. These significant deficiencies were the other—and as far as investors were concerned, more important—reasons why the FDA cancelled the AdCom: there were too many problems with the NDA to even warrant convening the AdCom. ¶102. Klaerner's statement concealed the real reason the AdCom had been cancelled, and in doing so falsely inflated veverimer's prospects for approval. *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 599 (N.D. Cal. 2019) ("Having touted the good news that supply disruptions were leading to increased prices and thus increased profits, McKesson had a duty to also disclose that some portion of its increased profits was actually due to far riskier and less sustainable unlawful agreements. And even if those unlawful agreements technically led to 'supply disruptions,' a reasonable investor would not interpret that phrase to encompass illegal market allocation agreements.").

---

[13] Defendants argue that Klaerner told the truth because "[t]he public record … shows that the FDA canceled or postponed many Advisory Committee meetings in the early months of the pandemic. Defs' Br. 18-19. The fact that the FDA may have cancelled other AdCom meetings early in the pandemic related to other companies' drug applications says nothing about why the FDA cancelled Tricida's AdCom.

### C. Defendants Knew or Recklessly Disregarded the Truth When Making the Alleged False and Misleading Statements

Plaintiff's allegations establish that Defendants knew the information necessary to cure the misleading nature of their statements at the time the statements were made. Defendants knew (and do not dispute that they knew) that a majority of the TRCA-301/TRCA-301E trial sites were in Eastern Europe yet stated only that trial sites were in "Europe." ¶56. Tricida's risk disclosures concerning the use of foreign clinical data and TRCA-301/TRCA-301E's majority enrollment outside the U.S. further demonstrate that Defendants' knew of the particular risks related to use of Eastern European trial sites to enroll CKD patients. ¶60. Defendants knew (and do not dispute that they knew) that the favorable effect seen in TRCA-301/TRCA-301E trial's results was disproportionately due to one high-enrolling clinical site, yet publicly labeled the study a "multicenter" trial without qualification. ¶57. They knew this information no later than June 5, 2018 when Tricida issued a press release discussing the TRCA-301 trial results. *See* ¶54. Moreover, FDA guidance on the weaknesses of single-trial NDAs and the meaning of "multicenter," as well as scientific literature on the differences in the Eastern European nephrology community, are well established. ¶¶56-57, 82.

Defendants knew that Tricida had publicly committed to reaching agreement with the FDA on the protocol for, and nearly fully enrolling, the postmarketing confirmatory VALOR-CKD trial before submitting an NDA in the second half of 2019, and, by October 2018 (when CW1 began working at Tricida), Tricida had set an enrollment target of 4,000 patients for VALOR-CKD. ¶¶29, 72-73. Indeed, Klaerner personally attended meetings discussing the progress of patient enrollment in June 2019 and "screamed" at PRA employees for the slow pace of recruitment. ¶¶29, 73. Yet Defendants represented in the 2018 10-K, secondary offering prospectus, and at the Goldman Sachs Global Healthcare Conference that they anticipated randomizing only 1,600 subjects. ¶¶71, 78.

Klaerner knew that the veverimer NDA faced significant obstacles to FDA approval—including the diminished credibility of the TRCA-301/TRCA-301E trial and the unproven clinical relevance of the chosen surrogate endpoint—yet represented that, given the progress made along

the ADA, the remaining obstacles to approval were few. ¶¶78-82. Klaerner also knew that an NDA supported by a single pivotal trial is subject to enhanced scrutiny and that veverimer's sole pivotal trial suffered from significant credibility-diminishing issues, but he represented that it was an accomplishment to be in a position to submit an NDA with the support of only a single pivotal trial. ¶¶78, 83. Klaerner is an experienced clinical stage pharmaceutical company executive. ¶82. He founded two clinical stage companies prior to Tricida (Ilpysa and Reylpsa) and taken "an idea … to a commercial product" now "3 times" including Tricida. ¶82. He also has a Ph.D. in polymer and organic chemistry and was an in-house scientist before founding several, companies. ¶124. In his own words, he is "very passionate about polymer chemistry," and he demonstrates himself to be intimately familiar with the design and functionality of veverimer. ¶124.

Klaerner knew that the FDA had articulated concerns related to the magnitude and durability of the treatment effect seen in TRCA-301/TRCA-301E and the applicability of the trial's data to the U.S. population before and during the May 2020 late-cycle meeting with the FDA. ¶¶102-03. He also knew that these review issues were significant enough that Tricida believed the FDA would issue a CRL. ¶¶102-03. Yet, Klaerner stated on May 7, 2020, that the previously scheduled advisory committee had been canceled due to logistical problems posed by COVID-19, and that he and Tricida "took the opportunity to address outstanding review issues" but "remain confident" that the NDA meets the standard for approval. ¶¶102-03.

Even without more, the sets forth classic evidence of scienter. Defendants "published statements when they knew facts suggesting the statements were in accurate. *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1132–34 (N.D. Cal. 2020); *see also In re CenturyLink Sales Practices and Sec. Litig.*, MDL No. 17-2795, 2019 WL 3431600, at *10 (D. Minn. July 30, 2019) ("One classic fact pattern giving rise to a strong inference of scienter is that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate.") (quotation marks omitted).

But there is more. Veverimer was Tricida's only drug candidate, and Klaerner was involved in and aware of far more than just the core operations of the Company.[14] ¶124.

