Sara B. Brody (SBN 130222)
sbrody@sidley.com
Sarah A. Hemmendinger (SBN 298659)
shemmendinger@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone:  415 772 1279

Matthew J. Dolan (SBN 291150)
mdolan@sidley.com
SIDLEY AUSTIN LLP
1001 Page Mill Road, Building 1
Palo Alto, CA 94304
Telephone: 650 565 7106

Robin E. Wechkin (admitted *pro hac vice*)
rwechkin@sidley.com
SIDLEY AUSTIN LLP
8426 316th Place Southeast
Issaquah, WA 98027
Telephone: 415 439 1799

*Attorneys for Defendants*
*Tricida, Inc. and Gerrit Klaerner*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL PARDI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TRICIDA, INC., and GERRIT KLAERNER,<br><br>Defendants. | Case No.:  5:21-cv-00076-LHK<br><br>CLASS ACTION<br><br>**DEFENDANTS TRICIDA, INC. AND GERRIT KLAERNER'S REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Hon. Lucy H. Koh<br><br>Date:  December 9, 2021<br>Time: 1:30 p.m.<br>Courtroom 8, 4th Floor |

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...................................................................................................................1

II.    DISCUSSION.......................................................................................................................2

      A.     Plaintiff Fails to Plead Facts Showing that Tricida's
           Statements Regarding Trial Sites in "Europe"
           Were Materially False or Misleading ...............................................................2

      B.     Plaintiff Fails to Plead Facts Showing that Tricida's
           Risk Disclosures About Foreign Trial Sites
           Were Materially False or Misleading ...............................................................5

      C.     Plaintiff Fails to Plead Facts Showing that Tricida's
           References to "Multicenter" Phase 3 Trials
           Were Materially False or Misleading ...............................................................5

      D.     Plaintiff Fails to Plead Facts Showing That Tricida's
           June 12, 2019 References to the Accelerated Approval
           Program Were Materially False or Misleading..................................................6

      E.     Plaintiff Fails to Plead Facts Showing That Statements
           Regarding the Design of VALOR-CKD
           Were Materially False or Misleading ...............................................................8

      F.     Plaintiff Fails to Plead Facts Showing That Tricida's
           May 7, 2020 Discussion of the May 1, 2020 Late-Cycle
           Meeting Were Materially False or Misleading ................................................11

      G.     Plaintiff Fails to Plead Facts Creating The Required Cogent
           and Compelling Inference of Intentional Fraud...............................................13

III.   CONCLUSION...................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abely v. Aeterna Zentaris Inc.*,
 2013 WL 2399869 (S.D.N.Y. May 29, 2013) ...............................................................................3

*Alexander v. Citigroup Glob. Mkts, Inc.*,
 2013 WL 12077818 (C.D. Cal. Apr. 10, 2013) ............................................................................4

*In re Amylin Pharm. Sec. Litig.*,
 2003 WL 21500525 (S.D. Cal. May 1, 2003).............................................................................15

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
 980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd,* 566 F. App'x 93 (2d Cir. 2014).............................4

*City of Royal Oak Ret. Sys. v. Juniper Networks*
 880 F. Supp. 2d 1045 (N.D. Cal. 2012) ......................................................................................5

*In re IsoRay Inc. Sec. Litig.*,
 189 F. Supp. 3d 1057 (E.D. Wash. 2016) ...................................................................................3

*In re Keyspan Corp. Sec. Litig.*,
 383 F. Supp. 2d 358 (E.D.N.Y. 2003) ........................................................................................4

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
 774 F.3d 598 (9th Cir. 2014) ......................................................................................................4

*In re Rigel Pharms., Inc. Sec. Litig.*,
 697 F.3d 869 (9th Cir. 2012) ......................................................................................................4

*Schueneman v. Arena Pharms., Inc.*,
 840 F.3d 698 (9th Cir. 2016) ............................................................................................... 14, 15

*Zucco Partners, LLC v. Digimarc Corp.*,
 552 F.3d 981 (9th Cir. 2009) ......................................................................................................9

OTHER AUTHORITIES

U.S. Department of Health and Human Services, Food and Drug Administration, *Special Protocol
 Assessment Guidance for Industry*, at 1 (April 2018)
 https://www.fda.gov/media/97618/download........................................................................10

ii

## I.     INTRODUCTION

Confronted with the fact that Tricida disclosed virtually all of the information Plaintiff alleges it concealed, Plaintiff retreats to assigning unsupported and idiosyncratic meanings to the words of the challenged statements.  Plaintiff argues that a reference to clinical trial sites in "Europe" signified to investors that sites were located in Western Europe.  Plaintiff asserts that the word "multicenter" meant that no trial site had disproportionate enrollment.  And Plaintiff contends that an objective report of clinical trial results created the "impression" that a particular regulatory pathway was "simpler and easier" than alternative routes to approval.  Plaintiff cites no facts supporting his contention that the plain words of Tricida's statements conveyed these bizarre meanings to investors—and there are none.

