# Exhibit 1

**Filed Pursuant to Rule 424(b)(4)**
**Registration Number 333-225420**

## 11,700,000 Shares



## Common Stock

This is the initial public offering of shares of common stock of Tricida, Inc. We are selling 11,700,000 shares of common stock in this offering. The initial public offering price of our common stock is $19.00 per share.

Prior to this offering, there has been no public market for our common stock.

Our common stock has been approved for listing on The Nasdaq Global Select Market under the symbol "TCDA."

We are an "emerging growth company" as defined under the federal securities laws and, as such, have elected to comply with certain reduced public company reporting requirements in this prospectus and may elect to do so in future filings.

*Investing in our common stock involves risks. See the section titled "Risk Factors" beginning on page 13 to read about factors you should consider before deciding to invest in shares of our common stock.*

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per Share | Total |
|---|---|---|
| Initial public offering price | $ 19.00 | $222,300,000 |
| Underwriting discounts(1) | $ 1.33 | $ 15,561,000 |
| Proceeds, before expenses, to us | $ 17.67 | $206,739,000 |

(1)  See the section titled "Underwriting" for a description of the compensation payable to the underwriters.

To the extent that the underwriters sell more than 11,700,000 shares of common stock, the underwriters have an option to purchase up to an additional 1,755,000 shares from us at the initial public offering price, less the underwriting discounts.

The underwriters expect to deliver the shares against payment in New York, New York on July 2, 2018.

Certain of our stockholders, including stockholders affiliated with certain of our directors, have agreed to purchase an aggregate of approximately $35.8 million of shares of our common stock in this offering at the initial public offering price per share and on the same terms as the other purchasers in this offering. The underwriters will receive the same discount from any shares sold to such entities as they will from any other shares sold to the public in this offering.

**Goldman Sachs & Co. LLC**        **J.P. Morgan**        **Cowen**

Prospectus dated June 27, 2018

Table of Contents

**PROSPECTUS SUMMARY**

*This summary highlights information contained elsewhere in this prospectus and does not contain all of the information you should consider in making your investment decision. Before deciding to invest in shares of our common stock, you should read this summary together with the more detailed information, including our financial statements and the accompanying notes, provided elsewhere in this prospectus. You should carefully consider, among other things, the matters discussed in "Risk Factors," our financial statements and the accompanying notes, and "Management's Discussion and Analysis of Financial Condition and Results of Operations," in each case included elsewhere in this prospectus. Some of the statements in this prospectus constitute forward-looking statements that involve risks and uncertainties. See "Special Note Regarding Forward-Looking Statements."*

**Overview**

Our goal is to slow the progression of chronic kidney disease, or CKD, through the treatment of metabolic acidosis. We are a late-stage pharmaceutical company focused on the development and commercialization of our drug candidate, TRC101, a non-absorbed polymer designed to treat metabolic acidosis by binding and removing acid from the gastrointestinal tract, or GI tract. We recently completed our double-blind, placebo-controlled, pivotal Phase 3 clinical trial, TRCA-301, in 217 CKD patients with metabolic acidosis. The TRCA-301 trial met both its primary and secondary endpoints in a highly statistically significant manner ($p < 0.0001$ for all primary and secondary endpoints). TRC101 was well tolerated in our TRCA-301 trial. Both active (124 subjects) and placebo groups (93 subjects) had low discontinuation rates and low rates of treatment-related adverse events. One hundred ninety-six of the 208 eligible subjects who completed the 12-week treatment period in our pivotal TRCA-301 trial agreed to continue into our 40-week blinded safety extension trial, TRCA-301E, which we expect to complete in the first half of 2019. We plan to submit a New Drug Application, or NDA, in the second half of 2019, seeking approval of TRC101 through the U.S. Food and Drug Administration's, or FDA's, Accelerated Approval Program. The FDA may grant accelerated approval to a product for a serious or life-threatening disease or condition that provides meaningful therapeutic advantage to patients over existing treatments based upon a determination that the product has an effect on a surrogate endpoint that is reasonably likely to predict clinical benefit. Metabolic acidosis is a chronic condition commonly caused by CKD and is believed to accelerate the progression of kidney deterioration. Today, there are no chronic therapies for treating metabolic acidosis approved by the FDA. We believe TRC101, an in-house discovered, new chemical entity, may be an effective treatment for metabolic acidosis and slow the progression of kidney disease in CKD patients affected by metabolic acidosis.

We estimate that metabolic acidosis affects approximately 3 million CKD patients in the United States, and we believe that slowing the progression of CKD in patients with metabolic acidosis represents a significant medical need and market opportunity. If approved, we plan to commercialize TRC101 in the United States initially using a nephrologist-focused sales force. To address markets outside of the United States, we plan to seek one or more partners with international sales expertise who can sell TRC101 in target markets. We have an intellectual property estate that we believe will provide patent protection for TRC101 until at least 2034 in the United States, the European Union, Japan, China, India and certain other markets. Tricida is led by a seasoned management team that includes the founders of Ilypsa, Inc. and Relypsa, Inc. Our management team has extensive experience in the development and commercialization of therapeutics, with deep expertise in developing polymers for the treatment of kidney-related diseases.

1

Table of Contents

**CKD and Metabolic Acidosis Represent a Major Medical Crisis and are Directly Linked**

CKD is a serious condition characterized by the gradual loss of essential kidney functions over time. According to Centers for Disease Control and Prevention, more than 30 million people in the United States are afflicted with CKD, representing an overall prevalence in the adult population of approximately 15%. CKD represents the ninth leading cause of death in the United States. The annual Medicare expense for CKD including end-stage renal disease, or ESRD, is approximately $98 billion. ESRD is the final stage of CKD in which the patient typically requires renal replacement therapy, i.e., dialysis or a kidney transplant, for survival.

Diabetes, hypertension and age have long been recognized as primary risk factors for the progression of CKD. More recently, metabolic acidosis has also been identified as a key risk factor in the progression of CKD. Metabolic acidosis is a serious condition in which the body has accumulated too much acid and occurs when a patient's kidneys can no longer excrete sufficient acid or produce enough bicarbonate to balance acid production. Metabolic acidosis can be diagnosed by measuring the level of bicarbonate in the blood, which is part of a standard metabolic panel. National and international kidney treatment guidelines recommend that in people with CKD, blood bicarbonate be maintained within the normal range of 22 to 29 mEq/L. Blood bicarbonate concentrations less than 22 mEq/L are associated with increased risk of CKD progression and increased risk of death.

Metabolic acidosis is a chronic condition commonly caused by CKD and is believed to accelerate the progression of kidney deterioration, creating a vicious cycle resulting in the decline in kidney functions, as measured by the estimated glomerular filtration rate, or eGFR. Multiple retrospective studies provide qualitative and quantitative evidence for the relationship between metabolic acidosis and the progression of CKD across a wide range of baseline eGFRs and blood bicarbonate levels. Prospective studies have shown that treating metabolic acidosis translates into a clinically meaningful slowing of CKD progression.

**No FDA-Approved Therapy for Chronic Treatment of Metabolic Acidosis**

While the need to treat metabolic acidosis to slow the progression of CKD is well-recognized, there are no FDA-approved therapies for the chronic treatment of metabolic acidosis. Unapproved methods to increase blood bicarbonate include oral alkali supplements, such as sodium bicarbonate, which introduce significant amounts of sodium to patients. However, approximately 85% to 95% of later-stage CKD patients suffer from sodium sensitive comorbid conditions, such as hypertension, cardiovascular disease, heart failure or edema, and require a sodium-restricted diet. As such, the use of sodium-based supplements can lead to worsening blood pressure control and volume overload in this population. Given the significant limitations on the use of sodium-based supplements, there exists a significant unmet medical need for a chronic therapy for CKD patients with metabolic acidosis. To chronically treat the broad population of CKD patients with metabolic acidosis, physicians need an FDA-approved treatment that is proven to be safe, effective and easy to comply with.

**Our Solution—TRC101**

TRC101 is a novel, non-absorbed polymer that is designed to bind hydrochloric acid in the GI tract and remove it from the body through excretion in the feces thereby decreasing the total amount of acid in the body and increasing blood bicarbonate. TRC101 is administered orally as a suspension in water once daily. TRC101 was specifically designed to combine high capacity and high selectivity for binding and removing hydrochloric acid. Importantly, TRC101 does not deliver sodium or other counter-ions, thereby allowing for chronic treatment of CKD patients with common comorbidities such as hypertension, cardiovascular disease, heart failure or edema. We believe that TRC101, if approved, will have a highly favorable product profile enabling rapid adoption amongst the broad population of CKD patients with metabolic acidosis.

2

Table of Contents

**TRC101 Target Product Profile**

We have designed TRC101 to target the following product profile:

- *Significantly Increase Blood Bicarbonate*

- *Well-Tolerated*

- *Suitable for a Broad Population of Patients, Including Patients with Sodium-Sensitive Comorbidities*

- *Compatible with Other Medications*

- *Convenient, Once-Daily, Oral Administration*

- *Room-Temperature Stable*

**TRC101 Pivotal Phase 3 Clinical Data**

Initial topline analysis of our pivotal Phase 3 clinical trial, TRCA-301, indicates that treatment with TRC101 resulted in statistically significant increases in blood bicarbonate, meeting both the primary and secondary endpoints of the trial. After 12 weeks of treatment, 59.2% of subjects in the TRC101-treated group, compared with 22.5% of subjects in the placebo group, exhibited an increase in blood bicarbonate level of at least 4 mEq/L or achieved a blood bicarbonate level in the normal range of 22 to 29 mEq/L, which was the primary endpoint of the trial. The secondary endpoint of the trial, the mean change in blood bicarbonate from baseline to week 12, was 4.49 mEq/L in the TRC101-treated group, compared with 1.66 mEq/L in the placebo group. The results of the primary and secondary endpoints were highly statistically significant (p < 0.0001). The following graphs summarize the efficacy data for the once daily dosing of TRC101-treated subjects versus subjects in the placebo group.

**Summary Data for Our Pivotal Phase 3 Clinical Trial, TRCA-301**



3

Table of Contents

We estimate that each increase of 1 mEq/L in blood bicarbonate is associated with approximately a 6% to 9% reduced risk for progression of CKD, defined as progressing to ESRD or a ☐40% reduction in eGFR, in CKD patients with metabolic acidosis.

We included two exploratory endpoints in our TRCA-301 trial to assess whether improvement in muscle function and in patient quality of life could be demonstrated in this patient population through the treatment of metabolic acidosis. We believe the results from these two exploratory endpoints indicate a positive trend and suggest an improvement, on average, in the physical function and in quality of life for TRC101-treated subjects in this trial. We believe these results indicate a potential clinical benefit in this acidotic population and are consistent with the basic physiology of the disease.

TRC101 was well tolerated in our TRCA-301 trial. Both active (124 subjects) and placebo groups (93 subjects) had low discontinuation rates and low rates of treatment-related adverse events. The overall safety profile of TRC101 observed in TRCA-301 is consistent with that expected for the general population of patients with Stage 3 to 5 CKD and with similar non-absorbed polymer drugs with a site of action in the GI tract.

**Our Development Program for TRC101**

Our development program for TRC101 is designed to obtain approval of TRC101 pursuant to the FDA's Accelerated Approval Program. Under the Accelerated Approval Program, we plan to pursue approval for TRC101 based upon efficacy data related to a primary endpoint measuring a change from baseline in blood bicarbonate level. We have completed a successful 135-subject, Phase 1/2 trial, TRCA-101, and a 217-subject, pivotal Phase 3 clinical trial, TRCA-301. Eligible subjects who completed the 12-week treatment period in our pivotal TRCA-301 trial were invited to continue in our 40-week safety extension trial, TRCA-301E, which we expect to complete in the first half of 2019. Based on feedback from the FDA, we believe that the data from the TRCA-101, TRCA-301 and TRCA-301E trials will provide sufficient evidence of clinical safety and efficacy to support the submission and review of an NDA for TRC101 pursuant to the Accelerated Approval Program. We plan to submit an NDA for TRC101 in the second half of 2019.

As part of the Accelerated Approval Program, the FDA may require one or more confirmatory postmarketing trials to verify and describe the anticipated effect or clinical benefit of TRC101. We have committed to conduct a confirmatory postmarketing trial, known as the VALOR-CKD trial, or TRCA-303, to evaluate the efficacy and safety of TRC101 in delaying CKD progression in subjects with metabolic acidosis. We anticipate that the VALOR-CKD trial will randomize approximately 1,400 to 1,600 subjects in order to show a 30% to 35% reduction in renal events, currently expected to be defined for purposes of the VALOR-CKD trial, as progressing to ESRD or a ☐ 40% reduction in eGFR. We plan to initiate our VALOR-CKD trial in the second half of 2018. The FDA has requested that our VALOR-CKD trial be completely enrolled, or nearly completely enrolled, prior to submission of our NDA for TRC101. We plan to complete the VALOR-CKD trial after the FDA's review of our NDA for TRC101 and potential approval of TRC101. The VALOR-CKD trial is a time-to-event study, and we estimate it will take approximately 4 years to accrue the number of events necessary to complete the trial. Assuming successful completion of the VALOR-CKD trial, we plan to file a supplemental NDA, or sNDA, that incorporates results from the VALOR-CKD trial.

**Commercial Opportunity and Strategy**

We plan to initially commercialize TRC101 in the United States with a specialty sales force of approximately 80 to 100 individuals focused on the highest prescribing subset of the approximately 9,000 practicing nephrologists currently treating our target patient population. We believe that

4

Table of Contents

nephrologists in the United States currently treat approximately 600,000 Stage 3 to 5 CKD patients with metabolic acidosis. Based on our market research, we believe that the pricing for TRC101 can be supported above the current pricing for other polymer therapeutics marketed for treating conditions related to kidney disease, but which are not disease modifying.

Over time, due to the disease modification potential of TRC101, we intend to address the broader CKD patient population who receive care from cardiologists, endocrinologists, diabetologists and a subset of primary care physicians, either on our own or with a partner. To address markets outside of the United States, we plan to seek one or more partners with international sales expertise who can sell TRC101 in target markets.

**Our Team Has Extensive Experience in the Development and Commercialization of Therapeutics**

We have assembled a team with deep scientific, clinical, business and leadership experience in the discovery, development and commercialization of therapeutics, including polymers. Our founder and Chief Executive Officer, Gerrit Klaerner, Ph.D., and our Chief Scientific Officer, Jerry Buysse, Ph.D., founded both Relypsa and Ilypsa, where they led the discovery, development and approval of Veltassa® (patiromer) and bixalomer (approved in Japan as Kiklin®), respectively. Other key members of our management team who had experience with Relypsa include our Chief Development Officer, Claire Lockey, our Chief Technology Officer, Wilhelm Stahl, Ph.D., and our General Counsel, Edward Hejlek, Esq. Our Chief Financial Officer, Geoffrey Parker, was previously the Chief Financial Officer at Anacor Pharmaceuticals, Inc. and prior to that, spent 20 years at Goldman Sachs in the Investment Banking Division. Our Chief Commercial Officer, Jeroen van Beek, Ph.D., over the last 20 years, has launched multiple successful therapeutic products at Alexion Pharmaceuticals, Inc. and Pfizer Inc.

**Risks Associated with Our Business**

Investing in our common stock involves significant risks. You should carefully consider the risks described in "Risk Factors" before making a decision to invest in our common stock. If we are unable to successfully address these risks and challenges, our business, financial condition or results of operations would be materially adversely affected. In such case, the trading price of our common stock would likely decline, and you may lose all or part of your investment. Below is a summary of some of the principal risks we face.

- We are dependent on the success of TRC101, our only product candidate. If we are unable to successfully develop, obtain regulatory approval for and commercialize TRC101, or experience significant delays in doing so, our business will be materially harmed.

- We will require substantial additional financing to achieve our goals, and a failure to obtain this necessary capital when needed on acceptable terms, or at all, could force us to delay, limit, reduce or terminate our product development, other operations or commercialization efforts of TRC101.

- We and our auditors have expressed substantial doubt about our ability to continue as a going concern, which may hinder our ability to obtain further financing.

- If we are unable to obtain approval of TRC101 through the Accelerated Approval Program in the United States, we may be required to conduct additional nonclinical and clinical studies and trials beyond those that we currently contemplate, which could increase the expense of obtaining, reduce the likelihood of obtaining and/or delay the timing of obtaining, necessary marketing approval thereby delaying commercialization of TRC101 and adversely impacting our ability to generate revenue, our business and our results of operations.

5

Table of Contents

- Even if we receive approval from the FDA under the Accelerated Approval Program, if our confirmatory postmarketing clinical trial, VALOR-CKD, does not verify clinical benefit, or if we do not comply with rigorous postmarketing requirements, the FDA may seek to withdraw the approval.

- For approval of TRC101 through the Accelerated Approval Program, we have not yet finalized the design of the confirmatory postmarketing clinical trial, VALOR-CKD, including the sample size, trial duration, endpoint definition, event rate assumptions and eligibility criteria. The FDA and/or comparable foreign regulators may not agree with our proposed confirmatory postmarketing trial design, in which case we may be required to modify our planned clinical trials, or run additional clinical trials, before we can submit the NDA or comparable foreign applications.

- We currently have limited sales or marketing capabilities. If we are unable to establish effective sales and marketing capabilities or if we are unable to enter into agreements with third parties to commercialize TRC101, we may not be able to effectively generate product revenues.

- We have relied and continue to rely on third parties, particularly contract research organizations, or CROs, to conduct and complete our clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines, we may be unable to obtain regulatory approval for or commercialize TRC101, if approved.

- We rely completely on third-party suppliers to manufacture our clinical drug supply of TRC101 drug substance (currently one supplier) and drug product (currently two suppliers), and we intend to rely on third parties to produce commercial supply of TRC101 drug substance and drug product, if approved. A performance failure on the part of any one of our suppliers could delay the development and potential approval or commercialization of TRC101.

- During our year-end close for the fiscal year ended December 31, 2017, we identified material weaknesses in our internal control over financial reporting. If we are unable to maintain effective internal control over financial reporting in the future, investors may lose confidence in the accuracy and completeness of our financial reports, and the market price of our common stock may be materially adversely affected.

- If we fail to attract and keep senior management, we may be unable to successfully develop TRC101, conduct our clinical trials and commercialize TRC101, if approved.

**Corporate Information**

We were incorporated in Delaware in May 2013. Our corporate office is located at 7000 Shoreline Court, Suite 201, South San Francisco, CA 94080, and our telephone number is (415) 429-7800. Our website is *tricida.com*. The information on, or that can be accessed through, our website is not part of this prospectus and is not incorporated by reference herein.

**Trademarks**

Tricida and our logo are some of our tradenames used in this prospectus. This prospectus also includes trademarks, tradenames, and service marks that are the property of other organizations. Solely for convenience, our trademarks and tradenames referred to in this prospectus appear without the ™ or ® symbol, but those references are not intended to indicate, in any way, that we will not assert, to the fullest extent under applicable law, our rights, or the right of the applicable licensor to these trademarks and tradenames.

6

Table of Contents

**RISK FACTORS**

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks described below, as well as the other information in this prospectus, including our financial statements and the related notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations," before deciding whether to invest in our common stock. The occurrence of any of the events or developments described below could materially and adversely affect our business, financial condition, results of operations, cash flows and prospects. In such an event, the market price of our common stock could decline, and you may lose all or part of your investment. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also impair our business operations.*

**Risks Related to Our Limited Operating History, Financial Condition and Capital Requirements**

***We have a limited operating history, have incurred significant losses in each year since our inception and anticipate that we will continue to incur significant losses for the foreseeable future. We have only one product candidate, TRC101, which is in clinical trials and has no commercial sales, which, together with our limited operating history, makes it difficult to assess our future viability.***

We are a late-stage pharmaceutical company focused on the development and commercialization of our drug candidate, TRC101, a non-absorbed polymer designed to treat metabolic acidosis by binding and removing acid from the gastrointestinal tract. We have only a limited operating history upon which you can evaluate our business and prospects. We are not profitable and have incurred significant losses in each year since our inception in May 2013. Our net losses were $28.7 million and $41.3 million for the years ended December 31, 2016 and 2017, respectively, and $20.5 million for the three months ended March 31, 2018. As of March 31, 2018, we had an accumulated deficit of $109.9 million. Pharmaceutical product development is a highly speculative undertaking, entails substantial upfront capital expenditures and involves a substantial degree of risk, including the risk that a potential product candidate will fail to demonstrate adequate efficacy or an acceptable safety profile, gain regulatory approval and become commercially viable. We have limited experience and have not yet demonstrated an ability to successfully overcome many of the risks and uncertainties frequently encountered by companies in new and rapidly evolving fields, particularly in the pharmaceutical industry. To date, we have focused principally on developing our product candidate TRC101. We have no products approved for commercial sale and have not generated any revenue from product sales or other arrangements to date and neither will we for the foreseeable future. We continue to incur significant research and development and other expenses related to our ongoing operations. We expect to continue to incur losses for the foreseeable future, and we anticipate these losses will increase as we continue our development of, and seek regulatory approval for, TRC101, prepare for potential commercialization of TRC101 and become a public company.

If TRC101 is not successfully developed or commercialized, including because of a lack of capital, or if we do not generate enough revenue following marketing approval, we will not achieve profitability and our business may fail. Even if we achieve profitability in the future, we may not be able to sustain profitability in subsequent periods. We may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect our business. The size of our future net losses will depend, in part, on the rate of future growth of our expenses and our ability to generate revenue. Our prior losses, combined with expected future losses, have had and will continue to have an adverse effect on our stockholders' equity and working capital.

13

Table of Contents

***We will require substantial additional financing to achieve our goals, and a failure to obtain this necessary capital when needed on acceptable terms, or at all, could force us to delay, limit, reduce or terminate our product development, other operations or commercialization efforts of TRC101.***

We are currently advancing TRC101 through clinical development. As of March 31, 2018 we had working capital of $35.9 million and cash, cash equivalents and marketable securities of $75.2 million. We believe that we will continue to expend substantial resources for the foreseeable future as we continue clinical development, seek regulatory approval, and prepare for the commercialization of TRC101 and develop any other product candidates we may choose to pursue in the future. These expenditures will include costs associated with research and development, sales and marketing, conducting nonclinical and clinical studies and trials, obtaining regulatory approvals, and manufacturing and supply. In addition, other unanticipated costs may arise. Because the outcome of any clinical trial and the regulatory approval process is highly uncertain, we cannot reasonably estimate the actual amounts necessary to successfully complete the development, regulatory approval process and commercialization of TRC101.

We believe that the net proceeds from this offering, proceeds from our Loan and Security Agreement, or the Term Loan, with Hercules Capital, Inc., or Hercules, together with our existing cash, cash equivalents and marketable securities, will allow us to fund our operating plan through at least the next 12 months. However, we have based these estimates on assumptions that may prove to be wrong, and we could spend our available capital resources much faster than we currently expect or require more capital to fund our operations than we currently expect. Moreover, our operating plan may change as a result of many factors currently unknown to us, and we may need to seek additional funds sooner than planned, through public or private equity, debt financings or other sources, such as strategic collaborations. Such financing may result in dilution to stockholders, imposition of debt covenants and repayment obligations, or other restrictions that may affect our business. In addition, we may seek additional capital due to favorable market conditions or strategic considerations even if we believe we have sufficient funds for our current or future operating plans.

The amount and timing of our future funding requirements will depend on many factors, including, but not limited to:

- the time and cost necessary to obtain regulatory approvals for TRC101 and any future product candidates that we develop, in-license or acquire;

- our ability to obtain approval for TRC101 under the Accelerated Approval Program;

- the costs of confirmatory postmarketing studies or trials for TRC101 that could be required by regulatory agencies or that we might otherwise choose to conduct;

- the costs of obtaining commercial supplies of TRC101;

- our ability to successfully commercialize TRC101;

- the manufacturing, selling and marketing costs associated with TRC101, including the cost and timing of expanding our sales and marketing capabilities;

- the amount of sales and other revenues from TRC101, including the sales price and the availability of adequate third-party reimbursement;

- the timing, receipt and amount of sales of, or royalties on, TRC101, if any;

- the costs of operating as a public company;

- the costs associated with any product recall that could occur;

- the emergence, approval, availability, perceived advantages, relative cost, relative safety and relative efficacy of alternative and competing products or treatments;

14

Table of Contents

- the cash requirements of any future acquisitions or discovery of future product candidates, if any;

- the progress, timing, scope and costs of our nonclinical and clinical studies and trials, including the ability to enroll patients in a timely manner for potential future clinical trials;

- the time and cost necessary to respond to technological and market developments; and

- the costs of preparing, filing, prosecuting, defending and enforcing any patent claims and other intellectual property rights, including litigation costs and the outcome of such litigation.

We cannot assure you that anticipated additional financing will be available to us on favorable terms, or at all. Our current Term Loan contains negative covenants that restrict our ability to obtain additional debt financing. Any future debt financing into which we enter may impose upon us covenants that restrict our operations, including limitations on our ability to incur liens or additional debt, pay dividends, redeem our stock, make certain investments and engage in certain merger, consolidation or asset sale transactions. Although we have been successful in obtaining financing through the issuance of our equity securities, we cannot assure you that we will be able to do so in the future. If we are unable to raise additional capital to fund our clinical development and commercialization of TRC101, if approved, and other business activities, we could be forced to significantly delay, scale back or abandon one or more clinical development programs or commercialization efforts and curtail or cease our operations. In addition, our ability to achieve profitability or to respond to competitive pressures would be significantly limited.

### *We and our auditors have substantial doubt about our ability to continue as a going concern, which may hinder our ability to obtain further financing.*

Our recurring losses from operations raise substantial doubt about our ability to continue as a going concern. As a result, our independent registered public accounting firm included an explanatory paragraph in its report on our financial statements for the year ended December 31, 2017 with respect to this uncertainty. Our 2017 financial statements and our unaudited interim financial statements for the three months ended March 31, 2018 do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that may result from the outcome of this uncertainty. Our ability to continue as a going concern will require us to obtain additional funding. We believe that the net proceeds from this offering, proceeds from our Term Loan with Hercules, together with our existing cash, cash equivalents and marketable securities, will allow us to fund our operating plan through at least the next 12 months. We have based these estimates, however, on assumptions that may prove to be wrong, and we could spend our available financial resources much faster than we currently expect and need to raise additional funds sooner than we anticipate. If we are unable to raise capital when needed or on acceptable terms, we would be forced to delay, reduce or eliminate our research and development programs and commercialization efforts.

### Risks Related to Our Business

### *We are dependent on the success of TRC101, our only product candidate. If we are unable to successfully develop, obtain regulatory approval for and commercialize TRC101, or experience significant delays in doing so, our business will be materially harmed.*

To date, we have invested all of our efforts and financial resources in the research and development of TRC101, which is our only product candidate, and our business and future success depends on our ability to successfully develop, obtain regulatory approval for and commercialize TRC101. We recently completed a randomized, double-blind, placebo-controlled, multicenter pivotal

15

Table of Contents

Phase 3 clinical trial for TRC101, known as TRCA-301. The TRCA-301 trial enrolled 217 CKD patients with metabolic acidosis. Eligible subjects who completed the 12-week treatment period in our pivotal Phase 3 trial were invited to continue in our 40-week safety extension trial, TRCA-301E. We expect to complete our TRCA-301E trial in the first half of 2019 and then seek approval for TRC101 through the Accelerated Approval Program. While we believe that the TRCA-301 trial successfully met its primary and secondary endpoints, we cannot assure you that the FDA or any foreign regulatory agency will approve TRC101 for marketing. Furthermore, even if we obtain regulatory approval for TRC101, we will still need to develop a commercial organization, or collaborate with a third party for the commercialization of TRC101, establish commercially viable pricing and obtain approval for coverage and adequate reimbursement from third parties, including government payors. If we are unable to successfully commercialize TRC101, we may not be able to generate sufficient revenues to continue our business.

Our near-term prospects, including our ability to finance our operations and generate revenue, will depend heavily on the successful development and commercialization of TRC101 in the United States. Though we plan to engage in marketing approval discussions with foreign regulatory agencies in the future, we have not yet begun marketing approval discussions with any regulatory agency other than the FDA, and we are not currently seeking regulatory approval for TRC101 outside the United States. The clinical and commercial success of TRC101 will depend on a number of factors, including the following:

- our ability to demonstrate TRC101's safety and efficacy to the satisfaction of the FDA and/or foreign regulatory agencies;

- the timely completion and reporting of our safety extension trial, TRCA-301E, and our confirmatory postmarketing trial, known as the VALOR-CKD trial, or TRCA-303;

- whether we are required by the FDA and/or foreign regulatory agencies to conduct additional clinical trials prior to approval to market TRC101;

- the prevalence and severity of adverse side effects of TRC101 in our ongoing and future clinical trials and commercial use, if approved;

- the timely receipt of necessary regulatory and marketing approvals from the FDA and foreign regulatory agencies for TRC101;

- our ability to obtain U.S. marketing approval for TRC101 under the Accelerated Approval Program;

- our ability to successfully conduct our confirmatory postmarketing trial, VALOR-CKD, and confirm renal benefit of TRC101, assuming TRC101 is initially approved under the FDA's Accelerated Approval Program;

- our ability to successfully commercialize TRC101, if approved for marketing and sale by the FDA and/or foreign regulatory agencies;

- our ability to manufacture clinical trial and commercial quantities of TRC101 drug substance and drug product and to develop, validate and maintain a commercially viable manufacturing process that is compliant with current good manufacturing practices, or cGMP, at a scale sufficient to meet anticipated demand and over time enable us to reduce our cost of manufacturing;

- achieving and maintaining compliance with all regulatory requirements applicable to TRC101;

- our success in educating physicians and patients about the benefits, administration and use of TRC101;

- acceptance of TRC101 as safe and effective by patients and the medical community;

16

Table of Contents

- the availability, perceived advantages, relative cost, relative safety and relative efficacy of alternative and competing treatments;

- our ability to obtain and sustain an adequate level of reimbursement for TRC101 by third-party payors;

- the effectiveness of our own or any future strategic collaborators' marketing, sales and distribution strategy and operations;

- our ability to continue to obtain protection for and to enforce our intellectual property rights in and to TRC101; and

- our ability to avoid and defend against third-party patent interference or patent infringement claims or similar proceedings with respect to our patent rights and patent infringement claims.

Many of these factors are beyond our control. Accordingly, we cannot assure you that we will ever be able to generate revenue through the sale of TRC101. If we are not successful in commercializing TRC101, or are significantly delayed in doing so, our business will be materially harmed.

