Jeffrey C. Block, *pro hac vice*
Michael D. Gaines, *pro hac vice*
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
michael@blockleviton.com

Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo, CA 94402
(650) 781-0025 phone
jake@blockleviton.com

*Attorneys for Lead Plaintiff Jeffrey M. Fiore and the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL PARDI, *Individually and on Behalf of All Others Similarly Situated,*<br><br>Plaintiff,<br><br>v.<br><br>TRICIDA, INC. and GERRITT KLAERNER,<br><br>Defendants. | Case No. 3:21-cv-00076-HSG<br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT KLAERNER'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>**Class Action**<br><br>Hon. Haywood S. Gilliam, Jr.<br><br>Date: June 1, 2023<br>Time: 2:00 p.m.<br>Courtroom 2, 4th Floor |

**TABLE OF CONTENTS**

INTRODUCTION………………………………………………………………………………...1

BACKGROUND…………………………………………………………………………….3

I.     Veverimer .................................................................................................................... 3

   A.   The FDA Repeatedly Raised Concerns as to How Tricida Would Measure Efficacy ........ 3

   B.   The FDA Cautioned Klaerner About Patient Population Being From Eastern Europe and Overreliance on a Single Trial Site in Bulgaria ........................................................................ 6

II.    The Truth About Veverimer's Prospects for FDA Approval Emerges ................................. 7

ARGUMENT…………………………………………………………………………………...8

III.    The SAC Adequately Alleges Falsity and Material Omissions ........................................... 8

   A.   The Court Need Not Revisit Its Finding that the Statements About The Trial Being Conducted In the "United States and Europe" Were False and Misleading When Made .......... 9

   B.   The Court Need Not Revisit its Finding that the Statements Describing the TRCA-301/TRCA-301E Trial as "Multicenter" Were Misleading ....................................................... 11

   C.   The FDA Record Conclusively Demonstrates that Klaerner Made False and Misleading Statements About the Late-Cycle Meeting And the Court Need Not Revisit Its Prior Ruling  13

   D.   Klaerner Made False and Misleading Statements About the Trial Results of TRCA-301/301E and the Use of SBC as a Surrogate Endpoint ........................................................... 15

IV.    The SAC Adequately Alleges Scienter ........................................................................ 21

   A.   Taking the SAC's Allegations Holistically, Plaintiff Has Raised a Strong Inference of Scienter ..................................................................................................................................... 24

CONCLUSION…………………………………………………………………………………...26

TABLE OF AUTHORITIES

**Cases**

*Berson v. Applied Signal Tech., Inc.*, 527 F. 3d 982 (9th Cir. 2008)................................................ 8

*Brody v. Transitional Hosps. Corp.*, 280 F.3d 997 (9th Cir. 2002)................................................ 9

*Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995) ........................................................................ 8

*Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557 (S.D.N.Y. 2016)............................................. 25

*Homyk v. ChemoCentryx, Inc.*, No. 21-cv-03343-JST (N.D. Cal. Feb. 23, 2023) (slip op.), ECF No. 50................................................................................................................................. passim

*Immanuel Lake v. Zogenix, Inc.*, 2020 WL 3820424 (N.D. Cal. Jan. 27, 2020) .......................... 12

*In re Amylin Pharm., Inc. Sec. Litig.*, 2003 WL 21500525 (S.D. Cal. May 1, 2003)............... 8, 17

*In re Atossa Genetics, Inc. Sec. Litig.*, 868 F. 3d 784 (9th Cir. 2017).......................................... 20

*In re BioMarin Pharms. Inc. Sec. Litig.*, 2022 WL 164299 (N.D. Cal. Jan. 6, 2022) .................. 21

In re GeoPharma, Inc. Sec. Litig., 411 F. Supp. 2d 434 (S.D.N.Y. 2006).................................... 22

*In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057 (E.D. Wash. 2016) ..................................... 11

*In re MannKind Sec. Actions*, 835 F. Supp. 2d 797 (C.D. Cal. 2011)........................................... 24

*In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217 (N.D. Cal. 2009)......................................... 17

*In re NVIDIA Corp. Sec. Litig.,* 2011 WL 4831192 (N.D. Cal. Oct. 12, 2011), *affd,* 768 F.3d 1046 (9th Cir. 2014)................................................................................................................. 22

*In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017) ............................................. 20

*In re STEC Inc. Sec. Litig.*, 2011 WL 2669217 (C.D. Cal. Jun. 17, 2011).................................... 8

*Miller v. Thane Int'l, Inc.*, 519 F.3d 879 (9th Cir. 2008)............................................................... 8

*Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020)............................................................. 25

*Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pen. Fund*, 575 U.S. 175 (2015)....... 20

*Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698 (9th Cir. 2016) .......................... 14, 16, 21, 25

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2021 WL 4864421 (N.D. Cal. Oct. 19, 2021).................................................................................................................. 17, 25

## INTRODUCTION

After this Court granted in part, and denied in part, Defendants' motion to dismiss the First Amended Class Action Complaint ("FAC"), ECF No. 93 ("Order"), and discovery began, Lead Plaintiff served a subpoena on the United States Food and Drug Administration and sought documents concerning Tricida's new drug application ("NDA") for veverimer. In response, the FDA produced over 11,000 pages of documents consisting of letters, information, and minutes of meetings held between the FDA and Tricida. Defendant Klaerner attended all the relevant meetings and received all relevant correspondence from the FDA. ¶41.[1]

The documents produced by the FDA establish that from the moment Tricida first sought to conduct clinical trials to demonstrate veverimer could slow the progression of chronic kidney disease ("CKD"), the FDA repeatedly expressed skepticism over how Tricida intended to measure the drug's efficacy. Indeed, the FDA specifically told Klaerner ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ¶¶12, 54.

