# Exhibit A
# Redacted - [Lead Plaintiff's Notice of Motion and Motion for Leave]

Jeffrey C. Block, *pro hac vice*
Jacob A. Walker (SBN 271217)
Michael D. Gaines, *pro hac vice*
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jake@blockleviton.com
jeff@blockleviton.com
michael@blockleviton.com

*Attorneys for Lead Plaintiff Jeffrey M. Fiore and the Class*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| MICHAEL PARDI, *Individually and on Behalf of All Others Similarly Situated,*<br><br>    Plaintiff,<br><br>v.<br><br>TRICIDA, INC. and GERRITT KLAERNER,<br><br>    Defendants. | Case No. 4:21-cv-00076-HSG<br><br>**LEAD PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE [PROPOSED] SECOND AMENDED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**[UNREDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED]**<br><br>**Class Action**<br><br>Hon. Haywood S. Gilliam, Jr.<br><br>Date: March 2, 2023<br>Time: 2:00pm<br>Courtroom 2, 4th Floor |

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION FOR LEAVE TO AMEND ......................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 2

I.    STATEMENT OF THE ISSUE(S) TO BE DECIDED ....................................................... 2

II.   INTRODUCTION ................................................................................................................. 2

III.  FACTS .................................................................................................................................... 4

    a.    The FAC and Motion to Dismiss ................................................................................. 4

    b.    The Scheduling Order ................................................................................................... 6

    c.    The FDA Productions ................................................................................................... 6

IV.   LEGAL STANDARD ......................................................................................................... 11

V.    ARGUMENT ....................................................................................................................... 12

    a.    The SAC is a good faith attempt to revive dismissed claims with new evidence. ............ 14

    b.    Lead Plaintiff has sought leave to amend as soon as practicable. .................................... 14

    c.    The SAC will not unduly prejudice Defendants at this early stage in the litigation.......... 15

    d.    The SAC is not futile. ................................................................................................. 16

        i.    New Allegations Establishing Scienter for Statements About the TRCA-301/301E Trial Sites and Multicenter Nature of the Study. .......................................................... 16

        ii.   New Allegations Establishing That the Advisory Committee Meeting Was Cancelled Because of the "Significant Issues" with TRCA-301/301E. ................................................ 20

        iii.  New Allegations Establishing That Defendants Misled the Market About the Adequacy of the Treatment Effect Observed in TRCA-301/301E ....................................................... 20

    e.    Lead Plaintiff has not repeatedly amended the complaint. ................................................ 22

VI.   CONCLUSION ................................................................................................................... 22

## TABLE OF AUTHORITIES

**CASES**

*AmerisourceBergen Corp. v. Dialysist W., Inc.*,
465 F.3d 946 (9th Cir. 2006) ..................................................................................... 11

*Artemus v. Louie*, No. 16-CV-00626-JSC,
2017 WL 747368 (N.D. Cal. Feb. 27, 2017) ........................................................ 11, 12, 14, 15

*Call v. Badgley*, No. 15-CV-03353-HSG,
2016 WL 4760903 (N.D. Cal. Sept. 13, 2016) ..................................................... 12, 15, 22

*Dunbar v. Google, Inc.*, No. 5:12-CV-003305-LHK,
2012 WL 6202797 (N.D. Cal. Dec. 12, 2012)................................................................ 14

*Eminence Capital, LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) .................................................................... 4, 11, 12, 15

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)...................................................................................................... 16

*Falla v. Vasquez*, No. 16-CV-00869-HSG (PR),
2016 WL 7013266 (N.D. Cal. Dec. 1, 2016)................................................................. 11

*Flores v. Zale Delaware, Inc.*, No. C07-0539 TEH,
2007 WL 4287540 (N.D. Cal. Dec. 6, 2007)........................................................... 11, 14

*Foman v. Davis*,
371 U.S, 178 (1962)...................................................................................................... 12

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ................................................................................ 16, 19, 22

*In re Amgen Inc. Sec. Litig.*, No. CV 07-2536 PSG (PLAx),
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)............................................................... 17

*In re Energy Recovery Inc. Sec. Litig.*, No. 15-CV-00265-EMC,
2016 WL 324150 (N.D. Cal. Jan. 27, 2016) .................................................... 17, 19, 22

*In re Silver Wheaton Corp. Sec. Litig.*, No. 2:15-cv-5146-CAS (JEMx),
2018 WL 1517130 (C.D. Cal. Mar. 26, 2018)............................................................ 13, 14

*In re: Facebook Priv. Litig.*, No. C-10-02389-RMW,
2015 WL 632329 (N.D. Cal. Feb. 13, 2015) ................................................................ 14

*James ex rel. James Ambrose Johnson, Jr., 1999 Tr. v. UMG Recordings, Inc.*, No. C 11-1613
SI, 2012 WL 4859069 (N.D. Cal. Oct. 11, 2012)......................................................... 15

*Johnson v. Serenity Transportation, Inc.*, No. 15-CV-02004-JSC,
2015 WL 4913266 (N.D. Cal. Aug. 17, 2015) ............................................................. 16

*MagTarget LLC v. Saldana*, No. 18-CV-03527-JST,
  2019 WL 1904205 (N.D. Cal. Apr. 29, 2019) ...................................................................... 13, 15

*Price v. Petaluma Health Ctr.*, No. 17-CV-05428-HSG,
  2018 WL 4940848 (N.D. Cal. Sept. 19, 2018) ......................................................................... 12

*Rooney v. EZCORP, Inc.*, No. A-15-CA-00608-SS,
  2018 WL 3596054 (W.D. Tex. July 26, 2018) .................................................................... 14, 15

*Ross v. AT&T Mobility, LLC*, No. 19-CV-06669-JST,
  2020 WL 9848733 (N.D. Cal. Dec. 18, 2020) ..................................................................... 12, 16

*Se. Pa. Trans. Auth. v. Orrstown Fin. Servs., Inc.*,
  335 F.R.D. 54 (M.D. Pa. 2020).............................................................................................. 13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)................................................................................................................. 17

*Todd v. Tempur-Sealy Int'l, Inc.*, No. 13-CV-04984-JST,
  2015 WL 5064076 (N.D. Cal. Aug. 26, 2015) ........................................................................ 22

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
  655 F.3d 1039 (9th Cir. 2011) ................................................................................................ 12

**STATUTES**

15 U.S.C. § 77z-1(b)(1) ................................................................................................................ 6

**RULES**

Fed. R Civ. P. 15(a) ..................................................................................................................... 11

Fed. R. Civ. P. 15(a)(2).................................................................................................................. 1

## NOTICE OF MOTION AND MOTION FOR LEAVE TO AMEND

PLEASE TAKE NOTICE THAT on March 2, 2023 at 2:00pm, or as soon thereafter as the matter may be heard by the Court, in the courtroom of the Honorable Haywood S. Gilliam, Jr., United States District Court for the Northern District of California, Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, CA 94612, Lead Plaintiff Jeffery M. Fiore ("Lead Plaintiff") moves for leave to amend his complaint under Fed. R. Civ. P. 15(a)(2). Lead Plaintiff's Motion is based on this Notice of Motion and Motion for Leave to File [Proposed] Second Amended Complaint and Memorandum of Points and Authorities In Support Thereof (the "Motion"), the accompanying Declaration of Jeffrey C. Block in Support of Lead Plaintiff's Motion for Leave to File [Proposed] Second Amended Complaint ("Block Decl."), all pleadings and papers in this action, and any oral argument of counsel. The Motion is based on newly discovered evidence produced to Lead Plaintiff by the U.S. Food and Drug Administration ("FDA" or the "Agency") between September 28, 2022, and October 18, 2022. Lead Plaintiff believes the proposed amendment is meritorious.

