# Exhibit K
# Redacted - [Lead Plaintiff's Opposition to Motion to Dismiss]

Jeffrey C. Block, *pro hac vice*
Michael D. Gaines, *pro hac vice*
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
michael@blockleviton.com

Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo, CA 94402
(650) 781-0025 phone
jake@blockleviton.com

*Attorneys for Lead Plaintiff Jeffrey M. Fiore and the Class*

<span style="color:red">FILED UNDER SEAL</span>

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL PARDI, *Individually and on Behalf of All Others Similarly Situated,*<br><br>Plaintiff,<br><br>v.<br><br>TRICIDA, INC. and GERRITT KLAERNER,<br><br>Defendants. | Case No. 3:21-cv-00076-HSG<br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT KLAERNER'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>**Class Action**<br><br>Hon. Haywood S. Gilliam, Jr.<br><br>Date: June 1, 2023<br>Time: 2:00 p.m.<br>Courtroom 2, 4th Floor |

**TABLE OF CONTENTS**

INTRODUCTION……………………………………………………………………………………...1

BACKGROUND………………………………………………………………………………….3

I.    Veverimer ........................................................................................................................ 3

    A.   The FDA Repeatedly Raised Concerns as to How Tricida Would Measure Efficacy ........ 3

    B.   The FDA Cautioned Klaerner About Patient Population Being From Eastern Europe and Overreliance on a Single Trial Site in Bulgaria ........................................................................ 6

II.    The Truth About Veverimer's Prospects for FDA Approval Emerges ................................... 7

ARGUMENT………………………………………………………………………………………...8

III.    The SAC Adequately Alleges Falsity and Material Omissions .......................................... 8

    A.   The Court Need Not Revisit Its Finding that the Statements About The Trial Being Conducted In the "United States and Europe" Were False and Misleading When Made .......... 9

    B.   The Court Need Not Revisit its Finding that the Statements Describing the TRCA-301/TRCA-301E Trial as "Multicenter" Were Misleading ........................................................ 11

    C.   The FDA Record Conclusively Demonstrates that Klaerner Made False and Misleading Statements About the Late-Cycle Meeting And the Court Need Not Revisit Its Prior Ruling  13

    D.   Klaerner Made False and Misleading Statements About the Trial Results of TRCA-301/301E and the Use of SBC as a Surrogate Endpoint .......................................................... 15

IV.    The SAC Adequately Alleges Scienter ......................................................................... 21

    A.   Taking the SAC's Allegations Holistically, Plaintiff Has Raised a Strong Inference of Scienter .................................................................................................................................. 24

CONCLUSION…………………………………………………………………………………..26

TABLE OF AUTHORITIES

**Cases**

*Berson v. Applied Signal Tech., Inc.*, 527 F. 3d 982 (9th Cir. 2008)..............................................8

*Brody v. Transitional Hosps. Corp.*, 280 F.3d 997 (9th Cir. 2002)...............................................9

*Fecht v. Price Co.*, 70 F.3d 1078 (9th Cir. 1995) ........................................................................8

*Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557 (S.D.N.Y. 2016).............................................25

*Homyk v. ChemoCentryx, Inc.*, No. 21-cv-03343-JST (N.D. Cal. Feb. 23, 2023) (slip op.), ECF
   No. 50.................................................................................................................... passim

*Immanuel Lake v. Zogenix, Inc.*, 2020 WL 3820424 (N.D. Cal. Jan. 27, 2020) .........................12

*In re Amylin Pharm., Inc. Sec. Litig.*, 2003 WL 21500525 (S.D. Cal. May 1, 2003)............... 8, 17

*In re Atossa Genetics, Inc. Sec. Litig.*, 868 F. 3d 784 (9th Cir. 2017).........................................20

*In re BioMarin Pharms. Inc. Sec. Litig.*, 2022 WL 164299 (N.D. Cal. Jan. 6, 2022) .................21

In re GeoPharma, Inc. Sec. Litig., 411 F. Supp. 2d 434 (S.D.N.Y. 2006)...................................22

*In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057 (E.D. Wash. 2016) ...................................11

*In re MannKind Sec. Actions*, 835 F. Supp. 2d 797 (C.D. Cal. 2011).........................................24

*In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217 (N.D. Cal. 2009).......................................17

*In re NVIDIA Corp. Sec. Litig.,* 2011 WL 4831192 (N.D. Cal. Oct. 12, 2011), *affd,* 768 F.3d
   1046 (9th Cir. 2014).............................................................................................................22

*In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017) .............................................20

*In re STEC Inc. Sec. Litig.*, 2011 WL 2669217 (C.D. Cal. Jun. 17, 2011)...................................8

*Miller v. Thane Int'l, Inc.*, 519 F.3d 879 (9th Cir. 2008)...............................................................8

*Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020)...........................................................25

*Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pen. Fund*, 575 U.S. 175 (2015).......20

*Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698 (9th Cir. 2016) ..........................14, 16, 21, 25

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2021 WL 4864421 (N.D.
   Cal. Oct. 19, 2021)........................................................................................................ 17, 25

**INTRODUCTION**

After this Court granted in part, and denied in part, Defendants' motion to dismiss the First Amended Class Action Complaint ("FAC"), ECF No. 93 ("Order"), and discovery began, Lead Plaintiff served a subpoena on the United States Food and Drug Administration and sought documents concerning Tricida's new drug application ("NDA") for veverimer. In response, the FDA produced over 11,000 pages of documents consisting of letters, information, and minutes of meetings held between the FDA and Tricida. Defendant Klaerner attended all the relevant meetings and received all relevant correspondence from the FDA. ¶41.[1]

The documents produced by the FDA establish that from the moment Tricida first sought to conduct clinical trials to demonstrate veverimer could slow the progression of chronic kidney disease ("CKD"), the FDA repeatedly expressed skepticism over how Tricida intended to measure the drug's efficacy. Indeed, the FDA specifically told Klaerner in November 2016 that it did not agree that with "successful completion of Study TRCA-301, the size of the treatment effect of TRC101 on serum bicarbonate *will be sufficient to support accelerated approval* of TRC101." ¶60. In May 2017 the FDA responded to an Advice/Information Request reminding Tricida that a "win" on the primary endpoint for TRCA-301 "would not be sufficient to support an application for accelerated approval"; rather, "the magnitude of the treatment effect on serum bicarbonate" would "need to be sufficient to provide confidence that the treatment will have the anticipated clinical benefit that you are powered to find in the agreed-upon postmarketing study." ¶¶12, 54.

Yet, despite these specific, clear warnings and concerns that the FDA communicated to Klaerner, he represented to investors in Tricida's June 2018 initial public offering—in which Tricida raised over $255 million and by which point in time Tricida had analyzed the results of its phase 3 trial, TRCA-301—that "*based on feedback from the FDA*" the data from the clinical trials "will provide sufficient evidence of clinical safety and efficacy to support the submission and review of an NDA for TRC 101 pursuant to the Accelerated Approval Program." This statement was false when made, and Klaerner was deliberately reckless in making it.

---

[1] Refences to "¶_" are to the Second Amended Complaint for Violations of the Federal Securities Laws, ECF No. 115.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT KLAERNER'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
3:21-cv-00076-LHK

1

The FAC alleged, among other things, that Tricida and Klaerner misrepresented that the trials were conducted in the "United States and Europe" when, in fact, most of the trials were conducted in Eastern Europe (and none in Western Europe). Defendants were also charged with misrepresenting that the trials were "multicenter". The Court found these statements were false and misleading when made but that the FAC failed to plead a strong inference of scienter. The SAC, based on the FDA documents, pleads that the FDA explicitly cautioned Klaerner and Tricida in July 2017 against relying on patients from Eastern European countries of "Bulgaria, Croatia, Hungary, Slovenia, Georgia, Serbia, and Ukraine." Tricida responded that "[a]dding additional countries, i.e., additional sites, for a study of this size is not reasonable." ¶16. The FDA then instructed Tricida to justify reliance on participants from these countries in June 2019. The FDA also questioned the reliability of TRCA-301/301E, finding that 68% of the participants were from Eastern European countries and the week 52 results came from a single trial site in Bulgaria.

