Sara B. Brody (SBN 130222)
sbrody@sidley.com
Sarah A. Hemmendinger (SBN 298659)
shemmendinger@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: 415 772 1279

Matthew J. Dolan (SBN 291150)
mdolan@sidley.com
SIDLEY AUSTIN LLP
1001 Page Mill Road, Building 1
Palo Alto, CA 94304
Telephone: 650 565 7106

Robin E. Wechkin (admitted *pro hac vice*)
rwechkin@sidley.com
SIDLEY AUSTIN LLP
8426 316th Place Southeast
Issaquah, WA 98027
Telephone: 415 439 1799

*Attorneys for Defendant
Gerrit Klaerner*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL PARDI, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> TRICIDA, INC., and GERRIT KLAERNER, <br><br> Defendants. | Case No.  4:21-cv-00076-HSG <br><br> <u>CLASS ACTION</u> <br><br> **DEFENDANT GERRIT KLAERNER'S NOTICE OF MOTION AND MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** <br><br> Assigned to: Hon. Haywood S. Gilliam, Jr. <br><br> Date: June 1, 2023 <br> Time: 2:00 p.m. <br> Courtroom 2, 4th Floor |

## NOTICE OF MOTION AND MOTION

### TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

Please take notice that on June 1, 2023, at 2:00 p.m., defendant Gerrit Klaerner (Defendant) brings for hearing this motion to dismiss, before the Honorable Judge Haywood S. Gilliam, Jr., Oakland Courthouse, Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, CA 94612.  Defendant moves to dismiss the Second Amended Complaint.  The Court previously granted a motion to dismiss the predecessor First Amended Complaint as to all but one purportedly false or misleading statement.

As set forth in the attached memorandum, the Court should dismiss this action in its entirety under Rule 12(b)(6) because Lead Plaintiff Jeffrey M. Fiore (Plaintiff) has failed to state a claim on which relief may be granted.  Plaintiff asserts a claim against Defendant under Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78j(b).  In the prior complaint, Plaintiff asserted that claim against both Dr. Klaerner and Tricida, Inc., of which Klaerner is the Chief Executive Officer.  On January 11, 2023, Tricida filed a voluntary petition for reorganization under Chapter 11 of the bankruptcy code in the United States Bankruptcy Court for the District of Delaware.  Pursuant to Section 362 of the Bankruptcy Code, this matter was automatically stayed as to Tricida.  On January 24, 2023, Plaintiff filed a motion under Federal Rule of Civil Procedure 41(a)(2) to dismiss Tricida from this case (Dkt. 125), which remains pending.  This motion is accordingly filed only by Klaerner.

Plaintiff fails to plead a Section 10(b) claim with the particularity required by the Private Securities Litigation Reform Act (PSLRA).  Specifically, Plaintiff has (1) failed to plead with particularity that Defendant made any materially false or misleading statement; and (2) failed to establish a strong inference of intentional fraud.  Plaintiff also asserts a control person claim against Defendant under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t.  This claim fails because Plaintiff has not established a primary violation under Section 10(b).

This motion is based on the attached memorandum, the Request for Judicial Notice, the Declaration of Sarah Hemmendinger and all attached exhibits, and such argument as may be presented before or after the hearing on this matter.

i

## TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................1

II.  BACKGROUND .................................................................................................2

III. DISCUSSION .....................................................................................................6

    A.   Plaintiff Fails To Plead Facts Showing That Any Challenged Statement Was Materially False Or Misleading When Made. ................................6

        1.   Plaintiff Fails To Plead Facts Showing That References To Trials Conducted In "Europe" Were Materially False Or Misleading..................6

        2.   Plaintiff Fails To Plead Facts Showing That Tricida's Risk Disclosures About Foreign Trial Sites Were Materially False Or Misleading.................................................................................................8

        3.   Plaintiff Fails To Plead Facts Showing That Tricida's References To "Multicenter" Phase 3 Trials Were Materially False Or Misleading.................................................................................................9

        4.   Plaintiff Fails To Plead Facts Showing That Klaerner's Statements On The May 7, 2020 Earnings Call Were Materially False Or Misleading................................................................................................11

        5.   Plaintiff Fails To Plead Facts Showing That Tricida's References To Trial Design And Endpoints Were Materially False Or Misleading................................................................................................14

    B.   Plaintiff Fails To Plead Facts Creating A Strong Inference Of Intentional Fraud. ........................................................................................17

        1.   Overview...................................................................................................17

        2.   Plaintiff Fails To Plead Scienter As To Statements Regarding the TRCA-301/301E Trial Site Locations and the Multicenter Nature of the Trial................................................................................................20

        3.   Plaintiff Fails To Plead Scienter As To Statements On Tricida's May 7, 2020 Earnings Call. ......................................................................22

        4.   Plaintiff Fails To Plead Scienter As To Statements Regarding The Surrogate Endpoint. .................................................................................23

        5.   Plaintiff's Scienter Allegations Fail When Considered Holistically. ........24

IV.  CONCLUSION...................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Decisions**

*In re Arrowhead Pharms, Inc. Sec. Litig.*,
2017 WL 5635422 (C.D. Cal. Sept. 20, 2017) ...............................................................................25

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ...............................................................................11

*Carr v. Zosano Pharma Corp.*,
2021 WL 3913509 (N.D. Cal. Sept. 1, 2021) ...............................................................................19

*City of Dearborn Heights v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ...............................................................................25

*Colyer v. AcelRx Pharms, Inc.*,
2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) ...............................................................................19

*Corban v. Sarepta Therapeutics, Inc.*,
868 F.3d 31 (1st Cir. 2017)...............................................................................7

*In re Dynavax Sec. Litig.*,
2018 WL 2554472 (N.D. Cal. June 4, 2018) ...............................................................................19

*In re GeoPharma, Inc., Sec. Litig.*,
411 F. Supp. 2d 434 (S.D.N.Y. 2006)...............................................................................19

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016)...............................................................................24, 25

*Immanuel Lake v. Zogenix, Inc.*,
2020 WL 3820424 (N.D. Cal. Jan. 27, 2020) ...............................................................................9, 25

*Jasin v. Vivus, Inc.*,
2016 WL 1570164 (N.D. Cal. Apr. 19, 2016), *aff'd* 721 F. App'x 665
(9th Cir. 2018)...............................................................................13, 21

*Kader v. Sarepta Therapeutics, Inc.*,
887 F.3d 48 (1st Cir. 2018)...............................................................................21

*In re Kalobios Pharms, Inc. Sec. Litig.*,
258 F. Supp. 3d 999 (N.D. Cal. 2017) ...............................................................................8

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ...............................................................................24

iii

*In re NVIDIA Corp. Sec. Litig.*,
  2011 WL 4831192 (N.D. Cal. Oct. 12, 2011), *aff'd*, 768 F.3d 1046 (9th Cir. 2014)........18, 19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)................................................................................................14, 17

*Padnes v. Scios Nova, Inc.*,
  1996 WL 539711 (N.D. Cal. Sept. 18, 1996) ...........................................................8

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ...............................................................................17

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ................................................................6, 10, 20, 21

*Rubin v. Trimble*,
  1997 WL 227956 (N.D. Cal. Apr. 28, 1997) ...........................................................8

*Rubke v. Cap. Bancorp Ltd.*,
  551 F.3d 1156 (9th Cir. 2009) .........................................................................16, 17

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015).................................................................13, 23

*Sneed v. AcelRx Pharms., Inc.*,
  2022 WL 4544721 (N.D. Cal. Sept. 28, 2022) ......................................................11

*In re Sona Nanotech, Inc. Sec. Litig.*,
  562 F. Supp. 3d 715 (C.D. Cal. 2021) ...................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)......................................................................................6, 17, 22

*Vallabhaneni v. Endocyte, Inc.*,
  2016 WL 51260 (S.D. Ind. Jan 4. 2016) .................................................................7

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019) ...................................................................11

**Statutes**

15 U.S.C. § 78j(b) (Section 10(b) of the Securities Exchange Act of 1934)......................... *passim*

15 U.S.C. § 78t (Section 20(a) of the Securities Exchange Act of 1934)....................................25

15 U.S.C. § 78u-4(b) *et seq.* (Private Securities Litigation Reform Act)..............................2, 6, 9

15 U.S.C. § 78u-4(b)(2)(A)...........................................................................................17

## I.   INTRODUCTION

On July 29, 2022, the Court granted the defendants' motion to dismiss as to all but one of the statements Plaintiff attacked in his prior complaint.  Plaintiff failed to plead that one group of challenged statements was materially false or misleading, and failed to allege particularized facts supporting the required strong inference of scienter as to another group.  The only challenged statement that survived the Court's July 2022 order was Defendant's May 7, 2020 oral account of issues discussed at a May 1, 2020 meeting with the FDA, which was then in the midst of reviewing the New Drug Application (NDA) for Tricida's kidney disease drug veverimer.

