Sara B. Brody (SBN 130222)
sbrody@sidley.com
Sarah A. Hemmendinger (SBN 298659)
shemmendinger@sidley.com
Sarah E. Gallo (SBN 335544)
sgallo@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone:  415 772 1279

Matthew J. Dolan (SBN 291150)
mdolan@sidley.com
SIDLEY AUSTIN LLP
1001 Page Mill Road, Building 1
Palo Alto, CA 94304
Telephone: 650 565 7106

Robin E. Wechkin (admitted *pro hac vice*)
rwechkin@sidley.com
SIDLEY AUSTIN LLP
8426 316th Place Southeast
Issaquah, WA 98027
Telephone: 415 439 1799

*Attorneys for Defendant*
*Gerrit Klaerner*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL PARDI, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> TRICIDA, INC., and GERRIT KLAERNER, <br><br> Defendants. | Case No.:  4:21-cv-00076-HSG <br><br> <u>CLASS ACTION</u> <br><br> **DEFENDANT GERRIT KLAERNER'S REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT** <br><br> Hon. Haywood S. Gilliam, Jr. <br><br> Date:  June 1, 2023 <br> Time: 2:00 p.m. <br> Courtroom 2, 4th Floor |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   DISCUSSION ........................................................................................................2

    A.    Plaintiff Fails to Plead Facts Showing that Tricida's
          References to Trial Sites in "Europe" Were Materially False
          or Misleading. ...................................................................................................2

    B.    Plaintiff Fails to Plead Facts Showing that Tricida's
          Risk Disclosures About Foreign Trial Sites Were Materially False
          or Misleading. ...................................................................................................5

    C.    Plaintiff Fails to Plead Facts Showing that Tricida's
          References to "Multicenter" Phase 3 Trials Were Materially False
          or Misleading. ...................................................................................................5

    D.    Plaintiff Fails to Plead Facts Showing that Klaerner's
          Statements on the May 7, 2020 Earnings Call Were Materially
          False or Misleading. ..........................................................................................7

    E.    Plaintiff Fails to Plead Facts Showing that Tricida's
          References to Trial Design and Endpoints Were Materially False
          or Misleading. ...................................................................................................8

    F.    Plaintiff Fails to Plead Facts Creating a
          Strong Inference of Intentional Fraud. ............................................................13

III.  CONCLUSION ....................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amarin Corp. PLC Sec. Litig.*,
  2022 WL 2128560 (3d Cir. June 14, 2022) ...................................................................... 11

*Colyer v. AcelRx Pharms, Inc.*,
  2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) .............................................................. 13

*Corban v. Sarepta Therapeutics, Inc.*,
  868 F.3d 31 (1st Cir. 2017) ................................................................................................ 3

*In re Dynavax Sec. Litig.*,
  2018 WL 2554472 (N.D. Cal. June 4, 2018) ................................................................... 3

*Homyk v. ChemoCentryx*,
  No. 21-cv-03343-JST (N.D. Cal. Feb. 23, 2023) ..................................................... 12, 14

*Immanuel Lake v. Zogenix, Inc.*,
  2020 WL 3820424 (N.D. Cal. Jan. 27 2020) ................................................................. 15

*In re Iso Ray, Inc. Sec. Litig.*,
  189 F. Supp. 3d 1057 (E.D. Wash. 2016) ........................................................................ 4

*Jun Shi v. Ampio Pharms., Inc.*,
  2020 WL 5092910 (C.D. Cal. June 19, 2020) ............................................................... 15

*Lou v. JP Morgan Chase Bank N.A.*,
  2018 WL 1070598 (N.D. Cal. Feb. 26, 2018) ................................................................. 5

*In re Medimmune, Inc. Sec. Litig.*,
  873 F. Supp. 953 (D. Md. 1995) ....................................................................................... 1

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) ......................................................................................... 15

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015) ............................................................................ 2, 9

*Schueneman v. Arena Pharmaceuticals*,
  840 F.3d 698 (9th Cir. 2016) ....................................................................................... 8, 11

*Sneed v. AcelRx Pharms., Inc.*,
  2022 WL 4544721 (N.D. Cal. Sept. 28, 2022) ................................................................ 6

*In re Sona Nanotech, Inc. Sec. Litig.*,
562 F. Supp. 3d 715 (C.D. Cal. 2021) ........................................................................................ 13

iii

## I.   INTRODUCTION

The FDA record now before the Court undermines Plaintiff's fraud claim.  It contradicts both the contention that Dr. Klaerner knew that open items between Tricida and the FDA would lead to an unfavorable outcome for veverimer and the assertion that he deliberately misled investors about the risk of that outcome.  Plaintiff sows confusion in his opposition brief, as he did in his complaint, by using snippets of FDA documents in isolation.  Viewed in context—as they must be—the FDA documents reflect a five-year dialogue in which Tricida responded to the FDA's questions as they arose, in a fluid process that necessarily encompassed differing viewpoints and shifts in position.

