Sara B. Brody (SBN 130222)
sbrody@sidley.com
Sarah A. Hemmendinger (SBN 298659)
shemmendinger@sidley.com
Sarah E. Gallo (SBN 335544)
sgallo@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone:  (415) 772-1279

Robin E. Wechkin (admitted *pro hac vice*)
rwechkin@sidley.com
SIDLEY AUSTIN LLP
8426 316th Place Southeast
Issaquah, WA 98027
Telephone: (415) 439-1799

*Attorneys for Defendant Gerrit Klaerner*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL PARDI, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> TRICIDA, INC., and GERRIT KLAERNER, <br><br> Defendants. | Case No.:  4:21-cv-00076-HSG <br><br> <u>CLASS ACTION</u> <br><br> **DEFENDANT GERRIT KLAERNER'S OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** <br><br> Hon. Haywood S. Gilliam, Jr. <br><br> Date:  September 12, 2024 <br> Time: 2:00 p.m. <br> Courtroom 2, 4th Floor |

# TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ................................................................................................................1

I.   BACKGROUND ................................................................................................................2

    A.   The Surviving Statements .................................................................................2

    B.   Plaintiff's Bid for Class Certification Does Not Fit
the Downsized Case Left by the Court's Rulings .........................................4

II.   ARGUMENT ................................................................................................................5

    A.   Klaerner Can Rebut the Fraud-on-the-Market Presumption
of Reliance by Showing that the Purported Corrective Disclosures
Were Not Corrective or Provided No New Information About the
Challenged Statements ................................................................................5

    B.   Klaerner's Statement About FDA Review Issues
Discussed at the May 1 Meeting Had No Price Impact
After July 16, 2020 ................................................................................9

        1.   Tricida disclosed the purportedly misrepresented "truth"
about the May 1 meeting on August 6, 2020 ................................9

        2.   The economic evidence further demonstrates that the
class period must end on July 16, the day after
the first purported corrective disclosure ......................................12

        3.   Information introduced in the four post-August 6 disclosures
is a "mismatch" with the challenged statement about
review issues discussed at the May 1 meeting ............................12

    C.   Klaerner's Statement About AdCom Scheduling Discussed in Connection with
the May 1 Meeting Had No Price Impact at Any Point Beyond July 16, 2020 .........19

    D.   The Lack of Price Impact Defeats the Fraud-on-the-Market
Presumption of Reliance ................................................................................20

    E.   The *Affiliated Ute* Presumption of Reliance Does Not Apply ...............................20

    F.   Plaintiff Is Subject to Unique Defenses and Lacks Typicality .................................21

III.   CONCLUSION ................................................................................................................25

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
CASE NO. 4:21-CV-00076-HSG

## **TABLE OF AUTHORITIES**

**Page(s)**

**Decisions**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)........................................................................................................2, 20-21

*Alghazwi v. The Beauty Health Co.*,
  2024 WL 1984879 (C.D. Cal. May 2, 2024) ...............................................................23

*In re Apache Corp. Sec. Litig.*,
  2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ........................................................... 8, 9, 13

*Basic, Inc. v. Levinson*,
  485 U.S. 224 (1988)............................................................................................................. 6

*Bhangal v. Haw. Elec. Indus., Inc.*,
  2023 WL 8482871 (N.D. Cal. Dec. 7, 2023) ..............................................................23

*In re Cardinal Health, Inc. Sec. Litig.*,
  226 F.R.D. 298 (S.D. Ohio 2005) ...............................................................................23

*In re Chicago Bridge & Iron Co., N.V. Sec. Litig.*,
  2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ............................................................. 8

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
  2024 WL 1060079 (S.D. Cal. Mar. 11, 2024) ...................................................... 12, 16

*Erickson v. Snap, Inc.*,
  2017 WL 11592635 (C.D. Cal. Sept. 18, 2017) ........................................................22

*In re FibroGen Sec. Litig.*,
  2024 WL 1064665 (N.D. Cal. Mar. 11, 2024)......................................................*passim*

*George v. China Auto. Sys., Inc.*,
  2013 WL 3357170 (S.D.N.Y. July 3, 2013) ...............................................................22

*Goldman Sachs Grp. v. Ark. Teachers Ret. Sys.*,
  594 U.S. 113 (2021)......................................................................................................*passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) .......................................................................................................5, 6

*Homyk v. ChemoCentryx, Inc.*,
  2024 WL 1141699 (N.D. Cal. Mar. 6, 2024)............................................................. 12

*In re Intuitive Surgical Sec. Litig.*,
  2016 WL 7425926 (N.D. Cal. Dec. 22, 2016)............................................................. 8

ii

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
    2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ................................................................................7

*In re Qualcomm Inc. Sec. Litig.*,
    2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) .....................................................................*passim*

*In re Safeguard Scis.*,
    216 F.R.D. 577 (E.D. Pa. 2003)..............................................................................................23

*In re Snap Inc. Sec. Litig.*,
    2019 WL 2223800 (C.D. Cal. Apr. 1, 2019) ..........................................................................23

*In re Valence Tech. Sec. Litig.*,
    1996 WL 119468 (N.D. Cal. Mar. 14, 1996).....................................................................22, 23

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    2 F.4th 1199 (9th Cir. 2021) ..............................................................................................20, 21

*In re World Access, Inc. Sec. Litig.*,
    310 F. Supp. 2d 1281 (N.D. Ga. 2004)...............................................................................22-23

**Statutes & Rules**

15 U.S.C. § 78j(b) (Section 10(b) of the Securities Exchange Act of 1934).............................*passim*

Fed. R. Civ. P. 23(a) ........................................................................................................................21

Fed. R. Civ. P. 23(b) .....................................................................................................................1, 6

## I.      INTRODUCTION

Plaintiff asks the Court to certify an overbroad class.  Under controlling law, a Section 10(b) class may be certified only if putative class members are entitled to a presumption of reliance.  If no presumption applies, individual issues of reliance predominate over common issues, making certification inappropriate under Federal Rule of Civil Procedure 23(b).

Plaintiff is not entitled to a presumption of reliance for the May 8, 2020-February 25, 2021 class period he seeks to have certified.  Plaintiff relies on the fraud-on-the-market presumption, but that presumption is rebutted when a Section 10(b) defendant shows that challenged statements more likely than not had no impact on stock price.  Under the Supreme Court's 2021 *Goldman Sachs* opinion and its progeny, defendants may demonstrate lack of price impact with respect to particular challenged statements, particular portions of a putative class period, or both.

Defendant Dr. Gerrit Klaerner has demonstrated in two ways that the challenged statements ceased to impact Tricida's stock price—if they ever impacted it at all—after August 6, 2020.  First, Tricida disclosed on that date exactly the information Plaintiff claims Klaerner misrepresented by means of the challenged statements—information about developments at a May 1, 2020 meeting between Tricida and the FDA.  After August 6, the two challenged statements remaining in this case, both made on May 7, accordingly ceased to have any impact on Tricida's stock price.  That is true at the level of both common sense and financial economics.  As defense expert Dr. Paul Zurek explains, "when the alleged truth about an alleged misrepresentation first becomes public, any stock price response to the disclosure is rapid, and there is no subsequent impact of the alleged misrepresentation on the stock price as an economic matter."

