# Exhibit 1

# *Michael Pardi v. Tricida, Inc. and Gerrit Klaerner*

## Expert Report of Paul Zurek, Ph.D.

### July 1, 2024

# Table of Contents

I.    Qualifications .................................................................................................... 1

II.   Assignment and Compensation.......................................................................... 1

III.  Summary of Opinions ........................................................................................ 2

IV.   Selected Public Disclosures About Tricida and the Approval Process for Veverimer....... 3

V.    Summary of Allegations and the Coffman Report ............................................ 8

    A.    Challenged Statements.................................................................... 8

    B.    Alleged Corrective Disclosures ..................................................... 11

    C.    The Coffman Report ...................................................................... 11

VI.   Implications of Market Efficiency .................................................................... 12

VII.  Event Study Analysis........................................................................................ 15

    A.    Overview of the Event Study Approach ......................................... 15

    B.    Regression Model for Tricida's Stock Returns.............................. 16

VIII. There Is No Economic Evidence That the Challenged Statements Regarding the May 1, 2020 FDA Meeting Impacted Tricida's Stock Price after August 6, 2020...................... 17

    A.    The Challenged Statements Regarding the May 1, 2020 FDA Meeting Could Not Have Impacted Stock Price after August 6, 2020 As An Economic Matter.................... 18

    B.    Any Stock Price Declines In Response to the Alleged Corrective Disclosures after August 6, 2020 Could Not and Therefore Did Not Result from the Revelation of the Alleged Truth ................... 25

        1.    August 24, 2020 ................................................................ 26

        2.    October 29, 2020............................................................... 32

        3.    December 8, 2020 ............................................................. 39

        4.    February 25, 2021 ............................................................. 44

## I.  Qualifications

1.  I am a Vice President at Cornerstone Research, a financial and economic consulting firm. I hold Ph.D. and M.A. degrees in finance and a B.S. degree in economics from the Wharton School at the University of Pennsylvania.  My research and work experience span several areas in financial economics, with a focus on asset pricing, valuation, and statistical analysis of financial data.  A copy of my curriculum vitae is attached as **Appendix A**.

2.  I have authored textbook chapters on issues in finance and economics.  I have taught valuation, corporate finance, risk management, and asset pricing, including in executive education programs, at the Wharton School at the University of Pennsylvania, and at Stanford Law School.

3.  I have more than fifteen years of experience conducting economic analyses on complex matters at all stages of litigation, including as an expert witness.  At Cornerstone Research, I have consulted on many litigation matters, including securities lawsuits by shareholders.  My work has involved issues of market efficiency, price impact, loss causation, and valuation, as well as the calculation of per share damages.  I have served as an expert in litigation, including in securities matters, testified in arbitrations and trial, and presented findings of my analyses to regulators.  I have also spoken on various topics related to securities litigation.  A list of my prior testimony is included as part of **Appendix A**.

## II.  Assignment and Compensation

4.  I understand that Plaintiff[1] is seeking to certify a "Proposed Class" comprising "[a]ll persons or entities who purchased or otherwise acquired common stock of Tricida, Inc. during the period from May 8, 2020 to February 25, 2021, inclusive" (the "Proposed Class Period").[2]  In

---

[1] "Plaintiff" refers to Jeffrey M. Fiore, the lead plaintiff in this matter.  *See* Second Amended Complaint for Violations of the Federal Securities Laws, dated December 15, 2022 ("Second Amended Complaint"), ¶ 39.

[2] Notice of Motion and Motion to Certify Class, Appoint Class Representative, and Appoint Class Counsel, dated April 30, 2024 ("Class Certification Motion"), p. 1.

support of Plaintiff's Class Certification Motion, Plaintiff submitted the Expert Report of Chad Coffman, CFA ("Mr. Coffman"), dated April 30, 2024 (the "Coffman Report").

5.      I have been retained by counsel for Gerrit Klaerner ("Dr. Klaerner"), former CEO of Tricida, Inc. ("Tricida" or the "Company"), to assess economic evidence regarding whether the alleged challenged statements regarding the May 1, 2020 FDA "late-cycle" meeting had an impact on Tricida's stock price throughout the Proposed Class Period.

6.      In undertaking this assignment, I have examined various materials, including legal pleadings in this litigation, academic literature, securities analyst reports, press articles, and various other public sources, including data from data providers such as the Center for Research in Security Prices ("CRSP") and the London Stock Exchange Group ("LSEG").  A list of materials that I have considered in forming my opinions is attached as **Appendix B**.

7.      I have been assisted in the preparation of this report by staff of Cornerstone Research, who worked under my direction.  Cornerstone Research is being compensated for my work in this matter at an hourly rate of $1,100.  My compensation is not dependent on the outcome of this matter.  My work in this matter is ongoing, and I reserve the right to supplement my opinions if additional information becomes available and/or if Mr. Coffman reaches additional opinions in this matter.

## III.    Summary of Opinions

8.      Based on the analyses described in my report, I have reached the following principal conclusions.

9.      *First*, as discussed in **Section VIII.A**, I examined available public information to determine when the alleged truth about the Challenged Statements[3] (the "Alleged Truth") was first publicly disclosed.  Assuming Tricida's stock traded in an efficient market during the Proposed Class Period, as Mr. Coffman asserts (the implications of which are discussed in **Section VI**), the full impact, if any, of publicly disclosed information would be rapidly incorporated into Tricida's market price and could not have impacted its stock price on a later date.  In other words, when the alleged truth about a challenged statement first becomes public,

---

[3] *See* **Section V.A** for a discussion of the "Challenged Statements."

any stock price response to the disclosure of that truth is rapid, and there is no subsequent impact of the challenged statement on the stock price as an economic matter.

10.    My analysis indicates that the Alleged Truth was disclosed at the latest on August 6, 2020.  Thus, I have concluded that, as an economic matter, the Challenged Statements could not have impacted Tricida's stock price after August 6, 2020 if the market for Tricida's stock was efficient.  In fact, for the reasons discussed in the report, economic evidence further shows that the Challenged Statements had no price impact after July 16, 2020, the day following the Company's July 15, 2020 after-market-hours disclosure that the FDA had "identified deficiencies that preclude discussion of labeling and postmarketing requirements/commitments at this time."[4]

11.    *Second*, as discussed in **Section VIII.B**, I also examined the Alleged Corrective Disclosures[5] after August 6, 2020.[6]  I find that any stock price declines in response to these disclosures could not and therefore did not result from the revelation of the Alleged Truth. Instead, the declines are consistent with factors other than the revelation of the Alleged Truth, including, in particular, the materialization of previously known risks regarding the approval prospects for veverimer.

## IV.    Selected Public Disclosures About Tricida and the Approval Process for Veverimer

12.    Tricida was a "pharmaceutical company focused on the development and commercialization of [its] drug candidate, veverimer."[7]  Tricida became publicly traded on the Nasdaq Global Select Market in June 2018, under the symbol "TCDA."[8]

---

[4] Second Amended Complaint, ¶ 78.

[5] *See* **Section V.B** for a discussion of the "Alleged Corrective Disclosures."

[6] As described in **Section VIII.B**, I also analyzed one additional day with a statistically significant decline during this period based on my event study model, May 19, 2020, and one day that did not have a statistically significant based on my model, but that did have a statistically significant decline based on Mr. Coffman's model, August 21, 2020.

[7] Tricida, Inc., Form 10-K for the Fiscal Year Ended December 31, 2019, filed on March 2, 2020 ("2019 10-K"), pp. 3, 89.  Veverimer was designed to "slow the progression of chronic kidney disease, or CKD, through [its] treatment of metabolic acidosis."  *See* 2019 10-K, p. 3.

[8] 2019 10-K, p. 86.  I have included as **Exhibit 1** a chart of Tricida's stock price.

13.     Tricida disclosed that its success depended on veverimer, its "only product candidate," which was "still in development."[9]  In its 2019 SEC Form 10-K ("2019 10-K"), which first became publicly available on March 2, 2020, the Company explained that "[t]o date, we have invested all of our efforts and financial resources in the research and development of veverimer, which is our only product candidate, and our business and future success depends on our ability to successfully develop, obtain regulatory approval for, and commercialize veverimer."[10]  In its 2019 10-K, the Company further stated that its:

> New Drug Application, or NDA, for veverimer as a chronic treatment for metabolic acidosis, is currently under review by the U.S. Food and Drug Administration, or FDA, through the Accelerated Approval Program.  The FDA has indicated that it is currently planning to hold a Cardiovascular and Renal Drugs Advisory Committee, or CRDAC, meeting to discuss the application.  The FDA has assigned a Prescription Drug User Fee Act, or PDUFA, goal date of August 22, 2020 for the potential approval to market veverimer in the United States.[11]

14.     Tricida's 2019 10-K further discussed the FDA's process for approval under the "Accelerated Approval Program," including the reliance on "surrogate endpoints" in clinical trials:

> The FDA's Accelerated Approval Program allows for drugs for serious conditions that address an unmet medical need to be approved based on a surrogate endpoint that is reasonably likely to predict clinical benefit.  Surrogate endpoints are used instead of clinical outcomes in some clinical trials.  Surrogate endpoints are used when the clinical outcomes might take a very long time to study, or in cases where the clinical benefit of improving the surrogate endpoint, such as controlling blood pressure, is well understood.  Clinical trials are needed to show that surrogate endpoints can be relied upon to predict, or correlate with, clinical benefit.  Surrogate endpoints that have undergone this testing are called validated surrogate endpoints and those are accepted by the FDA as evidence of benefit.[12]

---

[9] 2019 10-K, p. 1.
[10] 2019 10-K, p. 44.
[11] 2019 10-K, p. 89.
[12] 2019 10-K, p. 21.

15.     In its 2019 10-K, Tricida further discussed the principal clinical trial phases necessary to support New Drug Applications ("NDAs"):

> Clinical trials to support NDAs for marketing approval are typically conducted in three sequential phases, but the phases may overlap.  In Phase 1, the initial introduction of the product candidate is usually into healthy human subjects, and the product candidate is tested to assess metabolism, pharmacokinetics, pharmacological actions, side effects associated with increasing doses, and, if possible, early evidence on effectiveness.  Phase 2 usually involves trials in a limited patient population to determine the effectiveness of the product candidate for a particular indication, dosage tolerance, and optimal dosage, and to identify common adverse effects and safety risks.  If a product candidate demonstrates evidence of effectiveness and an acceptable safety profile in Phase 2 evaluations, Phase 3 trials are undertaken to obtain additional information about clinical efficacy and safety in a larger number of subjects, typically at geographically dispersed clinical trial sites, to permit the FDA to evaluate the overall benefit-risk relationship of the product candidate and to provide adequate information for the labeling of the product candidate.  In most cases, the FDA requires two adequate and well-controlled Phase 3 clinical trials to demonstrate the efficacy of the product candidate.  A single Phase 3 trial may be sufficient in certain circumstances.[13]

16.     Further, Tricida noted in its 2019 10-K that potential approval under the Accelerated Approval Program could be subject to a requirement that the drugmaker conduct confirmatory post-marketing clinical trials, the results of which could cause the FDA to withdraw approval for a drug originally approved under the Accelerated Approval Program:

> Approval through the Accelerated Approval Program is subject, however, to the requirement that the applicant conduct additional postmarketing clinical trials to verify and describe the drug's clinical benefit, where there is uncertainty as to the relationship of the surrogate endpoint to the clinical benefit, or of the observed clinical endpoint to ultimate outcome.  Typically, clinical benefit is verified when postmarketing clinical trials show that the drug provides a clinically meaningful positive therapeutic effect, that is, an effect on how a patient feels, functions, or survives.  The FDA may require that any confirmatory postmarketing trial be initiated or substantially underway prior to the submission of an application through the Accelerated Approval Program.  And, if such confirmatory postmarketing trial fails to confirm the drug's clinical profile or risks and benefits,

---

[13] 2019 10-K, pp. 28–29.

the FDA may withdraw its approval of the drug.  The FDA may also withdraw the approval if other evidence demonstrates that the product is not safe or effective.[14]

17.    In its 2019 10-K, Tricida also detailed factors the FDA generally considers in reviewing an NDA, including advisory committees:

> Among other things, the FDA reviews an NDA to determine whether the product is safe and effective for its intended use and whether the product candidate is being manufactured in accordance with [current Good Manufacturing Practices]. The FDA may also refer applications for novel product candidates, or product candidates that present difficult questions of safety or efficacy, to an advisory committee, typically a panel that includes clinicians and other experts for review, evaluation, and a recommendation as to whether the application should be approved.  The FDA is not bound by the recommendation of an advisory committee, but it generally follows such recommendations.[15]

18.    The 2019 10-K discussed various aspects of the Company's NDA submission for veverimer.  For example, Tricida discussed its Phase 3 trial, "TRCA-301," and its extension trial, "TRCA-301E."[16]  The Company published the results of these clinical trials in *The Lancet*, a peer-reviewed medical journal:[17]

> Results from our positive Phase 3, 12-week efficacy trial, TRCA-301, and a follow-on 40-week extension trial, TRCA-301E, formed the primary clinical basis of our NDA submission.  The Lancet published the results of the TRCA-301 trial in March 2019 and the results of the TRCA-301E trial in June 2019.[18]

19.    The 2019 10-K provided information regarding the two studies that formed the "primary clinical basis" of Tricida's NDA submission, TRCA-301 and TRCA-301E:

> The TRCA-301 trial was a double-blind, placebo-controlled trial that randomized 217 patients with non-dialysis dependent CKD and metabolic acidosis.  The trial met both its primary and secondary endpoints in a highly statistically significant

---

[14] 2019 10-K, pp. 31–32.
[15] 2019 10-K, p. 29.
[16] 2019 10-K, p. 89.
[17] "About *The Lancet*," available at https://www.thelancet.com/lancet/about ("Papers are subjected to *The Lancet*'s usual rigorous standards of external and statistical peer review, and edited by experienced technical copy editors to the highest standards.").
[18] 2019 10-K, p. 4.

manner (p<0.0001 for both the primary and secondary endpoints).  Veverimer was well tolerated in our TRCA-301 trial.  The primary endpoint of the trial measured improvements in serum bicarbonate levels in veverimer-treated patients versus placebo.  Serum bicarbonate is a surrogate measure of metabolic acidosis and a persistent serum bicarbonate level below 22 mEq/L indicates metabolic acidosis.  After 12 weeks of treatment, 59.2% of subjects in the veverimer-treated group, compared with 22.5% of subjects in the placebo group, had an increase in serum bicarbonate level of at least 4 mEq/L or achieved a serum bicarbonate level in the normal range of 22 to 29 mEq/L, which was the primary endpoint of the trial.  The secondary endpoint of the trial, the least squares, or LS, mean change from baseline to week 12 in serum bicarbonate, was 4.42 mEq/L in the veverimer-treated group, compared with 1.78 mEq/L in the placebo group.  The mean change in serum bicarbonate from baseline to week 12 was 4.5 mEq/L in the veverimer-treated group, compared with 1.7 mEq/L in the placebo group.[19]

The TRCA-301E trial was a blinded, 40-week extension of the 12-week TRCA-301 trial. One hundred ninety-six subjects, consisting of 114 subjects in the veverimer group and 82 subjects in the placebo group, elected and were qualified to continue in the extension trial.  The primary endpoint of the TRCA-301E trial was an assessment of the long-term safety profile of veverimer versus placebo. We observed fewer discontinuations, fewer serious adverse events and a comparable rate of GI adverse events on veverimer versus placebo.  The trial further demonstrated that the effect of veverimer on increasing serum bicarbonate was sustained over one year.  The differences between veverimer and placebo on the two endpoints related to serum bicarbonate increase were highly statistically significant compared to placebo in both the TRCA-301 trial and the TRCA-301E trial.[20]

20.    Tricida also described its confirmatory post-marketing trial, "VALOR-CKD":

As a condition of filing our NDA pursuant to the Accelerated Approval Program, we have committed to conduct our confirmatory postmarketing trial, VALOR-CKD, which is designed to demonstrate that veverimer provides a clinical benefit (i.e., improves how the patient feels, functions or survives) in addition to increasing serum bicarbonate levels.  If we receive FDA approval for veverimer, but do not complete the postmarketing trial with due diligence, or if the postmarketing trial fails to show a clinical benefit of veverimer treatment, the FDA may revoke its approval of veverimer. [¶] In the fourth quarter of 2018, we

---

[19] 2019 10-K, p. 4.
[20] 2019 10-K, p. 4.

initiated the VALOR-CKD postmarketing trial to evaluate the efficacy and safety of veverimer in delaying CKD progression in subjects with metabolic acidosis.[21]

## V.    Summary of Allegations and the Coffman Report

21.    Below I discuss my understanding of the challenged statements (**Section A**) and then discuss days on which allegedly corrective information was disclosed (**Section B**) and also provide a brief summary of the Coffman Report (**Section C**).

### A.    Challenged Statements

22.    I understand that the Amended Complaint[22] alleged multiple misrepresentations, or challenged statements, that were dismissed in the July 2022 Motion to Dismiss Order,[23] and that the Court in its March 2024 Motion to Dismiss Order further dismissed, with one exception pertaining to the reasons for the cancellation of the AdCom meeting (discussed below), the same challenged statements as well as statements challenged for the first time in the Second Amended Complaint.[24]  I understand the challenged statements that were dismissed by the Court to be:

- **"Statements About the Location of the Phase 3 TRCA-301/TRCA-301E Trial Sites."**  Plaintiff claimed that Tricida indicated that it "conducted its Phase 3 TRCA-301/TRCA-301E trials 'in the United States and Europe'" and that "by using 'Europe' (as opposed to 'Eastern Europe'), Defendants omitted material information necessary to make that characterization not misleading."[25]

- **"Risk Disclosures About the Location of the Phase 3 TRCA-301/TRCA-301E Trial Sites."**  Plaintiff claimed that "because Defendants knew that their NDA would 'rely[] upon a study with majority enrollment of Eastern European patients who are unlikely to be representative of the U.S. patient population and U.S. medical care,' they misrepresented the risk investors should have been aware of with respect to the likelihood of FDA approval."[26]

---

[21] 2019 10-K, p. 21.

[22] Amended Complaint for Violations of the Federal Securities Laws, dated June 1, 2021 ("Amended Complaint").

[23] Order Granting in Part and Denying in Part Motion to Dismiss, dated July 29, 2022 ("July 2022 Motion to Dismiss Order"), pp. 8–9, 26–27.

[24] Order Granting in Part and Denying in Part Motion to Dismiss, dated March 11, 2024 ("March 2024 Motion to Dismiss Order"), pp. 10–16, 18, 20–24.

[25] July 2022 Motion to Dismiss Order, pp. 8–9, 26–27.

[26] July 2022 Motion to Dismiss Order, pp. 11–12, 27–28.

- **"Statements about the Multicenter Nature of the Phase 3 TRCA-301/TRCA-301E Trial."** Plaintiff claimed that "because only a single study supported Defendants' NDA, Defendants misled investors by portraying that single study as a 'multicenter' study, when in reality the study's 'multicenter' aspect was diminished because 'data from one high-enrolling clinical site had a disproportionate impact on the trial's results.'"[27]

- **"Statements About Veverimer's Prospects for FDA Accelerated Approval During a June 12, 2019 Presentation."** Plaintiff claimed that Dr. Klaerner's statement that "'All You Expect To Do Is Show a Surrogate Effect'" was misleading because it "'suggested that FDA approval through the [Accelerated Drug Application program]—at least given the state of developments for veverimer—was easier or more likely than if the veverimer NDA had proceeded along the standard approval path.'"[28] Plaintiff further claims that Dr. Klaerner's statement that "'We Have The Ability To Submit Our NDA With Just One Pivotal Trial That Shows A Surrogate Effect'" was misleading because he "'presented the single phase 3 efficacy trial as a strength—something increasing the likelihood that the FDA would approve veverimer—when in fact it was a significant risk to FDA approval of the NDA.'"[29]

- **"Statements About the VALOR-CKD Trial Design."** Plaintiff claimed certain statements regarding the VALOR-CKD trial protocol were false "because [Defendants] 'lied to investors about the true anticipated number of randomized patients necessary for the VALOR-CKD trial to adequately confirm clinical efficacy.'"[30]

23.    I understand that, pursuant to the March 2024 Motion to Dismiss Order, the following challenged statements remain (the "Challenged Statements"). It is my understanding that all of the remaining Challenged Statements are statements concerning a May 1, 2020 "late-cycle" meeting with the FDA that were made by Dr. Klaerner during a May 7, 2020 earnings call.[31] According to the Second Amended Complaint, on that call Dr. Klaerner stated:

> In our Day 74 letter, the FDA indicated that they plan to hold an advisory committee meeting or AdCom to discuss the application. In our late-cycle meeting with the FDA held in May 2020, the FDA indicated it currently does not plan to hold an AdCom to discuss veverimer due in part to the logistical challenges posed by COVID-19. In our late-cycle meeting with [the] FDA, we took the opportunity to address outstanding review issues. We presented our data

---

[27] July 2022 Motion to Dismiss Order, pp. 13, 28.

[28] July 2022 Motion to Dismiss Order, pp. 15–16.

[29] July 2022 Motion to Dismiss Order, p. 17.

[30] July 2022 Motion to Dismiss Order, pp. 17–21.