Also, Tricida would have run out of money before even submitting the NDA without the cash raised in the June 28, 2018 IPO, and Tricida would have run out of money before being able to commercialize veverimer without the cash raised in the April 3-8, 2019 secondary offering. ¶¶33, 123. Tricida knew of the significant undisclosed risks to veverimer's approval when it sold these shares, and therefore knew that it was selling shares at an inflated price. ¶123. Klaerner similarly sold nearly $10 million in shares of Tricida stock since the IPO while making only a single purchase of 15,790 shares for $300,010 in that same window. ¶122.[15] Both Klaerner and Tricida itself engaged in insider trades, beginning with the IPO, by taking advantage of what they knew to be an inflated stock price at times when Tricida needed the money to be able to shepherd veverimer through FDA approval and commercialization. ¶¶122-23.

The most plausible inference drawn from these particularized facts is that Defendants knew of the shortcomings of the data supporting the NDA but concealed those shortcomings and sold investors on the upside to investing in the Company (even to the point of misleading investors) in

---

[14] The day-to-day operations at the Company leading up to and throughout the Class Period focused solely on shepherding veverimer through clinical trials and FDA approval to commercialization. ¶124. The Company's entire future hung on the success of bringing veverimer to market. ¶124, *see* MannKind, 835 F. Supp. 2d at 812 ("FDA approval was the sina qua non for MannKind Corporation's success…."). Moreover, Tricida was entirely Klaerner's project. ¶124. He started it in 2013 in his living room and involved himself in even smaller details of the Company's day-to-day. ¶124-25. He participated in meetings with lower-level employees, such as CW1, focused on individual components of the veverimer NDA preparation; he attended meetings with and inspections by the FDA and communicated with the FDA directly; and he even involved himself in deciding where the launch party would be for veverimer. ¶125.

[15] The fact that most of these trades occurred as part of a 10b5-1 plan is immaterial because the plan itself was implemented amidst Defendants' ongoing securities fraud, which began as of the IPO. ¶122; *see Azar v. Yelp*, No. 18-cv-400-EMC, 2018 WL 6182756, at *18 (N.D. Cal. Nov. 27, 2018) ("SEC regulations recognize 'a written plan for trading securities' as an affirmative defense to insider trading allegations only if the insider adopted the plan '[b]efore becoming aware of the [material nonpublic] information.'"). Indeed, Tricida made materially false statements about the TRCA-301 trial before shares were even available to the investing public. ¶122. Moreover, even if it were applicable to Klaerner's trades, "the use of the 10b5-1 plan is an affirmative defense that does not rebut well-pled allegations of scienter at the pleading stage." *In re Apple, Inc. Sec. Litig.*, No. 19-cv-2033-YGR, 2020 WL 2857397, at *22 n.13 (N.D. Cal. June 2, 2020).

the hope that they could fix enough issues before submitting the NDA for it to still receive FDA approval. Tricida needed to raise significant funds (over $255 million dollars) in the IPO to get through the clinical trials necessary for submitting an NDA, but even that was barely enough for the shorter timeline of the ADA (which was why it had been chosen). Tricida also needed to raise another $230+ million to be able to commercialize veverimer—hence the timing of the secondary offering. Defendants even likely anticipated by the secondary offering that the NDA was unlikely to be approved the first go-round, and additional cash would be needed to address the issues highlighted in a CRL. It was all a calculated risk, but it did not pan out as hoped.[16] *Cf. Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 709 (9th Cir. 2016) ("'[Plaintiff's] theory of fraud is that Defendants intentionally withheld information material to the market's assessment of whether and when the FDA would likely approve lorcaserin.' It is the failure to disclose 'issues' and 'concerns' with the Rat Study and the FDA's interest in the outcome of those studies – not who was ultimately right about the underlying science – that matters."); *Amylin*, 2003 WL 21500525, at *5 ("Based on the facts alleged by Plaintiffs, the most plausible inference to be drawn is that Amylin knew that there may be a problem with the methodology used in conjunction with the Phase III trials but took the calculated risk of continuing the trials and application process as originally planned. There is nothing unlawful about taking a calculated risk. However, if, as Plaintiffs allege, Defendants misled Plaintiffs about such risk by making assurances regarding the completeness of the data and the likelihood of FDA approval, Defendants may be held liable."). Along the way, Klaerner took advantage of the inflated stock price for himself, netting nearly $10 million in sales. *See Junge*, 2021 WL 1375960, at *7 ("On balance, Geron's close monitoring of the data and its executive's stock sales satisfy the heightened pleading standard for scienter.").

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied. If, however, the Court finds Plaintiff's allegations to be insufficient to state a claim for relief, Plaintiff respectfully requests leave to amend his allegations to cure any identified deficiencies.

---

[16] By comparison, Defendants' alternative theories of motivation (mischaracterized as Plaintiff's theories of the case) are completely implausible. *See* Defs' Br. 27-28, 31.

August 16, 2021

Respectfully submitted,

/s/ Jeffrey C. Block
Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (SBN 271217)
Michael D. Gaines (*pro hac vice*)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jeff@blockleviton.com
jake@blockleviton.com
michael@blockleviton.com

Whitney E. Street (SBN 223870)
**BLOCK & LEVITON LLP**
100 Pine Street, Suite 1250
San Francisco, CA 94111
whitney@blockleviton.com