But even if Plaintiff's meanings were supportable, this could not change the reality that the purportedly concealed facts were revealed.  The fact that Tricida's Phase 3 clinical trial sites were located in Eastern Europe was widely known.  Among other things, it was set forth in medical publications, available free of charge, to which Tricida repeatedly referred investors.  Information about the challenges faced by drug sponsors proceeding along the FDA's Accelerated Approval pathway was also readily available, both through Tricida's public statements and in FDA guidance documents.

With respect to the remaining challenged statements, Plaintiff's opposition brief reveals that his claims are premised on his misunderstanding (if not ignorance) of clinical trial and FDA approval fundamentals.  Plaintiff's claim that Tricida lied about its 1,600-patient randomization target in VALOR-CKD depends on his conflation of clinical trial *recruitment* with clinical trial *enrollment*, which are two distinct phases in the process.  Meanwhile, Plaintiff's claim that Tricida hid the FDA's "concerns" in discussing the May 1, 2020 late-cycle meeting rests on his misunderstanding of the term "review issues."  Because each of Plaintiff's attacks on Tricida's statements is refuted by materials properly before the Court, is grounded in demonstrable error, or both, Plaintiff has failed to plead falsity with the particularity required by the PSLRA.

As to scienter, Plaintiff simply refuses to address any of Defendants' arguments.  Plaintiff cannot create a strong inference of deliberate fraud by ignoring the facts and authorities arrayed

1

against him.  Defendants demonstrated in their opening brief that the facts alleged support the benign inference that Tricida strove in earnest to obtain FDA approval and to keep investors appropriately apprised of its progress in doing so.  The contrary inference Plaintiff asks the Court to draw—that Tricida believed its NDA was seriously flawed but nevertheless devoted enormous resources to commercialization—is not even plausible, let alone cogent and compelling.  The Court should dismiss Plaintiff's claims in their entirety.

## II.      DISCUSSION

### A.      Plaintiff Fails to Plead Facts Showing that Tricida's Statements Regarding Trial Sites in "Europe" Were Materially False or Misleading

In their opening brief, Defendants showed why Plaintiff's claim that Tricida concealed the location of Phase 3 sites was dead on arrival.  The location of the trial sites was repeatedly *disclosed*.  Even without such disclosures, moreover, the challenged statement was demonstrably true:  The Phase 3 sites were indisputably located "in the United States and Europe."  Mot. at 8-10.

Plaintiff responds that the statement was misleading because investors would have understood the term "Europe" to mean "both Eastern Europe and Western Europe."  Opp. at 11. Plaintiff advances no facts to support that assertion.  A reference to "Europe" does not suggest inclusion of both Eastern and Western Europe any more than it suggests inclusion of both Northern and Southern Europe.  At the very most, a reference to "Europe" without the adjective "Eastern" is incomplete.  And Section 10(b) plainly prohibits only false or misleading statements—not incomplete statements.  Mot. at 10-11 (citing authorities).

Plaintiff also contends—in the face of a factual record plainly showing otherwise—that the location of the trial sites was not *sufficiently* disclosed.  Because Plaintiff cannot dispute that the location of the sites appeared in two articles in *The Lancet* and on a government website, Plaintiff argues that these publications were not widely available to investors and therefore count for nothing. Opp. at 9.  This is plainly wrong.  Tricida did not leave it to investors to find the articles in *The Lancet*—a leading medical journal—on their own.  Tricida repeatedly referred investors to those articles in earnings calls and investor presentations.  Mot. at 9; Reply Ex. 1 at 6  ("Next I would like to highlight the publication of our Phase III [veverimer] clinical trial results in *The*

2

*Lancet*, a leading independent general medical journal. This is an important milestone for Tricida . . .").[1] Tricida also included the purportedly omitted information—the location of the trial sites—in an SEC filing. On January 13, 2020, Tricida filed a Form 8-K attaching materials used at an investor presentation; those materials included an image from the *Lancet* articles that identified multiple Eastern European countries as sites in the TRCA-301 and 301E trials. Reply Ex. 2 at 20.

Investors were also able to access information about the trial site locations in *The Lancet* itself. Plaintiff repeatedly describes *The Lancet* as a "paid-subscription-based medical science journal," Opp. at 9, but the abstracts of the two articles—which included trial site locations—were in front of the paywall. A free abstract of the March 8, 2019 *Lancet* article stated that the TRCA-301 study was conducted at "37 sites . . . in Bulgaria, Croatia, Georgia, Hungary, Serbia, Slovenia, Ukraine, and the USA." Reply Ex. 3 at 1. Similarly, a free abstract of the June 24, 2019 *Lancet* article disclosed that the TRCA-301E study was conducted at "29 sites . . . in seven countries (Bulgaria, Georgia, Hungary, Serbia, Slovenia, Ukraine, and the USA)." Reply Ex. 4 at 1. Clinicaltrials.gov also provided ready access to Tricida's Phase 3 trial site locations. Mot. at 9-10. Contrary to Plaintiff's assertion, this website is not an obscure source but a federally mandated clearinghouse for publication of clinical trial information. *E.g.*, *Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, at *13, 22 (S.D.N.Y. May 29, 2013) (noting that "federal law requires the publication and filing of" information on clinicaltrials.gov, and considering information from clinicaltrials.gov "to compare the trials' publicly disclosed descriptions with the alleged misstatements and omissions asserted by plaintiff").[2]