***We will attempt to secure approval of TRC101 from the FDA through the use of the Accelerated Approval Program, but such mechanism may not actually lead to a faster development or regulatory review or approval process. If we are unable to obtain approval of TRC101 through the Accelerated Approval Program in the United States, we may be required to conduct additional nonclinical and clinical studies and trials beyond those that we currently contemplate, which could increase the expense of obtaining, reduce the likelihood of obtaining and/or delay the timing of obtaining, necessary marketing approval. Even if we receive approval from the FDA under the Accelerated Approval Program, if our confirmatory postmarketing trial does not verify clinical benefit, or if we do not comply with rigorous postmarketing requirements, the FDA may seek to withdraw the approval.***

We currently plan to seek U.S. approval for our sole product candidate, TRC101, through the FDA's Accelerated Approval Program based on the results of our Phase 1/2 trial, TRCA-101, our pivotal Phase 3 clinical trial, TRCA-301, and our safety extension trial, TRCA-301E. For any approval to market a drug product, we must provide the FDA and foreign regulatory agencies with clinical data that adequately demonstrate the safety and efficacy of the product for the indication applied for in the New Drug Application, or NDA, or other respective regulatory filings. As described in the "Government Regulation" section, the Accelerated Approval Program is one of several approaches used by the FDA to make prescription drugs more rapidly available for the treatment of serious or life-threatening diseases. Section 506(c) of the Federal Food, Drug and Cosmetic Act, or FFDCA, provides that the FDA may grant accelerated approval to "a product for a serious or life-threatening condition upon a determination that the product has an effect on a surrogate endpoint that is reasonably likely to predict clinical benefit, or on a clinical endpoint that can be measured earlier than irreversible morbidity or mortality, that is reasonably likely to predict an effect on irreversible morbidity or mortality or other clinical benefit, taking into account the severity, rarity, or prevalence of the condition and the availability or lack of alternative treatments." Approval under the Accelerated Approval Program is subject, however, to the requirement that the applicant conduct additional postmarketing clinical trials to verify and describe the drug's clinical benefit, where there is uncertainty as to the relationship of the surrogate endpoint to the clinical benefit, or of the observed clinical endpoint to ultimate outcome. Typically, clinical benefit is verified when postmarketing clinical trials show that the drug provides a clinically meaningful positive therapeutic effect, that is, an effect on how a patient feels, functions, or survives. The FDA may require that any confirmatory postmarketing trial be initiated or substantially underway prior to the submission of an application under the Accelerated Approval Program. And, if such confirmatory postmarketing trial fails to confirm the drug's clinical profile or risks and benefits, the FDA may withdraw its approval of the drug.

17

Table of Contents

The FDA has broad discretion with regard to approval under the Accelerated Approval Program, and even if we believe that the Accelerated Approval Program is appropriate for TRC101, we cannot assure you that the FDA will ultimately agree. Furthermore, even if we do obtain approval under the Accelerated Approval Program, we may not experience a faster development process, review or approval compared to conventional FDA procedures.

We have sought feedback from the FDA on our ability to seek and receive approval for TRC101 under the Accelerated Approval Program, but there can be no assurance that the FDA will ultimately agree that the results of our pivotal Phase 3 clinical trial, TRCA-301, and our safety extension trial, TRCA-301E and the design of our confirmatory postmarketing trial, VALOR-CKD, will be sufficient to support such approval. There also can be no assurance that after subsequent FDA feedback that we will continue to pursue approval under the Accelerated Approval Program. Furthermore, if we submit an application for approval through the Accelerated Approval Program, there can be no assurance that such application will be accepted or that approval will be granted on a timely basis, or at all. For example, the FDA could require us to conduct further studies or trials prior to considering our application or granting approval of any type, including by determining that approval under the Accelerated Approval Program is not appropriate and that our pivotal Phase 3 clinical trial, TRCA-301, may not be used to support approval under the conventional pathway. We might not be able to fulfill the FDA's requirements in a timely manner, which would cause delays, or approval might not be granted because our submission is deemed incomplete by the FDA. A failure to obtain approval under the Accelerated Approval Program could result in a longer time period to commercialize TRC101, could increase the cost of development of it and could significantly harm our financial position and competitive position in the marketplace.

Even if we receive approval for TRC101 under the Accelerated Approval Program, we will be subject to rigorous postmarketing requirements, including the completion of our confirmatory postmarketing trial, VALOR-CKD, or such other confirmatory postmarketing trials as the FDA may require, to verify the clinical benefit of the product, and submission to the FDA of all promotional materials prior to their dissemination. The FDA could seek to withdraw the approval for multiple reasons, including if we fail to conduct any required confirmatory postmarketing trial with due diligence, a confirmatory postmarketing trial does not confirm the predicted clinical benefit, other evidence shows that the product is not safe or effective under the conditions of use, or we disseminate promotional materials that are found by the FDA to be false and misleading.

Any delay in obtaining, or inability to obtain, approval under the Accelerated Approval Program would delay or prevent commercialization of TRC101 and would materially adversely affect our business, financial condition, results of operations, cash flows and prospects.

***We may be unable to obtain regulatory approval for TRC101 under applicable regulatory requirements.***

To gain approval to market a drug product, regardless of whether it is through Accelerated Approval or the conventional pathway, we must provide the FDA and foreign regulatory agencies with clinical data that adequately demonstrates the safety and efficacy of the product for the intended indication applied for in the NDA or other respective regulatory filing. Drug development is a long, expensive and uncertain process, and delay or failure can occur at any stage of any of our clinical trials. A number of companies in the pharmaceutical industry have suffered significant setbacks in clinical trials even after promising results in earlier nonclinical or clinical studies and trials. These setbacks have been caused by, among other things, nonclinical findings made while clinical trials were underway and safety or efficacy observations made in clinical trials, including previously unreported adverse events. Success in nonclinical testing and early clinical trials does not ensure that later clinical trials will be successful, and the results of clinical trials by other parties may not be indicative of the results in trials we may conduct.

18

Table of Contents

Our business currently depends entirely on the successful development, regulatory approval and commercialization of our sole product candidate, TRC101. Based on the results of our pivotal Phase 3 clinical trial, TRCA-301*, we plan to prepare and submit an NDA seeking approval under the FDA's Accelerated Approval Program to market TRC101. We currently have efficacy and safety data from our TRCA-101 trial, and topline efficacy and safety data from our pivotal Phase 3 clinical trial, TRCA-301. In addition to our TRCA-101 and TRCA-301 clinical results, our NDA submission will include data from our safety extension trial, TRCA-301E, and such additional data may be less favorable than the information we have currently.

Furthermore, TRC101 may not receive marketing approval even though we believe we achieved the primary and secondary endpoints in our pivotal Phase 3 clinical trial, TRCA-301. The FDA and other foreign regulatory agencies have substantial discretion in evaluating the results of our pivotal Phase 3 clinical trial, TRCA-301, and our earlier Phase 1/2 trial, TRCA-101. For example, notwithstanding our view to the contrary, the FDA may determine that the efficacy data and/or safety data from our Phase 1/2 trial, TRCA-101, our pivotal Phase 3 clinical trial, TRCA-301, and our safety extension trial, TRCA-301E, do not support approval of an NDA for TRC101. Clinical data often is susceptible to varying interpretations and many companies that have believed that their products performed satisfactorily in clinical trials have nonetheless failed to obtain FDA approval for their products. The FDA or foreign regulatory agencies may disagree with our trial design and our interpretation of data from our Phase 1/2 trial, TRCA-101, our pivotal Phase 3 clinical trial, TRCA-301, our safety extension trial, TRCA-301E, or our nonclinical studies. Upon the FDA's review of the data from our pivotal Phase 3 clinical trial, TRCA-301, and our safety extension trial, TRCA-301E, it may request that we conduct additional analyses of the data and, if it believes that the data are not satisfactory, could advise us to delay our submission of an NDA. Accordingly, we may not submit our NDA for TRC101 within our anticipated time frame and, even after we make the submission, the FDA may not accept it for filing, may request additional information from us, including data from additional clinical trials, and, ultimately, may not grant marketing approval for TRC101.

While there are comparable approval pathways outside the United States that are similar to the Accelerated Approval Program, we have not yet explored whether TRC101 might qualify for such a program. Foreign regulatory authorities may determine that the results of our pivotal Phase 3 clinical trial, TRCA-301, and our safety extension trial, TRCA-301E, and our earlier Phase 1/2 trial, TRCA-101, are not sufficient to support regulatory approval and may require us to complete additional clinical trials or other studies prior to submitting an application for approval.

***The denial of regulatory approval for TRC101 could mean that we need to cease operations, and a delay in obtaining such approval could delay commercialization of TRC101 and adversely impact our ability to generate revenue, our business and our results of operations.***

If we are not successful in commercializing TRC101, or are significantly delayed in doing so, our business will be materially harmed, and we may need to curtail or cease operations. We currently have no drug products approved for sale, and we may never obtain regulatory approval to commercialize TRC101, either under FDA's Accelerated Program or the conventional pathway. The research, testing, manufacturing, labeling, approval, sale, marketing and distribution of drug products are subject to extensive regulation by the FDA and other regulatory agencies in the United States and other countries, and such regulations differ from country to country. We are not permitted to market TRC101 in the United States until we receive approval of an NDA from the FDA.

The FDA or any foreign regulatory agency can delay, limit or deny approval to market TRC101 for many reasons, including:

- our inability to demonstrate to the satisfaction of the FDA or the applicable foreign regulatory agency that TRC101 is safe and effective for the requested indication;

19

Table of Contents

- our inability to gain agreement from the FDA that TRC101 is appropriate for approval under FDA's Accelerated Approval Program;

- our inability to gain agreement from applicable foreign regulatory authorities that TRC101 is appropriate for approval under applicable regulatory pathways;

- the FDA's or the applicable foreign regulatory agency's disagreement with the interpretation of data from nonclinical and clinical studies and trials;

- our inability to demonstrate that the clinical and other benefits of TRC101 outweigh any safety or other perceived risks;

- our ability to enroll an adequate number of patients in our confirmatory postmarketing trial, VALOR-CKD;

- the FDA's or the applicable foreign regulatory agency's requirement for additional nonclinical or clinical studies or trials;

- the FDA's or the applicable foreign regulatory agency's having differing requirements for the trial protocols used in our clinical trials;

- the FDA's or the applicable foreign regulatory agency's non-approval of the formulation, labeling and/or the specifications of TRC101;

- the FDA's or the applicable foreign regulatory agency's failure to accept the manufacturing processes or third-party manufacturers with which we contract; or

- the potential for approval policies or regulations of the FDA or the applicable foreign regulatory agencies to significantly change in a manner rendering our clinical data insufficient for approval.

Of the large number of drugs in development, only a small percentage successfully complete the FDA or other regulatory approval processes and are commercialized.

Even if we eventually complete clinical testing and receive approval of an NDA or foreign marketing authorization for TRC101, the FDA or the applicable foreign regulatory agency may grant approval contingent on the performance of costly additional clinical trials, which may be required after approval. The FDA or the applicable foreign regulatory agency may also approve TRC101 for a more limited indication and/or a narrower patient population than we originally request, and the FDA or applicable foreign regulatory agency may not approve the labeling that we believe is necessary or desirable for the successful commercialization of TRC101. Any delay in obtaining, or inability to obtain, applicable regulatory approval would delay or prevent commercialization of TRC101 and would materially adversely impact our business and prospects.

***Clinical drug development involves a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results. Failure can occur at any stage of clinical development. We have not submitted an NDA for TRC101, or similar drug approval filings, to the FDA or to comparable foreign authorities.***

Clinical testing is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure can occur at any time during the clinical trial process. The results of nonclinical and clinical studies and trials of our product candidate may not be predictive of the results of later-stage clinical trials. For example, the positive results generated to date in our Phase 1/2 trial, TRCA-101, and our pivotal Phase 3 trial, TRCA-301, for TRC101 do not ensure that our late-stage clinical program, including our ongoing safety extension trial, TRCA-301E, will demonstrate similar results. Product

20

Table of Contents

candidates in later stages of clinical trials may fail to show the desired safety and efficacy despite having progressed through nonclinical and clinical studies and trials. A number of companies in the pharmaceutical industry have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier studies and trials, and we cannot be certain that we will not face similar setbacks. Based upon negative or inconclusive results, we or any potential future collaborator may decide, or regulators may require us, to conduct additional nonclinical and clinical studies and trials. In addition, data obtained from trials and studies are susceptible to varying interpretations, and regulators may not interpret our data as favorably as we do, which may delay, limit or prevent regulatory approval. Furthermore, we rely on contract research organizations, or CROs, and clinical trial sites to ensure the proper and timely conduct of our clinical trials and, while we have agreements governing their committed activities, we have limited influence over their actual performance. Even though we completed our pivotal Phase 3 clinical trial, TRCA-301, and even if our safety extension trial, TRCA-301E, and any future clinical trials are completed, the results may not be sufficient to obtain regulatory approval, regardless of whether it is through the Accelerated Approval Program or the conventional pathway, for TRC101 in the time frame we anticipate, or at all.

For approval of TRC101 through the Accelerated Approval Program, the FDA has specifically requested that a confirmatory postmarketing clinical trial be completely or nearly completely enrolled prior to submission of our NDA. We may experience delays in starting our confirmatory postmarketing trial, VALOR-CKD, as a result of various factors including reaching agreement with the FDA on the final clinical trial protocol for the trial and timely enrollment of an adequate number of patients. In addition, our confirmatory postmarketing trial, VALOR-CKD, may have a large dropout rate of participants, which could add time, expense and risk to the completion of the trial and could affect the results of the trial.

In addition, we do not know whether future clinical trials, if any, will begin on time, need to be redesigned, enroll an adequate number of patients on time or be completed on schedule, if at all. Clinical trials can be delayed or aborted for a variety of reasons, including delay or failure to:

- obtain regulatory approval to commence a trial, if applicable;

- reach agreement on acceptable terms with prospective CROs and clinical trial sites, the terms of which can be subject to extensive negotiation and may vary significantly among different CROs and trial sites;

- obtain ethics committee or institutional review board, or IRB, approval at each site;

- recruit suitable patients to participate in a trial and have such patients complete the clinical trial or return for post-treatment follow-up;

- ensure that clinical sites follow the trial protocol, comply with good clinical practices, or GCPs, and continue to participate in a clinical trial;

- address any patient safety concerns that arise during the course of a clinical trial;

- ensure that patients comply with and complete clinical trial protocol;

- achieve a sufficient level of endpoint events in the placebo group, if applicable;

- initiate or add a sufficient number of clinical trial sites;

- ensure that trial sites do not deviate from clinical trial protocol or drop out of a clinical trial;

- address any conflicts with new or existing laws or regulations;

- manufacture sufficient quantities of product candidate for use in clinical trials and ensure clinical trial material is provided to clinical sites in a timely manner; and

- obtain the statistical analysis plan to be used to evaluate the clinical trial data.

21

Table of Contents

Patient enrollment is a significant factor in the timing of clinical trials and is affected by many factors, including the size and nature of the patient population, the proximity of patients to clinical sites, the eligibility criteria for the trial, the design of the clinical trial, competing clinical trials and clinicians' and patients' perceptions as to the potential advantages of the drug being studied in relation to other available therapies, including any new drugs or treatments that may be approved for the indications we are investigating.

We could also encounter delays if a clinical trial is suspended or terminated by us, by the ethics committees or IRBs of the institutions in which such trials are being conducted, by an independent Safety Review Board, or SRB, for such trial or by the FDA or other regulatory agencies. Such parties may suspend or terminate a clinical trial due to a number of factors, including failure to conduct the clinical trial in accordance with regulatory requirements or our clinical protocols, inspection of the clinical trial operations or trial site by the FDA or other regulatory agencies resulting in the imposition of a clinical hold, unforeseen safety issues or adverse side effects, failure to demonstrate a benefit from using a drug, changes in governmental regulations or administrative actions or lack of adequate funding to continue the clinical trial.

Further, conducting clinical trials in foreign countries presents additional risks that may delay completion of our clinical trials. These risks include the failure of physicians or enrolled patients in foreign countries to adhere to clinical protocol as a result of differences in healthcare services or cultural customs, managing additional administrative burdens associated with foreign regulatory schemes, as well as political and economic risks relevant to such foreign countries. In addition, the FDA may determine that clinical trial results obtained in foreign subjects do not represent the safety and efficacy of a product when administered in U.S. patients and are thus not supportive of an NDA approval in the United States.

If we experience delays in the start or completion of, or termination of, any clinical trial of our sole product candidate, TRC101, the commercial prospects of TRC101 may be harmed, and our ability to generate product revenues from TRC101 will be delayed. In addition, any delays in completing our clinical trials will increase our costs, slow down our TRC101 development and approval process and jeopardize our ability to commence product sales and generate revenues. Any of these occurrences may significantly harm our business, financial condition and prospects. In addition, many of the factors that cause, or lead to, a delay in the commencement or completion of clinical trials may also ultimately lead to the denial of regulatory approval of TRC101.

### Results from completed human clinical trials may not be representative of the results that are obtained after approval, if obtained, and product launch.

Human clinical trials are very complicated undertakings and working with subjects with CKD is particularly difficult because of the serious nature of the disease and the comorbidities experienced by the subjects. If we obtain FDA approval under the Accelerated Approval Program, safety risks not identified in our prior clinical trials may first appear after we obtain approval and commercialize TRC101. Any new postmarketing adverse events may significantly impact our ability to market TRC101 and may require that we recall and discontinue commercialization of the product. Furthermore, if the confirmatory postmarketing trial, VALOR-CKD, fails to confirm TRC101's clinical profile or clinical benefits, the FDA may withdraw its approval of TRC101. Any of these events would materially harm our business.

22

Table of Contents

***We have relied and continue to rely on third parties, particularly CROs, to conduct and complete our clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines, we may be unable to obtain regulatory approval for or commercialize TRC101, if approved.***

We do not have the ability to independently conduct clinical trials. We rely on medical institutions, clinical investigators, contract laboratories, collaborative partners and other third parties, such as CROs, to conduct clinical trials for TRC101. We rely on these third parties to conduct and complete our clinical trials according to GCPs and the study protocol, statistical analysis plan and other study-specific documents (for example, monitoring and blinding plans). Responsibilities of these third parties include, but are not limited to, monitoring of the study sites and ensuring that the study is conducted in compliance with the informed consent process, protocol-specified inclusion/exclusion criteria, prior/concomitant medication restrictions, visit-specific assessment requirements and all study-specific blinding procedures.

Our safety extension trial, TRCA-301E, is being conducted at 29 sites in the United States and Europe. The third parties with whom we contract for execution of our clinical trials play a significant role in the conduct of these trials and the subsequent collection and analysis of data. However, these third parties are not our employees, and, except for contractual duties and obligations, we have limited ability to control the amount or timing of resources that they devote to our program. Although we rely on these third parties to conduct all of our clinical trials, we remain responsible for ensuring that each of our clinical trials is conducted and its data analyzed in accordance with its protocol and statistical analysis plan. Moreover, the FDA and foreign regulatory agencies require us to comply with regulations and standards, including GCPs for conducting, monitoring, recording and reporting the results of clinical trials to ensure that the data and results are scientifically credible and accurate, and that the trial subjects are adequately informed of the potential risks of participating in clinical trials.

In addition, the execution of clinical trials, and the subsequent compilation and analysis of the data produced, requires coordination among various parties. In order for these functions to be carried out effectively and efficiently, it is imperative that these parties communicate and coordinate with one another. Moreover, these third parties may also have relationships with other commercial entities, some of which may compete with us. These third parties may terminate their agreements with us upon as little as 30 days' prior written notice. Some of these agreements may also be terminated by such third parties under certain other circumstances, including our insolvency. If the third parties conducting our clinical trials do not perform their contractual duties or obligations, experience work stoppages, do not meet expected deadlines, terminate their agreements with us or need to be replaced, or if the quality or accuracy of the clinical data they obtain is compromised due to the intentional or inadvertent failure to adhere to our clinical trial protocols or GCPs, or for any other reason, we may need to enter into new arrangements with alternative third parties, which could be difficult, costly or impossible, and our clinical trials may be extended, delayed or terminated or may need to be repeated. The third parties upon whom we rely may be inspected by FDA or other regulatory authorities in relation to our, or to other, studies or trials. Such inspections may result in FDA or other regulatory authorities not accepting the data produced by the third party.

If any of the foregoing were to occur, we may not be able to obtain regulatory approval for or commercialize TRC101, which would have a material adverse effect on our business, results of operations and financial condition.

23

Table of Contents

***We rely completely on third-party suppliers to manufacture our clinical drug supply of TRC101 drug substance and drug product, and we intend to rely on third parties to produce commercial supply of TRC101 drug substance and drug product, if approved.***

We do not currently have, nor do we plan to acquire, the infrastructure or internal capability to manufacture TRC101 on a clinical or commercial scale. As such, we contract with third-party service providers to manufacture TRC101 drug substance and drug product and to perform analytical testing services under cGMPs. Pharmaceutical manufacturing facilities are subject to inspection by the FDA and foreign regulatory agencies on a regular basis, before and after product approval.

We do not directly control, and are completely dependent on, our contract manufacturers for compliance with, applicable requirements including cGMP, for manufacture of both TRC101 drug substance and drug product. If our contract manufacturers cannot successfully manufacture material that conforms to our specifications or they are unable to comply with the strict regulatory requirements of the FDA or foreign regulatory agencies, we will not be able to secure and/or maintain adequate supply of TRC101 drug substance and drug product. In addition, we have no direct control over the ability of our contract manufacturers to maintain adequate quality control, quality assurance and qualified personnel. Furthermore, all of our contract manufacturers are engaged with other companies to supply and/or manufacture materials or products for such companies, which exposes our manufacturers to regulatory risks for the production of such other materials and products. As a result, failure to meet the regulatory requirements for the production of those materials and products may generally affect the regulatory clearance of our contract manufacturers' facilities. If our contract manufacturers' facilities fail to comply with the FDA or a comparable foreign regulatory agency requirements, we may need to find alternative manufacturing facilities for TRC101 drug substance or drug product, which would negatively impact our ability to develop, obtain regulatory approval for, or market TRC101, if approved, and materially adversely affect our financial condition.

***We currently depend on a single third-party supplier for the manufacture of TRC101 drug substance, and any performance failure on the part of our supplier could delay the development and potential commercialization of TRC101.***

We cannot be certain that our drug substance supplier will continue to provide us with sufficient quantities of TRC101 drug substance, or that our manufacturers will be able to produce sufficient quantities of drug product incorporating such drug substance, to satisfy our anticipated specifications and quality requirements, or that such quantities can be obtained at pricing necessary to sustain acceptable pharmaceutical margins. We believe that there are a limited number of experienced contract manufacturers in the world capable of manufacturing a polymeric drug substance such as TRC101. Our current dependence on a single supplier for our drug substance and the challenges we may face in obtaining adequate supply of TRC101 drug substance involves several risks, including limited control over pricing, availability, quality and delivery schedules. Any supply interruption in TRC101 drug substance or drug product could materially harm our ability to complete our development program or satisfy commercial demand, if approved, until a new source of supply, if any, could be identified and qualified. We may be unable to find a sufficient alternative supply channel in a reasonable time or on commercially reasonable terms. Any performance failure on the part of our suppliers could delay the development and potential commercialization of TRC101, including limiting supplies necessary for clinical trials and regulatory approvals, which would have a material adverse effect on our business.

Moreover, our current supplier of drug substance may not have the capacity to manufacture TRC101 drug substance in the quantities that we believe will be sufficient to meet anticipated market demand or to enable us to achieve the economies of scale necessary to reduce the manufacturing cost of TRC101 drug substance. Our business plan assumes that we are able to develop a supply chain

24

Table of Contents

with multiple suppliers and significantly decrease our cost of goods within the first several years of commercialization of TRC101, if approved, enabling us to achieve gross margins similar to those achieved by other companies with polymer-based drugs. If we are unable to reduce the manufacturing cost of TRC101 drug substance, our financial results will suffer and our ability to achieve profitability will be significantly jeopardized. Outside of our current supplier, we currently do not have any agreements for the commercial production of TRC101 drug substance. If our contract manufacturer for drug substance is unable to source, or we are unable to purchase, sufficient quantities of materials necessary for the production of TRC101 drug substance, the ability of TRC101 to reach its market potential to be launched, would be delayed or suffer from a shortage in supply, which would impair our ability to generate revenues from the sale of TRC101. If there is a disruption to our contract manufacturers' or suppliers' relevant operations, we will have no other means of producing TRC101 drug substance until they restore the affected facilities or we or they procure alternative manufacturing facilities. Additionally, any damage to or destruction of our contract manufacturers' or suppliers' facilities or equipment may significantly impair our ability to manufacture TRC101 on a timely basis.

***We are in the process of scaling our two-step manufacturing process to commercial scale with our third-party supplier. Any performance failure or time delay in scaling our two-step drug substance manufacturing process could materially adversely affect or delay validation of our manufacturing process or delay the start or interrupt the execution of our confirmatory postmarketing trial, VALOR-CKD, and potentially impact the commercialization of TRC101, if approved.***

While we believe we have sufficient drug substance to supply the anticipated demand for at least the first four months of our confirmatory postmarketing trial, VALOR-CKD, we are in the process of scaling our two-step manufacturing process to commercial scale with our third-party supplier. The scale of the first step in our drug substance manufacturing process, step one, (currently at approximately 340 kg/batch) is being increased two-fold, and the scale of the second step in our manufacturing process, step two, (currently at approximately 65 kg/batch) is being increased ten-fold, to provide targeted commercial batch sizes for each of the steps in the range of 500 to 700 kg. As compared to soluble, small organic molecule pharmaceuticals, insoluble, non-absorbed polymers are manufactured in larger batches to satisfy greater doses, e.g., gram quantities versus milligram or even microgram quantities per dose, which presents unique requirements both in terms of scale-up and process controls. We are in the process of scaling the current production methods to meet our anticipated commercial needs without introducing changes to key TRC101 properties, including binding capacity, selectivity for hydrochloric acid and non-absorption. We use acid binding, competitive anion binding and particle size measurement assays to confirm these properties. Any difficulties experienced in the ongoing scale-up of our drug substance manufacturing processes to commercial scale could materially adversely affect or delay our ability to (i) meet regulatory process validation requirements to demonstrate that our manufacturing process is capable of consistently delivering quality product, or (ii) have sufficient quantities of TRC101 drug product manufactured to timely initiate and successfully conduct our confirmatory postmarketing trial, VALOR-CKD, or (iii) have sufficient quantities of TRC101 drug substance and drug product to supply commercial supply of TRC101, if approved, all of which would have a material adverse effect on our business and our prospects.

***If we fail to establish an effective distribution process for TRC101 drug product, if approved, our business may be adversely affected.***

We do not currently have the infrastructure necessary for distributing pharmaceutical products to patients. We intend to contract with a third-party logistics company to warehouse TRC101 and distribute it. This distribution network will require significant coordination with our sales and marketing and finance teams. Failure to secure contracts with a logistics company could negatively impact the distribution of TRC101, if approved, and failure to coordinate financial systems could negatively impact

25

Table of Contents

our ability to accurately report product revenue. If we are unable to effectively establish and manage the distribution process, the commercial launch and sales of TRC101 will be delayed or severely compromised and our results of operations may be harmed.

***Even if TRC101 obtains regulatory approval, it may never achieve market acceptance or commercial success, which will depend, in part, upon the degree of acceptance among physicians, patients, patient advocacy groups, health care payors and the medical community.***

Even if we obtain FDA or other regulatory approvals, TRC101 may not achieve market acceptance among physicians, patients, patient advocacy groups, health care payors or the medical community, and may not be commercially successful. If approved, market acceptance of TRC101 depends on a number of factors, including:

- the efficacy of the product as demonstrated in clinical trials;

- the prevalence and severity of any side effects and overall safety profile of the product;

- the clinical indications for which the product is approved;

- the potential and perceived advantages of TRC101 over current options or future alternative treatments;

- the strength of our marketing organization and distribution channels;

- the quality of our relationships with patient advocacy groups;

- the availability and sufficiency of third-party coverage and adequate reimbursement;

- acceptance by physicians, major operators of clinics and patients of the product as a safe and effective chronic daily treatment and willingness of physicians to prescribe TRC101;

- the cost of treatment in relation to alternative treatments and willingness to pay for TRC101, if approved, on the part of patients;

- relative convenience and ease of administration of TRC101; and

- the availability of the product and our ability to meet market demand, including providing a reliable supply for long-term daily treatment.

Any failure by our product candidate, if it obtains regulatory approval, to achieve market acceptance or commercial success would adversely affect our results of operations.

***The incidence and prevalence of the target patient population for TRC101 are based on estimates and third-party sources. If the market opportunity for TRC101 is smaller than we estimate or if any approval that we obtain is based on a narrower definition of the patient population, our revenue and ability to achieve profitability might be materially and adversely affected.***

Periodically, we make estimates regarding the incidence and prevalence of target patient populations based on various third-party sources and internally generated analysis. These estimates may be inaccurate or based on imprecise data. For example, the total addressable market opportunity for TRC101 will depend on, among other things, acceptance of TRC101 by the medical community and patient access, drug pricing and reimbursement. The number of patients in the addressable markets may turn out to be lower than expected, patients may not be otherwise amenable to treatment with TRC101, or new patients may become increasingly difficult to identify or gain access to, all of which may significantly harm our business, financial condition, results of operations and prospects.

26

Table of Contents

***TRC101, if approved, may face significant competition and our failure to effectively compete may prevent us from achieving significant market penetration.***

While we are not aware of any therapies approved by the FDA for the chronic treatment of metabolic acidosis and are not aware of any active clinical development programs other than ours for such a treatment in the United States, the pharmaceutical market is highly competitive and dynamic, and is characterized by rapid and substantial technological development and product innovations. Our TRC101 development program may serve as a template for a fast follower to develop a competing product candidate. Furthermore, we expect TRC101 to compete against non-approved options for increasing blood bicarbonate levels, including oral alkali supplementation such as sodium bicarbonate, sodium citrate or potassium citrate. TRC101 may not be able to compete effectively with existing non-approved options for increasing blood bicarbonate levels or new drugs that may be developed by competitors. The risk of competition is specifically important to us because TRC101 is our only product candidate.

Our competitors may have materially greater financial, manufacturing, marketing, research and drug development resources than we do. Large pharmaceutical companies in particular, may have extensive expertise in nonclinical and clinical testing and in obtaining regulatory approvals for drugs. In addition, academic institutions, government agencies, and other public and private organizations conducting research may seek patent protection with respect to potentially competitive products or technologies. These organizations may also establish exclusive collaborative or licensing relationships with our competitors.

Failure to compete effectively against available options for raising blood bicarbonate levels or in the future with new products would materially harm our business, financial condition and results of our operations.

***We currently have limited sales or marketing capabilities. If we are unable to establish effective sales and marketing capabilities or if we are unable to enter into agreements with third parties to commercialize TRC101, we may not be able to effectively generate product revenues.***

We currently have limited sales or marketing capabilities. In order to commercialize TRC101, if approved, we must build marketing and sales capabilities or make arrangements with third parties to perform these services, and we may not be successful in doing so. If TRC101 is approved by the FDA, we plan to initially commercialize it in the United States by deploying an 80- to 100-person specialty sales force targeting that subset of nephrologists most focused on treating CKD patients. Building the requisite sales, marketing or distribution capabilities will be expensive and time-consuming and will require significant attention of our leadership team to manage. Any failure or delay in the development of our sales, marketing or distribution capabilities would adversely impact the commercialization of our product. The competition for talented individuals experienced in selling and marketing pharmaceutical products is intense, and we cannot assure you that we can assemble an effective team. Additionally, we may choose to collaborate, either globally or on a territory-by-territory basis, with third parties on the commercialization of TRC101. If we are unable to enter into such arrangements on acceptable terms or at all, we may not be able to successfully commercialize TRC101 if and when it receives regulatory approval or any such commercialization may experience delays or limitations.