Yet, despite these specific, clear warnings and concerns that the FDA communicated to Klaerner, he represented to investors in Tricida's June 2018 initial public offering—in which Tricida raised over $255 million and by which point in time Tricida had analyzed the results of its phase 3 trial, TRCA-301—that *"based on feedback from the FDA"* the data from the clinical trials "will provide sufficient evidence of clinical safety and efficacy to support the submission and review of an NDA for TRC 101 pursuant to the Accelerated Approval Program." This statement was false when made, and Klaerner was deliberately reckless in making it.

---

[1] Refences to "¶_" are to the Second Amended Complaint for Violations of the Federal Securities Laws, ECF No. 115.

The FAC alleged, among other things, that Tricida and Klaerner misrepresented that the trials were conducted in the "United States and Europe" when, in fact, most of the trials were conducted in Eastern Europe (and none in Western Europe). Defendants were also charged with misrepresenting that the trials were "multicenter". The Court found these statements were false and misleading when made but that the FAC failed to plead a strong inference of scienter. The SAC, based on the FDA documents, pleads that ███████████████████████████████████████████████████████████████████████████ ¶16, ████████████████████████████████████████████

The FDA's specific feedback establishes that Klaerner was deliberately reckless in not revealing that most of the trial's participants came from Eastern European countries, whose population was too different from the U.S. population for purposes of testing veverimer. And because ████████████████████████, it was misleading to call the trials multicenter. The danger of misleading an investor was so obvious—the FDA specifically cautioned against relying these Eastern European countries for enrollment—that Klaerner was deliberately reckless.

Klaerner's motion to dismiss the SAC asks the Court to revisit and reverse all its prior findings because, he claims, the FDA documents establish the FDA never definitively said it would deny the NDA for veverimer before the complete response letter in August 2020. This is meritless.

Lead Plaintiff alleges that Klaerner misled investors as to what the FDA's actual feedback was, reducing the perceived risk to investors that Tricida would fail to obtain FDA approval for veverimer, which in turn caused Tricida's stock to trade at artificially inflated prices. In upholding the claim that Klaerner made an actionable misstatement on the May 7, 2020 conference call with investors, this Court held that

> Klaerner's touting positive discussions with the FDA required him to also disclose the negative discussions, and his failure to do so is 'an extreme departure from the standards of ordinary care … [that] present[ed] a danger

of misleading buyers or sellers that [was] either known to [Defendants] or [was] so obvious that [Defendants] must have been aware of it.'

Order 30. With the new discovery, this holding applies equally to the statements about measuring efficacy, the location of the trial sites, and the alleged "multicenter" nature of TRCA-301/301E.

## BACKGROUND

### I.    Veverimer

Tricida was a biopharmaceutical company whose sole drug candidate was veverimer. It was conducting clinical trials to obtain FDA approval for veverimer to slow the progression of CKD through the treatment of metabolic acidosis. ¶4. To demonstrate clinical efficacy, Tricida chose to use changes in serum bicarbonate ("SBC") levels as the predetermined surrogate endpoint for its Phase 3 trial. *Id.* As is typical, Tricida engaged in numerous meetings and discussions with the FDA concerning its Phase 3 trials and sought, and received, the FDA's feedback regarding the trials and prospects for obtaining approval for veverimer.

### A.    The FDA Repeatedly Raised Concerns as to How Tricida Would Measure Efficacy

As far back as 2015, and through 2020 when the FDA rejected Tricida's NDA for veverimer, the FDA repeatedly raised concerns and expressed skepticism to Klaerner as to whether changes in SBC levels could demonstrate clinical efficacy sufficient to support approval for veverimer. The FDA also repeatedly informed Klaerner that *if* it did accept changes in SBC levels to demonstrate clinical efficacy, those changes would have to be significant.

¶47 (emphasis added). The FDA told Tricida



*Id.* The FDA also informed Tricida

*Id.*

¶48.

¶49.

*Id.*

Klaerner and the FDA

¶50.

*Id.*

*Id.*

¶51.

¶52.

*Id.*



¶53.

Soon after, [redacted]

¶54.

*Id.*

In response, [redacted]

¶55. The FDA informed Klaerner, however, [redacted]

¶56. [redacted]

*Id.*

The FDA further explained: [redacted]

*Id.*

¶¶17, 58.

On September 4, 2019, Tricida filed its NDA for approval of veverimer. The clinical trials demonstrated that "the treatment effect [on SBC] levels at weeks 12 and 52 in TRCA-301/301E was 2.64 mEq/L and 1.99 mEq/L respectively." ¶23. [redacted], meaning that Klaerner knew that the clinical trial results fell short of a target the FDA might yet reject as insufficient treatment effect, dramatically increasing the risk that the NDA might not be approved.

¶74.

¶¶72, 73.

Next,

¶75. The FDA went further,

¶¶75-76.

¶¶23, 76.

¶165.

¶77.

**B.    The FDA Cautioned Klaerner About Patient Population Being From Eastern Europe and Overreliance on a Single Trial Site in Bulgaria**

¶¶57, 97.



¶¶57, 97. And, the FDA added, *Id.* ¶¶69, 140. ¶16. ¶73. ¶¶ 75-76.

## II.    The Truth About Veverimer's Prospects for FDA Approval Emerges

On July 15, 2020, Tricida revealed that the FDA "identified deficiencies that preclude discussion of labeling and postmarketing requirements/commitments at this time." ¶¶28, 79, 176. Although Tricida reported that the notification did not "specify the deficiencies identified by the FDA," Tricida and Klaerner knew which deficiencies the FDA had referenced— ¶¶72-78. Tricida's stock price fell $10.56 per share in response to this news.[2] ¶¶79, 175.