Accordingly, Lead Plaintiff respectfully requests that the Court grant this Motion and permit him to file his [Proposed] Second Amended Complaint.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     STATEMENT OF THE ISSUE(S) TO BE DECIDED**

Whether Lead Plaintiff should be granted leave to file his [Proposed] Second Amended Complaint to revive and add allegations based on new evidence recently acquired in discovery.

**II.     INTRODUCTION**

Based on documents produced by the United States Food and Drug Administration ("FDA") concerning Tricida's application for approval of its new drug, vevirimer, Lead Plaintiff seeks leave to file his [Proposed] Second Amended Complaint ("SAC").

This Court granted in part, and denied in part, Defendants' motion to dismiss the First Amended Class Action Complaint. *See* ECF No. 93 (the "MTD Order"). The MTD Order found that statements concerning (i) the location of veverimer's Phase 3 TRCA-301/TRCA-301E trial sites; and (ii) the "multicenter" nature of the TRCA-301/ 301E trial, were false and/or misleading when made but the Amended Complaint for Violations of the Federal Securities Laws (the "FAC")[1] failed to plead specific facts to support a strong inference of scienter regarding these statements. MTD Order at 26–28. The Court also found statements attributing the cancellation of an upcoming FDA Advisory Committee ("AdCom") meeting to the COVID-19 pandemic, rather than problems with Tricida's New Drug Application ("NDA") for veverimer, were not false or misleading as "the complaint nowhere pleads facts supporting the suggestion that the FDA told Defendants it canceled the AdCom meeting because of problems with the NDA." MTD Order at 21. The Court did find allegations that Defendants made misstatements concerning a May 1, 2020 late-cycle meeting with the FDA were false and/or misleading and that the FAC pled facts supporting a strong inference that these statements were made with scienter. MTD Order at 29–31.

In sum, the SAC adds the following facts, based on communications between the FDA, Tricida, and Defendant Klaerner:

---

[1] ECF No. 72.

- During the FDA's review process of vevirimer, and specifically on July 24, 2017, the FDA expressly "caution[ed]" Tricida that patients being enrolled in the trials from "Bulgaria, Croatia, Hungary, Slovenia, Georgia, Serbia, and Ukraine" were from countries "where the standard of care may be dissimilar to standard of care in the U.S. because the resulting data may not be applicable to the U.S. population;" that the FDA "believe[d] it [wa]s important to ensure adequate enrollment of subjects at sites in the U.S.;" and if the FDA was "unable to inspect sites in [a foreign] country for any reason," approval could be delayed;

- The FDA sent a letter to Tricida dated January 24, 2020, outlining numerous deficiencies in its application for approval of veverimer including whether veverimer "confirm[ed] a treatment benefit;" questioning the randomization of the trials; and noting that over 80% of patients were from Eastern Europe whose patient population was not equivalent to the U.S. population; that the FDA was unable to inspect the trial sites. The FDA specifically informed Tricida that "[g]iven the significant issues noted above, it is no longer obvious to us that an advisory committee meeting is needed;"

- The FDA reaffirmed that there was no need to hold an advisory committee meeting at a May 1, 2020 meeting with Tricida because of the numerous and serious deficiencies in Tricida's application as identified by the FDA; and

- The FDA repeatedly informed Tricida and Klaerner that it did not agree that Tricida's proposed endpoints to measure veviremer's effectiveness, changes in blood serum bicarbonate ("SBC") levels as a surrogate endpoint for its Phase 3 trials, could be used to predict clinical benefit. Indeed, as of November 20, 2017, the FDA responded to the following questions posed by Tricida: "Does the FDA agree that the predictive models provided by Tricida describing the quantitative relationship between changes in serum bicarbonate and the renal endpoint proposed for the post-marketing Study TRCA-303 . . . are adequate to support powering of the TRCA-303 study?" The FDA responded: "No, we do not agree." Tricida posed

Question 2: "Does the FDA agree that, with successful completion of Study TRCA-301, the size of the treatment effect of TRC101 on serum bicarbonate will be sufficient to support accelerated approval of TRC101?" The FDA responded: "No. See our response to Question 1."

Based on these facts, the SAC adds a new category of false and misleading statements, *i.e.*, Tricida and Klaerner's statements that "based on feedback from the FDA" the clinical trials for veverimer supported efficacy and safety. To the contrary, the FDA's feedback consistently questioned how Tricida planned to measure the effectiveness of its drug and expressed skepticism that it had demonstrated efficacy.

The proposed amendment is timely. Once the automatic discovery stay under the PSLRA was lifted, Lead Plaintiff served a subpoena on the FDA and the Agency began to produce documents in response. Between October 4, 2022, and October 18, 2022, the FDA made three productions totaling 11,717 pages of documents. The FDA productions consist of meeting minutes, letters, and other documents that reflect Tricida's communications with the FDA. Lead Plaintiff promptly reviewed these documents, analyzed them, and determined that they would support additional claims and add specificity to statements previously dismissed. Thereafter, his counsel drafted the proposed SAC and this accompanying motion. Taking approximately 5 weeks to review, analyze, and draft the SAC is well within reason.

The SAC seeks to revive or add these well-supported claims at this early stage in the litigation. Lead Plaintiff's Motion is well within the timeframe for amendment set by this Court and will not cause delay or unduly prejudice Defendants. Accordingly, the "presumption" in favor of allowing amendments under Fed. R. Civ. P. 15(a) applies here. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

We respectfully submit that the Court should permit Lead Plaintiff to file the SAC.

### III.    FACTS

#### a. *The FAC and Motion to Dismiss*

Throughout the Class Period, Tricida touted the results of the only Phase 3 trial and extension trial (TRCA-301/301E) for its lead investigational drug candidate, veverimer (TRC101).