The FDA's specific feedback establishes that Klaerner was deliberately reckless in not revealing that most of the trial's participants came from Eastern European countries, whose population was too different from the U.S. population for purposes of testing veverimer. And because a single trial site drove the 52-week results, it was misleading to call the trials multicenter. The danger of misleading an investor was so obvious—the FDA specifically cautioned against relying these Eastern European countries for enrollment—that Klaerner was deliberately reckless.

Klaerner's motion to dismiss the SAC asks the Court to revisit and reverse all its prior findings because, he claims, the FDA documents establish the FDA never definitively said it would deny the NDA for veverimer before the complete response letter in August 2020. This is meritless.

Lead Plaintiff alleges that Klaerner misled investors as to what the FDA's actual feedback was, reducing the perceived risk to investors that Tricida would fail to obtain FDA approval for veverimer, which in turn caused Tricida's stock to trade at artificially inflated prices. In upholding the claim that Klaerner made an actionable misstatement on the May 7, 2020 conference call with investors, this Court held that

> Klaerner's touting positive discussions with the FDA required him to also
> disclose the negative discussions, and his failure to do so is 'an extreme
> departure from the standards of ordinary care … [that] present[ed] a danger

of misleading buyers or sellers that [was] either known to [Defendants] or [was] so obvious that [Defendants] must have been aware of it.'

Order 30. With the new discovery, this holding applies equally to the statements about measuring efficacy, the location of the trial sites, and the alleged "multicenter" nature of TRCA-301/301E.

## BACKGROUND

### I.   Veverimer

Tricida was a biopharmaceutical company whose sole drug candidate was veverimer. It was conducting clinical trials to obtain FDA approval for veverimer to slow the progression of CKD through the treatment of metabolic acidosis. ¶4. To demonstrate clinical efficacy, Tricida chose to use changes in serum bicarbonate ("SBC") levels as the predetermined surrogate endpoint for its Phase 3 trial. *Id.* As is typical, Tricida engaged in numerous meetings and discussions with the FDA concerning its Phase 3 trials and sought, and received, the FDA's feedback regarding the trials and prospects for obtaining approval for veverimer.

### A.   The FDA Repeatedly Raised Concerns as to How Tricida Would Measure Efficacy

As far back as 2015, and through 2020 when the FDA rejected Tricida's NDA for veverimer, the FDA repeatedly raised concerns and expressed skepticism to Klaerner as to whether changes in SBC levels could demonstrate clinical efficacy sufficient to support approval for veverimer. The FDA also repeatedly informed Klaerner that *if* it did accept changes in SBC levels to demonstrate clinical efficacy, those changes would have to be significant.

On May 1, 2015, Klaerner received comments from the FDA stating that there "needs to be further discussion of what constitutes a clinically meaningful change in serum bicarbonate concentration *and the population in which such a change* would be expected to translate reliably into a clinical benefit" and Tricida "should also provide other data (*i.e.*, preclinical data or data from interventional trials) that indicate that the observed relationships between serum bicarbonate concentration and outcomes are likely causal in nature." ¶47 (emphasis added). The FDA told Tricida it would accept a "substantial" increase in SBC levels as a surrogate endpoint "in a population with marked metabolic acidosis at baseline," but that for patients with mild levels of acidosis, the FDA would be "unlikely to accept treatment effects on bicarbonate levels as a

surrogate endpoint[.]" *Id.* The FDA also informed Tricida that it did not believe "a change from baseline in SBC of ███████" was a substantial enough increase in SBC to "reliably translate into improved clinical outcomes in patients with CKD and metabolic acidosis." *Id.* At the May 6, 2015 meeting, Klaerner provided data purporting to support the use of SBC as a surrogate endpoint. But the FDA and Klaerner agreed only that there would have to be further discussions to resolve what constituted a "clinically meaningful change" in SBC levels. ¶48. In comments dated November 21, 2016, the FDA said, "we do not agree that the submitted data are sufficient to support the use of serum bicarbonate concentrations as a surrogate endpoint" and "we question whether the size of the treatment effect reported to date (████████████) is large enough to translate into a treatment benefit." ¶49. Asked if the FDA "agree[d] with the design of the proposed pivotal studies" the FDA responded, "No … we do not agree with your proposed endpoint." *Id.*

Klaerner and the FDA again discussed the use of changes in SBC as a surrogate endpoint during a Type A meeting on February 9, 2017. ¶50. In comments, the FDA identified as a "key issue" the question of whether the "magnitude of the treatment effect on serum bicarbonate" in Tricida's proposed Phase 3 Study, TRCA-301, was "sufficient to provide confidence that the treatment will have the anticipated clinical benefit that you are powered to find in your postmarketing study." *Id.* The FDA explained that resolving this issue would involve determining "how large the effect size on SBC would need to be to observe the expected benefit in your postmarketing trial" and "you would need to demonstrate a treatment effect on SBC that is greater than or equal to that magnitude" to be granted accelerated approval. *Id.*

At a February 9, 2017 meeting, the FDA again "emphasized that the size of the treatment effect seen in Study TRCA-301 will need to provide confidence that the postmarketing trial can verify the benefit, and that there should be further discussion of statistical considerations related to this issue." ¶51. The FDA also signaled that the relevant measure would be increases in SBC relative to the placebo group, not simply absolute increases. ¶52. Minutes from that meeting show that Tricida expected to show that 60-70% of TRCA-301 subjects would have an SBC increase of ███████ "as compared to < 5% of placebo subjects[.]" *Id.*

Tricida submitted the protocol for its TRCA-301 trial to the FDA on March 3, 2017. ¶53. Soon after, on May 24, 2017, the FDA "remind[ed] [Tricida] of the following issues and agreements reached at our meeting on February 9, 2017[,]" namely that although a "win" on the primary endpoint "will allow you to declare a successful trial, simply winning on the primary endpoint is not sufficient to trigger or support an application for accelerated approval." ¶54. "Rather, the magnitude of the treatment effect on serum bicarbonate in Study TRCA-301 will need to be sufficient to provide confidence that the treatment will have the anticipated clinical benefit that you are powered to find in the agreed-upon postmarketing study." *Id.*

In response, Tridica argued on June 6, 2017, that "a ▮▮▮▮▮▮▮ increase in blood bicarbonate sets a clinically meaningful threshold that is likely to predict renal benefit." ¶55. The FDA informed Klaerner, however, on July 24, 2017 that it did "not agree" with Tricida's proposed revisions to the protocol for TRCA-301. ¶56. The FDA explained that Tricida had to develop and apply a "predictive model to show the magnitude of the treatment effect on SBC that would need to be shown to produce the anticipated treatment effect on the clinical endpoint in your post-marketing trial (i.e., the treatment effect that your postmarketing trial is powered to detect)." *Id.* The FDA further explained: "For the purpose of accelerated approval, you will need to demonstrate a treatment effect on SBC that is greater than or equal to that magnitude. It is unclear how your proposed responder endpoint fits in with this approach." *Id.* The FDA repeated this position during the July 26, 2017 meeting and emphasized that, while Tricida "may proceed with Study TRCA-301," the FDA "could not commit to the size of the treatment effect on serum bicarbonate needed to support accelerated approval." ¶¶17, 58.