Plaintiff now seeks a do-over.  By means of his amended complaint, he asks the Court to change course on all but a handful of the statements it previously dismissed.  Plaintiff also challenges a multitude of new statements.  Plaintiff's amendments are based on communications he obtained by serving a subpoena on the FDA.  Plaintiff copies fragments of those documents into his complaint and posits that Klaerner committed fraud because he did not quote or paraphrase those fragments in his statements to investors.

Plaintiff's claims fail on multiple levels.  The FDA documents now before the Court fatally undermine Plaintiff's theory that Klaerner knew that the open items between Tricida and the agency would or were likely to lead to an unfavorable outcome in the review process.  This dooms Plaintiff's attack on all challenged statements, including the one statement that survived the prior motion to dismiss.  The documents reflect a five-year dialogue in which Tricida responded to the FDA's question as they arose—and at every step, the FDA was sufficiently satisfied with Tricida's answers that it agreed the company should proceed to the next stage.  Raising issues with a drug sponsor is the FDA's *function*, as is determining whether the sponsor's answers support continued development and review.  Until the FDA makes a final determination, its communications are interim positions, and sponsors have no obligation to recite the details of regulatory back-and-forth to investors.  The FDA first told Tricida in July 2020 that its concerns had reached a level of seriousness sufficient to put approval in jeopardy, and Tricida promptly disclosed that to investors.  The purported omission of previous interim comments is not fraud.

Plaintiff seeks to address this with the contention that in the absence of the omitted

1

information, Klaerner's affirmative statements were materially false or misleading. But that theory is viable only if the purportedly undisclosed information is closely tied to the challenged statements and plainly contradicts them; otherwise, the omission of that information cannot make the statements misleading. Plaintiff cannot plead that necessary connection here. The mismatch between challenged statements and the alleged omissions is well illustrated by Plaintiff's attack on Tricida's report that 196 of 208 patients had progressed to the safety extension stage of a Phase 3 clinical trial. Plaintiff claims that this numerical statement was misleading because Tricida did not also report each patient's *location*. A purported omission so far afield from the challenged statement does not, as a matter of law, make that statement misleading. But Plaintiff relies again and again on this kind of obvious mismatch.

These issues—the mismatch between statement and omission, the fluid and iterative nature of the FDA review process—doom Plaintiff's efforts to allege falsity with the particularly required by the PSLRA. Plaintiff's claims also fail on scienter grounds. The Court previously rejected Plaintiff's allegations concerning stock sales, the motivation to raise money, and core operations; Plaintiff has not cured or even changed those allegations. Plaintiff's principal scienter contention is that Klaerner knew what was in the FDA documents. But that does not begin to support a strong inference that he deliberately deceived investors by making the challenged statements without quoting the fragments Plaintiff lifts from those documents. To the contrary, Plaintiff's allegations support the inference that Klaerner and Tricida strove in earnest to bring veverimer to market and believed they were on the path to success at the time of the challenged statements. That time includes, critically, May 7, 2020, the date of the single statement that survived the previous motion to dismiss. The FDA documents show that on May 1, 2020, when the FDA raised concerns about the applicability of data from Eastern European patients to the U.S. population, Tricida had ready responses and no reason to believe that the FDA was not persuaded by its answers. The Court should dismiss the complaint, with prejudice.

## II.    BACKGROUND

*Veverimer.* Tricida developed veverimer as a treatment for metabolic acidosis, which is commonly caused by chronic kidney disease (CKD), and leads to the progression of CKD to end-

2

stage renal disease. Metabolic acidosis is a chronic and serious disease in which a patient's kidneys can no longer excrete the necessary amount of acid, causing it to build up in the patient's body. Ex. 1 at 2.[1]   Veverimer is an oral polymeric drug that selectively binds to acid in the GI tract. *Id.*

In developing veverimer, Klaerner brought to bear his extensive experience with the discovery and development of therapeutics, including polymers. *Id.* at 5. Before founding Tricida, Klaerner founded two other biotech companies—Ilypsa and Relypsa. *Id.* At Ilypsa, Klaerner and his team developed bixalomer, which is approved in Japan for treating hyperphosphatemia (high serum phosphate) in CKD patients. Klaerner next founded Relypsa, where he and his team discovered and developed patiromer, which received FDA approval for treatment of hyperkalemia (high serum potassium), a condition often found in CKD patients. *Id.* The pivotal Phase 3 trial for patiromer had majority enrollment in Eastern Europe:  64% of patients in Georgia, Ukraine and Serbia, 27% in the European Union (including Hungary and Croatia), and 9% in the U.S. Ex. 17 at 11. In approving patiromer, the FDA did not convene an Advisory Committee. *Id.* at 17.

When it conducted its IPO in July 2018, Tricida had completed successful Phase 1/2 and Phase 3 trials for veverimer. *Id.* at 3-4. The pivotal Phase 3 trial, TRCA-301, ran from September 2017 through May 2018. The patients enrolled in TRCA-301 suffered from low blood bicarbonate levels:  between 12 and 20 mEq/L, while a normal level is 22 to 29 mEq/L. *Id.*[2]   The primary endpoint of TRCA-301 was an increase in blood bicarbonate level of 4 mEq/L or achievement of a blood bicarbonate level in the normal range of 22 to 29 mEq/L at the end of the 12-week treatment period. *Id.* The trial met the primary endpoint and also met its secondary endpoint, which compared the mean increase from baseline to Week 12 in blood bicarbonate levels between the veverimer and placebo groups. *Id.* At the time of the IPO, Tricida was conducting a related Phase 3 trial, TRCA-301E, an extension of TRCA-301 that tested the safety and durability of effect of veverimer over 52 weeks. *Id.* at 115. In March 2019, Tricida reported the results of the extension trial:  TRCA-301E

---

[1] "Ex. _" citations refer to the exhibits to the concurrently-filed Declaration of Sarah Hemmendinger. These exhibits are properly before the Court for the reasons set forth in Defendants' Request for Judicial Notice. "¶ _" citations refer to the Second Amended Complaint, Dkt. 115.

[2] The unit "mEq/L" stands for milliequivalents per liter. An "equivalent" is the amount of a substance that reacts with one mole of another substance.

3

met its primary endpoint as well as all secondary endpoints.  Ex. 2 at 13.  The results of TRCA-301 and 301E were published in *The Lancet* in March 2019 and June 2019, respectively.  On November 14, 2019, Tricida announced that the FDA had accepted its NDA for review.  Ex. 4.

*FDA's Accelerated Approval Program*.  Tricida discussed the Phase 3 trials within the context of the regulatory approval pathway it had chosen to pursue, the FDA's Accelerated Approval Program.  This program allows drugs for "serious conditions that address an unmet medical need to be approved based on a surrogate endpoint that is reasonably likely to predict clinical benefit."  Ex. 1 at 114.  Tricida explained how a surrogate endpoint functions in the Accelerated Approval Program:

> Surrogate endpoints are used instead of clinical outcomes in some clinical trials. Surrogate endpoints are used when the clinical outcomes might take a very long time to study, or in cases where the clinical benefit of improving the surrogate endpoint, such as controlling blood pressure, is well understood. Clinical trials are needed to show that surrogate endpoints can be relied upon to predict, or correlate with, clinical benefit. Surrogate endpoints that have undergone this testing are called validated surrogate endpoints and those are accepted by the FDA as evidence of benefit.

> Surrogate endpoints that FDA determines are reasonably likely to predict clinical benefit may be used to support approval, in some cases, but are not yet validated. This is accomplished under FDA's Accelerated Approval Program, which is intended to provide patients with serious diseases more rapid access to promising therapies. Because such surrogate endpoints have not been validated, sponsors relying on them are generally required to verify the predicted clinical benefit of their products with confirmatory postmarketing clinical trials.