Plaintiff appears to advocate a duty to report to investors every question or concern the FDA raises.  Such disclosure is not required by law, would disrupt the FDA review process, and would whipsaw stock prices, which would fall with every disclosure of an FDA question, and then rise again with the drug sponsor's answer.  Courts have held for more than 25 years that drug sponsors are not obligated to recite details of ongoing dialogue with the FDA.  *In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 966 (D. Md. 1995); *infra* at 2-3 & n.2.

Plaintiff's claims are defective in other ways as well.  Plaintiff proceeds largely by way of an omission theory, but the information he says Tricida should have disclosed is not connected with the statements he claims were rendered misleading.  In a particularly egregious example, Plaintiff argues that the word "multicenter" is misleading because Tricida did not specify that if data from a Bulgarian site in a safety extension study were excluded, the result on two durability-of-effect metrics would flip from statistically significant to not statistically significant.  This verges on the absurd.  The word "multicenter" does not encompass the data analysis Plaintiff faults Tricida for not performing or reporting.

Plaintiff's scienter allegations also remain deficient.  His sole theory is that Klaerner knew the content of certain FDA communications.  But knowing a given set of facts does not equate to the state of mind required by the PSLRA—intentional deception, as to which Plaintiff must create a cogent and compelling inference.  Plaintiff's allegations do not support a strong inference of deliberate fraud.  The FDA documents show a dialogue between the FDA and Tricida, not a determination by the FDA that veverimer would not be approved.  The most obvious inference

1

arising from the facts alleged is a benign one.  Klaerner and Tricida invested years of effort and hundreds of millions of dollars into clinical trials because they believed veverimer's chance of success justified these expenditures, and continued to believe this until the very end, fully accounting for the FDA's comments.  Plaintiff's allegations do not support a competing inference; among other things, Plaintiff identifies no motive for fraud, in the form of stock sales or anything else.  Plaintiff's insistence that Klaerner nevertheless misled investors by purportedly concealing FDA concerns cannot be squared with a reading of the FDA documents in context or with an understanding of the iterative nature of the regulatory process.  The Court should dismiss the Complaint.

## II.   DISCUSSION

### A.   Plaintiff Fails to Plead Facts Showing that Tricida's References to Trial Sites in "Europe" Were Materially False or Misleading.

In his opening brief, Dr. Klaerner showed that the FDA communications Plaintiff cites actually undermine the claim that Tricida misled the market with its undisputedly accurate statements that clinical trials were taking place in "Europe."  In response to the FDA's general caution about "enrolling subjects at sites where the standard of care may be dissimilar to the standard of care in the U.S.," Tricida told the agency at a July 26, 2017 meeting that it *had* selected sites with a standard of care similar to that in the U.S.  Ex. 9 attachment at 20.[1]  Late in the NDA review process, the FDA raised a different concern—that patients might be suffering from a region-specific kidney disease called Balkan endemic nephropathy (BEN).  This is distinct from the standard of care, and in any event Tricida addressed this question too, explaining that it was unlikely that a substantive number of patients suffered from BEN.  Mot. at 7.  Tricida did not assume a duty to disclose the details of these interim exchanges with the FDA simply by telling investors that its trials were conducted in "Europe."  *Id.*; *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 541-42 (S.D.N.Y. 2015) ("in a series of cases, courts have rejected claims of material omissions where pharmaceutical

---

[1] "Ex. _" citations refer to the exhibits filed in connection with Defendants' opening brief.  "Reply Ex. _" citations refer to the exhibits to the Reply Declaration of Sarah Hemmendinger, filed concurrently with this brief.  "¶ _" citations refer to the Second Amended Complaint, Dkt. 115.

Plaintiff points to a second iteration of the general caution in June 2019, Opp. at 7, but does not allege that this was anything other than a standard item on a pre-NDA submission list.

companies did not reveal procedural or methodological commentary, or other interim status reports, received from the FDA as to drugs under review") (collecting authorities).  Companies seeking FDA approval have "no legal obligation to loop the public into each detail of every communication with the FDA." *Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31, 40 (1st Cir. 2017).[2]

In response, Plaintiff contends that FDA communications in 2020 and 2021 show that Tricida did not provide the FDA with a satisfactory answer on the participation of Eastern European patients.  Opp. at 10.  Plaintiff misunderstands the fluid and iterative nature of the FDA review process.  Based on its ongoing discussions with the FDA, Tricida had every reason to believe it had addressed the issue of foreign patient data.  Mot. at 2, 7.  That the FDA *ultimately* cited a concern with the Eastern European patient population when it denied Tricida's appeal in February 2021 does not show that the challenged statements were false when made.  Only impermissible hindsight provides any support for a different conclusion.

Plaintiff's argument fails as a matter of timing in another way as well.  The FDA communications on which Plaintiff relies post-dated the vast majority of Klaerner's references to "Europe."  These communications cannot show that Tricida's earlier references to Europe were false or misleading when made.