Second, no new or corrective information related to the challenged statements entered the market after August 6.  Plaintiff points to four purported corrective disclosures after August 6, but those disclosures contain no information about the May 1 meeting.  In the words of *Goldman Sachs*, there is a "mismatch" between the challenged statements and the purported corrective disclosures, and the premise that "back-end" stock price declines following those disclosures reflect "front-end" inflation breaks down in the face of that mismatch.  In this way too, the evidence disproves price impact at any point after August 6.

1

Additional economic evidence, supported by *both* sides' experts, shows that Tricida's stock price did not move to a statistically significant degree on any day between July 17 and August 6. That is not surprising, as Plaintiff has never alleged that new information about the challenged statements (or even Tricida) entered the market in this period. July 16—which is the day following the first purported corrective disclosure in the case—is thus the appropriate class-period cutoff date.

Plaintiff cursorily invokes a second presumption of reliance—the *Affiliated Ute* presumption, which applies to certain cases in which proving reliance would require impossible or impractical speculation about events that never occurred. This is not such a case, and Plaintiff notably fails to cite controlling Ninth Circuit law governing the application of *Affiliated Ute*.

Finally, Plaintiff is an atypical class member. With a class period ending on July 16, 2020, he made his only stock purchases not only after the single purported corrective disclosure, but also after the stock had already absorbed approximately 90% of what Plaintiff claims was the impact of that disclosure. Plaintiff is hence subject to unique defenses, and most obviously to the question how he could have relied on the challenged statements, either directly or indirectly, after Tricida had issued a press release that superseded them and drove the stock price down steeply. Plaintiff's answers reveal that he purchased Tricida stock for idiosyncratic reasons that make him atypical regardless of the length of the class period. That precludes certification altogether.

## I.    BACKGROUND

### A.    The Surviving Statements

The Court has allowed this case to move forward as to two statements, both made on May 7, 2020, and both concerning specific feedback the FDA provided to Tricida at a meeting six days earlier, on May 1, 2020. First, Klaerner stated:

> In our late-cycle meeting with [the] FDA, we took the opportunity to address outstanding review issues. We presented our data and rationale as to why we think [veverimer] satisfied the requirements for initial approval under the Accelerated Approval Program, including the magnitude and durability of the treatment effect on the surrogate mark[er] serum bicarbonate demonstrated in the TRCA-301 and TRCA-301E trials.

Dkt. 115 (Second Amended Complaint, or SAC) ¶ 158. The Court held that Plaintiff has adequately alleged that Klaerner misled investors by telling them about only one of two

"outstanding review issues" discussed at the May 1 meeting: "the magnitude and durability of the treatment effect on the surrogate marker." Dkt. 93 at 22. By disclosing this "key detail," the Court held, "Klaerner was obligated to share the other significant review issue—'applicability of data from the TRCA-301 and TRCA-301E trials to the U.S. population'—discussed with the FDA." *Id.*; *see also id.* at 30 (Defendants "could not disclose only one review issue discussed with the FDA . . . while omitting the other review issue they knew the FDA was concerned about").

Second, referring to the same May 1 meeting, Klaerner stated:

> In our late-cycle meeting with the FDA, held in May 2020, the FDA indicated it currently does not plan to hold an AdCom to discuss veverimer due in part to the logistical challenges posed by COVID-19.

SAC ¶ 158. The Court held that Plaintiff had adequately pled falsity, crediting Plaintiff's allegation that "'[t]he FDA did not cite logistical challenges stemming from COVID-19 as even a contributing factor in canceling the AdCom meeting in its communications with Tricida.'" Dkt. 145 at 17 (quoting SAC).

With these two exceptions, the Court dismissed Plaintiff's claims.[1] The Court's rulings on Defendants' pleading motions dramatically downsized Plaintiff's case. Plaintiff's theory of fraud in the SAC was expansive: Plaintiff challenged statements Tricida made between June 2018 and August 2020, faulting the Company for not discussing with investors numerous comments the FDA provided through meetings and other communications over a two-year period. SAC ¶¶ 94-173.

The Court rejected that theory of fraud. Dkt. 145 at 25. The Court held that Plaintiff had failed to plead that any challenged statement other than the two May 7 statements about the May 1 meeting was both materially false or misleading and made with scienter. *Id.*; Dkt. 93 at 30-31. Two years' worth of challenged statements are thus no longer part of the case. Similarly, Tricida's purported failure to tell investors what occurred in any interaction it had with the FDA apart from the May 1 meeting is no longer part of the case.

The Court's holding on the latter point was explicit. Dkt. 145 at 25. So was its reasoning.

---

[1] Plaintiff erroneously contends that three statements remain in the case. Motion to Certify Class, Dkt. 152 (Mot.) at 4. The Court has subsequently confirmed that the case is limited to two statements. Dkt. 161.

3

"The overarching flaw with [Plaintiff's] argument is his assumption that because the FDA communicated its views to Klaerner throughout the course of the extensive review and approval process, it follows that his statements failing to contemporaneously convey the FDA's views and accept them as true were materially misleading." *Id.* at 12-13.  The Court rejected Plaintiff's contention that Klaerner was required to "engage in a rolling, communication-by-communication disclosure" of the FDA's stated concerns. *Id.* at 12.  As a result of that ruling, Plaintiff's case is confined to the FDA's communications with Tricida at a single meeting, on two specified topics.  It does not concern any other FDA communications or issues.

> B.    **Plaintiff's Bid for Class Certification Does Not Fit the Downsized Case Left by the Court's Rulings**

In moving for class certification, Plaintiff has declined to tailor his case to conform to the Court's rulings.  Plaintiff recognizes that of the scores of statements he originally challenged, only the May 7, 2020 statements about the May 1 meeting survive.  Mot. at 1.  But Plaintiff makes no adjustment to account for the theories of falsity the Court rejected.

Specifically, Plaintiff originally alleged that the "truth" concealed by two years' worth of challenged statements was "revealed" through five purported corrective disclosures between July 15, 2020 and February 25, 2021.  SAC ¶¶ 174-86.  Notwithstanding the narrowing of this case to the May 1 meeting, Plaintiff defines the proposed class by reference to the same set of five disclosures purportedly correcting the far broader set of originally challenged statements.  Mot. at 4-7.  Notably, *none* of the five disclosures contains any reference to the May 1 meeting.

A different announcement *did* refer to the May 1 meeting, but Plaintiff conspicuously ignores that report in seeking class certification.  This was Tricida's August 6, 2020 Form 10-Q, which Plaintiff has previously cited as purported evidence that the May 7 statements remaining in the case are misleading.  SAC ¶¶ 27, 80, 162.  In the Form 10-Q, Tricida said the following:

> In our late cycle meeting with the FDA, held in May 2020, we addressed *two substantive review issues* that the FDA had raised in advance of the meeting, namely concerns related to the magnitude and durability of the treatment effect on the surrogate marker of serum bicarbonate demonstrated in the TRCA-301 and TRCA-301E trials *and the applicability of data from the TRCA-301 and TRCA-301E trials to the U.S. population*.

. . .

> While we plan to work with the FDA to resolve the deficiencies referenced in the July 14, 2020 letter, we require additional information from the FDA before we can evaluate whether and how we will be able to address those deficiencies. We believe we are likely to receive that clarification in the form of a Complete Response Letter, or CRL. *Consequently, at this time we do not believe we will receive approval to market veverimer in the United States by our PDUFA goal date of August 22, 2020, if at all.*

Ex. 9 at 21-22 (emphases added). In the first excerpt, Tricida provided investors with exactly the information Plaintiff complains was concealed on May 7: that the FDA raised a second review issue in connection with the May 1 meeting, concerning geographical applicability. In the second excerpt, Tricida provided the takeaway from the FDA's July 14 deficiency notice: Veverimer was not going to be approved on the expected timeline, and might not be approved at all.