[31] "Q1 2020 Tricida Inc Earnings Call," *Thomson Reuters,* May 7, 2020.

and rationale as to why we think [veverimer] satisfied the requirements for initial approval under the Accelerated Approval Program including the magnitude and durability of the treatment effect on the surrogate markup serum bicarbonate demonstrated in the TRCA-301 and TRCA-301E trials.[32]

24.    Plaintiff claims that "[t]he FDA told Tricida at the May 1, 2020, meeting that it was not necessary to hold an Advisory Committee ('AdCom') meeting because of the numerous, serious deficiencies the FDA had identified in the TRCA-301 and TRCA-301E trials … including the inapplicability of its Eastern European data to the U.S. population and the small treatment effect."[33]  Plaintiff further alleges that Dr. Klaerner misled investors on May 7, 2020 because "[i]nstead of revealing what the FDA actually told Tricida, Klaerner blamed the cancellation of the AdCom meeting on COVID-19."[34]  I understand the Court found in its March 2024 Motion to Dismiss Order that Plaintiff adequately pled that this statement was "false or misleading given that the FDA never cited COVID-19 logistics as the reason for the cancellation."[35]

25.    The Court also addressed the above statement regarding the May 1, 2020 meeting in its July 2022 Motion to Dismiss Order in a section titled "Discussing Outstanding Review Issues with the FDA."  I understand the Court found the statement sufficiently alleged to be misleading because:

> Klaerner disclosed the fact that Defendants had discussed "outstanding review issues" with the FDA at the May 2020 late-cycle meeting and shared one of those issues: "the magnitude and durability of the treatment effect on the surrogate marker." Compl. ¶ 101.  Fiore plausibly alleges that by disclosing this key detail, Klaerner was obligated to share the other significant review issue – "applicability of data from the TRCA-301 and TRCA-301E trials to the U.S. population" – discussed with the FDA.[36]

---

[32] Second Amended Complaint, ¶ 26 (emphasis added in complaint removed).

[33] Second Amended Complaint, ¶ 25.

[34] Second Amended Complaint, ¶ 26.

[35] March 2024 Motion to Dismiss Order, pp. 16–17.

[36] July 2022 Motion to Dismiss Order, pp. 21–22.  I understand from counsel that failure to disclose the "applicability of data from the TRCA-301 and TRCA-301E trials to the U.S. population" is the sole remaining reason why the statement regarding remaining review issues is alleged to be misleading.

### B.    Alleged Corrective Disclosures

26.    In a section titled "The Truth Begins to Emerge," the Second Amended Complaint discusses alleged corrective disclosures occurring on July 15, 2020, August 24, 2020, October 29, 2020, December 8, 2020, and February 25, 2021 (the "Alleged Corrective Disclosures").[37] Plaintiff alleges that stock price declines following these disclosures "were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors and the market."[38]  The Second Amended Complaint also claims that Tricida "finally disclosed some of the deficiencies" in its August 6, 2020 Form 10-Q for 2Q 2020.[39]  I discuss these alleged disclosures in **Section VIII**.

### C.    The Coffman Report

27.    In his expert report, Mr. Coffman assesses various financial and market metrics for Tricida's common stock and concludes that "the market for Tricida's Common Stock was efficient during the Class Period."[40]  In explaining market efficiency, Mr. Coffman asserts that:

> The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II* as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-strong form" efficiency.  "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price.  This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information.[41]

28.    In this report, I do not evaluate Mr. Coffman's opinion regarding the efficiency of Tricida's common stock.  Rather, for the purposes of my analysis, I have been asked to assume Mr. Coffman's conclusions regarding market efficiency are correct such that the market for

---

[37] Second Amended Complaint, ¶¶ 174–186.  These disclosures are also discussed in a section of the Second Amended Complaint titled "Loss Causation/Economic Loss."  *See* Second Amended Complaint, ¶¶ 193–197.

[38] Second Amended Complaint, ¶ 198.

[39] Second Amended Complaint, ¶ 80.  *See also* Second Amended Complaint, ¶¶ 27, 162.

[40] Coffman Report, ¶ 6.

[41] Coffman Report, ¶ 24.

Tricida's common stock was semi-strong efficient throughout the Proposed Class Period.  In **Section VI**, I discuss certain relevant implications of market efficiency.

## VI.    Implications of Market Efficiency

29.    Market efficiency is a fundamental concept in financial economics dating back to the seminal work of Nobel Prize–winning economist Professor Eugene Fama in the 1960s.[42] Professor Fama defined an efficient market for a security as one in which the security's price reflects the value implications of available information:

> In general terms, the ideal is a market in which prices provide accurate signals for resource allocation: that is, a market in which firms can make production-investment decisions, and investors can choose among the securities that represent ownership of firms' activities under the assumption that security prices at any time "fully reflect" all available information.  A market in which prices always "fully reflect" available information is called "efficient."[43]

30.    Empirical tests of market efficiency concern three different sets of information with respect to which efficiency is examined.  Tests of so-called weak form market efficiency examine whether security prices incorporate information that can be obtained from historical prices and dividends.  Tests of semi-strong form market efficiency examine whether security prices incorporate all publicly available information.[44]  Finally, tests of strong form market efficiency consider whether security prices incorporate all information, including private information that is not publicly available.[45]  Markets are generally not considered to be strong form efficient.[46]

---

[42] Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417 ("Fama I").

[43] Fama I, p. 383.

[44] If markets are semi-strong form efficient, they will also necessarily be weak form efficient, because all publicly available information includes information regarding historical prices and dividends.

[45] Fama I, p. 383.  *See also* Stephen A. Ross, Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 7th ed. (McGraw-Hill/Irwin, 2005) ("Ross et al. (2005)"), p. 356.

[46] Jonathan Berk, Peter DeMarzo, and Jarrad Harford, *Fundamentals of Corporate Finance*, Global Edition, 4th ed. (Pearson Education Limited, 2019), p. 348 ("Berk et al. (2019)") ("Mutual fund managers and fundamental analysts, such as those who work for brokerages and make stock recommendations, believe that mispricing can be uncovered by careful analysis of company fundamentals.  There is

31.     I understand that the form of market efficiency that is most relevant in the present context is semi-strong form market efficiency,[47] and Mr. Coffman uses the semi-strong form of market efficiency as the basis for his analysis as well.[48]  In other words, the relevant question is whether security prices quickly and fully incorporate all publicly available information.[49]

32.     Information is incorporated rapidly into a security's price in an efficient market, in many cases within minutes of the information becoming public.[50]  An important feature of securities that are traded in efficient markets is that security prices are the sum of discounted expected

---

evidence that traders with inside information about upcoming merger or earnings announcements can make abnormal returns by trading (illegally) on that information, so the market is clearly not strong form efficient.").

[47] For example, I understand that the concurrence in the Supreme Court's decision in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ("*Halliburton II*"), citing its decision in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*"), states:  "Specifically, the Court relied upon the 'semi-strong' version of that theory, which posits that the average investor cannot earn above-market returns (*i.e.*, 'beat the market') in an efficient market by trading on the basis of publicly available information."  *See Halliburton II*, 485 U.S. at 289.

[48] Coffman Report, ¶¶ 14, 18.

[49] Unless otherwise specified, any references to market efficiency and efficient markets in this report refer to the semi-strong form of market efficiency.

[50] *See, e.g.*, Eugene F. Fama, "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5 (1991): 1575–1617 ("Fama II"), pp. 1601–1602 ("The typical result in event studies on daily data is that, on average, stock prices seem to adjust within a day to event announcements.  The result is so common that this work now devotes little space to market efficiency.  The fact that quick adjustment is consistent with efficiency is noted, and then the studies move on to other issues.").  An article by Patell and Wolfson that studies news releases of earnings and dividend announcements finds that, while some impact persists for longer than a few minutes, "returns earned by simple trading rules dissipate within five to ten minutes" of an announcement.  *See* James M. Patell and Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13, no. 2 (1984): 223–252 at p. 223.  Busse and Green find that "prices of stocks discussed positively during the Midday Call report on CNBC experience a statistically and economically significant increase beginning seconds after the stock is initially mentioned and lasting approximately one minute.  The response to negative reports is larger but more gradual.  Prices continue falling for 15 minutes after airing."  *See* Jeffrey A. Busse and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics* 65, no. 3 (2002): 415–437 at p. 435.  Chordia et al. find that "pattern[s] of intra-day serial dependence [reveal] that it takes more than five minutes but less than sixty minutes" for sophisticated investors to react to order imbalances.  *See* Tarun Chordia, Richard Roll, and Avanidhar Subrahmanyam, "Evidence on the Speed of Convergence to Market Efficiency," *Journal of Financial Economics* 76, no. 2 (2005): 271–292 at p. 271.  Finally, Greene and Watts find that for stocks on the Nasdaq and the NYSE, "the majority of the price response to nontrading-hours earnings announcements is realized during the opening trade. …[W]hen clock time is considered, price adjusts rapidly over the first post-announcement half hour for both types of announcements on both exchanges."  *See* Jason T. Greene and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ:  The Case of Overnight and Daytime News Releases," *Financial Management* 25, no. 1 (1996): 19–42 at pp. 19–20.

future cash flows based on the market's assessment of publicly available information.[51]  As explained in finance textbooks, a market is semi-strong form efficient when *all information* that is publicly available is reflected in prices:

> A market is [semi-strong form] efficient if prices reflect (incorporate) ***all publicly available information***, including information such as published accounting statements for the firm as well as historical price information.[52]

> [Market efficiency] implies that securities will be fairly priced, based on their future cash flows, ***given all information that is available to investors***…. Information that is available to all investors includes information in news reports, financial statements, corporate press releases, or ***other public data sources***.[53]

33.    According to Professor Fama, if the market is semi-strong form efficient, "prices reflect information to the point where the marginal benefits of acting on information (the profits to be made) do not exceed the marginal costs."[54]  Given that the marginal cost of obtaining and acting on public information is relatively low, the marginal benefit of acting on public information is essentially zero if the market is efficient—that is, the value-relevant content of public information is incorporated fully into a security's price.  Notably, the existence of an efficient market does not require all investors to access, analyze, and trade on publicly available information.  It is sufficient for some (potentially the most sophisticated) investors to identify and trade on new public information such that it is rapidly incorporated into market prices.  For example, short-selling shares is one way through which negative information is incorporated into prices, while an investor optimistic about the prospects of a company may bid up the market price by purchasing shares.[55]

---

[51] Richard A. Brealey, Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 12th ed. (McGraw-Hill Education, 2017), p. 336 ("In an efficient market it is not possible to find expected returns greater (or less) than the risk-adjusted opportunity cost of capital.  This implies that every security trades at its fundamental value, based on future cash flows … and … the opportunity cost of capital.").

[52] Ross et al. (2005), p. 356 (emphasis added).

[53] Berk et al. (2019), p. 348 (emphasis added).

[54] Fama II, p. 1575.

[55] Short sellers are investors who borrow shares and sell them at the prevailing price, potentially anticipating that the price declines in the future when the shares are re-purchased and returned to the lender.  The act of selling borrowed shares can put downward pressure on the stock price, resulting in a lower market price.  *See, e.g.*, Paul Asquith, Parag A. Pathak, and Jay R. Ritter, "Short Interest, Institutional Ownership, and Stock Returns," *Journal of Financial Economics* 78, no. 2 (2005): 243–276, for a discussion of short-selling.

34.     A corollary of the efficient market hypothesis is that, because a semi-strong form efficient market rapidly incorporates all publicly available information that affects future cash flows and risks as soon as that information first becomes public (as soon as it enters the market's "information set"), the market will not react to subsequent repetition of previously available public information.  In fact, this very idea was used to introduce the concept of market efficiency by the economist Burton Malkiel in a chapter on the efficient market hypothesis in The New Palgrave's *Finance* (1989):

> A capital market is said to be efficient if it fully and correctly reflects all relevant information in determining security prices.  Formally, the market is said to be efficient with respect to some information set … if security prices would be unaffected by revealing that information to all participants.  Moreover, efficiency with respect to an information set … implies that it is impossible to make economic profits by trading on the basis of [that information set].[56]

35.     In other words, if a particular piece of information is already part of the market's information set at some point in time, and if the market is semi-strong form efficient, subsequent repetition of that information to market participants would not cause the security price to react further to the re-release of this information.

36.     Finally, a semi-strong form efficient market would also not react to information that is not value-relevant.  Value-relevant information is information that affects the market's assessment of a company's future cash flows and risks.  Information that is not value-relevant would not be expected to affect security prices.

## VII.    Event Study Analysis

### A.     Overview of the Event Study Approach

37.     An event study is a statistical tool used to measure the impact of a specific news event on value, as measured by changes in stock price (or the price of another security).[57]  An event study

---

[56] Burton G. Malkiel, "Efficient Market Hypothesis," in *Finance*, edited by John Eatwell, Murray Milgate, and Peter Newman (Palgrave Macmillan, 1989), p. 127.

[57] *See, e.g.*, A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 13–39 ("MacKinlay (1997)"), for an overview of event studies in financial economics.

generally involves three steps.[58]  First, a researcher selects the specific event to be examined and identifies when the information associated with that event first became public.  A researcher also selects the appropriate event window, or the period over which the stock prices will be examined.  For example, a researcher may examine the effect of an earnings announcement for a particular company as measured by the price reaction over a one-day window.  Second, a statistical regression model is used to calculate the abnormal or residual return accounting for market and industry movements, which is the portion of the observed return that is unexpected based on a model of expected returns—that is, the portion that cannot be attributed to market or industry price movements according to the statistical model employed.[59]  Third, a statistical hypothesis regarding the residual return is constructed and tested.  For example, a researcher may test a hypothesis (a so-called null hypothesis) that the residual return equals zero following the release of information—that is, that there is no security price reaction to the event after controlling for market and industry factors.  Hypothesis testing is a statistical technique that evaluates whether the null hypothesis (zero residual return in the example) can be rejected for a given significance threshold (conventionally 5%) based on the observed data.[60]  In an efficient market, the rejection of the null hypothesis of zero residual return supports a finding that information disclosed during the event window affected the security's price.

### B.    Regression Model for Tricida's Stock Returns

38.    For my analysis of Tricida's stock price movements, like Mr. Coffman, I used a two-factor (market and industry) linear regression model to estimate the statistical relationship between daily Tricida stock returns and the daily returns of market and industry indices.  The market index I used is the return on the CRSP value-weighted NYSE/NYSE MKT/Nasdaq/ARCA Market Index.  The industry index I used is the market-capitalization

---

[58] *See, e.g.*, MacKinlay (1997), pp. 14–16.

[59] Note that an event study is a joint test of whether the model used to calculate residual returns is correct and whether residual returns are zero.

[60] Whenever statistical significance is discussed in this report without specifying a confidence level, a 5% level using a two-tail test is applied.  *See, e.g.*, David H. Kaye and David A. Freedman, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence*, 3rd ed. (The National Academies Press, 2011), pp. 251–252 ("In practice, statistical analysts typically use levels of 5% and 1%.  The 5% level is the most common in social science, and an analyst who speaks of significant results without specifying the threshold probably is using this figure.…  These levels of 5% and 1% have become icons of science and the legal process.  In truth, however, such levels are at best useful conventions.").

weighted Nasdaq Biotechnology Total Return Index.[61]  The residual return is the actual, observed Tricida return less the return predicted by the two-factor model.  To estimate Tricida's residual returns I used the Proposed Class Period as an estimation window.[62]

39.    My regression model uses the same industry index that Mr. Coffman uses in his model.[63] Unlike Mr. Coffman, I estimate my model over the Proposed Class Period instead of using "rolling" windows of 120 trading days.[64]  I also use the broader CRSP value-weighted NYSE/NYSE MKT/Nasdaq/ARCA Market Index instead of the narrower S&P 500 Total Return Index, which contains fewer companies.[65]  Ultimately, these methodological differences do not affect the conclusions that I draw to reach my opinions in this report based on my event study.

## VIII.    There Is No Economic Evidence That the Challenged Statements Regarding the May 1, 2020 FDA Meeting Impacted Tricida's Stock Price after August 6, 2020

40.    I was asked to assess economic evidence regarding whether the Challenged Statements about the May 1, 2020 FDA "late-cycle" meeting had an impact on Tricida's stock price throughout the Proposed Class Period.

---

[61] Tricida compared its stock price performance to the Nasdaq Biotechnology Index in its FY 2019 and FY 2020 annual reports.  *See* 2019 10-K, p. 86; Tricida, Inc., Form 10-K for the Fiscal Year Ended December 31, 2020, filed on February 26, 2021, p. 102.  Consistent with Mr. Coffman's approach in his report, I do not exclude Tricida from the industry index.  The iShares Biotechnology ETF, which tracked the Nasdaq Biotechnology Index prior to June 21, 2021, contained 212 companies as of April 30, 2020, the latest date prior to the start of the Proposed Class Period for which constituent data were available. Tricida represented a small percentage of the ETF (approximately 0.18%).  *See LSEG*; "iShares Biotechnology ETF," *BlackRock*, available at https://www.blackrock.com/us/individual/products/239699/ishares-biotechnology-etf.

[62] I exclude from the estimation of my regression model the returns corresponding to the impact dates of the Challenged Statements, Alleged Corrective Disclosures, and the Company's Form 10-Q for Q2 2020, filed on August 6, 2020.  *See* **Exhibit 2** for the regression estimation results and **Exhibit 3** for residual returns.  For the impact dates of the Challenged Statements, Alleged Corrective Disclosures, and the Company's Form 10-Q for Q2 2020, filed on August 6, 2020, my ultimate determination regarding statistical significance is the same as Mr. Coffman's.  *See* Coffman Report, Exhibit 7 and Appendix C - Exhibit 1.

[63] Coffman Report, Exhibit 5.

[64] Coffman Report, Exhibit 5.

[65] Coffman Report, Exhibit 5.  While the S&P 500 Total Return Index has 500 constituent companies, the CRSP value-weighted NYSE/NYSE MKT/Nasdaq/ARCA Market Index is a "value-weighted portfolio … using all issues on the selected exchanges [(NYSE/NYSE MKT/Nasdaq/ARCA)]"; the Nasdaq exchange alone contains over 3,000 listed companies.  *See LSEG*; "An Overview of NASDAQ US," *LSEG*, available at https://www.lseg.com/en/data-analytics/financial-data/pricing-and-market-data/equities-market-data/us-nasdaq; "CRSP 1925 Historical Indexes Guide," *CRSP*, available at https://www.crsp.org/wp-content/uploads/guides/CRSP_Historical_Indexes_Guide.pdf.

41.     In making this assessment, I examined available public information to determine when the Alleged Truth was first publicly disclosed (**Section A**).  Once information was publicly available, assuming Tricida's stock traded in an efficient market during the Proposed Class Period, repetition of previously disclosed information could not have impacted Tricida's stock price on a later date.  This means that once a piece of information is disclosed, its full impact, if any, on the stock price is incorporated into the market price of a security.  Therefore, when the alleged truth about a particular challenged statement first becomes public, any stock price response is rapid, and there is no subsequent impact of the alleged failure to disclose the truth about the challenged statement on the stock price as an economic matter.

42.     As discussed below, my analysis indicates that the Alleged Truth was disclosed at the latest on August 6, 2020.  Thus, I conclude that the Challenged Statements could not have impacted Tricida's stock price after August 6, 2020 if the market for Tricida's stock was efficient.  In fact, economic evidence further shows that the Challenged Statements had no price impact after July 16, 2020, the day following the Company's July 15, 2020 after-market-hours disclosure that the FDA had "identified deficiencies that preclude discussion of labeling and postmarketing requirements/commitments at this time."[66]

43.     I also examined the Alleged Corrective Disclosures after August 6, 2020[67] (**Section B**).  I find that any stock price declines in response to these disclosures did not result from the revelation of the Alleged Truth because that truth had already been revealed.  Instead, the declines are consistent with factors other than the revelation of the Alleged Truth, including, in particular, the materialization of previously known risks regarding the approval prospects for veverimer.

### A.     The Challenged Statements Regarding the May 1, 2020 FDA Meeting Could Not Have Impacted Stock Price after August 6, 2020 As An Economic Matter

44.     As discussed in this section, I find that the Challenged Statements did not impact Tricida's price after August 6, 2020.  In fact, economic evidence further shows that the Challenged Statements had no price impact after July 16, 2020, the day following the Company's

---

[66] Second Amended Complaint, ¶ 78.

[67] These disclosures are alleged to have occurred on August 24, 2020, October 29, 2020, December 8, 2020, and February 25, 2021.

July 15, 2020 after-market-hours disclosure that the FDA had "identified deficiencies that preclude discussion of labeling and postmarketing requirements/commitments at this time."[68]

45.     As discussed above in **Section V.A**, I understand that the Challenged Statements are statements concerning a May 1, 2020 "late-cycle" meeting with the FDA.  First, I understand that Plaintiff claims that "[t]he FDA told Tricida at the May 1, 2020, meeting that it was not necessary to hold an Advisory Committee ('AdCom') meeting because of the numerous, serious deficiencies the FDA had identified in the TRCA-301 and TRCA-301E trials … including the inapplicability of its Eastern European data to the U.S. population and the small treatment effect."[69]  Plaintiff alleges that Dr. Klaerner misled investors on May 7, 2020 because "[i]nstead of revealing what the FDA actually told Tricida, Klaerner blamed the cancellation of the AdCom meeting on COVID-19."[70]  Second, I understand that Plaintiff alleges that Dr. Klaerner misled investors on May 7, 2020 by disclosing "the fact that Defendants had discussed 'outstanding review issues' with the FDA at the May 2020 late-cycle meeting and shar[ing] one of those issues: 'the magnitude and durability of the treatment effect on the surrogate marker'" but omitting "the other significant review issue – 'applicability of data from the TRCA-301 and TRCA-301E trials to the U.S. population.'"[71]

46.     As an initial observation, on May 8, 2020, the day following the after-market hours conference call during which the Challenged Statements were made, according to my event study, Tricida's residual return was 1.4%, which was not statistically significant.[72]

47.     Then, a July 15, 2020 press release by the Company disclosed that the FDA had identified "deficiencies" that "preclude[d] discussion of labeling and postmarketing requirements/commitments."  On that day, Tricida reported that:

> [O]n July 14, 2020, the Company received a notification from the U.S. Food and Drug Administration (FDA) stating that, as part of its ongoing review of the Company's New Drug Application (NDA), the FDA has identified deficiencies

---

[68] Second Amended Complaint, ¶ 78.