Because information about the location of the Phase 3 trial sites was publicly available— and because Tricida repeatedly referred investors to it—Tricida had no obligation to repeat that

---

[1] "Reply Ex. _" citations in this brief refer to the exhibits to the Reply Declaration of Sarah Hemmendinger, filed concurrently with this brief. "Ex. _" citations refer to the exhibits filed in connection with Defendants' opening brief.

[2] *In re IsoRay Inc. Securities Litigation,* which Plaintiff cites, does not suggest that the Court should ignore the *Lancet* articles or clinicaltrials.gov. 189 F. Supp. 3d 1057, 1073-74 (E.D. Wash. 2016); Opp. at 9. The court noted in that case that the journal article at issue was available only behind a paywall, and that the free abstract may not have sufficiently disclosed the allegedly omitted information in the absence of the full article. *Id.* at 1074. Here, by contrast, the two free abstracts contained exactly the information Plaintiff claims was omitted: the list of countries in which Tricida's Phase 3 trials took place.

information in additional SEC filings.  In their opening brief, Defendants cited decisions holding that the "securities laws do not require disclosure of information that is readily available in the public domain."  *Alexander v. Citigroup Glob. Mkts, Inc*., 2013 WL 12077818, at \*5 (C.D. Cal. Apr. 10, 2013); *see also In re Bank of Am. AIG Disclosure Sec. Litig*., 980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd,* 566 F. App'x 93 (2d Cir. 2014); Mot. at 8 & n.4.  Plaintiff ignores these authorities in his opposition, but they are directly on point.  In *Bank of America*, the plaintiffs alleged that the company had failed to disclose its exposure to anticipated litigation; the court dismissed that claim because information about the litigation was available through media sources. 980 F. Supp. 2d at 576-77.  The court explained that "[r]easonable investors thus had ready access to the very information that plaintiffs assert should have been disclosed and the defendants are not liable for failing to reiterate that information."  *Id.*  The facts here are even starker than those in *Bank of America*:  Investors had "ready access" to the purportedly concealed information through multiple widely-used sources, including one of Tricida's SEC filings.  This is fatal.  *E.g.*, *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) (affirming dismissal where defendant disclosed purportedly concealed information in its public statements); *In re Keyspan Corp. Sec. Litig.,* 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("dismissal is appropriate where the complaint is premised on nondisclosure of information that was actually disclosed").[3]

Unable to avoid the fact that the allegedly omitted information was disclosed, Plaintiff argues that Tricida has launched a premature "truth-on-the-market" defense.  Opp. at 8-10.  Plaintiff is again wrong.  Defendants have responded to Plaintiff's claim that Tricida concealed information about the location of trial sites by showing that this information was not concealed but disclosed. This is different from a "truth-on-the-market" defense, in which a defendant seeks to show that

---

[3] Plaintiff argues that *Apollo* and *Keyspan* are distinguishable because the claims in those cases were purportedly premised on "plain omissions of information" as opposed to "affirmatively misleading statements."  Opp. at 10.  This is no distinction at all.  Section 10(b) does not impose liability for "plain omissions of information."  An omission is actionable only if it renders a *statement* materially false or misleading.  *E.g.*, *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012).  Plaintiff also argues that these cases are distinguishable because the information at issue was contained in the defendants' SEC filings as opposed to third-party sources. That distinction fails too.  The courts focused on whether or not the information was "readily available to [defendant's] investors" and did not suggest that their analysis was limited to SEC filings.  *Apollo*, 774 F.3d at 607.  In this case, of course, information about the location of the Phase 3 trial sites was "readily available" through multiple sources.

4

concededly false or misleading statements were neutralized by corrective information from other sources—which compromises a plaintiff's ability to demonstrate materiality and reliance. This Court has rejected precisely the same "truth-on-the-market" recharacterization Plaintiff attempts here, explaining that "truth-on-the-market" is "inapposite" where "Defendants argue that they disclosed all required information, not that they failed to make required disclosures but should be excused because other sources have already made the same information available." *City of Royal Oak Ret. Sys. v. Juniper Networks*, 880 F. Supp. 2d 1045, 1066 n.6 (N.D. Cal. 2012). That reasoning applies with equal force here.