We may be subject to additional risks related to operating in foreign countries either ourselves or through a third-party, including:

- differing regulatory requirements in foreign countries;

- unexpected changes in tariffs, trade barriers, price and exchange controls and other regulatory requirements;

27

- economic weakness, including inflation or political instability in particular foreign economies and markets;

- compliance with tax, employment, immigration and labor laws for employees living or traveling abroad;

- foreign taxes, including withholding of payroll taxes;

- foreign currency fluctuations, which could result in increased operating expenses and reduced revenues, and other obligations incident to doing business in another country;

- difficulties staffing and managing foreign operations;

- workforce uncertainty in countries where labor unrest is more common than in the United States;

- potential liability under the Foreign Corrupt Practices Act of 1977 or comparable foreign regulations;

- challenges enforcing our contractual and intellectual property rights, especially in those foreign countries that do not respect and protect intellectual property rights to the same extent as the United States;

- production shortages resulting from any events affecting raw material supply or manufacturing capabilities abroad; and

- business interruptions resulting from geopolitical actions, including war and terrorism.

***Our clinical development program may not uncover all possible adverse events that patients who take TRC101 may experience. The number of subjects exposed to TRC101 treatment and the average exposure time in the clinical development program may be inadequate to detect adverse events, or chance findings, that may only be detected once TRC101 is administered to more patients and for greater periods of time.***

Clinical trials by their nature utilize a sample of the potential patient population. However, with a limited number of subjects and limited duration of exposure, we cannot be fully assured that TRC101 has no serious or severe side effects, and any such side effects may only be uncovered with a significantly larger number of patients exposed to the drug candidate. It is possible that ongoing and future clinical trials, as well as reports received from TRC101 use commercially, if approved, may identify safety concerns.

Although we have monitored the subjects in our trials for certain safety concerns and we have not seen evidence of significant safety concerns in our clinical trials to date, patients treated with TRC101 may experience adverse reactions. The most commonly reported adverse effect of TRC101 in the TRCA-101 trial was mild-to-moderate GI events, such as diarrhea and constipation. The most commonly reported treatment-related adverse events in the TRCA-301 trial were mild to moderate GI disorders, which included diarrhea, flatulence, nausea and constipation. It is possible that the FDA may ask for additional data regarding such matters. In addition, CKD patients often experience significant and frequent comorbidities and are being treated with other medications. Although in vitro studies and human drug-drug interaction, or DDI, studies available to date indicate that TRC101 does not interact with medications commonly used by CKD patients, if significant DDIs occur in the future, TRC101 may no longer be compatible with some of the medications used to treat CKD patients. If safety problems occur or are identified after TRC101 reaches the market, the FDA may require that we amend the labeling of TRC101, recall TRC101, or even withdraw approval for TRC101.

28

Table of Contents

***The FDA may not agree that the safety of TRC101 has been sufficiently characterized by the amount and quality of data provided from our clinical development program.***

The NDA safety database for new drugs intended for chronic use in non-life-threatening conditions typically includes at least 1500 individuals, with at least 100 patients exposed to the drug for a minimum of one year (Guideline for Industry ICH-E1A: *The Extent of Population Exposure to Assess Clinical Safety: For Drugs Intended for Long-term Treatment of Non-Life-Threatening Conditions*). At the time of filing our NDA, we anticipate that the TRC101 safety database will be significantly smaller than the guidance suggests. Given the toxicology study results and clinical safety profile observed to date for TRC101, as well as the non-absorbed nature of the drug, we believe our proposed safety database will be adequate for the filing of the TRC101 NDA and its review through the Accelerated Approval Program. However, we cannot assure you that the FDA will agree with our proposal. If they require additional safety data in the initial NDA filing, this could have a material adverse effect on our expected clinical and regulatory timelines, business, prospects, financial condition and results of operations.

***Our product candidate, TRC101, may cause undesirable side effects or have other properties that could delay or prevent its regulatory approval, reduce the commercial attractiveness of a prescribing label or result in significant negative consequences following regulatory approval, if approved.***

Clinical studies of TRC101 could reveal a high and unacceptable incidence and severity of undesirable and currently unknown side effects. Undesirable side effects could adversely affect patient enrollment in clinical studies, cause us or regulatory authorities to interrupt, delay or halt clinical studies or result in the delay, denial or withdrawal of regulatory approval by the FDA, the European Medicines Agency, or EMA, or other global regulatory authorities. Undesirable side effects also could result in regulatory authorities mandating additional clinical testing prior to approval, postmarketing testing following approval, or a more restrictive prescribing label for a product, which, in turn, could limit the market acceptance of the product by physicians and consumers.

Drug-related side effects could result in potential product liability claims, especially if they were not included in the consent forms for clinical trial patients or included in the warnings of any FDA-approved labeling. We currently carry product liability insurance covering use in our clinical trials in the amount of $10 million in the aggregate; however, we may not be able to maintain insurance coverage at a reasonable cost or in sufficient amounts if liability and legal costs exceed the threshold limited. A successful product liability claim or series of claims brought against us could cause our stock price to decline and, if judgments exceed our insurance coverage, could adversely affect our results of operations, business and financial condition, and commercial reputation. In addition, regardless of merit or eventual outcome, product liability claims may result in impairment of our business reputation, withdrawal of clinical study participants, increased costs due to related litigation, distraction of management's attention from our primary business, initiation of investigations by regulators or other governmental entities, monetary awards to patients or other claimants, the inability to commercialize TRC101 and decreased demand for our product, if approved for marketing.

Additionally, if TRC101 receives regulatory approval, and we or others later identify undesirable side effects or unanticipated adverse events caused by such product, a number of potentially significant negative consequences could result, including but not limited to:

- the requirement of additional warnings on the prescribing label;

- the withdrawal of approvals by regulatory authorities;

- the requirement of a risk evaluation and mitigation strategy plan, which could include a medication guide outlining the risks of such side effects for distribution to patients, a communication plan for healthcare providers and/or other elements to assure safe use;

29

Table of Contents

- litigation and the potential to be held liable for harm caused to patients; and

- an adverse effect on our reputation.

Any of these events could prevent us from achieving or maintaining market acceptance of TRC101 and could significantly harm our business, results of operations, financial condition and prospects.

### *We will need to significantly increase the size of our organization, and we may experience difficulties in managing growth.*

As of May 31, 2018, we had 61 full-time employees. We will need to continue to expand our managerial, operational, finance and other resources in order to manage our operations, regulatory filings, manufacturing and supply activities, clinical trials, marketing and commercialization activities for TRC101. Our management, personnel, systems and facilities currently in place may not be adequate to support this future growth. Our need to effectively execute our growth strategy requires that we:

- expand our general and administrative and sales and marketing organizations;

- identify, recruit, retain, incentivize and integrate additional employees;

- manage our internal development efforts effectively while carrying out our contractual obligations to third parties; and

- continue to improve our operational, legal, financial and management controls, reporting systems and procedures.

Our future financial performance and our ability to successfully develop and commercialize TRC101 will depend, in part, on our ability to effectively manage any future growth. Our management will have to dedicate a significant amount of its attention to managing these growth activities. In addition, we expect to incur additional costs in hiring, training and retaining such additional personnel.

If we are not able to effectively expand our organization by hiring new employees and expanding our groups of consultants and contractors, we may not be able to successfully execute the tasks necessary to further develop and commercialize our product candidate and, accordingly, may not achieve our research, development and commercialization goals.

### *If we fail to attract and keep senior management, we may be unable to successfully develop TRC101, conduct our clinical trials and commercialize TRC101, if approved.*

Our success depends in part on our continued ability to attract, retain and motivate highly qualified personnel. In particular, we are highly dependent upon our experienced senior management. The loss of services of any of these individuals or our inability to attract and retain additional qualified personnel could delay or prevent the successful development of our product, completion of our planned clinical trials or the commercialization of TRC101. Although we have entered into employment agreements with our senior management team, these agreements do not provide for a fixed term of service. Any of our employees could leave our employment at any time, with or without notice.

Although we have not historically experienced unique difficulties attracting and retaining qualified employees, we could experience such problems in the future. For example, competition for qualified personnel in the biotechnology and pharmaceuticals field is intense due to the limited number of individuals who possess the skills and experience required by our industry. We will need to hire additional personnel as we expand our clinical development and commercial activities. We may not be able to attract and retain quality personnel on acceptable terms, or at all. In addition, to the extent we

30

Table of Contents

hire personnel from competitors, we may be subject to allegations that they have been improperly solicited or that they have divulged proprietary or other confidential information, or that their former employers own their research output.

We may hire part-time employees or use consultants. As a result, certain of our employees, officers, directors or consultants may not devote all of their time to our business, and may from time to time serve as employees, officers, directors and consultants of other companies.

***Our employees, independent contractors, consultants, commercial partners and vendors may engage in misconduct or other improper activities, including noncompliance with regulatory standards and requirements.***

We are exposed to the risk of fraud or other illegal activity by our employees, independent contractors, consultants, commercial partners and vendors. In connection with this offering, we intend to adopt a code of business conduct and ethics, but it is not always possible to identify and deter employee misconduct, and the precautions we take to detect and prevent inappropriate conduct may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from misconduct or other failure to be in compliance with applicable laws or regulations.

Misconduct by our employees, independent contractors, consultants, commercial partners and vendors could include intentional failures to comply with FDA or international regulations, provide accurate information to the FDA or other international regulatory bodies, comply with manufacturing standards, comply with federal and state healthcare fraud and abuse laws and regulations, report financial information or data timely, completely and accurately or disclose unauthorized activities to us. In particular, sales, marketing and business arrangements in the healthcare industry are subject to extensive laws and regulations intended to prevent fraud, kickbacks, self-dealing and other abusive practices. These laws and regulations may restrict or prohibit a wide range of pricing, discounting, marketing and promotion, sales commission, customer incentive programs and other business arrangements. Misconduct by third parties could also involve the improper use of information obtained in the course of clinical trials.

If our operations are found to be in violation of any of the laws described above or any other governmental regulations that may apply to us, we may be subject to significant civil, criminal and administrative penalties, damages, fines, disgorgement, individual imprisonment, possible exclusion from government-funded healthcare programs, such as Medicare and Medicaid, additional integrity oversight and reporting obligations, contractual damages, reputational harm, diminished profits and future earnings and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations.

***If we seek and obtain approval to commercialize TRC101 outside of the United States, a variety of risks associated with international operations could materially adversely affect our business.***

If TRC101 is approved for commercialization outside the United States, we may enter into agreements with third parties to market TRC101 outside the United States. We expect that we will be subject to additional risks related to entering into these international business relationships, including:

- different regulatory requirements for drug approvals in foreign countries;

- differing U.S. and foreign drug import and export rules;

- reduced protection for intellectual property rights in foreign countries;

- unexpected changes in tariffs, trade barriers and regulatory requirements;

31

**Table of Contents**

- different reimbursement systems, and different competitive drugs indicated to treat metabolic acidosis;

- economic weakness, including inflation, or political instability in particular foreign economies and markets;

- compliance with tax, employment, immigration and labor laws for employees living or traveling abroad;

- foreign taxes, including withholding of payroll taxes;

- foreign currency fluctuations, which could result in increased operating expenses and reduced revenues, and other obligations incident to doing business in another country;

- workforce uncertainty in countries where labor unrest is more common than in the United States;

- production shortages resulting from any events affecting raw material supply or manufacturing capabilities abroad;

- potential liability resulting from development work conducted by these distributors; and

- business interruptions resulting from geopolitical actions, including war and terrorism, or natural disasters.

***Our Term Loan contains restrictions that limit our flexibility in operating our business.***

Our Term Loan with Hercules contains various covenants that limit our ability to engage in specified types of transactions without obtaining prior consent from our lenders. These covenants limit our ability to, among other things:

- use all of our cash;

- create, incur, assume, guarantee or be or remain liable with respect to any indebtedness;

- prepay any indebtedness;

- subject our assets that serve as collateral under the Term Loan, our intellectual property and all other property and assets used in our business to any lien or legal process;

- acquire, own or make investments;

- repurchase or redeem shares of our capital stock;

- declare or pay any cash dividends or make any other cash distributions;

- lend money to our employees, officers or directors, or guarantee such loans;

- waive, release or forgive indebtedness owed by our employees, officers or directors;

- voluntarily or involuntarily transfer, sell, lease, license, lend or convey our assets;

- merge or consolidate with another business organization;

- change our corporate name, legal form or jurisdiction of formation;

- suffer a change in control;

- relocate our chief executive office or principal place of business; and

- maintain deposit accounts or securities accounts without account control agreements in place.

The covenants in our Term Loan may limit our ability to take certain actions and, in the event that we breach one or more covenants, the agent may, and at the direction of the lenders will, declare

32

Table of Contents

an event of default and require that we immediately repay all amounts outstanding, plus penalties and interest, terminate their commitments to extend further credit and foreclose on the collateral granted to them to secure such indebtedness. The exercise of remedies by the lenders would have a material adverse effect on our business, operating results and financial condition.

***Our debt obligations expose us to risks that could adversely affect our business, operating results, overall financial condition and may result in further dilution to our stockholders.***

Our Term Loan with Hercules obligates us to make certain interest and principal payments. Our ability to make payments on this indebtedness depends on our ability to generate cash in the future. We expect to experience negative cash flow for the foreseeable future as we fund our operations and capital expenditures. There can be no assurance we will be in a position to repay this indebtedness when due or obtain extensions to the maturity date. We anticipate that we will need to secure additional funding to repay these obligations when due. We cannot guarantee that future financing will be available in sufficient amounts or on terms acceptable to us, if at all. If that additional funding involves the sale of equity securities or convertible securities, it would the issuance of additional shares of our capital stock, which would result in dilution to our stockholders.

This level of debt could have an adverse impact on our business or operations. For example, it could:

- limit our flexibility in planning for the development, clinical testing, approval and marketing of TRC101;

- place us at a competitive disadvantage compared to any of our competitors that are less leveraged than we are;

- increase our vulnerability to both general and industry-specific adverse economic conditions; and

- limit our ability to obtain additional funds.

***We will incur significant costs as a result of operating as a public company, and our management will devote substantial time to new compliance initiatives. We may fail to comply with the rules that apply to public companies, including Section 404 of the Sarbanes-Oxley Act of 2002, which could result in sanctions or other penalties that would harm our business.***

We will incur significant legal, accounting and other expenses as a public company, including costs resulting from public company reporting obligations under the Securities Exchange Act of 1934, as amended, or the Exchange Act, and regulations regarding corporate governance practices. The listing requirements of The Nasdaq Global Select Market require that we satisfy certain corporate governance requirements relating to director independence, distributing annual and interim reports, stockholder meetings, approvals and voting, soliciting proxies, conflicts of interest and a code of conduct. Our management and other personnel will need to devote a substantial amount of time to ensure that we comply with all of these requirements. Moreover, the reporting requirements, rules and regulations will increase our legal and financial compliance costs and will make some activities more time consuming and costly. Any changes we make to comply with these obligations may not be sufficient to allow us to satisfy our obligations as a public company on a timely basis, or at all. These reporting requirements, rules and regulations, coupled with the increase in potential litigation exposure associated with being a public company, could also make it more difficult for us to attract and retain qualified persons to serve on our board of directors or board committees or to serve as executive officers, or to obtain certain types of insurance, including directors' and officers' insurance, on acceptable terms.

33

Table of Contents

In addition, we implemented an enterprise resource planning, or ERP, system for our company. An ERP system is intended to combine and streamline the management of our financial, accounting, human resources, sales and marketing and other functions, enabling us to manage operations and track performance more effectively. However, an ERP system would likely require us to complete many processes and procedures for the effective use of the system or to run our business using the system, which may result in substantial costs. Additionally, in the future, we may be limited in our ability to convert any business that we acquire to the ERP. Any disruptions or difficulties in using an ERP system could adversely affect our controls and harm our business, including our ability to forecast or make sales and collect our receivables. Moreover, such disruption or difficulties could result in unanticipated costs and diversion of management attention.

After this offering, we will be subject to Section 404 of The Sarbanes-Oxley Act of 2002, or Section 404, and the related rules of the Securities and Exchange Commission, or SEC, which generally require our management and independent registered public accounting firm to report on the effectiveness of our internal control over financial reporting. Beginning with the second annual report that we will be required to file with the SEC, Section 404 requires an annual management assessment of the effectiveness of our internal control over financial reporting. However, for so long as we remain an emerging growth company as defined in the JOBS Act, we intend to take advantage of certain exemptions from various reporting requirements that are applicable to public companies that are not emerging growth companies, including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404. Once we are no longer an emerging growth company or, if prior to such date, we opt to no longer take advantage of the applicable exemption, we will be required to include an opinion from our independent registered public accounting firm on the effectiveness of our internal controls over financial reporting. We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.07 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our common stock that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (2) the date on which we have issued more than an aggregate of $1.0 billion in non-convertible debt during the prior three-year period.

***We have identified material weaknesses in our internal control over financial reporting, and if we are unable to implement and maintain effective internal control over financial reporting in the future, investors may lose confidence in the accuracy and completeness of our financial reports, and the market price of our common stock may be materially adversely effected.***

To date, we have never conducted a review of our internal control for the purpose of providing the reports required by the Sarbanes-Oxley Act. During our review and testing, we may identify deficiencies and be unable to remediate them before we must provide the required reports. We and our independent registered public accounting firm identified two material weaknesses in our internal control over financial reporting, related to (i) the lack of sufficient qualified accounting personnel and controls with respect to the review of third-party valuations used to determine the fair value of our preferred stock tranche obligations and the recording of the corresponding fair value, and (ii) a lack of effective communication and coordination between the accounting and operations personnel with respect to estimation of progress to completion on work orders with contract manufacturers, which resulted in a number of adjustments in contract manufacturing accruals. Following identification of the material weaknesses, we have undertaken specific remediation actions to address the control deficiencies in our financial reporting which are outlined elsewhere in this prospectus.

Furthermore, if in the future, we have a material weakness in our internal controls over financial reporting, we may not detect errors on a timely basis and our financial statements may be materially misstated. We or our independent registered public accounting firm may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting, which could harm our

Table of Contents

operating results, cause investors to lose confidence in our reported financial information and cause the trading price of our stock to fall. In addition, as a public company we will be required to file accurate and timely quarterly and annual reports with the SEC under the Exchange Act. Any failure to report our financial results on an accurate and timely basis could result in sanctions, lawsuits, delisting of our shares from The Nasdaq Global Select Market or other adverse consequences that would materially harm our business. In addition, we could become subject to investigations by the stock exchange on which our securities are listed, the SEC, and other regulatory authorities, and become subject to litigation from investors and stockholders, which could harm our reputation and our financial condition, or divert financial and management resources from our core business.

***Any collaboration arrangements that we may enter into in the future may not be successful, which could adversely affect our ability to develop and commercialize TRC101.***

We may seek to establish collaboration or similar agreements with one or more established biotechnology, pharmaceutical or specialty pharmaceutical companies to support the development, regulatory approval and commercialization of TRC101 outside of the United States and we may seek similar arrangements for the development or commercialization of TRC101. We may enter into these arrangements on a selective basis depending on the merits of retaining commercialization rights for ourselves as compared to entering into selective collaboration arrangements with leading pharmaceutical or biotechnology companies for TRC101, both in the United States and internationally. We will face, to the extent that we decide to enter into collaboration agreements, significant competition in seeking appropriate collaborators. Moreover, collaboration arrangements are complex and time consuming to negotiate, document and implement. We may not be successful in our efforts to establish and implement collaborations or other alternative arrangements should we so chose to enter into such arrangements. The terms of any collaborations or other arrangements that we may establish may not be favorable to us.

Any future collaborations that we enter into may not be successful. The success of our collaboration arrangements will depend heavily on the efforts and activities of our collaborators. Collaborators generally have significant discretion in determining the efforts and resources that they will apply to these collaborations.

Disagreements between parties to a collaboration arrangement regarding clinical development and commercialization matters can lead to delays in the development process or commercializing the applicable product candidate and, in some cases, termination of the collaboration arrangement. These disagreements can be difficult to resolve if neither of the parties has final decision-making authority.

Collaborations with pharmaceutical or biotechnology companies and other third parties often are terminated or allowed to expire by the other party. If we were to enter into any collaboration agreements, any such termination or expiration would adversely affect us financially and could harm our business reputation.

***If we engage in acquisitions, we will incur a variety of costs and we may never realize the anticipated benefits of such acquisitions.***

Although we currently have no intent to do so, we may attempt to acquire businesses, technologies, services, products or product candidates that we believe are a strategic fit with our business. If we do undertake any acquisitions, the process of integrating an acquired business, technology, service, products or product candidates into our business may result in unforeseen operating difficulties and expenditures, including diversion of resources and management's attention from our core business. In addition, we may fail to retain key executives and employees of the companies we acquire, which may reduce the value of the acquisition or give rise to additional

35

Table of Contents

integration costs. Future acquisitions could result in additional issuances of equity securities that would dilute the ownership of existing stockholders. Future acquisitions could also result in the incurrence of debt, contingent liabilities or the amortization of expenses related to other intangible assets, any of which could adversely affect our operating results. In addition, we may fail to realize the anticipated benefits of any acquisition.

***Our business involves the use of hazardous materials and we and our third-party manufacturers and suppliers must comply with environmental laws and regulations, which can be expensive and restrict how we do business.***

Our research and development activities and our third-party manufacturers' and suppliers' activities involve the controlled storage, use and disposal of hazardous materials, including the components of TRC101 and other hazardous compounds. We and our manufacturers and suppliers are subject to laws and regulations governing the use, manufacture, storage, handling and disposal of these hazardous materials. In some cases, these hazardous materials and various wastes resulting from their use are stored at our and our manufacturers' facilities pending their use and disposal. We cannot eliminate the risk of contamination, which could cause an interruption of our commercialization efforts, research and development efforts and business operations, environmental damage resulting in costly clean-up and liabilities under applicable laws and regulations governing the use, storage, handling and disposal of these materials and specified waste products. Although we believe that the safety procedures utilized by us and our third-party manufacturers for handling and disposing of these materials generally comply with the standards prescribed by these laws and regulations, we cannot guarantee that this is the case or eliminate the risk of accidental contamination or injury from these materials. In such an event, we may be held liable for any resulting damages and such liability could exceed our resources and state or federal or other applicable agencies may curtail our use of certain materials and/or interrupt our business operations. Furthermore, environmental laws and regulations are complex, change frequently and have tended to become more stringent. We cannot predict the impact of such changes and cannot be certain of our future compliance. We do not currently carry biological or hazardous waste insurance coverage.

***Unfavorable global economic conditions could adversely affect our business, financial condition or results of operations.***

Our results of operations could be adversely affected by general conditions in the global economy and in the global financial markets. The recent global financial crisis caused extreme volatility and disruptions in the capital and credit markets. A severe or prolonged economic downturn, such as the recent global financial crisis, could result in a variety of risks to our business, including reduced ability to raise additional capital when needed on acceptable terms, if at all. A weak or declining economy could also strain our suppliers, possibly resulting in supply disruption. It may also harm our ability to attract and retain collaboration partners or customers. Additionally, currency fluctuations may affect our ability to successfully market and sell TRC101 in markets outside of the United States. Any of the foregoing could harm our business and we cannot anticipate all of the ways in which the current or future economic climate and financial market conditions could adversely impact our business.

***We or the third parties upon whom we depend may be adversely affected by earthquakes or other natural disasters and our business continuity and disaster recovery plans may not adequately protect us from a serious disaster.***

Our corporate headquarters and other facilities are located in the San Francisco Bay Area, which in the past has experienced severe earthquakes. We do not carry earthquake insurance. Earthquakes or other natural disasters could severely disrupt our operations, and have a material adverse effect on our business, results of operations, financial condition and prospects.

36

Table of Contents

If a natural disaster, power outage or other event occurred that prevented us from using all or a significant portion of our headquarters, that damaged critical infrastructure, such as our enterprise financial systems or manufacturing resource planning and enterprise quality systems, or that otherwise disrupted operations, it may be difficult or, in certain cases, impossible for us to continue our business for a substantial period of time. The disaster recovery and business continuity plans we have in place currently are limited and are unlikely to prove adequate in the event of a serious disaster or similar event. We may incur substantial expenses as a result of the limited nature of our disaster recovery and business continuity plans, which, particularly when taken together with our lack of earthquake insurance, could have a material adverse effect on our business.

Furthermore, integral parties in our supply chain may operate from single sites, increasing their vulnerability to natural disasters or other sudden, unforeseen and severe adverse events. If such an event were to affect our supply chain, it could have a material adverse effect on our business.

***Our internal computer systems, or those of our CROs or other contractors or consultants, may fail or suffer security breaches, which could result in material disruptions to our drug development programs.***

Despite the implementation of security measures, our internal computer systems and those of our CROs and other contractors and consultants are vulnerable to damage from computer viruses, cyber attacks, industrial espionage, other unauthorized access, natural disasters, terrorism, war and telecommunication and electrical failures. While we have not experienced any such system failure, accident or security breach to date, if such an event were to occur, it could cause interruptions to our operations and result in material disruptions to our drug development programs. For example, the loss or theft of clinical trial data from completed or ongoing clinical trials for our product candidate could result in delays in our regulatory approval efforts and significantly increase our costs to recover or reproduce the data. To the extent that any disruption or security breach were to result in a loss or theft of or damage to our data or applications, or inappropriate disclosure of confidential or proprietary information, we could incur liability, our competitive position could be adversely affected, our reputation could be harmed and the further development of our product candidate could be delayed.

***We are subject to European data protection laws, including the new EU General Data Protection Regulation 2016/679, or GDPR. If we fail to comply with existing or future data protection regulations, our business, financial condition, results of operations and prospects may be materially adversely affected.***

By virtue of our clinical trial activities in Europe, we are subject to European data protection laws, including GDPR. The GDPR which came into effect on May 25, 2018, establishes new requirements applicable to the processing of personal data (i.e., data which identifies an individual or from which an individual is identifiable), affords new data protection rights to individuals (e.g., the right to erasure of personal data) and imposes penalties for serious breaches of up to 4% annual worldwide turnover or €20 million, whichever is greater. Individuals (e.g., study subjects) also have a right to compensation for financial or non-financial losses (e.g., distress). There may be circumstances under which a failure to comply with GDPR, or the exercise of individual rights under the GDPR, would limit our ability to utilize clinical trial data collected on certain subjects. The GDPR will likely impose additional responsibility and liability in relation to our processing of personal data. This may be onerous and materially adversely affect our business, financial condition, results of operations and prospects.

37

Table of Contents

**Risks Related to Government Regulation**

***The regulatory approval process is highly uncertain and we may not obtain approval under the Accelerated Approval Program or the conventional pathway, as required for the commercialization of TRC101.***

The research, testing, manufacturing, labeling, approval, selling, import, export, pricing and reimbursement marketing and distribution of drug products are subject to extensive regulation by the FDA and other regulatory agencies in the United States and other countries, which regulations differ from country to country. Neither we nor any future collaboration partner is permitted to market TRC101 in the United States until we receive approval of an NDA from the FDA. We have not submitted an application or obtained marketing approval for TRC101 anywhere in the world. Obtaining regulatory approval of an NDA, even under the Accelerated Approval Program, can be a lengthy, expensive and uncertain process. In addition, failure to comply with FDA and other applicable U.S. and foreign regulatory requirements may subject us to administrative or judicially imposed sanctions or other actions, including:

- warning letters;

- civil and criminal penalties;

- injunctions;

- withdrawal of regulatory approval of products;

- product seizure or detention;

- product recalls;

- total or partial suspension of production; and

- refusal to approve pending NDAs or supplements to approved NDAs.

Prior to obtaining approval to commercialize a drug candidate in the United States or abroad, we or our collaborators must demonstrate with substantial evidence from well-controlled clinical trials, and to the satisfaction of the FDA or other foreign regulatory agencies, that such drug candidates are safe and effective for their intended uses. The number of nonclinical and clinical studies and trials that will be required for FDA approval varies depending on the drug candidate, the disease or condition that the drug candidate is designed to address, and the regulations applicable to any particular drug candidate. We will seek approval for TRC101 under the FDA's Accelerated Approval Program, which would allow us to demonstrate an effect on a surrogate endpoint that is reasonably likely to predict TRC101's clinical benefit, but we will be subject to rigorous postmarketing requirements, including the completion of one or more confirmatory postmarketing trials to verify the clinical benefit of TRC101. If unable to obtain approval under the Accelerated Approval Program, we will have to pursue a conventional approval pathway for TRC101. In addition, in such case, the FDA could determine that our pivotal Phase 3 clinical trial, TRCA-301, may not be sufficient to support approval under the conventional pathway*.* Results from nonclinical and clinical trials and studies can be interpreted in different ways. Even if we believe the nonclinical or clinical data for our drug candidate is promising, such data may not be sufficient to support approval by the FDA and other regulatory agencies. Administering drug candidates to humans may produce undesirable side effects, which could interrupt, delay or halt clinical trials and result in the FDA or other regulatory agencies denying approval of a drug candidate for any or all targeted indications.

Both accelerated and conventional regulatory approval pathways of an NDA or NDA supplement are not guaranteed, and the approval process is expensive and may take several years. The FDA also has substantial discretion in the approval process and we may encounter matters with the FDA that require us to expend additional time and resources and delay or prevent the approval of our product

38

Table of Contents

candidate. For example, the FDA may require us to conduct additional studies or trials for TRC101 either prior to approval or postmarketing, such as additional drug-drug interaction studies or safety or efficacy studies or trials, or it may object to elements of our clinical development program such as the number of subjects enrolled in our current clinical trials from the United States. Despite the time and expense exerted, failure can occur at any stage. The FDA can delay, limit or deny approval of a drug candidate for many reasons, including, but not limited to, the following:

- a drug candidate may not be deemed safe or effective;

- the FDA might not approve our trial design and analysis plan;

- the FDA may not find the data from nonclinical and clinical studies and trials sufficient;

- clinical inspection(s) by the FDA or other regulatory authorities may result in unacceptable findings that could negatively impact approval of TRC101;

- the FDA might not accept or deem acceptable a third-party manufacturers' processes or facilities; or

- the FDA may change its approval policies or adopt new regulations.

If TRC101 fails to demonstrate safety and efficacy in clinical trials or does not gain regulatory approval, our business and results of operations will be materially and adversely harmed. Additionally, if the FDA requires that we conduct additional clinical trials, places limitations on TRC101 in our label, delays approval to market TRC101 or limits the use of TRC101, our business and results of operations may be harmed.