On August 24, 2020, Tricida issued a press release announcing that the Company received a CRL from the FDA for its veverimer NDA. ¶¶117, 177-179. Tricida's stock price fell 23.64% on this news. ¶194. On October 29, 2020, Tricida's stock price fell another 47% on the news that the FDA would not accept solely "serum bicarbonate data for determination of efficacy." ¶¶180-182, 195. On December 8, 2020, the stock price fell another 17% on the news that the FDA was, in essence, requiring new clinical trials. ¶196. On February 25, 2021, Tricida revealed it had

[2] Klaerner sold 24,000 shares between May 1, 2020 and July 15, 2020 (when the stock price fell) avoiding over $240,000 in lost value.

"received an Appeal Denied Letter ('ADL'), from the Office of New Drugs ('OND') of the FDA in response to its Formal Dispute Resolution Request ('FDRR') submitted in December 2020." ¶197. The press release disclosing the ADL revealed for the first time the FDA's "concerns that are particularly relevant in an NDA supported by a single registration trial": the trial results were "strongly influenced by a single site," and "the majority of sites for the TRCA-301/TRCA-301E trial" were in Eastern Europe, "where differences in patient management … might affect the treatment response to veverimer," rendering questionable "the applicability to a U.S. patient population." ¶¶185-186. Tricida's stock price fell 30% on this news. ¶197.

## ARGUMENT[3]

### III.   The SAC Adequately Alleges Falsity and Material Omissions

As this Court explained,

> "Material information only needs to be disclosed if its omission would "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." "But 'once defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information."

Order 7-8 (internal citations omitted). Moreover, a statement is false and misleading if it "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F. 3d 982, 985 (9th Cir. 2008). "[W]hether a public statement is misleading … is a mixed question to be decided by the trier of fact." *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *9 (C.D. Cal. Jun. 17, 2011) (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)). "[S]tatements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). So "if the FDA expresses significant concerns regarding the sufficiency of the trials, the company cannot make affirmative representations regarding the completeness or sufficiency of the trials without full disclosure." *In re Amylin Pharm., Inc. Sec. Litig.*, 2003 WL 21500525, at *8 (S.D. Cal. May 1, 2003).

---

[3] The Court previously set forth the pleading standards to be considered on a motion to dismiss a securities fraud action, so Lead Plaintiff will not repeat them here. *See* Order 3-4.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT KLAERNER'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
3:21-cv-00076-LHK

8

**A.    The Court Need Not Revisit Its Finding that the Statements About The Trial Being Conducted In the "United States and Europe" Were False and Misleading When Made**

The Court already held,

> Fiore sufficiently pleads that Defendants' statements characterizing their Phase 3 trials as conducted in "Europe" were misleading. Given that Fiore alleges differences between Eastern and Western European patient populations and that the FDA treats clinical data from those populations differently, Defendants' statements "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."

Order 8-9 (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). There is no basis for the Court to reverse its prior ruling.

On the contrary, the FDA documents demonstrate the FDA specifically cautioned Tricida from relying on participants from Eastern Europe. ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████[4] ¶57 (emphasis

added). ███████████████████████████████████ ¶58.

_____

[4] Klaerner dismisses this cautionary statement by the FDA as simply "a standard provision." MTD 7. Whether it is a standard provision is a question of fact not properly resolved on a motion to dismiss. Plus, the circumstances that prompted the FDA to caution Tricida about this were specific to the TRCA-310 trial: ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████ MTD 7. Apparently unsatisfied with Tricida's response, ████████

███████████████████████████████████████████████████████████



Then, after reviewing the NDA, ███████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████ ¶¶72, 73.

Although Klaerner and Tricida ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████ ¶76. ███████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████ *Id.*

Klaerner argues ████████████████████████████████ ██████████████████████████████████ his statements were neither false, misleading, or omitted a material fact. MTD 6-7, 9. First, Tricida did not ████ ████████████████████████████████████████████ ████████████████████████████████████████████

████ Second, in denying Tricida's appeal of the denial of the NDA, the FDA expressly "noted concerns around the trial results being strongly influenced by a single site, and the majority of sites for the TRCA-301/TRCA-301E trial being in Eastern Europe, where differences in patient management, including concomitant medications and diet, might affect the treatment response to

---

████████████████████████████████████ ¶¶69, 140. ████ ████████████████████████████████

veverimer and raise a concern of the applicability to a U.S. patient population." There is simply no support for Klaerner's assertion that Tricida always provided satisfactory answers to the FDA.

Klaerner also contends that Tricida had no obligation to disclose interim FDA communications. MTD 7. But Lead Plaintiff does not argue otherwise. Klaerner and Tricida repeatedly disclosed the trials were conducted with patients from the "United States and Europe" but knew full well that ███████████████████████████████████████████ ██████████████ And by the time Tricida went public, it knew the results of the Phase 3 clinical trials ████████████████████████ Claiming the trials were conducted in the "United States and Europe" "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists." Order 8-9.

Finally, Klaerner argues that his "in the United States and Europe" statements were not *materially* misleading because the location of TRCA-301/301E's trial sites were disclosed in the *Lancet* and on clinicaltrials.gov. MTD 8. Klaerner's "truth-on-the-market" defense fares no better now than it did on his first motion to dismiss. *See* Order 9-10. "Defendants bear a heavy burden of proving that information withheld or misrepresented was transmitted to the public with a degree of intensity and credibility to effectively counterbalance the misleading impressions created by insider one-sided representations." Order 10 (quoting *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1073 (E.D. Wash. 2016)). Once again Klaerner makes no evidentiary showing—let alone an incontrovertible one—of the intensity with which Tricida's exclusively Eastern European trial sites were transmitted to the public. *See id.* "Because Defendants do not meet, or even address, their burden of 'proving that information withheld or misrepresented was transmitted to the public with a degree of intensity and credibility to effectively counterbalance the misleading impressions created by insider one-sided representations,' *Iso Ray*, 189 F. Supp. 3d at 1073, Defendants' 'truth-on-the-market' defense cannot be a proper basis for dismissal at this stage." Order 10.