Veverimer was intended to slow the progression of chronic kidney disease ("CKD") through the treatment of metabolic acidosis. FAC ¶ 25. To demonstrate clinical efficacy, Tricida chose to use changes in SBC levels as its predetermined surrogate endpoint for the Phase 3 trial. *Id.*

However, although Tricida emphasized that TRCA-301/301E "was conducted at 47 sites in the United States and Europe," and that it "met both its primary and secondary endpoints in a statistically significant manner," there were serious undisclosed issues with the trial. *Id.* at ¶ 26. TRCA-301/301E was mainly conducted in *Eastern* Europe—which unlike Western Europe has significant differences in relevant population and medical care compared to the U.S.—and disproportionately relied on a single site. *Id.* at ¶¶ 11, 23. These issues contributed to the FDA's decision to issue a Complete Response Letter ("CRL") rejecting veverimer on August 24, 2020, *id.* at ¶ 113, and later to reject Tricida's appeal of the CRL, *id.* at ¶ 120.

The FAC alleged that Defendants made material misstatements when they: (i) identified the location of the TRCA-301/301E trial as being "the United States and Europe," *id.* at ¶¶ 60–62, (ii) published risk disclosures identifying the location of the TRCA-301/301E trial as a contingent, hypothetical problem, *e.g., id.* at ¶ 60; (iii) characterized TRCA-301/301E as being a "multicenter" study, *id.* at ¶¶ 58, 63, 106; (iv) touted veverimer's prospects for accelerated approval, *e.g. id.* at ¶ 80; (v) made representations concerning the protocols for the VALOR-CKD trial, *id.* at ¶¶ 70–73; (vi) attributed the cancellation of an AdCom meeting to the COVID-19 pandemic rather than problems with the NDA, *id.* at ¶ 17; and (vii) failed to disclose that the FDA had concerns about TRCA-301/301E's trial data when speaking about the May 2020 late-cycle meeting, *id.* at ¶ 102.

Defendants moved to dismiss the FAC on July 16, 2021, *see* ECF No. 76, and this Court issued the MTD Order on July 29, 2022, granting in part and denying in part Defendants' motion, *see* ECF No. 93. In the MTD Order, the Court found that the FAC adequately alleged that the statements about the location of the TRCA-301/301E trail were misleading. The Court explained:

> Given that Fiore alleges differences between Eastern and Western European patient populations and that the FDA treats clinical data from those populations differently . . . by using 'Europe' (as opposed to 'Eastern Europe'), Defendants omitted material information necessary to make that characterization not misleading–specifically, the fact the trials were conducted *only* in Eastern Europe, where 'several aspects of CKD differ significantly' …

MTD Order at 8–9. For similar reasons, the Court held that the FAC adequately alleged Defendants' risk factors concerning the location of the trial sites to be materially misleading. *Id.* at 12. The Court also found that the FAC plausibly alleged that Defendants' use of the term "multicenter" was misleading because the use of the term gave the "misleading impression" that "no single study site would be responsible for a disproportionate share of either the trial subjects or the favorable effect seen." *Id.* at 14.

However, with respect to the statements about the location of the TRCA-301/301E trial and its "multicenter" nature, the Court found that the FAC inadequately alleged that Defendants made these misstatements with scienter. *Id.* at 26–28. The Court held that "there are no allegations supporting the required 'strong inference' that Defendants intended to mislead or were deliberately reckless in characterizing the trial locations as 'Europe' generally." *Id.* at 27. Accordingly, the Court dismissed these claims[2]. *Id.*

As for the claim that Defendants had misattributed the AdCom meeting cancellation to the COVID-19 pandemic, the Court found a failure to plead falsity because the FAC did not contain "facts supporting the suggestion that the FDA told Defendants it canceled the AdCom meeting because of problems with the NDA." *Id.* at 21.

### b.  *The Scheduling Order*

On October 5, 2022, this Court entered the Scheduling Order. ECF No. 106. The Scheduling Order set January 27, 2023, as the "Deadline to Seek Leave to Amend." *Id.* The Court set the "Close of Fact Discovery" to July 14, 2023. *Id.*

### c.  *The FDA Productions*

On September 12, 2022, after the Court issued the MTD Order and the Private Securities Litigation Reform Act's ("PSLRA") automatic discovery stay lifted,[3] Lead Plaintiff served a

---

[2] Although the Court granted Lead Plaintiff leave to amend by August 19, 2022, *see* MTD Order at 31, Lead Plaintiff did not possess sufficient facts to support an amendment until after the FDA produced documents in response to Lead Plaintiff's subpoena and any attempted amendment would have been futile.

[3] Under the PSLRA, "all discovery" is automatically stayed during the pendency of a motion to dismiss. *See* 15 U.S.C. § 77z-1(b)(1). Accordingly, Lead Plaintiff could not have served the

subpoena on the FDA. Block Decl. at ¶ 3. The FDA served responses and objections on September 28, 2022 and produced 485 pages of documents. *Id.* at ¶ 4. Thereafter, the FDA produced an additional 377 pages of documents on October 4, 2022, and, on October 18, 2022, it made a third production consisting of 10,855 pages of documents. *Id.* at ¶¶ 6–8.

The FDA productions reveal that the Agency told Tricida as early as 2015 that it was concerned about the Company's study design. In preliminary comments shared with Tricida ahead of a May 6, 2015 meeting, the FDA wrote that it did not believe Tricida's proposed primary endpoint of a ▇▇▇▇ change in serum bicarbonate would "reliably translate into improved clinical outcomes…" SAC ¶ 47. The FDA advised that SBC changes might be an appropriate endpoint in patients with "marked metabolic acidosis at baseline," but that the increase would have to be "substantial." *Id.* Again, at the end of Phase-2 meeting on November 30, 2016, the FDA told Tricida: "we question whether the size of the treatment effect reported to date (▇▇▇▇▇▇▇▇) is large enough to translate into a treatment benefit." *Id.* at ¶ 49. Then, on February 9, 2017, the FDA informed Tricida that a "key issue" would be the question of whether the "magnitude of the treatment effect" on SBC would be "sufficient to provide confidence that the treatment will have the anticipated clinical benefit…" *Id.* at ¶ 50. The FDA reiterated that the onus was on Tricida to determine "how large the effect size on SBC would need to be to observe the expected benefit" and that "[t]o be granted accelerated approval, [Tricida] would need to demonstrate a treatment effect on SBC that is greater than or equal to that magnitude." *Id.* On November 20, 2017, the FDA rejected Tricida's claim that a ▇▇▇▇ increase in SBC, relative to placebo, was a sufficient treatment effect to support accelerated approval (the actual 52-week treatment effect relative to placebo Tricida reported in 2018 was 1.99 mEq/L). *Id.* at ¶¶ 20, 59–60. Thereafter, the FDA repeatedly told Tricida that it had failed to demonstrate its endpoint was of a sufficient magnitude to predict clinical benefit. *Id.* at ¶¶ 61, 64, 72, 75, 77.

The FDA also began warning Tricida in 2017 that the study population it selected for TRCA-301 would not be representative of the U.S. population. For example, at the July 26, 2017

subpoena in question prior to the MTD Order, and therefore could not possibly have included the newly discovered facts in the FAC.