On September 4, 2019, Tricida filed its NDA for approval of veverimer. The clinical trials demonstrated that "the treatment effect [on SBC] levels at weeks 12 and 52 in TRCA-301/301E was 2.64 mEq/L and 1.99 mEq/L respectively." ¶23. The treatment effect on SBC levels did not even come close the ▮▮▮▮▮ increase Tricida argued should support approval, meaning that Klaerner knew that the clinical trial results fell short of a target the FDA might yet reject as insufficient treatment effect, dramatically increasing the risk that the NDA might not be approved.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT KLAERNER'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
3:21-cv-00076-LHK

5

On January 24, 2020, the FDA raised "significant issues" with the veverimer NDA, which precluded convening the previously anticipated AdComm meeting. ¶74. The FDA questioned whether the "magnitude of the treatment effect on blood bicarbonate" seen in TRCA-301/301E "would be reasonably likely to predict benefit" and questioned the "applicability of data from TRCA-301/301E to the U.S. population," noting (1) that 148/217 subjects in the trial were enrolled in Bulgaria and Georgia (with randomization favoring veverimer); (2) only 27/217 subjects were enrolled in the U.S. (with randomization favoring placebo), of which only two patients randomized to veverimer contributed data to the week 52 data analysis; and (3) fewer than 10% of patients were receiving U.S. guideline-recommended treatment before the trial. ¶¶72, 73.

Next, on April 17, 2020, the FDA emphasized that it "remained concerned about" the magnitude and durability of the treatment effect on blood bicarbonate and the applicability of the data from TRCA-301/301E to the U.S. population. ¶75. The FDA went further, highlighting that "the treatment effect at Week 52 was driven entirely by a single site in Bulgaria" and questioning whether many of the study participants enrolled from Eastern Europe even suffered from CKD. ¶¶75-76. The FDA noted that the unexpectedly elevated baseline eGFR values seen in TRCA-301/301E participants were "consistent with a cause of acidosis other than reduced kidney function" and suspected that these participants might suffer from Balkan Endemic Nephropathy ("BEN"), which is "endemic in the region targeted for enrollment in [Tricida's] trial but is not typically seen in the U.S. or outside [Eastern Europe]." ¶¶23, 76. The FDA made this same observation during the May 1, 2020 late-cycle meeting, which Klaerner attended. ¶165. In the late-cycle meeting, the FDA reiterated that, given the "significant issues" with Tricida's NDA, it did "not believe an Advisory Committee Meeting is needed." ¶77.

**B.      The FDA Cautioned Klaerner About Patient Population Being From Eastern Europe and Overreliance on a Single Trial Site in Bulgaria**

In comments on July 24, 2017, and during the Type A meeting held July 26, 2017 (which Klaerner attended), the FDA highlighted that most of the patients enrolled in TRCA-301 were from sites in "Bulgaria, Croatia, Hungary, Slovenia, Georgia, Serbia, and Ukraine." ¶¶57, 97. The FDA cautioned Tricida "against enrolling subjects at sites where the standard of care may be

dissimilar to the standard of care in the U.S. because the resulting data may not be applicable to the U.S. population and U.S. medical practice." ¶¶57, 97. And, the FDA added, "it is important to ensure adequate enrollment of subjects at sites in the U.S." *Id.* The FDA continued to flag TRCA-301's reliance on Eastern European patients throughout the NDA review. On June 3, 2019, the FDA instructed Tricida to "provide your rationale for assuming the applicability of foreign data to the U.S. population/practice of medicine in the U.S." ¶¶69, 140. Klaerner and Tricida did not respond to this request, but in July 2017 Tricida told the FDA that "[a]dding additional countries, i.e., additional sites, for a study of this size is not reasonable." ¶16.

On January 24, 2020 the FDA explicitly questioned the applicability of the data from the clinical trials to the U.S. population because of the high concentration of patients coming from Eastern Europe. ¶73. On April 17, 2020, the FDA again questioned the reliability of the data, as the treatment effect from week 52 was "driven entirely by a single site in Bulgaria." ¶¶ 75-76.

## II.    The Truth About Veverimer's Prospects for FDA Approval Emerges

On July 15, 2020, Tricida revealed that the FDA "identified deficiencies that preclude discussion of labeling and postmarketing requirements/commitments at this time." ¶¶28, 79, 176. Although Tricida reported that the notification did not "specify the deficiencies identified by the FDA," Tricida and Klaerner knew which deficiencies the FDA had referenced—they were the same deficiencies discussed in the January 24, 2020 comments to the mid-cycle meeting and the comments sent on April 17, 2020 in anticipation of the May 2020 late cycle meeting. ¶¶72-78. Tricida's stock price fell $10.56 per share in response to this news.[2] ¶¶79, 175.

On August 24, 2020, Tricida issued a press release announcing that the Company received a CRL from the FDA for its veverimer NDA. ¶¶117, 177-179. Tricida's stock price fell 23.64% on this news. ¶194. On October 29, 2020, Tricida's stock price fell another 47% on the news that the FDA would not accept solely "serum bicarbonate data for determination of efficacy." ¶¶180-182, 195. On December 8, 2020, the stock price fell another 17% on the news that the FDA was, in essence, requiring new clinical trials. ¶196. On February 25, 2021, Tricida revealed it had

---

[2] Klaerner sold 24,000 shares between May 1, 2020 and July 15, 2020 (when the stock price fell) avoiding over $240,000 in lost value.

"received an Appeal Denied Letter ('ADL'), from the Office of New Drugs ('OND') of the FDA in response to its Formal Dispute Resolution Request ('FDRR') submitted in December 2020." ¶197. The press release disclosing the ADL revealed for the first time the FDA's "concerns that are particularly relevant in an NDA supported by a single registration trial": the trial results were "strongly influenced by a single site," and "the majority of sites for the TRCA-301/TRCA-301E trial" were in Eastern Europe, "where differences in patient management … might affect the treatment response to veverimer," rendering questionable "the applicability to a U.S. patient population." ¶¶185-186. Tricida's stock price fell 30% on this news. ¶197.

## ARGUMENT[3]

### III.    The SAC Adequately Alleges Falsity and Material Omissions

As this Court explained,

> "Material information only needs to be disclosed if its omission would "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." "But 'once defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information."

Order 7-8 (internal citations omitted). Moreover, a statement is false and misleading if it "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F. 3d 982, 985 (9th Cir. 2008). "[W]hether a public statement is misleading … is a mixed question to be decided by the trier of fact." *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *9 (C.D. Cal. Jun. 17, 2011) (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)). "[S]tatements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). So "if the FDA expresses significant concerns regarding the sufficiency of the trials, the company cannot make affirmative representations regarding the completeness or sufficiency of the trials without full disclosure." *In re Amylin Pharm., Inc. Sec. Litig.*, 2003 WL 21500525, at *8 (S.D. Cal. May 1, 2003).

---

[3] The Court previously set forth the pleading standards to be considered on a motion to dismiss a securities fraud action, so Lead Plaintiff will not repeat them here. *See* Order 3-4.

**A.** **The Court Need Not Revisit Its Finding that the Statements About The Trial Being Conducted In the "United States and Europe" Were False and Misleading When Made**

The Court already held,

> Fiore sufficiently pleads that Defendants' statements characterizing their Phase 3 trials as conducted in "Europe" were misleading. Given that Fiore alleges differences between Eastern and Western European patient populations and that the FDA treats clinical data from those populations differently, Defendants' statements "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."

Order 8-9 (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). There is no basis for the Court to reverse its prior ruling.

On the contrary, the FDA documents demonstrate the FDA specifically cautioned Tricida from relying on participants from Eastern Europe. On July 24, 2017 the FDA specifically noted that the Phase 3 "Study TRCA-301 will enroll subjects from sites in the U.S., Bulgaria, Croatia, Hungary, Slovenia, Georgia, Serbia, and Ukraine" and informed Tricida and Klaerner that: "In general, a) *we caution sponsors against enrolling subjects at sites where the standard of care may be dissimilar to standard of care in the U.S. because the resulting data may not be applicable to the U.S. population and U.S. medical practice*; [and] b) Because this study will provide important information that will be used to design your post-marketing trial and because your postmarketing trial will be conducted in additional regions, *we believe it is important to ensure adequate enrollment of subjects at sites in the U.S.*, and possibly these other regions."[4] ¶57 (emphasis added). The FDA repeated these comments during the July 26, 2017 meeting. ¶58.