*Id.*  Tricida's confirmatory trial, VALOR-CKD, was designed to "demonstrate that [veverimer] provides a clinical benefit (i.e., improves how the patient feels, functions, or survives) in addition to increasing blood bicarbonate levels . . ."  Ex. 2 at 17-18.

Throughout the purported class period (which runs from June 28, 2018 to February 25, 2021), Tricida provided detailed warnings about the risks associated with its business, including the use of a surrogate endpoint.  Tricida explained (among other things) that:

> We conducted the TRCA-301 trial and are conducting the TRCA-301E trial with majority enrollment outside the United States. . . . *The FDA may not accept such foreign clinical data . . .*

> Because we are developing a product candidate for the treatment of a disease or condition on the basis of an *unvalidated surrogate endpoint there are increased risks that the FDA . . .* may find that our clinical program provides insufficient evidence of clinical benefit, *may have difficulty analyzing and interpreting the results of our clinical program, and may delay or refuse to approve* [veverimer].

> Key issues with our endpoint include *uncertainty about the degree of change from baseline blood bicarbonate that will translate into improved clinical outcomes*, the

4

population in which such change is expected to translate into improved clinical outcomes, and the need for data supporting a causal relationship between blood bicarbonate concentration and clinical outcomes. As a result, we cannot be certain that FDA will ultimately conclude that the design and results of our pivotal Phase 3 clinical trial, TRCA-301, which uses changes from baseline in blood bicarbonate level as the primary endpoint, will be sufficient for approval of TRC101. Moreover, even if the FDA does find that changes from baseline in blood bicarbonate are sufficiently likely to predict clinical benefit for patients, *the FDA may not agree that we have achieved the primary endpoint in our pivotal Phase 3 clinical trial, TRCA-301, to the magnitude or to the degree of statistical significance required by the FDA*.

Ex. 1 at 40-41 (emphases added).

**July 2020 Letter and Subsequent Events.** On July 15, 2020, Tricida announced that on the previous day, it had received a letter from the FDA identifying "deficiencies" that precluded discussion of the remaining steps in the NDA review process. On August 21, 2020, the FDA issued a Complete Response Letter (CRL), which Tricida disclosed to investors the next business day.

In late October 2022 (20 months after the end of the purported class period), Tricida announced top-line results from its VALOR-CKD renal outcomes trial. Ex. 7. VALOR-CKD did not meet its primary endpoint. *Id.* And while VALOR-CKD "reinforced veverimer's excellent safety profile, the inability to demonstrate the required efficacy in slowing CKD progression during the VALOR-CKD trial effectively eliminated Tricida's ability to obtain additional funding, limiting go-forward operations and Tricida's ability to run additional trials." Ex. 27 at 3-4.

**Plaintiff's First Amended Complaint and the Court's July 29, 2022 Order.** In its June 1, 2021 First Amended Complaint, Plaintiff challenged six categories of statements: (1) references to clinical trials conducted in "Europe"; (2) risk disclosures regarding foreign trial sites; (3) references to the Phase 3 trials' "multicenter" nature; (4) statements on a June 12, 2019 investor call regarding the Accelerated Approval Program; (5) statements regarding the design of VALOR-CKD; and (6) statements on a May 7, 2020 earnings call. The Court rejected Plaintiff's challenge to statements in the first three categories on scienter grounds and statements in the fourth, fifth and part of the sixth categories on falsity grounds. Dkt. 93 (Order) at 15-21. The Court allowed Plaintiff to proceed as to one challenged statement in the sixth category: Klaerner's May 7, 2020 description of its May 1, 2020 late-cycle meeting with the FDA. *Id.* at 29.

**Plaintiff's Second Amended Complaint.** With the case reduced to a single challenged

statement about a single 2020 FDA meeting, discovery commenced.  In response to a subpoena from Plaintiff, the FDA produced several thousand pages of documents reflecting its communications with Tricida beginning in 2015.  Plaintiff has now amended his complaint to incorporate selected portions of those documents in an effort to resuscitate his challenge to statements in the first three categories listed above, as well as to attack previously unchallenged statements.

## III.  DISCUSSION

Under the PSLRA, Section 10(b) plaintiffs must "state with particularity both the facts constituting the alleged violation and the facts evidencing scienter."  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876-77 (9th Cir. 2012) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)).  To adequately allege falsity, plaintiffs must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  To plead scienter, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  A court should deny a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  Plaintiffs must thus "plead with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent—inference."  *Id.* at 323.

**A.   Plaintiff Fails To Plead Facts Showing That Any Challenged Statement Was Materially False Or Misleading When Made.**

**1.   Plaintiff Fails To Plead Facts Showing That References To Trials Conducted In "Europe" Were Materially False Or Misleading.**

In its July 2022 Order, the Court held that Plaintiff had adequately alleged that Tricida's references to trials in "Europe" were misleading (but then dismissed as to these statements on scienter grounds).  Order at 8-9.  The Court credited Plaintiff's allegation that aspects of CKD "differ significantly" between Eastern and Western European patient populations.  *Id.*  Plaintiff now attempts to bolster his claim with excerpts from FDA communications.  But rather than supporting the claim, those documents undermine the allegations the Court previously found sufficient.

The documents reflect the iterative nature of the drug development and NDA review processes.  Specifically, they show that over several cycles, the FDA raised questions about Eastern

6

European trial participants—and Tricida answered them. On July 24, 2017, the FDA sent preliminary meeting comments to Tricida, including a standard provision cautioning "[i]n general" against enrolling subjects at sites "where the standard of care may be dissimilar to the standard of care in the U.S. because the resulting data may not be applicable to the U.S. population . . ." ¶ 15. Plaintiff alleges that Tricida failed to address the FDA's concerns, but the very document Plaintiff cites shows that Tricida met those concerns head-on, telling the FDA that it had "selected sites with [a] similar standard of care to the U.S." Ex. 9 attachment at 20.

Plaintiff's documents also show that near the end of the review process, the FDA raised a different concern about Eastern Europe, suggesting for the first time in April 2020 that patients there could be suffering from a regional kidney disease condition called Balkan endemic nephropathy (BEN). Tricida addressed that concern too, telling the FDA in May 2020, based on a review of data from the patients in question, that it was "unlikely that any substantive number of patients had BEN." Ex. 14 at 3. Notably, Plaintiff does not allege that the FDA mentioned BEN again—either in the CRL or in a subsequent Appeal Denied Letter—which indicates that Tricida had adequately addressed the issue at the May 1, 2020 late-cycle meeting. ¶¶ 83-84; 91-92.

Tricida had no obligation to disclose these interim communications, particularly as the record shows that at each stage, Tricida had reason to believe it had fully addressed the FDA's concerns. Courts have repeatedly held that a company does not mislead its investors by failing to disclose the contents of interim communications with FDA staff, recognizing that until the agency makes a final determination, the review process is in flux. *See e.g.*, *Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31, 40 (1st Cir. 2017) (defendants "had no legal obligation to loop the public into each detail of every communication with the FDA"); *Vallabhaneni v. Endocyte, Inc.*, 2016 WL 51260, at *12 (S.D. Ind. Jan 4. 2016) ("numerous courts have concluded that a defendant pharmaceutical company does not have a duty to reveal interim FDA criticism regarding study design or methodology").[3]

Plaintiff's omission claim fails for another reason as well. Tricida did not conceal but

---

[3] Plaintiff also alleges that the FDA told Tricida that it was "important to ensure adequate enrollment of subjects at sites in the U.S." ¶ 97. That does not show that Tricida misled investors by stating that its Phase 3 trials took place "in the United States and Europe," particularly in light of Tricida's explicit disclosure that the trials had "majority enrollment outside the United States." ¶ 103.

7

*disclosed* the allegedly omitted fact that the majority of the trial participants were enrolled in Eastern Europe. Dkt. 76 at 8-10; Dkt. 80 at 2-5; Order at 9. In ruling on the prior motion to dismiss, the Court characterized this as a "truth-on-the-market" defense—although the defendants had not then invoked the truth-on-the-market doctrine. Klaerner invokes it now. A Section 10(b) claim fails on the pleadings where the defendant shows that the "information withheld or misrepresented was transmitted to the public with a degree of intensity and credibility to effectively counterbalance the misleading impressions." Order at 10 (citations omitted). That is exactly the case here: multiple sources with unquestioned credibility stated publicly that the majority of the sites were in Eastern Europe. Specifically, two publications in a leading medical journal, *The Lancet*, listed the locations of the sites. Exs. 18-21. A government website, clinicaltrials.gov, also listed the locations. Exs. 23-26. Tricida referred investors to *The Lancet* publications in SEC filings and on investor calls. Ex. 2 at 3; Ex. 3 at 4; Ex. 5 at 23; Ex. 15 at 6.