Nor do the communications that Plaintiff cherry-picks from the FDA record establish falsity as to Tricida's subsequent references to "Europe."  Plaintiff points to a question the FDA asked, at the January 27, 2020 mid-cycle meeting, about the applicability of data to the U.S. population.  Opp. at 10; Ex. 12 at 3.  But this was a preliminary question, and the meeting minutes show that Tricida had an answer:  It explained that it "believe[s] the trial data are applicable to the U.S. patient population and the practice of medicine in the U.S."  Ex. 13 at 2.

The same is true of a reference to foreign data in the FDA's April 17, 2020 background package, sent in advance of the late-cycle meeting.  The FDA raised BEN for the first time in this package, and the late-cycle minutes show that Tricida again had ready answers, explaining to the

---

[2] *See also e.g.*, *In re Dynavax Sec. Litig.*, 2018 WL 2554472, at *7 (N.D. Cal. June 4, 2018) ("Reasonable investors would expect that the company and the FDA would be engaged in a dialogue about the sufficiency of the clinical trials and that such dialogue inherently would include presentation of contrary views").

agency that it was unlikely that any substantive number of the patients in the trial were suffering from the condition.  Ex. 14 at 3.

Plaintiff's challenge to undisputedly true references to "Europe" also fails for a more fundamental reason.  On multiple occasions, Tricida *disclosed* that the majority of trial participants were enrolled in Eastern Europe.  Mot. at 7-9.  Two publications in a leading medical journal, *The Lancet*, listed the location of each site, as did the clearinghouse clinicaltrials.gov.  *Id.*  Klaerner highlighted *The Lancet* publications for investors on earnings calls and in SEC filings.  *Id.*  These disclosures doom Plaintiff's claim, which is based on purported omissions.  The information Plaintiff claims Klaerner failed to disclose was not omitted at all.

Unable to dispute that the information was disclosed in *The Lancet* and clinicaltrials.gov, Plaintiff contends that Klaerner has failed to show that the information was transmitted with sufficient "intensity and credibility" to counterbalance the purportedly misleading references to "Europe."  Opp. at 11.  Plaintiff is wrong, and the authority he cites underscores the defect in his argument.  Plaintiff relies on *Iso Ray*, in which the court rejected a truth-on-the-market defense at the pleading stage because the journal article the company cited was available only behind a paywall.  *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1073-74 (E.D. Wash. 2016).  Here, by contrast, there is no dispute that the allegedly omitted information—the location of Tricida's Phase 3 trial sites—was freely available to investors.

Plaintiff further suggests that the factual record does not sufficiently establish the truth-on-the-market defense.  But it is difficult to imagine how the record could be clearer or stronger.  In his opening brief, Klaerner submitted documents, whose authority and reliability is unchallenged, showing that purportedly omitted information was contained in (1) two publications in *The Lancet* listing the Phase 3 trial site locations, (2) free abstracts of both *Lancet* publications listing the same sites in front of the journal's paywall, and (3) the clinicaltrials.gov website listing Phase 3 sites, including those in Eastern Europe.  Exs. 18-21, 23-26.  An earnings call transcript confirms that securities analysts reviewed and digested the information disclosed in *The Lancet*.  *E.g.*, Reply Ex. 1 at 9 (analyst asks question on earnings call based on her review of *The Lancet* publications).  Plaintiff cites no authority suggesting that more is needed.  Multiple decisions from courts within

4

this district show that the quantum of evidence Klaerner has submitted establishes a truth-on the-market defense and entitles a defendant to dismissal at the pleading stage. Mot. at 8. Plaintiff simply ignores those authorities.

These disclosures doom Plaintiff's claim of falsity, as they show that Tricida revealed the purportedly omitted information. But even if the Court declines to apply the truth-on-the-market doctrine, the disclosures undercut any inference of scienter. *Infra* at 15. A defendant who intends to mislead investors about the location of trial sites would not voluntarily publish a list of the Eastern European countries in which the trials took place, and then encourage investors to review that information. Mot. at 21.

### B. Plaintiff Fails to Plead Facts Showing that Tricida's Risk Disclosures About Foreign Trial Sites Were Materially False or Misleading.

Tricida specifically cautioned investors that it "conducted the TRCA-301 trial and [is] conducting the TRCA-301E trial with majority enrollment outside the United States," and that the "FDA may not accept such foreign clinical data." ¶¶ 101-03. Plaintiff's challenge to these disclosures fails for the same reasons as his attack on the word "Europe." Mot. at 9. The FDA documents Plaintiff cites show that Tricida had ready responses to the FDA's questions about Eastern European data at each turn, and no reason to believe its use of foreign data put approval at risk. *Id.* Plaintiff does not respond to this argument, nor address Tricida's on-point risk disclosures. This is dispositive. *E.g. Lou v. JP Morgan Chase Bank N.A.*, 2018 WL 1070598, at *2 (N.D. Cal. Feb. 26, 2018) ("a failure to oppose an argument serves as a concession").

### C. Plaintiff Fails to Plead Facts Showing that Tricida's References to "Multicenter" Phase 3 Trials Were Materially False or Misleading.