Of the five purported corrective disclosures Plaintiff cites, four were made after Tricida's critical August 6 announcement. The stock price declines following these disclosures cannot show price impact because the relevant "truth" entered the market no later than August 6. Given the efficient market Plaintiff posits, that information was rapidly incorporated into Tricida's stock price and ceased to impact price thereafter. *Infra* at 9-11.

The substance of the four post-August 6 disclosures confirms the absence of price impact. As we discuss below, none of the four provided investors with any information about the May 1 meeting, let alone information correcting Klaerner's two May 7 statements about that meeting. The purported corrected disclosures do not match the challenged statements. *Infra* at 12-19.

II. **ARGUMENT**

    A.     **Klaerner Can Rebut the Fraud-on-the-Market Presumption of Reliance by Showing that the Purported Corrective Disclosures Were Not Corrective or Provided No New Information About the Challenged Statements**

The Supreme Court established the current framework for evaluating predominance in Section 10(b) cases in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) (*Halliburton II*). The Court held there that a Section 10(b) class may be certified only if the plaintiff can successfully establish that all class members are entitled to a presumption of reliance across the class period. In the absence of such a presumption, Section 10(b) plaintiffs would need

5

to prove each class member's reliance on an individual basis, and "'individual issues . . . would overwhelm the common ones,' making certification under Rule 23(b)(3) inappropriate." *Id.* at 268 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 242 (1988)).

Plaintiff invokes the fraud-on-the-market presumption of reliance here. Mot. at 13-15. When the presumption applies, Section 10(b) defendants are entitled to rebut it at class certification by showing an absence of "price impact"—"an essential precondition for any [Section 10(b)] class action." *Halliburton II,* 573 U.S. at 279-80, 282. "Defendants can rebut [the] presumption by showing that the misrepresentation in question did not actually impact price." *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *11 (S.D. Cal. Mar. 20, 2023).

The impact a challenged statement has on stock price can be shown most directly when the price moves in response to the statement. But Plaintiff does not allege that this occurred here. In fact, Plaintiff's expert, Chad Coffman, has performed an event study showing that Tricida's stock price did *not* rise a statistically significant amount following the challenged statements on May 7, 2020. Ex. 18. Dr. Paul Zurek, who is Klaerner's expert, has performed an event study of his own confirming that result. Expert Report of Paul Zurek ¶ 46 (Tricida's residual return on May 8 was 1.4%, which is not statistically significant).[2] The evidence in this case thus conclusively disproves price movement on what is termed the "front-end."

That leaves the theory of inflation maintenance, and the related concept of "back-end" price impact. Three years ago, the Supreme Court provided significant guidance for courts ruling on class certification in inflation maintenance cases. *Goldman Sachs Grp. v. Ark. Teachers Ret. Sys.*, 594 U.S. 113 (2021). Under the inflation maintenance theory, the Court explained,

> price impact is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen without the false statement. Plaintiffs typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation.

---

[2] The Zurek Report is attached as Exhibit 1 to the Declaration of Robin Wechkin in Opposition to Class Certification, which is filed concurrently with this brief. "Ex. _" citations in this brief refer to the exhibits to the same attorney declaration.

*Id.* at 123 (cleaned up).  In other words, "the back-end price drop—what happens when the truth is finally disclosed—operates as an indirect proxy for the front-end inflation, or the amount that the misrepresentation fraudulently propped up the stock price."  *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *6 (S.D.N.Y. Mar. 29, 2024) (citation omitted).  "Simply put, the theory goes:  back-end price drop equals front-end inflation."  *Id.* (citation omitted).  Courts assessing this theory of price impact "should be open to *all* probative evidence."  *Goldman Sachs*, 594 U.S. at 122 (emphasis in original; cleaned up).  That is so whether or not the evidence is also relevant to merits questions such as materiality and loss causation.  *Id.*

For an inflation maintenance theory to work, the disclosure on the back end must have "actually corrected" the challenged statement on the front end.  *Id.* at 123.  Critically, "the final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the challenged disclosure."  *Id.*

In a recent decision applying *Goldman Sachs*, one court in this District provided a helpful digest.  "A finding of 'back-end' price impact requires proof that the information disclosed . . . was (i) corrective of one or more prior false statements or omissions, (ii) new (unknown to the market prior to [the purported corrective disclosure date]), and (iii) 'value-relevant' (*i.e.*, caused at least some of the stock price decline)."  *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024) (citing *Goldman Sachs*).

Under the first requirement—proof that the purported corrective disclosure is actually *corrective*—post-*Goldman Sachs* courts have noted that the required connection between the challenged statement and the corrective disclosure is tight.  Avoiding a "mismatch" "requires a closer fit (even if not precise) between the front- and back-end statements than courts have required when analyzing the loss causation element of securities fraud."  *Kirkland Gold*, 2024 WL 1342800, at *6 (cleaned up).  And while the "mismatch" at issue in *Goldman Sachs* concerned specificity— the challenged statements were generic, while the corrective disclosure was specific—a mismatch in subject matter also severs the link between the challenged statement and the purported corrective disclosure.  *Id.* at *11 (price impact disproved where "there is a substantive mismatch" between the challenged statement and the purported corrective disclosure).

7

Under the second requirement—proof that the purportedly corrective information is *new*—the focus is specific. To show back-end price impact, the negative announcement triggering a stock decline must contain new information *about the challenged statement*. Bad news followed by a stock drop does not establish price impact unless it is bad (and new) in a way that corrects the challenged statement. *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *9 (S.D. Tex. Feb. 9, 2024) (report and recommendation) ("revealing the depths of [the company's] financial struggles did not shed any new light on [its] alleged misrepresentations" about a particular issue).

Under post-*Goldman Sachs* case law, Section 10(b) defendants may thus establish a lack of price impact if they can show that the purported corrective disclosures did not match the challenged statements, or did not contain new information correcting those statements. Significantly, price impact is not an all-or-nothing proposition. Defendants may show that a challenged statement ceased to impact stock price at a particular point in a putative class period. *E.g.*, *FibroGen*, 2024 1064665, at *11-15; *Apache*, 2024 WL 532315, at *9-10; *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *13-17 (N.D. Cal. Dec. 22, 2016). Defendants may also show that particular challenged statements did not impact stock price. *E.g.*, *Qualcomm*, 2023 WL 2583306, at *11-14. Analyzing price impact with respect to certain periods does not impermissibly stray into loss causation or the truth-on-the-market defense. *See Apache*, 2024 WL 523315, at *10. Inquiring into the possible "mismatch" between challenged statement and corrective disclosure is also plainly permitted. Indeed, this was the case even before the Supreme Court decided *Goldman Sachs*. *E.g.*, *In re Chicago Bridge & Iron Co., N.V. Sec. Litig.*, 2020 WL 1329354, at *5-6 (S.D.N.Y. Mar. 23, 2020) ("inquiry into whether a disclosure is actually corrective is proper on a motion for class certification").