[69] Second Amended Complaint, ¶ 25.

[70] Second Amended Complaint, ¶ 26.

[71] July 2022 Motion to Dismiss Order, pp. 21–22.

[72] **Exhibit 3**; "Q1 2020 Tricida Inc Earnings Call," *Thomson Reuters*, May 7, 2020.

that preclude discussion of labeling and postmarketing requirements/ commitments at this time.[73]

48.     Plaintiff claims that news of "significant" deficiencies caused Tricida's stock price to decline "sharply" on July 16, 2020, alleging that Tricida's stock price declined "40.31% after the market learned that Tricida's veverimer NDA suffered from review issues that were significant enough to preclude discussions of labeling and postmarketing requirements/commitments";[74] and "[i]n response to this news, on unusually heavy trading activity, Tricida's stock price dropped sharply in one day, falling $10.56 per share in response to the news to close at $15.64 per share on July 16, 2020."[75]  My event study analysis shows that Tricida's stock price declined in a statistically significant manner on July 16, 2020, consistent with negative company-specific information being impounded in the Company's stock price on that day.[76]

49.     Analysts discussed the Company's disclosure.  For example:

Goldman Sachs, July 16, 2020:  After market close yesterday (July 15), TCDA provided a negative update on the regulatory status of its lead (and sole) asset veverimer, the company's novel polymer drug candidate (for treatment of metabolic acidosis in patients with chronic kidney disease) that has an August 22 PDUFA date.…  TCDA elaborated that it had received a letter from [the] FDA on July 14, in which the agency notified the company of deficiencies it had identified during its ongoing review of the new drug application (NDA) for the drug that precluded any further discussions of veverimer's label and any post-marketing commitments.…  With the shares trading down as much as >30% in the after market, this news comes as a surprise to us as well, given we had heretofore viewed veverimer as supported by a solid body of data across several key areas (clinical, outcomes-based, market-access related, etc.).[77]

Cowen, July 15, 2020:  TCDA disclosed that the FDA has identified "deficiencies" in veverimer's application, suggesting a first cycle approval is

---

[73] "Tricida Provides Regulatory Update on Veverimer," *Business Wire*, July 15, 2020, 5:00 PM ET.  This press release was also filed as an exhibit to a Form 8-K.  *See* Tricida, Inc. Form 8-K, Exhibit 99.1, filed on July 15, 2020.

[74] Second Amended Complaint, ¶ 193 ("On July 16, 2020, the price of Tricida stock, which traded on NASDAQ, fell from the prior days close of $26.20 to a low of $15.64, a drop of 40.31% after the market learned that Tricida's veverimer NDA suffered from review issues that were significant enough to preclude discussions of labeling and postmarketing requirements/commitments.").

[75] Second Amended Complaint, ¶ 79.

[76] My event study estimates a residual return on July 16, 2020 of -39.8%.

[77] "Tricida Inc. (TCDA):  Regulatory Update Increases Risk to Approval Timelines; Expect a Cloud of Uncertainty in the Near-Term," *Goldman Sachs*, July 16, 2020.

unlikely and TCDA will receive a [Complete Response Letter] on the Aug. PDUFA. TCDA was not informed of the specific deficiencies. Despite the likely delay, we believe veverimer's clinical data are strong, that the drug serves a large unmet need, and that it will create [long-term] shareholder value.[78]

Needham, July 16, 2020: Tricida announced yesterday that the company received a letter from the FDA stating that certain deficiencies in the veverimer NDA preclude the agency from completing its review of the drug. The letter does not identify the deficiencies. [Management] expects to receive an additional communication with details, although it is unclear whether this next communication will be made before the PDUFA date (8/22/20) or on the PDUFA date, potentially in the form of a Complete Response Letter.[79]

50.    Subsequently, on August 6, 2020, before market open, the Company filed its Form 10-Q for Q2 2020 ("Q2 2020 10-Q").[80]

51.    As discussed, I understand that the Second Amended Complaint alleges that there were two review issues discussed during the May 1, 2020 meeting with the FDA—specifically, "the ability of the surrogate endpoint for the TRCA-301/TRCA-301E trial to demonstrate likely clinical effect as well as the comparability of the trial subjects to the U.S. patient population and U.S. medical practice."[81] I understand that Plaintiff further alleges that Dr. Klaerner had "shared one of those issues: 'the magnitude and durability of the treatment effect on the surrogate marker'" and thus "by disclosing this key detail, Klaerner was obligated to share the other significant review issue – 'applicability of data from the TRCA-301 and TRCA-301E trials to the U.S. population.'"[82]

52.    The Q2 2020 10-Q, however, disclosed that both review issues were discussed during the May 1, 2020 meeting (which is the subject of the Challenged Statements) and also included the Company's stated belief that it would not "receive approval to market veverimer in the United States by [its] PDUFA goal date of August 22, 2020, if at all," stating:

---

[78] "'Deficiencies' in Veverimer Package Make August Approval Unlikely," *Cowen*, July 15, 2020.

[79] "FDA Letter Likely to Lead to Veverimer Approval Delay," *Needham*, July 16, 2020.

[80] Tricida, Inc., Form 10-Q for the Quarterly Period Ended June 30, 2020, filed on August 6, 2020 ("Q2 2020 10-Q").

[81] Second Amended Complaint, ¶ 176 ("Defendants had just met with the FDA in May 2020 for a late-cycle review, during which the FDA specifically raised concerns about the ability of the surrogate endpoint for the TRCA-301/TRCA-301E trial to demonstrate likely clinical effect as well as the comparability of the trial subjects to the U.S. patient population and U.S. medical practice.").

[82] July 2022 Motion to Dismiss Order, pp. 21–22.

In our late cycle meeting with the FDA, held in May 2020, we addressed two substantive review issues that the FDA had raised in advance of the meeting, namely concerns related to the magnitude and durability of the treatment effect on the surrogate marker of serum bicarbonate demonstrated in the TRCA-301 and TRCA-301E trials and *the applicability of data from the TRCA-301 and TRCA-301E trials to the U.S. population*.[83]

At the late cycle meeting, we presented our rationale for why we believe our data addressed the substantive review issues raised by the FDA. Because the July 14th notification does not specify the deficiencies identified by the FDA, we cannot be certain what the identified deficiencies are or whether the deficiencies relate to the substantive review issues raised by the FDA in connection with the late cycle meeting, or other matters. While we plan to work with the FDA to resolve the deficiencies referenced in the July 14, 2020 letter, we require additional information from the FDA before we can evaluate whether and how we will be able to address those deficiencies. We believe we are likely to receive that clarification in the form of a Complete Response Letter, or CRL. *Consequently, at this time we do not believe we will receive approval to market veverimer in the United States by our PDUFA goal date of August 22, 2020, if at all*.[84]

53.     In other words, the existence of "significant" deficiencies,[85] as well as the specific review issues allegedly discussed on May 1, 2020 (which are the subject of the Challenged Statements),[86] was publicly revealed no later than August 6, 2020 in the Q2 2020 10-Q.

---

[83] Q2 2020 10-Q, pp. 21–22 (emphasis added).

[84] Q2 2020 10-Q, pp. 21–22 (emphasis added).

[85] Second Amended Complaint, ¶ 193 ("On July 16, 2020, the price of Tricida stock, which traded on NASDAQ, fell from the prior days close of $26.20 to a low of $15.64, a drop of 40.31% after the market learned that Tricida's veverimer NDA suffered from review issues that were significant enough to preclude discussions of labeling and postmarketing requirements/commitments.").

[86] The Second Amended Complaint alleges that "[o]n April 17, 2020, in advance of the late cycle meeting, the FDA sent Tricida a package in which the FDA identified the 'substantive review issues [that] have been identified to date.' The FDA raised the following issues: *Magnitude and durability of the treatment effect on blood bicarbonate… Applicability of data from TRCA-301/301E to the U.S. population.*" *See* Second Amended Complaint, ¶ 23 (emphasis in original). Similarly, I understand the Court refers to two review issues discussed with the FDA at the May 2020 late cycle meeting: "Klaerner disclosed the fact that Defendants had discussed 'outstanding review issues' with the FDA at the May 2020 late-cycle meeting and shared one of those issues: 'the magnitude and durability of the treatment effect on the surrogate marker.' Compl. ¶ 101. Fiore plausibly alleges that by disclosing this key detail, Klaerner was obligated to share the other significant review issue – 'applicability of data from the TRCA-301 and TRCA-301E trials to the U.S. population' – discussed with the FDA." *See* July 2022 Motion to Dismiss Order, pp. 21–22. The Second Amended Complaint further alleges that "[t]he FDA told Tricida at the May 1, 2020, meeting that it was not necessary to hold an Advisory Committee ('AdCom') meeting because of the numerous, serious deficiencies the FDA had identified in the TRCA-301 and TRCA-301E trials" and that "[i]nstead of revealing what the FDA actually told Tricida, Klaerner blamed the

54.     I further understand that Plaintiff alleges that on May 7, 2020, Dr. Klaerner falsely identified COVID-19 logistics as the reason the FDA provided for not scheduling an AdCom meeting.  According to Plaintiff, "[t]he FDA told Tricida at the May 1, 2020, meeting that it was not necessary to hold an Advisory Committee ('AdCom') meeting because of the numerous, serious deficiencies the FDA had identified in the TRCA-301 and TRCA-301E trials … including the inapplicability of its Eastern European data to the U.S. population and the small treatment effect."[87]  As described above, by August 6, 2020, these review issues were known, as was the Company's stated belief that the FDA would not approve its veverimer NDA by the August 22, 2020 PDUFA date, "if at all."[88]

55.     In an efficient market, once a piece of information is disclosed, its full impact, if any, on the stock price is incorporated into the market price of a security.  Therefore, when the alleged truth about a challenged statement first becomes public and the market assesses its implications for future expected cash flows, any stock price response is rapid, and there is no subsequent impact of the challenged statement on the stock price as an economic matter.  Thus, to the extent the Challenged Statements had an impact on Tricida's stock price, that impact ceased after August 6, 2020.

56.     Indeed, economic evidence further shows that the Challenged Statements had no price impact after July 16, 2020, the day following the Company's July 15, 2020 after-market-hours disclosure that the FDA had "identified deficiencies that preclude discussion of labeling and postmarketing requirements/commitments at this time."[89]  First, there is no economic evidence that the August 6, 2020 disclosure regarding the nature of both review issues discussed in the May 1, 2020 FDA meeting and the Company's expectations about approval was new and value-relevant information.  As discussed, the information was revealed in the Company's Q2 2020 10-Q (released publicly before market hours on August 6, 2020).  However, neither my event

cancellation of the AdCom meeting on COVID-19.  This was false.  Plus, by purporting to reveal discussions with the FDA from the May 2020 late-cycle meeting, without also revealing the overwhelmingly negative feedback Tricida received over the deficiencies in the TRCA-301 trial data, Klaerner misleadingly inflated veverimer's likelihood of FDA approval to investors." *See* Second Amended Complaint, ¶¶ 25–26.

[87] Second Amended Complaint, ¶ 25.

[88] Q2 2020 10-Q, p. 22.  As discussed in **Section VIII.B**, I have reviewed the information revealed in the subsequent Alleged Corrective Disclosures.  In my review of these disclosures, I have not identified any information about the reason for the cancellation of the AdCom meeting.

[89] Second Amended Complaint, ¶ 78.

study nor Mr. Coffman's finds a statistically significant price decline on August 6, 2020.[90]  My event study findings show that any price impact of the Challenged Statements ended before August 6, 2020.[91]

57.     Second, I analyzed the interim period between July 15, 2020 and August 6, 2020 to determine if any information about the Challenged Statements was revealed to the market during this interim period.  I reviewed public press and analyst reports during this period and did not identify new information revealing the Alleged Truth; the Complaint also does not discuss any such information.  Additionally, based on my event study analysis (and consistent with Mr. Coffman's event study results), there were no statistically significant price changes in Tricida's stock between July 16, 2020 and August 6, 2020.  In other words, I did not find any economic evidence that the Challenged Statements impacted Tricida's stock price between July 16, 2020 and August 6, 2020.

58.     Taken together, this analysis shows that the Challenged Statements had no price impact after July 16, 2020, the day following the Company's July 15, 2020 after-market-hours disclosure that the FDA had "identified deficiencies that preclude discussion of labeling and postmarketing requirements/commitments at this time."[92]

---

[90] My event study finds the residual return on August 6, 2020 was -0.7% and not statistically significant (t-stat of -0.16).  Similarly, Mr. Coffman's event study finds the residual return on August 6, 2020 was -0.3% and not statistically significant (t-stat of -0.09).

[91] On August 5, 2020, the Company issued a press release announcing financial results for Q2 2020 and held a conference call, both after market hours.  *See* Q2 2020 10-Q; "Q2 2020 Tricida Inc Earnings Call," *Thomson Reuters*, August 5, 2020.  Goldman Sachs described the earnings announcement and financial results as "largely a non-event."  Goldman Sachs also lowered its price target from $52 to $25 per share. In an August 6, 2020 analyst report, Cowen decreased its price target for the stock from $50 to $40 per share.  In an August 6, 2020 analyst report, Needham also lowered its price target from $50 to $44 per share.  *See* "Tricida Inc. (TCDA): 2Q20 Wrap: Lower PT to $25 as a CRL for Veverimer Becomes the Base Case," *Goldman Sachs*, August 6, 2020; "Reports Q2; CRL for Veverimer Expected This Month, Duration of Delay Unclear," *Cowen*, August 6, 2020; "2Q20 Review. FDA Approval by PDUFA Date Appears Unlikely. Target to $44.," *Needham*, August 6, 2020.

[92] Second Amended Complaint, ¶ 78.

**B.      Any Stock Price Declines In Response to the Alleged Corrective Disclosures after August 6, 2020 Could Not and Therefore Did Not Result from the Revelation of the Alleged Truth**

59.      In this section, I consider the Alleged Corrective Disclosures after August 6, 2020.[93] Based on my analysis, I find that stock price declines after these disclosures could not and therefore did not result from the revelation of the Alleged Truth—which, as discussed, I understand comprises statements regarding a May 1, 2020 FDA "late-cycle" meeting.  This is because the Alleged Truth was already public and thus would have already been incorporated into Tricida's stock price in an efficient market.  The declines are consistent with factors other than the revelation of the Alleged Truth, including, in particular, the materialization of previously known risks about veverimer's approval prospects (i.e., if and when the FDA would approve veverimer).  As described below, these materializations of risk reflected new developments in the Company's ongoing effort to obtain FDA approval for veverimer, as opposed to new information about the Challenged Statements.

---

[93] Based on my event study analysis, of the dates on which Tricida's stock price declined significantly during the Proposed Class Period, all except May 19, 2020 are "impact" dates of the Alleged Corrective Disclosures.  Based on my event study model, the residual return on May 19, 2020 was -14.4%.  On May 19, 2020, before market open, Tricida announced that (i) the Company had amended its existing loan agreement with Hercules Capital, Inc. ("Hercules"); (ii) it had received a term loan from Hercules for $15 million and issued warrants in connection with this loan; and (iii) it "intends to offer $175.0 million aggregate principal amount of its Convertible Senior Notes due 2027 … in a private offering … to qualified institutional buyers pursuant to Rule 144A."  Based on my review of the May 19, 2020 disclosure, as well as public filings and public press commentary after the disclosure, I have not identified any information revealing the Alleged Truth associated with that date.  *See* Tricida, Inc., Form 8-K, filed on May 19, 2020; "Tricida Announces Proposed Offering of $175 Million Convertible Senior Notes Due 2027," *Business Wire*, May 19, 2020, 8:13 AM ET.  In addition, I have examined dates on which, based on Coffman's event study, Tricida's stock price declined significantly during the Proposed Class Period.  All of these dates except August 21, 2020 are dates with a significant stock price decline based on my regression model.  Based on my review of analyst reports and public press around August 21, 2020, I have not identified any information revealing the Alleged Truth associated with that date.

### 1. August 24, 2020

#### a) Overview

60.    On August 24, 2020, before market open, Tricida issued a press release announcing that it had received a Complete Response Letter ("CRL") from the FDA.[94]  The press release stated:

> According to the CRL, the FDA is seeking additional data beyond the TRCA-301 and TRCA-301E trials regarding the magnitude and durability of the treatment effect of veverimer on the surrogate marker of serum bicarbonate and the applicability of the treatment effect to the U.S. population.  [The] FDA also expressed concern as to whether the demonstrated effect size would be reasonably likely to predict clinical benefit.[95]

61.    In its press release, Tricida also stated that (i) it planned to "request a Type A meeting with the FDA in the coming weeks" (which I understand is a formal meeting with the agency to address these issues),[96] (ii) the CRL "provided multiple options for resolving the identified deficiencies," and (iii) "[i]n order to obtain approval for veverimer the company may or may not have to conduct an additional clinical trial."[97]  Further, the press release quoted Dr. Klaerner discussing the CRL, stating:

> We have collaborated with the FDA on the Accelerated Approval Program for veverimer and while we are disappointed to receive this CRL, we are pleased that the FDA has provided helpful, specific comments and indicated their willingness to continue to work with us to pursue approval of veverimer.…  We remain confident in the fundamentals of, and unmet medical need for, veverimer and we continue to conduct our confirmatory trial, VALOR-CKD.[98]

---

[94] "Tricida Receives Complete Response Letter from the FDA for its New Drug Application for Veverimer for the Treatment of Metabolic Acidosis and Slowing of Kidney Disease Progression in Patients with Metabolic Acidosis Associated with CKD," *Business Wire*, August 24, 2020, 8:30 AM ET ("August 24, 2020 Press Release").  This press release was also filed as an exhibit to a Form 8-K.  *See* Tricida, Inc., Form 8-K, Exhibit 99.1, filed on August 24, 2020.

[95] August 24, 2020 Press Release.

[96] *See, e.g.*, "Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products – Guidance for Industry," *FDA*, available at https://www.fda.gov/media/172311/download ("Type A meetings are those that are necessary for an otherwise stalled product development program to proceed or to address an important safety issue.").

[97] August 24, 2020 Press Release.

[98] August 24, 2020 Press Release.

62.    Plaintiff alleges that the press release announcing the receipt of the CRL:

> [R]evealed for the first time the FDA's position that the Phase 3 TRCA-301/TRCA-301E trial was inadequate on its own to demonstrate the efficacy of veverimer. It also revealed that the FDA required additional data regarding the applicability of the observed treatment effect to the U.S. population.[99]

### b)    Analysis

63.    As discussed in **Section VIII.A**, Plaintiff alleges that on July 15, 2020, "the market learned that Tricida's veverimer NDA suffered from review issues that were significant enough to preclude discussions of labeling and postmarketing requirements/commitments."[100] Further, on August 6, 2020, the Company discussed what I understand to be both of the substantive review issues addressed in the May 2020 FDA meeting—specifically, "the magnitude and durability of the treatment effect on the surrogate marker of serum bicarbonate demonstrated in the TRCA-301 and TRCA-301E trials" and "the applicability of data from the TRCA-301 and TRCA-301E trials to the U.S. population."[101] The Company also discussed its belief that it would "likely" receive a CRL and consequently would not "receive approval to market veverimer in the United States by [its] PDUFA goal date of August 22, 2020, if at all."[102] Assuming Tricida's stock traded in an efficient market during the Proposed Class Period, repetition of previously disclosed information could not have impacted Tricida's stock price on a later date. Once a piece of information is disclosed, its full impact, if any, on the stock price is incorporated into the market price of the security. Therefore, when the alleged truth about a particular challenged statement first becomes public, any stock price response is rapid, and there is no subsequent impact of the challenged statements on the stock price as an economic matter.

64.    Analyst commentary is consistent with public knowledge of the Alleged Truth before August 24, 2020. For example:

---

[99] Second Amended Complaint, ¶ 179. Plaintiff claims that "Tricida's stock price fell by $3.13 per share, or 24% on this news, falling from its prior closing price of $13.24 per share to close at $10.11 per share on August 24, 2020." *See* Second Amended Complaint, ¶ 178.

[100] Second Amended Complaint, ¶ 193.

[101] Q2 2020 10-Q, p. 21.

[102] Q2 2020 10-Q, p. 22.

Cowen, August 24, 2020:  The CRL was not surprising as it was foreshadowed by an announcement in mid-July that the FDA has identified deficiencies in veverimer's application, and by disclosures in TCDA's recent SEC filings that in May 2020 the company addressed two substantive review issues at a late cycle meeting with FDA.  The CRL raises largely the same issues as discussed at that meeting.[103]

Needham, August 24, 2020:  [Management] had previously guided for a rejection based on an FDA communication earlier in the review process.[104]

Goldman Sachs, August 25, 2020:  The timing and outcome are generally in line with our expectations, given an August 22 PDUFA and prior communication by the company on its 2Q20 earnings call that it was expecting to receive such a CRL.…  Having revisited both studies [published prior to the Proposed Class Period] and as shown below, the data indicates that US subjects were under-represented when compared to their Eastern European counterparts.[105]

65.    Information about the Challenged Statements could not have caused Tricida's stock price decline on August 24, 2020 given the prior public disclosures, as discussed.  Consistent with this, my review of the August 24, 2020 Alleged Corrective Disclosure, as well as analyst reports and public press commentary after the disclosure, identified other potentially new, value-relevant information that could have contributed to the stock price decline on that day.

66.    Public revelations in Tricida's August 24, 2020 disclosure regarding the CRL included that "the FDA [was] seeking additional data beyond the TRCA-301 and TRCA-301E trials," and that the FDA had "concern as to whether the demonstrated effect size would be reasonably likely to predict clinical benefit."[106]  Moreover, the Company stated that the CRL did not reveal a certain path forward, but instead indicated that the FDA had provided "multiple options for resolving the identified deficiencies," raised a question regarding the need to "conduct an additional clinical trial," and conveyed a willingness to meet with Tricida to "discuss options for obtaining approval."[107]  These developments are consistent with the materialization of previously disclosed regulatory risks, including, for example, the possibility that veverimer would not be

---

[103] "Veverimer Receives a CRL, as Anticipated," *Cowen*, August 24, 2020.