**B.      Plaintiff Fails to Plead Facts Showing that Tricida's Risk Disclosures About Foreign Trial Sites Were Materially False or Misleading**

Plaintiff's own allegations show that Tricida specifically cautioned investors that it "conducted the TRCA-301 trial and [is] conducting the TRCA-301E trial with majority enrollment outside the United States," and that the "FDA may not accept such foreign clinical data." ¶ 60. Plaintiff alleges that these risk disclosures were themselves misleading because Tricida purportedly "omitted to reveal" that its Phase 3 trials were "conducted using a patient population mostly from Eastern Europe." *Id.* But as just shown, the allegedly concealed information was in fact disclosed and widely available.

Plaintiff responds that even if investors knew that a majority of Phase 3 *sites* were in Eastern Europe, they did not know that a majority of the *patient*s came from Eastern Europe. Opp. at 11-12. This is a non-starter. In the very statement Plaintiff challenges, Tricida told investors that its trials had "majority enrollment outside the United States." ¶ 60. Plaintiff has not pled facts showing that this statement was false or misleading.

**C.      Plaintiff Fails to Plead Facts Showing that Tricida's References to "Multicenter" Phase 3 Trials Were Materially False or Misleading**

Defendants showed in their opening brief why Plaintiff's attack on the term "multicenter" fails. Tricida's statement that it conducted "multicenter" Phase 3 trials was demonstrably true, and Plaintiff's suggestion that the Company had a duty to disclose precise enrollment figures at each site is contrary to law. Mot. at 12-13. Plaintiff's claim as a whole, moreover, is based entirely on

5

hindsight:  Plaintiff has simply projected later FDA activity back onto the time of the challenged statements.  *Id.*

Plaintiff responds by arguing that "multicenter" is a term of art, and that investors would understand it to mean "a study across multiple trial sites 'in which (1) no single study site provided an unusually large fraction of the patients and (2) no single investigator or site was disproportionately responsible for the favorable effect seen.'"  Opp. at 12-13.  This is sheer invention.  As with "Europe," Plaintiff is impermissibly substituting a self-serving and idiosyncratic reading for the word actually used in the challenged statement.  Plaintiff cites no facts suggesting that investors understood "multicenter" to mean anything other than "multiple centers."

Meanwhile, sources properly before the Court show that the FDA *has* defined the term "multicenter"—but the FDA's definition utterly belies Plaintiff's "term of art" contention.  The FDA defines "multicenter trial" as "[a] clinical trial conducted according to a single protocol but at more than one site, and, therefore, carried out by more than one investigator."  Reply Ex. 5, Glossary at 3.  Likewise, the National Institutes of Health define a "multicenter study" as "a clinical trial that is carried out at more than one medical institution."  Reply Ex. 6.  To the extent that "multicenter" is a "term of art" in the clinical trial context, its meaning completely aligns with its common meaning:  more than one center used in a trial.

Plaintiff cites no contrary definition; Plaintiff simply cites his own allegations.  Opp. at 13 (citing ¶ 57).  In the complaint, Plaintiff referred to a "Guidance for Industry" document in which the FDA stated that *one* characteristic that *could* make a single Phase 3 trial capable of supporting efficacy is the lack of disproportionate enrollment or effect from a particular site.  ¶ 57; Reply Ex. 7 at 13.  But that is not a definition of "multicenter":  It is one point of guidance for companies considering the number of Phase 3 trials to conduct before submitting an NDA.  Plaintiff's contention that Tricida's use of "multicenter" was misleading is baseless, and flatly contradicted by the very regulatory authorities on which Plaintiff purports to rely.

 **D.**  **Plaintiff Fails to Plead Facts Showing That Tricida's June 12, 2019 References to the Accelerated Approval Program Were Materially False or Misleading**

In their opening brief, Defendants discussed the fatal weakness in Plaintiff's attack on

6

Klaerner's June 12, 2019 statements about veverimer's progress along the Accelerated Approval pathway. Plaintiff alleges that Klaerner presented that pathway as "simpler and easier" than other routes to FDA approval—but "simpler and easier" are Plaintiff's words, not Klaerner's. Meanwhile, both Tricida's own disclosures and publicly-available FDA materials described the Accelerated Approval Program in detail, including its risks and drawbacks. Mot. at 14.

In response, Plaintiff concedes that Klaerner's statements were true but argues that they created misleading "impressions." Here again, Plaintiff asks the Court to look not at the text of the challenged statements but instead at Plaintiff's self-serving assertions about what investors would have drawn from the words Tricida used. Plaintiff's arguments stretch credulity.

With no support, Plaintiff contends that when Klaerner truthfully reported that the TRCA-301E extension trial provided evidence of clinical benefit, this "assured" investors that Tricida would succeed in demonstrating the necessary surrogate effect, and further "assured" them that veverimer had "excellent prospects" for FDA approval. Opp. at 14-15. But accurately reporting clinical trial results does not "assure" the market of anything beyond the results themselves—not what the outcome of other trials may be, and certainly not how the FDA will interpret trial results.