***We have not yet finalized the design of the confirmatory postmarketing trial, VALOR-CKD, including the sample size, trial duration, endpoint definition, event rate assumptions and eligibility criteria. The FDA and/or comparable foreign regulators may not agree with our proposed confirmatory postmarketing trial design, in which case we may be required to modify our planned clinical trials, or conduct additional clinical trials, before we can submit the NDA or comparable foreign applications.***

We are in discussions with the FDA to finalize the design of our confirmatory postmarketing trial, VALOR-CKD, for TRC101's approval under the Accelerated Approval Program. There can be no assurance that we will reach agreement with the FDA on the VALOR-CKD trial design. For example, we anticipate a sample size of 1,400 to 1,600 subjects, but agreement with the FDA on the sample size and the design of the VALOR-CKD trial is needed to support FDA's acceptance of the NDA submission for review under the Accelerated Approval Program; this is still an outstanding topic in our ongoing discussions with the FDA. The FDA has noted that a quantitative understanding of the relationship between changes in blood bicarbonate caused by TRC101 in our pivotal, Phase 3 study, TRCA-301, and the kidney disease progression endpoint planned for the VALOR-CKD trial is a key factor in finalizing the VALOR-CKD trial design. To address this factor and justify our methodology for establishing the sample size for our confirmatory postmarketing trial, VALOR-CKD, we are currently using a quantitative predictive model developed by Navdeep Tangri, M.D., Ph.D., of the University of Manitoba, in which he modeled the relationship between the change in blood bicarbonate and the risk of kidney disease progression. We have submitted that model to the FDA. However, if we are unable to reach consensus with the FDA on the sample size for our confirmatory postmarketing trial, VALOR-CKD, we may be required to find other approaches to justify the sample size, thereby requiring an increase or decrease of our proposed sample size. Moreover, the FDA may require us to make other changes to our proposed design of our confirmatory postmarketing trial, VALOR-CKD, including changes related to trial duration, endpoint definition, event rate assumptions and eligibility criteria. In general, a sponsor planning to use the Accelerated Approval Program should discuss with the FDA the possibility of accelerated approval and design of any necessary confirmatory postmarketing trials

39

Table of Contents

during development and any confirmatory postmarketing trials should be in progress at the time of NDA approval. The FDA has specifically requested that our confirmatory postmarketing trial, VALOR-CKD, be completely enrolled or nearly completely enrolled prior to submission of our NDA for TRC101. Therefore, we must obtain the FDA's agreement and finalize the design of our confirmatory postmarketing trial, VALOR-CKD, and completely enroll or nearly completely enroll our confirmatory postmarketing trial, VALOR-CKD, prior to the submission of an NDA. Our NDA submission may be delayed if the FDA does not accept the design of our proposed confirmatory postmarketing trial, we are unable to completely, or nearly completely, enroll our confirmatory postmarketing trial, VALOR-CKD, or the FDA imposes any additional requirements prior to NDA submission, any of which could have a material adverse effect on our expected clinical and regulatory timelines, business, prospects, financial condition and results of operations.

***Because we are developing a product candidate for the treatment of a disease or condition on the basis of an unvalidated surrogate endpoint, there are increased risks that the FDA or other regulatory authorities may find that our clinical program provides insufficient evidence of clinical benefit, may have difficulty analyzing and interpreting the results of our clinical program, and may delay or refuse to approve TRC101.***

There are no FDA-approved therapies for the chronic treatment of metabolic acidosis in CKD patients. In addition, we are not aware of any chronic therapeutic agent that has previously been approved by the FDA on the basis of a clinical trial that used blood bicarbonate level as the primary endpoint. We have engaged in discussions with the FDA regarding the design of our pivotal Phase 3 clinical trial, TRCA-301, and whether the use of blood bicarbonate as a surrogate endpoint is reasonably likely to predict clinical benefit. However, the FDA has discretion at any time, including during the NDA review, to determine whether there is support for the use of blood bicarbonate as a surrogate endpoint.

Key issues with our endpoint include uncertainty about the degree of change from baseline blood bicarbonate that will translate into improved clinical outcomes, the population in which such change is expected to translate into improved clinical outcomes, and the need for data supporting a causal relationship between blood bicarbonate concentration and clinical outcomes. As a result, we cannot be certain that FDA will ultimately conclude that the design and results of our pivotal Phase 3 clinical trial, TRCA-301, which uses changes from baseline in blood bicarbonate level as the primary endpoint, will be sufficient for approval of TRC101.

Moreover, even if the FDA does find that changes from baseline in blood bicarbonate are sufficiently likely to predict clinical benefit for patients, the FDA may not agree that we have achieved the primary endpoint in our pivotal Phase 3 clinical trial, TRCA-301, to the magnitude or to the degree of statistical significance required by the FDA. Further, even if those requirements are satisfied, the FDA also could give overriding weight to inconsistent or otherwise confounding results on other efficacy endpoints or other results of the trial, including results on secondary and exploratory endpoints. The FDA also weighs the benefits of a product against its risks and the FDA may view the efficacy results in the context of safety as not being supportive of regulatory approval. Regulatory authorities in other countries may take similar positions.

***We are conducting and may in the future conduct clinical trials for our product candidate, TRC101, outside the United States and the FDA may not accept data from such trials.***

Although the FDA may accept data from clinical trials conducted outside the United States in support of safety and efficacy claims for TRC101, this is subject to certain conditions. For example, such foreign clinical trials should be conducted in accordance with GCPs, including review and approval by an independent ethics committee and obtaining the informed consent from subjects of the

40

Table of Contents

clinical trials. The foreign clinical data should also be applicable to the U.S. population and U.S. medical practice. Other factors that may affect the acceptance of foreign clinical data include differences in clinical conditions, study populations or regulatory requirements between the United States and the foreign country.

We conducted the TRCA-301 trial and are conducting the TRCA-301E trial with majority enrollment outside the United States and may, in the future, conduct clinical trials of our product candidates outside the United States. The FDA may not accept such foreign clinical data, and in such event, we may be required to re-conduct the relevant clinical trials within the United States, which would be costly and time-consuming, and which could have a material and adverse effect on our ability to carry out our business plans.

***Even if we receive regulatory approval for TRC101, we will be subject to ongoing regulatory obligations and continued regulatory review, which may result in significant additional expense. Additionally, TRC101, if approved, could be subject to labeling and other restrictions and market withdrawal, and we may be subject to penalties if we fail to comply with regulatory requirements or experience unanticipated problems with TRC101.***

Even if a drug is approved by the FDA and/or foreign regulatory agencies, regulatory agencies may still impose significant restrictions on a product's indicated uses or marketing or impose various ongoing requirements. Furthermore, any new legislation addressing drug safety issues could result in delays or increased costs to assure compliance. In addition, if a drug receives approval under the FDA's Accelerated Approval Program, it will be subject to special postmarketing requirements, including the completion of confirmatory postmarketing clinical trials to verify the clinical benefit of the product, and submission to the FDA of all promotional materials prior to their dissemination. The FDA could seek to withdraw the approval for multiple reasons, including if we fail to conduct any required confirmatory postmarketing trial with due diligence, a confirmatory postmarketing trial does not confirm the predicted clinical benefit, other evidence shows that the product is not safe or effective under the conditions of use, or we disseminate promotional materials that are found by the FDA to be false and misleading.

If TRC101 receives approval under the Accelerated Approval Program, it will be subject to ongoing regulatory requirements for conducting postmarketing clinical studies and trials, labeling, packaging, storage, advertising, promotion, sampling, record-keeping and submission of safety and other post-market information, including both federal and state requirements in the United States. In addition, manufacturers and manufacturers' facilities are required to comply with extensive FDA requirements, including ensuring that quality control and manufacturing procedures conform to cGMP. As such, we and our contract manufacturers are subject to continual review and periodic inspections to assess compliance with cGMP. Accordingly, we must conduct the confirmatory postmarketing trial in a diligent manner and we and others with whom we work must continue to expend time, money, and effort in all areas of regulatory compliance, including manufacturing, production, and quality control. We will also be required to report certain adverse reactions and production problems, if any, to the FDA, and to comply with requirements concerning advertising and promotion for TRC101. Promotional communications with respect to prescription drugs are subject to a variety of legal and regulatory restrictions and must be consistent with the information in the product's approved label. As such, we may not promote TRC101 for indications or uses for which it does not have FDA approval.

If TRC101 receives approval under the Accelerated Approval Program but we fail to conduct the required confirmatory postmarketing trials with due diligence or such postmarketing trials fail to confirm TRC101's clinical profile or risks and benefits, the FDA may withdraw its approval. If a regulatory agency discovers previously unknown problems with TRC101, such as adverse events of unanticipated severity or frequency, or problems with the facility where the product is manufactured, or

41

Table of Contents

disagrees with the promotion, marketing, or labeling of a product, the regulatory agency may impose restrictions on the product or us, including requiring withdrawal of the product from the market. If we fail to comply with applicable regulatory requirements, a regulatory agency or enforcement authority may:

- issue warning letters;

- impose civil or criminal penalties;

- suspend regulatory approval;

- suspend any of our ongoing clinical trials;

- refuse to approve pending applications or supplements to approved applications submitted by us;

- impose restrictions on our operations, including closing our contract manufacturers' facilities; or

- seize or detain products or require a product recall.

Any government investigation of alleged violations of law could require us to expend significant time and resources in response and could generate negative publicity. Any failure to comply with ongoing regulatory requirements may significantly and adversely affect our ability to commercialize and generate revenues from TRC101. If regulatory sanctions are applied or if regulatory approval is withdrawn, the value of our company and our operating results will be adversely affected. Additionally, if we are unable to generate revenues from the sale of TRC101 our potential for achieving profitability will be diminished and the capital necessary to fund our operations will be increased.

The regulatory requirements and policies may change, and additional government regulations may be enacted for which we may also be required to comply. We cannot predict the likelihood, nature or extent of government regulation that may arise from future legislation or administrative action, either in the United States or in other countries. If we or any future collaboration partner are not able to maintain regulatory compliance, we or such collaboration partner, as applicable, may face government enforcement action and our business will suffer.

***Currently we plan to seek regulatory approval to market TRC101 for the treatment of metabolic acidosis and slowing of kidney disease progression in patients with metabolic acidosis associated with CKD and, unless we seek regulatory approval for additional indications, we will be prohibited from marketing TRC101 for other indications.***

We intend to seek FDA approval to market TRC101 for the treatment of metabolic acidosis and slowing of kidney disease progression in patients with metabolic acidosis, but we cannot be certain what indication and what labeling language will be approved for TRC101 until the NDA review and potentially as late as approval. If TRC101 is approved under the Accelerated Approval Program, the indications and usage section of the label is likely to include a statement that clinical benefit of TRC101 has not yet been established and that continued approval may be contingent upon demonstration of clinical benefit in a confirmatory postmarketing trial. The FDA strictly regulates the promotional claims that may be made about prescription products, and TRC101 may not be promoted for uses that are not approved by the FDA as reflected in its approved labeling. Under applicable regulations, promoting uses that are not reflected in the FDA-approved labeling, referred to as "off-label" marketing, is prohibited. If we are found to have promoted such off-label uses, we may become subject to significant liability.

42

Table of Contents

***If we fail to comply or are found to have failed to comply with FDA and other regulations related to the promotion of TRC101 for unapproved uses, we could be subject to criminal penalties, substantial fines or other sanctions and damage awards.***

The regulations relating to the promotion of products for unapproved uses are complex and subject to substantial interpretation by the FDA and other government agencies. If we receive marketing approval for TRC101, physicians may nevertheless prescribe it to their patients in a manner that is inconsistent with the approved label. We intend to implement compliance and training programs designed to ensure that our sales and marketing practices comply with applicable regulations. Notwithstanding these programs, the FDA or other government agencies may allege or find that our practices constitute prohibited promotion of TRC101 for unapproved uses. We also cannot be sure that our employees will comply with company policies and applicable regulations regarding the promotion of products for unapproved uses.

Over the past several years, a significant number of pharmaceutical and biotechnology companies have been the target of inquiries and investigations by various federal and state regulatory, investigative, prosecutorial and administrative entities in connection with the promotion of products for unapproved uses and other sales practices, including the Department of Justice and various U.S. Attorneys' Offices, the Office of Inspector General of the Department of Health and Human Services, the FDA, the Federal Trade Commission and various state Attorneys General offices. These investigations have alleged violations of various federal and state laws and regulations, including claims asserting antitrust violations, violations of the FFDCA, the federal civil False Claims Act, or FCA, the Prescription Drug Marketing Act, anti-kickback laws, and other alleged violations in connection with the promotion of products for unapproved uses and Medicare and/or Medicaid reimbursement. Many of these investigations originate as "qui tam" actions under the FCA. Under the FCA, any individual can bring a claim on behalf of the government alleging that a person or entity has presented a false claim, or caused a false claim to be submitted, to the government for payment. The person bringing a qui tam suit is entitled to a share of any recovery or settlement. Qui tam suits, also commonly referred to as "whistleblower suits," are often brought by current or former employees. In a qui tam suit, the government must decide whether to intervene and prosecute the case. If it declines, the individual may pursue the case alone.

If the FDA or any other governmental agency initiates an enforcement action against us or if we are the subject of a qui tam suit and it is determined that we violated prohibitions relating to the promotion of products for unapproved uses, or other applicable prohibitions we could be subject to substantial civil or criminal fines or damage awards and other sanctions such as consent decrees and corporate integrity agreements pursuant to which our activities would be subject to ongoing scrutiny and monitoring to ensure compliance with applicable laws and regulations. Any such fines, awards or other sanctions would have an adverse effect on our revenue, business, financial prospects and reputation.

***If approved, TRC101 may cause or contribute to adverse medical events that we are required to report to regulatory agencies and if we fail to do so we could be subject to sanctions that would materially harm our business.***

Some participants in our Phase 1/2 trial, TRCA-101, and our pivotal Phase 3 clinical trial, TRCA-301, reported mild to moderate adverse effects after being treated with TRC101, most commonly mild-to-moderate GI events, such as diarrhea, flatulence, nausea and constipation. If we are successful in commercializing TRC101, FDA and most foreign regulatory agency regulations require that we report certain information about adverse medical events if the product may have caused or contributed to those adverse events. The timing of our obligation to report would be triggered by the date we become aware of the adverse event as well as the nature of the event. We may fail to report adverse events we become aware of within the prescribed timeframe. We may also fail to appreciate

43

Table of Contents

that we have become aware of a reportable adverse event, especially if it is not reported to us as an adverse event or if it is an adverse event that is unexpected or removed in time from the use of TRC101. If we fail to comply with our reporting obligations, the FDA or a foreign regulatory agency could take action, including criminal prosecution, the imposition of civil monetary penalties, and seizure of our products.

### If third-party manufacturers fail to comply with manufacturing regulations, our financial results and financial condition will be adversely affected.

Before commercial distribution of TRC101, contract manufacturers may be inspected to determine acceptability by FDA or foreign regulatory agencies for their manufacturing facilities, processes and quality systems, as part of the NDA approval. In addition, pharmaceutical manufacturing facilities are subject to inspection by the FDA and foreign regulatory agencies on a regular basis, before and after product approval. Due to the complexity of the processes used to manufacture pharmaceutical products and product candidates, any potential third-party manufacturer may be unable to continue to pass or initially pass federal, state or international regulatory inspections in a cost-effective manner.

If a third-party manufacturer with whom we contract is unable to comply with manufacturing regulations, TRC101 may not be approved, or we may be subject to fines, unanticipated compliance expenses, recall or seizure of our products, total or partial suspension of production and/or enforcement actions, including injunctions, and criminal or civil prosecution. These possible sanctions would adversely affect our financial results and financial condition.

### We are currently only seeking regulatory approval to market TRC101 in the United States. If we want to expand the geographies in which we may market TRC101, we will need to obtain additional regulatory approvals.

We currently plan to seek regulatory approval for TRC101 in the United States. In the future, we may attempt to develop and seek regulatory approval to promote and commercialize TRC101 outside of the United States. In order to obtain such approvals, we may be required to conduct additional clinical trials or studies to support our applications, which would be time consuming and expensive, and may produce results that do not result in regulatory approvals. Further, we will have to expend substantial time and resources in order to establish the commercial infrastructure or pursue a collaboration arrangement that would be necessary to promote and commercialize TRC101 outside of the United States. If we do not obtain regulatory approvals for TRC101 in foreign jurisdictions, our ability to expand our business outside the United States will be severely limited.

### Our failure to obtain regulatory approvals in foreign jurisdictions for TRC101 would prevent us from marketing our products internationally.

In order to market any product in the European Economic Area, or EEA (which is composed of the 28 Member States of the European Union plus Norway, Iceland and Liechtenstein), and many other foreign jurisdictions, separate regulatory approvals are required. In the EEA, medicinal products can only be commercialized after obtaining a Marketing Authorization. Before granting a Marketing Authorization, the EMA, or the competent agencies of the Member States of the EEA make an assessment of the risk-benefit balance of the product on the basis of scientific criteria concerning its quality, safety and efficacy. It is unclear how the United Kingdom's pending exit of the European Union may affect our ability to seek marketing authorization for the United Kingdom market.

The approval procedures vary among countries and can involve additional nonclinical and clinical testing, and the time required to obtain approval may differ from that required to obtain FDA approval.

44

Table of Contents

Clinical trials conducted in one country may not be accepted by regulatory agencies in other countries. Approval by the FDA does not ensure approval by regulatory agencies in other countries, and approval by one or more foreign regulatory agencies does not ensure approval by regulatory agencies in other foreign countries or by the FDA. However, a failure or delay in obtaining regulatory approval in one country may have a negative effect on the regulatory process in others. The foreign regulatory approval process may include all of the risks associated with obtaining FDA approval. We may not be able to file for regulatory approvals or to do so on a timely basis, and even if we do file we may not receive necessary approvals to commercialize TRC101 in any market. If we do not obtain regulatory approvals for TRC101 in foreign jurisdictions, our ability to expand our business outside the United States will be severely limited.

***We may be subject to healthcare laws, regulation and enforcement; our failure to comply with these laws could have a material adverse effect on our results of operations and financial conditions.***

Although we do not currently have any products on the market, we are subject to a variety of regulatory requirements, and from time to time, we will be subject to additional healthcare statutory and regulatory requirements and enforcement by the federal government and the states and foreign governments of the countries in which we conduct our business. Even though we do not and will not control referrals of healthcare services or bill directly to Medicare, Medicaid or other third-party payors, federal and state healthcare laws and regulations pertaining to fraud and abuse and patients' rights may be applicable to our business. The laws that affect our current and future operations include:

- the federal healthcare programs' Anti-Kickback Statute, which prohibits, among other things, persons from knowingly and willfully soliciting, receiving, offering or paying remuneration, directly or indirectly, in cash or in kind, in exchange for or to induce either the referral of an individual for, or the purchase, order or recommendation of, any good or service for which payment may be made under federal healthcare programs such as the Medicare and Medicaid programs. The term "remuneration" has been broadly interpreted to include anything of value. The Anti-Kickback Statute has also been interpreted to apply to arrangements between pharmaceutical manufacturers on the one hand and prescribers, purchasers, and formulary managers on the other the other hand. There are a number of statutory exceptions and regulatory safe harbors protecting some common activities from prosecution;

- federal civil and criminal false claims laws and civil monetary penalty laws, such as the FCA which imposes significant penalties and can be enforced by private citizens through civil qui tam actions, prohibits individuals or entities from, among other things, knowingly presenting, or causing to be presented, false, fictitious or fraudulent claims for payment of federal funds, and knowingly making, using or causing to be made or used a false record or statement material to a false or fraudulent claim to avoid, decrease or conceal an obligation to pay money to the federal government. For example, pharmaceutical companies have been prosecuted under the FCA in connection with their alleged off-label promotion of drugs, purportedly concealing price concessions in the pricing information submitted to the government for government price reporting purposes, and allegedly providing free product to customers with the expectation that the customers would bill federal health care programs for the product. In addition, a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the FCA. As a result of a modification made by the Fraud Enforcement and Recovery Act of 2009, a claim includes "any request or demand" for money or property presented to the U.S. government. In addition, manufacturers can be held liable under the FCA even when they do not submit claims directly to government payors if they are deemed to "cause" the submission of false or fraudulent claims. Criminal prosecution is also possible for making or presenting a false, fictitious or fraudulent claim to the federal government. Government enforcement agencies and private whistleblowers have

45

Table of Contents

investigated pharmaceutical companies for or asserted liability under the FCA for a variety of alleged promotional and marketing activities, such as providing free product to customers with the expectation that the customers would bill federal programs for the product, providing consulting fees and other benefits to physicians to induce them to prescribe products, engaging in promotion for "off-label" uses, and submitting inflated best price information to the Medicaid Rebate Program;

- the federal Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, or HITECH, and its implementing regulations, or collectively, HIPAA, which imposes privacy, security and breach reporting obligations with respect to individually identifiable health information upon entities subject to the law, such as health plans, healthcare clearinghouses and healthcare providers and their respective business associates that perform services for them that involve individually identifiable health information. HITECH also created new tiers of civil monetary penalties, amended HIPAA to make civil and criminal penalties directly applicable to business associates, and gave state attorneys general new authority to file civil actions for damages or injunctions in U.S. federal courts to enforce the federal HIPAA laws and seek attorneys' fees and costs associated with pursuing federal civil actions;

- state law equivalents of each of the above federal laws, such as Anti-Kickback Statute and false claims laws which may apply to items or services reimbursed by any third-party payor, including commercial insurers;

- U.S. and European reporting requirements detailing interactions with and payments to healthcare providers, such as the U.S. the federal transparency requirements under the Physician Payments Sunshine Act, which requires, among other things, certain manufacturers of drugs, devices, biologics and medical supplies reimbursed under Medicare, Medicaid, or the Children's Health Insurance Program to report to the Department of Health and Human Services information related to payments and other transfers of value provided to physicians and teaching hospitals and physician ownership and investment interests, including such ownership and investment interests held by a physician's immediate family members. Failure to submit required information may result in civil monetary penalties; and

- state and foreign laws that require pharmaceutical companies to implement compliance programs, comply with the pharmaceutical industry's voluntary compliance guidelines and the relevant compliance guidance promulgated by the federal government, or to track and report gifts, compensation and other remuneration provided to physicians and other health care providers, and other federal, state and foreign laws that govern the privacy and security of health information or personally identifiable information in certain circumstances, including state health information privacy and data breach notification laws which govern the collection, use, disclosure, and protection of health-related and other personal information, many of which differ from each other in significant ways and often are not pre-empted by HIPAA, thus requiring additional compliance efforts.

In addition, the approval and commercialization of TRC101 outside the United States will also likely subject us to foreign equivalents of the healthcare laws mentioned above, among other foreign laws. Further, the Patient Protection and Affordable Care Act, or PPACA, among other things, amends the intent requirement of the federal Anti-Kickback Statute and criminal health care fraud statutes. A person or entity no longer needs to have actual knowledge of this statute or specific intent to violate it. Any action against us for violation of these laws, even if we successfully defend against it, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business.

46

Table of Contents

In addition, there has been a recent trend of increased federal and state regulation related to payments made to physicians. Some states mandate implementation of compliance programs and/or the tracking and reporting of gifts, compensation, and other remuneration to physicians. The shifting compliance environment and the need to build and maintain robust and expandable systems to comply with multiple jurisdictions with different compliance and/or reporting requirements increases the possibility that a healthcare company may run afoul of one or more of the requirements.

Ensuring that our business arrangements with third parties comply with applicable healthcare laws and regulations will likely be costly. If our operations are found to be in violation of any of the laws described above or any other governmental laws and regulations that apply to us, we may be subject to penalties, including civil, administrative and criminal penalties, damages, fines, the curtailment or restructuring of our operations, contractual damages, disgorgement, reputational harm, additional oversight and reporting obligations if we become subject to a corporate integrity agreement or similar agreement to resolve allegations of non-compliance with these laws, the exclusion from participation in federal and state healthcare programs and individual imprisonment, any of which could adversely affect our ability to market TRC101, if approved, and adversely impact our financial results. The risk of our being found in violation of these laws is increased by the fact that many of them have not been fully interpreted by the applicable regulatory agencies or the courts, and their provisions are open to a variety of interpretations.

***Legislative or regulatory FDA reforms in the United States may make it more difficult and costly for us to obtain regulatory clearance or approval of TRC101 and to produce, market and distribute our products after clearance or approval is obtained.***

From time to time, legislation is drafted and introduced in Congress that could significantly change the statutory provisions governing the regulatory clearance or approval, manufacture, and marketing of regulated products or the reimbursement thereof. In addition, FDA regulations and guidance are often revised or reinterpreted by the FDA in ways that may significantly affect our business and our products. Any new regulations or revisions or reinterpretations of existing regulations may impose additional costs or lengthen review times of TRC101. We cannot determine what effect changes in regulations, statutes, legal interpretation or policies, when and if promulgated, enacted or adopted may have on our business in the future. Such changes could, among other things, require:

- additional clinical trials to be conducted prior to obtaining approval;

- changes to manufacturing methods;

- recall, replacement, or discontinuance of TRC101; and

- additional record keeping.

Each of these would likely entail substantial time and cost and could materially harm our business and our financial results. In addition, delays in receipt of or failure to receive regulatory clearances or approvals would harm our business, financial condition and results of operations.

Further, the United States and some foreign jurisdictions have enacted or are considering a number of legislative and regulatory proposals to change the healthcare system in ways that could affect our ability to sell our products, if approved, and profitably. Among policy makers and payors in the United States and elsewhere, there is significant interest in promoting changes in healthcare systems with the stated goals of containing healthcare costs, improving quality and expanding access.

In the United States, the pharmaceutical industry has been a particular focus of these efforts and has been significantly affected by major legislative initiatives, including the PPACA, which contains provisions that may potentially reduce the profitability of products, including, for example, increased

47

Table of Contents

rebates for products sold to Medicaid programs, extension of Medicaid rebates to Medicaid managed care plans, mandatory discounts for certain Medicare Part D beneficiaries and annual fees based on pharmaceutical companies' share of sales to federal health care programs. There have been judicial and Congressional challenges to the PPACA, as well as efforts by the Trump administration to repeal or replace certain aspects of the PPACA. Since January 2017, President Trump has signed two Executive Orders and other directives designed to delay the implementation of certain provisions of the PPACA or otherwise circumvent some of the requirements for health insurance mandated by the PPACA. While Congress has not passed comprehensive repeal legislation, two bills affecting the implementation of certain taxes under the PPACA have been signed into law, including the repeal, effective January 1, 2019, of the tax-based shared responsibility payment imposed by the PPACA on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate." Additionally, on January 22, 2018, President Trump signed a continuing resolution on appropriations for fiscal year 2018 that delayed the implementation of certain fees mandated by the PPACA, including the so-called "Cadillac" tax on certain high cost employer-sponsored insurance plans, the annual fee imposed on certain health insurance providers based on market share, and the medical device excise tax on non-exempt medical devices. Moreover, the Bipartisan Budget Act of 2018, among other things, amends the PPACA, effective January 1, 2019, to increase from 50% to 70% the point-of-sale discount to eligible beneficiaries during their coverage gap period that is owed by pharmaceutical manufacturers who participate in Medicare Part D and to close the coverage gap in most Medicare drug plans, commonly referred to as the "donut hole." In the future, there may be additional challenges and amendments to the PPACA. It remains to be seen precisely what new legislation will provide, when it will be enacted, and what impact it will have on the availability of healthcare and containing or lowering the cost of healthcare, including the cost of pharmaceutical products.

Additionally, there has been increasing legislative and enforcement interest in the United States with respect to specialty drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drugs. At the federal level, the Trump administration's budget proposal for fiscal year 2019 contains additional drug price control measures that could be enacted during the 2019 budget process or in other future legislation, including, for example, measures to end Medicare Part B coverage of medications and to shift those medication costs to Medicare Part D, to allow some states to negotiate drug prices under Medicaid and to eliminate cost sharing for generic drugs for low-income patients. While any proposed measures will require authorization through additional legislation to become effective, Congress and the Trump administration have each indicated that it will continue to seek new legislative and/or administrative measures to control drug costs. At the state level, legislatures are increasingly passing legislation and implementing regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing. The implementation of cost containment measures or other healthcare reforms may prevent us from being able to generate revenue, attain profitability, or commercialize TRC101 and those for which we may receive regulatory approval in the future.

### *If we fail to obtain and sustain an adequate level of coverage and reimbursement for TRC101 by third-party payors, sales would be adversely affected.*

We expect patients who have metabolic acidosis to need chronic treatment but we anticipate that most patients will rely on coverage and reimbursement by a third-party payor, such as Medicare, Medicaid or a private health insurer, to pay for such treatment. There will be no commercially viable

48

Table of Contents

market for TRC101 without coverage and reimbursement from third-party payors. Additionally, even if we obtain third-party payor coverage and reimbursement for TRC101, if the level of coverage and reimbursement is below our expectations, our revenue and gross margins will be adversely affected.

Obtaining coverage and reimbursement approval for a product from a government or other third-party payor can be an expensive and time-consuming process that could require us to provide supporting scientific, clinical and cost effectiveness data for the use of our products to the payor. We cannot be certain if and when we will obtain formulary approval to allow us to sell TRC101, if approved, into our target markets. Even if we do obtain formulary approval, third-party payors, carefully review and increasingly question the coverage of, and challenge the prices charged for, drugs. Reimbursement rates from third-party payors vary depending on the payor, the insurance plan and other factors. A current trend in the United States health care industry is toward cost containment. Large public and private payors, managed care organizations, group purchasing organizations and similar organizations are exerting increasing influence on decisions regarding the use of, and reimbursement levels for, particular treatments. Such third-party payors, including Medicare, are questioning the coverage of, and challenging the prices charged for medical products and services, and many third-party payors limit coverage of, or reimbursement for, newly approved health care products.

In addition, there may be significant delays in obtaining such coverage and reimbursement for newly approved products, and coverage may be more limited than the purposes for which the product is approved by the FDA or comparable foreign regulatory authorities. Moreover, eligibility for coverage and reimbursement does not imply that a product will be paid for in all cases or at a rate that covers our costs, including research, development, intellectual property, manufacture, sale and distribution expenses.

Interim reimbursement levels for new products, if applicable, may also not be sufficient to cover our costs and may not be made permanent. Reimbursement rates may vary according to the use of the product and the clinical setting in which it is used, may be based on reimbursement levels already set for lower cost products and may be incorporated into existing payments for other services. Net prices for products may be reduced by mandatory discounts or rebates required by government healthcare programs or private payors, by any future laws limiting drug prices and by any future relaxation of laws that presently restrict imports of product from countries where they may be sold at lower prices than in the United States.

Coverage and reimbursement by a third-party payor may depend upon a number of factors, including the third-party payor's determination that use of a product is:

- a covered benefit under its health plan;

- safe, effective and medically necessary;

- appropriate for the specific patient;

- cost-effective; and

- neither experimental nor investigational.

We cannot be sure that reimbursement will be available for TRC101 and, if coverage and reimbursement are available, what the level of reimbursement will be. Our inability to promptly obtain coverage and adequate reimbursement rates from both government-funded and private payors for any approved products that we develop could have a material adverse effect on our operating results, our ability to raise capital needed to commercialize products and our overall financial condition.