**B.    The Court Need Not Revisit its Finding that the Statements Describing the TRCA-301/TRCA-301E Trial as "Multicenter" Were Misleading**

The Court already found misleading Klaerner's statements made between June 5, 2018 and March 2, 2020 describing the Phase 3 TRCA-301/301E trial as "multicenter." *See* Order 13-15;

¶¶62, 94, 101, 111, 118, 128, 139, 146, 152, 169. These statements "gave the misleading impression that the FDA would find them credible because no single study site [was] responsible for a disproportionate share of either the trial subjects or the favorable effect seen." Order 14. "But in reality …, 'the TRCA-301/301E trial results were 'strongly influenced by a single site.'" *Id.* Indeed, Tricida analyzed the TRCA-301E data no later than March 28, 2019, ¶66, and Klaerner therefore knew ███████████████████████████████████.[5]

Klaerner's arguments against the misleading nature of his "multicenter" statements lack merit. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████ MTD 9; ¶75. Klaerner asserts that during the late-cycle meeting, ████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
MTD 9 & Ex. 14, at 3. This response attempts to convince that ████████ (i.e., Eastern European) patients were similar enough to U.S. patients to yield applicable data, but it does not address the issue of a single site driving results (i.e. the single Phase 3 trial's lack of "multicenter" credibility).[6]

Klaerner also contends that the SAC's "multicenter" trial allegations "depend on ignoring the basic structure of TRCA-301 and TRCA-301E," because TRCA-301 was "designed to study efficacy" and TRCA-301E was designed to "establish the long-term safety of veverimer." MTD 9-10. Wrong. Again, the FDA expressed concern with a single trial site driving results, which undercut the representation that the trial was "multicenter." Whether the trial was to measure

---

[5] Plaintiff concedes that because there were no results for TRCA-301E until the extension's completion in March 2019, earlier statements describing TRCA-301/301E as "multicenter," *see* ¶¶94, 101, 111, did not mislead investors.

[6] Klaerner disingenuously argues that because the FDA "returned to the issue of the ████████ site when it later issued its CRL," this supports nothing more than fraud-by-hindsight. MTD 9 n.4 (again citing *Immanuel Lake v. Zogenix, Inc.*, 2020 WL 3820424, at *8-9 (N.D. Cal. Jan. 27, 2020)). The Court has already addressed this argument: "Plaintiff's claim [in *Zogenix*] is distinguishable from Fiore's claim here: while the plaintiff *Zogenix* alleged that the defendant failed to disclose a study only later identified by the FDA, Fiore alleges that Defendants *affirmatively touted* a feature of their trial—its 'multicenter' nature—to investors, which implied that the FDA would find it more credible." Order 15.

efficacy or safety, data from a single trial site undercuts the claim that the trial was "multicenter." Moreover, Klaerner did not even observe this purportedly "basic" dichotomy, as he repeatedly touted the efficacy results of TRCA-301E. *See* ¶¶ 114, 131.

Finally, Klaerner erroneously asserts there is a "disconnect" between the challenged statements and omitted information because "under Plaintiff's theory, the omission of details—no matter how far removed from the challenged statements—constitutes fraud." *See* MTD 11. As the Court found in its earlier decision, "Fiore plausibly alleges that Defendants' use of the term 'multicenter' was misleading because it 'would give a reasonable investor the impression of a state of affairs that differed in a material way from the one that actually existed" and rejected Defendants' argument that they "did not have a duty to go further and disclose the precise enrollment figures." Order 13-14.

### C. The FDA Record Conclusively Demonstrates that Klaerner Made False and Misleading Statements About the Late-Cycle Meeting And the Court Need Not Revisit Its Prior Ruling

Klaerner made numerous false and misleading statements during the investor call on May 7, 2020 about Tricida's interactions with the FDA at the May 1, 2020 late-cycle meeting. As the Court already found, by disclosing "the fact that Defendants had discussed 'outstanding review issues' with the FDA at the May 2020 late-cycle meeting and shar[ing] one of those issues"—"the magnitude and durability of the treatment effect on the surrogate marker"—"Klaerner was obligated to share the other significant review issue—'the applicability of data from the TRCA-301 and TRCA-301E trials to the U.S. population—discussed with the FDA." Order 22.

Klaerner now erroneously argues he did not have to disclose that the applicability of data from TRCA-301/301E to the U.S. population was a significant review issue because



MTD 13.

██████████████████████████████████████████████████████

██████████████████████████ MTD 13.

████████████████████████████████████████

████████████████████████████████████████

█████████[7] ¶¶75-77.██████████████████

█████████████████████ So when Klaerner affirmatively disclosed the "good" news about the late-cycle meeting discussion—that Tricida "took the opportunity to address outstanding review issues," by "present[ing] our data and rationale" as to why Tricida believed the veverimer NDA "satisfied the requirements for initial approval under the Accelerated Approval Program including the magnitude and durability of the treatment effect on the surrogate marker serum bicarbonate," such that Tricida was "confident" the NDA satisfied accelerated approval— he was also obligated to reveal the "bad" news—████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████ ¶¶75-77, 161-62; *see* Order 23 ("[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.") (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016)). His failure to do so materially misrepresented the hurdles to FDA approval of veverimer.

Plus, in denying Tricida's appeal of the denial of the NDA, the FDA specifically cited as a basis for the denial that "the majority of sites for the TRCA-301/TRCA-301E trial" were in Eastern Europe, "where differences in patient management … might affect the treatment response to veverimer," rendering questionable "the applicability to a U.S. patient population." ¶33.