Type A Meeting, the FDA observed that TRCA-301 would "enroll subjects from sites in the U.S., Bulgaria, Croatia, Hungary, Slovenia, Georgia, Serbia, and Ukraine," then bluntly told Tricida, "we caution sponsors against enrolling subjects at sites where the standard of care may be dissimilar to standard of care in the U.S. because the resulting data may not be applicable to the U.S. population and U.S. medical practice." *Id.* ¶ 15. The FDA went on to tell Tricida that it should enroll sufficient numbers of American subjects in its study: "Because this study will provide important information that will be used to design your post-marketing trial and because your postmarketing trial will be conducted in additional regions, we believe it is important to ensure adequate enrollment of subjects at sites in the U.S., and possibly these other regions." *Id.* Similarly, at the June 3, 2019 Type B meeting, the FDA asked Tricida to "provide [its] rationale for assuming the applicability of foreign data to the U.S. population/practice of medicine in the U.S." *Id.* at ¶ 69.

After having reviewed Tricida's NDA, on January 24, 2020, the FDA sent Tricida preliminary comments regarding "significant issues" ahead of a mid-cycle meeting to be held on January 27, 2020. *Id.* at ¶ 72. In the comments, the FDA informed Tricida about deficiencies in veverimer's Phase 3 trial:

- Regarding the "treatment effect on blood bicarbonate" observed in TRCA-301/301E at weeks 12 and 52 of "2.64 mEq/L and 1.99 mEq/L, respectively," the FDA stated: "We question whether an effect of this size would be reasonably likely to predict benefit and also note that your postmarketing trial, as currently designed, assumes a much larger treatment effect (i.e., ████████████████████ was based on an anticipated treatment effect on blood bicarbonate of █████)." *Id.* at ¶ 72.

- "Most subjects in the trial were enrolled in Bulgaria and Georgia (148/217), and randomization in those countries favored TRC101." *Id.* at ¶ 73. Meanwhile, "Only 27/217 subjects were enrolled in the U.S., and randomization in the U.S. favored placebo. In addition, it appears that only two patients randomized to TRC101 in the U.S. contributed data to analyses at Week 52." *Id.*

- "Fewer than 10% of patients were on oral alkali agents at baseline despite low baseline bicarbonate values and current guideline-recommended treatment in the U.S., and baseline eGFR values were higher than might have been anticipated given the target disease." *Id.*

"Given the significant issues noted above," the FDA told Tricida on January 24, 2020, "it is no longer obvious to us that an advisory committee meeting is needed." *Id.* at ¶ 20.

The FDA reiterated many of these points at the May 1, 2020, late-cycle meeting and in a package sent to Tricida ahead of that meeting in mid-April. *Id.* at ¶ 23. For example, the FDA reminded Tricida that:

> In addition to voicing concern [at the January 27, 2020 mid-cycle meeting] about the ability of your post-marketing trial, as designed, to verify the clinical benefit, we questioned whether an effect of this size should be considered 'reasonably likely' to predict benefit. We remain concerned about the magnitude and durability of the treatment effect. We further note that the treatment effect at Week 52 was driven entirely by a single site in Bulgaria (Site 11).
>
> * * *
>
> [O]n January 27, 2020, we indicated that it was not clear that the results of TRCA-301/301E were applicable to the U.S. population and practice of medicine. We noted that most patients in the trial were enrolled in Bulgaria and Georgia (148/217), and randomization in those countries favored TRC101. Only 27/217 patients were enrolled in the U.S., randomization in the U.S. favored placebo, and only two patients randomized to TRC101 in the U.S. contributed data to analyses at Week 52.

*Id.*

The FDA told Tricida that its study population was problematic not just because of general differences between the populations of Eastern Europe and the United States, but also because another condition, Balkan Endemic Nephropathy ("BEN"), "is endemic in the region targeted for enrollment in [the] trial but is not typically seen in the U.S. or outside this region." *Id.* BEN's symptoms are similar to CKD, and BEN patients also experience metabolic acidosis, but it is a distinct condition. *Id.* The FDA found evidence for its misgivings that the TRCA-301/301E trial population may be suffering from BEN rather than CKD in measures of kidney function which, the FDA noted, were "consistent with a cause of acidosis other than reduced kidney function (i.e., BEN)." *Id.* The FDA warned Tricida that measuring Eastern European BEN patients' responses to veverimer "may not be representative of the size of the treatment effect in patients in the U.S. with metabolic acidosis associated with CKD who do not have BEN." *Id.* More broadly, the FDA told Tricida that it "question[ed] whether the treatment effect on renal outcomes in one population can

be extrapolated to the other; an issue that has bearing on your ongoing trial." *Id.* At the same meeting, the FDA repeated, once more, that it did "not believe an Advisory Committee Meeting [wa]s needed." *Id.* at ¶ 77.

By letter dated July 14, 2020, and titled "Deficiencies Preclude Discussion," the FDA notified Tricida that it had "identified deficiencies that preclude discussion of labeling and postmarketing requirements/commitments at this time." *Id.* at ¶ 79. The FDA sent Tricida a CRL the following month declining to approve veverimer. *Id.* at ¶ 82. The CRL stated that the FDA had "concern about the reliability of the findings" of Tricida's Phase 3 study given that "the findings in Study TRCA-301 (and its extension trial) were driven by a single site" and that the Agency questioned "the applicability of these findings to the U.S. population and to the practice of medicine in the U.S." *Id.* at ¶ 83. The CRL also stated that the treatment effects on serum bicarbonate in Studies TRCA-301 and TRCA-301E were too small to be "reasonably likely to predict clinical benefit." *Id.* at ¶ 84.

The FDA sent preliminary meeting comments to Tricida on October 16, 2020, ahead of a meeting scheduled to take place four days later. The FDA expressed concern that Tricida's upcoming TRCA-303 study would make the same mistakes as its TRCA-301/301E predecessor. For example, the FDA observed that in TRCA-301:

> nearly 80% (173 of 217) of patients were enrolled from sites in Georgia, Bulgaria, and the Ukraine. Of the patients enrolled in TRCA-301, only 11 patients were randomized to TRC101 in the U.S., and most of these patients discontinued TRC101 before Month 12. . . . [E]nrollment patterns for TRCA-303 appear to be similar with 410 of 505 patients (~82%) you anticipate including in Analysis Set 1 enrolled from sites in Eastern Europe, predominantly Georgia, Bulgaria, the Ukraine, and North Macedonia. In contrast, only 41 (8%) of the 505 patients have been enrolled from sites in the U.S., and only 9 (<2%) have been enrolled from sites in Canada or Western Europe.