---

[4] Klaerner dismisses this cautionary statement by the FDA as simply "a standard provision." MTD 7. Whether it is a standard provision is a question of fact not properly resolved on a motion to dismiss. Plus, the circumstances that prompted the FDA to caution Tricida about this were specific to the TRCA-310 trial: the FDA initially expressed its concerns about the use of changes in SBC levels to measure efficacy and expressly informed Tricida that "the population in which such a change" would be relevant. Tricida's near-total reliance on Eastern European trial sites for enrollment was at odds with the FDA's express cautions to Tricida. Moreover, Tricida's conclusory response—"We have selected sites with similar standard of care to the U.S.," MTD 7 & Ex. 9 attachment, at 20—fails to even grapple with the substance of the FDA's concern, let alone meet it "head-on." MTD 7. Apparently unsatisfied with Tricida's response, the FDA, on June 3, 2019, instructed Tricida to "Please provide your rationale for assuming the applicability of

Then, after reviewing the NDA, the FDA expressly informed Klaerner and Tricida on January 24, 2020 that it was questioning the "applicability of data from TRCA-301/301E to the U.S. population," noting (1) that 148/217 subjects in the trial were enrolled in Bulgaria and Georgia (with randomization favoring veverimer); (2) only 27/217 subjects were enrolled in the U.S. (with randomization favoring placebo), of which only two patients randomized to veverimer contributed data to the week 52 data analysis; and (3) fewer than 10% of patients were receiving U.S. guideline-recommended treatment prior to the trial." ¶¶72, 73.

Although Klaerner and Tricida responded to the FDA's expressed concerns about the over reliance of patients from Eastern Europe, the FDA found the response inadequate as "Balkan Endemic Nephropathy (BEN) is endemic in the region targeted for enrollment in your trial but is not typically seen in the U.S. or outside this region." ¶76. The FDA continued to express its concern "that the response to treatment in patients with BEN (i.e., the size of the treatment effect on blood bicarbonate) may not be representative of the size of the treatment effect in patients in the U.S. with metabolic acidosis associated with CKD who do not have BEN. We also question whether the treatment effect on renal outcomes in one population can be extrapolated to the other; an issue that has bearing on your ongoing trial." *Id.*

Klaerner argues that because Tricida provided the FDA with a satisfactory answer every time the agency "raised questions about Eastern European trial participants" his statements were neither false, misleading, or omitted a material fact. MTD 6-7, 9. First, Tricida did not provide the FDA with satisfactory answers as shown by the FDA's comments on both January 27 and April 17, 2020 as the FDA continued to raise concerns about the over reliance on patients from Eastern Europe. Second, in denying Tricida's appeal of the denial of the NDA, the FDA expressly "noted concerns around the trial results being strongly influenced by a single site, and the majority of sites for the TRCA-301/TRCA-301E trial being in Eastern Europe, where differences in patient management, including concomitant medications and diet, might affect the treatment response to

foreign data to the U.S. population/practice of medicine in the U.S." ¶¶69, 140. Klaerner's response was that in a trial of its size, it was unreasonable to enroll additional patients.

veverimer and raise a concern of the applicability to a U.S. patient population." There is simply no support for Klaerner's assertion that Tricida always provided satisfactory answers to the FDA.

Klaerner also contends that Tricida had no obligation to disclose interim FDA communications. MTD 7. But Lead Plaintiff does not argue otherwise. Klaerner and Tricida repeatedly disclosed the trials were conducted with patients from the "United States and Europe" but knew full well that the FDA had already flagged its concerns about relying on patients from *Eastern* Europe. And by the time Tricida went public, it knew the results of the Phase 3 clinical trials and knew 68% of the patients came from Bulgaria and Georgia. Claiming the trials were conducted in the "United States and Europe" "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists." Order 8-9.

Finally, Klaerner argues that his "in the United States and Europe" statements were not *materially* misleading because the location of TRCA-301/301E's trial sites were disclosed in the *Lancet* and on clinicaltrials.gov. MTD 8. Klaerner's "truth-on-the-market" defense fares no better now than it did on his first motion to dismiss. *See* Order 9-10. "Defendants bear a heavy burden of proving that information withheld or misrepresented was transmitted to the public with a degree of intensity and credibility to effectively counterbalance the misleading impressions created by insider one-sided representations." Order 10 (quoting *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1073 (E.D. Wash. 2016)). Once again Klaerner makes no evidentiary showing—let alone an incontrovertible one—of the intensity with which Tricida's exclusively Eastern European trial sites were transmitted to the public. *See id.* "Because Defendants do not meet, or even address, their burden of 'proving that information withheld or misrepresented was transmitted to the public with a degree of intensity and credibility to effectively counterbalance the misleading impressions created by insider one-sided representations,' *Iso Ray*, 189 F. Supp. 3d at 1073, Defendants' 'truth-on-the-market' defense cannot be a proper basis for dismissal at this stage." Order 10.

**B.      The Court Need Not Revisit its Finding that the Statements Describing the TRCA-301/TRCA-301E Trial as "Multicenter" Were Misleading**

The Court already found misleading Klaerner's statements made between June 5, 2018 and March 2, 2020 describing the Phase 3 TRCA-301/301E trial as "multicenter." *See* Order 13-15;

¶¶62, 94, 101, 111, 118, 128, 139, 146, 152, 169. These statements "gave the misleading impression that the FDA would find them credible because no single study site [was] responsible for a disproportionate share of either the trial subjects or the favorable effect seen." Order 14. "But in reality …, 'the TRCA-301/301E trial results were 'strongly influenced by a single site.'" *Id.* Indeed, Tricida analyzed the TRCA-301E data no later than March 28, 2019, ¶66, and Klaerner therefore knew that the touted treatment effect came from a single site in Bulgaria.[5]

Klaerner's arguments against the misleading nature of his "multicenter" statements lack merit. On April 17, 2020, before the May 1, 2020 late-cycle meeting, the FDA flagged "that the treatment effect at Week 52 [in TRCA-301/301E] was driven entirely by a single site in Bulgaria (Site 11)." MTD 9; ¶75. Klaerner asserts that during the late-cycle meeting, Tricida "addressed this concern by explaining that the characteristics of patients in Bulgaria 'fall well within the range of those of the subjects' from all other sites, and 'within the range of US patients with CKD.'" MTD 9 & Ex. 14, at 3. This response attempts to convince that Bulgarian (i.e., Eastern European) patients were similar enough to U.S. patients to yield applicable data, but it does not address the issue of a single site driving results (i.e. the single Phase 3 trial's lack of "multicenter" credibility).[6]

Klaerner also contends that the SAC's "multicenter" trial allegations "depend on ignoring the basic structure of TRCA-301 and TRCA-301E," because TRCA-301 was "designed to study efficacy" and TRCA-301E was designed to "establish the long-term safety of veverimer." MTD 9-10. Wrong. Again, the FDA expressed concern with a single trial site driving results, which undercut the representation that the trial was "multicenter." Whether the trial was to measure

---

[5] Plaintiff concedes that because there were no results for TRCA-301E until the extension's completion in March 2019, earlier statements describing TRCA-301/301E as "multicenter," *see* ¶¶94, 101, 111, did not mislead investors.

[6] Klaerner disingenuously argues that because the FDA "returned to the issue of the Bulgarian site when it later issued its CRL," this supports nothing more than fraud-by-hindsight. MTD 9 n.4 (again citing *Immanuel Lake v. Zogenix, Inc.*, 2020 WL 3820424, at *8-9 (N.D. Cal. Jan. 27, 2020)). The Court has already addressed this argument: "Plaintiff's claim [in *Zogenix*] is distinguishable from Fiore's claim here: while the plaintiff *Zogenix* alleged that the defendant failed to disclose a study only later identified by the FDA, Fiore alleges that Defendants *affirmatively touted* a feature of their trial—its 'multicenter' nature—to investors, which implied that the FDA would find it more credible." Order 15.

efficacy or safety, data from a single trial site undercuts the claim that the trial was "multicenter." Moreover, Klaerner did not even observe this purportedly "basic" dichotomy, as he repeatedly touted the efficacy results of TRCA-301E. *See* ¶¶ 114, 131.