Such disclosures defeat Section 10(b) claims as a matter of law. *E.g.*, *Rubin v. Trimble*, 1997 WL 227956, at *7 (N.D. Cal. Apr. 28, 1997) ("a truth-on-the-market defense can be granted on a motion to dismiss where the company's SEC filings disclose the very information necessary to make their public statements not misleading"); *Padnes v. Scios Nova, Inc.*, 1996 WL 539711, at *7 (N.D. Cal. Sept. 18, 1996) (dismissing based on the truth-on-the-market doctrine where allegedly concealed information was published in a medical journal and read by analysts). Here, the disclosure of Eastern European trial sites by multiple highly credible and authoritative sources had sufficient "intensity and credibility" to correct any misimpression investors may have formed from the term "Europe." *E.g.*, *In re Kalobios Pharms, Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1007-08 (N.D. Cal. 2017) (dismissing under truth-on-the-market doctrine based on credible and widely-circulated news articles).

**2.      Plaintiff Fails To Plead Facts Showing That Tricida's Risk Disclosures About Foreign Trial Sites Were Materially False Or Misleading.**

Plaintiff also challenges the very risk disclosures in which Tricida warned investors that its trials had "majority enrollment outside the United States" and that the "FDA may not accept such foreign clinical data." *E.g.* ¶¶ 101-03. The Court previously held that Plaintiff plausibly pled that

8

Tricida's statements "allegedly obscured a known and concrete risk" posed by the "heavy reliance on Eastern European clinical data" (but again dismissed on scienter grounds). Order at 11-13.

Plaintiff's challenge to these risk disclosures fails for the same reasons his challenge to the term "Europe" fails. The FDA documents Plaintiff now cites belie the contention that a "known and concrete risk" existed at the time of the challenged statements. The documents show, again, that Tricida had ready responses to the questions the FDA raised about the applicability of Eastern European trial data, and no reason to believe that use of those data jeopardized approval.

### 3. Plaintiff Fails To Plead Facts Showing That Tricida's References To "Multicenter" Phase 3 Trials Were Materially False Or Misleading.

The Court previously held that Plaintiff had plausibly alleged that Tricida's references to "multicenter" Phase 3 trials were misleading because a single site in Bulgaria purportedly had a disproportionate impact on certain trial results. Order at 13. Here too, Plaintiff's new allegations undermine his falsity case.

Plaintiff cites a statement from a package sent to Tricida in preparation for the May 1, 2020 late-cycle meeting, in which the FDA noted that "the treatment effect at Week 52 was driven entirely by a single site in Bulgaria (Site 11)." ¶ 75. Plaintiff leaves out what happened at the meeting itself: Tricida *addressed* this concern by explaining that the characteristics of patients in Bulgaria "fall well within the range of those of the subjects" from all other sites, and "within the range of US patients with CKD." Ex 14 at 3. The meeting minutes show that the FDA gave Tricida no reason to believe this response was unsatisfactory. At the end of the meeting, the FDA "noted that the information was still under review and a final decision had not been made regarding the application." *Id.* at 4.[4]

Stepping back, Plaintiff's allegations depend on ignoring the basic structure of TRCA-301 and TRCA-301E. The TRCA-301 study was designed to study efficacy, which was examined after 12 weeks of treatment. The primary objective of the extension study, TRCA-301E, was to establish

---

[4] The fact that the FDA returned to the issue of the Bulgarian site when it later issued its CRL does not change that: fraud cannot be alleged by hindsight. *E.g. Immanuel Lake v. Zogenix, Inc.*, 2020 WL 3820424, at *8-9 (N.D. Cal. Jan. 27, 2020) (dismissing claim that company failed to tell investors that its NDA omitted toxicity studies that led to FDA rejection; this is "the very sort of fraud-by-hindsight reasoning that the PSLRA was enacted to avoid").

9

the long-term safety of veverimer.  Ex. 1 at 4.  In addition to the primary safety endpoint, the 301E extension study had four secondary endpoints to asses durability of effect, which were examined at Week 52.  Ex. 28 at 20. The FDA's single site concern relates to two secondary endpoints at Week 52, not the primary analysis of efficacy from the 301 study.  *Id.* at 20-21.  Plaintiff makes no allegation that Defendant had reason to expect that the FDA's statistical analysis would hinge upon removing the Bulgarian site at Week 52 from the safety extension study.  And critically, Plaintiff alleges nothing suggesting that the FDA believed that the data from this site were obtained through any impropriety in clinical practice or data collection and analysis.

But even if the FDA's inquiry into the Bulgarian site should have signaled to Tricida in May 2020 that approval was in jeopardy, Plaintiff would not have pled fraud.  Plaintiff must identify a false or misleading statement.  The statement—or rather word—Plaintiff seeks to connect to the purportedly omitted information about the Bulgarian site is "multicenter."  Plaintiff's theory is that Tricida could not use that word without committing fraud unless it also stated that the FDA had noted that excluding results from one site would significantly impact one of the secondary endpoints. The complete disconnect between the challenged statement and the purportedly omitted information dooms Plaintiff's attack on "multicenter" as well as on other statements far removed from the alleged omissions.

In analyzing this issue, it is useful to bear in mind basic features of a Section 10(b) claim. Omissions are not actionable in the abstract.  A company is not required to disclose information unless its omission "ma[kes] the actual statements misleading."  *Rigel*, 697 F.3d at 880 n.8.  Plaintiff is advancing an omission theory, and his extensive citations to FDA documents make this even clearer than it was in the prior complaint:  Plaintiff claims that Tricida misled investors by not quoting or paraphrasing language Plaintiff now pulls from those documents.  But as Plaintiff recognizes, he must *attach* the alleged omissions to affirmative statements to state a claim.  And the difficulty for Plaintiff—both as to the word "multicenter" and as to other statements he attacks—is that the challenged statements do not match the information he claims should have been disclosed. In order to make his omission theory work, Plaintiff is forced to take the following positions:

- It is fraud for Tricida to make the undisputedly true statement that the trials were "multicenter" unless Tricida also states that as to a particular statistical analysis of a secondary endpoint in the safety extension trial, omitting results from one site would tip the balance from statistical significance to statistical non-significance.  *E.g.*, ¶¶ 95, 98.

- It is fraud for Tricida to make the undisputedly true statement that 196 out of 208 patients participated in the safety extension trial unless Tricida also specifies the number of those patients at trial sites in the U.S.  *E.g.*, ¶¶ 127, 138.

- It is fraud for Tricida to make the undisputedly true statement that its Phase 3 trials met primary and secondary endpoints unless Tricida also expresses doubts about the likelihood that those results will be repeated in a confirmatory study.  *E.g.*, ¶¶ 99-100; *infra* at 16-17.

The problem is the same in each instance.  Because the purportedly omitted information has no obvious or necessary connection to the challenged statement, a speaker has no way of knowing, at the time he or she makes the statement, what more should be added.  The Ninth Circuit has recognized that any time a public company speaks, "there are likely to be additional details that could have been disclosed but were not."  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  But under Plaintiff's theory, the omission of details—no matter how far removed from the challenged statements—constitutes fraud.

That is not tenable.  Courts consistently dismiss claims where purportedly omitted information is disconnected from the substance of the challenged statements.  *E.g.*, *Sneed v. AcelRx Pharms., Inc.*, 2022 WL 4544721, at *4 (N.D. Cal. Sept. 28, 2022) (dismissing where "[although] the misbranding violations are serious, the [complaint] does not allege a sufficient nexus between the misbranding of [defendants' drug] and the identified statements to investors"); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 807 (N.D. Cal. 2019) (dismissing where "the reasons . . . why many of the statements are false or misleading bear no connection to the substance of the statements").[5]

**4.**    **Plaintiff Fails To Plead Facts Showing That Klaerner's Statements On The May 7, 2020 Earnings Call Were Materially False Or Misleading.**

Plaintiff also falls short with his attack on three statements Klaerner made on May 7, 2020 about the May 1, 2020 late-cycle meeting.