Plaintiff's new allegations undermine his attack on Tricida's use of the term "multicenter." Mot. at 9-10. In support of his claim that the term was misleading, Plaintiff cites the FDA's comments about the impact of a single Bulgarian site on Week 52 data. ¶ 23. The FDA raised this topic for the first time in preparation for the May 1, 2020 late-cycle meeting, and Tricida responded by explaining that the Bulgarian patients were not unusual: Their clinical characteristics fell well within the range of other patients, including U.S. patients. Mot. at 9-10. Tricida had no way to

5

predict that the FDA would exclude data collected from the single site in the TRCA-301 *safety* extension study as part of a statistical analysis of *efficacy* data. Even more fundamentally, the FDA's statistical analysis is entirely disconnected from statement Plaintiff challenges—the single word "multicenter."

In response, Plaintiff concedes that the word "multicenter" was not misleading at any time before Tricida reported the results of the TRCA-301E safety study in March 2019. Opp. at 12 n.5. But he insists that the word "multicenter" became misleading thereafter, arguing that "[w]hether the trial was to measure efficacy or safety, data from a single trial site undercuts the claim that the trial was 'multicenter.'" *Id.* at 12-13.

This is a non sequitur. A trial does not cease to be "multicenter" when it generates new results. The FDA defines a multicenter trial as a "clinical trial conducted according to a single protocol but at more than one site, and, therefore, carried out by more than one investigator." Dkt. 81-5. The NIH defines a multicenter study as "a clinical trial that is carried out at more than one medical institution." Dkt. 81-6. Under Plaintiff's reasoning, use of this common term, with its commonsense definition, turns into fraud if excluding the data from any one site, as to any metric, at any time, has statistically significant implications. That is neither logical nor practical.

Nor is it legally supportable. A statement may be misleading by virtue of omitted information, but not where the information is unrelated to the statement. Courts dismiss Section 10(b) claims where plaintiffs cannot establish a "sufficient nexus" between the challenged statement and the purportedly omitted information. *Sneed v. AcelRx Pharms., Inc.*, 2022 WL 4544721, at *4 (N.D. Cal. Sept. 28, 2022); Mot. at 11 (citing authorities). Plaintiff does not address this line of authorities, instead citing to the Court's prior ruling that Plaintiff plausibly alleged falsity as to the use of the term "multicenter." Opp. at 13 (citing Order at 13-14). But the facts before the Court on the prior motion to dismiss were different, and the fuller picture provided by the FDA documents supports a different conclusion. The FDA documents show just how disconnected the FDA's single site statistical analysis was from the word "multicenter." The documents also underscore the fact that Plaintiff's theory is based on hindsight. The FDA raised the single site issue in connection with the May 1, 2020 late-cycle meeting—which was after all but one challenged use of "multicenter."

6

**D.** **Plaintiff Fails to Plead Facts Showing that Klaerner's Statements on the May 7, 2020 Earnings Call Were Materially False or Misleading.**

***Statement discussing Advisory Committee (AdCom) meeting.*** The FDA documents do not cure Plaintiff's defective challenge to Klaerner's statement that the FDA had "indicated it currently does not plan to hold an AdCom to discuss veverimer . . . due in part to the logistical challenges posed by COVID-19." Mot. at 11-12. Plaintiff cites the FDA's preliminary agenda for its January 27, 2020 mid-cycle meeting with Tricida, but the FDA stated there only that the need for an AdCom was "no longer obvious." Ex. 12 at 7. That does not show that Klaerner's statement about the FDA's AdCom plans or the reason it gave for those plans was false or misleading. Critically, the mid-cycle meeting minutes themselves—as opposed to the preliminary agenda—confirm that the FDA had not reached a conclusion about the need for an AdCom. Ex. 13 at 7; Mot at 12.

Plaintiff does not address these points. He continues to assert that "an AdCom[] meeting was not scheduled because of the significant review issues concerning the NDA." Opp. at 15. But this is simply Plaintiff's assertion; it is devoid of factual support. Without facts, Plaintiff cannot plead fraud with the particularity required by the PSLRA.

***Discussion of outstanding review issues with the FDA.*** The FDA documents also undermine Plaintiff's attack on Klaerner's statement that "[i]n our late-cycle meeting with the FDA, we took the opportunity to address outstanding review issues." ¶ 158. While the Court previously held that Tricida failed to disclose the FDA's concerns about applicability of foreign data to U.S. patients in light of BEN, the late-cycle meeting minutes now before the Court show that the company addressed this concern, explaining to the FDA that it was unlikely that any substantive number of patients had the condition. Mot. at 12-13; *supra* at 3. Klaerner's reference to outstanding review issues did not impose a duty to say more about the interim BEN discussion. Mot. at 13.