We show below that the four post-August 6 purported corrective disclosures neither corrected the challenged May 7 statements nor introduced new information about the May 1 meeting into the market. That is the case as to both of the two remaining challenged statements—about outstanding review issues and about AdCom scheduling. We address the two statements in that order, and further explain why additional economic evidence moves the class-period cutoff date back from August 6 to July 16, 2020. The relevant dates, to recap, are:

8

- May 1—late-cycle meeting between FDA and Tricida
- May 7—Klaerner makes challenged statements about review issues and AdCom scheduling discussed at the May 1 meeting; no statistically significant price movement
- July 15—Tricida reports receipt of FDA deficiency notice
- July 16—Tricida's stock price falls, allegedly in response to July 15 report
- July 17-August 5—no statistically significant stock price movement
- August 6—Tricida files Form 10-Q including information about the May 1 meeting and veverimer's prospects for approval; also no statistically significant stock price movement

B.    **Klaerner's Statement About FDA Review Issues Discussed at the May 1 Meeting Had No Price Impact After July 16, 2020**

1.    **Tricida disclosed the purportedly misrepresented "truth" about the May 1 meeting on August 6, 2020**

Section 10(b) defendants may demonstrate a lack of back-end price impact by showing that the information in purported corrective disclosures was already publicly available. "[D]isclosure of purportedly omitted information before a stock drop demonstrates a lack of price impact." *FibroGen*, 2024 WL 1064665, at *12 (discussing *Qualcomm*, 2023 WL 2583306, at *13). As a practical matter, determining the date on which the "purportedly omitted information" entered the market may also be necessary to set the cutoff date for the class period. "In the case of a securities fraud class action . . . a class period ends when the truth has been disseminated to the market." *Apache*, 2024 WL 532315, at *7 (citing authority; cleaned up).

The purportedly omitted information at issue here is that on May 1, 2020, Tricida and the FDA discussed not one but two issues about which the FDA had concerns. *Supra* at 2-3. That information entered the market on August 6, 2020, when Tricida disclosed the second review issue in its Form 10-Q: the "applicability" to "the U.S. population" of data from clinical trials whose population was not restricted to the U.S. *Supra* at 4-5. After August 6, the fact that the FDA was concerned with geographical applicability—and specifically, that it had discussed the issue with Tricida in connection with the May 1 meeting—was known to the market. Plaintiff himself has previously recognized this, alleging that the existence of a second review issue discussed on May 1 was (purportedly) concealed from investors only "until" August 6.[3]

---

[3] Dkt. 72 ¶ 16 ("Tricida neither revealed what it learned from the FDA in its May 2020 meeting, nor that it expected to receive a Complete Response Letter . . . until it filed its Second Quarter 10-Q . . . on August 6, 2020.").

On August 6, Tricida in fact did *more* than simply identify the second review issue from the May 1 meeting.  Tricida also told the market that given the July 14 deficiency notice, it did not expect the FDA to approve its veverimer NDA by the scheduled date of August 22, 2020—if at all. *Supra* at 5.  After August 6, the market knew about both the discussion of a second review issue at the May 1 meeting and the broadest possible implications of the FDA's concerns generally.

Plaintiff seeks to extend the class period more than six months beyond the August 6, 2020 Form 10-Q, citing four purported corrective disclosures between August 24, 2020 and February 25, 2021.  But none even mentions the May 1 meeting.  *Infra* at 12-19.  And it is undisputed that Tricida's stock price did not fall to a statistically significant degree in response to the August 6 disclosure—the sole disclosure in which Tricida *did* refer to the May 1 meeting.  Zurek Report ¶ 56.

The Court's task on class certification in a case like this one is to "determine whether it is more likely than not that the alleged misrepresentation had a price impact."  *Goldman Sachs*, 594 U.S. at 126-27.  When a defendant can show that the disclosure that precedes a back-end price decline contains no information about the subject of the purported fraud that was not already public, price impact is "less likely," not more.  *Qualcomm*, 2023 WL 2583306, at *13.  That is, "[i]f the corrective disclosures did not actually contain new information correcting the alleged misrepresentations, it becomes less likely that their announcement caused the back-end price drops and less reasonable to assume that Defendants' alleged misrepresentations caused front-end inflation in the first place."  *Id.*  On such facts, certification is inappropriate.  *Id.* (declining to certify class as to one group of challenged statements where, among other things, "Defendants' evidence that [the purportedly concealed information] was public prior to the corrective disclosures makes price impact less likely").

That is the case here too.  No disclosure after August 6 contained new information about the May 1 discussion of the second review issue.  That means that the post-August 6 back-end price drops are less likely, not more likely, to correspond to inflation purportedly maintained in the stock price by means of the challenged May 7 statement.  Indeed, given what Tricida disclosed about the May 1 meeting on August 6, the challenged statement "*could not* have impacted Tricida's stock price on a later date."  Zurek Report ¶ 41 (emphasis added).  Consequently, assuming that the May

10

7 statement had any price impact at all, Klaerner has met his burden of proving that the statement ceased to have any such impact after August 6. Back-end price declines after that date cannot show stock price inflation. The relevant information about the May 1 meeting entered the market before those declines occurred. The declines therefore do not correspond to any front-end inflation purportedly maintained by the challenged May 7 statements.

Both common sense and expert economic analysis confirm the result; both show that stale information does not move stock prices. The Supreme Court in *Goldman Sachs* commended the use of "a good dose of common sense" in analyzing price impact, 594 U.S. at 122, and the district court in *Qualcomm* recently demonstrated the utility of common sense in inflation maintenance cases. The purported corrective disclosures in *Qualcomm* "only repeated already public information." 2023 WL 2583306, at *13. The court concluded that "[a]t a 'common sense[]' level, this evidence makes it less likely that Defendants' alleged misrepresentations inflated Qualcomm's stock price on the front end and the information in the disclosures caused the price drop on the back end." *Id.* (citing *Goldman Sachs*).

Economic analysis leads to the same result. In an efficient market, "when the alleged truth about an alleged misrepresentation first becomes public, any stock price response to the disclosure is rapid, and there is no subsequent impact of the alleged misrepresentation on the stock price as an economic matter." Zurek Report ¶ 9; *see also id.* ¶ 41.[4] In this case, that means that "repetition of previously disclosed information could not have impacted Tricida's stock price on a later date." *Id.* Zurek's event study and analysis of market commentary further demonstrate that the challenged statement "did not impact Tricida's stock price after August 6, 2020." *Id.* ¶ 44; *see also id.* ¶¶ 45-49. Because Tricida disclosed the purportedly concealed information about the May 1 meeting in its August 6 Form 10-Q, none of the four post-August 6 stock price declines can show that the challenged statement had any impact on Tricida's stock price after August 6. And when price impact is disproven, the fraud-on-the-market presumption cannot apply.[5]

---

[4] Plaintiff contends that the market for Tricida's stock was efficient. Mot. at 15-20.

[5] In two recent class certification rulings in cases against companies seeking FDA approval, courts

11

2.   **The economic evidence further demonstrates that the class period must end on July 16, the day after the first purported corrective disclosure**

The economic evidence further demonstrates that the correct class-period cutoff date is July 16. Plaintiff alleges that Tricida's stock price declined "sharply" on July 16, in response to Tricida's July 15 announcement that the FDA had issued a deficiency notice. SAC ¶ 79. According to Plaintiff, this was the first corrective disclosure in the case. *Id.* ¶¶ 174-76, 193. Assuming that is true, the class period should end on July 16. Tricida's stock made no statistically significant movement on any day between July 16 and August 5. Coffman's report establishes this. Ex. 18. Zurek's event study shows the same: no statistically significant price decline on any day within this period, and no statistically significant decline on August 6 either, after Tricida filed its Form 10-Q before market open. Zurek Report ¶ 56. This is not surprising. Plaintiff has never alleged that any company-specific information entered the market between July 16 and August 5. On these facts, the correct end-date is July 16. *See, e.g.*, *FibroGen*, 2024 WL 1064665, at *12, *15 (class period ends on the date of the last disclosure actually correcting challenged statements).