[104] "FDA Issues CRL for Veverimer," *Needham*, August 24, 2020.

[105] "CRL for Veverimer; Moving to Neutral and $10 PT as a New US Clinical Trial and Multi-Year Delay Become Our Base Case," *Goldman Sachs*, August 25, 2020.

[106] August 24, 2020 Press Release.

[107] August 24, 2020 Press Release.

approved on a timely basis (if at all) through the Accelerated Approval Program, that the FDA might require additional clinical trials to support approval, and that the FDA would not accept its foreign clinical data:[108]

> While our NDA is being reviewed through the Accelerated Approval Program, ***there can be no assurance that approval will be granted on a timely basis, or at all***.[109]

> [T]here can be ***no assurance*** that the FDA will ultimately agree that the results of our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial,

---

[108] Prior to the Proposed Class Period, it was public information that the majority of the trial sites as well as the majority of trial enrollments were outside the U.S., and that there were certain limitations arising from the fact that the population the clinical trials were based on was racially homogeneous. For example, Tricida's IPO Prospectus stated that the Company "conducted the TRCA-301 trial and [was] conducting the TRCA-301E trial with majority enrollment outside the United States and may, in the future, conduct clinical trials of [its] product candidates outside the United States." *See* Tricida, Inc., Form S-1, filed on June 4, 2018, p. 40. Additionally, a webpage dated December 18, 2017 on the U.S. Department of Health and Human Services' clinicialtrials.gov website lists the city and country for individual sites for the TRCA-301 trial, including 13 sites in the U.S., one site in Bulgaria, two sites in Croatia, seven sites in Georgia, nine sites in Hungary, four sites in Serbia, four sites in Slovenia, and seven sites in Ukraine. *See* "History of Changes for Study: NCT03317444, Evaluation of TRC101 in Subjects with Metabolic Acidosis Associated with Chronic Kidney Disease, Study Status, Contacts/Locations and Eligibility," *ClinicalTrials.gov*, December 18, 2017, available at https://clinicaltrials.gov/ct2/history/NCT03317444?A=2&B=2&C=merged#StudyPageTop. The TRCA-301 clinical trial published in *The Lancet* on March 8, 2019 included site locations—"37 sites (hospitals and specialty clinics) in eight countries (Bulgaria, Croatia, Georgia, Hungary, Serbia, Slovenia, Ukraine and the USA"—and the number of patients in Europe and the U.S. that received veverimer and the placebo. Similar information was included in the published results of the TRCA-301E clinical trial. The results published in *The Lancet* discussed limitations of the clinical trial, including the "racial homogeneity" of the study. *See* Donald E. Wesson et al., "Veverimer versus Placebo in Patients with Metabolic Acidosis Associated with Chronic Kidney Disease: A Multicentre, Randomized, Double-Blind, Controlled, Phase 3 Trial," *The Lancet*, March 8, 2019, pp. 1419, 1421, 1426 ("The limitations of our study include the racial homogeneity of the study population and the short treatment duration (12 weeks). Although meaningful effects of veverimer on increasing serum bicarbonate levels and self-reported physical functioning were achieved at 12 weeks, the sustainability of these effects over a longer time horizon needs to be confirmed in longer-term studies."); Donald E. Wesson et al., "Long-Term Safety and Efficacy of Veverimer in Patients with Metabolic Acidosis in Chronic Kidney Disease: A Multicentre, Randomized, Blinded, Placebo-Controlled, 40-week Extension," *The Lancet,* June 24, 2019, pp. 400, 404 ("Limitations of this study include a study population that was predominantly white, with very few African American or Hispanic patients, 1-year treatment duration and absence of an active comparator group. Although the 1-year duration of this study was appropriate to assess durability of increase in serum bicarbonate and improvement in physical function, longer-term and larger studies are needed to establish benefit of treatment of metabolic acidosis on chronic kidney disease progression and mortality.").

[109] 2019 10-K, p. 46 (emphasis added).

TRCA-301E, and the design of our confirmatory postmarketing trial, VALOR-CKD, *will be sufficient to support such approval*.[110]

We conducted the TRCA-101, TRCA-301 and TRCA-301E trials, and are conducting the VALOR-CKD trial with majority enrollment outside the United States and may, in the future, conduct clinical trials of our product candidates outside the United States. *The FDA may not accept such foreign clinical data*, and in such event, we may be required to re-conduct the relevant clinical trials within the United States.[111]

67.     Following the Company's August 24, 2020 disclosure, analysts discussed the negative implications of (i) an additional clinical trial, (ii) expectations that veverimer's launch would be delayed from 2021 to 2023, and (iii) the negative overhang of uncertainty.  For example:

Goldman Sachs, August 25, 2020:  Importantly, TCDA communicated that conduct of an additional clinical trial may or may not be required in order to secure veverimer's approval in the US….

…[G]iven near-term uncertainty over the next several months as to the future development path for veverimer, we believe the general lack of clarity will create an overhang on the shares.  Further, based on the news and our model changes that take into account *our new base case assumptions of (1) the conduct [of] a new US clinical trial (which is still to be determined between [the] FDA and TCDA, and may be premature of us to conclude) and (2) a new US launch timing of veverimer in 2023, we lower our price target to $10* [from $25] (implies 1% downside potential from current levels), which given the current weighted average upside of 24% for our US [small-mid cap] biopharma coverage universe, moves us to Neutral (from Buy)….

…*Leaving our probability of success assumption at 75%, we now assume a US launch for veverimer in 2023*.  This represents an additional six quarters of a delay, relative to our previous assumption of 3Q21 for US launch timing.[112]

Needham, August 24, 2020:  We expect the drug to ultimately be approved and reiterate BUY, but reduce target to $20 [from $44] to reflect extended timelines.

---

[110] 2019 10-K, p. 46 (emphasis added).

[111] 2019 10-K, p. 65 (emphasis added).

[112] "CRL for Veverimer; Moving to Neutral and $10 PT as a New US Clinical Trial and Multi-Year Delay Become Our Base Case," *Goldman Sachs*, August 25, 2020 (emphasis added).

…We acknowledge uncertainty around the review process, but continue to believe the Phase 3 data are sufficiently strong to justify approval of the drug. *We no longer expect the drug to be approved in 2021, but assuming a launch delay until 2023*, we believe the stock is still undervalued and may be attractive for longer-term investors.[113]

68.    Analysts also pointed to what they saw as positive aspects of the August 24, 2020 disclosure, including that "[n]o safety, clinical pharmacology, or CMC issues were reportedly identified by the FDA"[114] and that the FDA "has provided multiple options for resolving the identified deficiencies."[115]  More generally, analysts discussed upside and downside risk going forward, for example:

Goldman Sachs, August 25, 2020:  Key upside risks include:  better-than-expected post-CRL FDA outcome and an earlier US commercial launch timeline vs. what we currently anticipate as previously discussed.  Key downside risks [] include[:]  delay in approval for veverimer beyond our current expectation of 2023, non-approval of veverimer, slower-than-expected product uptake and hence sales trajectory, disappointing results in future clinical studies, and loss of exclusivity/earlier-than-expected competition.[116]

Cowen, August 24, 2020:  Though veverimer's path [cannot] be understood until after the Type A meeting, we are cautiously optimistic that TCDA and [the] FDA will agree on an expeditious one that does not require results from [V]ALOR-CKD….

Admittedly, given the limited disclosures it is not possible to be certain that data from VALOR-CKD is not necessary, which would be a substantial delay.  Interim data are anticipated in 2022-23 with final data in 2024-25.[117]

---

[113] "FDA Issues CRL for Veverimer," *Needham*, August 24, 2020 (emphasis added).

[114] "FDA Issues CRL for Veverimer," *Needham*, August 24, 2020.  I understand that CMC refers to "Chemistry, Manufacturing, and Control" issues.  *See*, e.g., "IND Applications for Clinical Investigations: Chemistry, Manufacturing, and Control (CMC) Information," FDA, available at https://www.fda.gov/drugs/investigational-new-drug-ind-application/ind-applications-clinical-investigations-chemistry-manufacturing-and-control-cmc-information.

[115] "CRL for Veverimer; Moving to Neutral and $10 PT as a New US Clinical Trial and Multi-Year Delay Become Our Base Case," *Goldman Sachs*, August 25, 2020.

[116] "CRL for Veverimer; Moving to Neutral and $10 PT as a New US Clinical Trial and Multi-Year Delay Become Our Base Case," *Goldman Sachs*, August 25, 2020.

[117] "Veverimer Receives a CRL, as Anticipated," *Cowen*, August 24, 2020.

69.     In sum, the price decline on August 24, 2020 does not support a claim that the Challenged Statements impacted Tricida's stock price after August 6, 2020. The decline is consistent with factors other than the revelation of the Alleged Truth, including the materialization of previously known risks.

### 2.     October 29, 2020

#### a)     Overview

70.     On October 29, 2020, before market open, Tricida issued a press release announcing that on October 20, 2020, it held a "Type A meeting" with the FDA's Division of Cardiology and Nephrology.[118] Tricida announced that it had proposed to the FDA "an interim analysis of serum bicarbonate data from VALOR-CKD" to confirm "the treatment effect of veverimer observed in the TRCA-301/301E trials and its applicability to the U.S. population and practice of medicine," but the Company now believed that the FDA was "unlikely to rely solely on serum bicarbonate data for determination of efficacy."[119] Instead, Tricida stated it believed the FDA would "require evidence of veverimer's effect on CKD progression from a near-term interim analysis of the VALOR-CKD trial for approval under the Accelerated Approval Program."[120] The Company did not believe it could provide a near-term interim analysis "without compromising the integrity of the ongoing [VALOR-CKD] trial."[121] The press release further stated:

> [P]rior to the End-of-Review Type A meeting, over nearly four years, Tricida's discussions with the FDA focused on development of veverimer based solely on the use of serum bicarbonate as the surrogate endpoint to enable accelerated approval, with CKD progression data to be provided only at the completion of the VALOR-CKD trial…. The company continues to believe that its current development program for veverimer is an appropriate candidate for accelerated approval based on (1) the seriousness of end-stage renal disease (ESRD), (2) the high unmet need for an approved therapy, and (3) data supporting the link between metabolic acidosis and progression of CKD, including data describing

---

[118] "Tricida Provides Update on FDA Interactions," *Business Wire*, October 29, 2020, 7:30 AM ET ("October 29, 2020 Press Release"). This press release was also filed as an exhibit to a Form 8-K. *See* Tricida, Inc., Form 8-K, Exhibit 99.2, filed on October 29, 2020.

[119] October 29, 2020 Press Release.

[120] October 29, 2020 Press Release.

[121] October 29, 2020 Press Release.

the pathophysiology of metabolic acidosis, published data from multiple interventional trials and observational cohort analyses, and the availability of two validated models that consistently describe the relationship between serum bicarbonate and the renal outcome that is being measured in VALOR-CKD.[122]

71.    The press release quoted Dr. Klaerner's statements about the Type A meeting:

We are surprised by the feedback received from the FDA during the Type A meeting.… The introduction of a requirement for data on the effect of veverimer on renal disease progression to support initial accelerated approval clearly represents a major setback in the timeline for the development of veverimer. We remain dedicated to bringing veverimer to patients with CKD and metabolic acidosis who currently have no FDA-approved therapy for their disease.[123]

72.    Tricida further disclosed that it was "re-organizing … to extend its financial runway," "reducing its headcount from 152 to 59 people," discussing its "commitments with vendors and contract service providers," and "plan[ning] to wait for formal meeting minutes from the FDA related to the End-of-Review Type A meeting prior to determining how to proceed with obtaining regulatory approval for veverimer."[124] In addition to its press release, the Company published an investor presentation and held a conference call to "discuss the preliminary feedback from its FDA interactions and future plans," also before market open.[125]

73.    Plaintiff alleges that the press release announcing the Type A meeting:

[R]evealed for the first time that Tricida would have to provide clinical evidence of CKD progression (instead of just chemical evidence of serum bicarbonate levels), and that that evidence would have to come from the VALOR-CKD trial or some other yet-to-be designed trial. However, acquiring that evidence from the VALOR-CKD trial would eliminate its ability to function as a confirmatory postmarketing trial for purposes of the accelerated approval process.[126]

---

[122] October 29, 2020 Press Release.

[123] October 29, 2020 Press Release.

[124] October 29, 2020 Press Release.

[125] Tricida, Inc., Form 8-K, Exhibit 99.1, filed on October 29, 2020; October 29, 2020 Press Release; "Tricida Inc End-of-Review Type A Meeting Update Conference Call," *Refinitiv Streetevents*, October 29, 2020.

[126] Second Amended Complaint, ¶ 182. Plaintiff claims that "[i]n response to this news, Tricida's stock price fell $3.90 per share, to close at $4.37 per share on October 29, 2020." *See* Second Amended Complaint, ¶ 181.

### b)    Analysis

74.    As discussed in **Sections VIII.A** and **VIII.B.1.b**, my analysis indicates that the Alleged Truth was disclosed at the latest on August 6, 2020.  Thus, I conclude that the Challenged Statements could not have impacted Tricida's stock price after August 6, 2020 if the market for Tricida's stock was efficient.

75.    Information about the Challenged Statements could not have caused Tricida's stock price decline on October 29, 2020 given the prior public disclosures.  Consistent with that finding, my review of the October 29, 2020 Alleged Corrective Disclosure, as well as analyst reports and public press commentary after the disclosure, identified other potentially new, value-relevant information that could have contributed to the stock price decline on that day.

76.    Public revelations in Tricida's October 29, 2020 disclosure pertained to new regulatory developments, including that the FDA was "unlikely to rely solely on serum bicarbonate data for determination of efficacy," that the FDA would "require evidence of veverimer's effect on CKD progression from a near-term interim analysis of the VALOR-CKD trial for approval," and that the Company believed it could not provide a near-term interim analysis "without compromising the integrity of the ongoing [VALOR-CKD] trial."[127]  As with August 24, 2020, the October 29, 2020 disclosure is consistent with the materialization of previously known risks, including, for example, the possibility that veverimer would not be approved on a timely basis (if at all) through the Accelerated Approval Program and that the FDA might require additional clinical trials to support approval:

> While our NDA is being reviewed through the Accelerated Approval Program, ***there can be no assurance that approval will be granted on a timely basis, or at all***.[128]

> [T]here can be ***no assurance*** that the FDA will ultimately agree that the results of our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial, TRCA-301E, and the design of our confirmatory postmarketing trial, VALOR-CKD, ***will be sufficient to support such approval***.[129]

---

[127] October 29, 2020 Press Release.
[128] 2019 10-K, p. 46 (emphasis added).
[129] 2019 10-K, p. 46 (emphasis added).

77.     The Company's disclosure also is consistent with the materialization of risks related to the use of serum bicarbonate as a surrogate endpoint, and whether the FDA would approve the drug through the Accelerated Approval Program based on the surrogate endpoint.  Prior to the Proposed Class Period, the Company had disclosed the following information about this specific risk in its 2019 10-K:

> Because we are developing a product candidate for the treatment of a disease or condition on the basis of an unvalidated surrogate endpoint, there are increased risks that the FDA or other regulatory authorities may find that our clinical program provides insufficient evidence of clinical benefit, may have difficulty analyzing and interpreting the results of our clinical program, and may delay or refuse to approve veverimer.

> There are no FDA-approved therapies for the chronic treatment of patients with metabolic acidosis and CKD.  In addition, we are not aware of any chronic therapeutic agent that has previously been approved by the FDA on the basis of a clinical trial that used serum bicarbonate level as the primary endpoint.  We have engaged in discussions with the FDA regarding the design of our pivotal Phase 3 clinical trial, TRCA-301, and whether the use of serum bicarbonate as a surrogate endpoint is reasonably likely to predict clinical benefit.  ***However, the FDA has discretion at any time, including during our NDA review, to determine whether there is support for the use of serum bicarbonate as a surrogate endpoint.***

> Key issues with our endpoint include uncertainty about the degree of change from baseline serum bicarbonate that will translate into improved clinical outcomes, the population in which such change is expected to translate into improved clinical outcomes, and the need for data supporting a causal relationship between serum bicarbonate concentration and clinical outcomes.  ***As a result, we cannot be certain that [the] FDA will ultimately conclude that the design and results of our pivotal Phase 3 clinical trial, TRCA-301, which uses changes from baseline in serum bicarbonate level as the primary endpoint, and our 40-week extension study, TRCA-301E, or that the design of the VALOR-CKD trial, will be sufficient for approval of veverimer.***

> Moreover, even if the FDA does find that changes from baseline in serum bicarbonate are sufficiently likely to predict clinical benefit for patients, the FDA may not agree that we have achieved the primary endpoint in our pivotal Phase 3 clinical trial, TRCA-301, to the magnitude or to the degree of statistical significance required by the FDA.  Further, even if those requirements are satisfied, the FDA also could give overriding weight to inconsistent or otherwise confounding results on other efficacy endpoints or other results of the trial, including results on secondary and exploratory endpoints.  The FDA also weighs

the benefits of a product against its risks and the FDA may view the efficacy results in the context of safety as not being supportive of regulatory approval. Regulatory authorities in other countries may take similar positions.[130]

78.     Following the Company's October 29, 2020 disclosure, analysts discussed the negative implications, including delays and lack of clarity regarding the next steps for Tricida, of requiring evidence of veverimer's effect on CKD progression instead of accepting the serum bicarbonate data.  For example:

J.P. Morgan, October 29, 2020:  In what we see as a major setback for veverimer's timeline to approval, Tricida now believes the FDA will require evidence of veverimer's effect on CKD progression from a near-term interim analysis of the VALOR-CKD trial for approval under the Accelerated Approval Program and TCDA does not believe it can provide this without compromising the integrity of the trial.…

…In what clearly came as a surprise to management, the FDA is now not accepting bicarb alone as the basis for accelerated approval despite interactions over the past several years focused on this surrogate with no prior mention of the need for data on CKD progression as part of the accelerated approval requirements.[131]

Goldman Sachs, October 30, 2020:  Despite the update, the path forward for veverimer remains unclear.…

…From our perspective, the FDA's apparent moving of goal posts for veverimer's US approval is unfortunate.…

While it still remains uncertain what the regulatory path and approval timelines might look like for veverimer, we now model a US commercial launch in 2024, representing a one-year delay from our prior base case assumption of a US launch in 2023.[132]

---

[130] 2019 10-K, p. 64 (original emphasis removed; emphasis added in bold italics).
[131] "The Waiting Is the Hardest Part; No Fast Fix for CRL, Watch Nov Update for Path Fwd," *J.P. Morgan*, October 29, 2020.
[132] "Tricida Inc. (TCDA):  Veverimer Update Provided but Future Path to Approval Remains Unclear; Await Next Update," *Goldman Sachs*, October 30, 2020.

Cowen, October 29, 2020:  Our Take: It Is Disappointing That Veverimer's Approval Will Depend On Efficacy Results From VALOR-CKD As This Is Likely A Multi-Year Delay.

…Given the FDA's initial acceptance of serum bicarbonate as a surrogate endpoint when veverimer's clinical trial program was designed, and the use of serum bicarbonate in a number of academic studies, management had been hopeful that the FDA's concerns outlined in veverimer's CRL could be answered by an interim analysis of serum bicarbonate in VALOR-CKD.  Such data would have permitted a resubmission in several months.

The Type A meeting made it clear this will not be sufficient and it now appears that the delay will be more significant.[133]

Needham, October 30, 2020:  Given this shift by the FDA, it is now evident that veverimer approval is not possible until Tricida generates evidence of effectiveness against CKD progression endpoints in the ongoing Phase 3 VALOR-CKD trial.  This trial was originally initiated as a post-approval confirmatory trial.  We expect a positive outcome from the VALOR-CKD trial based on serum bicarbonate data from the TRCA-301 Phase 3 program, which also provided evidence of an impact on quality of life and patient outcomes.  However, timing of results from the event-driven VALOR-CKD trial is unclear.  [Management] noted that the first interim efficacy analysis may take place as soon as next year.  It is likely, however, that effectiveness may not be demonstrated until subsequent analyses are conducted 2022+.[134]

79.    Despite the overall negative news, analysts still noted the drug's potential future success. For example, Needham stated that it "believe[d] veverimer is likely an effective and differentiated drug for Metabolic Acidosis" reiterating its "BUY,"[135] and Cowen noted that it thought the drug "addresses an unmet need" and that the Company was "undervalued despite today's disappointment."[136]  More generally, analysts continued to discuss upside and downside risks going forward, including:

Goldman Sachs, October 30, 2020:  Key upside risks include:  better-than-expected post-CRL FDA outcome and an earlier US commercial launch timeline

---

[133] "FDA's Request For CKD Progression Data to Delay Veverimer's Approval," *Cowen*, October 29, 2020 (original emphasis removed).

[134] "FDA Focused on CKD Progression for Approval," *Needham*, October 30, 2020.

[135] "FDA Focused on CKD Progression for Approval," *Needham*, October 30, 2020.