Plaintiff also attacks Klaerner's statement that "[w]e have the ability to submit our NDA with just one pivotal trial that shows surrogate effect, and we've completed that." ¶ 78. Again, Plaintiff concedes that the statement was true but argues that investors would be left with the "impression" that Tricida was "uniquely able to submit the veverimer NDA with a single pivotal trial, which was a strength, improving the perceived likelihood of FDA approval." Opp. at 15. But Klaerner said nothing of the sort in the challenged statements. He neither said nor implied that Tricida was "unique" in using the Accelerated Approval pathway, and said nothing at all about approval—only that Tricida had met the criteria for submitting an NDA. Under Plaintiff's tortured reading of Klaerner's statements, no pharmaceutical developer could report accurate clinical trial results or regulatory developments without opening itself up to unsupported fraud claims based on a disappointed investor's purported "impressions." That is not the law.

### E.   Plaintiff Fails to Plead Facts Showing That Statements Regarding the Design of VALOR-CKD Were Materially False or Misleading

In the opening brief, Defendants identified multiple defects in Plaintiff's claim that the VALOR-CKD trial was under-enrolled and that Tricida concealed this purported fact. This claim is based on a misunderstanding of the difference between enrollment and randomization, on the account of an unreliable confidential witness, and on both hindsight and a transparently implausible narrative about purportedly shifting internal targets. Mot. at 15-18. Plaintiff's opposition confirms and underscores these fatal defects.

With respect to the number of patients at issue, Plaintiff acknowledges that Tricida consistently told investors that it anticipated randomizing between 1,400 and 1,600 patients in VALOR-CKD. With no factual support, Plaintiff now posits that at some point between the June 2018 IPO and March 29, 2019, Tricida became aware through communications with the FDA that "it needed to recruit 4,000 patients to achieve the necessary randomization for the VALOR-CKD trials." Opp. at 17 n.9. According to Plaintiff, this made Tricida's subsequent references to a 1,600-patient randomization target false because the Company did not disclose the "true anticipated number of randomized patients necessary for the VALOR-CKD trial to adequately confirm clinical efficacy." *Id.* at 17.

By spelling out this narrative in his brief, Plaintiff has helpfully simplified the issues—and revealed even more clearly that his fraud claim is built on a fundamental misunderstanding of clinical trial enrollment. Plaintiff explains in his brief that the 4,000-patient figure on which he relies is a *recruitment* target—not an enrollment or randomization target. Opp. at 17 n.9; *see generally id.* at 16-19. Recruitment is very different from enrollment and randomization. The population in a clinical trial undergoes a funneling effect. At the broadest point of the funnel is recruitment, in which investigators identify patients who *may* meet the trial's eligibility criteria. Reply Ex. 5, Glossary at 5. After patients are recruited, they are screened to determine whether they in fact meet those criteria. *Id.* Of course, not all patients who are recruited are ultimately deemed eligible. Those who are eligible are enrolled. In some study designs, all enrolled subjects are randomized, *i.e.*, assigned to treatment or control arms. In other designs—including the design

8

used for VALOR-CKD—enrolled patients are further winnowed before randomization occurs. Tricida disclosed in its IPO prospectus that it anticipated that "the VALOR-CKD trial will enroll 1,900 to 2,100 subjects in the run-in portion of the trial to randomize 1,400 to 1,600 subjects." Ex. 1 at 116.

By making clear that he is alleging that Tricida had a 4,000 patient *recruitment* target, Plaintiff entirely undermines his claim that statements regarding *randomization* of 1,600 patients were false or misleading. The two numbers are actually in accord. A recruitment goal of 4,000 patients at the top of the funnel is consistent with an enrollment goal of 1,900 to 2,100 patients and a randomization target of 1,600—the figures Tricida reported to investors.[4]

Plaintiff's attempts to bolster CW1's credibility cannot solve this fatal numbers problem; indeed, it puts the problem into high relief. CW1 is the source of Plaintiff's 4,000-patient allegation, and Plaintiff now emphasizes that CW1's job as a "Clinical Trial Assistant" was in recruitment. Plaintiff notes that CW1 worked with a contract research organization to "recruit patients for Tricida's clinical trial," and that CW1 "was in a position to know how many patients Tricida needed to recruit and how many had already been recruited." Opp. at 16. CW1's job was "completely focused" on "the act of recruiting trial subjects." *Id.* at 19. Plaintiff's defense of CW1 actually makes Defendants' point. CW1's "complete focus" on recruitment shows that this low-level employee was not knowledgeable about enrollment, let alone randomization—which is the subject of the challenged statement.[5]

---

[4] At times, Plaintiff appears to *equate* the 4,000 patient recruitment target with "enrolling 4,000 patients." *Compare* Opp. at 17 n.9 ("Tricida knew that it needed to recruit 4,000 patients") *with* Opp. at 18 ("Defendants had internally set a target of enrolling 4,000 patients"). This is nonsensical. As discussed, recruitment and enrollment are distinct. Plaintiff cannot seriously contend that the recruitment and enrollment targets were both 4,000 patients.