Reimbursement may impact the demand for, and the price of, TRC101, if approved. Assuming we obtain coverage for TRC101 by a third-party payor, the resulting reimbursement payment rates may

49

**Table of Contents**

not be adequate or may require co-payments that patients find unacceptably high. Patients who are prescribed medications for the treatment of their conditions, and their prescribing physicians, generally rely on third-party payors to reimburse all or part of the costs associated with those medications. Patients are unlikely to use TRC101 unless coverage is provided and reimbursement is adequate to cover all or a significant portion of the cost of TRC101. Therefore, coverage and adequate reimbursement is critical to new product acceptance. Coverage decisions may depend upon clinical and economic standards that disfavor new products when more established or lower cost therapeutic alternatives are already available or subsequently become available.

We expect to experience pricing pressures in connection with the sale of our product candidate due to the trend toward managed healthcare, the increasing influence of health maintenance organizations, and additional legislative changes. The downward pressure on healthcare costs in general, particularly prescription medicines, medical devices and surgical procedures and other treatments, has become very intense. As a result, increasingly high barriers are being erected to the successful commercialization of new products. Further, the adoption and implementation of any future governmental cost containment or other health reform initiative may result in additional downward pressure on the price that we may receive for TRC101, if approved.

These cost-control initiatives could decrease the price we might establish for TRC101, which could result in product revenues being lower than anticipated. The pricing, coverage and reimbursement of TRC101, if approved, must be adequate to support a commercial infrastructure. If the price for TRC101 decreases or if governmental and other third-party payors do not provide adequate coverage and reimbursement levels, our revenue and prospects for profitability will suffer. Reimbursement systems in international markets vary significantly by country and by region, and reimbursement approvals must be obtained on a country-by-country basis.

Outside the United States, international operations are generally subject to extensive governmental price controls and market regulations, and we believe the increasing emphasis on cost-containment initiatives in Europe, Canada, China and other countries will put pressure on the pricing and usage of TRC101. In many countries, the prices of medical products are subject to varying price control mechanisms as part of national health systems. Other countries allow companies to fix their own prices for medicinal products, but monitor and control company profits. Additional foreign price controls or other changes in pricing regulation could restrict the amount that we are able to charge for TRC101, if approved. Accordingly, in markets outside the United States, the reimbursement for TRC101 compared with the United States and may be insufficient to generate commercially reasonable revenue and profits.

***We are subject to U.S. and certain foreign export and import controls, sanctions, embargoes, anti-corruption laws, and anti-money laundering laws and regulations. Compliance with these legal standards could impair our ability to compete in domestic and international markets. We can face criminal liability and other serious consequences for violations which can harm our business.***

We are subject to export control and import laws and regulations, including the U.S. Export Administration Regulations, U.S. Customs regulations, various economic and trade sanctions regulations administered by the U.S. Treasury Department's Office of Foreign Assets Controls, the U.S. Foreign Corrupt Practices Act of 1977, as amended, the United States domestic bribery statute contained in 18 U.S.C. § 201, the United States Travel Act, the USA PATRIOT Act, and other state and national anti-bribery and anti-money laundering laws in the countries in which we conduct activities. Anti-corruption laws are interpreted broadly and prohibit companies and their employees, agents, contractors, and other partners from authorizing, promising, offering, or providing, directly or indirectly, improper payments or anything else of value to recipients in the public or private sector. We may

50

Table of Contents

engage third parties for clinical trials outside of the United States, to sell TRC101 abroad once we enter a commercialization phase, and/or to obtain necessary permits, licenses, patent registrations, and other regulatory approvals. We have direct or indirect interactions with officials and employees of government agencies or government-affiliated hospitals, universities, and other organizations. We can be held liable for the corrupt or other illegal activities of our employees, agents, contractors, and other partners, even if we do not explicitly authorize or have actual knowledge of such activities. Any violations of the laws and regulations described above may result in substantial civil and criminal fines and penalties, imprisonment, the loss of export or import privileges, debarment, tax reassessments, breach of contract and fraud litigation, reputational harm, and other consequences.

**Risks Related to Intellectual Property**

***We may become subject to claims alleging infringement of third parties' patents or proprietary rights and/or claims seeking to invalidate our patents, which would be costly, time consuming and, if successfully asserted against us, delay or prevent the development and commercialization of TRC101.***

Our success depends in part on our ability to develop, manufacture, market and sell TRC101, if approved, and use our proprietary technologies without alleged or actual infringement, misappropriation or other violation of the patents and other intellectual property rights of third parties. There have been many lawsuits and other proceedings asserting patents and other intellectual property rights in the pharmaceutical and biotechnology industries. We cannot assure you that TRC101 will not infringe existing or future third-party patents. Because patent applications can take many years to issue and may be confidential for 18 months or more after filing, there may be applications now pending of which we are unaware and which may later result in issued patents that we may infringe by commercializing TRC101. There may also be issued patents or pending patent applications that we are aware of, but that we think are irrelevant to TRC101, which may ultimately be found to be infringed by the manufacture, sale, or use of TRC101. Moreover, we may face claims from non-practicing entities that have no relevant product revenue and against whom our own patent portfolio may thus have no deterrent effect. In addition, TRC101 has a complex structure that makes it difficult to conduct a thorough search and review of all potentially relevant third-party patents. We may be unaware of one or more issued patents that would be infringed by the manufacture, sale or use of TRC101.

We may be subject to third-party claims in the future against us or our collaborators that would cause us to incur substantial expenses and, if successful against us, could cause us to pay substantial damages, including treble damages and attorney's fees if we are found to be willfully infringing a third-party's patents. Furthermore, because of the potential for significant damage awards, which are not necessarily predictable, it is not unusual to find even arguably unmeritorious claims resulting in large settlements. We may be required to indemnify future collaborators against such claims. If a patent infringement suit were brought against us or our collaborators, we or they could be forced to stop or delay research, development, manufacturing or sales of the product or product candidate that is the subject of the suit. As a result of patent infringement claims, or in order to avoid potential claims, we or our collaborators may choose to seek, or be required to seek, a license from the third party and would most likely be required to pay license fees or royalties or both. These licenses may not be available on acceptable terms, or at all. Even if we or our collaborators were able to obtain a license, the rights may be nonexclusive, which would give our competitors access to the same intellectual property. Ultimately, we could be prevented from commercializing a product, or forced to redesign it, or to cease some aspect of our business operations if, as a result of actual or threatened patent infringement claims, we or our collaborators are unable to enter into licenses on acceptable terms. Even if we are successful in defending against such claims, such litigation can be expensive and time consuming to litigate and would divert management's attention from our core business. Moreover, some claimants may have substantially greater resources than we do and may be able to sustain the costs of complex intellectual

Table of Contents

**BUSINESS**

**Overview**

Our goal is to slow the progression of chronic kidney disease, or CKD, through the treatment of metabolic acidosis. We are a late-stage pharmaceutical company focused on the development and commercialization of our drug candidate, TRC101, a non-absorbed polymer designed to treat metabolic acidosis by binding and removing acid from the gastrointestinal, or GI, tract. We recently completed our pivotal Phase 3 clinical trial, TRCA-301, that met both its primary and secondary endpoints in a highly statistically significant manner (p<0.0001 for all primary and secondary endpoints). One hundred ninety-six of the 208 eligible subjects who completed the 12-week treatment period in our pivotal TRCA-301 trial were invited to continue in our safety extension trial, TRCA-301E, which we expect to complete in the first half of 2019. We plan to submit a New Drug Application, or NDA, in the second half of 2019, pursuant to the U.S. Food and Drug Administration's, or FDA's, Accelerated Approval Program.

Metabolic acidosis is a chronic condition commonly caused by CKD and is believed to accelerate the progression of kidney deterioration. Today, there are no chronic therapies for treating metabolic acidosis approved by the FDA. We believe TRC101, an in-house discovered, new chemical entity, may be an effective treatment for metabolic acidosis and slow the progression of kidney disease in CKD patients affected by metabolic acidosis.

We estimate that metabolic acidosis affects approximately 3 million CKD patients in the United States, and we believe that slowing the progression of CKD in patients with metabolic acidosis represents a significant medical need and market opportunity. We have an intellectual property estate that we believe will provide patent protection for TRC101 until at least 2034 in the United States, the European Union Japan, China, India and certain other markets. Tricida is led by a seasoned management team that includes the founders of Ilypsa, Inc. and Relypsa, Inc. Our management team has extensive experience in the development and commercialization of therapeutics, with deep expertise in developing polymers for the treatment of kidney-related diseases.

**Our Strategy**

Our strategy is focused on developing and commercializing TRC101 as a first-in-class FDA-approved chronic treatment for metabolic acidosis for the large CKD patient population with metabolic acidosis. Key elements of our strategy are to:

- *Obtain FDA approval of TRC101.*    Based on feedback from the FDA, we believe TRC101 will be eligible for review and potential approval through the FDA's Accelerated Approval Program. If approved, TRC101 could be the first FDA-approved therapy for the chronic treatment of metabolic acidosis to slow the progression of CKD. We plan to submit an NDA for TRC101 in the second half of 2019.

- *Commercialize TRC101 in the United States.*    If TRC101 is approved by the FDA, we plan to initially commercialize it in the United States by deploying an 80- to 100-person specialty sales force targeting that subset of nephrologists most focused on treating CKD patients. With this sales force approach we believe we can reach a majority of the approximately 600,000 Stage 3 to 5 CKD patients with metabolic acidosis treated by nephrologists. Over time, due to the disease modification potential of TRC101, we intend to address the broader population of CKD patients who receive care from cardiologists, endocrinologists, diabetologists and a subset of primary care physicians, either on our own or with a partner.

- *Commercialize TRC101 outside of the United States with one or more partners.*    We believe there is a significant commercial opportunity for TRC101 in markets outside the United States.

98

Table of Contents

To address these markets, we plan to seek one or more partners with international sales expertise who can sell TRC101 in target markets.

**Chronic Kidney Disease and Metabolic Acidosis Represent a Major Health Crisis**

*Overview of CKD*

CKD is a serious condition characterized by the gradual loss of essential kidney functions over time. In patients with CKD, normal fluid and electrolyte balance can no longer be maintained, and the excretion of metabolic end products, toxins and drugs is impaired. Furthermore, production and secretion of certain enzymes and hormones are disturbed.

According to the Centers for Disease Control and Prevention, or CDC, more than 30 million people in the United States are afflicted with CKD, representing an overall prevalence in the adult population of approximately 15%. The incidence of CKD is primarily driven by the increasing prevalence of diabetes and hypertension. CKD represents the ninth leading cause of death in the United States. The treatment of CKD adds a tremendous financial burden to the United States, with annual Medicare expenses for CKD at approximately $98 billion, including approximately $64 billion on CKD costs and approximately $34 billion for end-stage renal disease, or ESRD. ESRD is total and permanent kidney failure that is treated with a kidney transplant or dialysis. There are approximately 700,000 people in the United States living on kidney dialysis or with a kidney transplant and approximately 124,000 new ESRD cases annually. Each year kidney disease kills more people than breast cancer or prostate cancer. According to United States Renal Data System report, there were approximately 100,000 deaths from ESRD in 2015. There is a significant medical need to slow progression of kidney disease and reduce the number of patients progressing to kidney failure.

To help improve the diagnosis and management of kidney disease, the National Kidney Foundation, or NKF, has divided CKD into five stages. The severity of CKD at each stage is identified by the estimated glomerular filtration rate, or eGFR. Treatment during the first four stages of CKD focuses on ways to preserve kidney function for as long as possible. ESRD is the final stage of CKD in which the patient typically requires renal replacement therapy, i.e., dialysis or a kidney transplant, for survival.

**Stages of CKD and Key Risk Factors for CKD Progression**



99

Table of Contents

### *Overview of Metabolic Acidosis*

Diabetes, hypertension and age have long been recognized as primary risk factors for the progression of CKD. More recently, metabolic acidosis, a serious condition in which the body has accumulated too much acid, has also been identified as a key risk factor in the progression of CKD. The human body generates acid every day through normal food intake and metabolism. Sources of acid include amino and nucleic acids from daily dietary intake and digestion of proteins. A healthy kidney counteracts these sources of acid through excretion mechanisms that rid the body of the excess acid and by restoring bicarbonate, a base that buffers acid. Metabolic acidosis results when the kidneys can no longer excrete sufficient acid or produce enough bicarbonate to balance acid production.

The prevalence and severity of metabolic acidosis in people with CKD progressively rises as kidney function declines. Adaptations by the kidneys initially prevent a fall in blood bicarbonate concentration but as eGFR continues to decline below 40 ml/min/1.73 m$^2$, metabolic acidosis commonly develops. Over time, metabolic acidosis can lead to an increased risk of muscle wasting, loss of bone density and death. Additionally, if uncontrolled, a vicious cycle of worsening acidosis and accelerated progression of kidney disease can result.

The mechanism that links metabolic acidosis to kidney disease involves a cascade of events whereby patients with compromised kidneys do not excrete adequate amounts of acid to maintain acid-base balance. This imbalance and acid load accumulation leads to increases in the production of select peptides and hormones, including endothelin-1, aldosterone and angiotensin II, that increase the secretion of acid through the proximal and distal renal tubules of the remaining healthy nephrons. As currently understood, this sustained over-production of hormones exacerbates the damage in the diseased kidneys, resulting in long-term consequences, including renal fibrosis, proteinuria and inflammation, as well as sodium and water retention, which are hallmarks of the progression of CKD.

Metabolic acidosis can be diagnosed by measuring the level of bicarbonate in the blood, which is part of a standard metabolic panel. Properly functioning kidneys will maintain a blood bicarbonate level of between 22 to 29 milliequivalents per liter, or mEq/L. A persistent blood bicarbonate level below 22 mEq/L indicates metabolic acidosis. The NKF's Kidney Disease Outcomes Quality Initiative, or KDOQI, guidelines and the International Society of Nephology's Kidney Disease: Improving Global Outcomes, or KDIGO, guidelines recommend that in people with CKD, blood bicarbonate be maintained within the normal range of 22 to 29 mEq/L. Blood bicarbonate concentrations less than 22 mEq/L are associated with increased risk of CKD progression and increased risk of death.

100

Table of Contents

The prevalence and severity of metabolic acidosis increases from Stage 3 to Stage 5 of CKD. We estimate the prevalence of metabolic acidosis to be 9% of the estimated 13.4 million Stage 3a CKD patients, 18% of the estimated 5.7 million Stage 3b CKD patients and over 30% of the estimated 2.5 million Stage 4 and Stage 5 CKD, patients resulting in a total prevalence of approximately 3 million patients in the United States.

**Metabolic Acidosis Poses a Significant Health Risk to Approximately 3 Million CKD Patients in the United States**



### There is Significant Evidence that Treating Metabolic Acidosis Can Slow the Progression of CKD

Multiple retrospective studies provide qualitative and quantitative evidence for the relationship between metabolic acidosis and the progression of CKD across a wide range of baseline eGFRs and blood bicarbonate levels. Prospective studies have shown that treating metabolic acidosis translates into a clinically meaningful slowing of CKD progression.

In particular, three prospective trials (Garneata et al., 2016; de Brito-Ashurst et al., 2009; Phisitkul et al., 2010) studying Stage 3 to 5 CKD patients with metabolic acidosis demonstrated slowing of CKD progression following an increase in blood bicarbonate with three different interventions, comprising a very low-protein diet, oral sodium bicarbonate and oral sodium citrate, respectively. Increases in blood bicarbonate resulted in improved clinical outcomes, including fewer patients who progressed to ESRD and/or experienced significant declines of eGFR. Additionally, clinical trials reported by Goraya et al., 2013 and 2014 and Mahajan et al., 2010 showed that, in patients with CKD Stages 2 to 4 due to hypertensive nephropathy, increasing blood bicarbonate levels with sodium bicarbonate or a low protein diet rich in fruits and vegetables resulted in reduced markers of kidney injury and slower decline in eGFR.

Four large published retrospective database analyses show an association between higher blood bicarbonate levels and slower progression of CKD, independent of baseline eGFR and other factors such as age, sex, proteinuria, hypertension and diabetes (Shah et al., 2009; Dobre et al., 2013; Raphael et al., 2011; Tangri et al., 2011). In these four distinct large cohorts of CKD patients, the analyses all demonstrate that clinical outcomes for CKD patients with blood bicarbonate levels that are

101

Table of Contents

below normal (i.e., < 22 mEq/L) are significantly worse compared to patients with normal blood bicarbonate levels (i.e., 22 to 29 mEq/L).

Dr. Navdeep Tangri, M.D., Ph.D., and colleagues have developed a validated model which is an accepted standard for predicting the risk of kidney disease progression (Tangri, et al., 2011). This validated model and its underlying kidney failure risk equations have been proven generalizable in a multinational retrospective study of more than 30 cohorts and 720,000 participants with CKD, including 450,000 individuals from the Veterans Affairs Health System (Tangri, et al., 2016). Blood bicarbonate is one of the key variables predicting kidney disease progression in Dr. Tangri's eight variable risk equation.

Together with Dr. Tangri, we presented data at the NKF 2018 Spring Clinical Meeting that describes an analysis of the relationship between blood bicarbonate and the proposed renal outcome of interest in our confirmatory postmarketing trial (progressing to ESRD or ☐40% reduction in eGFR). For purposes of this analysis, Dr. Tangri isolated the effect of blood bicarbonate on disease progression in a population of CKD patients with metabolic acidosis. Included in this analysis were 2,378 non-dialysis Stage 3 to 5 CKD patients from Dr. Tangri's validated cohort who had at least two nephrology visits and a blood bicarbonate value at their baseline visit (including a cohort of 289 patients with eGFR between 15 to 45 mL/min/1.73m$^2$ and blood bicarbonate of 12 to 22 mEq/L). The resulting predictive metabolic acidosis model, or the Predictive MA Model, established the quantitative relationship between an increase in blood bicarbonate and the reduction in risk of kidney disease progression (defined as progression to ESRD or a ☐40% reduction in eGFR). The Predictive MA Model shows that the relationship between blood bicarbonate and the renal outcome of interest is effectively linear, independent of baseline kidney function (eGFR), and consistent across subgroups of patients with reduced eGFR and those with established metabolic acidosis. Furthermore, it shows that each 1 mEq/L increase in blood bicarbonate is associated with a 6% to 9% reduction in the risk of CKD progression.

102

Table of Contents

The following table summarizes the three prospective trials most relevant to our target population and the retrospective Predictive MA Model. (See Summary of Key Prospective Studies, for additional background information regarding the prospective studies.)

**Four Studies Supporting Relationship between Metabolic Acidosis and CKD Progression across a Wide Range of Baseline eGFR and Blood Bicarbonate**

| | Garneata (2016) (N = 207) | de Brito-Ashurst (2009) (N = 134) | Phisitkul (2010) (N = 59) | Predictive MA Model (N = 289) |
|---|---|---|---|---|
| Baseline Blood Bicarbonate (mEq/L) Mean (Range or SD) | Active: 16.7 (15.8 –17.6) Control: 16.8 (15.9–17.8) | Active: 19.8 (2.2) Control: 19.9 (1.5) | Active: 20.5 (1.1)[a] Control: 20.5 (0.8)[a] | 20.1 (2.0) |
| Baseline eGFR (ml/min/1.73m$^2$) Mean (Range or SD) | Active: 18.0 (15.5–20.1) Control: 17.9 (14.3–19.3) | Active: 20.1 (6.5)[b] Control: 20.7 (5.6)[b] | Active: 32.7 (8.2) Control: 32.5 (8.3) | 28.6 (8.5) |
| Type of Study (intervention) | Prospective (diet) | Prospective (oral sodium bicarbonate) | Prospective (oral sodium citrate) | Retrospective (NA) |
| Number of Patients (active/control) | 104/103 | 67/67 | 30/29 | 289 [c] |
| Duration | 15 months | 2 years | 2 years | Median follow up 1.2 years |
| Renal Event Endpoint | ESRD / > 50% eGFR reduction | ESRD | Not Applicable | ESRD / ☐ 40% eGFR reduction |
| Renal Event Rate Control Active | 42% 13% } p < 0.001 | 33% 6.5% } p < 0.001 | Not Applicable | 20.6%[d] Not Applicable |
| Relative Risk Reduction of Renal Events | 69% | 80% | | Not Applicable |
| Difference in Blood Bicarbonate (mEq/L) from baseline (active versus control at end of study) | 6.8* | 4** | 4.2** | Not Applicable |
| Difference eGFR (ml/min/1.73m$^2$) decline (active versus control at end of study) | 4.2* | 4.0** | 4.4*** | Not Applicable |
| Relative Risk Reduction of Renal Events per 1 mEq/L of Blood Bicarbonate Increase Over Study Duration | 10% | 20% | Not Applicable | 6 - 9%[e] |

[a] Reported as venous total $CO_2$. Greater than 90% of the total $CO_2$ in blood is in the form of bicarbonate.

[b] Reported as creatinine clearance, or CrCl.

[c] Number of patients who met the criteria of eGFR 15 to 45 ml/min/1.73m$^2$ and blood bicarbonate 12 to 22 mEq/L out of total cohort of 2,378 subjects.

[d] Annualized.

[e] From Cox proportional hazards model adjusted for age, sex, eGFR and urine albumin-to-creatinine ratio across four patient populations: 1) the entire cohort of 2,378 patients with eGFR of 10 to 60 ml/min/1.73m$^2$ 2) 1,560 patients with eGFR of 15-45 ml/min/1.73m$^2$ 3) 437 patients with blood bicarbonate of 12 to 22 mEq/L and 4) 289 patients with eGFR of 15-45 ml/min/1.73m$^2$ and blood bicarbonate of 12 to 22 mEq/L.

* p < 0.01      ** p< 0.0001      *** p = 0.066

**The Unmet Medical Need for the Chronic Treatment of Metabolic Acidosis**

While the need to treat metabolic acidosis to slow the progression of CKD is well established, there are no FDA-approved therapies for the chronic treatment of metabolic acidosis. Specifically, the KDIGO guidelines recommend that in people with CKD, blood bicarbonate be maintained within the normal range of 22 to 29 mEq/L, because blood bicarbonate concentrations less than 22 mEq/L are associated with increased risk of CKD progression and increased risk of death.

103

**Table of Contents**

Unapproved methods to increase blood bicarbonate include oral alkali supplements, such as sodium bicarbonate. However, the use of alkali supplements such as sodium bicarbonate to increase blood bicarbonate introduces significant amounts of sodium to patients. Approximately 85% to 95% of later-stage CKD patients suffer from sodium sensitive comorbid conditions, such as hypertension, cardiovascular disease, heart failure or edema, and require a sodium-restricted diet. As such, the use of sodium-based supplements can lead to worsening blood pressure control and volume overload in this population.

A randomized, crossover study conducted by Husted et al., 1977, demonstrated that when equal amounts of sodium were delivered from either sodium bicarbonate or sodium chloride, each regimen led to similar increases in systolic blood pressure and fluid retention resulting in weight gain after just 4 days of dosing. In the control cohort the CKD patients were given approximately 12 grams/day of sodium chloride and in the treatment cohort the CKD patients were given approximately 6 grams/day sodium chloride plus approximately 8 grams/day sodium bicarbonate. During the treatment period, mean blood bicarbonate increased from 21 to 26 mEq/L. Systolic blood pressure increases (9 to 13 mm Hg) and weight gains (2 to 3 pounds) were not significantly different after administration of sodium chloride or sodium bicarbonate. We believe that increases of this magnitude in systolic blood pressure and fluid-based weight gain would pose a significant risk in CKD patients.

Consistent with the Husted et al., 1977 study, Abramowitz et al., 2013, demonstrated that achieving a 2 to 3 mEq/L increase in blood bicarbonate requires 4 to 6 grams of sodium bicarbonate (for an 80 kilogram, or kg, patient) which results in an additional sodium load of 1.1 to 1.6 grams (each gram of sodium bicarbonate delivers 274 mg of sodium). According to the CDC, the average diet in the United States includes approximately 3.4 grams of sodium each day, which equates to 8.6 grams of sodium chloride. KDIGO guidelines recommend that patients with CKD consume less than 2 grams of total sodium per day. Given the sodium-sensitive comorbidities of most CKD patients, there are significant limitations on the use of sodium-based supplements.

As a result, while existing guidelines recommend treating patients into the normal range of blood bicarbonate, the limitations of currently available options results in approximately 3 million CKD patients with metabolic acidosis in the United States alone. There is a significant unmet medical need for a chronic therapy which treats metabolic acidosis and slows the progression of kidney disease in these patients. To chronically treat the broad population of CKD patients with metabolic acidosis, physicians need an FDA-approved treatment that is proven to be safe, effective and easy to comply with.

**Our Solution—TRC101**

TRC101 is a novel, non-absorbed polymer that is designed to bind hydrochloric acid in the GI tract and remove it from the body through excretion in the feces thereby decreasing the total amount of acid in the body and increasing blood bicarbonate. TRC101 is administered orally as a suspension in water and removes acid without delivering additional sodium or other counter-ions, such as potassium and calcium, which would allow for the chronic treatment of patients with common comorbidities such as hypertension, edema and heart failure.

**TRC101 Target Product Profile**

We have designed TRC101 to target the following product profile:

- *Significantly Increase Blood Bicarbonate*:    Bind and remove sufficient amounts of acid such that a majority of the patients will achieve an increase from baseline blood bicarbonate of 4 mEq/L or more and/or reach the normal blood bicarbonate range. We estimate that each

104

Table of Contents

increase of 1 mEq/L in blood bicarbonate is associated with approximately a 6% to 9% reduced risk for progression of CKD, defined as progressing to ESRD or a ☐40% reduction in eGFR, in CKD patients with metabolic acidosis. In our pivotal TRCA-301 trial, 59.2% of TRC101-treated patients achieved a ☐4 mEq/L increase from baseline blood bicarbonate or reached the normal blood bicarbonate range, which we believe is a clinically meaningful increase in blood bicarbonate.

- *Well-Tolerated*:    Based on our TRCA-101 and TRCA-301 trial results, patients infrequently reported GI-related adverse events, which were generally mild, self-limited and did not require treatment or dose adjustment of TRC101.

- *Suitable for a Broad Population of Patients, including Patients with Sodium-Sensitive Comorbidities*:    Increase blood bicarbonate without delivering sodium or other counter-ions; such a therapy would be particularly advantageous for the approximately 85% to 95% of later-stage CKD patients with hypertension, cardiovascular disease, heart failure or edema comorbidities.

- *Compatible with Other Medications*:    Avoid drug-drug interactions and allow concomitant dosing of common CKD medications. TRC101's unique characteristics include a particle size designed to prevent systemic absorption and size-exclusion that provides high selectivity for hydrochloric acid. Hydrochloric acid binding results in a transient increase in gastric pH. Therefore we believe that the only dose separation instructions that may be required for TRC101 would be for drugs with pH-dependent bioavailability, which are not commonly used in CKD patients.

- *Convenient, Once-Daily, Oral Administration:*    In our pivotal TRCA-301 trial, subjects self-administered 3-, 6- or 9-gram doses, once daily, with high overall compliance.

- *Room-Temperature Stable:*    Current data demonstrate 12-month room temperature stability and we plan to have data supporting 24-month shelf-life at room temperature at the time of the commercial launch.

### TRC101 Mechanism of Action

The metabolic acidosis observed in patients with CKD is often caused by an imbalance in production of acids relative to acid excretion. The human body generates acid every day through normal food intake and metabolism. Sources of acid include amino and nucleic acids from daily dietary intake and digestion of proteins. The daily load of acids from metabolic processes amounts to approximately 1 mEq per kg of body weight, or 50 to 100 mEq per day for adults. Prior studies with alkali supplementation have shown that 40% to 80% (20 to 80 mEq) of the daily acid produced needs to be neutralized in order to increase blood bicarbonate.

Acid binding is a novel approach to treating metabolic acidosis and increasing blood bicarbonate levels without introducing deleterious counter-ions or metals. This approach mimics the physiologic response to acid removal seen with persistent vomiting or nasogastric suction that results in an elevated blood bicarbonate level. To achieve the desired effect of increasing blood bicarbonate with a compliance enhancing daily dose of less than 10 grams per day, an acid binding polymer should have an amine capacity to bind at least 5 mEq of proton/gram. Once protonated, the acid binding polymer needs to preserve the effect of the proton binding by not removing anions such as fatty and bile acids that represent precursors metabolized to bicarbonate in the blood. The complementary anion to be bound that ensures net acid removal from the GI tract is chloride, the smallest anion present in the GI tract.

TRC101 is composed of low-swelling, spherical polymer beads that are approximately 100 micrometers in diameter. Each bead is a single, high molecular weight, crosslinked polyamine

105

Table of Contents

molecule. The size of the beads prevents the systemic absorption of TRC101 from the GI tract. The high degree of cross-linking within the TRC101 beads limits swelling and the overall volume in the GI tract, to ensure good GI tolerability. The high amine content of TRC101 provides proton binding capacity of at least 10 mEq/gram of polymer. Size exclusion built into the three-dimensional structure of the polymer enables preferential binding of chloride versus larger inorganic and organic anions, including phosphate, citrate, fatty acids and bile acids. This size exclusion mechanism allows a majority of the binding capacity to be used for hydrochloric acid binding.

The mechanism of action of TRC101 is illustrated below:

**TRC101 Mechanism of Action**

$NH_2$      = Amino group, $H^+$ = proton, $NH_3^+$ = Ammonium, $Cl^-$ = Chloride

**Our Development Program for TRC101**

*Overview*

Our development program for TRC101 is designed to obtain approval of TRC101 pursuant to the FDA's Accelerated Approval Program. Under the Accelerated Approval Program, we plan to pursue approval for TRC101 based upon data from a primary endpoint that measures a change from baseline in blood bicarbonate. We have completed a successful 135-subject, Phase 1/2 trial, TRCA-101, and a successful 217-subject, pivotal, Phase 3 clinical trial, TRCA-301. Both TRCA-101 and TRCA-301 utilized change from baseline in blood bicarbonate as their primary endpoint. Eligible subjects who completed the 12-week treatment period in our pivotal TRCA-301 trial were invited to continue in our safety extension trial, TRCA-301E, which we expect to complete in the first half of 2019. Based on feedback from the FDA, we believe that the data from the TRCA-101, TRCA-301 and TRCA-301E clinical trials will provide sufficient clinical evidence of safety and efficacy to support the submission and review of an NDA for TRC101 pursuant to the Accelerated Approval Program. We plan to submit the NDA for TRC101 in the second half of 2019.

As part of the Accelerated Approval Program, the FDA may require one or more confirmatory postmarketing trials to verify and describe the anticipated effect or clinical benefit. We have committed to conduct a confirmatory postmarketing trial, known as the VALOR-CKD trial, or TRCA-303, to

106

Table of Contents

evaluate the efficacy and safety of TRC101 in delaying CKD progression in subjects with metabolic acidosis. We anticipate that the VALOR-CKD trial will randomize approximately 1,400 to 1,600 subjects in order to show a 30% to 35% reduction in renal events, currently expected to be defined for purposes of the VALOR-CKD trial, as progressing to ESRD or a ☐40% reduction in eGFR. The FDA has requested that the VALOR-CKD confirmatory postmarketing trial be completely enrolled, or nearly completely enrolled, prior to submission of our NDA for TRC101. We plan to complete the VALOR-CKD trial after the FDA's review of our NDA for TRC101 and potential approval of TRC101. VALOR-CKD is a time-to-event study, and we estimate it will take approximately 4 years to accrue the number of events necessary to complete the study. Assuming successful completion of the VALOR-CKD trial, we plan to file a supplemental NDA, or sNDA, that incorporates results from the VALOR-CKD trial.