---

[7] ████████████████████████████

████████████████████████ *See* MTD Ex. 13, at FDACDER011706████████████████

██████████████████████████████████████████

█████████████; ¶73.

Klaerner also misled investors when he said that during the late-cycle meeting, "the FDA indicated it currently does not plan to hold an AdCom to discuss veverimer due in part to the logistical challenges posed by COVID-19."[8]



¶¶25, 159.

¶159.

¶¶72-77.

Klaerner offers a tortured and disingenuous explanation for why his statement was neither false nor misleading.

MTD at 12.

*Id.*

Klaerner falsely told investors that an AdComm meeting would not occur because of COVID-19. In truth, an AdComm meeting was not scheduled because of the significant review issues concerning the NDA. It is the *reason* why there was no AdComm meeting— masking the significant review issues with the NDA—that is false, not that there would never be a meeting.

> **D.    Klaerner Made False and Misleading Statements About the Trial Results of TRCA-301/301E and the Use of SBC as a Surrogate Endpoint**

Relying on the FDA documents, the SAC pleads that Klaerner made numerous false and misleading statements and omitted to disclose material facts about fundamental issues repeatedly raised by the FDA regarding TRCA-301/301E's efficacy endpoints and use of SBC as a surrogate. *See, e.g.,* ¶¶99, 100, 127, 156. For example, statements that "the TRCA-301 trial met both its

---

[8] The Court previously found that Plaintiff failed to plead facts supporting the suggestion that the FDA told Defendants it cancelled the AdCom meeting because of problems with the NDA. Order 21. The SAC now does so.

primary and secondary endpoints in a highly statistically significant manner," ¶¶94, 106, 121, 123, 125, 136, 144, 155, that Tricida had been "agreeing with FDA," ¶131, and "[b]ased on feedback from the FDA, we believe that the data from the TRCA-101, TRCA-301 and TRCA-301E trials will provide sufficient evidence of clinical safety and efficacy to support the submission and review of an NDA for TRC101 pursuant to the Accelerated Approval Program," ¶104, created a false and misleading impression of the Phase 3 trial's efficacy results and veverimer's prospects for accelerated approval.

At the time these statements were made, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ As a result, "based on the FDA's feedback" at the relevant times, the data from TRCA-301/301E likely **would not** provide sufficient evidence of clinical safety and efficacy. *See, e.g.,* ¶¶47-49, 51, 53-58, 60-61, 63, 70, 72, 75, 78, 80. It was also misleading to represent that TRCA-301 had met its endpoints "in a highly statistically significant manner" when █████████████████████████████████████████████████████████████████████████████████ ¶¶12, 54 (emphasis added).

Unable to refute these allegations, Klaerner instead mischaracterizes the SAC as asserting that Klaerner knew, and failed to disclose, that the FDA would deny accelerated approval. *See* MTD 1, 14. This is simply not so. The SAC alleges that ████████████████████████████████████████████████████████████████████████████████████████, thereby increasing the risk that the FDA would not grant approval to the NDA for veverimer.[9] In *Schueneman,* the Ninth Circuit found that touting trial results, while withholding the agency's underlying concerns with that trial, is actionable under §10(b): "[Plaintiff's] theory of fraud is that Defendants intentionally

---

[9] Klaerner also attempts to downplay the FDA's communications as mere "interim positions," and argues there was no obligation to recite the details of regulatory back-and-forth to investors. *See* MTD 1. That argument similarly misses the mark and avoids directly addressing the nature of Plaintiff's allegations. *See Homyk v. ChemoCentryx, Inc.,* No. 21-cv-03343-JST (N.D. Cal. Feb. 23, 2023) (slip op.), ECF No. 50, at 20 ("Because the omission of adverse facts, including concerns shared by FDA representatives during interim communications with ChemoCentryx, rendered certain of Defendants' statements misleading[,] Defendants had a duty to disclose those facts.").

withheld information material to the market's assessment of whether and when the FDA would likely approve lorcaserin.' It is the failure to disclose 'issues' and 'concerns' with the Rat Study and the FDA's interest in the outcome of those studies—not who was ultimately right about the underlying science—that matters." 840 F.3d at 709.[10]

Judge Tigar's recent opinion in *Homyk v. ChemoCentryx, Inc.*, is directly on point. There, as here, plaintiff alleged ChemoCentryx and its officers knowingly withheld that the FDA had expressed concerns about their clinical trial's design and results in private communications with the defendants. No. 21-cv-03343-JST (slip op.), at 2. ChemoCentryx similarly had no approved drugs on the market, generated no sales revenue, and relied on capital from investors to fund research and development, and the trial at issue was designed to provide evidence for FDA approval. *Id.* Faced with the same arguments Klaerner raises here, the court held that "[r]egardless of whether Defendants had any indication that the FDA's concerns would fully prevent the drug's approval *those concerns at least increased the risk that the drug would not be approved*," which "could be important to a reasonable investor." *Id.* at 14 (emphasis added).