*Id.* at ¶ 85. Also, the FDA again questioned whether Tricida's proposed surrogate endpoint was large enough to demonstrate clinical benefit. *Id.*

Tricida submitted a Formal Dispute Resolution Request to the FDA on December 3, 2020, effectively appealing the CRL. *Id.* at ¶ 90. The FDA denied this request on February 17, 2021. *Id.*

at ¶ 91. In its denial, the FDA explained that "[i]n addition to the limitations of Study TRCA-301/301E leading to the determination that there was not substantial evidence of effectiveness based upon this single trial, the Division also concluded that the extent of effect on SBC observed was not 'reasonably likely' to predict benefit on CKD progression." *Id.* The FDA also reminded Tricida that:

> In earlier meetings you had with the Division, the Division expressed skepticism that SBC was an acceptable surrogate for delay of CKD progression. For example, the Division commented that "...we do not agree that the submitted data are sufficient to support the use of serum bicarbonate concentrations as a surrogate endpoint for a treatment effect on renal, bone, and/or muscle function-related outcomes in the proposed population." (Meeting Minutes 12/23/2016). In a subsequent meeting, the Division ultimately did agree that SBC may be a reasonably likely surrogate but noted that "a key issue is whether the magnitude of the treatment effect on serum bicarbonate....is sufficient to provide confidence that the treatment will have the anticipated benefit...". (Meeting Minutes, 3/9/17).

*Id.* In sum, the FDA expressed that while it would accept an increase in serum bicarbonate as an effect reasonably likely to predict a clinically important outcome, the "relatively small increase in SBC with TRC101 may not provide a discernible reduction in CKD progression." *Id.*

## IV.    LEGAL STANDARD

Motions for leave to amend filed before a deadline "set forth in a court's scheduling order" are governed by Fed. R Civ. P. 15(a). *Artemus v. Louie*, No. 16-CV-00626-JSC, 2017 WL 747368, at *2 n.1 (N.D. Cal. Feb. 27, 2017); *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 952 (9th Cir. 2006) (since plaintiff "filed its motion for leave to amend within the deadline set by the district court . . . [it's] motion is subject to the limited constraints placed on motions for leave to amend under Rule 15(a)."). The Ninth Circuit has held that there is a "strong policy permitting amendment," *Flores v. Zale Delaware, Inc.*, No. C07-0539 TEH, 2007 WL 4287540, at *1 (N.D. Cal. Dec. 6, 2007) (quoting *Poling v. Morgan*, 829 F.2d 882, 886 (9th Cir.1987)), which "is to be applied with extreme liberality." *Eminence Capital*, 316 F.3d at 1051; *see also Falla v. Vasquez*, No. 16-CV-00869-HSG (PR), 2016 WL 7013266 at *1 (N.D. Cal. Dec. 1, 2016) ("Federal Rule of Civil Procedure 15(a) is to be applied liberally in favor of amendments and, in general, leave shall be freely given when justice so requires."). Under the framework established by the Supreme

Court in *Foman v. Davis*,[4] courts disallow amendment only where there is evidence of: "(1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) previous amendments." *Price v. Petaluma Health Ctr.*, No. 17-CV-05428-HSG, 2018 WL 4940848, at *1 (N.D. Cal. Sept. 19, 2018). Prejudice to the opposing party is the most prominent of the *Foman* factors. *Id.*

The party opposing amendment bears the burden of making "a strong showing" that the *Foman* factors overcome the "*presumption* under Rule 15(a) in favor of granting leave to amend." *Eminence Capital*, 316 F.3d at 1052 (emphasis in original); *see also Call v. Badgley*, No. 15-CV-03353-HSG, 2016 WL 4760903, at *2 (N.D. Cal. Sept. 13, 2016) (granting leave where Defendants "failed to overcome the presumption in favor of leave to amend"). The Ninth Circuit has recognized that "it is an abuse of discretion to deny" a motion for leave to amend "[w]here there is a lack of prejudice . . . the amended complaint is obviously not frivolous, [and it is not] made as a dilatory maneuver in bad faith." *Artemus*, 2017 WL 747368, at *5 (quoting *Howey v. United States*, 481 F.2d 1187, 1190-91 (9th Cir. 1973)).

## V.    ARGUMENT

Amendment is particularly appropriate where, as here, a plaintiff discovers new facts after the motion to dismiss stage in a federal securities action. As the Ninth Circuit has observed, a court's "power to allow an amended complaint with regard to claims that it earlier dismissed" is especially important in the context of the PSLRA because "[t]o some extent, the ability of a district court to revive dismissed claims should evidence come to light tempers the heightened pleading standards of the PSLRA" where some claims survive. *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1059 (9th Cir. 2011), *abrogated on other grounds by Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 203 L. Ed. 2d 484 (2019). "Courts in this circuit," therefore "freely grant leave to amend in securities cases where plaintiffs learn new information during discovery."[5] *In re Silver Wheaton Corp. Sec. Litig.*, No. 2:15-cv-5146-CAS (JEMx), 2018

---

[4] 371 U.S. 178 (1962).

[5] Courts find that the discovery of new facts warrants amendment even under the stricter standard of Rule 16, as opposed to the liberal Rule 15(a) standard that is applicable here. *See Ross v. AT&T Mobility, LLC*, No. 19-CV-06669-JST, 2020 WL 9848733, at *1–2 (N.D. Cal.

WL 1517130, at *5 (C.D. Cal. Mar. 26, 2018); *see also Se. Pa. Trans. Auth. v. Orrstown Fin. Servs., Inc.*, 335 F.R.D. 54, 75–76 (M.D. Pa. 2020), *aff'd*, No. 20-2829, 2021 WL 3923389 (3d Cir. Sept. 2, 2021) ("[T]he PSLRA discovery stay . . . does not bar the use of subsequently discovered evidence in support of a motion for leave to amend.").

Here, Lead Plaintiff seeks leave to add allegations based on more than eleven-thousand pages of FDA records documenting Tricida's interactions with the FDA. These documents were not previously available at the time Lead Plaintiff drafted the FAC, but they have a direct bearing on claims this Court dismissed in the MTD Order. In particular, the new documents allow Lead Plaintiff to revive claims that Defendants acted with scienter when they misspoke about the location of the TRCA-301/301E trial sites and the "multicenter" nature of the trial. The documents show that the FDA explicitly warned Defendants that the trial's Eastern European participants were not likely to be representative of the U.S. patient population and that the trial was overly reliant on a single site in Bulgaria. Lead Plaintiff can also now allege with supporting facts that Defendants knew the FDA cancelled the AdCom meeting because of overwhelming issues with Tricida's NDA, not the COVID-19 pandemic.

In addition to providing supporting facts to previously dismissed allegations, the FDA documents demonstrate that the FDA told Tricida that the treatment effect it intended to show (and did observe) in the TRCA-301/301E trial was too small to demonstrate a clinical benefit. Accordingly, Lead Plaintiff can now also claim that it was materially misleading for Defendants to tout that TRCA-301/301E had met its endpoints and to suggest that the FDA agreed that the data demonstrated efficacy when the FDA told Defendants that the results were insufficient.