Finally, Klaerner erroneously asserts there is a "disconnect" between the challenged statements and omitted information because "under Plaintiff's theory, the omission of details—no matter how far removed from the challenged statements—constitutes fraud." *See* MTD 11. As the Court found in its earlier decision, "Fiore plausibly alleges that Defendants' use of the term 'multicenter' was misleading because it 'would give a reasonable investor the impression of a state of affairs that differed in a material way from the one that actually existed" and rejected Defendants' argument that they "did not have a duty to go further and disclose the precise enrollment figures." Order 13-14.

### C.     The FDA Record Conclusively Demonstrates that Klaerner Made False and Misleading Statements About the Late-Cycle Meeting And the Court Need Not Revisit Its Prior Ruling

Klaerner made numerous false and misleading statements during the investor call on May 7, 2020 about Tricida's interactions with the FDA at the May 1, 2020 late-cycle meeting. As the Court already found, by disclosing "the fact that Defendants had discussed 'outstanding review issues' with the FDA at the May 2020 late-cycle meeting and shar[ing] one of those issues"—"the magnitude and durability of the treatment effect on the surrogate marker"—"Klaerner was obligated to share the other significant review issue—'the applicability of data from the TRCA-301 and TRCA-301E trials to the U.S. population—discussed with the FDA." Order 22.

Klaerner now erroneously argues he did not have to disclose that the applicability of data from TRCA-301/301E to the U.S. population was a significant review issue because Tricida responded to the FDA's concern that trial patients appeared to have BEN instead of CKD by stating "that the Bulgarian patients had the same clinical characteristics as U.S. patients and that it was highly unlikely that any meaningful number of them were suffering from BEN." MTD 13.

Regardless of whether Tricida responded to the data applicability concerns, it remained a significant review issue highlighted by the FDA and there is nothing to indicate that, at the time, the FDA accepted Klaerner's explanation. Tricida's response did not, therefore give "Tricida every

reason to believe it had adequately addressed the FDA's questions about the applicability of the Eastern European data to U.S. patients." MTD 13.

In the April 17, 2020 package sent before the late-cycle meeting, the FDA wrote that the "[a]pplicability of data from TRCA-301/301E to the U.S. population" remained a "substantive review issue."[7] ¶¶75-77. It did not cease to be a substantive review issue simply because Tricida attempted to address the FDA's concerns. So when Klaerner affirmatively disclosed the "good" news about the late-cycle meeting discussion—that Tricida "took the opportunity to address outstanding review issues," by "present[ing] our data and rationale" as to why Tricida believed the veverimer NDA "satisfied the requirements for initial approval under the Accelerated Approval Program including the magnitude and durability of the treatment effect on the surrogate marker serum bicarbonate," such that Tricida was "confident" the NDA satisfied accelerated approval— he was also obligated to reveal the "bad" news—that (1) the FDA was increasingly concerned about the applicability of the TRCA-301/301E trial data to U.S. patients and U.S. medical practice, and (2) Tricida's presentation concerning the magnitude and durability of treatment effect was prompted by the FDA questioning (a) whether the effect size seen in TRCA-301/301E should be considered reasonably likely to predict clincal benefit and (b) whether the VALOR-CKD trial, as designed, could verify the clinical benefit. ¶¶75-77, 161-62; *see* Order 23 ("[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.") (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016)). His failure to do so materially misrepresented the hurdles to FDA approval of veverimer.

Plus, in denying Tricida's appeal of the denial of the NDA, the FDA specifically cited as a basis for the denial that "the majority of sites for the TRCA-301/TRCA-301E trial" were in Eastern Europe, "where differences in patient management … might affect the treatment response to veverimer," rendering questionable "the applicability to a U.S. patient population." ¶33.

---

[7] And this is *despite Tricida's response* to these concerns during the mid-cycle meeting, where it was characterized as a "Significant Issue." *See* MTD Ex. 13, at FDACDER011706 ("The applicant stated that they believe the trial data are applicable to the U.S. patient population and the practice of medicine in the U.S…."); ¶73.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT KLAERNER'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
3:21-cv-00076-LHK

14

Klaerner also misled investors when he said that during the late-cycle meeting, "the FDA indicated it currently does not plan to hold an AdCom to discuss veverimer due in part to the logistical challenges posed by COVID-19."[8] The FDA expressly informed Tricida on January 24, 2020, well before the COVID-19 pandemic caused shutdowns in the United States, that "[g]iven the significant issues" with the TRCA-301/301E trials, it was "no longer obvious to us that an advisory committee meeting is needed." ¶¶25, 159. The FDA then conclusively told Tricida that there would be no AdCom meeting during a March 31, 2020 phone call and during the May 1, 2020 late-cycle meeting. ¶159. The late-cycle pre-meeting package and meeting minutes reiterate (and expand upon) the "significant issues" outlined on January 24, 2020; neither identifies COVID-19 as a reason for deciding not to hold an AdCom meeting. ¶¶72-77.

Klaerner offers a tortured and disingenuous explanation for why his statement was neither false nor misleading. He claims that because in January 2020 the FDA said it was "no longer obvious" that an AdComm meeting was necessary does not mean "the meeting will not take place." MTD at 12. He then argues that because the minutes from the May 1 meeting show that the FDA said it would definitively decide on an AdComm meeting after reviewing Tricida's responses to the issues raised by the FDA, an AdComm meeting was never fully off the table. *Id.*

Klaerner falsely told investors that an AdComm meeting would not occur because of COVID-19. In truth, an AdComm meeting was not scheduled because of the significant review issues concerning the NDA. It is the *reason* why there was no AdComm meeting— masking the significant review issues with the NDA—that is false, not that there would never be a meeting.

**D.      Klaerner Made False and Misleading Statements About the Trial Results of TRCA-301/301E and the Use of SBC as a Surrogate Endpoint**

Relying on the FDA documents, the SAC pleads that Klaerner made numerous false and misleading statements and omitted to disclose material facts about fundamental issues repeatedly raised by the FDA regarding TRCA-301/301E's efficacy endpoints and use of SBC as a surrogate. *See, e.g.*, ¶¶99, 100, 127, 156. For example, statements that "the TRCA-301 trial met both its

---

[8] The Court previously found that Plaintiff failed to plead facts supporting the suggestion that the FDA told Defendants it cancelled the AdCom meeting because of problems with the NDA. Order 21. The SAC now does so.

primary and secondary endpoints in a highly statistically significant manner," ¶¶94, 106, 121, 123, 125, 136, 144, 155, that Tricida had been "agreeing with FDA," ¶131, and "[b]ased on feedback from the FDA, we believe that the data from the TRCA-101, TRCA-301 and TRCA-301E trials will provide sufficient evidence of clinical safety and efficacy to support the submission and review of an NDA for TRC101 pursuant to the Accelerated Approval Program," ¶104, created a false and misleading impression of the Phase 3 trial's efficacy results and veverimer's prospects for accelerated approval.

At the time these statements were made, the FDA had repeatedly questioned whether the magnitude of the treatment effect on SBC that Tricida proposed to show in the TRCA-301 trial would provide sufficient confidence to support approval and the FDA had not been satisfied with Klaerner and Tricida's responses. As a result, "based on the FDA's feedback" at the relevant times, the data from TRCA-301/301E likely *would not* provide sufficient evidence of clinical safety and efficacy. *See, e.g.*, ¶¶47-49, 51, 53-58, 60-61, 63, 70, 72, 75, 78, 80. It was also misleading to represent that TRCA-301 had met its endpoints "in a highly statistically significant manner" when the FDA had already communicated that a "win" on the primary endpoint for TRCA-301 "*would not be sufficient to support an application for accelerated approval*." ¶¶12, 54 (emphasis added).