***Statement Regarding Advisory Committee (AdCom) meeting***.  The Court previously

---

[5] The disconnect between the word "multicenter" and the purported omission of the FDA's concern with the Bulgarian site is exacerbated by temporal discontinuity.  Plaintiff alleges that the FDA expressed its concern in the leadup to the May 1, 2020 meeting, but Tricida made virtually all of the challenged "multicenter" statements before that meeting.  ¶¶ 94, 101, 111, 118, 128, 139, 146, 152.

11

rejected Plaintiff's attack on Klaerner's statement that the FDA had "indicated it currently does not plan to hold an AdCom to discuss veverimer . . . due in part to the logistical challenges posed by COVID-19." Order at 21. "[T]he complaint nowhere pleads facts supporting the suggestion that the FDA told Defendants it canceled the AdCom meeting because of problems with the NDA." *Id.*

Plaintiff seeks to cure this defect by reference to a preliminary agenda the FDA provided Tricida before the January 27, 2020 mid-cycle meeting. The FDA stated there that "[g]iven the significant issues noted above, it is no longer obvious to us that an advisory committee meeting is needed." ¶¶ 25; 159; Ex. 12 at 7. That does not show that the challenged statement was false or misleading. Saying that the need for a meeting is "no longer obvious" is a far cry from saying that the meeting will not take place and even further removed from a statement that the drug will not be approved. And critically, the minutes of the mid-cycle meeting itself (which Plaintiff ignores) show that the issue of an AdCom was still on the table: "[t]he applicant asked when the Agency expected to reach a conclusion about the need for an Advisory Committee Meeting. The Agency indicated that the decision would be made after reviewing the applicant's response to the issues raised in the Mid-Cycle Communication." Ex. 13 at 7. This is dispositive.

Plaintiff further alleges that the FDA "reiterated that problems with the NDA precluded an AdCom meeting during a March 31, 2020 phone call and then again during the May 1, 2020 late-cycle meeting." ¶ 159. Not so. The documents Plaintiff cites do not provide a reason for not scheduling a meeting, and are consistent with Klaerner's statement. Ex. 14 at 4. Plaintiff's attack on Klaerner's reference to COVID-19 as a reason to forgo a meeting remains defective.

***Discussion of Outstanding Review Issues with the FDA.*** The Court previously permitted Plaintiff to proceed with his challenge to Klaerner's description of outstanding review issues at the May 1, 2020 FDA meeting. Order at 22. In response to an analyst's question about "outstanding topics [that] still need to be addressed with the FDA," Klaerner explained that "we are really looking at the magnitude and also the durability of effect and also the clinical benefit that the U.S. patients get under the initial approval while the outcome trial is still ongoing." Ex. 16 at 10. The Court held that Klaerner's reference to the "clinical benefit that the U.S. patients get" was not sufficient to disclose the FDA's concerns about applicability of foreign data to U.S. patients. Order at 23.

12

Minutes from the late-cycle meeting, which are now properly before the Court, show Klaerner's statements in a new light. Ex. 14. As noted, Plaintiff alleges that in connection with the late-cycle meeting, the FDA surmised that the "response to treatment in patients with BEN [. . .] may not be representative of the size of the treatment effect in patients in the U.S.," who do not have BEN. *Id.* at 3; ¶¶ 76-77, 162. But again, Tricida addressed this concern. *Supra* at 7. Although Plaintiff ignores the fact, Tricida told the FDA that the Bulgarian patients had the same clinical characteristics as U.S. patients and that it was highly unlikely that any meaningful number of them was suffering from BEN. Ex. 14 at 3. As discussed, this back-and-forth makes plain that at this stage, Tricida had every reason to believe it had adequately addressed the FDA's questions about the applicability of the Eastern European data to U.S. patients. Klaerner had no duty to say more about this interim discussion. *E.g.*, *Jasin v. Vivus, Inc.,* 2016 WL 1570164, at *4, 13-14 (N.D. Cal. Apr. 19, 2016) (dismissing claim that company's statements about "productive" meetings with EU regulators were misleading insofar as the company omitted regulators' allegedly negative comments; company had no duty to disclose comments short of final agency determinations), *aff'd* 721 F. App'x 665 (9th Cir. 2018); *see also In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 541-42 (S.D.N.Y. 2015) (no duty to disclose interim regulatory communications in review process because problems, issues and questions arise and "tend to get answered in the process") (internal quotation marks omitted). Plaintiff argued previously that once Klaerner elected to "tout" good news about the late-cycle meeting, he assumed an obligation to disclose the bad news about the FDA's concerns with Eastern European data as well. What the FDA documents now before the Court show is that the news was not at that time bad.

***Statement Regarding Accelerated Approval.*** Plaintiff attacks for the first time Klaerner's May 7, 2020 statement that "[o]verall, while the FDA continues its review, we remain confident that our submission meets the standard for approval through the Accelerated Approval Program." ¶ 158. Plaintiff claims that this statement was misleading in light of the FDA's concerns about BEN, the impact of Site 11 in Bulgaria, and the relationship between the surrogate endpoint and the anticipated results in the confirmatory trial. ¶¶ 160-161. But as discussed, Klaerner had every reason to believe he had addressed these concerns. *Supra* at 7, 9; *infra* at 16-17. In any event,

13

Klaerner's statement—"we remain confident"—expresses an opinion.  Plaintiff does not allege the facts required to challenge opinion statements:  that Klaerner did not subjectively believe his opinion or that he omitted material facts about the basis of the opinion that differed from what reasonable investors would expect.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).

> **5.      Plaintiff Fails To Plead Facts Showing that Tricida's References To Trial Design And Endpoints Were Materially False Or Misleading.**

Finally, in attacking previously unchallenged statements, Plaintiff seeks to construct a fraud claim from documents reflecting an extremely complex dialogue between Tricida and the FDA about the relationship between the surrogate endpoint in the TRCA-301/301E trial and the anticipated clinical benefit in the confirmatory study.  Plaintiff's strategy is to highlight any negative comment the FDA made in that dialogue and to assert that Klaerner's failure to quote it constitutes fraud.  *E.g.* ¶¶ 99, 104, 108, 114, 131, 157, 172.  Neither the facts nor the law supports that effort.

As noted, the Accelerated Approval program allows drugs for "serious conditions that address an unmet medical need to be approved based on a surrogate endpoint that is reasonably likely to predict clinical benefit."  *Supra* at 4.  Surrogate endpoints are used when establishing a clinical benefit requires a trial of very long duration.  *Id.*  Plaintiff's theory of fraud is that Tricida knew from its interactions with the FDA that the surrogate endpoint it studied in TRCA-301 (increase in serum bicarbonate) would fail to "demonstrate an adequate treatment effect."  ¶ 99; *see also* ¶¶ 125, 126, 144, 155.

That theory is infirm:  it depends on plucking snippets of phrases, often without key context and often superseded, from years of FDA interactions.  For example, Plaintiff relies heavily on comments the FDA made in 2015 and 2016, when Tricida contemplated seeking approval based *solely* on a surrogate endpoint trial, without performing a confirmatory study.  ¶¶ 47-49.  The FDA's concerns about that plan were obviously superseded once Tricida elected to proceed along the Accelerated Approval pathway, in which the surrogate endpoint must only be *reasonably likely* to predict clinical benefit and a confirmatory study is required.

The documents Plaintiff cites also once again show an evolving dialogue—here, a discussion,

14

which Tricida disclosed to investors, about the size of the treatment effect that would support Accelerated Approval. ¶ 108. As in other instances, Plaintiff strategically refers to only one facet of the discussion. In a February 2017 meeting, the FDA "identified as a 'key issue'" the magnitude of the surrogate endpoint effect required to predict a favorable outcome in the confirmatory study. ¶ 50. But while Plaintiff leaves it out, the FDA also suggested a way forward, which was to use a predictive model similar to one published by Dr. Navdeep Tangri, an expert in kidney disease. Ex. 8 at 4. Critically—and Plaintiff ignores this point too—Tricida did just as the FDA suggested and worked with Dr. Tangri to develop a suitable model. Indeed, Dr. Tangri became a member of Tricida's advisory board and co-authored the two articles about veverimer in *The Lancet.* In other communications, the FDA stated its takeaway from the February 2017 meeting: it was "open to approval under the accelerated approval program," subject to further discussion about the design and powering of the confirmatory trial. Ex. 10 at 1.