Plaintiff acknowledges that Tricida responded to the FDA's concern about BEN, but claims that by telling investors that the company "took the opportunity to address outstanding review issues," Klaerner was obligated to disclose the "bad news" about the Eastern European data and BEN. Opp. at 14. But there was no "bad news" to report at the time of the challenged statement— there were only further interim discussions, which courts have held repeatedly do not need to be

7

disclosed.[3]  Mot. at 13.  Significantly, Plaintiff does not and could not allege that the FDA mentioned BEN again after the late-cycle meeting, either in the CRL or the Appeal Denied Letter.[4]

*Schueneman v. Arena Pharmaceuticals* is not to the contrary.  840 F.3d 698 (9th Cir. 2016).  There, the court recognized that drug sponsors are not required to adopt negative comments by FDA staff.  *Id.* at 708.  A company in receipt of such comments remains "free to express confidence in FDA approval" and may even represent that it is "working through some requests from the FDA and [is] confident the data [will] vindicate" its position.  *Id.*  This is the most Klaerner did here.

### E.  Plaintiff Fails to Plead Facts Showing that Tricida's References to Trial Design and Endpoints Were Materially False or Misleading.

Plaintiff also challenges statements about the endpoints and design of Tricida's Phase 3 trials.  But Plaintiff's attack on these statements depends on pulling phrases without context from years of highly complex FDA interactions.  Mot. at 14-15.  Furthermore, Tricida disclosed precisely the risk Plaintiff claims was omitted:  that there was "uncertainty about the degree of change from baseline blood bicarbonate that will translate into improved clinical outcomes," and that the FDA "may not agree that we have achieved the primary endpoint in our Phase 3 clinical trial, TRCA-301, to the magnitude or to the degree of statistical significance required."  *Id.* (quoting ¶ 108).

Rather than addressing these arguments, Plaintiff attempts to sow confusion.  He reprises the defects in his complaint by taking sections of FDA documents out of context to arrive at factually unsupported conclusions.  Plaintiff argues that based on FDA feedback, Klaerner knew at the time of the challenged statements that "the data from TRCA-301/301E likely ***would not*** provide sufficient evidence of clinical safety and efficacy."  Opp. at 16 (emphasis in original).  This makes no sense.  The complaint contains no allegations at all about veverimer's safety.  And if the FDA believed that Tricida's Phase 3 trials were unlikely to provide sufficient evidence of safety and efficacy, the

[3] Plaintiff also suggests that by discussing outstanding review issues, Klaerner assumed and then breached a duty to reveal "bad" news about Tricida's presentation of "the magnitude and durability of treatment effect."  Opp. at 14.  That is inconsistent with Plaintiff's own allegation that Klaerner *told* investors on May 7, 2020 that "the magnitude and durability of the treatment effect on the surrogate marker" was an outstanding review issue.  ¶¶ 26, 27, 80, 158, 162; *see also* Order at 22.

[4] Plaintiff argues that in the ADL, the FDA raised the issue of the applicability of Eastern European data to the U.S. population.  Opp. at 14.  But the cited concern relates not to BEN but to "differences in patient management" that "might affect the treatment response to veverimer."  ¶ 33.

agency would not have allowed Tricida to continue.  The FDA does not allow experimentation with human subjects without the prospect of approval.  *Sanofi*, 87 F. Supp. 3d at 533.

In support of his illogical narrative, Plaintiff presents out-of-context fragments of FDA documents in a way that obscures the fact that Tricida *incorporated* the FDA's concerns and feedback into its evolving trial design, and was permitted to move forward as a result.  For example, Plaintiff claims that on November 20, 2017, Tricida asked a question about its proposed predictive model for powering the post-marketing TRCA-303 study, and the FDA responded "No, we do not agree."  Opp. at 18.  Plaintiff claims that Tricida then asked a second question, "Does the FDA agree that, with the successful completion of Study TRCA-301, the size of the treatment effect on TRC101 on serum bicarbonate will be sufficient to support accelerated approval of TRC101?" and the FDA responded "No.  See our response to Question 1."  *Id.*  Plaintiff's framing is misleading.  In response to Question 1, the FDA provided detailed comments, asking technical questions about Tricida's modeling and its relationship to a model published by Dr. Navdeep Tangri.  Ex. 10 at 2.  The FDA then asked Tricida to perform certain modeling steps and submit the results for review.  Plaintiff makes no allegation that Tricida failed to follow this direction.

Indeed, Plaintiff all but ignores the substantial dialogue that followed between Tricida and the FDA about predictive modeling and the Tangri model in particular.  Mot. at 15.  Plaintiff claims that the model is not relevant to his allegations because it links the "surrogate effect in TRCA-301 to the clinical effect in VALOR-CKD," and therefore purportedly "had no bearing on the FDA's concerns that the magnitude of veverimer's treatment effect on SBC in TRCA-301/301E would simply be inadequate to show clinical benefit (an absolute and independent consideration)."  Opp. at 18 n.11.  This is deeply confused.  TRCA-301 was not designed to "show clinical benefit."  The whole point of the Accelerated Approval Program is that a surrogate endpoint trial *predicts* clinical benefit, which is then assessed directly in a postmarketing trial—in Tricida's case, VALOR-CKD.