3.   **Information introduced in the four post-August 6 disclosures is a "mismatch" with the challenged statement about review issues discussed at the May 1 meeting**

For a second reason too, the class period must end no later than July 16 if a class is certified. None of the four post-August 6 disclosures corrected the challenged statement about the second review issue discussed at the May 1 meeting. In the words of *Goldman Sachs*, there is a "mismatch" between the challenged statement and each of these purported corrective disclosures, which means that the necessary link between back-end price decline and purported front-end inflation maintenance breaks down. We address the four post-August 6 disclosures in turn.

---

rejected the defendants' efforts to demonstrate lack of price impact by showing that information related to FDA approval was already circulating in the market before the purported corrective disclosures appeared. *Homyk v. ChemoCentryx, Inc.*, 2024 WL 1141699, at *5 (N.D. Cal. Mar. 6, 2024); *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2024 WL 1060079, at *9-13 (S.D. Cal. Mar. 11, 2024). Those cases are easily distinguishable. Tricida's August 6 disclosure makes them inapposite. On August 6, Tricida disclosed exactly the information purportedly omitted from the challenged May 7 statement—the discussion at the May 1 meeting of a second review issue, related to geographical applicability. In neither *ChemoCentryx* nor *Acadia* were the defendants able to point to an equivalent disclosure—one that precisely corrected the challenged statement.

***August 24, 2020:  The Complete Response Letter.***  On August 24, 2020, Tricida announced that it had received a Complete Response Letter (CRL) denying the veverimer NDA.  Ex. 3. Tricida did not refer to the May 1 meeting in the August 24 announcement.  That is hardly surprising.  At this point, investors had known for several weeks that two distinct review issues were on the table at the May 1 meeting.  The market had also known for several weeks that Tricida expected the FDA to reject its NDA.  Dkt. 93 at 22 (Tricida "acknowledged" on August 6 "that the FDA would likely decline to approve the NDA").  Analyst commentary following the August 24 announcement confirms the market's prior understanding that the FDA would reject the NDA. *E.g.*, Zurek Report ¶ 64 (citing analyst's August 24 statement "Mgmt had previously guided for a rejection based on an FDA communication earlier in the review process," Ex. 10 at 1).[6]

What Tricida reported on August 24 was not additional detail about a meeting more than three months in the past, but new information about veverimer's future, based on a subsequent communication from the FDA—the CRL.  In its August 24 press release, Tricida discussed the contents of the CRL, noted that the FDA had "provided multiple options for resolving the identified deficiencies," and told investors that it might be required to perform an additional clinical trial before obtaining approval.  Ex. 3 at 1.  Analyst commentary shows that the market reacted to this news not by looking backward to the May 1 meeting but by seeking to understand what the CRL meant for Tricida's future—what the likelihood of approval was, when approval might occur, and when (if ever) Tricida could be expected to launch veverimer.  Zurek Report ¶ 67 (citing August 25, 2020 Goldman Sachs report, Ex. 11 at 1, 4, and August 24, 2020 Needham report, Ex. 10 at 1).

Tricida's stock price declined in the wake of this disclosure.  But that plainly does not in itself show price impact.  Back-end price impact requires a *corrective* disclosure, and "revelations that are not 'corrective' cannot form the basis for a corrective disclosure." *FibroGen*, 2024 WL 1064665, at *12.  "Recall that a disclosure is considered corrective only when it reveals *new facts* that, taken as true, render some aspect of the defendants' prior statements false or misleading." *Apache*, 2024 WL 532315, at *10 (emphasis in original; cleaned up).  The "new facts" Tricida

---

[6] For the purpose of completeness, we attach as exhibits to the Wechkin Declaration the six analyst reports discussed in the Zurek Report and cited in this brief.  Exs. 10-15.

13

reported on August 24 did not reveal that any aspect of Klaerner's statement about review issues was false or misleading. Plaintiff's fraud claim is that Klaerner misled investors by revealing only one of the two review issues discussed at the May 1 meeting. Tricida's August 24 announcement contained no facts about that purported omission. As discussed above, moreover, the facts about the May 1 meeting had been public knowledge since August 6.

***October 29, 2020: The Type A meeting.*** On October 29, 2020, Tricida reported on its October 20 "Type A" meeting with the FDA. The Company told investors that the FDA had stated at the meeting that it would likely not grant accelerated approval based solely on the serum bicarbonate surrogate endpoint data collected in the completed Phase 3 trials. Ex. 4 at 1. Rather, the FDA would also require evidence on the clinical marker that was the subject of the ongoing confirmatory VALOR-CKD trial—evidence that veverimer slowed disease progression. *Id.* Tricida characterized this as a retreat by the FDA, telling investors that for "nearly four years, [its] discussions with FDA focused on the development of veverimer based solely on the use of serum bicarbonate as the surrogate endpoint to enable accelerated approval, with CKD progression data to be provided only at the completion of the VALOR-CKD trial." *Id.* Analysts characterized the FDA's position the same way, and saw this as a major setback: "From our perspective, the FDA's apparent moving of goal posts for veverimer's US approval is unfortunate." Zurek Report ¶ 78 (quoting October 30, 2020 Goldman Sachs report, Ex. 13 at 2); *see also id.* ("In what clearly came as a surprise to management, the FDA is now not accepting bicarb alone as the basis for accelerated approval despite interactions over the past several years focused on this surrogate") (quoting October 29, 2020 J.P. Morgan report, Ex. 12 at 1).

As with the August 24 announcement, Tricida did not discuss the May 1 meeting in its October 29 press release. Unsurprisingly, the Company was concerned with the future—in particular, how it could respond to the FDA's new requirement for disease progression data, and whether it could collect those data from the VALOR study "without compromising the integrity of the ongoing trial." Ex. 4 at 1. On October 29, Tricida believed the answer to the latter question was "no." *Id.* This was further bad news.

Also as with the August 24 announcement, there is a pronounced mismatch between the

14

challenged statement and the purported corrective disclosure. The former relates to the May 1 FDA meeting. The latter relates to an FDA meeting nearly six months later. The dramatic intervening events of the July 14 deficiency notice and the August 24 CRL separate the two meetings.

Finally as with the August 24, announcement, Tricida's stock price fell in the wake of the October 29 press release. But that decline is again not attributable to the "correction" of any purported fraud: There was no such correction. Moreover, while a defendant need not identify an alternative reason for a back-end stock decline to show lack of price impact, such a reason is readily apparent here. The price decline following the October 29 announcement was the market's response to the materialization of a known risk. Zurek Report ¶¶ 76-77. Tricida had previously warned the market generally that it could not assure FDA approval. *Id.* ¶ 76. And it had warned the market specifically that the FDA could depart from the accelerated approval pathway and serum bicarbonate surrogate endpoint trial design it had for years discussed with Tricida:

> [T]he FDA has discretion at any time, including during our NDA review, to determine whether there is support for the use of serum bicarbonate as a surrogate endpoint.
>
> . . .
>
> . . . . As a result, we cannot be certain that FDA will ultimately conclude that the design and results of our pivotal Phase 3 clinical trial, TRCA-301, which uses changes from baseline in serum bicarbonate level as the primary endpoint . . . will be sufficient for approval of veverimer.