[136] "FDA's Request for CKD Progression Data to Delay Veverimer's Approval," *Cowen*, October 29, 2020.

vs. what we currently anticipate as previously discussed.  Key downside risks [] include[:]  delay in approval for veverimer beyond our current expectation of 2024; non-approval of veverimer; if approved, slower-than-expected product uptake and hence sales trajectory; disappointing results in future clinical studies, and loss of exclusivity/earlier-than-expected competition.[137]

Cowen, October 29, 2020:  Despite the delay and risks, we continue to believe that there is a major need for a therapy that can increase blood bicarbonate in CKD patients without conferring a large dose of sodium.  We remain hopeful that veverimer will ultimately become a standard treatment in CKD with $1B in peak revenue potential.[138]

80.    Analysts also noted that they expected the Company to provide a further update "in … late November/early December" after the receipt of formal minutes from the Type A meeting:[139]

J.P. Morgan, October 29, 2020:  In the meantime, Tricida is evaluating the appropriate way to provide the FDA with interim data on CKD progression from VALOR-CKD without compromising study integrity, and we see this as likely entailing a shift to a group sequential design.  Following the minutes, we expect TCDA to provide clarity on their updated plan along with timing of progression events and further statistical details.[140]

Goldman Sachs, October 30, 2020:  As a first next step, TCDA will need to see (and then digest) the FDA's official minutes from the Oct. 20 meeting.  On the assumption that such minutes are made available 30 days after the original meeting, we believe it's reasonable to expect that TCDA will be in a position to provide another update to the market in the late November/early December timeline.[141]

81.    In sum, the price decline on October 29, 2020 does not support a claim that the Challenged Statements impacted Tricida's stock price after August 6, 2020.  The decline is

---

[137] "Tricida Inc. (TCDA):  Veverimer Update Provided but Future Path to Approval Remains Unclear; Await Next Update," *Goldman Sachs*, October 30, 2020.

[138] "FDA's Request for CKD Progression Data to Delay Veverimer's Approval," *Cowen*, October 29, 2020.

[139] "Tricida Inc. (TCDA):  Veverimer Update Provided but Future Path to Approval Remains Unclear; Await Next Update," *Goldman Sachs*, October 30, 2020.

[140] "The Waiting Is the Hardest Part; No Fast Fix for CRL, Watch Nov Update for Path Fwd," *J.P. Morgan*, October 29, 2020.

[141] "Tricida Inc. (TCDA):  Veverimer Update Provided but Future Path to Approval Remains Unclear; Await Next Update," *Goldman Sachs*, October 30, 2020.

consistent with factors other than the revelation of the Alleged Truth, including the materialization of previously known risks.

### 3.    December 8, 2020

#### a)    Overview

82.    On December 8, 2020, after market close, Tricida issued a press release announcing several developments related to veverimer's prospects for FDA approval.[142]  The Company announced that it had revised the protocol for the VALOR-CKD trial (from an "adaptive design" to a "group sequential design")[143] to collect interim data on CKD progression, that it had closed trial recruitment in "all regions except for the United States, Canada, and Western Europe," and that it intended this trial to "serve as the confirmatory trial for accelerated approval or form the basis for traditional approval of veverimer."[144]

83.    Additionally, the Company announced that it had submitted a Formal Dispute Resolution Request ("FDRR") to the FDA "to seek clarity on the path forward for resubmitting [the] New Drug Application."[145]  The press release further stated:

> The FDRR requests that the Office of New Drugs (OND) find that the magnitude of serum bicarbonate change seen in the TRCA-301 and TRCA-301E trials is reasonably likely to predict clinical benefit in the treatment of metabolic acidosis associated with CKD and that it can therefore serve as the basis for accelerated approval.  If accepted for consideration, a decision on the FDRR is expected in the first quarter of 2021.  The timing and next steps for a resubmission of the NDA for veverimer will be dependent upon the OND's decision.[146]

---

[142] "Press Release:  Tricida Announces Updates on Veverimer Development Program, Regulatory Status and New Patent Extending Protection through 2038," *Dow Jones Institutional News*, December 8, 2020, 4:05 PM ET ("December 8, 2020 Press Release").  This press release was also filed as an exhibit to a Form 8-K.  *See* Tricida, Inc., Form 8-K, Exhibit 99.2, filed on December 8, 2020.

[143] Dr. Klaerner stated:  "[W]e've revised the VALOR-CKD [adaptive design] protocol to eliminate the previous unblinded sample size re-estimation and a late interim analysis for early stopping for efficacy and we have added interim analyses for early stopping for efficacy after accrual of 150 and 250 subjects with [endpoint] events."  *See* "Tricida Inc End-of-Year Business Update Conference Call," *LSEG*, December 8, 2020.

[144] December 8, 2020 Press Release.

[145] December 8, 2020 Press Release.

[146] December 8, 2020 Press Release.

84.     In the press release, Dr. Klaerner is also quoted as stating:

> We believe that we are studying the right patient population and the right CKD
> progression endpoint in VALOR-CKD.  Hence, we believe that an adaptive
> design is no longer necessary and have locked in the sample size at 1,600 subjects
> and built in two opportunities for stopping early for efficacy over the next 18 to
> 24 months, in the event that the effect of veverimer on slowing CKD progression
> is greater than currently modeled.…  And while we are disappointed that we
> could not come to a resolution with the Division of Cardiology and Nephrology
> on the resubmission of our NDA during our Type A meeting, we believe that the
> focused, single issue FDRR currently represents the best approach to bring
> veverimer to patients through accelerated approval.[147]

85.     The Company also announced that it had "received [a] notice of allowance" for a patent, which would  "extend veverimer's patent coverage in the United States to 2038."[148]  In addition to issuing a press release, the same day after market close, the Company released an investor presentation and held a conference call to "discuss veverimer updates."[149]

86.     Plaintiff alleges that the press release:

> [F]ocused on one issue with the NDA:  the surrogate endpoint's ability to predict
> clinical benefit.  This time, the press release presented a new way—the FDRR—
> for the FDA to approve the NDA.[150]

### b)     Analysis

87.     As discussed in **Sections VIII.A** and **VIII.B.1.b**, my analysis indicates that the Alleged Truth was disclosed at the latest on August 6, 2020.  Thus, I have concluded that the Challenged Statements could not have impacted Tricida's stock price after August 6, 2020 if the market for Tricida's stock was efficient.

---

[147] December 8, 2020 Press Release.

[148] December 8, 2020 Press Release.  A "Notice of Allowance" indicates that the applicant is "entitled to a patent."  *See* "Patent process overview | USPTO," United States Patent and Trademark Office, available at https://www.uspto.gov/patents/basics/patent-process-overview.

[149] Tricida, Inc., Form 8-K, Exhibit 99.1, filed on December 8, 2020; December 8, 2020 Press Release; "Tricida Inc End-of-Year Business Update Conference Call," *Refinitiv Streetevents*, December 8, 2020.

[150] Second Amended Complaint, ¶ 184.  Plaintiff claims that "Tricida's stock price fell from its closing price of $8.12 per share on December 8, 2020, to close at $6.68 per share on December 9, 2020, an almost 18% decline."  *See* Second Amended Complaint, ¶ 184.

88.    Information about the Challenged Statements could not have caused Tricida's stock price decline on December 9, 2020 given the prior public disclosures. Consistent with this conclusion, my review of the December 8, 2020 Alleged Corrective Disclosure, as well as analyst reports and public press commentary after the disclosure, identified other potentially new, value-relevant information that could have contributed to the stock price decline on that day.

89.    Public revelations in Tricida's December 8, 2020 disclosure included that Tricida had revised the protocol for the VALOR-CKD trial (from an "adaptive design" to a "group sequential design") and that the Company had submitted an FDRR.[151] The disclosure is consistent with the materialization of previously disclosed regulatory risks, including, for example, the possibility that veverimer would not be approved on a timely basis (if at all) through the Accelerated Approval Program, that the FDA might require additional clinical trials to support approval, and risks specifically related to the use of serum bicarbonate as a surrogate endpoint and whether the FDA would approve the drug based on the surrogate endpoint (see discussion in **Section VIII.B.2.b**).

90.    Following the Company's December 8, 2020 disclosure, analysts discussed the implications of the update. Goldman Sachs noted that it saw "this news as largely consistent with TCDA's prior communications. While there had been some potential that the FDA would allow for resubmission of their NDA without additional data, this now appears increasingly unlikely."[152] Goldman Sachs also noted that the Company "reaffirmed that the FDA [was] unlikely to accept resubmission of [the] NDA."[153] Analysts focused on the updates to the study design. For example:

> Cowen, December 9, 2020:  Most notable in last night's update is the revised design of the VALOR-CKD trial, as this provides some clarity on veverimer's potential paths to market.  The revised design now includes interim analyses at 150 events, anticipated to be reached during H2:21, and 250 events, anticipated to be reached around Mid:22 with a final analysis at 511 events expected in 2024. Though the trial's statistics and TCDA's analysis suggest that the trial is unlikely to stop at the first interim (TCDA estimates a 1-4% chance), there would seem to

---

[151] December 8, 2020 Press Release.
[152] "Tricida Inc. (TCDA):  New Veverimer Update Provided; VALOR-CKD Gets Amended, Maintain Current Base Case of a 2024 Launch," *Goldman Sachs*, December 9, 2020.
[153] "Tricida Inc. (TCDA):  New Veverimer Update Provided; VALOR-CKD Gets Amended, Maintain Current Base Case of a 2024 Launch," *Goldman Sachs*, December 9, 2020.

be a meaningful chance that it could at the second (TCDA estimates a 21-40% likelihood).  Our model assumes a late 2023 launch, which would be consistent with the trial stopping at the second interim.[154]

J.P. Morgan, December 8, 2020:  With the formal minutes confirming the initial Type A meeting feedback that the FDA is not accepting bicarb alone as the basis for accelerated approval, Tricida outlined their revised plan to obtain regulatory approval.  The new plan would allow Tricida to provide the FDA the data it desires on CKD progression data from VALORCKD without compromising study integrity.  Indeed, Tricida revised the VALOR protocol to a group sequential design with 2 unblinded interim looks for early stopping based on efficacy, the first after 150 primary endpoint events (~2H21) and the second after 250 events (~mid-2022) with small alpha spend on each look before full results in 2024. While we generally agree with this move, we remain ~18 mos from a relatively low-probability 2nd interim and while we think the stock reflects an extended delay and substantially lower probability of approval (in addition to potentially some funding concerns), we still see a longer wait (barring an upside surprise on the path forward from OND) for data that could support approval.[155]

Goldman Sachs, December 9, 2020:  As such, TCDA has adapted their protocols to collect interim data from their ongoing VALOR-CKD outcomes study, and now plan to evaluate clinical efficacy on an unblinded basis at two earlier points (2H21 and in mid-2022), based on the number of adverse renal events that occur. Should the data meet statistical significance at either of these earlier time-points, they would likely be able to end VALOR-CKD early and re-submit their NDA.[156]

91.    Analysts also discussed the Company's FDRR, although they noted that this was unlikely to affect the FDA's decision on the use of serum bicarbonate data as a surrogate endpoint.  For example:

J.P. Morgan, December 8, 2020:  Dispute resolution could offer further clarity on [the] path forward (though not expecting an about face on use of bicarb alone to support accelerated approval).  The Formal Dispute Resolution Request Tricida submitted asks the Office of New Drugs (OND) to find that the magnitude of serum bicarb change seen in the TRCA-301 and TRCA-301E trials (accompanied by data on veverimer's safety and effect on daily activities as well as the predictive model) is reasonably likely to predict clinical benefit in [patients] with

---

[154] "TCDA Discloses Revised Design of VALOR-CKD, New Patent, and FDA FDRR," *Cowen*, December 9, 2020.

[155] "No Shortcuts to Outcomes; Can 2nd Interim Keep Hope Alive?," *J.P. Morgan*, December 8, 2020.

[156] "Tricida Inc. (TCDA):  New Veverimer Update Provided; VALOR-CKD Gets Amended, Maintain Current Base Case of a 2024 Launch," *Goldman Sachs*, December 9, 2020.

metabolic acidosis associated with CKD (and therefore supportive of accelerated approval).  [Management] expects the OND's response in 1Q21 and while historically only ~16% of these have been granted (which could lead to label discussions under accelerated approval), [management] is optimistic that the process could still result in further regulatory clarity and potentially an alternative path forward for accelerated approval.[157]

Goldman Sachs, December 9, 2020:  To challenge the agency's stance, TCDA has in response submitted an FDRR (formal dispute resolution request), seeking to have the FDA acknowledge that the data presented by TCDA to date are sufficient to meet the stated criteria for surrogate endpoints under the accelerated approval process.  While the company struck a constructive tone in characterizing its ongoing dialog with the agency, it is not their base case that the FDRR will be granted.  A decision on the FDRR is expected sometime in 1Q21.[158]

92.    More generally, analysts continued to discuss upside and downside risks going forward, including:

Goldman Sachs, December 9, 2020:  Key upside risks include: better-than-expected post-CRL FDA outcome and an earlier US commercial launch timeline vs. what we currently anticipate as previously discussed.  Key downside risks include: delay in approval for veverimer beyond our current expectation of 2024; non-approval of veverimer; if approved, slower-than-expected product uptake and hence sales trajectory; disappointing results in future clinical studies, and loss of exclusivity/earlier-than-expected competition.[159]

Cowen, December 9, 2020:  Despite the delay to veverimer's approval, we continue to believe that there is a major need for a therapy that can increase blood bicarbonate in CKD patients without conferring a large dose of sodium.  We remain hopeful that veverimer will ultimately become a standard treatment in CKD with $1B in peak revenue potential.[160]

93.    Analysts also commented on the potential extension of veverimer's patent coverage:

---

[157] "No Shortcuts to Outcomes; Can 2nd Interim Keep Hope Alive?," *J.P. Morgan*, December 8, 2020 (original emphasis removed).

[158] "Tricida Inc. (TCDA):  New Veverimer Update Provided; VALOR-CKD Gets Amended, Maintain Current Base Case of a 2024 Launch," *Goldman Sachs*, December 9, 2020 (original emphasis removed).

[159] "Tricida Inc. (TCDA):  New Veverimer Update Provided; VALOR-CKD Gets Amended, Maintain Current Base Case of a 2024 Launch," *Goldman Sachs,* December 9, 2020.

[160] "TCDA Discloses Revised Design of VALOR-CKD, New Patent, and FDA FDRR," *Cowen,* December 9, 2020.

Goldman Sachs, December 9, 2020: TCDA also announced notice of allowance for a new composition of matter patent for the compound that once issued, could extend patent protection for veverimer out to 2038. At this time, TCDA is not sharing any additional details about the new IP; hence, until we are able to better understand and learn more about the new patent itself, we maintain our current base case of US loss of exclusivity for veverimer in 2034.[161]

Cowen, December 9, 2020: Tricida announced that the U.S. PTO has allowed an Orange Book eligible composition of matter patent for veverimer. Tricida expects that once the patent is issued it will extend veverimer's patent coverage and hence exclusivity until 2038 in the U.S.[162]

94.      In sum, the price decline on December 9, 2020 does not support a claim that the Challenged Statements impacted Tricida's stock price after August 6, 2020. The decline is consistent with factors other than the revelation of the Alleged Truth, including the materialization of previously known risks.

### 4.      February 25, 2021

#### a)      Overview

95.      On February 25, 2021, after market close, Tricida issued a press release announcing that it had received an Appeal Denied Letter ("ADL") from the Office of New Drugs ("OND") of the FDA in response to its FDRR submission.[163] The press release described the FDA's apparent concerns, stating that:

In the ADL, the OND acknowledged that the TRCA-301/TRCA-301E trial met its serum bicarbonate endpoints with statistical significance but concluded that the

---

[161] "Tricida Inc. (TCDA): New Veverimer Update Provided; VALOR-CKD Gets Amended, Maintain Current Base Case of a 2024 Launch," *Goldman Sachs,* December 9, 2020.

[162] "TCDA Discloses Revised Design of VALOR-CKD, New Patent, and FDA FDRR," *Cowen,* December 9, 2020. The Orange Book is an FDA publication that "identifies drug products approved on the basis of safety and effectiveness by the Food and Drug Administration (FDA) under the Federal Food, Drug, and Cosmetic Act (the Act) and related patent and exclusivity information." *See* "Approved Drug Products with Therapeutic Equivalence Evaluations | Orange Book," *FDA*, available at https://www.fda.gov/drugs/drug-approvals-and-databases/approved-drug-products-therapeutic-equivalence-evaluations-orange-book.

[163] "Press Release: Tricida Provides Update on FDA Interactions," *Dow Jones Institutional News*, February 25, 2021, 4:05 PM ET ("February 25, 2021 Press Release"). This press release was also filed as an exhibit to a Form 8-K. *See* Tricida, Inc., Form 8-K, Exhibit 99.2, filed on February 25, 2021.

extent of serum bicarbonate increase observed in the TRCA-301/TRCA-301E trial is not reasonably likely to provide a discernible reduction in CKD progression. The OND also concluded that the confirmatory trial, VALOR-CKD, is underpowered.… The OND also provided feedback on other concerns that are particularly relevant in an NDA supported by a single registrational trial. The OND noted concerns around the trial results being strongly influenced by a single site, and the majority of sites for the TRCA-301/TRCA-301E trial being in Eastern Europe, where differences in patient management, including concomitant medications and diet, might affect the treatment response to veverimer and raise a concern of the applicability to a U.S. patient population.[164]

96.     The press release further disclosed that the OND indicated that:

[I]f the [52-week serum bicarbonate results from the VALOR-CKD trial] were to demonstrate a meaningfully larger treatment effect on serum bicarbonate than seen in the TRCA-301/TRCA-301E trial, results from VALOR-CKD, along with the results from the TRCA-301/TRCA-301E trial, could address the deficiencies identified in the CRL. However, the OND noted that whether these data would support accelerated approval would remain a review issue[.][165]

97.     Tricida also announced its belief that, "based on the concerns expressed," the "FDA could require an additional trial or trials to confirm the magnitude, durability of effect or applicability to the U.S. population for resubmission of the veverimer NDA through the Accelerated Approval Program."[166]

98.     Tricida, however, "believed[d] the [52-week] timeline … as suggested in the ADL may not result in the most rapid development path for veverimer" and announced that it "intend[ed] to continue the VALOR-CKD trial without further modifications … with consideration of both the accelerated and traditional approval pathways."[167] The Company stated:

[The] planned interim analyses in the VALOR-CKD trial could result in early stopping for efficacy and resubmission of the NDA through a traditional approval pathway with a potential indication of treatment of metabolic acidosis to slow CKD progression. Tricida is also evaluating several options with respect to the VALOR-CKD trial that are focused on obtaining additional data prior to the end of 2022 on the effect of veverimer on (1) CKD progression; (2) physical

---

[164] February 25, 2021 Press Release.
[165] February 25, 2021 Press Release.
[166] February 25, 2021 Press Release.
[167] February 25, 2021 Press Release.

functioning; and (3) serum bicarbonate.  These options include the possibility of stopping the trial early for administrative reasons, which would allow analysis of the data using all alpha remaining at that time.[168]

99.    In the press release, Dr. Klaerner was also quoted as stating:

> The feedback that we received from OND makes clear that the results from the TRCA-301/TRCA-301E trial alone will not support accelerated approval of veverimer.…  We certainly hear and understand the need for additional data and believe that the VALOR-CKD trial is the best near-term source to provide that information.[169]

100.    On February 25, 2021, also after market close, the Company reported its Q4 2020 results and held an earnings conference call.[170]  In particular, the Company provided guidance about its available financial resources:

> Tricida currently has the financial resources to fund its operations into at least mid-2022, prior to modifying any of its material agreements.  Discussions are ongoing to modify certain of these agreements and, if successful, would extend the company's financial resources beyond mid-2022.[171]

101.    Plaintiff alleges that the press release announcing the receipt of the ADL:

> [P]ublicly revealed for the first time the FDA's "concerns that are particularly relevant in an NDA supported by a single registration trial":  the trial results were "strongly influenced by a single site," and "the majority of sites for the TRCA-301/TRCA-301E trial" were in Eastern Europe, "where differences in patient management … might affect the treatment response to veverimer," rendering questionable "the applicability to a U.S. patient population."  This press release finally revealed the numerous deficiencies plaguing the veverimer NDA, all of which the Company had known about long before it even submitted the NDA.[172]

---

[168] February 25, 2021 Press Release.

[169] February 25, 2021 Press Release.

[170] Tricida, Inc., Form 8-K, filed on February 25, 2021; "Q4 2020 Tricida Inc Earnings Call," *Refinitiv Streetevents*, February 25, 2021.

[171] Tricida, Inc., Form 8-K, Exhibit 99.2, filed on February 25, 2021.

[172] Second Amended Complaint, ¶ 185.  Plaintiff claims that "[o]n this news, Tricida's stock price fell from $7.36 per share at close on February 25, 2021 to $5.11 per share at close on February 26, 2021." *See* Second Amended Complaint, ¶ 186.

**b)** **Analysis**

102.    As discussed above in **Sections VIII.A** and **VIII.B.1.b**, my analysis indicates that the Alleged Truth was disclosed at the latest on August 6, 2020.  Thus, I have concluded that the Challenged Statements could not have impacted Tricida's stock price after August 6, 2020 if the market for Tricida's stock was efficient.

103.    Information about the Challenged Statements could not have caused Tricida's stock price decline on February 26, 2021 given the prior public disclosures.  Consistent with this conclusion, my review of the February 25, 2021 Alleged Corrective Disclosure, as well as analyst reports and public press commentary after the disclosure, identified other potentially new, value-relevant information that could have contributed to the stock price decline on that day.

104.    Public revelations in Tricida's February 25, 2021 disclosure included that the Company received an ADL, the FDA "concluded that the extent of serum bicarbonate increase observed in the TRCA-301/TRCA-301E trial is not reasonably likely to provide a discernible reduction in CKD progression," "VALOR-CKD is underpowered," and the FDA had "concerns around the trial results being strongly influenced by a single site."[173]  As with prior days discussed above, the February 25, 2021 disclosure is consistent with the materialization of previously disclosed regulatory risks, including, for example, the possibility that veverimer would not be approved on a timely basis (if at all) through the Accelerated Approval Program, that the FDA might require additional clinical trials to support approval, and risks specifically related to the use of serum bicarbonate as a surrogate endpoint and whether the FDA would approve the drug based on the surrogate endpoint (see discussion in **Section VIII.B.2.b** above).