[5] Case law Plaintiff himself cites underscores CW1's unreliability on matters of enrollment and randomization. In determining whether Section 10(b) plaintiffs have adequately alleged that a confidential witness has personal knowledge of the information attributed to him or her, courts look to "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged . . . the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." Opp. at 18 (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009)). CW1 flunks all of these criteria. CW1's purported account is not corroborated, not detailed on the subject of recruitment (let alone enrollment or randomization) and not plausible, coherent or reliable, given the "complete focus" of CW1's job on a subject distinct from that at issue in the challenged statement.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT: CASE NO. 5:21-CV-00076-LHK

Plaintiff's contention that *the FDA* required Tricida to adopt a 4,000-patient target is similarly based on misunderstanding, willful or otherwise. Plaintiff argues that Tricida committed to obtaining FDA approval of VALOR-CKD's trial design and "completely enrolling" the trial before submitting its NDA. Opp. at 16-17. Because VALOR-CKD was not completely enrolled at the time of the NDA submission, Plaintiff speculates that Tricida must either have failed to reach agreement with the FDA on trial design or chosen not to adhere to the agreed design. That in turn, Plaintiff posits, ultimately led the FDA to conclude that VALOR-CKD was "underpowered." *Id.*

None of this unsupported speculation relates to Tricida's statement that it anticipated randomizing 1,600 patients, let alone shows that the statement was false or misleading. Most fundamentally, Plaintiff misunderstands the nature of the FDA "agreement" Tricida sought and obtained. In its IPO offering documents, Tricida told investors that it needed to "obtain the FDA's agreement and finalize the design of our confirmatory postmarketing trial, VALOR-CKD, and completely enroll or nearly completely enroll our confirmatory postmarketing trial, VALOR-CKD, *prior to the submission of an NDA*." Ex. 1 at 39-40 (emphasis added). Tricida sought "agreement," in other words, on the criteria it needed to satisfy to file an NDA that could be *accepted for review*. *Id.* at 39 ("agreement with the FDA . . . is still needed to support FDA's acceptance of the NDA submission for review"). By contrast, Tricida did *not* seek approval of trial design. In certain instances, drug sponsors may indeed ask for FDA approval of trial design; such approval leads to a Special Protocol Assessment, in which the FDA agrees that certain elements of a protocol design could support approval of the drug.[6] Plaintiff does not and cannot allege that Tricida was proceeding under a Special Protocol Assessment. The agreement at issue here related to the number of VALOR-CKD patients the FDA required to be enrolled *at the time Tricida filed the NDA*—not to the total number of patients to be enrolled or randomized. As Tricida announced in November 2019, the FDA accepted the NDA for filing—meaning that Tricida had enrolled enough patients up to that point to satisfy the FDA's filing criteria. Ex. 3 at 4. This is entirely unrelated to total enrollment or randomization targets, and similarly unrelated to the powering of the VALOR-

---

[6] *See e.g.*, U.S. Department of Health and Human Services, Food and Drug Administration, *Special Protocol Assessment Guidance for Industry*, at 1 (April 2018) https://www.fda.gov/media/97618/download.

CKD trial.

This touches on the final defect in Plaintiff's claim. In his opposition, as in the complaint, Plaintiff misunderstands the statistics related to powering a clinical trial. Tricida explained in its opening brief that the FDA's February 2021 statement that VALOR-CKD was "underpowered" does not equate to a conclusion that the trial was "under-enrolled." Mot. at 17-18. Multiple factors are relevant to the powering calculation; the number of randomized subjects is only one such factor. *Id.* Plaintiff labels this point "theoretical musings" and argues that "if all Tricida needed to do in order to achieve a validly powered study was change the inputs, one would expect them to have done this." Opp. at 18 n.10. But there is nothing "theoretical" about this distinction: Tricida amended the VALOR-CKD trial protocol in late 2020 in a way that changed the power of the study without increasing the number of randomized patients above Tricida's original (and consistent) figure of 1,600. Mot. at 18; Ex. 17 at 2. Plaintiff cannot plead fraud with the particularity required by the PSLRA by equating terms that are demonstrably distinct.

F.     **Plaintiff Fails to Plead Facts Showing That Tricida's May 7, 2020 Discussion of the May 1, 2020 Late-Cycle Meeting Were Materially False or Misleading**

Defendants showed in their opening brief that Tricida accurately described, on May 7, 2020, the Company's May 1, 2020 late-cycle meeting with the FDA, and that Plaintiff's two attacks on Tricida's May 7 statements therefore fail. First, Plaintiff alleged nothing in support of his contention that the FDA told Tricida it had canceled the AdCom meeting because it had decided not to approve the NDA. Mot. at 18-19. Second, Plaintiff's contention that Tricida misrepresented the discussion of FDA "review issues" at the late-cycle meeting is based on Tricida's August 6, 2020 Form 10-Q—but the Form 10-Q is *consistent* with Tricida's May 7, 2020 discussion of the same review issues. *Id.* at 19-20.