### TRC101 Clinical and Nonclinical Results

*TRCA-301 Phase 3 Clinical Trial*

In May 2018, we completed our pivotal Phase 3 clinical trial, TRCA-301. The double blind, randomized, placebo-controlled trial enrolled 217 subjects with Stage 3b or 4 CKD (an estimated glomerular filtration rate, or eGFR, of 20 to 40 mL/min/1.73m$^2$) and low blood bicarbonate levels (between 12 mEq/L and 20 mEq/L). At the beginning of the 12-week treatment period, subjects were randomized in a 4:3 ratio to receive once-daily, or QD, TRC101 or placebo. Subjects in the active group initially received a QD dose of 6 grams of TRC101 (2 sachets). After week 4, bi-directional blinded dose adjustments to 3 grams/day (1 sachet) or 9 grams/day (3 sachets) were allowed in order to maintain blood bicarbonate in the normal range. Subjects in the placebo group initially received 2 sachets of placebo, with the same ability for bi-directional dose adjustments after 4 weeks. The dose titration algorithm required down-titration at blood bicarbonate values of ☐27 to ≤30 mEq/L. Subjects with a blood bicarbonate level >30 mEq/L underwent an interruption of the study drug in accordance with the titration algorithm. Subjects were permitted to continue their existing oral alkali supplement during the trial, provided that dosing remained stable. We conducted the trial at 47 sites in the United States and Europe.

**TRCA-301 Pivotal Phase 3 Clinical Trial**



eGFR = Estimated glomerular filtration rate, QD = Once daily, R = Randomization,

107

Table of Contents

The underlying comorbid conditions of TRC101-treated subjects and subjects in the placebo group in the TRCA-301 trial were well-balanced and included 97% hypertension, 65% type 2 diabetes, 44% left ventricular hypertrophy, and 31% congestive heart failure. During the three months prior to baseline, 12% of subjects had shortness of breath with exertion and 9% had edema or fluid overload. Nine percent of the total patient population in the trial reported the use of oral alkali therapy at baseline.

### TRCA-301 Pivotal Phase 3 Trial Results

*Primary and Secondary Endpoints*

The blood bicarbonate levels of subjects were measured on day 1, week 1, week 2, and bi-weekly thereafter, up to and including week 14, which was a post-treatment visit for those subjects not continuing into the TRCA-301E safety extension trial. The primary endpoint of the trial was an increase in blood bicarbonate level of at least 4 mEq/L or achieving a blood bicarbonate level in the normal range of 22 to 29 mEq/L, at the end of the 12-week treatment period. The secondary endpoint of the trial was the change from baseline in blood bicarbonate at the end of the 12-week treatment period.

Initial topline analysis of our pivotal Phase 3 trial demonstrated that treatment with TRC101 resulted in statistically significant increases in blood bicarbonate, meeting both the primary and secondary endpoints. After 12 weeks of treatment, 59.2% of subjects in the TRC101-treated group, compared with 22.5% of subjects in the placebo group, had an increase in blood bicarbonate level of at least 4 mEq/L or achieved a blood bicarbonate level in the normal range of 22 to 29 mEq/L, which was the primary endpoint of the trial. The secondary endpoint of the trial, the mean change from baseline to week 12 in blood bicarbonate, was 4.49 mEq/L in the TRC101-treated group, compared with 1.66 mEq/L in the placebo group. The results of the primary and secondary endpoints were highly statistically significant (p<0.0001).

**The Pivotal Phase 3 Trial, TRCA-301, Met Both Its Primary and Secondary Endpoints**



108

**Table of Contents**

*Exploratory Endpoints*

Metabolic acidosis has been implicated as an important factor contributing to reduced muscle mass, manifested in decreases in lean body mass and muscle strength as well as increases in protein catabolic rate. Prior to a measurable decrease in blood bicarbonate, the body adapts, in part, to the increasing acid load by using intracellular buffers in muscle (primarily proteins and organic phosphates).

We included two exploratory endpoints in our pivotal Phase 3 trial, TRCA-301, to assess whether improvement in muscle function and patient quality of life could be demonstrated in this patient population through the treatment of metabolic acidosis.

The first exploratory endpoint examined the effect of treatment with TRC101 on self-reported responses to the physical functioning subpart of the Kidney Disease and Quality of Life Short Form, or the KDQOL-SF, survey. The KDQOL-SF survey is a validated questionnaire designed to assess health-related quality of life, or HRQOL, in kidney disease patients. Subjects in the trial responded to 10 questions related to physical function during daily activities, or KDQOL-SF Physical Function Survey.

The second exploratory endpoint objectively measured physical function derived from a repeated chair stand test, or Repeated Chair Stand Test. In the Repeated Chair Stand Test, subjects were asked to fold their arms across their chests and to stand up from a sitting position once; if they successfully rose from the chair, they were asked to stand up and sit down five times as quickly as possible, and the time for these five repetitions was recorded.

The KDQOL-SF Physical Function Survey and Repeated Chair Stand Test were administered and scored in a blinded fashion, and a change in Physical Function Survey score and Repeated Chair Stand Test time from baseline at week 12 were pre-defined as exploratory endpoints.

Initial topline analyses of the TRCA-301 trial demonstrated statistically significant results from the KDQOL-SF Physical Function Survey. The least squares, or LS, mean change from baseline in the TRC101-treated group was 6.29 points (p<0.0001). In the placebo group, the LS mean change from baseline was 1.10 points (p=0.4787). The between group change from baseline difference between TRC101-treated subjects versus subjects in the placebo group was 5.19 points and was statistically significant (p=0.0122).

Table of Contents

**KDQOL-SF Physical Function Survey Results Demonstrated Statistically Significant Improvement with TRC101**

(Point Estimate of Least Squares Mean with 95% Confidence Interval)



The TRCA-301 results for the second exploratory endpoint, the Repeated Chair Stand Test, showed a statistically significant improvement for the TRC101-treated subjects after 12 weeks of treatment, compared to their baseline score (a reduction in the LS mean of 1.17 seconds, p=0.0249) and showed a trend toward significance for the difference between TRC101-treated subjects and subjects in the placebo group (a reduction in the LS mean of 1.52 seconds, p=0.0630).

We believe the results from the two exploratory endpoints are consistent and suggest an improvement, on average, in the physical function and related quality of life for TRC101-treated subjects in this trial. We believe the two endpoints together address that same potential clinical benefit in this acidotic population and are consistent with the basic physiology of the disease.

*Safety*

The overall safety profile of TRC101 observed in our pivotal Phase 3 trial, TRCA-301, is consistent with that expected for the general population of patients with Stage 3 to 5 CKD and with similar non-absorbed polymer drugs with a site of action in the gastrointestinal tract. The incidence of serious adverse events was low and balanced in the two treatment groups. The types of serious adverse events were consistent with those expected in the study population, and none of the serious adverse events were assessed to be related to treatment by the trial investigator, Medical Monitor or Drug Safety and Pharmacovigilance Team. There were two deaths in the study and both of these occurred in the placebo group.

TRC101 was well-tolerated in our pivotal Phase 3 trial, TRCA-301. In total, over 95% of subjects in each of the groups completed the trial. Overall treatment-related adverse events occurred in 9.7% of subjects in the placebo group and 13.7% of TRC101-treated subjects. The most common treatment-related adverse events were mild to moderate GI disorders, which occurred in 5.4% of subjects in the placebo group and 12.9% of TRC101-treated subjects. The treatment-related GI adverse events that occurred in more than one subject in the trial included diarrhea, flatulence, nausea and constipation. The only other treatment-related adverse event that occurred in more than one subject was paresthesia (1.1% of subjects in the placebo group and 0.8% of TRC101-treated subjects). There were no apparent effects of TRC101 on serum parameters, such as sodium, calcium, potassium, phosphate,

110

Table of Contents

magnesium, or low-density lipoprotein observed in the trial that would indicate off-target effects of TRC101. A high blood bicarbonate level, defined as greater than 30 mEq/L, was observed transiently in 2 subjects, or 0.9%. Discontinuation of TRC101 per the protocol-defined dosing algorithm resulted in normalization of blood bicarbonate in these subjects.

*TRCA-101 Phase 1/2 Clinical Trial*

In 2016, we completed our Phase 1/2 trial, TRCA-101, a 135-subject, double-blind, randomized, placebo-controlled trial of TRC101. In this trial, subjects received either placebo or one of four different dosing regimens of TRC101 for two weeks as shown in the diagram below:

**TRCA-101 Phase 1/2 Clinical Trial**



eGFR = Estimated glomerular filtration rate, R = Randomization, BID = Twice daily, QD = Once daily, CRU = Clinical Research Unit

The subjects were Stage 3 or 4 CKD patients with blood bicarbonate levels at baseline between 12 and 20 mEq/L. The treatment groups were demographically well matched, and the mean blood bicarbonate levels at baseline ranged between 17.5 and 18.0 mEq/L across the treatment groups. Comorbid conditions of the subjects enrolled in TRCA-101 included 93% with hypertension, 70% with type 2 diabetes, 29% with left ventricular hypertrophy and 21% with congestive heart failure. We conducted the trial at five in-patient clinical research units where the subjects were monitored for the duration of the 2-week treatment period. During the 16-day in-unit residence (including the 14-day treatment period), clinical trial subjects were given a diet controlled for protein, caloric content, anions, cations and fiber, in accordance with dietary recommendations for patients with CKD. The potential renal acid load, or PRAL, value was calculated for the daily meal plans to ensure that the trial diet was neither acidic nor basic. Daily PRAL values averaged 0.8 mEq/day. Average protein intake during the trial was 0.7 g/kg/day.

111

Table of Contents

The blood bicarbonate levels of subjects were measured on a daily basis. Statistically significant increases in blood bicarbonate levels were observed in all TRC101-treated groups within 24 to 72 hours of initiation of therapy. After 14 days of treatment, the mean increase in blood bicarbonate levels from baseline in each of the TRC101-treated groups was between 2.95 and 3.83 mEq/L, with a mean blood bicarbonate increase of 3.3 mEq/L in the combined TRC101 group. All of these results were highly statistically significant (p-value < 0.0001), as were the increases from baseline as compared to the placebo group, whose mean blood bicarbonate level decreased by 0.18 mEq/L. The blood bicarbonate levels of all subjects were measured up to four times during the 2-week off-treatment follow-up period. In the TRC101-treated groups, the mean levels had reverted to near baseline levels after two weeks off treatment.

**TRC101 Significantly Increased Mean Blood Bicarbonate Throughout the 2-week Treatment Period, with Blood Bicarbonate Rapidly Returning Toward Baseline After Treatment Discontinuation**



In our Phase 1/2 trial, TRC101 was well-tolerated. All subjects completed treatment and remained in the trial through the applicable follow-up period. All treatment emergent adverse events, or TEAEs, were mild or moderate, and there were no serious adverse events. The most common TEAE was diarrhea which was reported by 20.2% of TRC101 treated subjects as compared to 12.9% of subjects in the placebo group. All cases of diarrhea were mild, self-limited, and none required treatment. There were no apparent effects of TRC101 on serum parameters, such as sodium, calcium, potassium, phosphate, magnesium, or low-density lipoprotein observed in the trial that would indicate off-target effects of TRC101. There were no apparent effects on vital signs, such as blood pressure, heart rate, respiratory rate or temperature, or body weight. The results of this trial were published in the Clinical Journal of the American Society of Nephrology (Bushinsky, et al., 2018).

Table of Contents

*Nonclinical Studies*

We have conducted a range of nonclinical in vivo and in vitro studies to assess the mechanism of action, pharmacology, pharmacokinetics, and toxicology of TRC101.

Nonclinical in vitro and in vivo pharmacology studies demonstrated robust proton and chloride binding and retention by the TRC101 polyamine polymer resulting in removal of hydrochloric acid from the body. In vitro studies demonstrated that TRC101 can selectively bind and retain chloride under conditions that mimic the pH, transit times, and ionic content of various compartments of the GI tract. The marked binding capacity and selectivity for chloride observed with TRC101 in vitro translates into in vivo pharmacological effects. Removal of acid by TRC101 results in a dose-dependent increase in mean blood bicarbonate, as observed in rats with adenine-induced nephropathy and low blood bicarbonate. A significant increase in fecal chloride relative to controls suggests that TRC101 retained its functional integrity during transit through the rat GI tract. This study in an animal model of CKD illustrated the potential of TRC101 to correct depleted blood bicarbonate levels, the hallmark of metabolic acidosis.

Safety pharmacology assessments of the central nervous, respiratory, cardiovascular, and GI systems did not identify any TRC101-related adverse effects at oral doses up to 4 g/kg (central nervous system, respiratory) and up to 2 g/kg (GI) in rats and at 2 g/kg (cardiovascular) in dogs.

Lack of TRC101 absorption from the GI tract was demonstrated in both rats and dogs administered a single oral dose of radiolabeled [$^{14}$C]-TRC101. Because radioactivity was not observed in the plasma of either species, metabolism was not evaluated. The lack of absorption, in conjunction with the in vivo pharmacology study in rats, supports that TRC101 is not metabolized or degraded but maintains functional, and therefore, structural integrity during transit through the GI tract following oral administration. The results of the radiolabeled TRC101 absorption, distribution, metabolism, and excretion, or ADME, studies demonstrating a lack of oral bioavailability is consistent with the physicochemical properties of TRC101 (insolubility in aqueous and organic solvents, particle size averaging 100 micrometers in diameter, and particle stability).

Repeat-dose, GLP toxicology studies of up to 26-weeks duration in rats and 39-weeks duration in dogs demonstrated that TRC101 has a very low order of toxicity and was well tolerated. There were no effects on male or female reproductive organs and local GI tolerance was good. The no observed adverse effect level, or NOAEL, in both the rat and dog in the chronic toxicity studies was the highest dose of 2 g/kg/day; this dose of TRC101 is 13-fold higher than the highest proposed human dose of 9 g/day (0.15 g/kg/day based on a 60-kg patient). We also established that the polymer has no effect on the absorption of fat soluble vitamins, such as A, D2, D3, and E. Reproductive toxicity studies indicate there are no adverse TRC101-related effects on maternal reproductive function or embryofetal development and no evidence of teratogenicity. TRC101 was not mutagenic or clastogenic when evaluated in genotoxicity studies. Given the non-absorbed nature of TRC101, we have been granted a waiver from FDA for fertility and early embryonic development (Segment I) and peri/postnatal development (Segment III) reproductive toxicity and carcinogenicity studies.

*Drug-drug Interaction Studies*

As part of our NDA filing, we will submit data evaluating the potential for drug-drug interactions, or DDIs, to occur with TRC101. TRC101 was designed to minimize DDIs. The size of the TRC101 particles prevents systemic absorption of the polymer from the GI tract; therefore, potential DDIs are confined to those that could occur in the GI tract (i.e., direct binding or indirect effects on bioavailability resulting from transient increases in gastric pH). In vitro studies have demonstrated that, as expected, given the charge and the size exclusion properties of TRC101, potential direct binding interactions are

113

Table of Contents

limited to small compounds (< 435 daltons) that are negatively charged under physiologic conditions. In our review of the structures of drugs commonly used in the CKD patient population, we observed that drugs with these characteristics are uncommon (approximately 10% of commonly used drugs in CKD patients). In our studies, the two drugs commonly used in CKD patient population showing the most binding to TRC101 in vitro (aspirin and furosemide, both of which are small and negatively-charged) have been tested in human DDI studies in healthy volunteers, and preliminary results suggest no significant impact on their bioavailability upon co-administration with TRC101. Since TRC101 binds acid in the stomach, it was anticipated that it would transiently increase gastric pH. Therefore, we have conducted a study in healthy volunteers to evaluate the effect of the polymer on fed and fasting gastric pH, both with and without concomitant administration of a proton pump inhibitor. Preliminary results suggest TRC101 increases gastric pH by an amount comparable to food, proton pump inhibitors and phosphate binders (approximately 2 to 4 pH units) and that the increase is transient, with pH levels returning to baseline in less than 4 hours. Recognizing that even a transient increase in gastric pH could alter the absorption of drugs with pH-dependent bioavailability, the TRC101 label may contain instructions to separate dosing from drugs of this type. We do not believe that drugs with pH-dependent bioavailability (e.g., ketoconazole and itraconazole, which are antifungal therapies, atazanavir, which is an HIV therapy, iron salts used for anemia therapy, erlotinib, which is a non-small cell lung cancer therapy, mycophenolate mofetil, which is a transplant rejection therapy) are commonly used in CKD patients.

Final analysis of data from our DDI studies is anticipated in the second half of 2018.

### TRC101 Regulatory Pathway and Future Clinical Trials

*Our Development of TRC101 Pursuant to the Accelerated Approval Program*

Based upon the success of the TRCA-101 Phase 1/2 and TRCA-301 pivotal Phase 3 trials and discussions with the FDA, we plan to pursue approval of TRC101 through the Accelerated Approval Program. The FDA's Accelerated Approval Program allows for drugs for serious conditions that address an unmet medical need to be approved based on a surrogate endpoint that is reasonably likely to predict clinical benefit. Surrogate endpoints are used instead of clinical outcomes in some clinical trials. Surrogate endpoints are used when the clinical outcomes might take a very long time to study, or in cases where the clinical benefit of improving the surrogate endpoint, such as controlling blood pressure, is well understood. Clinical trials are needed to show that surrogate endpoints can be relied upon to predict, or correlate with, clinical benefit. Surrogate endpoints that have undergone this testing are called validated surrogate endpoints and these are accepted by the FDA as evidence of benefit.

Surrogate endpoints that FDA determines are reasonably likely to predict clinical benefit may be used to support approval, in some cases, but are not yet validated. This is accomplished under FDA's Accelerated Approval Program, which is intended to provide patients with serious diseases more rapid access to promising therapies. Because such surrogate endpoints have not been validated, sponsors relying on them are generally required to verify the predicted clinical benefit of their products with confirmatory postmarketing clinical trials.

We believe that TRC101 is eligible for approval pursuant to the FDA's Accelerated Approval Program based upon meeting the following three criteria:

- *Treatment of a Serious Condition*: We believe that the progression of CKD to ESRD is a serious condition and the chronic treatment of metabolic acidosis may slow the progression of CKD.

- *Meaningful Advantage over Available Therapy*: We believe that there is an unmet need for chronic therapies that slow progression to ESRD in patients with CKD and metabolic acidosis.

114

Table of Contents

There are no FDA-approved chronic treatments for metabolic acidosis and there exists a large CKD patient population with metabolic acidosis.

- *Demonstrates an Effect on an Endpoint That Is Reasonably Likely to Predict Clinical Benefit*: We believe that blood bicarbonate is an appropriate surrogate endpoint and that increasing blood bicarbonate is reasonably likely to predict a slowing of progression of CKD.

Under the Accelerated Approval Program, we believe that our TRCA-301 Phase 3 trial will serve as the pivotal trial for our NDA submission for TRC101.

As a condition of filing our NDA pursuant to the Accelerated Approval Program, we have committed to conduct our confirmatory postmarketing trial, VALOR-CKD, which is designed to demonstrate that TRC101 provides a clinical benefit beyond increasing blood bicarbonate levels. The FDA has requested that the trial be completely enrolled, or nearly completely enrolled, prior to submission of our NDA. If we receive FDA approval for TRC101, but do not complete the postmarketing trial, or if the postmarketing trial fails to show a clinical benefit, the FDA may revoke its approval of TRC101.

*TRCA-301E Safety Extension Clinical Trial*

At the conclusion of participation in the TRCA-301 trial, eligible subjects were invited to participate in a 40-week safety extension trial, TRCA-301E. One hundred ninety-six subjects have been enrolled in the extension trial and will continue to receive the same treatment (TRC101 or placebo) they were receiving in the parent trial. Trial drug doses may be adjusted upwards or downwards during the extension trial in an effort to maintain blood bicarbonate within the normal range. In addition, subjects receiving an oral alkali supplement during the parent trial may discontinue supplementation if their blood bicarbonate is ☐ 22 mEq/L. The purpose of the TRCA-301E trial is to obtain up to one year of safety data to be included in the NDA filing. This trial will be conducted in parallel with enrollment of the VALOR-CKD trial. The primary endpoint of the trial is the incidence of adverse events, serious adverse events and adverse events leading to withdrawal. This trial also includes secondary endpoints to assess the durability of effect and the physical function and quality of life of TRC101-treated patients.

**TRCA-301E Phase 3 Safety Extension Clinical Trial**



QD = Once daily

115

Table of Contents

Based on the initial topline analyses from the TRCA-301 trial, we have amended the protocol for the TRCA-301E safety extension trial to add assessments at an additional timepoint for two secondary endpoints and to modify the dose-titration algorithm. Given the statistically significant improvement on the KDQOL-SF Physical Function Survey observed in the TRCA-301 trial, assessment of this parameter has been added to the week 40 visit in the TRCA-301E trial. Similarly, given the strong trend observed in improvement in the Repeated Chair Stand Test, assessment of this parameter has been added to the week 40 visit. Both of these secondary endpoints will also be assessed at week 52. Very few instances of blood bicarbonate values >30 mEq/L were observed in the TRCA-301 trial; therefore, the dose titration algorithm has been amended to delete the required down-titration at blood bicarbonate values of $\square$27 to $\leq$30 mEq/L.

*VALOR-CKD (also known as TRCA-303) Clinical Trial*

Based on feedback from the FDA regarding potential approval of TRC101 pursuant to the Accelerated Approval Program, we plan to conduct a postmarketing trial to confirm that treatment with TRC101 provides clinical benefit in slowing progression of kidney disease. For this trial, we plan to conduct a double-blind, placebo-controlled, randomized withdrawal trial of approximately 1,400 to 1,600 CKD patients with Stage 3b or 4 CKD (eGFR of 20 to 40 ml/min/1.73m$^2$) with blood bicarbonate levels between 12 and 20 mEq/L. Subjects will be followed in the trial until the target number of endpoint events has been observed. The entry and exclusion criteria for the trial and the trial procedures will be similar to those used in our pivotal Phase 3 clinical trial, TRCA-301. The primary endpoint will compare the time to first renal event, with a renal event currently expected to be defined as progressing to ESRD or a $\square$40% reduction in eGFR, in TRC101-treated subjects and subjects in the placebo group. We plan to initiate our VALOR-CKD trial in the second half of 2018. The trial will terminate when the independent blinded Clinical Endpoint Committee has positively adjudicated the targeted number of primary endpoint events, which is estimated to be approximately four years following full enrollment.

Based on the magnitude of change from baseline increase in blood bicarbonate observed in the TRCA-301 trial, we are designing the VALOR-CKD trial with a TRC101 run-in period of up to 8 weeks where all subjects will receive TRC101, followed by a placebo-controlled, randomized withdrawal. This run-in period is designed to ensure that, over the duration of treatment we will have a large separation of blood bicarbonate levels in TRC101-treated subjects and subjects in the placebo group.

In the TRCA-301 trial, 90 out of 120, or 75%, of TRC101-treated subjects achieved a $\square$ 4 mEq/L increase in blood bicarbonate or blood bicarbonate in the normal range of 22 to 29 mEq/L at the 4-week or 8-week visit. This group of subjects achieved a 5.5 mEq/L mean change from baseline increase in blood bicarbonate at the week 12 visit. The sample size for the VALOR-CKD trial has been determined based on a change from baseline in blood bicarbonate increase observed in this patient population together with the Predictive MA Model, where a 1.0 mEq/L increase in blood bicarbonate is associated with a 6% to 9% reduction in the risk of the VALOR-CKD trial renal endpoint event. We anticipate that the VALOR-CKD trial will enroll approximately 1,900 to 2,100 subjects in the run-in portion of the trial to randomize 1,400 to 1,600 subjects. We believe that this number of randomized subjects will be sufficient to demonstrate a 30% to 35% reduction in renal events, currently expected to be defined for purposes of the VALOR-CKD trial as progressing to ESRD or a $\square$40% reduction in eGFR.

Additionally, in this trial, based on observations from the TRCA-301 trial, we have strengthened the screening requirements in the VALOR-CKD trial to enable enrollment of subjects with metabolic acidosis at baseline, and we have removed the down-titration dosing algorithm for subjects with blood bicarbonate of $\square$27 mEq/L and $\leq$30 mEq/L, as we believe that down-titration is no longer needed to avoid sustained blood bicarbonate levels above the normal range.

116

Table of Contents

**VALOR-CKD Postmarketing Clinical Trial**



CFB = Change from baseline, eGFR = Estimated glomerular filtration rate, QD = Once daily R = Randomization

The FDA has requested that the VALOR-CKD trial should be completely enrolled, or nearly completely enrolled, prior to submission of our NDA for TRC101.

**Commercial Opportunity and Commercialization Plan**

The commercial opportunity for TRC101, as potentially the first and only FDA-approved therapy for the chronic treatment of CKD patients with metabolic acidosis, is rooted in its distinctive value proposition. TRC101 has the potential for disease modification by slowing the progression of CKD by treating metabolic acidosis.

CKD patients suffering from metabolic acidosis frequently present with diabetes, hypertension, and cardiovascular disease leading to progressive kidney disease. CKD patients are managed by multiple physician specialties and are generally referred to a nephrologist as their kidney disease progresses to Stage 3 or 4. Nephrologists have few treatment options to slow the progression of CKD, such as renin-angiotensin-aldosterone system, or RAAS, inhibitors, and typically manage common symptoms and complications of kidney disease, such as hyperkalemia, hyperphosphatemia and anemia.

We have identified nephrologist-treated, CKD patients with metabolic acidosis as our initial target patient population for TRC101 if approved. We estimate that metabolic acidosis affects approximately 3 million of the approximately 22 million Stage 3 to 5 CKD patients in the United States, but only approximately 35% of those patients are currently diagnosed. Of those CKD patients diagnosed with metabolic acidosis, we estimate that approximately 50%, or 600,000, are treated by a nephrologist. We plan to initially commercialize TRC101 in the United States with a specialty sales force of approximately 80 to 100 individuals focused on the highest prescribing subset of the approximately 9,000 practicing nephrologists who we believe are currently treating our target patient population.

Small academic trials conducted in CKD patients with mild metabolic acidosis (blood bicarbonate of > 20 and ≤ 22 mEq/L) and no sodium-sensitive co-morbidities (hypertension, cardiovascular disease, heart failure or edema) suggest that metabolic acidosis in this patient population may be adequately treated with oral alkali supplements. We estimate that approximately 50 % of CKD patients with metabolic acidosis present with milder disease (blood bicarbonate > 20 and ≤ 22 mEq/L), but that approximately 85% to 95% of this population has one or more sodium sensitive comorbidities. Accordingly, we believe that less than 10% of our 600,000 target patient population are candidates for oral alkali supplementation. We believe this results in approximately 90%, or approximately 540,000, of

117

Table of Contents

our targeted patients with metabolic acidosis (blood bicarbonate of > 12 and ≤ 22 mEq/L) and one or more sodium-sensitive co-morbidities without a safe and efficacious treatment option for their metabolic acidosis.

Our pre-launch activities are focused on delivering comprehensive disease awareness and education to nephrology specialists. These disease education efforts will communicate the existing evidence that increasing blood bicarbonate in CKD patients with metabolic acidosis slows the progression of CKD and reduces kidney failure events. We believe the broad understanding of this evidence will help to establish and increase the urgency to treat patients with TRC101 and support our rapid launch uptake following FDA approval, if achieved. Over time, due to the disease modification potential of TRC101, we intend to address the broader CKD patient population who receive care from cardiologists, endocrinologists, diabetologists and a subset of primary care physicians, either on our own or with a partner.

We have conducted market research with physicians and payors to forecast the potential commercial opportunity for TRC101 in the United States. We have also completed preliminary health economic analyses of the potential direct cost savings that TRC101 may be able to provide to the healthcare system and have completed multiple surveys with payors to evaluate the potential coverage for TRC101 by health insurers. Health insurers surveyed have indicated that their perception of the likelihood of TRC101 coverage is influenced by the lack of FDA-approved chronic treatments for metabolic acidosis and the potential for TRC101 to provide significant direct cost savings based on its potential to slow the progression of kidney disease for CKD patients with metabolic acidosis. Based on these analyses, we believe that the pricing for TRC101 can be supported above the current pricing for other polymer therapeutics marketed for treating conditions related to kidney disease, but which are not disease modifying. Notably, we estimate that approximately 25% to 30% of our target patient population is commercially-insured and may be eligible for co-pay assistance programs to help them access TRC101.

To address markets outside of the United States, we plan to seek one or more partners with international sales expertise who can sell TRC101 in target markets. We anticipate that in certain markets additional clinical trials of TRC101 may be required to obtain regulatory approval and/or ensure market access.

## Manufacturing

TRC101 drug substance is a room-temperature stable, free flowing powder, composed of low-swelling, polymeric beads, approximately 100 micrometers in diameter. As a non-absorbed polymeric drug, TRC101 is designed to be insoluble in all solvents, including water, and is characterized by its desired function, including high binding capacity and selectivity, physical properties, such as minimal swelling, and impurities. Characterization of isolated intermediates and careful control of each step of the process, such as rate and amount of incorporation of starting materials, define the structure of the polymer. Because the process to manufacture TRC101 fundamentally defines the key polymer attributes for safety and efficacy, the same process that was originally developed by us during the discovery and early development phase, is still closely followed at larger scales.

TRC101 is manufactured using an efficient, scalable, two-step process. This two-step approach enables, in step one, the preparation of a crosslinked polymer having a high binding capacity, and in step two, further crosslinking for low swelling and selectivity for hydrochloric acid.

The resulting TRC101 drug substance is converted into drug product by filling it into sachets without the addition of excipients. TRC101 drug product is stored at room temperature. Ongoing

118

Table of Contents

stability studies demonstrate that TRC101 is stable at room temperature for at least 12 months and we plan to conduct registration stability studies that we anticipate will enable us to indicate on our label, if approved, that TRC101 is stable at room temperature for up to 24 months.

We contract with third-party service providers to manufacture TRC101 drug substance, TRC101 drug product and to perform analytical testing services. We currently have no manufacturing facilities and limited personnel with manufacturing experience. We developed the process to manufacture TRC101 drug substance in-house and have successfully transferred it to three manufacturers. We believe that there are a limited number of experienced contract manufacturers in the world capable of manufacturing a polymeric drug substance such as TRC101. We currently rely on Patheon Austria GmbH & Co KG, or Patheon, as our sole supplier for drug substance manufacturing and we have two suppliers for drug product manufacturing. We intend to initially commercialize with a single supplier for drug substance and a single supplier for drug product. Nevertheless, we plan to establish a diverse and volume-appropriate portfolio of third-party manufacturers to reduce our dependency on single suppliers for drug substance and drug product in the future. We plan to continue to rely upon contract manufacturers and commercial suppliers of raw materials for the commercial manufacture of TRC101 if it is approved by regulatory authorities.