Klaerner concedes that the ███████████████████████████████ ████████████████████████. *See* MTD 14. His assertion, however, that those concerns were "obviously superseded" when Tricida chose to pursue accelerated approval, where "the surrogate endpoint must only be *reasonably likely* to predict clinical benefit" and a confirmatory study would be included, is specious. █████████████████████████

---

[10] *See also Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2021 WL 4864421, at *3 (N.D. Cal. Oct. 19, 2021) (holding that Bayer's "statements concerning its due diligence" in acquiring Monsanto "could have 'give[n] a reasonable investor the [false] impression'" that "Bayer had assessed Monsanto's litigation risks, and had reviewed non-public information to inform that review") (first alteration in original); *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1230 (N.D. Cal. 2009) ("[T]he SAC need not allege that defendants knew SONOMA–2 would fail; the SAC need merely allege that defendants misled investors by omitting to disclose a material risk that SONOMA–2 would fail"); *Amylin*, 2003 WL 21500525, at *5 ("Based on the facts alleged by Plaintiffs, the most plausible inference to be drawn is that Amylin knew that there may be a problem with the methodology used in conjunction with the Phase III trials but took the calculated risk of continuing the trials and application process as originally planned. There is nothing unlawful about taking a calculated risk. However, if, as Plaintiffs allege, Defendants misled Plaintiffs about such risk by making assurances regarding the completeness of the data and the likelihood of FDA approval, Defendants may be held liable.").

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████ ¶56 (emphasis added). ████████

████████████ the FDA provided the following responses to Tricida's questions about the clinical trials:

█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████████████

¶60 (emphasis added).

Nothing in the SAC or the supporting documents suggests that the FDA's concerns were superseded. To the contrary, the SAC clearly alleges that █████████████████████ ██████████████████████████████████████████████ ██████████████████████████████[11] That the FDA did not reject Veverimer earlier in the application process is immaterial. As Klaerner recognizes, the FDA's function is to work with companies and provide feedback to help steer them toward approval if possible. MTD 1. Klaerner and Tricida were given many opportunities to address the FDA's concerns and repeatedly failed.[12]

---

[11] Defendant's references to the Tangri model similarly fail to address Plaintiff's allegations. *See* MTD 15. The Tangri model was intended to predict the change in SBC that would need to be shown in TRCA-301 to produce the anticipated treatment effect on the clinical endpoint in the VALOR-CKD postmarketing trial—it was supposed to link the surrogate effect in TRCA-301 to the clinical effect in VALOR-CKD. It (and the FDA's opinion of its usefulness for that purpose) had no bearing on the FDA's concerns ███████████████████████████████ ██████████████████████████████████████ (an absolute and independent consideration).

[12] Moreover, the FDA ultimately confronted Klaerner and Tricida about their failures to directly address its concerns in February 2021, in the ADL. ¶¶91. In their requested appeal, Defendant and

Klaerner's argument that he disclosed the risk that "the FDA might not agree that the Phase 3 trial results reflected the magnitude or degree of statistical significance required," MTD 15, also misses the point and continues to mischaracterize the SAC. *See ChemoCentryx*, No. 21-cv-03343-JST (slip op.), at 19 ("Plaintiff plausibly alleges that, at the time the statements were made, the FDA had already shared feedback on trial design that indicated it disagreed with Defendants' position on how trial results could be interpreted, rendering Defendants' abstract warnings of future risk insufficient"). Nor does Plaintiff allege that Klaerner should have "told investors that these issues would not or could not be resolved[.]" MTD 16. As discussed above, the SAC alleges that the omitted information rendered certain statements about SBC and endpoints false and misleading. *See, e.g.*, ¶108. For example, stating the "FDA may not agree that we have achieved the primary endpoint in our pivotal Phase 3 clinical trial, TRCA-301, to the magnitude or to the degree of statistical significance required by the FDA[,]" ¶108, was misleading for failing to disclose that ███████████████████████████████████████████████ ███████████████████████████████. ¶¶17-18, 99, 100, 108.

Klaerner further contends that his statements that he believes the TRCA-301/301E trials "will provide sufficient evidence of safety and efficacy to support the approval of our NDA," *e.g.*, ¶157, and "we feel good about what we've learned in the 301E study regarding safety and efficacy, increasing our confidence for a successful [post-marketing] trial," ¶114, are inactionable statements of opinion and corporate optimism. *See* MTD 17. Not so. An opinion is misleading by omission where (1) the statement omits material facts about the defendant's inquiry into or

Tricida attempted to contradict the FDA's prior finding that there was not adequate evidence of a treatment effect. In response, the FDA stated that Tricida's interpretation of the data "*misrepresents the concern expressed in the CR letter* – that the relatively small increase in SBC with TRC101 may not provide a discernable reduction in CKD progression" and that the FDA's position on the Phase 3 trial's design issues "*is entirely consistent with prior advice from the Division*." *Id.* The FDA explained, "[i]n earlier meetings you had with the Division [citing minutes from December 2016 and March 2017], the Division expressed skepticism that SBC was an acceptable surrogate for delay of CKD progression" and reiterated that the magnitude of the treatment effect was a "key issue[.]" *Id.* The FDA was clearly never "sufficiently satisfied" as Klaerner alleges; the agency continued to consistently express concern and caution.

knowledge concerning a statement of opinion, and (2) those facts conflict with what a reasonable investor would take from the statement itself. *In re Atossa Genetics, Inc. Sec. Litig.*, 868 F. 3d 784, 802 (9th Cir. 2017); *see Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pen. Fund*, 575 U.S. 175, 196 (2015) ("[T]he court must ask whether the alleged omission rendered [defendant's] opinions misleading … because the excluded fact shows that [defendant] lacked the basis for making those statements that a reasonable investor would expect.").

In *ChemoCentryx* Judge Tiger found opinion statements, which omitted material facts actionable and pled with scienter:

> A reasonable investor informed of Phase III trial results involving 'clinically meaningful primary and secondary endpoint[s]' would expect that the speaker had a factual basis for their belief that such results were relevant or meaningful. When told the benefit-risk or safety profile of the drug was favorable or stronger than another treatment such an investor would assume the trial design could support such analysis. In the context of a Phase III trial—which typically precedes the filing of an NDA—such an investor would expect the speaker's proposed interpretation of trial results had not already been undermined by the agency tasked with evaluating the NDA.

No. 21-cv-03343-JST (slip op.), at 24.