None of the *Foman* factors weigh against Fed. R. Civ. P. 15(a)'s presumption in favor of amendment. Lead Plaintiff's request comes months before the deadline in the Scheduling Order and at the outset of discovery. The amendment should not cause any delay in the schedule of this case. Lead Plaintiff therefore should be given an opportunity to amend.

Dec. 18, 2020) (collecting cases and finding "discovery of new facts" constitutes good cause under Rule 16); *MagTarget LLC v. Saldana*, No. 18-CV-03527-JST, 2019 WL 1904205, at *2 (N.D. Cal. Apr. 29, 2019) (finding "good cause" to amend where party "did not become aware of facts giving rise to new claims" until after emails were produced in discovery).

### a. The SAC is a good faith attempt to revive dismissed claims with new evidence.

The first *Foman* factor examines whether "the amendment is introduced to cause a delay in proceedings or for some other improper purpose," *Artemus*, 2017 WL 747368, at *3. There is no intention to delay or improper purpose behind the amendment. Lead Plaintiff seeks leave to amend because he has obtained new evidence from the FDA which he believes will allow him to correct pleading deficiencies the Court identified in its MTD Order. This case is in its early stages and the January 27, 2023 deadline to seek leave to amend is months away. *See* ECF No. 106.

### b. Lead Plaintiff has sought leave to amend as soon as practicable.

Lead Plaintiff promptly sought leave to amend upon the discovery of new facts that were not previously accessible to him. The second *Foman* factor, which alone is "insufficient to justify denying a motion to amend," weighs against amendment only where a plaintiff has unduly delayed the request to amend. *Dunbar v. Google, Inc.*, No. 5:12-CV-003305-LHK, 2012 WL 6202797, at *12 (N.D. Cal. Dec. 12, 2012) (quoting *Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir.1999)). Even where a delay is "significant," however, courts have allowed amendments to proceed where "there is no evidence of a dilatory motive." *In re: Facebook Priv. Litig.*, No. C-10-02389-RMW, 2015 WL 632329, at *2 (N.D. Cal. Feb. 13, 2015). In securities cases, courts acknowledge that greater delays may be reasonable because plaintiffs are subject to heightened pleading standards and to the PSLRA's discovery stay. *See Silver Wheaton*, 2018 WL 1517130, at *4 (holding that delay after discovery of new facts was warranted given PSLRA's "more exacting pleading requirements") (internal quotations omitted); *Rooney v. EZCORP, Inc.*, No. A-15-CA-00608-SS, 2018 WL 3596054, at *3 (W.D. Tex. July 26, 2018) (holding delay justified in PSLRA context where plaintiff waited to review a 21,000 page production before amending complaint so as not to amend on "incomplete information").

Here, Lead Plaintiff seeks leave to amend a little over a month after having received over eleven-thousand pages of documents from the FDA. *See* Block Decl. ¶ 8. Because of the PSLRA's discovery stay, Lead Plaintiff could not have obtained these documents earlier in the litigation. *See Flores*, 2007 WL 4287540, at *2 (explaining delay is a question of "whether the moving party knew or should have known the facts and theories raised by the amendment in the original

pleading."). Lead Counsel diligently reviewed those documents and worked to carefully revise the pleadings, which are subject to the PSLRA's heightened standards. Block Decl. ¶ 9. Lead Plaintiff seeks leave to file the SAC months ahead of the Scheduling Order's January 27, 2023, deadline to seek leave to amend. *See* ECF No. 106. Accordingly, Lead Plaintiff has not unduly delayed.

### c. *The SAC will not unduly prejudice Defendants at this early stage in the litigation.*

There is no prejudice to Defendants in allowing Lead Plaintiff leave to amend. The party opposing amendment bears the burden of establishing undue prejudice, *Eminence Capital*, 316 F.3d at 1052, and "[i]f a court is to deny leave to amend on grounds of undue prejudice, the prejudice must be substantial." *James ex rel. James Ambrose Johnson, Jr., 1999 Tr. v. UMG Recordings, Inc.*, No. C 11-1613 SI, 2012 WL 4859069, at *2 (N.D. Cal. Oct. 11, 2012). Neither the "mere addition of new claims," *Artemus*, 2017 WL 747368, at *4, nor "delay resulting from the proposed amendment nor the prospect of additional discovery" constitute undue prejudice, *MagTarget*, 2019 WL 1904205, at *3. Rather, courts in the Ninth Circuit have held that "a defendant may establish prejudice by demonstrating that a motion to amend was made after the cutoff date for such motions, or when discovery had closed or was about to close." *Artemus*, 2017 WL 747368, at *4.

Other than Tricida's insurance policies, Defendants have yet to produce any documents. Block Decl. at ¶ 10. *Call*, 2016 WL 4760903, at *2 (finding no undue prejudice where "discovery has not yet been completed"). Moreover, the proposed amendment does not fundamentally alter the complexion of this case. The SAC merely revives allegations that Defendants are already "intimately familiar" with and adds a single new theory of liability premised on the same underlying facts and statute. *See EZCORP*, 2018 WL 3596054, at *4 (concluding that effects of amendment would be "minimal" where plaintiff sought "only to revive a claim which Defendants previously moved to dismiss and with which Defendants are intimately familiar."). The new allegations in the SAC are based on documents Defendants' have had for years and Defendants cannot demonstrate prejudice from the revival of previous claims on the basis of facts they already knew.

### d. *The SAC is not futile.*

The SAC adds specific facts which support a strong inference that Defendants acted with scienter when describing Tricida's clinical trials as being in "the United States and Europe" and not in Eastern Europe; specific facts that the FDA told Defendants there would be no AdCom meeting because of the significant issues with Tricida's NDA; and specific facts demonstrating that the FDA repeatedly informed and questioned how Tricida intended to measure veverimer's efficacy and that it did not agree with Tricida's proposals. As courts have recognized, "[d]enial of leave to amend for futility is 'rare.'" *Ross*, 2020 WL 9848733, at *5 (citing *Netbula, LLC v. Distinct Corp.*, 212 F.R.D. 534, 538-39 (N.D. Cal. 2003)). "A proposed amendment is futile only if it would be immediately subject to dismissal." *Johnson v. Serenity Transportation, Inc.*, No. 15-CV-02004-JSC, 2015 WL 4913266, at *3 (N.D. Cal. Aug. 17, 2015). Here, the new allegations in the SAC support valid claims for relief.

#### i. *New Allegations Establishing Scienter for Statements About the TRCA-301/301E Trial Sites and Multicenter Nature of the Study.*

Although the Court found that the FAC plausibly alleged that Defendants misled investors about the location of the TRCA-301/301E trial sites and the multicenter nature of the study, it also found that the FAC failed to establish scienter with respect to these misstatements. MTD Order at 26–28. The SAC's allegations, however, establish specific facts that now support the requisite strong inference of scienter.