Unable to refute these allegations, Klaerner instead mischaracterizes the SAC as asserting that Klaerner knew, and failed to disclose, that the FDA would deny accelerated approval. *See* MTD 1, 14. This is simply not so. The SAC alleges that Klaerner was warned repeatedly by the FDA of core issues with Tricida's trial design and proposed use of SBC, thereby increasing the risk that the FDA would not grant approval to the NDA for veverimer.[9] In *Schueneman,* the Ninth Circuit found that touting trial results, while withholding the agency's underlying concerns with that trial, is actionable under §10(b): "[Plaintiff's] theory of fraud is that Defendants intentionally

---

[9] Klaerner also attempts to downplay the FDA's communications as mere "interim positions," and argues there was no obligation to recite the details of regulatory back-and-forth to investors. *See* MTD 1. That argument similarly misses the mark and avoids directly addressing the nature of Plaintiff's allegations. *See Homyk v. ChemoCentryx, Inc.*, No. 21-cv-03343-JST (N.D. Cal. Feb. 23, 2023) (slip op.), ECF No. 50, at 20 ("Because the omission of adverse facts, including concerns shared by FDA representatives during interim communications with ChemoCentryx, rendered certain of Defendants' statements misleading[,] Defendants had a duty to disclose those facts.").

withheld information material to the market's assessment of whether and when the FDA would likely approve lorcaserin.' It is the failure to disclose 'issues' and 'concerns' with the Rat Study and the FDA's interest in the outcome of those studies—not who was ultimately right about the underlying science—that matters." 840 F.3d at 709.[10]

Judge Tigar's recent opinion in *Homyk v. ChemoCentryx, Inc.*, is directly on point. There, as here, plaintiff alleged ChemoCentryx and its officers knowingly withheld that the FDA had expressed concerns about their clinical trial's design and results in private communications with the defendants. No. 21-cv-03343-JST (slip op.), at 2. ChemoCentryx similarly had no approved drugs on the market, generated no sales revenue, and relied on capital from investors to fund research and development, and the trial at issue was designed to provide evidence for FDA approval. *Id.* Faced with the same arguments Klaerner raises here, the court held that "[r]egardless of whether Defendants had any indication that the FDA's concerns would fully prevent the drug's approval ***those concerns at least increased the risk that the drug would not be approved***," which "could be important to a reasonable investor." *Id.* at 14 (emphasis added).

Klaerner concedes that the FDA expressed concerns about Tricida's use of surrogate endpoints beginning in 2015 and 2016. *See* MTD 14. His assertion, however, that those concerns were "obviously superseded" when Tricida chose to pursue accelerated approval, where "the surrogate endpoint must only be *reasonably likely* to predict clinical benefit" and a confirmatory study would be included, is specious. The FDA expressly informed Klaerner in a letter dated **July**

---

[10] *See also Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2021 WL 4864421, at *3 (N.D. Cal. Oct. 19, 2021) (holding that Bayer's "statements concerning its due diligence" in acquiring Monsanto "could have 'give[n] a reasonable investor the [false] impression'" that "Bayer had assessed Monsanto's litigation risks, and had reviewed non-public information to inform that review") (first alteration in original); *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1230 (N.D. Cal. 2009) ("[T]he SAC need not allege that defendants knew SONOMA–2 would fail; the SAC need merely allege that defendants misled investors by omitting to disclose a material risk that SONOMA–2 would fail"); *Amylin*, 2003 WL 21500525, at *5 ("Based on the facts alleged by Plaintiffs, the most plausible inference to be drawn is that Amylin knew that there may be a problem with the methodology used in conjunction with the Phase III trials but took the calculated risk of continuing the trials and application process as originally planned. There is nothing unlawful about taking a calculated risk. However, if, as Plaintiffs allege, Defendants misled Plaintiffs about such risk by making assurances regarding the completeness of the data and the likelihood of FDA approval, Defendants may be held liable.").

**24, 2017** that "[f]or purposes of *accelerated approval* you will need to demonstrate a treatment effect on SBC that is greater than or equal to [the] magnitude [of treatment effect that Tricida's postmarketing trial is powered to detect]. It is unclear how your proposed responder endpoint [a ▮▮▮▮ increase in SBC] fits in with this approach." ¶56 (emphasis added). And by letter dated November 20, 2017 the FDA provided the following responses to Tricida's questions about the clinical trials:

> "Question1" was "Does the FDA agree that the predictive models provided by Tricida describing the quantitative relationship between changes in serum bicarbonate and the renal endpoint proposed for the post-marketing Study TRCA-303 . . . are adequate to support powering of the TRCA-303 study?" The FDA responded: "No, we do not agree." Tricida's second question was: "Does the FDA agree that, with successful completion of Study TRCA-301, the size of the treatment effect of TRC101 on serum bicarbonate **will be sufficient to support accelerated approval of TRC101**?" The FDA responded: "**No. See our response to Question 1.**"

¶60 (emphasis added).

Nothing in the SAC or the supporting documents suggests that the FDA's concerns were superseded. To the contrary, the SAC clearly alleges that the FDA repeatedly cautioned Klaerner that the magnitude of the treatment effect on SBC would need to be sufficient to support accelerated approval and was never fully satisfied by Klaerner's various responses.[11] That the FDA did not reject Veverimer earlier in the application process is immaterial. As Klaerner recognizes, the FDA's function is to work with companies and provide feedback to help steer them toward approval if possible. MTD 1. Klaerner and Tricida were given many opportunities to address the FDA's concerns and repeatedly failed.[12]

---

[11] Defendant's references to the Tangri model similarly fail to address Plaintiff's allegations. *See* MTD 15. The Tangri model was intended to predict the change in SBC that would need to be shown in TRCA-301 to produce the anticipated treatment effect on the clinical endpoint in the VALOR-CKD postmarketing trial—it was supposed to link the surrogate effect in TRCA-301 to the clinical effect in VALOR-CKD. It (and the FDA's opinion of its usefulness for that purpose) had no bearing on the FDA's concerns that the magnitude of veverimer's treatment effect on SBC in TRCA-301/301E would simply be inadequate to show clinical benefit (an absolute and independent consideration).

[12] Moreover, the FDA ultimately confronted Klaerner and Tricida about their failures to directly address its concerns in February 2021, in the ADL. ¶¶91. In their requested appeal, Defendant and

Klaerner's argument that he disclosed the risk that "the FDA might not agree that the Phase 3 trial results reflected the magnitude or degree of statistical significance required," MTD 15, also misses the point and continues to mischaracterize the SAC. *See ChemoCentryx*, No. 21-cv-03343-JST (slip op.), at 19 ("Plaintiff plausibly alleges that, at the time the statements were made, the FDA had already shared feedback on trial design that indicated it disagreed with Defendants' position on how trial results could be interpreted, rendering Defendants' abstract warnings of future risk insufficient"). Nor does Plaintiff allege that Klaerner should have "told investors that these issues would not or could not be resolved[.]" MTD 16. As discussed above, the SAC alleges that the omitted information rendered certain statements about SBC and endpoints false and misleading. *See, e.g.*, ¶108. For example, stating the "FDA may not agree that we have achieved the primary endpoint in our pivotal Phase 3 clinical trial, TRCA-301, to the magnitude or to the degree of statistical significance required by the FDA[,]" ¶108, was misleading for failing to disclose that the FDA had already told Klaerner, by 2017, of its concerns that the magnitude of the treatment effect Tricida proposed to show would be insufficient and had repeatedly questioned the proposed use of SBC. ¶¶17-18, 99, 100, 108.