Plaintiff also ignores the fact that while the FDA subsequently noted that it "could not commit to the size of the treatment effect on serum bicarbonate needed to support accelerated approval," it "confirmed that the sponsor may proceed with Study TRCA-301." Ex. 9 at 5. Plaintiff summarizes the dialogue with the claim that the "FDA found that the logistical regression analysis Tricida submitted to support its proposed use of changes in SBC levels was seriously flawed," and "did not reach agreement with Tricida," but cites nothing supporting this sweeping allegation. ¶ 61. In fact, the dialogue continued into 2018 with further exchanges related to statistical modeling and modifications to the Tangri model based on FDA comments. ¶¶ 61, 64; Ex. 11 at 4. In June 2018, the FDA wrote that "[y]our sample size and power recalculation for study TRCA-303 should be based on the treatment effect derived from the validated Tangri quantitative predictive model." *Id.* Plaintiff does not claim that Tricida did anything but follow this direction.

Moreover, as with so many issues, Tricida disclosed the risk that the FDA might not agree that the Phase 3 trial results reflected the magnitude or degree of statistical significance required:

> Key issues with our endpoint include *uncertainty about the degree of change from baseline blood bicarbonate that will translate into improved clinical outcomes*, the population in which such change is expected to translate into improved clinical outcomes, and the need for data supporting a causal relationship between blood bicarbonate concentration and clinical outcomes . . . Moreover even if the FDA does find that changes

15

from baseline in blood bicarbonate are sufficiently likely to predict clinical benefit for patients, *the FDA may not agree that we have achieved the primary endpoint in our Phase 3 clinical trial, TRCA-301, to the magnitude or to the degree of statistical significance required by the FDA.*

¶ 108 (emphasis added).  Plaintiff says that Tricida should have gone further and told investors that these issues would not or could not be resolved, but to posit such a duty on Tricida's part depends on a level of certainty about outcomes that has no support in the FDA documents Plaintiff cites.

Plaintiff's attack on three groups of statements related to endpoints and trial design fails for additional reasons:

***Statement about meeting endpoints.***  Plaintiff challenges Tricida's statements that TRCA-301 "met both its primary and secondary endpoints in a highly statistically significant manner" and that 301E "met its primary and all secondary endpoints." *E.g.* ¶¶ 99, 114, 123, 125, 136, 144, 155. Plaintiff says these undisputedly true statements were misleading because Tricida did not disclose that the FDA purportedly told it that "TRCA-301 failed to show its surrogate endpoint would demonstrate an adequate treatment effect." ¶ 99.  Plaintiff cites no facts suggesting that the FDA told Tricida this.  The communications Plaintiff cites show a robust dialogue in which the FDA *raised questions* about the size of increase in serum bicarbonate needed to support approval.  ¶¶ 50-51; 54-56; 58; 60-61.  That is critically different from a statement by the FDA that the increase shown in TRCA-301/301E was not statistically significant.

Plaintiff also challenges Tricida's statement that of the 208 patients who completed the 12-week TRCA-301 study, 196 participated in the 52-week TRCA-301E extension study.  ¶¶ 125-127; 138.   laintiff does not dispute the truth of the statement but claims that unless Tricida specified how many of the 196 patients were in the U.S., it misled investors.  That claim fails, as noted, because Plaintiff does not and cannot connect the subject matter of the challenged statement (number of continuing patients) with the omitted information (patients' locations).  *Supra* at 11.  The claim also fails because Tricida told investors in the very statements Plaintiffs challenge that a majority of the patients were outside the U.S.  ¶ 103.  Tricida did not need to repeat that caution every time it referred to the patients.  *Rubke v. Cap. Bancorp Ltd.*, 551 F.3d 1156, 1163 (9th Cir. 2009) ("it is pointless and costly to compel firms to reprint information already in the public domain").

16

***Statement about submission and review of NDA.*** Plaintiff next challenges the statement in Tricida's IPO prospectus that "[b]ased on feedback from the FDA, we believe that the data from the TRCA-101, TRCA-301 and TRCA-301E trials will provide sufficient evidence of clinical safety and efficacy to support the submission and review of an NDA . . ." ¶ 104. This challenge is easily disposed of: the FDA accepted Tricida's NDA for review. ¶ 71. Plaintiff also challenges Tricida's later opinion statement "we believe that the data from the TRCA-101, TRCA-301, and TRCA-301E clinical trials will provide sufficient evidence of safety and efficacy to support the approval of our NDA for veverimer pursuant to the Accelerated Approval Program." ¶ 157. Plaintiff claims that Tricida misleadingly omitted outstanding issues about the size of the serum bicarbonate increase in TRCA-301 that would predict success in the confirmatory study. *Id.* But as discussed, those issues were the subject of ongoing dialogue with the FDA, and Tricida disclosed this. *Supra* at 15; ¶ 108.

***Statements about the agreement on specified issues; non-actionable corporate optimism.*** Plaintiff finally challenges statements in which Klaerner referred to agreement between Tricida and the FDA as to (1) use of Accelerated Approval generally, and (2) after the FDA had issued the July 14, 2020 deficiency notice, a "quantitative understanding" of the relationship between the surrogate endpoint and disease progression going forward. ¶¶ 131, 172. Plaintiff alleges no facts showing that Tricida and the FDA did *not* agree on these specified points. Klaerner obviously did not report or promise agreement on the ultimate issue of approval. Plaintiff also challenges Klaerner's statement "we feel good about what we've learned in the 301E study regarding safety and efficacy, increasing our confidence for a successful [post-marketing] trial." ¶ 114. This is not only an opinion statement with respect to which Plaintiff fails to allege the facts required by *Omnicare*, *supra* at 13-14, it is also a statement of generalized corporate optimism that is not actionable under controlling law. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014).

**B.      Plaintiff Fails To Plead Facts Creating A Strong Inference Of Intentional Fraud.**

**1.   Overview.**

Plaintiff also fails to plead particularized facts establishing the "strong inference" of scienter required by statute. 15 U.S.C. § 78u-4(b)(2)(A). A court should deny a motion to dismiss under the PSLRA "only if a reasonable person would deem the inference of scienter cogent and at least as

17

compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. In the Ninth Circuit, courts evaluate scienter allegations both individually and holistically. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014).

***Prior Ruling.*** The Court previously rejected all of Plaintiff's general bases for inferring scienter. Order at 24-26. First, the Court rejected Plaintiff's allegation that "Defendants were motivated to mislead the market into believing that the FDA would approve veverimer because Defendants otherwise would have run out of money." *Id.* at 24. Such allegations are deficient because the idea that a drug sponsor would "knowingly or recklessly carry on a defective trial—so that any defects were not remedied—virtually defies reason." *Id.* at 24-25 (citing *Jun Shi v. Ampio Pharms., Inc.*, 2020 WL 5092910, at *5 (C.D. Cal. June 19, 2020)). Second, while Plaintiff alleged that Klaerner sold Tricida stock, each of the sales Plaintiff identified was made under a Rule 10b5-1 trading plan, and Plaintiff did not show that the "timing of Klaerner's stock sales was unusual or suspicious." *Id.* at 25. Finally, while Plaintiff alleged that "Tricida was entirely Klaerner's project," "generalized 'core operations' allegations like these do not create an inference of scienter." *Id.* at 26.

The Court next held that Plaintiff failed to plead scienter as to three groups of statements: (1) references to trial sites in "Europe"; (2) risk disclosures about site locations; and (3) statements that TRCA-301/301E was a "multicenter" trial. *Id.* at 26-28. By contrast, the Court found that Plaintiff *had* adequately pled scienter as to Klaerner's May 7, 2020 description of the May 1, 2020 late-cycle meeting. Plaintiff adequately alleged that the risk that investors would be misled about the FDA's concerns with foreign clinical data was either "known" or "so obvious" that defendants "must have been aware of it." *Id.* at 29-30 (citing *Zucco*, 552 F.3d at 991). But as discussed above and again below, the FDA documents Plaintiff cites put the May 7, 2020 statement in a new light.