Plaintiff cannot simply wave away the Tangri model in an effort to establish fraud.  Plaintiff himself alleges that the FDA told Tricida that "[a] key issue is whether the magnitude of the treatment effect on serum bicarbonate in Study TRCA-301 is sufficient to provide confidence that the treatment will have the anticipated clinical benefit that you are powered to find in your

9

postmarketing study." ¶ 50; Ex. 8 at 3.  The FDA suggested that Tricida consider the Tangri model, and that is exactly what Tricida did.  Tricida worked closely with Dr. Tangri, who joined the company's advisory board and co-authored the two articles about veverimer in *The Lancet*.

Plaintiff next appears to introduce a new liability theory about the Phase 3 trial.  Opp. at 5.  Plaintiff plainly may not raise a new theory in opposing a motion to dismiss, and the theory fails of its own accord in any event.  Plaintiff argues that the Phase 3 trials demonstrated that the "treatment effect [on SBC] levels at weeks 12 and 52 in TRCA-301/301E was 2.64 mEq/L and 1.99 mEq/L respectively."  Opp. at 5 (quoting ¶ 23).  He asserts that this "did not even come close to the 4 mEq/L increase Tricida argued should support approval."  Opp. at 5.  Plaintiff is again confused.  The primary endpoint of TRCA-301 was the proportion of subjects achieving a 4 mEq/L increase or normalization of SBC at Week 12.  Ex. 3 at 4; Reply Ex. 2 at 16-17.  Tricida met this mark and the secondary endpoint of least squares mean change from baseline to Week 12 with statistical significance:  The mean serum bicarbonate increase from baseline to Week 12 was 4.42 mEq/L in the veverimer group and 1.78 mEq/L in the placebo group, a between-group difference of 2.64 mEq/L.  Plaintiff has improperly substituted the comparative figure (2.64 mEq/L) for the absolute figure (4.42 mEq/L, which is greater than 4 mEq/L).  That is an error, if not a misrepresentation, on Plaintiff's part.  It is certainly no basis for a fraud claim against Klaerner.

Plaintiff's attack on three groups of statements related to trial design and endpoints fails for additional reasons.

***Statements about meeting endpoints.***  Plaintiff attacks the undisputedly true statement that TRCA-301 met its endpoints "in a highly statistically significant manner."  Plaintiff argues that this was misleading because "the FDA had already communicated that a 'win' on the primary endpoint for TRCA-301 'would not be sufficient to support an application for accelerated approval.'"  Opp. at 16 (emphasis omitted).  Plaintiff is again misleadingly taking language out of context.  He ignores the sentence that follows in the quoted FDA letter:  "Rather, the magnitude of the treatment effect on serum bicarbonate in Study TRCA-301 will need to be sufficient to provide confidence that the treatment will have the anticipated clinical benefit that you are powered to find in the agreed-upon postmarketing study." ¶ 12 (emphasis omitted).  In other words, the FDA pointed out that a

10

successful TRCA-301 trial would not *guarantee* Accelerated Approval.  But Tricida never suggested otherwise.  The challenged statements are factual recitations of Phase 3 trial results, and making such statements does not trigger a duty to say more.  *See, e.g.*, *In re Amarin Corp. PLC Sec. Litig.*, 2022 WL 2128560, at *3 (3d Cir. June 14, 2022) (disclosure of topline results "did not put into play either the full trial data or additional information regarding the [biologically active] placebo").

In any event, Tricida warned investors that "[b]ecause we are developing a product candidate for the treatment of a disease or condition on the basis of an unvalidated surrogate endpoint, there are *increased risks* that the FDA or other regulatory authorities may find that our clinical program provides insufficient evidence of clinical benefit, may have difficulty analyzing and interpreting the results of our clinical program, and may delay or refuse to approve TRC101."  Ex. 1 at 40-41 (emphasis added).  Tricida further cautioned that because of "uncertainty about the degree of change from baseline blood bicarbonate that will translate into improved clinical outcomes . . . we cannot be certain that the FDA will ultimately conclude that the design and results of [the Phase 3 trials] will be sufficient for approval."  ¶ 108 (emphasis omitted).  Plaintiff acknowledges these warnings, but claims they were themselves misleading because the FDA had already told Tricida "of its concerns that the magnitude of the treatment effect Tricida proposed to show would be insufficient and had repeatedly questioned the proposed use of SBC."  Opp. at 19.  But that does not make the risk disclosures misleading.  Plaintiff presents FDA questions as *fait accompli*, when in fact they simply signaled risk—which is precisely what Tricida disclosed.  Plaintiff also misconstrues the FDA documents he cites.  He claims that the FDA "questioned the proposed use of SBC."  *Id.*  But the FDA's minutes show that it "*agreed* that the submitted data supported the use of changes in blood bicarbonate as a reasonably likely surrogate for renal benefit . . ."  Ex. 9 at 5 (emphasis added).