*Id.* ¶ 77 (quoting Tricida's 2019 Form 10-K, Ex. 8 at 64; emphases deleted). This risk fully materialized at the October 20 meeting, when the FDA abandoned the accelerated approval pathway for veverimer. But that did not "correct" what was purportedly misleading about the challenged May 7 statement—that at a different meeting, earlier in the review process, the FDA raised not one but two review issues, the second of which concerned geographical applicability.

A similar pattern of disclosures was at issue in *FibroGen*. The company there reported on underlying adverse facts, related to alleged data manipulation, well before the purported corrective disclosure plaintiff sought to use as the class period end-date. 2024 WL 1064665, at *2, *11-12. When the company reported the underlying facts, it did not at the same time report on the FDA's response to those facts. It could not have done so: At that time, the FDA had not yet made any response. *Id.* at *13. Later, "when the market learned about the FDA's reaction," the stock price

15

fell. *Id.* That, however, could "not be characterized as a corrective disclosure because it was not previously known." *Id.*

The situation here is comparable. On August 6, Tricida disclosed the underlying fact Plaintiff claims it had previously concealed: The FDA raised a concern with geographical applicability in connection with the May 1 meeting. What the FDA would do thereafter, however, was not something Tricida could have disclosed on August 6, much less on May 7—because that had not yet occurred. In this situation, the later disclosure about regulatory action is not corrective and cannot show price impact.

*Goldman Sachs*' invitation to apply "a good dose of common sense" is again worth bearing in mind here. The market learned on August 6 what happened at the May 1 meeting. Tricida's report of what happened at the October 20 meeting almost six months later did not "correct" the challenged statements about the May 1 meeting. The challenged statement and the purported corrective disclosure do not match. And the formulation on which the inflation maintenance theory is based—"back-end price drop equals front-end inflation," *supra* at 7—breaks down in the face of such a mismatch. *Goldman Sachs*, 594 U.S. at 123.[7]

***December 8, 2020: Changes to the VALOR-CKD trial design.*** On December 8, Tricida reported on two steps it was taking in response to the development it had discussed on October 29—that the FDA would not approve veverimer without disease progression data. First, Tricida announced, it was amending the protocol for VALOR-CKD, the confirmatory study ongoing at the time; the amendment would enable the company to obtain the disease progression data the FDA had requested without compromising the integrity of the trial. Ex. 5 at 1; *see also* Zurek Report ¶ 90 (revised protocol "would allow Tricida to provide the FDA the data it desires on CKD progression data from VALOR-CKD without compromising study integrity") (quoting December 8, 2020 J.P. Morgan report, Ex. 14 at 1). Second, Tricida was making use of an internal FDA appeal process by

---

[7] In *Acadia*, a recent class certification decision in the FDA approval context, the court agreed with the company that "[one] way to establish a lack of price impact is to show a mismatch between the contents of the misrepresentation and the corrective disclosure." 2024 WL 1060079, at *11 (cleaned up); *see supra* at 11-12 n.5. But the court then rejected the company's mismatch argument on the merits because the plaintiff had shown that the purported corrective disclosure in fact *did* match—and contradict—the challenged statement. 2024 WL 1060079, at *12. That is plainly not the case here. The challenged statement related to the May 1 meeting; the October 29 disclosure did not.

16

submitting a Formal Dispute Resolution Request.  Ex. 5 at 1.  By means of that request, Tricida sought a finding that the serum bicarbonate data it had collected in the Phase 3 trials could "serve as the basis for accelerated approval."  *Id.*

As with the August 24 and October 29 disclosures, Tricida's December 8 press release contained no information whatsoever about the May 1 meeting.  The press release addressed veverimer's future, and the market understood it that way.  Analysts focused on how soon the revised VALOR-CKD protocol would provide sufficient data for pre-specified interim analyses, and how likely it was that those analyses would be sufficient to establish the success or failure of the VALOR-CKD trial.  Zurek Report ¶ 90 (citing December 9, 2020 Cowen report, Ex. 15 at 1).  Analysts also handicapped Tricida's chances of winning its FDA appeal.  *Id.* ¶ 91 (citing December 8, 2020 J.P. Morgan report in which analyst noted that "only ~ 16%" of such appeals had historically succeeded, Ex. 14 at 1).

As with the earlier announcements, there is thus a pronounced mismatch between the substance of the purported corrective disclosure and the subject of the challenged statement.  And once more, while Section 10(b) defendants need not establish alternative reasons for a back-end stock price decline, such a reason appears readily here.  The developments on which Tricida reported on December 8 reflected the consequences of the FDA's actions at the October 20 Type A meeting; those actions in turn reflected the materialization of the disclosed risk that the agency could depart from the accelerated approval/surrogate endpoint path along which Tricida had been proceeding.  As Zurek explains, the stock price decline following December 8 press release accordingly "does not support a claim" that the challenged statements impacted Tricida's stock price after August 6, and "is consistent with factors other than the revelation of the Alleged Truth, including the materialization of previously known risks."  Zurek Report ¶ 94; *supra* at 15.

***February 25, 2021:  The Appeal Denied Letter.***  In the final purported corrective disclosure, a February 25, 2021 press release, Tricida again said nothing about the May 1 meeting that is the subject of the challenged statements. Ex. 6 at 1.  Rather, Tricida reported on the outcome of its appeal, which the FDA had denied.  *Id.*  This again reflects the materialization of disclosed risks.  Zurek Report ¶ 110.  The development Tricida reported on February 25 was the end of the

17

chain of events arising from the FDA's decision, reported on October 29, 2020, to depart from the accelerated approval/surrogate endpoint pathway.

Moreover, as with the August 24 and October 29 disclosures, Tricida's February 25 announcement concerned a *new* regulatory development—the FDA's ruling on Tricida's appeal. Market reaction to such a development does not show price impact. The announcement of a new agency action "cannot properly be characterized as a corrective disclosure because it was not previously known." *FibroGen*, 2024 WL 1064665, at *13; *supra* at 15-16.

Plaintiff notes that Tricida referred in the February 25 press release to the reasons the FDA cited for denying the appeal, including a concern with geographical applicability. Mot. at 6. But the market had known about that concern since August 6, and a stock decline following the repetition of information cannot show price impact. *Supra* at 9-11. Plaintiff nevertheless insists that Tricida disclosed certain *aspects* of the FDA's geographical applicability concern "for the first time" on February 25 press release. Mot. at 6 Plaintiff flags Tricida's statement that the FDA

> provided feedback on other concerns that are particularly relevant in an NDA supported by a single registrational trial . . . . concerns around the trial results being strongly influenced by a single site, and the majority of sites for the TRCA-301/TRCA-301A trial being in Eastern Europe, where differences in patient management . . . might raise a concern of the applicability to a U.S. patient population.