105.    Following the Company's February 25, 2021 disclosure, analysts pointed to the ADL as a "[s]etback" even though it was "largely expected":

> J.P. Morgan, February 25, 2021:  Appeal Denial Letter Another Setback for Veverimer; Runway Tight to Reach 2nd Interim … In short, the description of the ADL is disappointing, summarizing multiple issues that the FDA sees with the

---

[173] February 25, 2021 Press Release.  As noted in **Section V.A**, I understand that allegations related to the "multicenter" nature of the clinical trial were dismissed by the Court.

phase III TRCA-301/TRCA-301E trial and its ability to serve as the basis for approval of veverimer and does not instill confidence.[174]

Goldman Sachs, March 3, 2021:  **Tricida Inc. (TCDA): 4Q20 Wrap: Appeal denial confirms our expectation of a long path to approval; stay Neutral** … We view the receipt of an ADL as largely expected, given TCDA had previously highlighted that <20% of FDRRs succeed in obtaining any form of redress. Therefore, TCDA's near-to-medium-term outlook remains relatively unchanged. With respect to the potential for an early end to VALOR in 2022, we remain cautious.[175]

106.   Analysts acknowledged the reasons provided by the FDA for not approving veverimer based on the TRCA-301/TRCA-301E trials:

J.P. Morgan, February 25, 2021:  **ADL reflects multiple reasons FDA sees to not approve veverimer based on the '301/301E trial** . . . The ADL concluded that although the TRCA-301/TRCA-301E trial met its endpoints on increase of serum bicarbonate with statistical significance, the magnitude of the increase is not reasonably likely to translate to a discernible reduction in CKD progression. In addition, the ADL noted other concerns in the CRL including the reliability of the data given the disproportionate impact of data from a single high-enrolling trial site and the applicability of the results to US patients given the majority of patients enrolled in TRCA-301/TRCA-301E were from sites outside the US or in regions the FDA does not see as "US-like," e.g., Eastern Europe.[176]

Cowen, February 26, 2021:  In particular, the OND's response highlighted a number of deficiencies the FDA perceives in veverimer's Ph. III TRCA-301/TRCA-301E trial.  Issues include the reliability of the data (impact of a single high-enrolling site) and the applicability of the trial to U.S. patients (most subjects were enrolled in regions not considered "U.S.-like").  In the view of the OND, the extent of serum bicarb changes observed in '301/'301E is not likely to provide a discernible reduction in CKD progression.[177]

107.   Analysts also noted that the FDA provided a pathway for accelerated approval:

---

[174] "Appeal Denial Letter Another Setback for Veverimer; Runway Tight to Reach 2nd Interim," *J.P. Morgan*, February 25, 2021 (original emphasis removed).

[175] "Tricida Inc. (TCDA): 4Q20 Wrap: Appeal Denial Confirms Our Expectation of a Long Path to Approval; Stay Neutral," *Goldman Sachs*, March 3, 2021.

[176] "Appeal Denial Letter Another Setback for Veverimer; Runway Tight to Reach 2nd Interim," *J.P. Morgan*, February 25, 2021.

[177] "Reports Q4 & FDA Update; TCDA is Defining Strategies to Re-File Using Valor-CKD," *Cowen*, February 26, 2021.

Cowen, February 26, 2021:  To pursue accelerated approval, the OND suggested that Tricida consider submitting 52-week serum bicarbonate results from VALOR-CKD.  According to the letter, were the submission to include results from U.S. and "U.S.-like" patients, and a larger treatment effect than that seen in '301/'301E, the OND indicated that the deficiencies in the CRL might be addressed. However, accelerated approval would still not be guaranteed and would depend on the magnitude of the serum bicarbonate increase.[178]

J.P. Morgan, February 25, 2021:  As expected, the ADL offered some clarity on a path forward for accelerated approval of veverimer, although the company laid out alternative options it expects may provide relevant data sooner.  The OND recommended discussing the potential for 52-week serum bicarb results from the full VALORCKD trial population that include a substantial proportion of US/US-like pts.  In the event they showed a meaningfully larger treatment effect than the '301/301E study, they could (along with previous data) address the concerns of the CRL, although the ability of these data to support accelerated approval would still hinge on the FDA's assessment of the magnitude of the increase in serum bicarb.[179]

108.    More generally, analysts noted that the Company still had prospects for obtaining approval for veverimer, although it faced risks in achieving this outcome:

Cowen, February 26, 2021:  TCDA is now skeptical a path to accelerated approval is viable, and is evaluating resubmission options focused on VALOR-CKD's results. We are hopeful veverimer will launch in 2023 and maintain a $20 P.T.[180]

J.P. Morgan, February 25, 2021:  Net-net, while we think the stock reflects an extended delay and substantially lower probability of approval (in addition to funding concerns), we still see a long wait for data that could support approval, and with the upside potential from what was a long-shot resolution request now gone, we remain Underweight.[181]

Goldman Sachs, March 3, 2021:  We are Neutral-rated on TCDA with a 12-month PT of $6. We value TCDA on a DCF valuation basis and assume 14% WACC

---

[178] "Reports Q4 & FDA Update; TCDA is Defining Strategies to Re-File Using Valor-CKD," *Cowen*, February 26, 2021.

[179] "Appeal Denial Letter Another Setback for Veverimer; Runway Tight to Reach 2nd Interim," *J.P. Morgan*, February 25, 2021.

[180] "Reports Q4 & FDA Update; TCDA is Defining Strategies to Re-File Using Valor-CKD," *Cowen*, February 26, 2021.

[181] "Appeal Denial Letter Another Setback for Veverimer; Runway Tight to Reach 2nd Interim," *J.P. Morgan*, February 25, 2021.

and -10% terminal growth rate (unchanged).  Key upside risks include: better-than-expected post-CRL FDA outcome and an earlier US commercial launch timeline vs. what we currently anticipate as previously discussed.  Key downside risks include: delay in approval for veverimer beyond our current expectation of 2024; non-approval of veverimer; if approved, slower-than-expected product uptake and hence sales trajectory; disappointing results in future clinical studies, and loss of exclusivity/earlier-than-expected competition.[182]

109.    Analysts also commented on Tricida's Q4 2020 results, with a focus on the Company's cash "runway":

> Needham, March 2, 2021:  We project cash runway into mid-2022. TCDA ended 2020 with $332M cash, down from $376M in 3Q20.  The company holds $200M in convertible debt and a separate $75M loan.[183]

> J.P. Morgan, February 25, 2021:  Management sees cash/[equivalents] of ~$332mm as of year-end 2020 funding operations to at least mid 2022. Additionally, the company is in discussions to modify certain supplier agreements that could further extend the runway beyond mid 2022, but should VALOR-CKD run to completion we would see additional resources required to reach the final analysis in 2024.[184]

> Cowen, February 26, 2021:  Tricida reported a Q4 net loss of $54.8MM, and a year-end cash balance of $332.3MM.  Tricida currently has the financial resources to fund its operations into mid-22, prior to modifying any material agreements.  Discussions are ongoing to modify these agreements.[185]

110.    In sum, the price decline on February 26, 2021 does not support a claim that the Challenged Statements impacted Tricida's stock price after August 6, 2020.  The decline is consistent with factors other than the revelation of the Alleged Truth, including the materialization of previously known risks.

---

[182] "Tricida Inc. (TCDA): 4Q20 Wrap: Appeal Denial Confirms Our Expectation of a Long Path to Approval; Stay Neutral," *Goldman Sachs*, March 3, 2021.

[183] "Veverimer Path Forward Through VALOR-CKD Outcomes Trial," *Needham*, March 2, 2021.

[184] "Appeal Denial Letter Another Setback for Veverimer; Runway Tight to Reach 2nd Interim," *J.P. Morgan*, February 25, 2021.

[185] "Reports Q4 & FDA Update; TCDA is Defining Strategies to Re-File Using Valor-CKD," *Cowen*, February 26, 2021.

Executed this 1st day of July, 2024

_____
Paul Zurek, Ph.D.

# PAUL ZUREK, Ph.D.
## Vice President

**Cornerstone Research**
Two Embarcadero Center, 20th Floor • San Francisco, CA 94111
415.229.8225 • mobile 917.434.7602
pzurek@cornerstone.com

## ACADEMIC BACKGROUND

| | | |
|---|---|---|
| 2002 – 2008 | **The Wharton School, University of Pennsylvania** | Philadelphia, Pennsylvania |

*Ph.D. and M.A. in Finance*

Research interests include valuation, asset pricing, financial econometrics and financial institutions risk management.

| | | |
|---|---|---|
| 1998 – 2002 | **The Wharton School, University of Pennsylvania** | Philadelphia, Pennsylvania |

*B.S. in Economics, Concentration in Finance, Minor in Mathematics, Summa Cum Laude*

## PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| 7/08 – Present | **Cornerstone Research, Inc.** | New York and San Francisco |

*Vice President*

Experience conducting financial and economic analysis for financial institution and other corporate and individual clients in complex litigation, including securities, valuation, appraisal, market structure, market manipulation, hedge funds, PE and investment management, international arbitration, financial fraud, risk management, and government investigations.  Design and oversee development of quantitative analysis models.
Provide testimony and presentation of findings to regulators and arbitration panels.

| | | |
|---|---|---|
| 2023, 2024 | **Stanford University Law School** | Palo Alto, California |

Lecturer in Law, teaching Corporate Finance and Valuation

| | | |
|---|---|---|
| 6/10 – 03/11 | **United Poles Federal Credit Union** | Perth Amboy, New Jersey |

*Director and ALCO Committee Member*
Member of the Board of Directors.  Advised on issues of strategy and risk.

| | | |
|---|---|---|
| 9/02 – 12/07 | **Kimberton International Associates – The Banking Group** | Kimberton, Pennsylvania |

*Senior Consultant*
Designed executive education programs for banking and financial services.  Taught seminars on financial institutions risk management, macroeconomics, banking, and general business management.  Worked with clients in the United States, Europe and Latin America.

| | | |
|---|---|---|
| 5/01 – 8/01 | **Credit Suisse First Boston** | San Francisco, California |

*Mergers & Acquisitions Summer Analyst*
Assisted in transactions during both preparatory and due-diligence stages.  Performed financial statement, precedent transaction and comparable company analysis.  Updated league tables and analyzed revenue, market share and headcount trends in the Technology M&A Group.

**APPENDIX A**

---

**TEACHING EXPERIENCE**

Stanford Law School                                                                                                     2023
*Lecturer, teaching Corporate Finance and Valuation*

Wharton / Ping An Bank Executive Education Program                                          2015
*Taught global economics and credit risk modeling in Beijing, China.*

Wharton China Asset Management Company Executive Development Program     2011
*Taught global financial markets and market microstructure.*

Risk Management Association and Wharton Advanced Risk Management Program     2007 – 2009
*Instructor (2007–2009) and Academic Co-Director (2009)*

Wharton Hana Financial Hana Leaders Academy Global Course                          2008
*Instructor in Risk Management*

Merrill Lynch Investment Banking Institute                                               2006, 2007
*Teaching Assistant*

Investment Management, Derivative Securities, International Banking,            2002 – 2008
Venture Capital, Corporate Finance, Macroeconomics, Microeconomics
*Teaching Assistant*

**RESEARCH AND PUBLICATIONS**

"Momentum and Long-Run Risks," Working Paper, *The Wharton School*, November 2007.
"Essays on Asset Pricing," Doctoral Dissertation, *The University of Pennsylvania*, 2008.
The Guide to Damages in International Arbitration. Chapter 16:  Market Approach or Comparables
(with José Alberro), 1st Edition, November 2016, 2nd Edition, December 2017, 3rd Edition, November
2018.
Commodities:  Markets, Performance, Strategies. Chapter 14:  Commodity Mutual Funds (with
Gustavo Camilo and Janko Cizel), Oxford University Press 2018.
"Collateralized loan obligations in the age of COVID-19" (with Yan Cao and Manuel Vasconcelos),
Thomson Reuters Westlaw Expert Analysis, June 22, 2020.

**HONORS AND AWARDS**

Outstanding Doctoral Student Paper Award at the Southern Finance Association
Annual Meeting, Western Finance Association Doctoral Student Travel Grant                 2008

Weiss Center for International Financial Research Summer Fellowship                      2007

Dean's Fellowship for Distinguished Merit                                                               2002

Class of 1939 Fellowship                                                                                         2002

**APPENDIX A**

---

**INVITED AND CONFERENCE PRESENTATIONS, SPEAKING ENGAGEMENTS**

| | |
|---|---|
| "Securities Litigation Trends in 2022: Notable Developments and Challenges" webcast, The Knowledge Group | 2022 |
| "The Rise of Special Purpose Acquisition Companies (SPACs): How to Minimize Securities Litigation Risks" webcast, The Knowledge Group | 2021 |
| "Trends and Updates on Class Action Litigation: Hot Buttons During the COVID-19 Crisis," webcast, The Knowledge Group | 2020 |
| "Discussion: Loss Causation in a Bear Market: The Economists' Perspective," Chicago Bar Association Securities Law Committee | 2020 |
| "The Evolving Securities Litigation Landscape:  Recent Trends and Updates You Need to Know," webcast, The Knowledge Group | 2020 |
| "Effective Use of Statistical Evidence in Class Action Litigation: Practical Guide in 2019," webcast, The Knowledge Group | 2019 |
| "Securities Litigation in 2019:  Winning Tips and Strategies," webcast, The Knowledge Group | 2019 |
| "Proving and Determining Damages in International Arbitration: Methods, Trends and Best Practices," webcast, The Knowledge Group | 2019 |
| Cambridge Forums Forum on Securities Litigation, panel speaker. | 2019 |
| Western Finance Association Annual Meeting, Southern Finance Association Annual Meeting, Drexel University, Ohio State University, University of Iowa, University of Minnesota, University of Notre Dame, Virginia Polytechnic Institute and State University | 2008 |
| The Wharton School | 2007 |

**CONFERENCE PARTICIPATION**

| | |
|---|---|
| Wharton Rodney L. White Center for Financial Research Conference on Financial Decisions and Asset Markets[*] | 2019 |
| American Finance Association Annual Meeting | 2008, 2009, 2011 – 2020 |
| Western Finance Association Annual Meeting[*] | 2008, 2016 – 2018 |
| NYU Five Star Conference in Finance | 2012 |
| Wharton FIC and Oliver Wyman's Risk Roundtable | 2003, 2011 |
| Southern Finance Association Annual Meeting[*], Mid-Atlantic Research Conference in Finance[*] | 2008 |
| Mid-Atlantic Research Conference in Finance[*], Wharton FIC and Oliver Wyman's Risk Roundtable | 2007 |
| NBER's Asset Pricing Program Meeting | 2006 |
| The Philadelphia Fed Policy Forum | 2003 |
| NSF/NBER Time Series Conference | 2002 |

* Paper Discussant or Presenter

## OTHER PAST ACTIVITIES

Referee for the Journal of Economic Dynamics and Control and Finance Research Letters.  Fellow at the Wharton Financial Institutions Center.

**APPENDIX A**

---

**TESTIMONY AND EXPERT REPORTS**

In the Matter of Deutsche Bank Securities, Inc. (SEC administrative proceeding 3-17730), presentation to the SEC and NY AG, June 2015.

Pattelli v. Lending Club Corporation (American Arbitration Association), testimony, January 2016.

In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation (MDL No. 2672 CRB (JSC), USDC ND California), expert declaration, August 2016.

Confidential expert reports submitted to the SEC regarding execution quality in FX markets, September 2016 and October 2016.

B.K. et al v. Gregory McKay (2:15-cv-00185, USDC District of Arizona), expert report, December 2017.

MidCoast Council and Division CCMF Ltd. v. Fitch Ratings, Inc., Federal Court of Australia, New South Wales (NSD995 of 2014), expert reports, June 2018 and February 2019, expert conclave and joint expert report, June 2019.

In Re: RH Securities Litigation (4:17-cv-00554, USDC ND California), expert report, August 2018, deposition, September 2018.

Public Employees' Retirement System of Mississippi v. Treehouse Foods, Inc. et al (1:16-cv-10632, USDC ND Illinois), expert report, October 2018, deposition, April 2019.

Aaron Booth and Cody Tucker on behalf of themselves and all others similarly situated v. Galveston County, Texas, et al (3:18-cv-104, USDC SD Texas), two expert declarations and deposition, January 2019.

Brian C. Schartz, On Behalf of Himself and All Others Similarly Situated and Derivatively on Behalf of Nominal Defendant The Female Health Company v. O.B. Parrish, et al (2016CH14488 and 2016CH13815, Circuit Court of Cook Country, Illinois, County Department, Chancery Division), expert report, February 2019, deposition, March 2019.

In Re: Spectrum Pharmaceuticals, Inc. Securities Litigation (2:16-cv-02279, USDC District of Nevada), expert report, March 2019.

Trevor Mild, Individually and on Behalf of All Others Similarly Situated v. PPG Industries, Inc., Michael H. McGarry, Vincent J. Morales, and Mark C. Kelly (2:18-cv-04231, USDC CD California), expert report and deposition, April 2019.

In Re:  Novo Nordisk Securities Litigation (3:17-cv-00209, USDC District of New Jersey), expert report, June 2019, deposition July 2019.

Christakis Vrakas et al v. United States Steel Corporation et al (2:17-cv-00579, USDC WD Pennsylvania), expert report and deposition, June 2019.

Margaret Tinsley, et al v. Michael Faust, et al (2:15-cv-00185, USDC District of Arizona), expert reports, October and November 2019, deposition, January 2020.

In re Health Insurance Innovations Securities Litigation (8:17-cv-02186, USDC MD Florida), expert report, January 2020, deposition, February 2020.

Frederic Haghebaert, Individually and On Behalf of All Others Similarly Situated v. Tandy Leather Factory, Inc., Janet Carr, Tina L. Castillo, and Shannon L. Greene (4:19-cv-01000, USDC ND Texas), expert declaration, February 2020.

Matt Karinski v. Stamps.com, Inc. et al (2:19-cv-01828, USDC CD California), expert report, August 2020, deposition, October 2020.

Matt Wolther, individually and on behalf of all others similarly situated v. Shubham Maheshwari et al (18CV329690, Superior Court of the State of California, County of Santa Clara), expert report, February 2021.

Cambridge Retirement System, Individually and On Behalf of All Others Similarly Situated v. Amneal Pharmaceuticals, Inc. et al (SOM-L-1701-19, Superior Court of New Jersey, Law Division, Somerset County), expert report, March 2021.

Indiana Public Retirement System, Individually and on Behalf of All Others Similarly Situated v. Michael T. Cartwright, Kirk R. Manz, and Andrew W. McWilliams (3:19-cv-00407, USDC MD Tennessee), expert report, September 2021, deposition June 2022.

Shela Camenisch and Dale Dean; Luna Baron; and Eva King, Individually and as Trustee of the Eva M. King Trust, individually and on behalf of all others similarly situated v. Umpqua Bank (3:20-cv-5905-RS, USDC ND California), expert report, March 2022, deposition, April 2022.

Lewis Stein, Individually and on Behalf of All Others Similarly Situated v. U.S. Xpress Enterprises, Inc. et al (1:19-cv-00098, USDC ED Tennessee), expert report, October 2022, deposition, November 2022.

In Re Maxar Technologies, Inc. Shareholder Litigation (19CV357070, Superior Court of the State of California, County of Santa Clara), expert report, December 2022.

In Re Jernigan Capital, Inc. Securities Litigation (1:20-cv-09575, USDC SD New York), expert report, February 2023, deposition, March 2023.

In Re Fibrogen Inc. Securities Litigation (3:21-cv-02623, USDC ND California), expert report, May 2023, deposition June 2023.

RSBIX Corp. v. Eris Exchange LLC and Eris Clearing LLC (American Arbitration Association), expert report, May 2023, hearing testimony, June 2023.

Barbara Strougo, individually and on behalf of all others similarly situated v. Mallinckrodt Public Limited Company et al (3:20-cv-10100, USDC District of New Jersey), expert report, June 2023, deposition, August 2023.

L-5 Healthcare Partners, LLC v. Alphatec Holdings, Inc. (2019-0412-NAC, Court of Chancery of the State of Delaware), expert report, September 2023 and October 2023, deposition, November 2023, trial testimony, January 2024.

Virgo Ventures Liquidating Trust et al v. Daniel Rosenberg et al (2019 L 011889, Circuit Court of Cook County, Illinois, Country Department, Law Division), expert report, December 2023, March 2024.