Plaintiff's opposition cannot repair these defects. With respect to the canceled AdCom meeting, Plaintiff continues to contend that Klaerner "concealed the real reason the AdCom had been canceled." Opp. at 21. As in the complaint, Plaintiff cites no facts showing that the FDA provided Tricida with any reasons for cancellation other than logistical issues related to COVID-19. Notably, the issue of possible additional reasons was discussed explicitly during the May 7, 2020

11

call. An analyst said to Klaerner "I know you mentioned it's mostly COVID-19 related, but do you know what other factors beyond that led to the FDA's decision to cancel the AdCom?" Ex. 15 at 10. Klaerner's reply was "Nope. No, we don't." *Id.* Plaintiff has not challenged this statement, nor pled any facts suggesting that it is false. Plaintiff's "real reason" claim is devoid of factual support.

As to Tricida's reference to the "two substantive review issues" discussed during the May 1, 2020 meeting, Plaintiff continues to rely on Tricida's August 6, 2020 Form 10-Q—but wholly ignores that Tricida discussed the same two review issues in its May 7, 2020 and August 6, 2020 public statements. Mot. at 19 (comparing May 7, 2020 transcript with August 6, 2020 Form 10-Q). Plaintiff now omits from his quotation of the challenged May 7, 2020 statement the text in which Klaerner identified the review issues (*compare* Opp. at 19 *with* ¶ 101) but cannot simply wish that text away. Plaintiff's claim fails because here, as elsewhere, Tricida disclosed the information Plaintiff says it concealed: that during the late-cycle meeting, two outstanding review issues remained and were addressed, one related to the magnitude and durability of veverimer's treatment effect on the surrogate marker and the other related to the drug's clinical benefit for U.S. patients. Mot. at 19; ¶ 101.

Plaintiff appears to contend—although his brief is less than clear on the point—that Klaerner misleadingly failed to tell investors that the "outstanding review issues" he identified were "concerns" for the FDA, and that such concerns could preclude approval. Opp. at 20. Plaintiff is wrong. The FDA has defined "substantive review issues" as "[i]ssues identified to date that may preclude approval if not resolved." Reply Ex. 8 at 5. Klaerner's use of the term "review issues" signified to investors that the FDA had "concerns." This alone dooms Plaintiff's argument.

Plaintiff also continues to disregard chronology. A seismic event occurred between Tricida's May 7, 2020 discussion of the May 1, 2020 meeting and Tricida's reference to the same late-cycle meeting in its August 6, 2020 Form 10-Q. The FDA issued a deficiency notice on July 14, 2020. This significant adverse development required Tricida to re-evaluate both its chances of approval and its prior interactions with the FDA. Plaintiff argues in a footnote that the deficiency notice should have made no difference in Tricida's view of the previously-identified review issues because the notice did not itself specify what the deficiencies were. Opp. at 20 n.11. Plaintiff is

ignoring the obvious.  Receipt of the deficiency notice put the review issues discussed during the May 1, 2020 late-cycle meeting in a new light.

Finally, to the extent Tricida conveyed more information to investors on August 6, 2020 than on May 7, 2020, this is expressly permitted by law.  Courts have recognized that drug sponsors need not disclose all interim comments made by FDA staff during the give-and-take that is part of the regulatory approval process.  Mot. at 20 (citing authorities).  Plaintiff tries to brush off this law, arguing that Defendant seeks to apply it only to events *between* May 7, 2020 and August 6, 2020, and that because Plaintiff has not challenged any statements in that period, the law does not apply. Opp. at 20 n.12.  Plaintiff is again wrong.  The law Defendants cited applies to Tricida's May 7, 2020 discussion of the May 1, 2020 late-cycle meeting, Mot. at 20, and it holds that Tricida was not required to report every comment the FDA made at the meeting.  That law is directly on point.

### G.    Plaintiff Fails to Plead Facts Creating The Required Cogent and Compelling Inference of Intentional Fraud

Under the PSLRA, Plaintiff must allege particularized facts creating a strong inference that Defendants intended to defraud investors.  Mot. at 20.  Plaintiff fails to allege such facts here. Defendants showed in their opening brief that Tricida's knowledge of allegedly omitted information does not establish an intent to defraud; that Plaintiff's counterintuitive theories of motivation do not support an inference of scienter; that in alleging insider stock sales, Plaintiff failed to properly account for Klaerner's trading plan and failed to identify sales that were unusual in timing or amount; that Plaintiff's "core operations" allegations are hollow; and that Plaintiff's confidential witness allegations establish nothing.  Defendants also showed that the facts before the Court strongly support an inference of benign conduct and intent.  *Id.* at 20-25.