In May 2018, we entered into a Master Development/Validation Services and Clinical/Launch Supply Agreement, or the Patheon Agreement, with Patheon. Pursuant to the Patheon Agreement, Patheon has agreed to manufacture and supply to us, and we have agreed to purchase from Patheon, on a project basis, TRC101 drug substance in amounts necessary to satisfy our currently projected demand for the our confirmatory postmarketing trial, VALOR-CKD, manufacturing process validation to satisfy FDA requirements, and the initial commercial supply for our TRC101 launch, assuming approval, through at least 2020. The Patheon Agreement has an initial term of three years or such time as there has been a period of 12 months without any statement of work outstanding absent earlier termination. Thereafter, the Patheon Agreement will continue for consecutive one-year renewal terms unless earlier terminated. Either party may terminate the Patheon Agreement after the initial term, at any time, by providing the other party at least three months written notice of termination prior to the end of the then current term. Either party may terminate the Patheon Agreement for the other party's material breach or bankruptcy.

We have adequate TRC101 drug substance and drug product supply for our currently ongoing TRCA-301E trial. We have also completed manufacturing of TRC101 drug substance for our ongoing registration stability studies. TRC101 drug product registration stability studies are scheduled to begin in mid-2018. Ongoing TRC101 drug substance manufacturing campaigns have produced the initial quantities to support the anticipated demand for at least the first four months of our confirmatory postmarketing trial, VALOR-CKD, and drug product manufacturing will commence as the drug substance batches are released.

Manufacturing commercial quantities of TRC101 will require larger scale production than we have been using to produce TRC101 for use in our clinical trials. We believe that our current production methods can be scaled to meet our anticipated commercial needs without introducing changes to key TRC101 properties, including binding capacity, selectivity for hydrochloric acid and non-absorption. We use acid binding, competitive anion binding and particle size measurement assays to confirm these properties. The scale of the first step in our drug substance manufacturing process, step one, (currently at approximately 340 kg/batch) is being increased two-fold, and the scale of the second step in our drug substance manufacturing process, step two, (currently at approximately 65 kg/batch) is being increased ten-fold, to provide targeted commercial batch sizes for each of the steps in the range of 500 to 700 kg.

Our third-party service providers, their facilities and the TRC101 used in our clinical trials or for commercial sale are required to be in compliance with current Good Manufacturing Practices, or

119

Table of Contents

cGMP. The cGMP regulations include requirements relating to organization of personnel, buildings and facilities, equipment, control of components and packaging containers and closures, production and process controls, packaging and labeling controls, holding and distribution, laboratory controls, records and reports, and returned or salvaged products. The facilities manufacturing and testing our products must meet cGMP requirements and satisfy FDA or other authorities before any product is approved and before we can manufacture commercial products. Our third-party manufacturers are also subject to periodic inspections of facilities by the FDA and other authorities, including procedures and operations used in the testing and manufacture of TRC101 to assess compliance with applicable regulations. Failure to comply with statutory and regulatory requirements subjects a manufacturer to possible legal or regulatory action, including warning letters, the seizure or recall of products, injunctions, consent decrees placing significant restrictions on or suspending manufacturing operations and civil and criminal penalties. These actions could have a material impact on the availability of TRC101. Contract manufacturers at times encounter difficulties involving production yields, quality control and quality assurance, as well as shortages of qualified personnel.

**Summaries of Key Prospective Studies**

In multiple prospective studies it has been observed that increasing blood bicarbonate results in improved renal outcomes in CKD patients. In particular, three prospective studies (Garneata et al., 2016, de Brito-Ashurst et al., 2009; Phisitkul et al., 2010) ranging from 15 months to 2 years in duration, demonstrated slowing of CKD progression following an increase in blood bicarbonate in Stage 3 to 5 CKD patients with metabolic acidosis (*See* table titled, "Four Studies Supporting Relationship between Metabolic Acidosis and CKD Progression across a Wide Range of Baseline eGFR and Blood Bicarbonate"). Clinical observations included fewer cases of rapid kidney function decline, and fewer patients who developed ESRD requiring dialysis in CKD patients who received interventional therapy in order to increase their blood bicarbonate.

The following are summaries of these three prospective studies:

***Prospective Study #1: Ketoanalogue-Supplemented Vegetarian Very Low-Protein Diet and CKD Progression, Garneata et al., 2016***

In this single-center, open-label, prospective, parallel-group study, 207 patients with CKD and metabolic acidosis were studied for 15 months. One hundred four (104) patients were randomized to receive a vegetarian, ketoanalogue-supplemented very low protein diet (0.3 g/kg/day; N = 104) and the remaining 103 patients served as the control group and received a typical low protein diet (0.6 g/kg/day; N = 103). The patient population had a baseline average eGFR of ~ 18 ml/min/1.73m$^2$ and an average blood bicarbonate of approximately 16.7 mEq/L. Patients with hypertension (BP □ 145/85 mmHg), diabetes, or heart failure were not allowed to enroll in the trial; only 14% of the screened patients met all the eligibility criteria and agreed to adhere to the dietary requirements and could, therefore, be randomized in this study.

At the end of the 15-month treatment period, blood bicarbonate levels in the treated patients increased by 6.8 mEq/L compared to the control group; these results were clinically meaningful and statistically significant ($p < 0.01$).

Kidney function decline over the treatment period was significantly slower (-4.2 mL/min/1.73m$^2$; $p < 0.01$) in the patients on the very low protein diet compared to controls. Patients treated with the very low protein diet were also significantly less likely ($p < 0.001$) than control patients to meet the primary endpoint of renal replacement therapy or a decrease in eGFR of > 50% (13% vs 42%) over the 15-month treatment period.

120

**Table of Contents**

**Garneata: A Lower Percentage of Patients on VLPD
Experienced > 50% Reduction of Initial EGFR or Renal Replacement Therapy**



Garneata et al. JASN 2016;27:2164-2176
©2016 by American Society of Nephrology. Reprinted with permission.

***Prospective Study #2: Bicarbonate Supplementation Slows Progression of CKD and Improves Nutritional Status, de Brito-Ashurst et al., 2009***

In this single-center, open-label, prospective, parallel-group study, 134 CKD patients with mild metabolic acidosis were randomized to intervention with oral sodium bicarbonate or standard care with no intervention (67 patients in each group) for 2 years. The patient population had a baseline average eGFR of approximately 20 ml/min/1.73m$^2$ and an average blood bicarbonate of approximately 20 mEq/L. Patients with poorly controlled hypertension or overt congestive heart failure were not allowed to enroll in the trial.

At the end of the 2-year study, blood bicarbonate levels in the treated patients increased by approximately 4 mEq/L compared to the control group; these results were clinically meaningful and statistically significant (p < 0.001).

Kidney function decline over the 2-year treatment period was significantly slower (-4.0 mL/min/1.73m$^2$; p < 0.0001) in the sodium bicarbonate treated patients compared to controls. Patients who received treatment for their metabolic acidosis were also significantly less likely than untreated patients to experience rapid progression of kidney failure (9% vs 45%; p < 0.0001) or to develop ESRD (6.5% vs 33%; p < 0.001) over the 2-year treatment period.

121

Table of Contents

**de Brito-Ashurst: Kaplan-Meier Analysis to Assess the Probability of
Reaching ESRD Between Oral Alkali Supplement Intervention and Control**



de Brito-Ashurst et al. JASN 2009;20:2075-2084
©2009 by American Society of Nephrology. Reprinted with permission.

***Prospective Study #3: Amelioration of Metabolic Acidosis in Patients with Low GFR Reduced Kidney Endothelin Production and Kidney Injury, and Better Preserved GFR, Phisitkul et al., 2010***

In this single-center, open-label, prospective, parallel-group study, 59 patients with hypertensive nephropathy and mild metabolic acidosis were studied. Thirty (30) patients were treated with oral sodium citrate for 2 years, and the remaining 29 patients, who were unable or unwilling to take sodium citrate, served as controls. The patient population had a baseline average eGFR of approximately 32.5 ml/min/1.73m$^2$ and an average blood bicarbonate of approximately 20.5 mEq/L. Patients with diabetes, heart failure or edema were not allowed to enroll in the trial, and blood pressure was controlled to recommended levels in all patients prior to and during the treatment period.

At the end of the 2-year study, blood bicarbonate levels in the treated patients increased by 4.2 mEq/L compared to the control group; these results were clinically meaningful and statistically significant ($p < 0.0001$). Kidney function decline over the 2-year treatment period was 4.4 mL/min/1.73m$^2$ slower in the sodium citrate treated patients compared to controls, but the difference between groups in eGFR at the end of this small study did not reach statistical significance ($p = 0.066$).

**Intellectual Property**

Our commercial success depends in part on our ability to obtain and maintain proprietary protection for our drug candidates, manufacturing and process discoveries, and other know-how, to operate without infringing the proprietary rights of others and to prevent others from infringing our proprietary rights. Our policy is to seek to protect our proprietary position by, among other methods, filing U.S. and foreign patent applications related to our proprietary technology, inventions and improvements that are important to the development and implementation of our business. We also rely on trade secrets, know-how, continuing technological innovation and potential in-licensing opportunities to develop and maintain our proprietary position.

TRC101 was discovered by us utilizing our proprietary technology. We have filed several non-provisional and provisional patent applications, all owned by us, relating to TRC101 in the United

Table of Contents

States, certain foreign countries, and the World Intellectual Property Organization that are directed to compositions-of-matter, dosage unit forms, methods-of-treatment, medical use, and methods of manufacture.

Our patent portfolio, which is solely owned by us, includes two issued U.S. composition of matter patents (U.S. Patent No. 9,205,107B2 and No. 9,925,214B2), an issued U.S. method of treatment patent (U.S. Patent No. 9,993,500B2) and an issued European medical use patent (EP3 003 327B1); each of these patents is expected to expire in 2034, excluding any additional term resulting from patent term extension if the appropriate maintenance fees are paid. In addition, we expect that U.S. and European patents and the patent applications in this portfolio, if issued, would expire between 2034 and 2038, excluding any additional term from patent term adjustment or patent term extension if appropriate maintenance and other governmental fees are paid. Additional patent term for the presently-issued or later issued U.S. patents may be awarded as a result of the patent term extension provision of the Hatch-Waxman Amendments of 1984, or the Hatch-Waxman Act. In the European Union member countries, a supplementary protection certificate, if obtained, provides a maximum five years of market exclusivity.

In other jurisdictions (currently, Australia, Brazil, Canada, China, Hong Kong, India, Israel, Japan, Mexico, Republic of Korea, and Russia), the term and patent applications relating to TRC101, including composition of matter and various other patents, including dosage unit form, method-of-treatment, medical use and method of manufacture patents, where applicable, are expected to expire between 2034 and 2038, if the appropriate maintenance, renewal, annuity, and other government fees are paid. These patents and patent applications (if applicable), depending on the national laws, may benefit from extension of patent term in individual countries if regulatory approval of TRC101 is obtained in those countries. For example, in Japan, the term of a patent may be extended by a maximum of five years in certain circumstances.

Individual patents extend for varying periods depending on the date of filing of the patent application or the date of patent issuance and the legal term of patents in the countries in which they are obtained. Generally, patents issued for regularly filed applications in the United States are effective for 20 years from the earliest effective filing date. In addition, in certain instances, a patent term can be extended to recapture a portion of the USPTO delay in issuing the patent as well as a portion of the term effectively lost as a result of the FDA regulatory review period. However, as to the FDA component, the restoration period cannot be longer than five years and the total patent term including the restoration period must not exceed 14 years following FDA approval. The duration of foreign patents varies in accordance with provisions of applicable local law, but typically is also 20 years from the earliest effective filing date. The actual protection afforded by a patent varies on a product by product basis, from country to country and depends upon many factors, including the type of patent, the scope of its coverage, the availability of regulatory-related extensions, the availability of legal remedies in a particular country and the validity and enforceability of the patent.

We also protect our proprietary technology and processes, in part, by confidentiality and invention assignment agreements with our employees, consultants, scientific advisors and other contractors. These agreements may be breached, and we may not have adequate remedies for any breach. In addition, our trade secrets may otherwise become known or be independently discovered by competitors. To the extent that our employees, consultants, scientific advisors or other contractors use intellectual property owned by others in their work for us, disputes may arise as to the rights in related or resulting know-how and inventions.

Our commercial success will also depend in part on not infringing the proprietary rights of third parties. It is uncertain whether the issuance of any third-party patent would require us to alter our development or commercial strategies, alter our drugs or processes, obtain licenses or cease certain

123

Table of Contents

activities. Our breach of any license agreements or failure to obtain a license to proprietary rights that we may require to develop or commercialize our future drugs may have a material adverse impact on us.

### Research and Development

We are conducting clinical trials and other development activities to support submission of our NDA for TRC101 and manufacturing of commercial supply of TRC101. We invested $21.8 million and $35.9 million in research and development in the years ended December 31, 2016 and 2017, respectively, and invested $16.6 million in research and development for the three months ended March 31, 2018.

### Competition

Our industry is highly competitive and subject to rapid and significant technological change. While we believe that our development experience, commercialization expertise and scientific knowledge provide us with competitive advantages, we may face competition from large pharmaceutical and biotechnology companies, smaller pharmaceutical and biotechnology companies, specialty pharmaceutical companies, academic institutions, government agencies and research institutions and others.

Many of our competitors may have significantly greater financial, technical and human resources than we have. Mergers and acquisitions in the pharmaceutical and biotechnology industries may result in even more resources being concentrated among a smaller number of our competitors. Our commercial opportunity could be reduced or eliminated if our competitors develop or market products or other novel technologies that are more effective, safer or less costly than TRC101, or they may obtain regulatory approval for their products more rapidly than we may obtain approval for ours.

There are no therapies approved by the FDA for the chronic treatment of metabolic acidosis, and we are not aware of any active clinical development programs other than ours for a treatment in the United States. The FDA has approved generic intravenous sodium bicarbonate solutions for the treatment of acute metabolic acidosis which may occur in severe renal disease, uncontrolled diabetes, and certain other disorders accompanied by a significant loss of bicarbonate; however, those therapies are used for short-term hospital-based treatments and are not used in clinical practice to treat metabolic acidosis. Metabolic acidosis in CKD patients is currently most commonly treated using oral alkali supplementations, such as sodium bicarbonate, sodium citrate or, less frequently, potassium citrate. These treatments have not been approved by the FDA for the treatment of metabolic acidosis.

### Government Regulation

#### *Government Regulation and Product Approval*

Government authorities in the United States, at the federal, state and local level, and in other countries and jurisdictions, including the European Union, extensively regulate, among other things, the research, development, testing, manufacture, quality control, approval, packaging, storage, recordkeeping, labeling, advertising, promotion, distribution, marketing, postmarketing monitoring and reporting, and import and export of drug products. The processes for obtaining regulatory approvals in the United States and in foreign countries and jurisdictions, along with subsequent compliance with applicable statutes and regulations and other regulatory authorities, require the expenditure of substantial time and financial resources.

#### *FDA Approval Process*

In the United States, the Food and Drug Administration, or FDA, regulates drugs under the Federal Food, Drug, and Cosmetic Act, or FFDCA, and implementing regulations. These laws and

124

Table of Contents

other federal and state statutes and regulations, govern, among other things, the research, development, testing, manufacture, storage, recordkeeping, approval, labeling, promotion and marketing, distribution, postmarketing monitoring and reporting, sampling, and import and export of drug products. The process of obtaining regulatory approvals and the subsequent compliance with applicable federal, state, local and foreign statutes and regulations require the expenditure of substantial time and financial resources. Failure to comply with applicable U.S. requirements may subject a company to a variety of administrative or judicial sanctions, such as clinical hold, FDA refusal to approve pending regulatory applications, warning or untitled letters, product recalls, product seizures, total or partial suspension of production or distribution, injunctions, fines, civil penalties, and criminal prosecution.

The process required by the FDA before a drug may be marketed in the United States generally includes the following:

- completion of nonclinical laboratory tests, animal studies and formulation studies according to Good Laboratory Practices, or GLP, or other applicable regulations;

- submission to the FDA of an investigational new drug application, or IND, which must become effective before human clinical trials may begin in the United States;

- performance of adequate and well-controlled human clinical trials according to Good Clinical Practices, or GCP, to establish the safety and efficacy of the product candidate for its intended use;

- submission to the FDA of a New Drug Application, or NDA, for a new product;

- satisfactory completion of an FDA inspection, if conducted, of the facility or facilities where the product candidate is manufactured to assess compliance with the FDA's current Good Manufacturing Practices, or cGMP, to assure that the facilities, methods and controls are adequate to preserve the drug product candidate's identity, strength, quality, purity, and potency;

- potential FDA inspection of the nonclinical and clinical trial sites;

- potential FDA inspection of us and vendors involved in the generation of the data in support of the NDA; and

- FDA review and approval of the NDA.

Satisfaction of FDA pre-market approval requirements typically takes many years and the actual time required may vary substantially based upon the type, complexity, and novelty of the product candidate or disease. A clinical hold may occur at any time during the life of an IND and may affect one or more specific trials or all trials conducted under the IND.

Nonclinical tests include laboratory evaluation of the product candidate's chemistry, formulation, and toxicity, as well as animal studies to assess the characteristics and potential safety and efficacy of the product candidate. The conduct of the nonclinical tests must comply with federal regulations and requirements, including GLP. The results of nonclinical testing are submitted to the FDA as part of an IND along with other information, including information about product candidate's chemistry, manufacturing and controls, and a proposed clinical trial protocol. Long-term nonclinical tests, such as animal tests of reproductive toxicity and carcinogenicity, may continue after the IND is submitted. A 30-day waiting period after the submission of each IND is required prior to the commencement of clinical testing in humans. If the FDA has neither commented on nor questioned the IND within this 30-day period, the clinical trial proposed in the IND may begin. Clinical trials involve the administration of the investigational product to healthy volunteers or subjects under the supervision of a qualified investigator. Clinical trials must be conducted: (i) in compliance with federal regulations; (ii) in compliance with GCP, an international standard meant to protect the rights and health of subjects and

125

Table of Contents

to define the roles of clinical trial sponsors, administrators, and monitors; as well as (iii) under protocols detailing the objectives of the trial, the parameters to be used in monitoring safety, and the effectiveness criteria to be evaluated. Each protocol involving testing on U.S. subjects and subsequent protocol amendments must be submitted to the FDA as part of the IND.

The FDA may order the temporary or permanent discontinuation of a clinical trial at any time, or impose other sanctions if it believes that the clinical trial either is not being conducted in accordance with FDA requirements or presents an unacceptable risk to the clinical trial subjects. The trial protocol and informed consent information for subjects in clinical trials must also be submitted to an ethics committee/institutional review board, or IRB, for approval. An ethics committee/IRB may also require the clinical trial at the site to be halted, either temporarily or permanently, for failure to comply with the ethics committee/IRB's requirements, or may impose other conditions. The study sponsor may also suspend a clinical trial at any time on various grounds, including a determination that the subjects are being exposed to an unacceptable health risk.

Clinical trials to support NDAs for marketing approval are typically conducted in three sequential phases, but the phases may overlap. In Phase 1, the initial introduction of the product candidate is usually into healthy human subjects, the product candidate is tested to assess metabolism, pharmacokinetics, pharmacological actions, side effects associated with increasing doses, and, if possible, early evidence on effectiveness. Phase 2 usually involves trials in a limited patient population to determine the effectiveness of the product candidate for a particular indication, dosage tolerance, and optimal dosage, and to identify common adverse effects and safety risks. If a product candidate demonstrates evidence of effectiveness and an acceptable safety profile in Phase 2 evaluations, Phase 3 trials are undertaken to obtain additional information about clinical efficacy and safety in a larger number of subjects, typically at geographically dispersed clinical trial sites, to permit the FDA to evaluate the overall benefit-risk relationship of the product candidate and to provide adequate information for the labeling of the product candidate. In most cases, the FDA requires two adequate and well-controlled Phase 3 clinical trials to demonstrate the efficacy of the product candidate. A single Phase 3 trial may be sufficient in certain circumstances.

A drug product candidate being studied in clinical trials may be made available for treatment of individual patients, in certain circumstances. Pursuant to the 21st Century Cures Act, or Cures Act, which was signed into law in December 2016, the manufacturer of an investigational product for a serious disease or condition is required to make available, such as by posting on its website, its policy on evaluating and responding to requests for individual patient access to such investigational product.

During the development of a new product candidate, sponsors are given opportunities to meet with the FDA at certain points; specifically, prior to the submission of an IND, at the end of Phase 2 and before an NDA is submitted. Meetings at other times may be requested. These meetings can provide an opportunity for the sponsor to share information about the data gathered to date and for the FDA to provide advice on the next phase of development. Sponsors typically use the meeting at the end of Phase 2 to discuss their Phase 2 clinical results and present their plans for the pivotal Phase 3 clinical trials that they believe will support the approval of the new product candidate.

Concurrent with clinical trials, sponsors usually complete additional animal safety studies and also develop additional information about the chemistry and physical characteristics of the product candidate and finalize a process for manufacturing commercial quantities of the product candidate in accordance with cGMP requirements. The manufacturing process must be capable of consistently producing quality batches of the product candidate and the manufacturer must develop methods for testing the quality, purity and potency of the product candidate. Additionally, appropriate packaging must be selected and tested and stability studies must be conducted to demonstrate that the product candidate does not undergo unacceptable deterioration over its proposed shelf life. After completion of

126

Table of Contents

the required clinical testing, an NDA is prepared and submitted to the FDA. FDA approval of the NDA is required before marketing of the product may begin in the United States. The NDA must include the results of all nonclinical, clinical, and other testing and a compilation of data relating to the product candidate's pharmacology, chemistry, manufacture, and controls. The cost of preparing and submitting an NDA is substantial. The submission of most NDAs is additionally subject to a substantial application user fee, and the applicant under an approved NDA is also subject to annual product and establishment user fees. These fees are typically increased annually. On August 3, 2017, Congress passed the FDA Reauthorization Act of 2017, or FDARA, which reauthorizes the various user fees to facilitate the FDA's product review and oversight.

The FDA has 60 days from its receipt of an NDA to determine whether the application will be accepted for filing based on the agency's threshold determination that it is sufficiently complete to permit substantive review. The FDA may refuse to file any NDA that it deems incomplete or not properly reviewable at the time of submission and may request additional information. In this event, the NDA must be resubmitted with the additional information and the resubmitted application also is subject to review before the FDA accepts it for filing. Once the submission is accepted for filing, the FDA begins an in-depth review. The FDA has agreed to certain performance goals in the review of NDAs. Most such applications for standard review product candidates are reviewed within ten months of the date the FDA files the NDA; most applications for priority review product candidates are reviewed within six months of the date the FDA files the NDA. Priority review can be applied to a product candidate that the FDA determines has the potential to treat a serious or life-threatening condition and, if approved, would be a significant improvement in safety or effectiveness compared to available therapies. The review process for both standard and priority review may be extended by the FDA for three additional months to consider certain late-submitted information, or information intended to clarify information already provided in the submission.

Among other things, the FDA reviews an NDA to determine whether the product is safe and effective for its intended use and whether the product candidate is being manufactured in accordance with cGMP. The FDA may also refer applications for novel product candidates, or product candidates that present difficult questions of safety or efficacy, to an advisory committee—typically a panel that includes clinicians and other experts—for review, evaluation, and a recommendation as to whether the application should be approved. The FDA is not bound by the recommendation of an advisory committee, but it generally follows such recommendations.

Before approving an NDA, the FDA will typically inspect one or more clinical sites to assure compliance with GCP. Additionally, the FDA may inspect the facility or the facilities at which the product candidate is manufactured. The FDA will not approve the product candidate unless it determines that the manufacturing processes and facilities are in compliance with cGMP requirements and adequate to assure consistent production of the product within required specifications. To assure GCP and cGMP compliance, an applicant must incur significant expenditures of time, money and effort in the areas of training, record keeping, production, and quality control.

Notwithstanding the submission of relevant data and information, the FDA may ultimately decide that the NDA does not satisfy the criteria for approval and deny approval. Data obtained from clinical trials are not always conclusive. The FDA may disagree with our trial design or interpret data from nonclinical studies and clinical trials differently than we interpret the same data. If the agency decides not to approve the NDA in its present form, the FDA will issue a complete response letter that describes all of the specific deficiencies in the application identified by the FDA. The deficiencies identified may be minor, for example, requiring labeling changes, or major, for example, requiring additional clinical trials. If a complete response letter is issued, the applicant may either resubmit the NDA, addressing the deficiencies identified in the letter, or withdraw the application. If, or when, those deficiencies have been addressed to the FDA's satisfaction in a resubmission of the NDA, the FDA will

127

Table of Contents

issue an approval letter. The FDA has committed to reviewing such resubmissions in two or six months depending on the type of information included. An approval letter authorizes commercial marketing of the drug in the United States with specific prescribing information for specific indications.

Even if a product candidate receives regulatory approval, the approval may be significantly limited to specific indications and dosages or the indications for use may otherwise be limited, which could restrict the commercial value of the product. Further, the FDA may require that certain contraindications, warnings or precautions be included in the product labeling. The FDA may impose restrictions and conditions on product distribution, prescribing, or dispensing in the form of a risk evaluation and mitigation strategy, or REMS, or otherwise limit the scope of any approval. REMS can include medication guides, communication plans for healthcare professionals, and elements to assure safe use, or ETASU. ETASU can include, but are not limited to, special training or certification for prescribing or dispensing, dispensing only under certain circumstances, special monitoring, and the use of patient registries. The requirement for an REMS can materially affect the potential market and profitability of the product. In addition, the FDA may require confirmatory postmarketing trials, sometimes referred to as "Phase 4" clinical trials, designed to further assess a product's safety and effectiveness, and testing and surveillance programs to monitor the safety of approved products that have been commercialized.

### Foreign Clinical Studies to Support an IND or NDA

The FDA will accept as support for an IND or NDA a well-designed, well-conducted, non-IND foreign clinical trial if it was conducted in accordance with GCP and the FDA is able to validate the data from the trial through an on-site inspection, if necessary. A sponsor or applicant who wishes to rely on a non-IND foreign clinical trial must submit supporting information to the FDA to demonstrate that the trial conformed to GCP.

Regulatory applications based solely on foreign clinical data meeting these criteria may be approved if the foreign data are applicable to the U.S. population and U.S. medical practice, the trials have been performed by clinical investigators of recognized competence, and the data may be considered valid without the need for an on-site inspection by FDA or, if FDA considers such an inspection to be necessary, FDA is able to validate the data through an on-site inspection or other appropriate means. Failure of an application to meet any of these criteria may result in the application not being approvable based on the foreign data alone.

### Disclosure of Clinical Trial Information

Sponsors of clinical trials of FDA-regulated products are required to register and disclose certain clinical trial information. Information related to the product, patient population, phase of investigation, trial sites and investigators, and other aspects of the clinical trial is then made public as part of the registration. Sponsors are also obligated to disclose the results of their clinical trials after completion. Disclosure of the results of these trials can be delayed in certain circumstances for up to two years after the date of completion of the trial. Competitors may use this publicly available information to gain knowledge regarding the progress of development programs.

### Expedited Development and Review Programs

The FDA has various programs, including Fast Track Designation, Priority Review Designation, Accelerated Approval Program and Breakthrough Therapy Designation, which are intended to expedite or simplify the process for reviewing product candidates. Even if a product candidate qualifies for one or more of these programs, the FDA may later decide that the product candidate no longer meets the conditions for qualification or that the time period for FDA review or approval will be lengthened. Generally, product candidates that are eligible for these programs are those for serious or life-

128

Table of Contents

threatening conditions, those with the potential to address unmet medical needs and those that offer meaningful benefits over existing treatments. For example, Fast Track Designation is a process designed to facilitate the development and expedite the review of product candidates to treat serious or life-threatening diseases or conditions and fill unmet medical needs. Priority Review Designation is designed to give a product candidate that treats a serious condition and, if approved, would provide a significant improvement in safety or effectiveness, an initial review within eight months as compared to a standard review time of within ten months of the date the FDA files the NDA.

Although Fast Track Designation and Priority Review Designation do not affect the standards for approval, the FDA will attempt to facilitate early and frequent meetings with a sponsor of a Fast Track Designation product candidate and expedite review of the application for a Priority Review Designation product candidate.

In the Food and Drug Administration Safety and Innovation Act, or FDASIA, which was signed into law in July 2012, the U.S. Congress encouraged the FDA to utilize innovative and flexible approaches to the assessment of product candidates under the Accelerated Approval Program. The law required the FDA to issue related guidance and also promulgate confirming regulatory changes. In May 2014, the FDA published a final Guidance for Industry titled "Expedited Programs for Serious Conditions—Drugs and Biologics," which provides guidance on the FDA programs that are intended to facilitate and expedite development and review of new product candidates as well as threshold criteria generally applicable to concluding that a product candidate is a candidate for these expedited development and review programs.

In addition to the Fast Track Designation and Priority Review Designation Programs discussed above, the FDA also provided guidance on a new program for Breakthrough Therapy Designation, established by FDASIA to subject a new category of product candidates to expedited approval. A sponsor may seek Breakthrough Therapy Designation of a product candidate if the product candidate is intended, alone or in combination with one or more other therapeutics, to treat a serious or life-threatening disease or condition, and preliminary clinical evidence indicates that the product candidate may demonstrate substantial improvement over existing therapies on one or more clinically significant endpoints, such as substantial treatment effects observed early in clinical development. A request for Breakthrough Therapy Designation should be submitted concurrently with, or as an amendment to, an IND, but ideally no later than the end of Phase 2 meeting.

### *Accelerated Approval Program*

Under the accelerated approval provisions of the FFDCA and the FDA's implementing regulations, the FDA may grant accelerated approval to a product for a serious or life-threatening disease or condition that provides meaningful therapeutic advantage to patients over existing treatments based upon a determination that the product has an effect on a surrogate endpoint that is reasonably likely to predict clinical benefit. Products approved under the Accelerated Approval Program must meet the same statutory standards for safety and effectiveness as those granted traditional approval.

The Accelerated Approval Program is most often used in settings in which the course of a disease is long and an extended period of time is required to measure the intended clinical benefit of a product, while the effect on the surrogate endpoint occurs more rapidly. The FDA will not grant approval under the Accelerated Approval Program to products that meet standards for traditional approval.

The evidence to support the determination that an endpoint is reasonably likely to predict clinical benefit may include epidemiological, pathophysiological, therapeutic, pharmacologic, or other evidence developed using biomarkers, for example, or other scientific methods or tools. The FDA considers all

129

Table of Contents

relevant evidence and may consult external experts, as needed. Important factors for the agency's consideration include the disease process and the relationship between the drug's effect and the disease process.

Approval under the Accelerated Approval Program is subject, however, to the requirement that the applicant conduct additional postmarketing clinical trials to verify and describe the drug's clinical benefit, where there is uncertainty as to the relationship of the surrogate endpoint to the clinical benefit, or of the observed clinical endpoint to ultimate outcome. Typically, clinical benefit is verified when postmarketing clinical trials show that the drug provides a clinically meaningful positive therapeutic effect, that is, an effect on how a patient feels, functions, or survives. The FDA may require that any confirmatory postmarketing trial be initiated or substantially underway prior to the submission of an application under the Accelerated Approval Program. And, if such confirmatory postmarketing trial fails to confirm the drug's clinical profile or risks and benefits, the FDA may withdraw its approval of the drug. The FDA may also withdraw the approval if other evidence demonstrates that the product is not safe or effective. All promotional materials for product candidates approved under the Accelerated Approval Program are subject to prior review by the FDA. The FDA has issued labeling instructions specific to the program. For example, if a drug is approved based on a surrogate endpoint under the program, its labeling should include a succinct description of the limitations of usefulness of the drug and any uncertainty about anticipated clinical benefits. False or misleading promotional materials may also lead to expedited withdrawal of approval.