The same analysis holds true here. A reasonable investor would expect the FDA had not already undermined the basis for Klaerner's statements when he made them; yet ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ¶¶99-100, 157; *see In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) ("[E]ven 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly."). Moreover, these statements "convey concrete facts that Plaintiff alleges are materially misleading;" they are not inactionable corporate optimism. *See ChemoCentryx*, No. 21-cv-03343-JST (slip op.), at 27 (citing *In re BioMarin Pharms. Inc. Sec. Litig.*, 2022 WL 164299,

at *12 (N.D. Cal. Jan. 6, 2022)) (statements were not "empty opinions similar to puffery" where "they were undergirded by factual assertions")).

## IV.    The SAC Adequately Alleges Scienter

The Court previously found that Klaerner acted with scienter when, on the May 7, 2020 conference call with investors

> he only shared one issue discussed at that meeting—"the magnitude and durability of the treatment effect on the surrogate marker." He did not share the other issue that was discussed—the FDA's concerns with the applicability of Defendants' foreign clinical data to the U.S. population. Klaerner only said that Defendants were "looking at … the clinical benefit that the U.S. patients get."

Order 29. Finding these facts similar to those in *Schueneman*, 840 F. 3d at 702, the Court held,

> Defendants' failure to inform the market about the FDA's applicability concerns is plausibly alleged to be "an extreme departure from the standards of ordinary care … [that] present[ed] a danger of misleading buyers or sellers that [was] either known to [Defendants] or [was] so obvious that [Defendants] must have been aware of it." *Zucco*, 552 F.3d at 991."

Order 29-30.

This finding is equally applicable to each of the statements that Plaintiff alleges were false, misleading, and omitted material facts. The FDA documents establish that each time Klaerner spoke, he knowingly withheld material facts from investors. *See, e.g.,* ¶¶10-25, 47-78, 187-190.[13] The FDA documents demonstrate that Klaerner attended all relevant meetings with the FDA and thus knew the relevant and important information about Tricida's application for FDA approval of its only drug, veverimer. *See, e.g.,* ¶41. Klaerner knew of the FDA's concerns that (i)



, *e.g.,* ¶¶57, 69, 73, 75; (ii)

, *e.g.,* ¶¶66, 75, 77; and (iii)

, *e.g.,* ¶¶54, 60, 72, 75-77.

---

[13] Klaerner's argument about the lack of confidential witness allegations is merely an attempt to distract from his own direct communications with the FDA, which are more than enough to support a strong inference of scienter. *See* MTD 19.

In the initial public offering registration statement, Klaerner and Tricida represented to investors that "[b]*ased on feedback from the FDA,* we believe that the data from the TRCA-101, TRCA-301 and TRCA-301E trials will provide sufficient evidence of clinical safety and efficacy to support the submission and review of an NDA for TRC101 pursuant to the Accelerated Approval Program."[14] But Klaerner knew then that ███████████████████████████████████████████████████████████████████████████████████████████████████████. Thus, representing that "based on the FDA's feedback" the trials "will provide sufficient evidence of … efficacy" was contrary to the FDA's feedback, making the danger of misleading an investor so obvious that Klaerner must have been aware of it.[15] Once Klaerner touted the FDA's feedback, he was obligated to do so in a manner that was truthful, accurate, and did not "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." Order 8.[16]

Klaerner's scienter is also readily inferred from his misrepresenting why there was no AdComm meeting. ████████████████████████████████████████████████████████████████████████████████████████████. Yet, Klaerner blamed COVID-19 and deliberately withheld the truth about why the meeting was cancelled.

---

[14] Although prefaced with the statement, "we believe," this is still an actionable misstatement—misrepresenting what the FDA's feedback was—and omitted material facts. *See supra* at 19-21.

[15] Defendant's own case, *In re GeoPharma, Inc. Sec. Litig.*, supports Plaintiff's allegations: "Recklessness is often shown when plaintiff 'specifically alleges **defendants' knowledge of facts or access to information contradicting their public statements.**'" 411 F. Supp. 2d 434, 442 (S.D.N.Y. 2006) (emphasis added). This is exactly what Plaintiff alleges here.

[16] Klaerner's cases to this point are also inapt. *See* MTD 19. *In re NVIDIA Corp. Sec. Litig.* is readily distinguishable. 2011 WL 4831192 (N.D. Cal. Oct. 12, 2011), *affd,* 768 F.3d 1046 (9th Cir. 2014). There, the court held that knowledge of a "material set problem" was insufficient without allegations defendants knew of the financial implications of that problem. *See id.* at *11. But the SAC clearly alleges Klaerner's participation in the FDA approval process and knowledge of the issues posing a concrete risk to veverimer's approval. The facts in *GeoPharma* are also inapposite, as that case centered on allegations that the defendants failed to disclose the precise nature of the FDA approval the company obtained, not an undisclosed increased risk repeatedly communicated by the FDA that put approval at risk. *See* 411 F. Supp. 2d at 446.

Plus, Tricida's 2019 Form 10-K, filed March 3, 2020 and signed by Klaerner, falsely stated, "We believe that the data from the TRCA-101, TRCA-301 and TRCA-301E clinical trials will provide sufficient clinical evidence of safety and efficacy to support the approval of our NDA for veverimer pursuant to the Accelerated Approval Program." ¶157. Klaerner made this statement ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████ ¶¶72-73. The FDA told Tricida,[17] ███████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████ ¶156. Again, Klaerner withheld adverse facts he knew put FDA approval at risk, and the danger of misleading an investor was so obvious that he must have been aware of it.