The required state of mind for a Section 10(b) violation is scienter, which encompasses "knowing or intentional misconduct." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197 (1976). Deliberate recklessness satisfies this standard and is found, as the Ninth Circuit recently explained, where a defendant disregards a "danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701 (9th Cir. 2021) (quoting *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020)) (emphasis in original). "One avenue by which to establish scienter is to show, through direct or circumstantial evidence, that the defendants knew or should have known that their statements were false or misleading." *In re Energy Recovery Inc. Sec. Litig.*, No. 15-CV-00265-

EMC, 2016 WL 324150, at *22 (N.D. Cal. Jan. 27, 2016). Accordingly, it is well established that "[t]he most direct way to show" scienter is to show that there were "contemporaneous reports or data, available to the party, which contradict the statement." *Id.* (quoting *Nursing Home Pension Fund Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004)).

At the pleading stage, the "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences," but need only be "at least as strong as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324–26 (2007) (internal quotations omitted). "In other words, the tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, No. CV 07-2536 PSG (PLAx) 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014) (internal quotations omitted).

In July 2017 the FDA expressly "caution[ed]" Tricida that patients being enrolled in the Phase 3 trials from "Bulgaria, Croatia, Hungary, Slovenia, Georgia, Serbia, and Ukraine" were from countries "where the standard of care may be dissimilar to standard of care in the U.S. and the resulting data may not be applicable to the U.S. population;" that the FDA "believe[d] it [wa]s important to ensure adequate enrollment of subjects at sites in the U.S.;" and if the FDA was "unable to inspect sites in that country for any reason" approval could be delayed. SAC ¶ 57. In other words, the FDA was telegraphing to Tricida that data from Eastern European patients were not applicable to the U.S., which would affect the trial's results. Defendants, however, clearly ignored this warning as Klaerner subsequently admitted his belief that "*we think that patients are pretty much the same all over the world*" but finally, in October 2020, conceded that Tricida would attempt to enroll patients in the "U.S. and Western Europe and Canada" because the "FDA asked us to do that." *Id.* at ¶ 87 (emphasis added). Klaerner and Tricida were therefore reckless as the danger of misleading investors as to where the trials were being conducted as Klaerner disregarded the FDA's warnings about where patients were enrolled for the trials.

After having reviewed Tricida's data, in January 2020, the FDA specifically informed Tricda that "it was not clear that the results of TRCA-301/301E were applicable to the U.S. population and practice of medicine." *Id.* at ¶ 75. The FDA "noted" that 148 out of the 217 trial subjects were enrolled in Bulgaria and Georgia where randomization favored TRC101. *Id.* Yet

only 27 subjects were enrolled in the U.S. and just *two* of them contributed data at 52 weeks. *Id***.** On top of that, the U.S. population *favored the placebo*. *Id.* All of these observations would have been equally apparent to Defendants in May 2018, when they had the results of the TRCA-301 trial in hand.

The FDA also pointed out to Tricida that there were concrete and observable differences between the study population and the target patient population as a result of the mismatched geography. A much smaller proportion of the study enrollees were on oral alkali agents than was the case for actual CKD patients in the U.S., the Agency told Defendants, and curiously "baseline eGFR [kidney function] values were higher than might have been anticipated given the target disease." *Id.* at ¶ 73. As it turns out, there was a very good reason kidney function measures were higher than would be expected in CKD patients: the Eastern European subjects were apparently suffering from BEN, an entirely different condition specific to Eastern Europe. *Id.* at ¶ 23.

Despite this direct feedback from the FDA in January 2020 informing Tricida of the flaws in its trials, Tricida issued its 2019 Form 10-K filed with the SEC on March 2, 2020, representing that "[w]e believe that the data from the TRCA-101, TRCA-301 and TRCA 301E clinical trials *will provide sufficient clinical evidence of safety and efficacy to support the approval of our NDA* for veverimer pursuant to the Accelerated Approval Program." *Id.* at ¶ 157 (emphasis added).

No later than April 2020, the FDA again stressed that data collected from an Eastern European population was particularly unlikely to apply to Western patients because BEN was "endemic in the region targeted for enrollment in your trial but is not typically seen in the U.S. or outside this region." *Id.* at ¶ 76. It was not merely an abstract risk that TRCA-301/301E's trial population might have BEN rather than CKD. Examining the data from the trial, the FDA noted that the patients had presented with "significant metabolic acidosis . . . despite a relatively preserved" kidney function, "which would be consistent with a cause of acidosis other than reduced kidney function (i.e., BEN[ instead of CKD])." *Id.* The FDA communicated all of this directly to Defendants.

Undeterred by the FDA's warnings and observations, Defendants boasted that the trial produced positive results from "47 sites in the United States and Europe," *id.* at ¶¶ 94, 101, 151,

without disclosing that hardly any of the study participants were located in the U.S., none of the participants were located in Western Europe, and the FDA believed the data from the Eastern European subjects were practically useless. Meanwhile, Tricida's risk disclosures acknowledged that "factors that may affect the acceptance of foreign clinical data include differences in clinical conditions[ and] study populations"—*i.e.*, the exact differences the FDA flagged as having caused Defendants' trial to generate inconclusive results. *Id.* at ¶¶ 103, 113, 120, 130, 141, 148, 154, 171. Yet Defendants continued to caution only in hypothetical terms that "[t]he FDA may not accept such foreign clinical data." *Id.*

Tricida was also put on notice that its study could not be characterized as "multicenter." Where an NDA is predicated upon only a single trial, FDA guidance states that the trial should be "a large multicenter study in which (1) no single study site provided an unusually large fraction of the patients and (2) no single investigator or site was disproportionately responsible for the favorable effect seen." *Id.* at ¶ 98. Yet TRCA-301/301E pulled an unusually large number of patients from a single site and this single site was completely responsible for the results Tricida touted to investors. As the FDA told Tricida with apparent alarm, the "treatment effect at Week 52," meager as it was already, "was *driven entirely by a single site in Bulgaria* (Site 11)." *Id.* at ¶ 164 (emphasis added). Defining the study as "multicenter" was therefore disingenuous, especially where "only two patients randomized to TRC101 in the U.S. contributed data to analyses at Week 52." *Id.* at ¶ 20. Again, Defendants possessed (and boasted about having) these trial results beginning in May 2018. *Id.* at ¶ 62.