Klaerner further contends that his statements that he believes the TRCA-301/301E trials "will provide sufficient evidence of safety and efficacy to support the approval of our NDA," *e.g.*, ¶157, and "we feel good about what we've learned in the 301E study regarding safety and efficacy, increasing our confidence for a successful [post-marketing] trial," ¶114, are inactionable statements of opinion and corporate optimism. *See* MTD 17. Not so. An opinion is misleading by omission where (1) the statement omits material facts about the defendant's inquiry into or

Tricida attempted to contradict the FDA's prior finding that there was not adequate evidence of a treatment effect. In response, the FDA stated that Tricida's interpretation of the data "*misrepresents the concern expressed in the CR letter* – that the relatively small increase in SBC with TRC101 may not provide a discernable reduction in CKD progression" and that the FDA's position on the Phase 3 trial's design issues "*is entirely consistent with prior advice from the Division*." *Id.* The FDA explained, "[i]n earlier meetings you had with the Division [citing minutes from December 2016 and March 2017], the Division expressed skepticism that SBC was an acceptable surrogate for delay of CKD progression" and reiterated that the magnitude of the treatment effect was a "key issue[.]" *Id.* The FDA was clearly never "sufficiently satisfied" as Klaerner alleges; the agency continued to consistently express concern and caution.

knowledge concerning a statement of opinion, and (2) those facts conflict with what a reasonable investor would take from the statement itself. *In re Atossa Genetics, Inc. Sec. Litig.*, 868 F. 3d 784, 802 (9th Cir. 2017); *see Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pen. Fund*, 575 U.S. 175, 196 (2015) ("[T]he court must ask whether the alleged omission rendered [defendant's] opinions misleading … because the excluded fact shows that [defendant] lacked the basis for making those statements that a reasonable investor would expect.").

In *ChemoCentryx* Judge Tiger found opinion statements, which omitted material facts actionable and pled with scienter:

> A reasonable investor informed of Phase III trial results involving 'clinically meaningful primary and secondary endpoint[s]' would expect that the speaker had a factual basis for their belief that such results were relevant or meaningful. When told the benefit-risk or safety profile of the drug was favorable or stronger than another treatment such an investor would assume the trial design could support such analysis. In the context of a Phase III trial—which typically precedes the filing of an NDA—such an investor would expect the speaker's proposed interpretation of trial results had not already been undermined by the agency tasked with evaluating the NDA.

No. 21-cv-03343-JST (slip op.), at 24.

The same analysis holds true here. A reasonable investor would expect the FDA had not already undermined the basis for Klaerner's statements when he made them; yet the FDA had repeatedly questioned the viability of SBC as a surrogate, cautioned that the magnitude of the treatment effect was what mattered, said an average increase in SBC of ▮▮▮▮ould not suffice, and explicitly identified "significant issues" with the TRCA-301/301E trial data. ¶¶99-100, 157; *see In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) ("[E]ven 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly."). Moreover, these statements "convey concrete facts that Plaintiff alleges are materially misleading;" they are not inactionable corporate optimism. *See ChemoCentryx*, No. 21-cv-03343-JST (slip op.), at 27 (citing *In re BioMarin Pharms. Inc. Sec. Litig.*, 2022 WL 164299,

at *12 (N.D. Cal. Jan. 6, 2022)) (statements were not "empty opinions similar to puffery" where "they were undergirded by factual assertions")).

## IV.    The SAC Adequately Alleges Scienter

The Court previously found that Klaerner acted with scienter when, on the May 7, 2020 conference call with investors

> he only shared one issue discussed at that meeting—"the magnitude and durability of the treatment effect on the surrogate marker." He did not share the other issue that was discussed—the FDA's concerns with the applicability of Defendants' foreign clinical data to the U.S. population. Klaerner only said that Defendants were "looking at … the clinical benefit that the U.S. patients get."

Order 29. Finding these facts similar to those in *Schueneman*, 840 F. 3d at 702, the Court held,

> Defendants' failure to inform the market about the FDA's applicability concerns is plausibly alleged to be "an extreme departure from the standards of ordinary care … [that] present[ed] a danger of misleading buyers or sellers that [was] either known to [Defendants] or [was] so obvious that [Defendants] must have been aware of it." *Zucco*, 552 F.3d at 991."

Order 29-30.

This finding is equally applicable to each of the statements that Plaintiff alleges were false, misleading, and omitted material facts. The FDA documents establish that each time Klaerner spoke, he knowingly withheld material facts from investors. *See, e.g.*, ¶¶10-25, 47-78, 187-190.[13] The FDA documents demonstrate that Klaerner attended all relevant meetings with the FDA and thus knew the relevant and important information about Tricida's application for FDA approval of its only drug, veverimer. *See, e.g.*, ¶41. Klaerner knew of the FDA's concerns that (i) the vast majority of the TRCA-301/TRCA-301E trial sites and enrolled patients were in Eastern Europe, placing the applicability of the data to the U.S. population at issue, *e.g.*, ¶¶57, 69, 73, 75; (ii) the favorable effect seen in TRCA-301/TRCA-301E trial's results was entirely driven by one clinical site in Bulgaria, *e.g.*, ¶¶66, 75, 77; and (iii) that the magnitude of the treatment effect on blood bicarbonate seen in TRCA-301/301E would likely be insufficient to provide confidence that the treatment will have the anticipated clinical benefit, *e.g.*, ¶¶54, 60, 72, 75-77.

---

[13] Klaerner's argument about the lack of confidential witness allegations is merely an attempt to distract from his own direct communications with the FDA, which are more than enough to support a strong inference of scienter. *See* MTD 19.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT KLAERNER'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
3:21-cv-00076-LHK

21

In the initial public offering registration statement, Klaerner and Tricida represented to investors that "[b]*ased on feedback from the FDA,* we believe that the data from the TRCA-101, TRCA-301 and TRCA-301E trials will provide sufficient evidence of clinical safety and efficacy to support the submission and review of an NDA for TRC101 pursuant to the Accelerated Approval Program."[14] But Klaerner knew then that the FDA expressed concern with how Tricida was planning to measure the effectiveness of veverimer treating CKD by measuring SBC levels, and expressly informed Klaerner that it "did not agree" with Tricida on this. Thus, representing that "based on the FDA's feedback" the trials "will provide sufficient evidence of … efficacy" was contrary to the FDA's feedback, making the danger of misleading an investor so obvious that Klaerner must have been aware of it.[15] Once Klaerner touted the FDA's feedback, he was obligated to do so in a manner that was truthful, accurate, and did not "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." Order 8.[16]

Klaerner's scienter is also readily inferred from his misrepresenting why there was no AdComm meeting. In January 2020, before any COVID shutdowns, the FDA informed Klaerner that due to "significant issues" with the NDA there was no need to hold an AdComm meeting. The FDA reiterated this in April 2020, never mentioning COVID. Yet, Klaerner blamed COVID-19 and deliberately withheld the truth about why the meeting was cancelled.

---

[14] Although prefaced with the statement, "we believe," this is still an actionable misstatement—misrepresenting what the FDA's feedback was—and omitted material facts. *See supra* at 19-21.

[15] Defendant's own case, *In re GeoPharma, Inc. Sec. Litig.*, supports Plaintiff's allegations: "Recklessness is often shown when plaintiff 'specifically alleges **defendants' knowledge of facts or access to information contradicting their public statements**.'" 411 F. Supp. 2d 434, 442 (S.D.N.Y. 2006) (emphasis added). This is exactly what Plaintiff alleges here.

[16] Klaerner's cases to this point are also inapt. *See* MTD 19. *In re NVIDIA Corp. Sec. Litig.* is readily distinguishable. 2011 WL 4831192 (N.D. Cal. Oct. 12, 2011), *affd,* 768 F.3d 1046 (9th Cir. 2014). There, the court held that knowledge of a "material set problem" was insufficient without allegations defendants knew of the financial implications of that problem. *See id.* at *11. But the SAC clearly alleges Klaerner's participation in the FDA approval process and knowledge of the issues posing a concrete risk to veverimer's approval. The facts in *GeoPharma* are also inapposite, as that case centered on allegations that the defendants failed to disclose the precise nature of the FDA approval the company obtained, not an undisclosed increased risk repeatedly communicated by the FDA that put approval at risk. *See* 411 F. Supp. 2d at 446.