***New Allegations of Scienter.*** In his amended complaint, Plaintiff both asks the Court to infer scienter as to the previously-dismissed statements and seeks to establish the required strong inference as to the newly challenged statements. But the great majority of the scienter allegations in the amended complaint are identical to the allegations the Court has already held are deficient. Dkt. 108-4. Plaintiff makes no attempt to remedy his flawed allegation that Klaerner was motivated to mislead the market because Tricida would otherwise run out of money; the allegation is as defective

18

as it was before.  ¶¶ 188-89.  Plaintiff's allegations about stock trades and core operations also remain the same.  ¶¶ 187, 189-90.  As before, Plaintiff identifies no cognizable motive for deceit.  Notably, Plaintiff has abandoned the confidential witness allegations he made in the prior complaint.  All of this weighs heavily against any inference of scienter.  *E.g.*, *Carr v. Zosano Pharma Corp.*, 2021 WL 3913509, at *10 (N.D. Cal. Sept. 1, 2021) (where plaintiffs "fail to include any allegations against Defendants from confidential witnesses or former [company] employees . . . their complaint lacks notable features that tend to be hallmarks of a potentially viable securities claim").

Unable to muster facts supporting an intent to deceive, Plaintiff banks heavily on allegations through which he strives to show that Klaerner knew purportedly omitted information.  That does not constitute scienter.  "[K]nowing about the existence of [certain information bearing on FDA approval] and knowing one should report [that information] to the public are two different things."  *Colyer v. AcelRx Pharms, Inc.*, 2015 WL 7566809, at *13 (N.D. Cal. Nov. 25, 2015).  Courts have made this point repeatedly:  scienter is an intent to deceive, and in an omission case like this one, that means withholding information that a defendant has a well-established duty to disclose.  *In re GeoPharma, Inc., Sec. Litig.*, 411 F. Supp. 2d 434, 446 (S.D.N.Y. 2006) ("a failure to disclose particular information, by itself, can only constitute recklessness if there was an obvious duty to disclose that information"); *see also, e.g.*, *In re NVIDIA Corp. Sec. Litig.*, 2011 WL 4831192, at *11 (N.D. Cal. Oct. 12, 2011) ("Knowledge of the problem, however, is insufficient to infer that [defendant] acted with the intent to defraud or with deliberate recklessness in not reporting the issue publicly"), *aff'd*, 768 F.3d 1046 (9th Cir. 2014).

Plaintiff's reliance on Tricida's FDA communications reflects not only a misapprehension of scienter but also a fundamental misunderstanding of the drug development and NDA review process.  Plaintiff presents the FDA's feedback to Tricida as static, and suggests that Tricida must have understood each time the FDA raised a question or concern that veverimer would not likely be approved.  But as Klaerner understood from his prior experiences, the FDA review process is iterative; the agency raises issues and the sponsor works to address them over multiple cycles of communication and feedback.  That dynamic is well understood in securities litigation.  *Supra* at 6; *In re Dynavax Sec. Litig.*, 2018 WL 2554472, at *7 (N.D. Cal. June 4, 2018) (the "FDA approval

19

process necessarily involves a dialogue between the company and the agency" and "[s]imply failing to divulge the details of interim regulatory back-and-forth with the FDA . . . alone cannot support an inference of scienter") (internal quotation marks omitted).  Plaintiff alleges nothing suggesting that Klaerner understood the FDA's interim comments as an indication that veverimer risked not being approved, or believed anything other than that Tricida was working productively to address the FDA's questions as they arose.  Plaintiff certainly alleges nothing supporting a strong inference that Klaerner sought to deceive investors on the subject.

**2.      Plaintiff Fails To Plead Scienter As To Statements Regarding the TRCA-301/301E Trial Site Locations and the Multicenter Nature of the Trial.**

In its July 2022 Order, the Court held that Plaintiff failed to plead scienter as to statements and risk disclosures regarding trial site locations, explaining that "nothing about the claimed underlying representativeness problems meets [the] high 'so obvious' standard such that Defendants would have to have known that their literally true use of 'Europe' would be misleading."  Order at 27.   ikewise, the Court found that Plaintiff failed to establish a strong inference that defendants intended to mislead investors or were deliberately reckless in describing the TRCA-301/301E trial as "multicenter"—another statement that was undisputedly true.  *Id.* at 28.

Plaintiff's amendments do not remedy these deficiencies.  Plaintiff now alleges that Klaerner attended meetings in which the FDA "warned against relying on patient data from Eastern European countries," and that he knew patient enrollment details from the TRCA-301/301E trial, including the impact of Site 11 in Bulgaria on trial results.  ¶¶ 98, 188.  These allegations are no different from those the Court previously rejected—that defendants "knew that the FDA would be less likely to accept[] the clinical data" from Europe because those data purportedly did not reflect the experiences of U.S. patients, and because of the allegedly disproportionate impact of one site.  Order at 26-28.  Plaintiff's scienter allegations continue to fall short because Plaintiff has not pled facts showing that Tricida's true statements—that it was conducting multicenter trials in Europe—were so obviously misleading that Klaerner must have made them with an intent to defraud investors.

On the issue of foreign data in particular, the Ninth Circuit's analysis in *Rigel* is instructive.  697 F.3d at 883-84.  The plaintiff in *Rigel* alleged that results from clinical trial sites in Mexico were

20

subject to a "country effect" that made them appear more promising than data from the U.S.  *Id.* at 874.  Plaintiff argued that "because [defendants] had access to the clinical trial results and therefore knew there was a substantial country interaction," defendants also knew that their statements about the trial results were false or misleading.  *Id.* at 883.  The Ninth Circuit rejected the claim: "[a]lthough Plaintiff notes that it alleged that [defendants] knew there was a country effect, Plaintiff points us to no allegations that [defendants] believed that they made false or misleading statements relating to a country effect or that [defendants] believed that they were misrepresenting the statistical significance of their results."  *Id.*  Just so here:  Plaintiff pleads no facts showing that Klaerner sought to deceive investors through undisputedly true statements that clinical trials were taking place in Europe.

Tricida's record of disclosures on these issues also cuts strongly against any inference of scienter.  Tricida and Klaerner informed the market that most trial sites were in Eastern Europe.  Tricida provided this information through scientific articles published in *The Lancet*, through the website clinicaltrials.gov, and through an SEC filing.  Indeed, Klaerner prominently featured the *Lancet* publication on an earnings call.  *Supra* at 8; Ex. 15 at 6 ("Next I would like to highlight the publication of our Phase III . . . clinical trial results in the Lancet . . .").  Even if the Court declines to hold that these disclosures defeat Plaintiff's omission claim, they are highly relevant to scienter.  Publishing a list of the Eastern European countries in which the trials took place and then encouraging investors to review those publications are not the actions of a defendant trying to keep this information from investors.  *E.g.*, *Rigel*, 697 F.3d at 885 ("if the individual defendants were acting based on their belief that they had a financial motive to conceal the 'true' results of the clinical trial, they would not have voluntarily publicly disclosed all the data and the statistical methodology" at a scientific meeting and in a medical journal article).  Likewise, Tricida's risk disclosures, which specifically warned investors that the FDA might not accept foreign data, undermine any inference that Klaerner intended to mislead the market on the subject.  *E.g.*, *Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 58 (1st Cir. 2018) ("providing warning to investors, or otherwise disclosing potential risks, erodes inferences of scienter"); *Jasin*, 2016 WL 1570164, at *22 ("the thoroughness of [the] risk disclosures . . . negate[s] any inference of scienter even further").

21

**3.** **Plaintiff Fails To Plead Scienter As To Statements On Tricida's May 7, 2020 Earnings Call.**

Plaintiff pleads no facts supporting the inference that Klaerner intended to mislead investors by telling them that the FDA had indicated that it did not plan to convene an Advisory Committee "due in part to the logistical challenges posed by COVID-19." ¶ 158.[6]  As noted, Plaintiff cites no confidential witness or other source suggesting fraudulent intent.[7]  The public record, on the other hand, is wholly consistent with Klaerner's statement.  It shows that the FDA cancelled or postponed many Advisory Committee meetings in the pandemic's early months.  Ex. 22.