Plaintiff again cites *Schueneman*, but the facts in that case were critically different.  The company there characterized *all* clinical trial data as "favorable," omitting the fact that rats given large quantities of the study drug had developed cancer.  840 F.3d at 701-02, 707.  The FDA was concerned by those results, and directed the company to submit bi-monthly reports and conduct follow-up studies—steps the company knew were "highly unusual" and "out-of-process."  *Id.* at 707.  The Ninth Circuit held that the company's statement that *all* trials yielded favorable data triggered a

11

duty to disclose the FDA's concern about the rat study, notwithstanding the company's belief that the FDA's concern was misguided.  Plaintiff here identifies no comparable statement that would trigger a disclosure duty, and no FDA requirement to take unusual steps.  Indeed, Plaintiff acknowledges that the dialogue between Tricida and the FDA was "typical."  Opp. at 3.

Plaintiff also relies heavily on *Homyk v. ChemoCentryx* in suggesting that Defendant had a duty to disclose interim FDA comments.  Opp. at 17 (citing No. 21-cv-03343-JST (N.D. Cal. Feb. 23, 2023) (slip op.)).  But the facts in that case were critically different too.  The plaintiffs there alleged that the FDA had told the company that its trial design was "likely not adequate" to support the safety comparisons the company was making.  This contradicted the company's statements emphasizing the drug's "superior safety profile." *ChemoCentryx*, slip op. at 14.  Plaintiff has not alleged anything of the sort here.  The FDA asked questions.  It did not tell Tricida that its trial design was likely inadequate.

***Statements about submission and review of NDA.***  Plaintiff next doubles down on his challenge to Tricida's statement that it believed data from the clinical trials "will provide sufficient evidence of clinical safety and efficacy to support the submission and review of an NDA for TRC101 pursuant to the Approval Program."  Opp. at 1, 16, 22 (citing ¶ 104).  This is nonsensical.  It is undisputed that the FDA *did* accept Tricida's NDA for review.  ¶ 71.

Plaintiff further challenges two opinion statements:  (1) "[w]e believe that the data from the TRCA-101, TRCA-301, and TRCA-301E clinical trials will provide sufficient evidence of safety and efficacy to support the approval of our NDA for veverimer pursuant to the Accelerated Approval Program," and (2) "we feel good about what we've learned in the 301E reading safety and efficacy, increasing our confidence for a successful [post-marketing] trial."  ¶¶ 114, 157.  Plaintiff contends that the statements are actionably misleading because Tricida omitted questions and issues the FDA raised.  Opp. at 20.  But here again, Plaintiff's arguments depend upon selectively quoting and at times simply misstating the content of the FDA communications.  *Supra* at 10-11.

***Statement about agreement on specified issues.***  Finally, Plaintiff challenges Klaerner's reference to agreement between Tricida and the FDA on the use of the Accelerated Approval program.  ¶ 131.  But Plaintiff cites no facts suggesting that Tricida and the FDA did *not* agree on

12

this point.  Nor did Klaerner's reference to agreement on the approval pathway trigger a duty to report details about interim discussions on the magnitude of treatment effect.  *Supra* at 10.[5]

### F.     Plaintiff Fails to Plead Facts Creating a Strong Inference of Intentional Fraud.

Under the PSLRA, Plaintiff must allege particularized facts creating a strong inference of deliberate fraud.  Mot. at 17-18.  Plaintiff fails to plead such facts here.  Plaintiff reruns the flawed allegations in his prior complaint—that scienter can be inferred from the "core operations" principle and from stock sales, and that Klaerner was motivated to mislead the market because otherwise Tricida would run out of money.  Mot. at 18-19.  The Court has already considered and rejected these allegations.  They fail when considered in connection with each group of challenged statements, and they also fail when viewed holistically.  *Id.* at 20-25.

Plaintiff's scienter theory is that Klaerner knew what the FDA said to Tricida.  This is plainly insufficient.  Knowing information that a plaintiff later claims should have been disclosed is not the same as intending to deceive investors by not reporting it.  Mot. at 19 (citing *Colyer v. AcelRx Pharms, Inc.*, 2015 WL 7566809, at *13 (N.D. Cal. Nov. 25, 2015)); *see also, e.g.*, *In re Sona Nanotech, Inc. Sec. Litig.*, 562 F. Supp. 3d 715, 727-28 (C.D. Cal. 2021) (rejecting scienter allegations based on "general inference that [defendants] knew [diagnostic test developer's] statements were incorrect based on apparent possession of contradictory information").  Plaintiff points to no facts showing that Klaerner knew of any obligation to report interim FDA feedback publicly, much less that Klaerner intended to mislead investors as to veverimer's approval prospects.