*See id.*; Ex. 6 at 1. But contrary to Plaintiff's suggestion, none of this information was both new and corrective. The market had known for years that the veverimer NDA was based on a single registrational trial. Ex. 7 at 35. Tricida had also cautioned investors that the FDA generally requires more than one trial. Zurek Report ¶ 15 (citing Tricida's 2019 Form 10-K, Ex. 8 at 28-29). And the market had known since August 6 that the FDA raised concerns about geographical applicability in connection with the May 1 meeting. *Supra* at 4. As to "results being strongly influenced by a single site" in Bulgaria, the Court *rejected* Plaintiff's claim that Klaerner made knowingly false or misleading statements about that matter. Dkt. 93 at 28 (holding that Plaintiff failed to establish scienter with respect to challenged statements that trials were "multicenter," which Plaintiff alleged were misleading in light of the single-site issue); Dkt. 145 at 22 (same). Because the February 25 press release neither corrected nor "matched" the review issue statement,

18

the stock decline following the press release cannot show that the statement had an impact on Tricida's stock after August 6.

### C.   Klaerner's Statement About AdCom Scheduling Discussed in Connection with the May 1 Meeting Had No Price Impact at Any Point Beyond July 16, 2020

The second challenged statement remaining in the case is Klaerner's May 7 comment that at the May 1 meeting, the FDA cited COVID-19 logistics as one reason it was not scheduling an AdCom meeting. *Supra* at 3. Like the challenged statement about review issues, the challenged statement about the AdCom had no price impact after August 6. First, the August 6 disclosure again provided the market with the "truth" Plaintiff claims was withheld on May 7. Plaintiff claims that the FDA's reasons for not convening an AdCom were unrelated to the pandemic and instead concerned "numerous, serious deficiencies the FDA had identified in the TRCA-301 and TRCA-301E trials . . . including the inapplicability of its Eastern European data to the U.S. population and the small treatment effect." SAC ¶ 25. But after August 6, the market knew about the geographical applicability issue raised at the May 1 meeting. Meanwhile, Tricida disclosed the "small treatment effect" issue—that is, the "magnitude and durability of the treatment effect"—both on August 6 and on May 7 itself. *Supra* at 4 (August 6); SAC ¶ 158 (May 7). Given Plaintiff's contention that the market for Tricida's stock is efficient, that information was rapidly incorporated into Tricida's stock price after August 6. Zurek Report ¶¶ 41-42. At that point, any artificial price inflation purportedly maintained by the challenged May 7 statement about AdCom scheduling was eliminated.

Second, and again as with the challenged review issue statement, the evidence shows in an additional way that the challenged AdCom statement ceased to have any price impact after August 6. None of the four post-August 6 disclosures "matches" the challenged statement. None refers to the May 1 meeting, let alone to the FDA's discussion in connection with that meeting of the reasons for not convening an AdCom. That means that the back-end price declines following the four disclosures cannot serve as proxies showing that, on the front end, the May 7 statement maintained artificial inflation in Tricida's stock price after August 6, if it had ever done so in the first place.

Common sense is also once again a useful and powerful tool here. After August 6, investors knew that the FDA might never approve veverimer. The FDA's reasons for declining to schedule a

19

particular optional event as part of the review and approval process were moot in the face of that development.

### D.　The Lack of Price Impact Defeats the Fraud-on-the-Market Presumption of Reliance

Under *Goldman Sachs*, the Court must consider all relevant evidence to determine whether the two challenged statements more likely than not impacted Tricida's stock price after August 6. *Supra* at 7. The evidence here all points in the same direction. With respect to both challenged statements, no new corrective information entered the market after that date. Investors learned the relevant information about the May 1 meeting on August 6, and each of the post-August 6 purported corrective disclosures reflects a substantive mismatch with the challenged statements. On these facts, Klaerner has rebutted the presumption of reliance by disproving price impact after August 6. And because the experts agree that Tricida's stock made no significant movement on any day between July 16 and August 6, the appropriate class-period cutoff date is July 16. *Supra* at 12.

### E.　The *Affiliated Ute* Presumption of Reliance Does Not Apply

Plaintiff argues in three short paragraphs that a second presumption of reliance applies because his claims are "predicated in part upon omissions." Mot. at 14-15, 20 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972)). Plaintiff fails to cite recent, controlling law holding that *Affiliated Ute*'s "narrow presumption" is "limited to cases that primarily allege omissions and present plaintiffs with the difficult task of proving a speculative negative." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2 F.4th 1199, 1204, 1206 (9th Cir. 2021). This cannot remotely be characterized as such a case. Plaintiff cannot satisfy either of the requirements set forth in *Volkswagen*, let alone both.

First, this is not "primarily" an omission case. Two challenged statements remain in the case. With respect to the first, Plaintiff alleges that Klaerner misleadingly omitted one of two review issues the FDA raised in connection with the May 1 meeting. But that claim is anchored to a challenged statement—the reference to the "magnitude and durability" review issue. With respect to the second statement, about convening an AdCom, Plaintiff alleges an outright falsehood, claiming that "[t]he FDA did not cite logistical challenges stemming from COVID-19 as even a

20

contributing factor in canceling the AdCom meeting." SAC ¶ 159. Plaintiff labels this a "blatant lie." Dkt. 109 at 20. Claims of affirmative false statements are not merely incidental to this case.

Nor is this a case in which Plaintiff would bear the burden of "proving a speculative negative" in the absence of a presumption. In *Volkswagen*, the Ninth Circuit was guided by *Affiliated Ute*'s rationale—that "reliance is impossible or impractical to prove when no positive statements were made," which creates the need for a presumption. 2 F.4th at 1206. But here, of course, "positive statements" *were* made, and proof of reliance is neither impossible or impractical. To prove reliance on the review issue statement, a plaintiff would need to testify that she listened to or read about Tricida's May 7, 2020 earnings call and understood Klaerner's reference to a single review issue to mean that no other issues were outstanding. To prove reliance on the statement about AdCom scheduling, a plaintiff would need to testify, again, that she listened to or read about the earnings call, and that she was unconcerned about the absence of an AdCom meeting because the FDA cited COVID-19 logistics as a reason for not scheduling one. If evidence of this sort seems far-fetched, that is not because of any conceptual difficulty with proving a "speculative negative." It is because relatively few investors could truthfully give such testimony. But that is not a reason to adopt a presumption or certify a class. If such testimony is not possible to procure, it simply means that an individual plaintiff should lose on the element of reliance at summary judgment or trial. *See id.* at 1209 (plaintiff "either relied on the alleged affirmative misrepresentations in purchasing the [securities at issue] or it did not").

F.    **Plaintiff Is Subject to Unique Defenses and Lacks Typicality**

Plaintiff finally fails to meet Rule 23(a)'s typicality requirement. As discussed, the cutoff date for any class certified should be July 16, 2020. Plaintiff made two class-period purchases, both on that date. Dkt. 12-2. Significantly, he made those purchases only *after* Tricida made the single purported corrective disclosure within a class period ending on July 16, 2020—Tricida's report, after market close on July 15, 2020, that it had received an FDA deficiency notice.

Tricida's stock closed at $26.20 on July 15, before Tricida announced the bad news. Ex. 17. The price fell steeply in after-hours trading and opened at $17.79 on July 16. *Id.* That morning, Plaintiff made his sole class-period purchases, investing approximately $1950. He paid $1154.62 to

21

acquire 68 shares at $16.98, and another $802.62 to acquire 49 shares at $16.38. Dkt. 12-2; Ex. 16 at 133:6-15. The stock closed at $15.64, a decline for which Plaintiff seeks to hold Klaerner responsible. SAC ¶¶ 175, 193. When Plaintiff made his first purchase, at $16.98, the stock had already absorbed 87% of that decline. When Plaintiff made his second purchase, at $16.38, the stock had absorbed 93% of the decline.