# Documents Considered by Paul Zurek, Ph.D.

**Academic Articles**

- Asquith, Paul, Parag A. Pathak, and Jay R. Ritter, "Short Interest, Institutional Ownership, and Stock Returns," *Journal of Financial Economics* 78, no. 2 (2005): 243–276

- Busse, Jeffrey A., and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics* 65, no. 3 (2002): 415–437

- Chordia, Tarun, Richard Roll, and Avanidhar Subrahmanyam, "Evidence on the Speed of Convergence to Market Efficiency," *Journal of Financial Economics* 76, no. 2 (2005): 271–292

- Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417

- Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5 (1991): 1575–1617

- Greene, Jason T., and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ:  The Case of Overnight and Daytime News Releases," *Financial Management* 25, no. 1 (1996): 19–42

- MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 13–39

- Patell, James M., and Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13, no. 2 (1984): 223–252

- Wesson, Donald E., Vandana Mathur, Navdeep Tangri, et al., "Veverimer Versus Placebo in Patients with Metabolic Acidosis Associated with Chronic Kidney Disease:  A Multicentre, Randomised, Double-Blind, Controlled, Phase 3 Trial," *The Lancet*, Vol. 393, (March 8, 2019): 1417–1427

- Wesson, Donald E., Vandana Mathur, Navdeep Tangri, et al., "Long-Term Safety and Efficacy of Veverimer in Patients with Metabolic Acidosis in Chronic Kidney Disease:  A Multicentre, Randomised, Blinded, Placebo-Controlled, 40-Week Extension," *The Lancet*, Vol. 394, (June 24, 2019): 396–406

**APPENDIX B**

**Analyst Reports**

- "Key Takeaways from Inside the J.P. Morgan Healthcare Conference," *J.P. Morgan*, January 14, 2020

- "The Little Polymer That Could," *Cowen*, February 24, 2020

- Reports Q4; Commercial Preparations Underway for Veverimer's Expected Q4 Launch, *Cowen*, February 27, 2020

- "Key Takeaways Post 4Q Results," *J.P. Morgan*, February 27, 2020

- "Tricida Inc. (TCDA):  4Q19 Wrap:  Results In-Line, but Raise PT to $52 on Improved Near-and Longer-Term OpEx Outlook; Maintain Buy," *Goldman Sachs*, February 28, 2020

- "Equity Research Morning Summary," *Needham & Company*, February 28, 2020

- "4Q19 Review.  Veverimer FDA Review Ongoing.," *Needham & Company*, February 28, 2020

- "4Q2019 and YE2019 Financial Results Maintain Buy and $58 Price Target," *Empire Asset Management Company*, March 2, 2020

- "Tricida, Inc. Company Report," *Biopharm Insight*, March 2020

- "Termination of Coverages ALDX, DVAX, GBT, ODT, TCDA, ZGNX," *Empire Management Company*, April 14, 2020

- "Minimal Impact of COVID-19 on Veverimer's FDA Review So Far; PDUFA Remains 8/22," *Cowen*, April 15, 2020

- "Initial Thoughts on COVID-19 Updates," *J.P. Morgan*, April 15, 2020

- "Equity Research Morning Summary," *Needham & Company*, April 17, 2020

- "Update from Needham Healthcare Conference," *Needham & Company*, April 17, 2020

- "Reports Q1; Adcomm Cancelled, Veverimer on Track for an August Approval," *Cowen*, May 7, 2020

- "No Ad Com; Approval / Launch on Deck," *J.P. Morgan*, May 7, 2020

- "Tricida Inc. (TCDA):  1Q20 Wrap:  August PDUFA on Track, Slightly Adjusting Initial Launch Curve Due to COVID Uncertainty," *Goldman Sachs*, May 8, 2020

- "Model Update," *J.P. Morgan*, May 8, 2020

**APPENDIX B**

- "1Q20 Review.  FDA No Longer Holding AdCom Mtg for Veverimer," *Needham & Company*, May 8, 2020

- "Tricida, Inc. Company Report," *Biopharm Insight*, June 2020

- "Tricida Inc. (TCDA):  GS 41st Annual Global Healthcare Conference 2020 - Key Takeaways," *Goldman Sachs*, June 9, 2020

- "Highlights from Meetings with Management:  Veverimer on Track for Aug. Approval," *Cowen*, June 18, 2020

- "Deficiencies in Ververimer Package Make August Approval Unlikely," *Cowen*, July 15, 2020

- "Tricida Inc. (TCDA):  Regulatory Update Increases Risk to Approval Timelines; Expect a Cloud of Uncertainty in the Near-Term," *Goldman Sachs*, July 16, 2020

- "FDA Letter Likely to Lead to Veverimer Approval Delay," *Needham & Company*, July 16, 2020

- "Tricida, Inc. Company Report," *Biopharm Insight*, August 2020

- "Reports Q2; CRL for Veverimer Expected This Month. Duration of Delay Unclear," *Cowen*, August 6, 2020

- "Tricida Inc. (TCDA): 2Q20 Wrap:  Lower PT to $25 as a CRL for Veverimer Becomes the Base Case," *Goldman Sachs*, August 6, 2020

- "2Q20 Review.  FDA Approval by PDUFA Date Appears Unlikely. Target to $44.," *Needham & Company*, August 6, 2020

- "Veverimer Receives a CRL, as Anticipated," *Cowen*, August 24, 2020

- "FDA Issues CRL for Veverimer," *Needham & Company*, August 24, 2020

- "Tricida Inc. (TCDA) – CRL for Veverimer; Moving to Neutral and $10 PT as a New US Clinical Trial and Multi-Year Delay Became Our Base Case," *Goldman Sachs*, August 25, 2020

- "The Second Wave You Do Want to See - Resuming Ratings:  AMRN, APRE, BCRX, ESPR, IMGN, MRSN, RDUS, STOK, TCDA, ZYME," *J.P. Morgan*, September 29, 2020

- "The Little Polymer That Could," *Cowen*, October 1, 2020

- "FDA's Request for CKD Progression Data to Delay Veverimer's Approval," *Cowen*, October 29, 2020

**APPENDIX B**

- "The Waiting Is the Hardest Part; No Fast Fix for CRL, Watch Nov Update for Path Fwd," *J.P. Morgan*, October 29, 2020

- "Tricida Inc. (TCDA):  Veverimer Update Provided but Future Path to Approval Remains Unclear; Await Next Update," *Goldman Sachs*, October 30, 2020

- "FDA Focused on CKD Progression for Approval," *Needham & Company*, October 30, 2020

- "Tricida Inc. (TCDA):  3Q20 Wrap:  Outlook Unchanged as We Continue to Await Post-CRL FDA Type A Meeting Minutes for Veverimer," *Goldman Sachs*, November 9, 2020

- "Reports Q3; Updated Veverimer Development Plans Anticipated Later This Month," *Cowen*, November 10, 2020

- "3Q20 Review.  Awaiting Details on VALOR-CKD Trial Timing.," *Needham & Company*, November 10, 2020

- "Model Update," *J.P. Morgan*, November 15, 2020

- "No Shortcuts to Outcomes; Can 2nd Interim Keep Hope Alive?," *J.P. Morgan*, December 8, 2020

- "TCDA Discloses Revised Design of Valor-CKD, New Patent, and FDA FDRR," *Cowen*, December 9, 2020

- "Tricida Inc. (TCDA):  New Veverimer Update Provided; VALOR-CKD Gets Amended, Maintain Current Base Case of a 2024 Launch," *Goldman Sachs*, December 9, 2020

- "Key Takeaways from the J.P. Morgan Healthcare Conference," *J.P. Morgan*, January 13, 2021

- "The Little Polymer That Could," *Cowen*, February 19, 2021

- "Appeal Denial Letter Another Setback for Veverimer; Runway Tight to Reach 2nd Interim," *J.P. Morgan*, February 25, 2021

- "Reports Q4 & FDA Update; TCDA Is Defining Strategies to Re-File Using VALOR-CKD," *Cowen*, February 26, 2021

- "Veverimer Path Forward through VALOR-CKD Outcomes Trial," *Needham & Company*, March 2, 2021

- "Tricida Inc. (TCDA): 4Q20 Wrap: Appeal Denial Confirms Our Expectation of a Long Path to Approval; Stay Neutral," *Goldman Sachs*, March 3, 2021

**APPENDIX B**

**Data**

- Center for Research in Security Prices (CRSP)

- London Stock Exchange Group (LSEG)

**Earnings Conference Call Transcripts and Investor Presentations**

- Edited Transcript – Q1 2020 Tricida Inc Earnings Call, *Thomson Reuters*, May 7, 2020

- Investor Presentation – Treating Metabolic Acidosis and Slowing the Progression of Chronic Kidney Disease, Tricida, May 2020

- Edited Transcript – Tricida Inc at Goldman Sachs Global Healthcare Conference (Virtual), *Thomson Reuters*, June 9, 2020

- Edited Transcript – Tricida Inc Annual Shareholders Meeting, *Thomson Reuters*, June 11, 2020

- Edited Transcript – Q2 2020 Tricida Inc Earnings Call, *Thomson Reuters*, August 5, 2020

- Investor Presentation – Treating Metabolic Acidosis and Slowing the Progression of Chronic Kidney Disease, Tricida, August 2020

- Edited Transcript – Tricida Inc End-of-Review Type A Meeting Updates Conference Call, *Refinitiv Streetevents*, October 29, 2020

- Edited Transcript – Tricida Inc End-of-Year Business Update Conference Call, *Refinitiv Streetevents*, December 8, 2020

- Investor Presentation – Treating Metabolic Acidosis and Slowing the Progression of Chronic Kidney Disease, Tricida, January 2020

- Edited Transcript – Tricida Inc at JPMorgan Healthcare Conference (Virtual), *Refinitiv Streetevents*, January 13, 2020

- Edited Transcript – Q4 2020 Tricida Inc Earnings Call, *Refinitiv Streetevents*, February 25, 2021

**Expert Reports**

- Expert Report of Chad Coffman, CFA dated April 30, 2024, with exhibits and appendices, including documents cited therein and backup materials

**APPENDIX B**

**Legal Documents, Pleadings, and Opinions**

- Amended Complaint for Violations of the Federal Securities Laws, *Michael Pardi v. Tricida, Inc. et al.*, Case No. 5:21-cv-00076-LHK, June 01, 2021

- *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)

- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014)

- Notice of Motion and Motion to Certify Class, Appoint Class Representative, and Appoint Class Counsel, *Michael Pardi v. Tricida, Inc. et al.*, Case No. 4:21-cv-00076-HSG, April 30, 2024

- Order Granting in Part and Denying in Part Motion to Dismiss, *Michael Pardi v. Tricida, Inc. et al.*, Case No. 4:21-cv-00076-HSG, July 29, 2022

- Order Granting in Part and Denying in Part Motion to Dismiss, *Michael Pardi v. Tricida, Inc. et al.*, Case No. 4:21-cv-00076-HSG, March 11, 2024

- Second Amended Complaint for Violations of the Federal Securities Laws *Michael Pardi v. Tricida, Inc. et al.*, Case No. 4:21-cv-00076-HSG, December 15, 2022

**Public Press**

- Articles obtained from Factiva, published from May 7, 2020 through March 4, 2021, inclusive, with the keywords "Tricida" anywhere in the article or tagged by Factiva as relating to Tricida, excluding republished news, recurring pricing and market data, and articles flagged by Factiva as obituaries, sports, or calendars.

- Articles obtained from Bloomberg Law, published from May 7, 2020 through March 4, 2021, inclusive, containing the keyword "Tricida."

- "Tricida Announces Proposed Offering of $175 Million Convertible Senior Notes Due 2027," *Business Wire*, May 19, 2020

- "Tricida Provides Regulatory Update on Veverimer," *Business Wire*, July 15, 2020

- "Tricida Receives Complete Response Letter from the FDA for Its New Drug Application for Veverimer for the Treatment of Metabolic Acidosis and Slowing of Kidney Disease Progression in Patients with Metabolic Acidosis Associated with CKD," *Business Wire*, August 24, 2020

- "Tricida Suffers Setback, and Other News:  The Good, Bad and Ugly of Biopharma," *Seeking Alpha*, August 26, 2020

**APPENDIX B**

- "Tricida Provides Update on FDA Interactions," *Business Wire*, October 29, 2020

- "Tricida's Veverimer CRL and Regulatory Updates:  An Analysis," *Seeking Alpha*," November 17, 2020

- "Press Release:  Tricida Announces Updates on Veverimer Development Program, Regulatory Status and New Patent Extending Protection through 2038," *Dow Jones Institutional News*, December 8, 2020

- "Press Release:  Tricida Provides Update on FDA Interactions," *Dow Jones Institutional News*, February 25, 2021


**SEC Filings (Including Exhibits)**

- Tricida, Inc. Form S-1, filed on June 4, 2018

- Tricida, Inc. Form 10-K for the Fiscal Year Ended December 31, 2019, filed on March 2, 2020

- Tricida, Inc. Form 8-K, filed on May 7, 2020

- Tricida, Inc. Form 10-Q for the Quarterly Period Ended March 31, 2020, filed on May 8, 2020

- Tricida, Inc. Form 8-K, filed on May 19, 2020

- Tricida, Inc. Form 8-K, filed on May 20, 2020

- Tricida, Inc. Form 8-K, filed on May 22, 2020

- Tricida, Inc. Form 8-K, filed on June 16, 2020

- Tricida, Inc. Form 8-K, filed on June 30, 2020

- Tricida, Inc. Form 8-K, filed on July 15, 2020

- Tricida, Inc. Form 8-K, filed on August 5, 2020

- Tricida, Inc. Form 10-Q for the Quarterly Period Ended June 30, 2020, filed August 6, 2020

- Tricida, Inc. Form 8-K, filed on August 24, 2020

- Tricida, Inc. Form 8-K, filed on October 29, 2020

- Tricida, Inc. Form 10-Q for the Quarterly Period Ended September 30, 2020. filed on November 9, 2020

- Tricida, Inc. Form 8-K, filed on November 9, 2020

**APPENDIX B**

- Tricida, Inc. Form 8-K, filed on December 4, 2020

- Tricida, Inc. Form 8-K, filed on December 8, 2020

- Tricida, Inc. Form 8-K, filed on January 11, 2021, 9:07 AM

- Tricida, Inc. Form 8-K, filed on January 11, 2021, 9:13 AM

- Tricida, Inc. Form 8-K, filed on February 22, 2021

- Tricida, Inc. Form 8-K, filed on February 25, 2021

- Tricida, Inc. Form 10-K for the Fiscal Year Ended December 31, 2020, filed on February 26, 2021

**Textbooks**

- Berk, Jonathan, Peter DeMarzo, and Jarrad Harford, *Fundamentals of Corporate Finance*, Global Edition, 4th ed., Pearson Education Limited, 2019

- Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 12th ed., McGraw-Hill Education, 2017

- Kaye, David H., and David A. Freedman, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence*, 3rd ed., The National Academies Press, 2011

- Malkiel, Burton G., "Efficient Market Hypothesis," in *Finance*, John Eatwell, Murray Milgate, and Peter Newman (eds.), Palgrave Macmillan, 1989

- Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 7th ed., McGraw-Hill/Irwin, 2005

**Websites and Other Materials**

- "About *The Lancet*," *The Lancet*, available at https://www.thelancet.com/lancet/about

- "An Overview of NASDAQ US," *LSEG*, available at https://www.lseg.com/en/data-analytics/financial-data/pricing-and-market-data/equities-market-data/us-nasdaq

- "Approved Drug Products with Therapeutic Equivalence Evaluations | Orange Book," FDA, available at https://www.fda.gov/drugs/drug-approvals-and-

databases/approved-drug-products-therapeutic-equivalence-evaluations-orange-book

- "CRSP 1925 Historical Indexes Guide," CRSP, available at https://www.crsp.org/wp-content/uploads/guides/CRSP_Historical_Indexes_Guide.pdf

- "Formal Meetings Between the FDA and Sponsors or Applicants of PDUFA Products Guidance for Industry," FDA, August 29, 2023 available at https://www.fda.gov/media/172311/download

- "History of Changes for Study: NCT03317444, Evaluation of TRC101 in Subjects with Metabolic Acidosis Associated with Chronic Kidney Disease, Study Status, Contacts/Locations and Eligibility," ClinicalTrials.gov archive, December 18, 2017, available at https://clinicaltrials.gov/ct2/history/NCT03317444?A=2&B=2&C=merged#StudyPageTop

- "IND Applications for Clinical Investigations: Chemistry, Manufacturing, and Control (CMC) Information," FDA, available at https://www.fda.gov/drugs/investigational-new-drug-ind-application/ind-applications-clinical-investigations-chemistry-manufacturing-and-control-cmc-information

- "iShares Biotechnology ETF," *BlackRock*, available at https://www.blackrock.com/us/individual/products/239699/ishares-biotechnology-etf

- "Patent Process Overview | USPTO," United States Patent and Trademark Office, available at https://www.uspto.gov/patents/basics/patent-process-overview

**All documents cited and referenced in this report and exhibits.**

**EXHIBIT 1**



# Tricida, Inc.
## Closing Stock Price
2/7/20 – 5/26/21

Source:  *CRSP*

**EXHIBIT 2**

# Tricida, Inc.
# Regression Estimation Results
## Dependent Variable: Tricida Returns

|  | **Estimation Period:** 5/8/20 – 2/25/21[1] | |
| --- | --- | --- |
|  | **Coefficient** | **p-value[2]** |
| Market Index[3] | 0.375 | 0.245 |
| Nasdaq Biotechnology Index[4] | 0.510 | 0.034 * |
| Intercept | 0.001 | 0.824 |
|  | | |
| Observations | 196 | |
| Adjusted R-Squared | 0.059 | |
| Standard Error | 0.041 | |

Source: *CRSP*; *LSEG*; Second Amended Complaint

Note:
[1] The two-factor regression model with market and industry indices is estimated using the Proposed Class Period (i.e., 5/8/20 – 2/25/21), excluding the impact dates of the Challenged Statements, Alleged Corrective Disclosures, and Tricida's Form 10-Q for Q2 2020, filed August 6, 2020.
[2] p-values marked with the asterisk * denote statistical significance at the 5% level using a two-tailed test.
[3] Market Index represents the returns on the CRSP value-weighted NYSE/NYSE MKT/Nasdaq/ARCA Market Index.
[4] Nasdaq Biotechnology Index represents the returns on the Nasdaq Biotechnology Total Return Index.

**EXHIBIT 3**

# Tricida, Inc.
# Summary of Residual Returns[1]
5/8/20 – 2/26/21

| Date[2] | TCDA Closing Price | TCDA Raw Return | Market Index Return[3] | Industry Index Return[4] | Residual Return | T-Statistic[5] |
|---|---|---|---|---|---|---|
| **5/8/20** | **$30.01** | **2.6%** | **1.9%** | **0.8%** | **1.4%** | **0.33** |
| 5/11/20 | $29.42 | -1.9% | 0.0% | 4.2% | -4.1% | -0.97 |
| 5/12/20 | $29.82 | 1.4% | -2.0% | -1.9% | 3.0% | 0.73 |
| 5/13/20 | $30.41 | 2.0% | -1.9% | -1.2% | 3.2% | 0.78 |
| 5/14/20 | $31.17 | 2.5% | 1.0% | -0.4% | 2.3% | 0.54 |
| 5/15/20 | $30.98 | -0.6% | 0.5% | 2.4% | -2.1% | -0.50 |
| 5/18/20 | $31.55 | 1.8% | 3.3% | 1.2% | -0.1% | -0.02 |
| 5/19/20 | $26.58 | -15.8% | -1.0% | -2.0% | -14.4% | -3.47 * |
| 5/20/20 | $26.59 | 0.0% | 1.7% | 2.1% | -1.8% | -0.42 |
| 5/21/20 | $26.83 | 0.9% | -0.7% | -1.1% | 1.7% | 0.40 |
| 5/22/20 | $27.14 | 1.2% | 0.3% | 0.8% | 0.6% | 0.14 |
| 5/26/20 | $27.23 | 0.3% | 1.4% | -1.9% | 0.7% | 0.17 |
| 5/27/20 | $27.03 | -0.7% | 1.5% | 0.8% | -1.8% | -0.42 |
| 5/28/20 | $27.19 | 0.6% | -0.4% | 0.2% | 0.5% | 0.13 |
| 5/29/20 | $26.86 | -1.2% | 0.5% | 1.9% | -2.4% | -0.58 |
| 6/1/20 | $25.91 | -3.5% | 0.7% | -0.5% | -3.6% | -0.86 |
| 6/2/20 | $26.63 | 2.8% | 0.8% | 0.3% | 2.3% | 0.54 |
| 6/3/20 | $26.90 | 1.0% | 1.5% | -1.2% | 1.0% | 0.24 |
| 6/4/20 | $25.98 | -3.4% | -0.3% | -1.0% | -2.9% | -0.69 |
| 6/5/20 | $26.10 | 0.4% | 2.5% | 0.1% | -0.6% | -0.14 |
| 6/8/20 | $26.74 | 2.5% | 1.4% | 1.2% | 1.2% | 0.30 |
| 6/9/20 | $26.48 | -1.0% | -1.0% | -0.2% | -0.6% | -0.14 |
| 6/10/20 | $26.30 | -0.7% | -0.7% | 0.4% | -0.7% | -0.16 |
| 6/11/20 | $25.40 | -3.4% | -5.8% | -4.5% | 1.0% | 0.22 |

EXHIBIT 3

# Tricida, Inc.
# Summary of Residual Returns[1]
5/8/20 – 2/26/21

| Date[2] | TCDA Closing Price | TCDA Raw Return | Market Index Return[3] | Industry Index Return[4] | Residual Return | T-Statistic[5] |
|---|---|---|---|---|---|---|
| 6/12/20 | $25.54 | 0.5% | 1.4% | 0.7% | -0.4% | -0.10 |
| 6/15/20 | $27.09 | 6.1% | 1.1% | 1.8% | 4.7% | 1.13 |
| 6/16/20 | $27.56 | 1.7% | 1.8% | 1.5% | 0.2% | 0.06 |
| 6/17/20 | $26.37 | -4.3% | -0.4% | 0.4% | -4.4% | -1.07 |
| 6/18/20 | $27.22 | 3.2% | 0.1% | 0.4% | 2.9% | 0.70 |
| 6/19/20 | $27.10 | -0.4% | -0.5% | 3.3% | -2.0% | -0.48 |
| 6/22/20 | $27.19 | 0.3% | 0.7% | 0.1% | 0.0% | -0.01 |
| 6/23/20 | $26.88 | -1.1% | 0.4% | 0.5% | -1.6% | -0.39 |
| 6/24/20 | $26.82 | -0.2% | -2.6% | -1.9% | 1.6% | 0.39 |
| 6/25/20 | $27.08 | 1.0% | 1.1% | 1.4% | -0.2% | -0.06 |
| 6/26/20 | $25.75 | -4.9% | -2.3% | -2.2% | -3.0% | -0.72 |
| 6/29/20 | $25.55 | -0.8% | 1.4% | -0.4% | -1.2% | -0.29 |
| 6/30/20 | $27.48 | 7.6% | 1.5% | 1.7% | 6.1% | 1.47 |
| 7/1/20 | $26.79 | -2.5% | 0.4% | 0.5% | -3.0% | -0.72 |
| 7/2/20 | $26.49 | -1.1% | 0.5% | 0.8% | -1.8% | -0.42 |
| 7/6/20 | $26.56 | 0.3% | 1.5% | 0.6% | -0.7% | -0.17 |
| 7/7/20 | $26.74 | 0.7% | -1.0% | 0.6% | 0.7% | 0.17 |
| 7/8/20 | $26.93 | 0.7% | 0.8% | 0.5% | 0.1% | 0.02 |
| 7/9/20 | $26.54 | -1.4% | -0.6% | -0.2% | -1.2% | -0.28 |
| 7/10/20 | $26.00 | -2.1% | 1.0% | -0.9% | -2.1% | -0.49 |
| 7/13/20 | $25.78 | -0.8% | -1.1% | -1.4% | 0.3% | 0.06 |
| 7/14/20 | $25.95 | 0.7% | 1.3% | 2.3% | -1.1% | -0.26 |
| 7/15/20 | $26.20 | 1.0% | 1.2% | 1.6% | -0.4% | -0.08 |
| **7/16/20** | **$15.64** | **-40.3%** | **-0.4%** | **-0.9%** | **-39.8%** | **-9.60** * |