In response, Plaintiff simply declines to engage.  He addresses none of Defendants' arguments and none of Defendants' authorities, including on-point decisions by the Ninth Circuit and this Court.  Plaintiff cannot create a cogent and compelling inference of scienter by ignoring everything that weighs against it.  That in itself justifies dismissal on scienter grounds.

In addition, and on the most basic level, Plaintiff's scienter theory is unmoored from his own allegations.  Plaintiff argues that "the most plausible inference drawn" from his allegations is

13

that Defendants "knew of the shortcomings of the data supporting the NDA but concealed those shortcomings . . . in the hope that they could fix enough issues before submitting the NDA for it to still receive FDA approval" and that this was "all a calculated risk, but it did not pan out as hoped." Opp. at 24-25.  This bears little resemblance to Plaintiff's allegations.  Plaintiff did not allege that Defendants were working to "fix" any purported deficiencies in the NDA.  Nor does Plaintiff now explain how any "shortcomings"—for existence, the location of the trial sites—*could* have been fixed.  Meanwhile, Tricida made most of the challenged statements *after* it had submitted its NDA in August 2019, which is entirely inconsistent with the assertion that Tricida hoped to fix issues before submitting it.  Plaintiff appears to have copied his scienter theory from a different case.

An equally grave defect in Plaintiff's theory is its dependence on hindsight.  As noted, Plaintiff's claim depends on reading the FDA's post-July 2020 determinations backwards onto the time of the challenged statements.  Plaintiff's reliance on *Schueneman v. Arena Pharmaceuticals, Inc.*, 840 F.3d 698 (9th Cir. 2016), is misplaced for this reason.  The Ninth Circuit held that the plaintiffs in that case had adequately pled scienter because they had identified obstacles to approval the FDA had communicated to the company *at the time of the challenged statements.*  Specifically, a rat trial had shown that animals given large quantities of the study drug had developed cancer, and the FDA was concerned that the drug may have been responsible.  *Id.* at 701-02, 707.  In light of the FDA's *contemporaneous* expressions of concern, the plaintiffs had sufficiently pled scienter with respect to the company's statements that all trial results were favorable.  *Id.* at 708.

Plaintiff has identified no such contemporaneous FDA communications here.  Plaintiff speculates that the FDA told Tricida to adopt a 4,000-patient target for VALOR-CKD at some unspecified point within a nine-month period, *supra* at 8, 10, but speculation obviously does not suffice to create the required cogent and compelling inference.  As to the FDA review issues addressed during the May 1, 2020 late-cycle meeting, Tricida identified and disclosed these issues to investors, and such disclosure weighs against an inference of fraud.  Mot. at 24; *supra* at 11-12.

In reality, *Schueneman* supports Defendants' position, not Plaintiff's.  In discussing falsity, Plaintiff quotes Tricida's May 7, 2020 statement that it felt confident that trial data satisfied the criteria for approval.  Opp. at 19.  The *Schueneman* court recognized that precisely such statements

14

are permissible. The court explained that drug sponsors are not required to adopt negative comments by FDA staff; a company in receipt of such comments remains "free to express confidence in FDA approval" and may even represent that it is "working through some requests from the FDA and [is] confident the data [will] vindicate" its position. 840 F.3d at 708. That is the very most Tricida did here.

Other than citing *Schueneman* and one similar (though older) decision from a district court, Plaintiff does little more in his brief than reprint the scienter allegations in his complaint.[7] Defendants, again, have addressed those allegations, and Plaintiff has simply refused to engage.

Considered holistically, the facts related to scienter support a benign inference, not an inference of deliberate deceit. Tricida (and Klaerner) worked in good faith to secure FDA approval for veverimer, spending enormous amounts of time and effort to "get it right." Tricida's additional expenditures on commercialization while its NDA was pending are further testament to the Company's belief in its prospects for approval. The contrary inference Plaintiff asks the Court to draw—that Tricida made these expenditures knowing that its application was seriously flawed— makes no sense, commercial or otherwise. Mot. at 24-25. On such facts, courts do not infer deliberate fraud, and this Court should not do so here. *Id.* (citing authorities).

## III. CONCLUSION

The Court should dismiss Plaintiff's claims in their entirety.

Dated:  September 15, 2021                Respectfully submitted,

                                          **SIDLEY AUSTIN LLP**

                                          By:  */s/ Sara B. Brody*
                                                Sara B. Brody (SBN 130222)

                                          *Attorneys for Defendants*

---

[7] Plaintiff's district court case, *Amylin*, is inapplicable for much the same reason *Schueneman* is inapplicable. *In re Amylin Pharm. Sec. Litig.*, 2003 WL 21500525 (S.D. Cal. May 1, 2003). The court in *Amylin* held that the plaintiff's scienter allegations were adequate because the company had decided to forge ahead after the FDA told it that its trial design was flawed—but had failed to disclose the FDA's message to investors. Plaintiff pleads no such facts here.

15