### *Patent Term Restoration and Marketing Exclusivity*

After approval, owners of relevant drug patents may apply for up to a five-year patent extension under the Drug Price Competition and Patent Term Restoration Act of 1984, referred to as the Hatch- Waxman Act. The allowable patent term extension is calculated as half of the product's testing phase—the time between IND and NDA submission—and all of the review phase—the time between NDA submission and approval, up to a maximum of five years. The time can be shortened if the FDA determines that the applicant did not pursue approval with due diligence. The total patent term after the extension may not exceed 14 years.

For patents that might expire during the application phase, the patent owner may request an interim patent extension. An interim patent extension increases the patent term by one year and may be renewed up to four times. For each interim patent extension granted, the post-approval patent extension is reduced by one year. The director of the U.S. Patent and Trademark Office must determine that approval of the product candidate covered by the patent for which a patent extension is being sought is likely. Interim patent extensions are not available for a product candidate for which an NDA has not been submitted.

Market exclusivity provisions under the FFDCA also can delay the submission or the approval of certain applications. The FFDCA provides a five-year period of non-patent marketing exclusivity within the United States to the first applicant to gain approval of an NDA for a new chemical entity. A product candidate is a new chemical entity if the FDA has not previously approved any other new product candidate containing the same active moiety, which is the molecule or ion responsible for the action of the product candidate substance. During the exclusivity period, the FDA may not accept for review an abbreviated new drug application, or ANDA, or a 505(b)(2) NDA submitted by another company for another version of such product candidate where the applicant does not own or have a legal right of reference to all the data required for approval. However, an application may be submitted after four years if it contains a certification of patent invalidity or non-infringement. The FFDCA also provides three years of marketing exclusivity for an NDA, 505(b)(2) NDA or supplement to an approved NDA if new clinical investigations, other than bioavailability studies, that were conducted or sponsored by the applicant are deemed by the FDA to be essential to the approval of the application, for example, for

130

Table of Contents

new indications, dosages or strengths of an existing product candidate. This three-year exclusivity covers only the conditions associated with the new clinical investigations and does not prohibit the FDA from approving ANDAs for product candidates containing the original active agent. Five-year and three-year exclusivity will not delay the submission or approval of a full NDA. However, an applicant submitting a full NDA would be required to conduct or obtain a right of reference to all of the nonclinical studies and adequate and well-controlled clinical trials necessary to demonstrate safety and effectiveness.

*Postmarketing Requirements*

Once an approval is granted, the FDA may withdraw the approval if compliance with regulatory requirements is not maintained or if problems occur after the product reaches the market. Later discovery of previously unknown problems with a product may result in restrictions on the product or even complete withdrawal of the product from the market. After approval, some types of changes to the approved product, such as adding new indications, manufacturing changes and additional labeling claims, are subject to further FDA review and approval. In addition, the FDA may under some circumstances require testing and surveillance programs to monitor the effect of approved products that have been commercialized, and the FDA under some circumstances has the power to prevent or limit further marketing of a product based on the results of these postmarketing programs.

TRC101, which will be manufactured or distributed by us or our collaborators pursuant to FDA approvals, is subject to continuing regulation by the FDA, including, among other things:

- record-keeping requirements;

- reporting of adverse experiences associated with the product;

- providing the FDA with updated safety and efficacy information;

- therapeutic sampling and distribution requirements;

- notifying the FDA and gaining its approval of specified manufacturing or labeling changes;

- registration and listing requirements; and

- complying with FDA promotion and advertising requirements, which include, among other things, standards for direct-to-consumer advertising, restrictions on promoting products for uses or in patient populations that are not described in the product's approved labeling, limitations on industry-sponsored scientific and educational activities and requirements for promotional activities involving the internet.

Manufacturers, their subcontractors, and other entities involved in the manufacture and distribution of TRC101, if approved, are required to register their establishments with the FDA and certain state agencies and are subject to periodic unannounced inspections by the FDA and some state agencies for compliance with cGMP, including data integrity requirements, and other laws. The FDA periodically inspects manufacturing facilities to assess compliance with ongoing regulatory requirements, including cGMP, which impose extensive procedural, substantive and record-keeping requirements upon us and third-party manufacturers engaged by us if TRC101 is approved. In addition, changes to the manufacturing process are strictly regulated, and, depending on the significance of the change, may require FDA approval before being implemented. FDA regulations would also require investigation and correction of any deviations from cGMP and impose reporting and documentation requirements upon us and our third-party manufacturers. Accordingly, manufacturers must continue to expend time, money and effort in the area of production and quality control to maintain compliance with cGMP and other aspects of regulatory compliance. Failure to comply with the statutory and regulatory requirements can subject a manufacturer to possible legal or regulatory actions, such as warning letters, suspension of manufacturing, seizures of products, injunctive actions or other civil penalties.

**Table of Contents**

In addition, drug manufacturers in the United States must comply with applicable provisions of the Drug Supply Chain Security Act and provide and receive product tracing information, maintain appropriate licenses, ensure they only work with other properly licensed entities, and have procedures in place to identify and properly handle suspect and illegitimate product.

### New Legislation and Regulations

From time to time, legislation is drafted, introduced and passed in Congress that could significantly change the statutory provisions governing the testing, approval, manufacturing and marketing of products regulated by the FDA. In addition to new legislation, FDA regulations and policies are often revised or interpreted by the agency in ways that may significantly affect our business and TRC101. It is impossible to predict whether further legislative changes will be enacted or whether FDA regulations, guidance, policies or interpretations will be changed or what the effect of such changes, if any, may be.

### Other U.S. Healthcare Laws and Compliance Requirements

In the United States, our activities are potentially subject to regulation by various federal, state and local authorities in addition to the FDA, including but not limited to, the Centers for Medicare and Medicaid Services, or CMS, other divisions of the U.S. Department of Health and Human Services (such as the Office of Inspector General and the Health Resources and Service Administration), the U.S. Department of Justice, or the DOJ, and individual U.S. Attorney offices within the DOJ, and state and local governments. For example, sales, marketing and scientific/educational grant programs may have to comply with the anti-fraud and abuse provisions of the Social Security Act, the false claims laws, the privacy and security provisions of the Health Insurance Portability and Accountability Act, or HIPAA, and similar state laws, each as amended, as applicable.

The federal Anti-Kickback Statute prohibits, among other things, any person or entity, from knowingly and willfully offering, paying, soliciting or receiving any remuneration, directly or indirectly, overtly or covertly, in cash or in kind, to induce or in return for purchasing, leasing, ordering or arranging for the purchase, lease or order of any item or service reimbursable, in whole or in part, under Medicare, Medicaid or other federal healthcare programs. The term remuneration has been interpreted broadly to include anything of value. The Anti-Kickback Statute has been interpreted to apply to arrangements between therapeutic product manufacturers on one hand and prescribers, purchasers, and formulary managers on the other. There are a number of statutory exceptions and regulatory safe harbors protecting some common activities from prosecution. The exceptions and safe harbors are drawn narrowly and practices that involve remuneration that may be alleged to be intended to induce prescribing, purchasing or recommending may be subject to scrutiny if they do not qualify for an exception or safe harbor. Failure to meet all of the requirements of a particular applicable statutory exception or regulatory safe harbor does not make the conduct per se illegal under the Anti-Kickback Statute. Instead, the legality of the arrangement will be evaluated on a case-by-case basis based on a cumulative review of all of its facts and circumstances. Our practices may not in all cases meet all of the criteria for protection under a statutory exception or regulatory safe harbor.

Additionally, the intent standard under the Anti-Kickback Statute was amended by the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, or the PPACA , to a stricter standard such that a person or entity no longer needs to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation. In addition, the PPACA codified case law that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal False Claims Act, or FCA (discussed below).

The federal false claims and civil monetary penalty laws, including the FCA, which imposes significant penalties and can be enforced by private citizens through civil qui tam actions, prohibit any

132

Table of Contents

person or entity from, among other things, knowingly presenting, or causing to be presented, a false or fraudulent claim for payment to, or approval by, the federal healthcare programs, including Medicare and Medicaid, or knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim to the federal government. A claim includes "any request or demand" for money or property presented to the U.S. government. For instance, historically, pharmaceutical and other healthcare companies have been prosecuted under these laws for allegedly providing free product to customers with the expectation that the customers would bill federal programs for the product. Other companies have been prosecuted for causing false claims to be submitted because of the companies' marketing of the product for unapproved, off-label, and thus generally non-reimbursable, uses.

HIPAA created additional federal criminal statutes that prohibit, among other things, knowingly and willfully executing, or attempting to execute, a scheme to defraud or to obtain, by means of false or fraudulent pretenses, representations or promises, any money or property owned by, or under the control or custody of, any healthcare benefit program, including private third-party payors, willfully obstructing a criminal investigation of a healthcare offense, and knowingly and willfully falsifying, concealing or covering up by trick, scheme or device, a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items or services. Like the Anti-Kickback Statute, the PPACA amended the intent standard for certain healthcare fraud statutes under HIPAA such that a person or entity no longer needs to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation.

Also, many states have similar, and typically more prohibitive, fraud and abuse statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, or, in several states, apply regardless of the payor. Additionally, to the extent that TRC101 may in the future be sold in a foreign country, we may be subject to similar foreign laws.

We may be subject to data privacy and security regulations by both the federal government and the states in which we conduct our business. HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act, or HITECH, and its implementing regulations, imposes requirements relating to the privacy, security and transmission of individually identifiable health information. Among other things, HITECH makes HIPAA's privacy and security standards directly applicable to business associates, independent contractors, or agents of covered entities that receive or obtain protected health information in connection with providing a service on behalf of a covered entity. HITECH also created four new tiers of civil monetary penalties, amended HIPAA to make civil and criminal penalties directly applicable to business associates, and gave state attorneys general new authority to file civil actions for damages or injunctions in federal courts to enforce HIPAA and seek attorneys' fees and costs associated with pursuing federal civil actions. In addition, many state laws govern the privacy and security of health information in specified circumstances, many of which differ from each other in significant ways, are often not pre-empted by HIPAA, and may have a more prohibitive effect than HIPAA, thus complicating compliance efforts.

We expect that TRC101, if approved, may be eligible for coverage under Medicare, the federal health care program that provides health care benefits to the aged and disabled, and covers outpatient services and supplies, including certain pharmaceutical products, that are medically necessary to treat a beneficiary's health condition. In addition, TRC101 may be covered and reimbursed under other government programs, such as Medicaid and the 340B Drug Pricing Program. The Medicaid Drug Rebate Program requires pharmaceutical manufacturers to enter into and have in effect a national rebate agreement with the Secretary of the Department of Health and Human Services as a condition for states to receive federal matching funds for the manufacturer's outpatient drugs furnished to Medicaid patients. Under the 340B Drug Pricing Program, the manufacturer must extend discounts to entities that participate in the program. As part of the requirements to participate in these government

133

Table of Contents

programs, many pharmaceutical manufacturers must calculate and report certain price reporting metrics to the government, such as average manufacturer price, or AMP, and best price.

Additionally, the federal Physician Payments Sunshine Act, or the Sunshine Act, within the PPACA, and its implementing regulations, require that certain manufacturers of drugs, devices, biological and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) report annually to CMS information related to certain payments or other transfers of value made or distributed to physicians and teaching hospitals, or to entities or individuals at the request of, or designated on behalf of, the physicians and teaching hospitals and to report annually certain ownership and investment interests held by physicians and their immediate family members. In addition, many states also govern the reporting of payments or other transfers of value, many of which differ from each other in significant ways, are often not pre-empted, and may have a more prohibitive effect than the Sunshine Act, thus further complicating compliance efforts.

In order to distribute products commercially, we must comply with state laws that require the registration of manufacturers and wholesale distributors of drug and biological products in a state, including, in certain states, manufacturers and distributors who ship products into the state even if such manufacturers or distributors have no place of business within the state. Some states also impose requirements on manufacturers and distributors to establish the pedigree of product in the chain of distribution, including some states that require manufacturers and others to adopt new technology capable of tracking and tracing product as it moves through the distribution chain. Several states have enacted legislation requiring pharmaceutical and biotechnology companies to establish marketing compliance programs, file periodic reports with the state, make periodic public disclosures on sales, marketing, pricing, clinical trials and other activities, and/or register their sales representatives, as well as to prohibit pharmacies and other healthcare entities from providing certain physician prescribing data to pharmaceutical and biotechnology companies for use in sales and marketing, and to prohibit certain other sales and marketing practices. All of our activities are potentially subject to federal and state consumer protection and unfair competition laws.

Ensuring business arrangements with third parties comply with applicable healthcare laws and regulations is a costly endeavor. If our operations are found to be in violation of any of the federal and state healthcare laws described above or any other current or future governmental regulations that apply to us, we may be subject to penalties, including without limitation, civil, criminal and/or administrative penalties, damages, fines, disgorgement, individual imprisonment, exclusion from participation in government programs, such as Medicare and Medicaid, injunctions, private "qui tam" actions brought by individual whistleblowers in the name of the government, or refusal to allow us to enter into government contracts, contractual damages, reputational harm, administrative burdens, diminished profits and future earnings, additional reporting obligations and oversight if we become subject to a corporate integrity agreement or other agreement to resolve allegations of non-compliance with these laws, and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations.

### *Coverage, Pricing and Reimbursement*

Significant uncertainty exists as to the coverage and reimbursement status of TRC101, if approved. In the United States and in foreign markets, sales of TRC101, if and when we receive regulatory approval for commercial sale, will depend, in part, on the extent to which third-party payors provide coverage and establish adequate reimbursement levels for such products. In the United States, third-party payors include federal and state healthcare programs, private managed care providers, health insurers and other organizations. Adequate coverage and reimbursement from governmental healthcare programs, such as Medicare and Medicaid in the United States, and commercial payors are critical to new product acceptance.

134

Table of Contents

Our ability to commercialize TRC101 successfully also will depend in part on the extent to which coverage and reimbursement for these products and related treatments will be available from government health administration authorities, private health insurers and other organizations. Government authorities and third-party payors, such as private health insurers and health maintenance organizations, decide which therapeutics they will pay for and establish reimbursement levels. Coverage and reimbursement by a third-party payor may depend upon a number of factors, including the third-party payor's determination that use of a therapeutic is:

- a covered benefit under its health plan;

- safe, effective and medically necessary;

- appropriate for the specific patient;

- cost-effective; and

- neither experimental nor investigational.

We cannot be sure that reimbursement will be available for TRC101 and, if coverage and reimbursement are available, what the level of reimbursement will be. Coverage may also be more limited than the indications for which the product is approved by the FDA or comparable foreign regulatory authorities. Reimbursement may impact the demand for, or the price of, TRC101, if approved.

Third-party payors are increasingly challenging the price, examining the medical necessity, and reviewing the cost-effectiveness of medical products, therapies and services, in addition to questioning their safety and efficacy. Obtaining reimbursement for TRC101 may be particularly difficult because of the higher prices often associated with branded drugs and drugs administered under the supervision of a physician. We may need to conduct expensive pharmacoeconomic studies in order to demonstrate the medical necessity and cost-effectiveness of TRC101, in addition to the costs required to obtain FDA approvals. TRC101 may not be considered medically necessary or cost-effective. Obtaining coverage and reimbursement approval of a product from a government or other third-party payor is a time-consuming and costly process that could require us to provide to each payor supporting scientific, clinical and cost-effectiveness data for the use of TRC101 on a payor-by-payor basis, with no assurance that coverage and adequate reimbursement will be obtained. A payor's decision to provide coverage for a product does not imply that an adequate reimbursement rate will be approved. Further, one payor's determination to provide coverage for a product does not assure that other payors will also provide coverage for the product. Adequate third-party reimbursement may not be available to enable us to maintain price levels sufficient to realize an appropriate return on our investment in product development. In addition, prices for drugs may be reduced by mandatory discounts or rebates required by government healthcare programs or private payors and by any future relaxation of laws that presently restrict imports of drugs from countries where they may be sold at lower prices than in the United States. It is difficult to predict how Medicare coverage and reimbursement policies will be applied to TRC101 in the future and coverage and reimbursement under different federal healthcare programs are not always consistent. If reimbursement is not available or is available only at limited levels, we may not be able to successfully commercialize TRC101.

Different pricing and reimbursement schemes exist in other countries. In the European Union, governments influence the price of pharmaceutical products through their pricing and reimbursement rules and control of national health care systems that fund a large part of the cost of those products to consumers. Some jurisdictions operate positive and negative list systems under which products may only be marketed once a reimbursement price has been agreed. To obtain reimbursement or pricing approval, some of these countries may require the completion of clinical trials that compare the cost effectiveness of a particular product candidate to currently available therapies. Other member states allow companies to fix their own prices for medicines, but monitor and control company profits. The downward pressure on health care costs has become intense. As a result, increasingly high barriers

135

Table of Contents

are being erected to the entry of new products. In addition, in some countries, cross- border imports from low-priced markets exert a commercial pressure on pricing within a country.

The marketability of TRC101, if approved, for commercial sale may suffer if the government and third-party payors fail to provide adequate coverage and reimbursement. In addition, emphasis on managed care, the increasing influence of health maintenance organizations, and additional legislative changes in the United States has increased, and we expect will continue to increase, the pressure on healthcare pricing. The downward pressure on the rise in healthcare costs in general, particularly prescription medicines, medical devices and surgical procedures and other treatments, has become very intense. Coverage policies and third-party reimbursement rates may change at any time. Even if favorable coverage and reimbursement status is attained for one or more products for which we receive regulatory approval, less favorable coverage policies and reimbursement rates may be implemented in the future.

### Healthcare Reform

In the United States and some foreign jurisdictions, there have been, and continue to be, several legislative and regulatory changes and proposed changes regarding the healthcare system that could prevent or delay marketing approval of product candidates, restrict or regulate post-approval activities, and affect the ability to profitably sell product candidates for which marketing approval is obtained. Among policy makers and payors in the United States and elsewhere, there is significant interest in promoting changes in healthcare systems with the stated goals of containing healthcare costs, improving quality and/or expanding access. In the United States, the pharmaceutical industry has been a particular focus of these efforts and has been significantly affected by major legislative initiatives.

For example, the PPACA has substantially changed healthcare financing and delivery by both governmental and private insurers. Among the PPACA provisions of importance to the pharmaceutical and biotechnology industries, in addition to those otherwise described above, are the following:

- an annual, nondeductible fee on any entity that manufactures or imports certain specified branded prescription drugs and biologic agents apportioned among these entities according to their market share in some government healthcare programs that began in 2011;

- an increase in the statutory minimum rebates a manufacturer must pay under the Medicaid Drug Rebate Program, retroactive to January 1, 2010, to 23.1% and 13% of the average manufacturer price for most branded and generic drugs, respectively, and capped the total rebate amount for innovator drugs at 100% of the Average Manufacturer Price, or AMP;

- a new Medicare Part D coverage gap discount program, in which manufacturers must currently agree to offer 50%, which will change to 70% starting in 2019, point-of-sale discounts off negotiated prices of applicable brand drugs to eligible beneficiaries during their coverage gap period, as a condition for the manufacturers' outpatient drugs to be covered under Medicare Part D;

- extension of manufacturers' Medicaid rebate liability to covered drugs dispensed to individuals who are enrolled in Medicaid managed care organizations;

- expansion of eligibility criteria for Medicaid programs by, among other things, allowing states to offer Medicaid coverage to additional individuals beginning in 2014 and by adding new mandatory eligibility categories for individuals with income at or below 133% of the federal poverty level, thereby potentially increasing manufacturers' Medicaid rebate liability;

- expansion of the entities eligible for discounts under the 340B Drug Discount Program;

- a new Patient-Centered Outcomes Research Institute to oversee, identify priorities in, and conduct comparative clinical effectiveness research, along with funding for such research;

136

Table of Contents

- expansion of healthcare fraud and abuse laws, including the FCA and the Anti-Kickback Statute, new government investigative powers, and enhanced penalties for noncompliance;

- a new methodology by which rebates owed by manufacturers under the Medicaid Drug Rebate Program are calculated for drugs that are inhaled, infused, instilled, implanted, or injected;

- requirements to report certain financial arrangements with physicians and teaching hospitals;

- a requirement to annually report certain information regarding drug samples that manufacturers and distributors provide to physicians;

- establishment of a Center for Medicare Innovation at CMS to test innovative payment and service delivery models to lower Medicare and Medicaid spending, potentially including prescription drug spending that began on January 1, 2011; and

- a licensure framework for follow on biologic products.

There have been legal and judicial, Congressional, and political challenges to certain aspects of the PPACA, as well as recent efforts by the Trump administration to repeal and replace certain aspects of the PPACA. Since January 2017, President Trump has signed two executive orders and other directives designed to delay, circumvent, or loosen certain requirements mandated by the PPACA. Furthermore, each chamber of Congress has put forth multiple bills designed to repeal or repeal and replace portions of the PPACA. The newly enacted federal income tax law includes a provision repealing, effective January 1, 2019, the tax-based shared responsibility payment imposed by the PPACA on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate." Additionally, on January 22, 2018, President Trump signed a continuing resolution on appropriations for fiscal year 2018 that delayed the implementation of certain PPACA-mandated fees, including the so called "Cadillac" tax on certain high cost employer-sponsored insurance plans, the annual fee imposed on certain health insurance providers based on market share, and the medical device excise tax on nonexempt medical devices. Further, the Bipartisan Budget Act of 2018 among other things, amends the PPACA, effective January 1, 2019, to close the coverage gap in most Medicare drug plans, commonly referred to as the "donut hole." Congress may consider other legislation that would alter other aspects of the PPACA.

We anticipate that the PPACA, if substantially maintained in its current form, will continue to result in additional downward pressure on coverage and the price that we receive for TRC101, and could seriously harm our business. Any reduction in reimbursement from Medicare and other government programs may result in a similar reduction in payments from private payors. The implementation of cost containment measures or other healthcare reforms may prevent us from being able to generate revenue, attain profitability, or commercialize TRC101. Such reforms could have an adverse effect on anticipated revenues from product candidates that we may successfully develop and for which we may obtain regulatory approval and may affect our overall financial condition and ability to develop product candidates.

Further legislation or regulation could be passed that could harm our business, financial condition and results of operations. Other legislative changes have been proposed and adopted since the PPACA was enacted. For example, in August 2011, President Obama signed into law the Budget Control Act of 2011, which, among other things, created the Joint Select Committee on Deficit Reduction to recommend to Congress proposals in spending reductions. The Joint Select Committee on Deficit Reduction did not achieve a targeted deficit reduction of at least $1.2 trillion for fiscal years 2012 through 2021, triggering the legislation's automatic reduction to several government programs. This includes aggregate reductions to Medicare payments to providers of up to 2% per fiscal year, which went into effect beginning on April 1, 2013 and will stay in effect through 2027 unless additional Congressional action is taken.

137

Table of Contents

Additionally, there has been increasing legislative and enforcement interest in the United States with respect to specialty drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries and proposed federal legislation designed to, among other things, bring more transparency to drug pricing, reduce the cost of prescription drugs under Medicare, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drugs. At the federal level, the Trump administration's budget proposal for fiscal year 2019 contains further drug price control measures that could be enacted during the 2019 budget process or in other future legislation, including, for example, measures to permit Medicare Part D plans to negotiate the price of certain drugs under Medicare Part B, to allow some states to negotiate drug prices under Medicaid, and to eliminate cost sharing for generic drugs for low-income patients. While any proposed measures will require authorization through additional legislation to become effective, Congress and the Trump administration have each indicated that it will continue to seek new legislative and/or administrative measures to control drug costs. At the state level, individual states in the United States are increasingly passing legislation and implementing regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures. For example, in September 2017, the California State Assembly approved SB17, which requires pharmaceutical companies to notify health insurers and government health plans at least 60 days before any scheduled increases in the prices of their products if they exceed certain thresholds over a two-year period, and further requiring pharmaceutical companies to explain the reasons for such increase. Effective in 2016, Vermont passed a law requiring certain manufacturer identified by the state to justify their price increases.

### The Foreign Corrupt Practices Act

The Foreign Corrupt Practices Act, or the FCPA, prohibits any U.S. individual or business from paying, offering, or authorizing payment or offering of anything of value, directly or indirectly, to any foreign official, political party or candidate for the purpose of influencing any act or decision of the foreign entity in order to assist the individual or business in obtaining or retaining business. The FCPA also obligates companies whose securities are listed in the United States to comply with accounting provisions requiring us to maintain books and records that accurately and fairly reflect all transactions of the corporation, and to devise and maintain an adequate system of internal accounting controls for international operations.

### Additional Regulation

In addition to the foregoing, state and federal laws regarding environmental protection and hazardous substances, including the Occupational Safety and Health Act, the Resource Conservancy and Recovery Act and the Toxic Substances Control Act, affect our business. These and other laws govern our use, handling and disposal of various biological, chemical and radioactive substances used in, and wastes generated by, our operations. If our operations result in contamination of the environment or expose individuals to hazardous substances, we could be liable for damages and governmental fines. We believe that we are in material compliance with applicable environmental laws and that continued compliance therewith will not have a material adverse effect on our business. We cannot predict, however, how changes in these laws may affect our future operations.

### Other Regulations

We are also subject to numerous federal, state and local laws relating to such matters as safe working conditions, manufacturing practices, environmental protection, fire hazard control, and disposal of hazardous or potentially hazardous substances. We may incur significant costs to comply with such laws and regulations now or in the future.

138

Table of Contents

*European Union / Rest of World Government Regulation*

In addition to regulations in the United States, we will be subject to a variety of regulations in other jurisdictions governing, among other things, clinical trials and any future commercial sales and distribution of TRC101. Whether or not we obtain FDA approval to market TRC101, we must obtain the requisite approvals from regulatory authorities in foreign jurisdictions prior to the commencement of clinical trials or marketing of the products in those countries.

Even if a product obtains FDA marketing approval, most foreign jurisdiction require that the investigational product undergo national requirements related to clinical trials and authorization processes, similar to those in the United States. With respect to clinical trials, certain countries outside of the United States have a similar process that requires the submission of a clinical trial application, much like the IND, prior to the commencement of human clinical trials. In the European Union, for example, before starting a clinical trial, a valid request for authorization must be submitted by the sponsor to the competent authority of the EU Member State(s) in which the sponsor plans to conduct the clinical trial, as well as to independent national Ethics Committee(s). A clinical trial may commence only once the relevant Ethics Committee(s) has (have) issued a favorable opinion and the competent authority of the EU Member State(s) concerned has (have) not informed the sponsor of any grounds for non-acceptance. Failure to comply with the EU requirements may subject a company to the rejection of the request and the prohibition to start a clinical trial. Clinical trials conducted in the European Union (or used for marketing authorization application in the European Union) must be conducted in accordance with applicable laws, GCP and GMP rules, International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use, or ICH, guidelines and be consistent with ethical principles. EU Member State inspections are regularly conducted to verify the sponsor's compliance with applicable rules. The sponsor is required to record and report to the relevant national competent authorities (and to the Ethics Committee) information about suspected serious unexpected adverse reactions.

The authorization of a clinical trial may be suspended or revoked by EU Member States in their territory if the conditions in the request for an authorization are no longer met, or if an EU Member State has information raising doubts about the safety or scientific validity of the clinical trial. Various penalties exist in EU Member States for non-compliance with the clinical trial rules and related requirements, for example with respect to data protection and privacy. If we or our potential collaborators fail to comply with applicable EU regulatory requirements, we may also be subject to damage compensation and civil and criminal liability. The way clinical trials are conducted in the European Union will undergo a major change when the new EU Clinical Trial Regulation (Regulation 536/2014) comes into application in 2019.

As in the United States, no medicinal product may be placed on the EU market unless a marketing authorization has been issued. Medicinal products may be authorized in different ways in the EU, depending on certain criteria: the national authorization procedure (i.e., via the EU Member States' national authorization procedure, which later allows for application via the mutual-recognition procedure), the centralized authorization procedure (i.e., at EU level), or the decentralized authorization procedure (i.e., authorization of a product that is not yet authorized in the EU, which can simultaneously be authorized in several EU Member States). Products submitted for approval via the national procedure must follow the national authorization procedures, which vary from Member State to Member State. Products submitted for approval via the centralized procedure (only available for certain products and indications) are assessed by the Committee for Medicinal Products for Human Use, or CHMP, a committee within the European Medicines Agency, or EMA. The CHMP assesses, inter alia, whether a medicine meets the necessary quality, safety and efficacy requirements and whether it has a positive risk-benefit balance. Products submitted for approval via the decentralized procedure, as for the mutual-recognition procedure, must first undergo an assessment performed by one Member State, or reference Member State, which another Member State may approve.

139

Table of Contents

Various penalties and sanctions exist in different EU Member States for non-compliance with the EU marketing authorization procedure. In addition, for centrally authorized products the European Commission may also impose financial penalties on the holders of marketing authorizations if they fail to comply with certain obligations in connection with the authorizations as well as pharmacovigilance rules. If we or our potential collaborators fail to comply with applicable EU or other foreign regulatory requirements, we may be subject to, among other things, fines, suspension or withdrawal of regulatory approvals, product recalls, seizure of products, operating restrictions and criminal prosecution.

Coverage and reimbursement status of TRC101, if approved, are provided for by the national laws of EU Member States. The requirements may differ across the EU Member States. Also at EU Member State level, actions have been taken to enact transparency laws regarding payments between pharmaceutical companies and health care professionals, or HCPs.

The EU Data Protection Directive and Member State implementing legislation may also apply to health-related and other personal information obtained outside of the United States. The Directive will be replaced by the EU General Data Protection Regulation in May 2018. The Regulation will increase our responsibility and liability in relation to personal data that we process, and we may be required to put in place additional mechanisms to ensure compliance with the new EU data protection rules.

For other countries outside of the European Union, such as countries in Eastern Europe, Latin America or Asia, the requirements governing the conduct of clinical trials, product licensing, pricing and reimbursement vary from country to country. In all cases, again, the clinical trials must be conducted in accordance with GCP and the applicable regulatory requirements. The requirements and process governing the conduct of clinical trials, product licensing, pricing and reimbursement also vary from country to country.

**Employees**

As of May 31, 2018, we had 61 full-time employees. Of these employees, 45 are engaged in research and development. Our employees are not represented by labor unions or covered by collective bargaining agreements. We consider our relationship with our employees to be good.

**Facilities**

We lease approximately 26,897 square feet of office and laboratory space in South San Francisco, California under a lease that expires June 30, 2021. We believe that our existing facilities and other available properties will be sufficient for our needs for the foreseeable future.

**Legal Proceedings**

From time to time, we may become involved in litigation or other legal proceedings. We are not currently a party to any litigation or legal proceedings that, in the opinion of our management, are likely to have a material adverse effect on our business. Regardless of outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.