Klaerner's argument that he did not act with scienter regarding the May 7, 2020 conference call also lacks merit. Klaerner informed investors that what he discussed with the FDA was the "magnitude and durability of the treatment effect on the surrogate marker" and then "expressed confidence that our submission meets the standard for approval through the Accelerated Approval program," despite the FDA informing ███████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████ By touting the positive discussions with the FDA, Klaerner was obligated to discuss the negative so as not to mislead investors.[18] Order 29-30. Indeed, as the Court summarized,

> Defendants could have remained altogether silent about the review issues
> they discussed with the FDA. But they could not disclose only one review

---

[17] Not for the first time. *See* ¶¶47, 49, 51-52, 59-60, 99.

[18] The court in *ChemoCentryx* found a strong inference of scienter based on similar allegations: the CEO (1) was "personally aware of FDA's concerns regarding the trial's design and how it could be interpreted;" (2) "repeatedly discussed the trial's safety and efficacy results, in detail, with investors throughout the Class Period;" and (3) was "experienced in the field of drug development and understood the obvious risk that omission of adverse facts would mislead investors about the changes that [veverimer] would obtain FDA approval." No. 21-cv-03343-JST (slip op.), at 30-31.

issue discussed with the FDA and conclude that they were thus confident about their chances for approval, while omitting the other review issue they knew the FDA was concerned about…. Fiore's allegations viewed *in toto* create a 'strong inference' of scienter. *Zucco*, 552 F.3d at 992.

Order 30.

### A. Taking the SAC's Allegations Holistically, Plaintiff Has Raised a Strong Inference of Scienter

Viewing the facts holistically, they raise a strong inference of Klaerner's scienter. Klaerner knew of the FDA's repeatedly expressed concerns about Tricida's NDA for veverimer, from its concerns ██████████████████████████████████████████████████ ██████████████████████████████████████████████████. Yet despite these direct and repeated warnings from the FDA, Klaerner told investors that based on the FDA's feedback, the data would support accelerated approval. This was a lie. Even after the FDA went through the NDA and told Klaerner and Tricida ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ Klaerner continued to lie to investors. He also inexplicably lied in claiming that the AdComm meeting was put off because of COVID-19, which was blatantly false. In sum, Klaerner chose to only tout positive feedback from the FDA and withhold the negative feedback. This meets the deliberately reckless standard for scienter. *See In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 811 (C.D. Cal. 2011) ("When the FDA tells a company about the problems with a product, and the company nonetheless continues to make confident statements about the product, courts have inferred scienter and falsity.").

In contrast, Klaerner argues there is no strong inference of scienter because Klaerner "believed" Tricida was "on the path to approval." MTD 24.[19] While Klaerner may have believed in veverimer, and he may have believed he could overcome all the FDA's objections and concerns, he still knowingly misled investors. Indeed, the Ninth Circuit in *Schueneman* rejected a similar

---

[19] Similarly, that Tricida hired a sales staff and asked about labeling says nothing about Klaerner's misrepresentations.

argument: "the simple fact that Arena had an explanation for its views of the data does not mean investors would not want to know that Arena and the FDA were at odds." 840 F. 3d at 709. Plaintiff's "theory of fraud is that Defendants intentionally withheld information material to the market's assessment of whether and when the FDA would likely approve" veverimer. *Id.* The same is true here; Klaerner withheld information material to the market's assessment of possible FDA approval and was deliberately reckless in doing so.

Finally, Klaerner argues against a strawman—that it makes no sense that Tricida "went ahead with a drug development plan they believed would likely fail"—in disputing scienter. MTD 25. This is not what Plaintiff alleges.[20] Klaerner and Tricida may well have believed they would convince the FDA to approve veverimer to treat CKD. What they could not do, however, was misrepresent the FDA's feedback to the market, lowering the perceived risk that the FDA would reject the NDA. *See ChemoCentryx*, No. 21-cv-03343-JST (slip op.), at 33 ("Plaintiffs' theory is not that Defendants knew that the FDA would withhold approval, but rather that Defendants knew of and concealed adverse facts regarding trial results from investors in order to buy time and finance the company's operations while trying to alter the potential effect of those adverse facts on the NDA process. This motive is plausible."); *Sheet Metal Workers*, 2021 WL 4864421, at *5 ("The Complaint alleges more than that the Monsanto deal was bad in hindsight; it alleges that the Defendants advanced in pursuit of the merger despite being aware that acquiring Monsanto brought significant risks, all the while assuring investors they had fully assessed those risks.").

Plaintiff's allegations that Klaerner knew or was deliberately reckless in misrepresenting the FDA's actual feedback about the veverimer NDA is far more compelling.

---

[20] Defendant's cases for this point are also inapposite. *See* MTD 24. In *Endologix*, the plaintiffs based allegations of knowledge solely on the defendants' prior experience (not communications with the FDA), and argued that as a result, "defendants knew the FDA would not approve Nellix[.]" *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). The plaintiffs in *QRX Pharma* alleged, **without support**, that the defendants "knew for years, long even before the CRL, that MoxDuo would face a heightened proof hurdle (in the form of a Superiority Requirement) which it could not clear." *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600 (S.D.N.Y. 2016). In contrast, the SAC explains how Klaerner knew of the heightened risks to veverimer's approval through his repeated communications with the FDA.

**CONCLUSION**

For all these reasons, Defendant's Motion to Dismiss should be denied. If, however, the Court finds Plaintiff's allegations to be insufficient to state a claim for relief, Plaintiff respectfully requests leave to amend his allegations to cure any identified deficiencies.

DATED: March 23, 2023                              Respectfully submitted,

                                /s/ Jeffrey C. Block

Jeffrey C. Block (*pro hac vice*)
Michael D. Gaines (*pro hac vice*)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jeff@blockleviton.com
michael@blockleviton.com

Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo, CA 94402
(650) 781-0025 phone
jake@blockleviton.com