The FDA documents therefore serve as direct evidence that Defendants possessed contemporaneous information contradicting their public statements. This is the most "direct" evidence of scienter and more than suffices at the pleading stage. *See Energy Recovery*, 2016 WL 324150, at *22. At a minimum, Defendants disregarded a risk of misleading investors that should have been obvious to them based on the FDA's communications and negative feedback, as well as the fact that Tricida had in its possession all of the data on which the FDA based its observations. *Alphabet*, 1 F.4th 687 at 701. The competing inference that Defendants were unaware of the problems with the study population and TRCA-301/301E's reliance on a single site in Bulgaria for

its entire treatment effect, even after the FDA's pre-trail warnings and post-trial explanations, is implausible, let alone *more* plausible. The new scienter allegations regarding the study population are not futile.

ii. *New Allegations Establishing That the Advisory Committee Meeting Was Cancelled Because of the "Significant Issues" with TRCA-301/301E.*

There can now be little dispute that Klaerner's statement that the AdCom meeting was being cancelled "in part due to the logistical challenges posed by COVID-19" FAC at ¶ 17 was false. The FDA documents establish that the FDA told Defendants, quite explicitly, that it was canceling the AdCom meeting because of the "significant issues" with TRCA-301/301E—including the insufficient treatment effect and the fact that the study was heavily reliant on a single site in Bulgaria. SAC ¶ 74. Nowhere did the FDA suggest in any way that the meeting was being canceled because of the COVID-19 pandemic, as Klaerner falsely claimed. *Id.* at ¶ 158. That Klaerner would so blatantly lie about the cancellation of the AdCom meeting is further evidence of his scienter in misleading the market about the problems with TRCA-301/301E.

iii. *New Allegations Establishing That Defendants Misled the Market About the Adequacy of the Treatment Effect Observed in TRCA-301/301E*

The FDA documents further reveal that Defendants misled the market about a fundamental aspect of the TRCA-301/301E trial: the ability of the surrogate endpoint to demonstrate clinical benefit. As far back as 2015, the FDA was skeptical about Tricida's ability to use changes in SBC as a surrogate endpoint. *Id.* at ¶ 47. While the FDA eventually came around to using SBC levels as a surrogate for clinical effectiveness, it did so provided that Tricida could establish the reliability of such a measure, although it was skeptical about the size of the effect Tricida intended to show. SAC ¶¶ 47–52. TRCA-301/301E ended up using an absolute change in blood bicarbonate of ▇▇▇ ▇▇▇▇ as its endpoint, but even as early as November 2016, the FDA warned Tricida that it "question[ed] whether the size of the treatment effect reported to date (▇▇▇▇▇▇▇▇▇) is large enough to translate into a treatment benefit." *Id.* ¶ 49. In February 2017, during a meeting the FDA cautioned Tricida that "[t]o be granted accelerated approval," it would need to establish and demonstrate a treatment effect on SBC of a sufficient "magnitude." *Id.* at ¶ 50. The FDA warned

that a "key issue" would be "whether the magnitude of the treatment effect on serum bicarbonate….is sufficient to provide confidence that the treatment will have the anticipated benefit…" *Id.* at ¶ 91.Asked in November 2017 if the FDA "agree[d] that, with successful completion of Study TRCA-301, the size of the treatment effect of TRC101 on serum bicarbonate[, at that time a ███████ increase relative to the placebo group,] will be sufficient to support accelerated approval of TRC101?" the FDA responded "No." *Id.* at ¶ 60. In March 2018, Tricida attempted again to get the FDA to agree that "the increase in serum bicarbonate expected to be observed in Study TRCA-301, one can determine the treatment effect size on serum bicarbonate needed to confirm clinical benefit," but once again the FDA disagreed. *Id.* at ¶ 61.

Nonetheless, despite the FDA's consistent feedback that Tricida had not justified that clinical benefit could be predicted from its proposed SBC endpoint, Tricida misrepresented in its June 2018 Prospectus that *"[b]ased on feedback from the FDA*, we believe that the data from the TRCA-101, TRCA-301 and TRCA-301E trials will provide sufficient evidence of clinical safety and efficacy to support the submission and review of an NDA for TRC101 pursuant to the Accelerated Approval Program." *Id.* at ¶ 104 (emphasis added). Tricida also reported that 60% of TRCA-301/301E participants achieved the endpoint of a 4 mEq/L absolute increase in serum bicarbonate after 12 weeks. *Id.* at ¶ 106. However, as the FDA pointed out, when placebo group, the treatment effect amounted to only an additional 2.64 mEq/L at 12 weeks and 1.99 mEq/L at 52 weeks over the increases observed in the placebo group. *Id.* at ¶ 72. The FDA determined this level of increase over the placebo group was modest at best and had already told Tricida that a ███████ change over the placebo group was insufficient in November 2017. *Id.* at ¶¶ 59–60. Moreover, this modest treatment effect was observed entirely at a single site, Site 11, in Bulgaria. *Id.* at ¶ 75. In January 2020, the FDA told Tricida that it was not confident that the observed effect was sufficient to predict a clinical benefit, and in May 2020 reaffirmed the Agency's "concern[] about the magnitude and durability of the treatment effect." *Id.* at ¶ 77.

Despite this, Defendants told the market throughout the class period that veverimer "met both its primary and secondary endpoints in a highly statistically significant manner…" *Id.* at ¶¶ 94, 106, 121, 123, 125, 136, 144, 155. These and other related statements would have misled a

reasonable investor into believing that TRCA-301/301E had demonstrated a reasonable treatment effect when in fact the FDA had expressed a lack of confidence in the endpoints and the size of the observed result relative to the placebo group. Moreover, because defendants possessed contemporaneous information contrary to their representations, they made these statements with scienter. *See Energy Recovery*, 2016 WL 324150, at *22. At a minimum, Defendants ignored an obvious risk of misleading investors by touting the treatment effect without revealing that the FDA disagreed with Tricida's endpoints and told the Company its treatment effect was too small. *See Alphabet*, 1 F.4th at 701. Ultimately, the FDA's concerns over the inadequacy of the treatment effect contributed to the Agency's decision to reject veverimer's NDA, and later to reject Tricida's appeal of that decision. *Id.* at ¶¶ 83–84, 91. Because the SAC properly identifies material misstatements, made with scienter, regarding the treatment effect observed in TRCA-301/301E, these claims are not futile.

### e. Lead Plaintiff has not repeatedly amended the complaint.

The SAC is the first time Lead Plaintiff has tried to cure pleading deficiencies through an amendment. The fifth *Foman* factor, meanwhile, disturbs the presumption in favor of amendment where there has been a "repeated failure to cure deficiencies by amendments previously allowed." *Todd v. Tempur-Sealy Int'l, Inc.*, No. 13-CV-04984-JST, 2015 WL 5064076, at *1 (N.D. Cal. Aug. 26, 2015). Here, the only prior amendment to the complaint came as a matter of course. *Call*, 2016 WL 4760903, at *2 (granting leave to amend where "Plaintiff ha[d] only amended his complaint once before."). The final *Foman* factor therefore does not displace the presumption in favor of permitting amendment.

## VI.   CONCLUSION

For the foregoing reasons, this Court should GRANT Lead Plaintiff's Motion and allow him to file the SAC.

November 23, 2022

Respectfully submitted,

/s/ Jeffrey C. Block
Jeffrey C. Block (*pro hac vice*)
Jacob A. Walker (SBN 271217)
Michael D. Gaines (*pro hac vice*)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jeff@blockleviton.com
jake@blockleviton.com
michael@blockleviton.com