Plus, Tricida's 2019 Form 10-K, filed March 3, 2020 and signed by Klaerner, falsely stated, "We believe that the data from the TRCA-101, TRCA-301 and TRCA-301E clinical trials will provide sufficient clinical evidence of safety and efficacy to support the approval of our NDA for veverimer pursuant to the Accelerated Approval Program." ¶157. Klaerner made this statement *after* the FDA flagged the "Significant Issues," on January 24, 2020, of (1) the magnitude of the treatment effect on blood bicarbonate and the ability of TRCA-303 to confirm a treatment benefit and (2) the applicability of data from TRCA-301/301E to the U.S. Population. ¶¶72-73. The FDA told Tricida,[17] "the treatment effect on blood bicarbonate at weeks 12 and 52 was 2.64 mEq/L and 1.99 mEq/L, respectively. We question whether an effect of this size would be reasonably likely to predict benefit." ¶156. Again, Klaerner withheld adverse facts he knew put FDA approval at risk, and the danger of misleading an investor was so obvious that he must have been aware of it.

Klaerner's argument that he did not act with scienter regarding the May 7, 2020 conference call also lacks merit. Klaerner informed investors that what he discussed with the FDA was the "magnitude and durability of the treatment effect on the surrogate marker" and then "expressed confidence that our submission meets the standard for approval through the Accelerated Approval program," despite the FDA informing Klaerner that the results of Tricida's sole phase 3 trial were not "reasonably likely to predict benefit," questioning the "applicability of data" from that sole phase 3 trial to the U.S. population, and questioning the "ability of your post-marketing trial, as designed, to verify the clinical benefit." By touting the positive discussions with the FDA, Klaerner was obligated to discuss the negative so as not to mislead investors.[18] Order 29-30. Indeed, as the Court summarized,

> Defendants could have remained altogether silent about the review issues
> they discussed with the FDA. But they could not disclose only one review

---

[17] Not for the first time. *See* ¶¶47, 49, 51-52, 59-60, 99.

[18] The court in *ChemoCentryx* found a strong inference of scienter based on similar allegations: the CEO (1) was "personally aware of FDA's concerns regarding the trial's design and how it could be interpreted;" (2) "repeatedly discussed the trial's safety and efficacy results, in detail, with investors throughout the Class Period;" and (3) was "experienced in the field of drug development and understood the obvious risk that omission of adverse facts would mislead investors about the changes that [veverimer] would obtain FDA approval." No. 21-cv-03343-JST (slip op.), at 30-31.

issue discussed with the FDA and conclude that they were thus confident about their chances for approval, while omitting the other review issue they knew the FDA was concerned about…. Fiore's allegations viewed *in toto* create a 'strong inference' of scienter. *Zucco*, 552 F.3d at 992.

Order 30.

### A.    Taking the SAC's Allegations Holistically, Plaintiff Has Raised a Strong Inference of Scienter

Viewing the facts holistically, they raise a strong inference of Klaerner's scienter. Klaerner knew of the FDA's repeatedly expressed concerns about Tricida's NDA for veverimer, from its concerns about how to measure efficacy, to warning Tricida that it was not convinced measuring changes in SBC levels could support accelerated approval, to warning Klaerner against over relying on a patient population from Eastern Europe. Yet despite these direct and repeated warnings from the FDA, Klaerner told investors that based on the FDA's feedback, the data would support accelerated approval. This was a lie. Even after the FDA went through the NDA and told Klaerner and Tricida in January and April 2020 of "significant issues" with the trial and the data— overreliance on patients from Eastern Europe, the measurement of efficacy by changes in SBC (with which the FDA never agreed), trial results that did not even meet the magnitude of change in SBC Tricida claimed would establish efficacy—Klaerner continued to lie to investors. He also inexplicably lied in claiming that the AdComm meeting was put off because of COVID-19, which was blatantly false. In sum, Klaerner chose to only tout positive feedback from the FDA and withhold the negative feedback. This meets the deliberately reckless standard for scienter. *See In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 811 (C.D. Cal. 2011) ("When the FDA tells a company about the problems with a product, and the company nonetheless continues to make confident statements about the product, courts have inferred scienter and falsity.").

In contrast, Klaerner argues there is no strong inference of scienter because Klaerner "believed" Tricida was "on the path to approval." MTD 24.[19] While Klaerner may have believed in veverimer, and he may have believed he could overcome all the FDA's objections and concerns, he still knowingly misled investors. Indeed, the Ninth Circuit in *Schueneman* rejected a similar

---

[19] Similarly, that Tricida hired a sales staff and asked about labeling says nothing about Klaerner's misrepresentations.

argument: "the simple fact that Arena had an explanation for its views of the data does not mean investors would not want to know that Arena and the FDA were at odds." 840 F. 3d at 709. Plaintiff's "theory of fraud is that Defendants intentionally withheld information material to the market's assessment of whether and when the FDA would likely approve" veverimer. *Id.* The same is true here; Klaerner withheld information material to the market's assessment of possible FDA approval and was deliberately reckless in doing so.

Finally, Klaerner argues against a strawman—that it makes no sense that Tricida "went ahead with a drug development plan they believed would likely fail"—in disputing scienter. MTD 25. This is not what Plaintiff alleges.[20] Klaerner and Tricida may well have believed they would convince the FDA to approve veverimer to treat CKD. What they could not do, however, was misrepresent the FDA's feedback to the market, lowering the perceived risk that the FDA would reject the NDA. *See ChemoCentryx*, No. 21-cv-03343-JST (slip op.), at 33 ("Plaintiffs' theory is not that Defendants knew that the FDA would withhold approval, but rather that Defendants knew of and concealed adverse facts regarding trial results from investors in order to buy time and finance the company's operations while trying to alter the potential effect of those adverse facts on the NDA process. This motive is plausible."); *Sheet Metal Workers*, 2021 WL 4864421, at *5 ("The Complaint alleges more than that the Monsanto deal was bad in hindsight; it alleges that the Defendants advanced in pursuit of the merger despite being aware that acquiring Monsanto brought significant risks, all the while assuring investors they had fully assessed those risks.").

Plaintiff's allegations that Klaerner knew or was deliberately reckless in misrepresenting the FDA's actual feedback about the veverimer NDA is far more compelling.

---

[20] Defendant's cases for this point are also inapposite. *See* MTD 24. In *Endologix*, the plaintiffs based allegations of knowledge solely on the defendants' prior experience (not communications with the FDA), and argued that as a result, "defendants knew the FDA would not approve Nellix[.]" *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). The plaintiffs in *QRX Pharma* alleged, **without support**, that the defendants "knew for years, long even before the CRL, that MoxDuo would face a heightened proof hurdle (in the form of a Superiority Requirement) which it could not clear." *See Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600 (S.D.N.Y. 2016). In contrast, the SAC explains how Klaerner knew of the heightened risks to veverimer's approval through his repeated communications with the FDA.

**CONCLUSION**

For all these reasons, Defendant's Motion to Dismiss should be denied. If, however, the Court finds Plaintiff's allegations to be insufficient to state a claim for relief, Plaintiff respectfully requests leave to amend his allegations to cure any identified deficiencies.

DATED: March 23, 2023                    Respectfully submitted,

                                   /s/ Jeffrey C. Block
                                   Jeffrey C. Block (*pro hac vice*)
                                   Michael D. Gaines (*pro hac vice*)
                                   **BLOCK & LEVITON LLP**
                                   260 Franklin Street, Suite 1860
                                   Boston, MA 02110
                                   (617) 398-5600 phone
                                   jeff@blockleviton.com
                                   michael@blockleviton.com

                                   Jacob A. Walker (SBN 271217)
                                   **BLOCK & LEVITON LLP**
                                   400 Concar Drive
                                   San Mateo, CA 94402
                                   (650) 781-0025 phone
                                   jake@blockleviton.com