The Court previously held that Plaintiff adequately pled scienter as to Klaerner's description of the review issues discussed at the late-cycle meeting:  Plaintiff alleged that Klaerner omitted the FDA's concerns about the applicability of the foreign clinical data to the U.S. population.  Order at 29-30.  But information before the Court for the first time now undermines Plaintiff's allegation, and the Court may appropriately revisit the issue in light of that information.  Plaintiff cites the FDA's minutes from the late-cycle meeting, and those minutes negate any inference that Defendant intended to mislead the market regarding the FDA's concern.  The minutes show that while the FDA suggested that patients from Eastern Europe may have been suffering from BEN, Tricida showed that they likely did not have the condition.  *Supra* at 7.

Particularly in light of the minutes, Plaintiff has failed to plead facts supporting a cogent and compelling inference that Klaerner intentionally misled the market by failing to describe the FDA's concern about Eastern Europe in greater detail.  Under *Tellabs*, this Court must compare an inference of deliberate fraud against competing benign inferences arising from the facts, 551 U.S. at 324, and here the stronger inference is that Klaerner believed Tricida had addressed the FDA's concern by showing that the Eastern European patients did not have the condition the FDA had raised.  Even if, with the benefit of hindsight, Klaerner's assessment of the FDA's position turned

---

[6] In its previous ruling, the Court did not reach scienter with respect to this statement because Plaintiff failed to adequately allege falsity.

[7] The same is true of Plaintiff's new challenge to Klaerner's statement on the May 7 call that he believed Tricida met the standards for Accelerated Approval.  Plaintiff alleges no facts supporting an inference of fraudulent intent.

22

out to have been mistaken, this does not support an inference that Klaerner intentionally misled investors. *Sanofi*, 87 F. Supp. 3d at 545 ("whether [the company's] optimism was, by hindsight, unwarranted does not give rise to securities violations because up to a point, companies must be permitted to operate with a hopeful outlook") (internal quotation marks and brackets omitted).

### 4. Plaintiff Fails To Plead Scienter As To Statements Regarding The Surrogate Endpoint.

Plaintiff's new allegations regarding the surrogate endpoint for the Phase 3 trials are likewise deficient on scienter grounds. Plaintiff once again focuses entirely on knowledge of interim FDA communications, claiming that the FDA "repeatedly informed Tricida that TRCA-301 failed to show its surrogate endpoint would demonstrate an adequate treatment effect." ¶ 99. But the FDA did not take a definitive position on the surrogate endpoint during the review process. *Supra* at 15. The FDA raised questions about the size of the increase in serum bicarbonate levels sufficient to support accelerated approval, and then engaged with Tricida in an iterative discussion of the issue—one in which, among other things, the FDA suggested that Tricida use a model like the one published by Dr. Tangri, Tricida adopted that suggestion by working with Dr. Tangri to develop an appropriate model, and Dr. Tangri became a scientific advisor to the company. Critically, as a result of that discussion, the FDA allowed Tricida to proceed with Phase 3 trials. Ex. 9 at 5 ("FDA confirmed that the sponsor may proceed with Study TRCA-301 . . ."). The FDA does not allow companies to conduct studies with human subjects unless there is a path forward to approval. *E.g.*, *Sanofi*, 87 F. Supp. 3d at 533 (if the FDA believes that "human subjects [may be exposed] to flawed and therefore scientifically worthless studies," it bars drug developers from conducting or continuing trials).

Here again, there is a critical difference between knowing particular information—the content of the FDA's communications—and making a deliberately false or misleading statement. *Supra* at 19 (citing authorities). Plaintiff alleges that Klaerner knew what the FDA had said about the relationship between the serum bicarbonate treatment effect and Accelerated Approval, but that is a far cry from showing that Klaerner made any challenged statement in an effort to defraud investors. Klaerner's statements were objectively true—for example, the statement that TRCA301 "met both its primary and secondary endpoints in a highly statistically significant manner." *E.g.*

23

¶¶ 99, 125, 136, 144, 155.  And Tricida disclosed the risk that the FDA could conclude that the surrogate endpoint results, though favorable, did not sufficiently establish a clinical benefit.  ¶ 108. No facts Plaintiff alleges support the inference that when Tricida made the challenged statements without going into more detail about the FDA's interim comments, it was "so obvious" that this would mislead investors that the Court should infer intentional fraud.

Indeed, Plaintiff has not explained and cannot explain why Klaerner would intentionally deceive investors.  Courts have repeatedly rejected the counterintuitive notion that companies seeking FDA approval would persist in that pursuit—and lie to the market about their chance of success—after the FDA has told them that approval will not be forthcoming.  Absent cognizable allegations of financial incentives, that premise, on which Plaintiff here depends, "has no basis in logic or common experience."  *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 408 (9th Cir. 2020) (rejecting as illogical on scienter grounds the theory that the "company invested in a U.S. clinical trial and made promising statements about FDA approval, yet knew . . . that the FDA would eventually reject the product . . ."); *see also e.g.*, *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600-01 (S.D.N.Y. 2016) (rejecting scienter allegations as illogical where "Defendants would have known that their efforts to prop up [company] stock by feigning likely FDA approval would be revealed, in relatively short order, upon the FDA's rejection of the [] NDA").

**5.        Plaintiff's Scienter Allegations Fail When Considered Holistically.**

Rather than supporting an inference of fraud, the complaint shows a company that believed it was on the path to approval.  Tricida poured time and resources into clinical trials and invested heavily in commercialization efforts in anticipation of approval.  Tricida hired sales executives as it worked in 2020 to "transform[] [itself] into a commercial organization that is preparing to launch veverimer, if approved."  Ex. 6 at 5.  As late as the May 1, 2020 late-cycle meeting with the FDA, Tricida asked when it might expect labeling for veverimer.  Ex. 14 at 4.  After receiving the August 2020 CRL, Tricida was forced to reverse these commercialization efforts, laying off nearly 100 employees and incurring over $13 million in restructuring costs.  *See* Dkt. 76 at 25.  But even then, Tricida continued to pursue all available avenues that might have led to Accelerated Approval, for which it continued to believe it qualified.  ¶¶ 85, 90-91 (discussing Tricida's appeal efforts).

24

Plaintiff does not advance a credible contrary narrative.  Plaintiff's theory appears to be that Tricida and Klaerner made statements to the market that were literally true, but obscured or omitted the FDA concerns about Tricida's clinical trials, and that they went ahead with a drug development plan they believed would likely fail.  In advancing this counterfactual theory of fraud, Plaintiff disregards the obvious fact that Tricida had "every incentive to get it right the first time, and to put [its drug] on the path to approval." *Zogenix*, 2020 WL 3820424, at \*11; *see also e.g.*, *In re Arrowhead Pharms, Inc. Sec. Litig.*, 2017 WL 5635422, at \*12 (C.D. Cal. Sept. 20, 2017) (rejecting as implausible the notion that "Defendants knew that [drug] has unsafe toxicity levels and hid that fact, deceiving the public in order to finance the testing of a drug it knew could never be approved by the FDA and thus never be brought to market").

Plaintiff identifies no incentive for Klaerner to mislead the market about Tricida's interactions with the FDA or veverimer's approval prospects.  Without any cognizable allegations of insider sales or other financial gain related to the purported fraud, Plaintiff has pled no "concrete benefit to defendants to justify [the alleged] risks." *Gillis*, 197 F. Supp. 3d at 600.  Another court that recently considered fraud allegations in the context of failed FDA approval summarized the situation well.  The plaintiffs there urged the court to "adopt the unreasonable inference that [defendants] sought for some unspecified reason to inflate stock prices by withholding bad information it later released . . .  in pursuit of some unspecified strategy to accrue some unspecified benefit." *In re Sona Nanotech, Inc. Sec. Litig.*, 562 F. Supp. 3d 715, 728 (C.D. Cal. 2021).  The court declined to do so, holding that the better inference was that the company simply "tried and failed to get FDA approval for a product after optimistic predictions that just did not pan out." *Id*. The latter inference is the more cogent and compelling one in this case as well.

## IV.   CONCLUSION

For all of these reasons, the Court should dismiss Plaintiff's Section 10(b) claim.  The Court should also dismiss Plaintiff's claim against Klaerner for control person liability under Section 20(a) of the Exchange Act, which depends on a primary violation of Section 10(b). *E.g., City of Dearborn Heights v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017).

Date:  February 6, 2023

Respectfully submitted,

**SIDLEY AUSTIN LLP**

By:*/s/ Sara B. Brody*
    Sara B. Brody (SBN 130222)

*Attorneys for Defendant Gerrit Klaerner*

26