Without facts supporting the required strong inference that Klaerner intended to deceive investors (or recklessly disregarded the risk of doing so), Plaintiff repeats his flawed falsity arguments, citing fragments of FDA documents in a circular and misleading fashion.  Opp. at 21-25. For example, Plaintiff points to Klaerner's statement on the May 7, 2020 earnings call that the FDA had "indicated it currently does not plan to hold an AdCom to discuss veverimer . . . due in part to logistical challenges posed by COVID-19."  ¶ 158.  Plaintiff claims that Klaerner "deliberately

---

[5] Klaerner addressed in his opening brief the defects in Plaintiff's attack on an August 5, 2020 statement about agreement with the FDA as to a "quantitative understanding" of the relationship between the surrogate endpoint and disease progression.  Mot. at 17 (citing ¶ 172).  Plaintiff does not respond to this argument.

withheld the truth about why the meeting was cancelled," (Opp. at 22) but cites no contemporaneous facts showing even what the purported "truth" was, let alone facts showing that Klaerner had any reason to conceal it. Plaintiff then argues that Klaerner's purported choice to deceive investors about the reasons an AdCom was not scheduled is "inexplicabl[e]"—which appears to be a concession that Plaintiff's narrative of fraud does not make sense. Opp. at 24. Plaintiff otherwise argues that the risk of deceiving investors was "so obvious that [Klaerner] must have been aware of it," but in support simply repackages arguments about falsity. Opp. at 23.[6]

Plaintiff next argues that while Klaerner may have believed in veverimer's prospects, he was deliberately reckless in withholding FDA feedback in a way that led investors to underestimate the risk of non-approval. Opp. at 25. Plaintiff again cites *ChemoCentryx*, but the allegations there presented a coherent theory—that defendants concealed adverse facts and encouraged investors to lowball risk in order to "buy time and finance the company's operations while trying to alter the potential effect of those adverse facts on the NDA process." *ChemoCentryx*, slip op. at 33. Plaintiff has alleged nothing comparable here. Plaintiff simply claims that Klaerner "knew the FDA had *already* found Tricida's 'clinical program provides insufficient evidence of clinical benefit.'" ¶ 108 (emphasis added). On the facts alleged here, the Court has rejected the contention that scienter can be inferred from the financial pressure Tricida faced: "Courts routinely conclude that such theories do not give rise to an inference of scienter." Order at 24.

Stepping back, Plaintiff's contention that Klaerner and Tricida failed to adequately disclose the risk of non-approval runs headlong into the company's risk disclosures. Tricida specifically warned investors of an "increased risk" that the FDA might not approve veverimer because of the development program's use of an unvalidated surrogate endpoint. Ex. 1 at 40; *supra* at 11. Tricida also warned investors that "the FDA may not accept . . . foreign clinical data," and that "the FDA may not agree that we have achieved the primary endpoint in our Phase 3 clinical trial . . . to the

---

[6] Here as elsewhere, Plaintiff also mischaracterizes the FDA's statements. He argues, for example, that the FDA told Klaerner that the results of the Phase 3 trials "were not 'reasonably likely to predict benefit.'" Opp. at 23. The FDA did not say this. In connection with the late-cycle meeting, the FDA noted the serum bicarbonate treatment effect and then "questioned whether an effect of this size should be considered 'reasonably likely' to predict benefit." Ex. 14 at 2. Plaintiff cannot make out a fraud claim by representing *questions* the FDA asked during an ongoing review process as final determinations—a tactic he deploys repeatedly.

14

magnitude or to the degree of statistical significance required." *Id.* at 41.  These on-point disclosures undermine Plaintiff's claim that Klaerner intended to deceive investors about risks to approval.  The same is true of Tricida's publication of lists of Eastern European trial sites.  *Supra* at 4-5.

Considered holistically, the facts alleged support a benign inference, not an inference of deliberate deceit.  Klaerner worked in good faith to secure FDA approval for veverimer, spending enormous amounts of time and effort to "get it right" and put veverimer on the path to approval. *Immanuel Lake v. Zogenix, Inc.*, 2020 WL 3820424 (N.D. Cal. Jan. 27 2020) (rejecting "reckless gamble" theory of scienter).  Tricida invested heavily in commercialization efforts and asked the FDA about expected labeling as late as the May 1, 2020 late-cycle meeting, which is further testament to the company's and Klaerner's belief in the prospects for approval.  Mot. at 24.  The contrary inference Plaintiff asks the Court to draw—that Klaerner would intentionally deceive the market about those prospects—makes no sense.  *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) (rejecting theory that company would promise the market FDA approval of a product that could not be approved based on known issues because this "does not resonate in common experience"); *see also Jun Shi v. Ampio Pharms., Inc.*, 2020 WL 5092910, at *6 (C.D. Cal. June 19, 2020) (inference of scienter is "significantly less compelling than the opposition inference that [company] tried in good faith to design a successful Phase 3 pivotal trial" but was not successful). On such facts, courts do not infer deliberate fraud, and the Court should not do so here.

**III.   CONCLUSION**

The Court should dismiss Plaintiff's claims in their entirety.

Dated:  April 24, 2023

Respectfully submitted,

**SIDLEY AUSTIN LLP**

By:  *Sara B. Brody*
     Sara B. Brody (SBN 130222)

*Attorneys for Defendant Gerrit Klaerner*