This subjects Plaintiff to unique defenses. Purely as an economic matter, Plaintiff will have no damages at all if the inflation purportedly maintained by the challenged May 7 statements had dissipated when he made his two purchases. As to reliance, courts have long recognized that post-disclosure purchases subject Section 10(b) plaintiffs to unique defenses; such purchases can powerfully rebut the fraud-on-the-market presumption. "The fact that [plaintiff] continued to trade in the stock [of defendants] after he learned of the alleged misrepresentations of defendants severs the link between the alleged misrepresentations of defendants and the stock purchases made by [plaintiff]." *In re Valence Tech. Sec. Litig.*, 1996 WL 119468, at *4 (N.D. Cal. Mar. 14, 1996) (cleaned up; brackets in original). A post-disclosure purchase accordingly "acts to rebut the presumption that [plaintiff] relied on the alleged misrepresentations in making his purchases." *Id.* (cleaned up; brackets in original). And an investor subject to unique defenses becomes atypical.

Courts have continued to follow this reasoning over the decades. The Southern District of New York more recently explained that "[a] named plaintiff who has engaged in a post-disclosure purchase is subject to the defense that the alleged misstatements or omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision." *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013). Even more recently, in the context of a lead plaintiff motion, the Central District of California explained that "post-disclosure purchases can defeat the typicality requirement for class certification when plaintiffs made a disproportionately large percentage of their purchases post-disclosure." *Erickson v. Snap, Inc.*, 2017 WL 11592635, at *3 (C.D. Cal. Sept. 18, 2017) (cleaned up). On the merits, plaintiffs who make post-disclosure purchases may lose on the element of reliance based on those purchases. *E.g.*, *In re World Access, Inc. Sec. Litig.*, 310 F. Supp. 2d 1281, 1300 (N.D. Ga. 2004) (granting summary judgment for defendants where plaintiff failed to prove

22

reliance; among other things, plaintiff bought stock after purported corrective disclosure and accompanying stock drop, relying on his belief that "the stock would eventually go back up"). Courts have accordingly declined on typicality grounds to certify classes that would be helmed by such post-disclosure purchasers. *E.g.*, *In re Safeguard Scis.*, 216 F.R.D. 577, 582-83 (E.D. Pa. 2003) (proposed class representative atypical because he "increased his holdings in [the company's] stock even after public disclosure of the alleged fraud."); *Valence*, 1996 WL 119468, at *5.

Given the unique defenses to which post-disclosure purchasers are susceptible, some courts have concluded that such investors cannot serve in a representative capacity even at the lead plaintiff stage, where the standard for establishing typicality is lower than it is at class certification. In *Bhangal v. Hawaiian Electric Industries, Inc.*, for example, a court in this District recently denied the lead plaintiff application of an investor who was subject to unique defenses because he "purchased all of his shares of [the company's] stock after a partial disclosure." 2023 WL 8482871, at *3 (N.D. Cal. Dec. 7, 2023) (citing authorities). Other courts have reached the same result even where plaintiffs made only a portion of their purchases after the purported corrective disclosure. *Alghazwi v. The Beauty Health Co.*, 2024 WL 1984879, at *5 (C.D. Cal. May 2, 2024) (investors fail to make out prima facie case of typicality at lead plaintiff stage where they more than doubled their holdings after the corrective disclosure); *In re Snap Inc. Sec. Litig.*, 2019 WL 2223800, at *2 (C.D. Cal. Apr. 1, 2019) (investor fails to make out prima facie case of typicality at lead plaintiff stage where he purchased more than 60% of his holdings after the corrective disclosure); *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 310 (S.D. Ohio 2005) (denying lead plaintiff application of investor that "incurred the vast bulk of its injury after [the company] acknowledged that its accounting methodologies were under investigation," and "began buying . . . at almost exactly the same time that [the company] began to disclose publicly the ongoing investigations.").

Here, Plaintiff made the *entirety* of his class-period purchases after Tricida had corrected its purportedly false or misleading May 7 statements. His claim is not typical. As the Court recognized in *Bhangal*, post-disclosure purchases are relevant to defeat typicality because they show that a plaintiff may have traded in stock for reasons unrelated to market integrity and hence different from those underlying other class members' purchases. 2023 WL 8482871, at *3. That is

23

the case here.  Plaintiff has testified that he bought stock on July 16 not in reliance on the challenged May 7 statements (which he never heard or read), nor in the belief that market price incorporated publicly available information (a subject about which he professed to know nothing) but instead because Tricida ostensibly said, in connection with the deficiency notice, that "there's no issues on their side, it's just like red tape."  Ex. 16 at 118:11-19, 123:19-124:4, 130:14-15.

That answer renders Plaintiff atypical because it shows that the fraud-on-the-market presumption is conclusively rebutted *for him*.  Plaintiff purchased for a reason unrelated to the May 7 statements or their effect on stock price.  He testified that he was "100 percent certain" that he bought stock after learning about a different statement—Tricida's purported assurance in the July 15 press release that notwithstanding the deficiency notice, "everything was fine and everything was great, [and] it was just a delay."  Ex. 16 at 130:23-131:3, 136:9-13; *id.* at 134:10-16 (testifying that he purchased stock "based on . . . them saying that there was no issue and it was just a timing delay").  Neither that alleged assurance nor anything else Tricida told the market about the deficiency notice is a challenged statement in this case.  Plaintiff's idiosyncratic reason for purchasing Tricida stock undermines the presumption of reliance and renders him atypical.

Notably, Plaintiff's idiosyncratic reason is also contrary to fact.  Plaintiff testified repeatedly that Tricida characterized the deficiency notice as "just a delay," and "just a timing issue," promising investors that "it's not really a problem," that "there was no issue and it was just a timing delay," and "specifically" that "it's just like red tape, they're going to get through it, it's just a matter of time."  Ex. 16 at 130:9-17, 131:4-10, 132:14-18, 134:15-16.  But that is emphatically *not* what Tricida stated in the July 15 press release on which Plaintiff claims to have relied.  Instead, Tricida said:

> The notification does not specify the deficiencies identified by the FDA.  The Company plans to work with the FDA to identify and seek to resolve the deficiencies. The Company has no current plans to modify or suspend [VALOR-CKD].  However, at this time the Company is unable to evaluate whether it will be able to address the FDA's concerns.

> "We are surprised and disappointed by this news," said Gerrit Klaerner . . . . "We continue to believe in the potential of veverimer to be disease modifying and our goal is to work with FDA to identify and resolve the issues in order to bring veverimer to patients."

24

Ex. 2 at 1. Expressing disappointment and identifying eventual resolution with the FDA as a "goal" is a far cry from an assurance that the deficiency notice presented "just a delay," with "no issues on their side." An idiosyncratic reason for trading that differs markedly from the information actually circulating in the marketplace subjects Plaintiff to unique defenses. He is atypical.

III.   **CONCLUSION**

The Court should deny Plaintiff's motion for class certification. If the Court grants the motion, the class definition should encompass only purchasers of Tricida's stock between May 8, 2020 and July 16, 2020.

Dated: July 1, 2024                         Respectfully submitted,

                                            **SIDLEY AUSTIN LLP**

                                            By:        */s/ Sara B. Brody*

                                                 Sara B. Brody (SBN 130222)
                                                 *Attorneys for Defendant Gerrit Klaerner*