**EXHIBIT 3**

# Tricida, Inc.
# Summary of Residual Returns[1]
## 5/8/20 – 2/26/21

| Date[2] | TCDA Closing Price | TCDA Raw Return | Market Index Return[3] | Industry Index Return[4] | Residual Return | T-Statistic[5] |
|---|---|---|---|---|---|---|
| 7/17/20 | $16.50 | 5.5% | 0.4% | 1.9% | 4.3% | 1.04 |
| 7/20/20 | $15.71 | -4.8% | 0.9% | 1.2% | -5.8% | -1.40 |
| 7/21/20 | $15.05 | -4.2% | 0.2% | -2.3% | -3.2% | -0.76 |
| 7/22/20 | $14.77 | -1.9% | 0.5% | -0.2% | -2.0% | -0.48 |
| 7/23/20 | $14.39 | -2.6% | -1.1% | -1.9% | -1.3% | -0.31 |
| 7/24/20 | $13.89 | -3.5% | -0.7% | -2.1% | -2.2% | -0.53 |
| 7/27/20 | $14.59 | 5.0% | 0.9% | 2.7% | 3.3% | 0.78 |
| 7/28/20 | $13.89 | -4.8% | -0.7% | -1.5% | -3.9% | -0.93 |
| 7/29/20 | $13.30 | -4.2% | 1.3% | -1.0% | -4.3% | -1.04 |
| 7/30/20 | $13.27 | -0.2% | -0.4% | 0.3% | -0.3% | -0.07 |
| 7/31/20 | $13.38 | 0.8% | 0.5% | -1.9% | 1.6% | 0.38 |
| 8/3/20 | $13.75 | 2.8% | 0.9% | 3.1% | 0.8% | 0.18 |
| 8/4/20 | $14.26 | 3.7% | 0.5% | -0.8% | 3.9% | 0.93 |
| 8/5/20 | $13.80 | -3.2% | 0.8% | -0.2% | -3.5% | -0.84 |
| **8/6/20** | **$13.71** | **-0.7%** | **0.5%** | **-0.5%** | **-0.7%** | **-0.16** |
| 8/7/20 | $13.74 | 0.2% | 0.0% | -0.4% | 0.3% | 0.08 |
| 8/10/20 | $13.67 | -0.5% | 0.3% | -1.1% | -0.1% | -0.03 |
| 8/11/20 | $13.30 | -2.7% | -0.8% | -2.2% | -1.4% | -0.32 |
| 8/12/20 | $13.75 | 3.4% | 1.3% | 1.5% | 2.1% | 0.50 |
| 8/13/20 | $14.12 | 2.7% | -0.1% | 0.3% | 2.5% | 0.61 |
| 8/14/20 | $14.18 | 0.4% | -0.1% | -0.6% | 0.7% | 0.17 |
| 8/17/20 | $14.97 | 5.6% | 0.5% | 2.1% | 4.3% | 1.02 |
| 8/18/20 | $14.35 | -4.1% | 0.1% | -0.6% | -4.0% | -0.96 |
| 8/19/20 | $14.26 | -0.6% | -0.4% | -1.2% | 0.1% | 0.01 |

**EXHIBIT 3**

# Tricida, Inc.
# Summary of Residual Returns[1]
5/8/20 – 2/26/21

| Date[2] | TCDA Closing Price | TCDA Raw Return | Market Index Return[3] | Industry Index Return[4] | Residual Return | T-Statistic[5] |
|---|---|---|---|---|---|---|
| 8/20/20 | $14.43 | 1.2% | 0.3% | -0.3% | 1.2% | 0.28 |
| 8/21/20 | $13.24 | -8.2% | 0.2% | -0.6% | -8.1% | -1.95 |
| **8/24/20** | **$10.11** | **-23.6%** | **0.9%** | **-1.2%** | **-23.4%** | **-5.62 *** |
| 8/25/20 | $10.66 | 5.4% | 0.3% | 1.6% | 4.4% | 1.05 |
| 8/26/20 | $10.38 | -2.6% | 0.9% | -0.3% | -2.8% | -0.68 |
| 8/27/20 | $10.39 | 0.1% | 0.2% | 0.0% | 0.0% | 0.00 |
| 8/28/20 | $10.18 | -2.0% | 0.7% | 0.2% | -2.5% | -0.59 |
| 8/31/20 | $10.57 | 3.8% | -0.2% | 2.0% | 2.8% | 0.67 |
| 9/1/20 | $11.02 | 4.3% | 0.8% | -1.9% | 4.8% | 1.15 |
| 9/2/20 | $11.19 | 1.5% | 1.2% | 1.5% | 0.3% | 0.06 |
| 9/3/20 | $11.34 | 1.3% | -3.4% | -3.7% | 4.4% | 1.04 |
| 9/4/20 | $11.02 | -2.8% | -0.8% | -0.6% | -2.3% | -0.55 |
| 9/8/20 | $11.27 | 2.3% | -2.7% | -1.8% | 4.1% | 0.99 |
| 9/9/20 | $11.32 | 0.4% | 2.0% | 1.9% | -1.3% | -0.32 |
| 9/10/20 | $11.71 | 3.4% | -1.6% | -1.8% | 4.9% | 1.17 |
| 9/11/20 | $11.79 | 0.7% | 0.0% | 0.6% | 0.3% | 0.07 |
| 9/14/20 | $12.00 | 1.8% | 1.5% | 5.4% | -1.6% | -0.38 |
| 9/15/20 | $12.32 | 2.7% | 0.5% | 1.1% | 1.8% | 0.44 |
| 9/16/20 | $11.73 | -4.8% | -0.3% | 0.0% | -4.8% | -1.15 |
| 9/17/20 | $11.71 | -0.2% | -0.8% | -0.4% | 0.3% | 0.06 |
| 9/18/20 | $11.36 | -3.0% | -0.9% | 0.4% | -2.9% | -0.70 |
| 9/21/20 | $10.55 | -7.1% | -1.3% | -2.5% | -5.5% | -1.31 |
| 9/22/20 | $10.23 | -3.0% | 0.9% | 0.8% | -3.9% | -0.93 |
| 9/23/20 | $9.33 | -8.8% | -2.4% | -1.4% | -7.3% | -1.73 |

EXHIBIT 3

# Tricida, Inc.
# Summary of Residual Returns[1]
5/8/20 – 2/26/21

| Date[2] | TCDA Closing Price | TCDA Raw Return | Market Index Return[3] | Industry Index Return[4] | Residual Return | T-Statistic[5] |
|---|---|---|---|---|---|---|
| 9/24/20 | $9.05 | -3.0% | 0.2% | -1.0% | -2.6% | -0.64 |
| 9/25/20 | $9.07 | 0.2% | 1.6% | 2.2% | -1.5% | -0.37 |
| 9/28/20 | $8.87 | -2.2% | 1.7% | 0.7% | -3.2% | -0.78 |
| 9/29/20 | $8.56 | -3.5% | -0.4% | 0.2% | -3.5% | -0.84 |
| 9/30/20 | $9.06 | 5.8% | 0.7% | 0.5% | 5.2% | 1.26 |
| 10/1/20 | $8.98 | -0.9% | 0.8% | 0.9% | -1.7% | -0.42 |
| 10/2/20 | $8.93 | -0.6% | -0.8% | -2.2% | 0.8% | 0.19 |
| 10/5/20 | $9.46 | 5.9% | 1.8% | 4.4% | 2.9% | 0.70 |
| 10/6/20 | $9.25 | -2.2% | -1.2% | -1.2% | -1.2% | -0.30 |
| 10/7/20 | $9.46 | 2.3% | 1.7% | 2.2% | 0.4% | 0.11 |
| 10/8/20 | $9.38 | -0.8% | 0.9% | 0.3% | -1.4% | -0.33 |
| 10/9/20 | $9.22 | -1.7% | 0.9% | 0.8% | -2.5% | -0.60 |
| 10/12/20 | $9.37 | 1.6% | 1.3% | 0.7% | 0.7% | 0.16 |
| 10/13/20 | $9.10 | -2.9% | -0.5% | 0.5% | -3.0% | -0.73 |
| 10/14/20 | $9.30 | 2.2% | -0.6% | -1.3% | 3.0% | 0.72 |
| 10/15/20 | $9.08 | -2.4% | -0.1% | -2.3% | -1.2% | -0.29 |
| 10/16/20 | $9.19 | 1.2% | -0.1% | 0.5% | 0.9% | 0.22 |
| 10/19/20 | $9.01 | -2.0% | -1.4% | -1.8% | -0.6% | -0.14 |
| 10/20/20 | $8.81 | -2.2% | 0.4% | -0.6% | -2.1% | -0.51 |
| 10/21/20 | $8.84 | 0.3% | -0.3% | -1.6% | 1.2% | 0.29 |
| 10/22/20 | $8.90 | 0.7% | 0.6% | 1.3% | -0.3% | -0.07 |
| 10/23/20 | $8.75 | -1.7% | 0.4% | 0.3% | -2.0% | -0.49 |
| 10/26/20 | $8.29 | -5.3% | -1.8% | -0.9% | -4.2% | -1.00 |
| 10/27/20 | $7.94 | -4.2% | -0.3% | 0.5% | -4.4% | -1.07 |

EXHIBIT 3

# Tricida, Inc.
# Summary of Residual Returns[1]
## 5/8/20 – 2/26/21

| Date[2] | TCDA Closing Price | TCDA Raw Return | Market Index Return[3] | Industry Index Return[4] | Residual Return | T-Statistic[5] |
|---|---|---|---|---|---|---|
| 10/28/20 | $8.27 | 4.2% | -3.3% | -2.5% | 6.6% | 1.56 |
| **10/29/20** | **$4.37** | **-47.2%** | **1.0%** | **0.6%** | **-47.9%** | **-11.56** * |
| 10/30/20 | $5.63 | 28.8% | -1.3% | -2.1% | 30.3% | 7.28 * |
| 11/2/20 | $6.35 | 12.8% | 1.2% | 0.1% | 12.2% | 2.94 * |
| 11/3/20 | $6.75 | 6.3% | 1.9% | 1.7% | 4.7% | 1.12 |
| 11/4/20 | $7.12 | 5.5% | 2.0% | 6.2% | 1.5% | 0.35 |
| 11/5/20 | $6.95 | -2.4% | 2.1% | -0.1% | -3.2% | -0.76 |
| 11/6/20 | $7.05 | 1.4% | 0.0% | -1.6% | 2.2% | 0.52 |
| 11/9/20 | $6.96 | -1.3% | 1.1% | -0.7% | -1.4% | -0.33 |
| 11/10/20 | $6.61 | -5.0% | -0.1% | 0.2% | -5.2% | -1.25 |
| 11/11/20 | $6.50 | -1.7% | 0.8% | 1.2% | -2.6% | -0.64 |
| 11/12/20 | $6.55 | 0.8% | -1.0% | 0.0% | 1.1% | 0.26 |
| 11/13/20 | $6.46 | -1.4% | 1.3% | 1.3% | -2.6% | -0.62 |
| 11/16/20 | $6.41 | -0.8% | 1.2% | 0.0% | -1.3% | -0.31 |
| 11/17/20 | $6.44 | 0.4% | -0.2% | -0.4% | 0.6% | 0.15 |
| 11/18/20 | $6.39 | -0.7% | -0.9% | -1.9% | 0.6% | 0.14 |
| 11/19/20 | $7.52 | 17.7% | 0.6% | 0.1% | 17.3% | 4.18 * |
| 11/20/20 | $7.12 | -5.3% | -0.4% | 0.6% | -5.5% | -1.33 |
| 11/23/20 | $7.03 | -1.3% | 0.8% | 0.2% | -1.8% | -0.42 |
| 11/24/20 | $7.43 | 5.7% | 1.5% | -0.7% | 5.4% | 1.29 |
| 11/25/20 | $7.52 | 1.2% | 0.0% | 0.5% | 0.9% | 0.21 |
| 11/27/20 | $7.46 | -0.8% | 0.4% | 3.1% | -2.6% | -0.62 |
| 11/30/20 | $7.31 | -2.0% | -0.6% | 1.1% | -2.4% | -0.58 |
| 12/1/20 | $7.36 | 0.7% | 1.0% | 0.4% | 0.1% | 0.02 |

**EXHIBIT 3**

# Tricida, Inc.
## Summary of Residual Returns[1]
5/8/20 – 2/26/21

| Date[2] | TCDA Closing Price | TCDA Raw Return | Market Index Return[3] | Industry Index Return[4] | Residual Return | T-Statistic[5] |
|---|---|---|---|---|---|---|
| 12/2/20 | $7.42 | 0.8% | 0.1% | -0.3% | 0.8% | 0.20 |
| 12/3/20 | $7.48 | 0.8% | 0.2% | 0.9% | 0.2% | 0.05 |
| 12/4/20 | $7.66 | 2.4% | 1.0% | 1.0% | 1.4% | 0.35 |
| 12/7/20 | $7.46 | -2.6% | 0.0% | 0.0% | -2.7% | -0.64 |
| 12/8/20 | $8.12 | 8.8% | 0.4% | 1.7% | 7.7% | 1.86 |
| **12/9/20** | **$6.68** | **-17.7%** | **-1.0%** | **-1.8%** | **-16.5%** | **-3.98 *** |
| 12/10/20 | $6.84 | 2.4% | 0.3% | 1.5% | 1.5% | 0.36 |
| 12/11/20 | $7.51 | 9.8% | -0.2% | 0.2% | 9.7% | 2.34 * |
| 12/14/20 | $7.78 | 3.6% | -0.3% | 2.4% | 2.4% | 0.58 |
| 12/15/20 | $7.77 | -0.1% | 1.3% | 0.1% | -0.7% | -0.18 |
| 12/16/20 | $7.20 | -7.3% | 0.1% | -0.6% | -7.1% | -1.72 |
| 12/17/20 | $7.43 | 3.2% | 0.8% | 1.4% | 2.1% | 0.51 |
| 12/18/20 | $7.53 | 1.3% | -0.2% | 0.4% | 1.2% | 0.28 |
| 12/21/20 | $7.27 | -3.5% | -0.3% | 0.5% | -3.6% | -0.88 |
| 12/22/20 | $7.44 | 2.3% | 0.1% | 0.3% | 2.1% | 0.51 |
| 12/23/20 | $7.51 | 0.9% | 0.1% | 0.3% | 0.7% | 0.16 |
| 12/24/20 | $7.74 | 3.1% | 0.2% | -0.8% | 3.3% | 0.80 |
| 12/28/20 | $7.61 | -1.7% | 0.4% | -1.5% | -1.1% | -0.27 |
| 12/29/20 | $7.40 | -2.8% | -0.4% | -1.2% | -2.1% | -0.50 |
| 12/30/20 | $7.15 | -3.4% | 0.3% | 0.5% | -3.8% | -0.92 |
| 12/31/20 | $7.05 | -1.4% | 0.4% | -0.7% | -1.3% | -0.30 |
| 1/4/21 | $7.17 | 1.7% | -1.3% | -0.6% | 2.4% | 0.58 |
| 1/5/21 | $7.23 | 0.8% | 0.9% | 0.2% | 0.4% | 0.09 |
| 1/6/21 | $7.36 | 1.8% | 0.8% | 1.3% | 0.8% | 0.18 |

EXHIBIT 3

# Tricida, Inc.
# Summary of Residual Returns[1]
5/8/20 – 2/26/21

| Date[2] | TCDA Closing Price | TCDA Raw Return | Market Index Return[3] | Industry Index Return[4] | Residual Return | T-Statistic[5] |
|---|---|---|---|---|---|---|
| 1/7/21 | $7.67 | 4.2% | 1.6% | 2.9% | 2.0% | 0.49 |
| 1/8/21 | $7.80 | 1.7% | 0.5% | 0.6% | 1.1% | 0.27 |
| 1/11/21 | $7.57 | -2.9% | -0.6% | -0.1% | -2.7% | -0.66 |
| 1/12/21 | $7.66 | 1.2% | 0.4% | 0.2% | 0.8% | 0.20 |
| 1/13/21 | $7.23 | -5.6% | 0.1% | -0.2% | -5.6% | -1.35 |
| 1/14/21 | $7.21 | -0.3% | 0.0% | 2.4% | -1.6% | -0.38 |
| 1/15/21 | $7.03 | -2.5% | -0.9% | -0.1% | -2.2% | -0.53 |
| 1/19/21 | $7.15 | 1.7% | 0.9% | 1.9% | 0.3% | 0.08 |
| 1/20/21 | $7.15 | 0.0% | 1.2% | 0.2% | -0.6% | -0.15 |
| 1/21/21 | $7.15 | 0.0% | -0.1% | -1.0% | 0.5% | 0.12 |
| 1/22/21 | $7.45 | 4.2% | -0.1% | 0.9% | 3.7% | 0.90 |
| 1/25/21 | $7.12 | -4.4% | 0.2% | 1.7% | -5.5% | -1.32 |
| 1/26/21 | $6.92 | -2.8% | -0.3% | -1.8% | -1.9% | -0.45 |
| 1/27/21 | $6.87 | -0.7% | -2.5% | -3.0% | 1.7% | 0.40 |
| 1/28/21 | $6.93 | 0.9% | 0.9% | 0.4% | 0.3% | 0.07 |
| 1/29/21 | $6.58 | -5.1% | -1.8% | 0.3% | -4.6% | -1.10 |
| 2/1/21 | $6.91 | 5.0% | 1.7% | 1.2% | 3.7% | 0.89 |
| 2/2/21 | $6.96 | 0.7% | 1.4% | 1.1% | -0.4% | -0.10 |
| 2/3/21 | $6.87 | -1.3% | 0.1% | -0.3% | -1.2% | -0.30 |
| 2/4/21 | $7.12 | 3.6% | 1.1% | 1.4% | 2.4% | 0.58 |
| 2/5/21 | $7.16 | 0.6% | 0.6% | 1.7% | -0.6% | -0.14 |
| 2/8/21 | $7.41 | 3.5% | 1.0% | 2.1% | 2.0% | 0.48 |
| 2/9/21 | $7.26 | -2.0% | 0.1% | -0.6% | -1.8% | -0.44 |
| 2/10/21 | $7.27 | 0.1% | 0.0% | -0.8% | 0.5% | 0.12 |

**EXHIBIT 3**

# Tricida, Inc.
# Summary of Residual Returns[1]
## 5/8/20 – 2/26/21

| Date[2] | TCDA Closing Price | TCDA Raw Return | Market Index Return[3] | Industry Index Return[4] | Residual Return | T-Statistic[5] |
|---|---|---|---|---|---|---|
| 2/11/21 | $7.00 | -3.7% | 0.2% | -0.2% | -3.8% | -0.91 |
| 2/12/21 | $6.79 | -3.0% | 0.5% | 0.5% | -3.5% | -0.84 |
| 2/16/21 | $6.78 | -0.1% | -0.1% | -2.2% | 0.9% | 0.22 |
| 2/17/21 | $6.90 | 1.8% | -0.2% | 0.4% | 1.6% | 0.38 |
| 2/18/21 | $6.57 | -4.8% | -0.7% | -1.8% | -3.7% | -0.88 |
| 2/19/21 | $6.89 | 4.9% | 0.3% | 1.0% | 4.2% | 1.01 |
| 2/22/21 | $7.15 | 3.8% | -1.0% | -2.4% | 5.3% | 1.27 |
| 2/23/21 | $6.98 | -2.4% | -0.1% | -1.4% | -1.7% | -0.40 |
| 2/24/21 | $7.66 | 9.7% | 1.1% | 0.9% | 8.8% | 2.12 * |
| 2/25/21 | $7.36 | -3.9% | -2.7% | -2.6% | -1.7% | -0.40 |
| **2/26/21** | **$5.11** | **-30.6%** | **-0.4%** | **0.0%** | **-30.5%** | **-7.35** * |

Source:  *CRSP; LSEG*; Second Amended Complaint

Note:
[1]  Residual returns are calculated based on the model described in **Exhibit 2**.
[2]  Impact dates of the Challenged Statements, Alleged Corrective Disclosures, and Tricida's Form 10-Q for Q2 2020, filed August 6, 2020, are shown in bold.
[3]  The Market Index represents the returns on the CRSP value-weighted NYSE/NYSE MKT/Nasdaq/ARCA Market Index.
[4]  The Industry Index represents the returns on the Nasdaq Biotechnology Total Return Index.
[5]  T-statistics with an "*" indicate statistical significance at the 95% confidence level using a two-tailed test.