**Exhibit 7**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549
# FORM 10-Q

☒  QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended September 30, 2019

or

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from to
Commission File Number: 001-38558

# TRICIDA, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **46-3372526** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**7000 Shoreline Court, Suite 201, South San Francisco, CA 94080**
(Address of principal executive offices, including zip code)

**(415) 429-7800**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act

| **Title of each class** | **Trading Symbol(s)** | **Name of exchange on which registered** |
|---|---|---|
| Common stock, par value $0.001 per share | TCDA | The Nasdaq Global Select Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes  ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.  ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No  ☒

On November 7, 2019, the registrant had 49,613,330 shares of common stock, par value $0.001 per share, outstanding.

**TABLE OF CONTENTS**

| | | |
|---|---|---:|
| Note Regarding Forward-Looking Statements | | 1 |
| | Part I. Financial Information | |
| Item 1. | Financial Statements (Unaudited): | 3 |
| | Condensed Balance Sheets as of September 30, 2019 and December 31, 2018 | 3 |
| | Condensed Statements of Operations and Comprehensive Loss for the three and nine months ended September 30, 2019 and 2018 | 4 |
| | Condensed Statements of Convertible Preferred Stock and Stockholders' Equity (Deficit) for the three and nine months ended September 30, 2019 and 2018 | 5 |
| | Condensed Statements of Cash Flows for the nine months ended September 30, 2019 and 2018 | 7 |
| | Notes to Condensed Financial Statements | 8 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 20 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 29 |
| Item 4. | Controls and Procedures | 30 |
| | Part II. Other Information | |
| Item 1. | Legal Proceedings | 31 |
| Item 1A. | Risk Factors | 31 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 74 |
| Item 3. | Defaults Upon Senior Securities | 74 |
| Item 4. | Mine Safety Disclosures | 74 |
| Item 5. | Other Information | 74 |
| Item 6. | Exhibits | 75 |
| | Signatures | 76 |

**NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q contains forward-looking statements concerning our business, operations and financial performance and condition, as well as our plans, objectives and expectations for our business operations and financial performance and condition. Any statements contained herein that are not statements of historical facts may be deemed to be forward-looking statements. Forward-looking statements generally can be identified by words such as "aim," "anticipate," "assume," "believe," "contemplate," "continue," "could," "due," "estimate," "expect," "goal," "intend," "may," "objective," "plan," "predict," "potential," "seek," "should," "target," "will," "would" and other similar expressions that are predictions of or indicate future events and future trends, or the negative of these terms or other comparable terminology. These forward-looking statements include, but are not limited to, statements about:

- estimates of our expenses, capital requirements and our needs for additional financing;

- the prospects of veverimer (also known as TRC101), our only product candidate, which is still in development;

- our ability to obtain approval of our New Drug Application, or NDA, for veverimer from the U.S Food and Drug Administration, or FDA, under the Accelerated Approval Program;

- our expectations regarding the timing of the completion of our nonclinical studies;

- the design of our ongoing confirmatory postmarketing trial, VALOR-CKD, including the sample size, trial duration, endpoint definition, event rate assumptions and eligibility criteria;

- our expectations regarding the timing of the enrollment, completion and reporting of our confirmatory postmarketing trial, VALOR-CKD;

- the outcome and results of our VALOR-CKD trial;

- the market acceptance or commercial success of veverimer, if approved, and the degree of acceptance among physicians, patients, patient advocacy groups, health care payers and the medical community;

- our expectations regarding competition, potential market size and the size of the patient population for veverimer, if approved for commercial use;

- our expectations regarding our ability to draw under our credit facility with Hercules Capital, Inc.;

- our expectations regarding the safety, efficacy and clinical benefit of veverimer;

- our ability to achieve and maintain regulatory approval of veverimer, and any related restrictions, limitations and/or warnings in the label of veverimer;

- our sales, marketing or distribution capabilities and our ability to commercialize veverimer, if we obtain regulatory approval;

- our current and future agreements with third parties in connection with the manufacturing, commercialization, packaging and distribution of veverimer;

- our expectations regarding the ability of our contract manufacturing partners to produce veverimer in the quantities and timeframe that we will require;

- our expectations regarding our future costs of goods;

- our ability to attract, retain and motivate key personnel and increase the size of our organization;

- the scope of protection we are able to establish and maintain for intellectual property rights covering veverimer;

- potential claims relating to our intellectual property and third-party intellectual property;

- the duration of our intellectual property estate that will provide protection for veverimer;

1

- our ability to establish collaborations in lieu of obtaining additional financing; and

- our financial performance.

These forward-looking statements are based on management's current expectations, estimates, forecasts, and projections about our business and the industry in which we operate and management's beliefs and assumptions and are not guarantees of future performance or development and involve known and unknown risks, uncertainties, and other factors that are in some cases beyond our control. As a result, any or all of our forward-looking statements in this Quarterly Report on Form 10-Q may turn out to be inaccurate. Factors that may cause actual results to differ materially from current expectations include, among other things, those listed in Item 1A. "Risk Factors" and elsewhere in this Quarterly Report on Form 10-Q. Investors in our securities are urged to consider these factors carefully in evaluating the forward-looking statements. These forward-looking statements speak only as of the date of this Quarterly Report on Form 10-Q. Except as required by law, we assume no obligation to update or revise these forward-looking statements for any reason, even if new information becomes available in the future. Investors in our securities should, however, review the factors and risks we describe in the reports we will file from time to time with the Securities and Exchange Commission after the date of this Quarterly Report on Form 10-Q.

2

**PART II - OTHER INFORMATION**

## ITEM 1. LEGAL PROCEEDINGS

We are not currently a party to any material legal proceedings. We may, however, in the ordinary course of business face various claims brought by third parties and we may, from time to time, make claims or take legal actions to assert our rights, including intellectual property rights as well as claims relating to employment matters and the safety or efficacy of our products. Any of these claims could subject us to costly litigation and, while we generally believe that we have adequate insurance to cover many different types of liabilities, our insurance carriers may deny coverage, may be inadequately capitalized to pay on valid claims, or our policy limits may be inadequate to fully satisfy any damage awards or settlements. If this were to happen, the payment of any such awards could have a material adverse effect on our operations, cash flows and financial position. Additionally, any such claims, whether or not successful, could damage our reputation and business.

## ITEM 1A. RISK FACTORS

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks described below, together with the information contained elsewhere in this Quarterly Report on Form 10-Q, including Part I, Item 1. "Financial Statements" and Part I, Item 2. "Management's Discussion and Analysis of Financial Condition and Results of Operations" as well as our other filings with the Securities and Exchange Commission, or SEC, before deciding whether to invest in our common stock. The occurrence of any of the events or developments described below could materially and adversely affect our business, financial condition, results of operations, cash flows and prospects. In such an event, the market price of our common stock could decline, and you may lose all or part of your investment. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also impair our business operations.*

**Risks Related to Our Limited Operating History, Financial Condition and Capital Requirements**

***We have a limited operating history, have incurred significant losses in each year since our inception and anticipate that we will continue to incur significant losses for the foreseeable future. We have only one product candidate, veverimer (also known as TRC101), which is in clinical trials and has no commercial sales, which, together with our limited operating history, makes it difficult to assess our future viability.***

We are a pharmaceutical company focused on the development and commercialization of our product candidate, veverimer, a non-absorbed, orally-administered polymer designed to treat metabolic acidosis in patients with chronic kidney disease, or CKD. We have only a limited operating history upon which you can evaluate our business and prospects. We are not profitable and have incurred significant losses in each year since our inception in 2013. Our net losses were $44.1 million and $29.1 million for the three months ended September 30, 2019 and 2018, and $118.6 million and $75.0 million for the nine months ended September 30, 2019 and 2018, respectively. As of September 30, 2019, we had an accumulated deficit of $310.8 million. Pharmaceutical product development is a highly speculative undertaking, entails substantial upfront capital expenditures and involves a substantial degree of risk, including the risk that a potential product candidate will fail to demonstrate adequate efficacy or an acceptable safety profile, gain regulatory approval and become commercially viable. We have limited experience and have not yet demonstrated an ability to successfully overcome many of the risks and uncertainties frequently encountered by companies in new and rapidly evolving fields, particularly in the pharmaceutical industry. To date, we have focused principally on developing our product candidate veverimer. We have no products approved for commercial sale and have not generated any revenue from product sales or other arrangements to date and neither will we for the foreseeable future. We continue to incur significant research and development and other expenses related to our ongoing operations. We expect to continue to incur losses for the foreseeable future, and we anticipate these losses will increase as we continue our development of, and seek regulatory approval for, veverimer, prepare for potential commercialization of veverimer and continue to operate as a public company and comply with legal, accounting and other regulatory requirements.

If veverimer is not successfully developed or commercialized, including because of a lack of capital, or if we do not generate enough revenue following marketing approval, we will not achieve profitability and our business may fail. Even if we achieve profitability in the future, we may not be able to sustain profitability in subsequent periods. We may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect our business. The size of our future net losses will depend, in part, on the rate of future growth of our expenses and our ability to generate revenue. Our prior losses, combined with expected future losses, have had and will continue to have an adverse effect on our stockholders' equity and working capital.

31

Further, the net losses we incur may fluctuate significantly from quarter to quarter and year to year, such that a period-to-period comparison of our results of operations may not be a good indication of our future performance.

***We will require substantial additional financing to achieve our goals, and a failure to obtain this necessary capital when needed on acceptable terms, or at all, could force us to delay, limit, reduce or terminate our product development, other operations or commercialization efforts of veverimer.***

We are currently advancing veverimer through clinical development. As of September 30, 2019, we had working capital of $306.0 million and cash, cash equivalents and investments of $363.6 million. We believe that we will continue to expend substantial resources for the foreseeable future as we continue clinical development, seek regulatory approval, and prepare for the commercialization of veverimer and develop any other product candidates we may choose to pursue in the future. These expenditures will include costs associated with research and development, sales and marketing, conducting nonclinical and clinical studies and trials, obtaining regulatory approvals, and manufacturing and supply. In addition, other unanticipated costs may arise. Because the outcome of any clinical trial and the regulatory approval process is highly uncertain, we cannot reasonably estimate the actual amounts necessary to successfully complete the development, regulatory approval process and commercialization of veverimer.

We believe that our existing cash, cash equivalents and investments of $363.6 million and additional borrowings under our Loan and Security Agreement, or Term Loan, with Hercules Capital, Inc., or Hercules, will allow us to fund our operating plan through at least the next 12 months. However, we have based these estimates on assumptions that may prove to be wrong, and we could spend our available capital resources much faster than we currently expect or require more capital to fund our operations than we currently expect. Moreover, our operating plan may change as a result of many factors currently unknown to us, and we may need to seek additional funds sooner than planned, through public or private equity or debt financings or other sources, such as strategic collaborations. Such financing may result in dilution to stockholders, imposition of debt covenants and repayment obligations, or other restrictions that may affect our business. In addition, we may seek additional capital due to favorable market conditions or strategic considerations even if we believe we have sufficient funds for our current or future operating plans.

The amount and timing of our future funding requirements will depend on many factors, including, but not limited to:

- the time and cost necessary to obtain regulatory approvals for veverimer and any future product candidates that we develop, in-license or acquire;

- our ability to obtain approval for veverimer under the Accelerated Approval Program;

- the costs of confirmatory postmarketing studies or trials for veverimer that could be required by regulatory agencies or that we might otherwise choose to conduct;

- the costs of obtaining commercial supplies of veverimer;

- our ability to successfully commercialize veverimer;

- the manufacturing, selling and marketing costs associated with veverimer, including the cost and timing of expanding our sales and marketing and medical affairs capabilities;

- the timing and costs related to the optimization and scale-up of our manufacturing processes for veverimer and commercial supply of veverimer;

- the amount and timing of sales, royalties and other revenue from veverimer, if approved, including the sales price and the availability of adequate third-party reimbursement;

- the costs of operating as a public company;

- the costs associated with any product recall that could occur;

- the emergence, approval, availability, perceived advantages, relative cost, relative safety and relative efficacy of alternative and competing products or treatments;

- the cash requirements of any future acquisitions or discovery of future product candidates, if any;

- the progress, timing, scope and costs of conducting our nonclinical and clinical studies and trials, including the ability to enroll patients in a timely manner for our confirmatory postmarketing trial, VALOR-CKD (also known as TRCA-303), or potential future nonclinical and clinical studies and trials;

- the costs of hiring and retaining personnel as we grow;

- the time and cost necessary to respond to technological and market developments; and

- the costs of preparing, filing, prosecuting, defending and enforcing any patent claims and other intellectual property rights, including litigation costs and the outcome of such litigation.

We cannot assure you that anticipated additional financing will be available to us on favorable terms, or at all. Our current Term Loan contains negative covenants that restrict our ability to obtain additional debt financing. Any future debt financing into which we enter may impose upon us covenants that restrict our operations, including limitations on our ability to incur liens or additional debt, pay dividends, redeem our stock, make certain investments and engage in certain merger, consolidation or asset sale transactions. Although we have been successful in obtaining financing through the issuance of our equity securities and debt financing, we cannot assure you that we will be able to do so in the future. If we are unable to raise additional capital to fund our clinical development and commercialization of veverimer, if approved, and other business activities, we could be forced to significantly delay, scale back or abandon one or more clinical development programs or commercialization efforts and curtail or cease our operations. In addition, our ability to achieve profitability or to respond to competitive pressures would be significantly limited.

**Risks Related to Our Business**

***We are dependent on the success of veverimer, our only product candidate. If we are unable to successfully develop, obtain regulatory approval for and commercialize veverimer, or experience significant delays in doing so, our business will be materially harmed.***

To date, we have invested all of our efforts and financial resources in the research and development of veverimer, which is our only product candidate, and our business and future success depends on our ability to successfully develop, obtain regulatory approval for, and commercialize veverimer. In May 2018, we completed our multicenter, randomized, double-blind, placebo-controlled, pivotal Phase 3 clinical trial for veverimer, known as TRCA-301. The TRCA-301 trial enrolled 217 CKD patients with metabolic acidosis. Eligible subjects who completed the 12-week treatment period in our pivotal Phase 3 trial were invited to continue in our 40-week extension trial, TRCA-301E, and we completed the TRCA-301E trial in March 2019. While we believe that these trials successfully met their primary and secondary endpoints and are sufficient to support our NDA, we cannot assure you that the U.S. Food and Drug Administration, or FDA, or any foreign regulatory agency will approve veverimer for marketing.

We submitted our NDA for veverimer to the FDA in August 2019. We subsequently received the filing communication letter, also referred to as the Day 74 Letter, which stated that the NDA had been accepted for review by the FDA under the Accelerated Approval Program and that a user fee goal date of August 22, 2020 had been set under the Prescription Drug User Fee Act, or PDUFA. The FDA is not bound by, and has in the past missed, its PDUFA goal dates, and it is unknown whether the review of our NDA filing for veverimer will be completed by the PDUFA goal date designated in the Day 74 Letter or will be delayed. The Day 74 Letter also stated the FDA is currently planning to hold an advisory committee meeting to discuss the NDA, which we believe would likely occur in the first half of 2020. While the FDA is not bound by the recommendation of an advisory committee, it considers such recommendations carefully when making decisions.

If, as anticipated, the FDA holds an advisory committee meeting, the advisory committee may recommend against approval or may recommend limitations, conditions or restrictions on the use of veverimer. The FDA may agree with some or all of those recommendations or impose its own limitations, conditions and restrictions on the use of veverimer. Furthermore, even if we obtain regulatory approval for veverimer, we need to continue to develop a commercial organization, or collaborate with a third party for the commercialization of veverimer, establish commercially viable pricing and obtain approval for coverage and adequate reimbursement from third parties, including government payers. If we are unable to successfully commercialize veverimer, we may not be able to generate sufficient revenue to continue our business.

Our near-term prospects, including our ability to finance our operations and generate revenue, will depend heavily on the successful development and commercialization of veverimer in the United States. Though we plan to engage in marketing approval discussions with foreign regulatory agencies in the future, we have not yet begun marketing approval discussions with any regulatory agency other than the FDA, and we are not currently seeking regulatory approval for veverimer outside the United States. The clinical and commercial success of veverimer will depend on a number of factors, including the following:

- our ability to demonstrate veverimer's safety and efficacy to the satisfaction of the FDA and/or foreign regulatory agencies;

- the timely reporting of our confirmatory postmarketing trial, known as the VALOR-CKD trial;

- whether we are required by the FDA and/or foreign regulatory agencies to conduct additional clinical trials prior to approval to market veverimer;

- the prevalence and severity of adverse side effects of veverimer in our ongoing and future clinical trials and commercial use, if approved;

- the timely receipt of necessary regulatory and marketing approvals from the FDA and foreign regulatory agencies for veverimer;

- our ability to obtain U.S. marketing approval for veverimer under the Accelerated Approval Program;

- our ability to successfully conduct our confirmatory postmarketing trial, VALOR-CKD, and confirm clinical benefit of veverimer, assuming veverimer is initially approved under the FDA's Accelerated Approval Program;

- our ability to successfully commercialize veverimer, if approved for marketing and sale by the FDA and/or foreign regulatory agencies;

- our ability to manufacture clinical trial and commercial quantities of veverimer drug substance and drug product and to develop, validate and maintain commercially viable manufacturing processes that are compliant with current good manufacturing practices, or cGMP, at a scale sufficient to meet anticipated demand and over time enable us to reduce our cost of manufacturing;

- achieving and maintaining compliance with all regulatory requirements applicable to veverimer;

- our success in educating physicians and patients about the benefits, risks, administration and use of veverimer;

- acceptance of veverimer as safe and effective by patients and the medical community;

- the availability, perceived advantages, relative cost, relative safety and relative efficacy of alternative and competing treatments;

- our ability to obtain and sustain an adequate level of reimbursement for veverimer by third-party payers;

- the effectiveness of our own or any future strategic collaborators' marketing, sales and distribution strategy and operations;

- our ability to continue to obtain protection for and to enforce our intellectual property rights in and to veverimer; and

- our ability to avoid and defend against third-party patent interference or patent infringement claims or similar proceedings with respect to our patent rights and patent infringement claims.

Many of these factors are beyond our control. Accordingly, we cannot assure you that we will ever be able to generate revenue through the sale of veverimer. If we are not successful in commercializing veverimer, or are significantly delayed in doing so, our business will be materially harmed.

***We will attempt to secure approval of veverimer from the FDA through the use of the Accelerated Approval Program, but such mechanism may not actually lead to a faster development or regulatory review***

34

*or approval process. If we are unable to obtain approval of veverimer through the Accelerated Approval Program in the United States, we may be required to conduct additional nonclinical and clinical studies and trials beyond those that we currently contemplate, which could increase the expense of obtaining, reduce the likelihood of obtaining and/or delay the timing of obtaining, necessary marketing approval. Even if we receive approval from the FDA under the Accelerated Approval Program, if our confirmatory postmarketing trial does not verify clinical benefit, or if we do not comply with rigorous postmarketing requirements, the FDA may seek to withdraw the approval.*

We currently plan to seek U.S. approval for our sole product candidate, veverimer, through the FDA's Accelerated Approval Program based on the results of our Phase 1/2 trial, TRCA-101, our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial, TRCA-301E. For any approval to market a drug product, we must provide the FDA and foreign regulatory agencies with clinical data that adequately demonstrate the safety and efficacy of the product for the indication applied for in the NDA or other respective regulatory filings. As described in the "Government Regulation" section, the Accelerated Approval Program is one of several approaches used by the FDA to make prescription drugs more rapidly available for the treatment of serious or life-threatening diseases. Section 506(c) of the Federal Food, Drug and Cosmetic Act, or FFDCA, provides that the FDA may grant accelerated approval to "a product for a serious or life-threatening condition upon a determination that the product has an effect on a surrogate endpoint that is reasonably likely to predict clinical benefit, or on a clinical endpoint that can be measured earlier than irreversible morbidity or mortality, that is reasonably likely to predict an effect on irreversible morbidity or mortality or other clinical benefit, taking into account the severity, rarity, or prevalence of the condition and the availability or lack of alternative treatments." Approval under the Accelerated Approval Program is subject, however, to the requirement that the applicant conduct additional postmarketing clinical trials to verify and describe the drug's clinical benefit, where there is uncertainty as to the relationship of the surrogate endpoint to the clinical benefit, or of the observed clinical endpoint to ultimate outcome. Typically, clinical benefit is verified when postmarketing clinical trials show that the drug provides a clinically meaningful positive therapeutic effect, that is, an effect on how a patient feels, functions, or survives. If such confirmatory postmarketing trial fails to confirm the drug's clinical profile or risks and benefits, the FDA may withdraw its approval of the drug.

The FDA has broad discretion with regard to approval under the Accelerated Approval Program, and even if we believe that the Accelerated Approval Program is appropriate for veverimer, we cannot assure you that the FDA will ultimately agree. Furthermore, even if we do obtain approval under the Accelerated Approval Program, we may not experience a faster development process, review or approval compared to conventional FDA procedures.

While our NDA is being reviewed under the Accelerated Approval Program, there can be no assurance that approval will be granted on a timely basis, or at all. For example, there can be no assurance that the FDA will ultimately agree that the results of our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial, TRCA-301E, and the design of our confirmatory postmarketing trial, VALOR-CKD, will be sufficient to support such approval. Additionally, the FDA could require us to conduct further studies or trials prior to granting approval of any type, including by determining that approval under the Accelerated Approval Program is not appropriate and that our pivotal Phase 3 clinical trial, TRCA-301, may not be used to support approval under the conventional pathway. We might not be able to fulfill the FDA's requirements in a timely manner, which would cause delays, or approval might not be granted because our submission is deemed incomplete by the FDA. There also can be no assurance that after subsequent FDA feedback we will continue to pursue approval under the Accelerated Approval Program. A failure to obtain approval under the Accelerated Approval Program could result in a longer time period to obtain approval of veverimer, could increase the cost of development of it, could delay our ability to commercialize veverimer and could significantly harm our financial position and competitive position in the marketplace.

We submitted our NDA for veverimer to the FDA in August 2019. We subsequently received the filing communication letter, also referred to as the Day 74 Letter, which stated that the NDA had been accepted for review by the FDA under the Accelerated Approval Program, and that a user fee goal date of August 22, 2020 had been set under PDUFA. The FDA is not bound by, and has in the past missed, its PDUFA goal dates, and it is unknown whether the review of our NDA filing for veverimer will be completed by the PDUFA goal date designated in the Day 74 Letter or will be delayed. The Day 74 Letter also stated the FDA is currently planning to hold an advisory committee meeting to discuss the NDA, which we believe would likely occur in the first half of 2020. While the FDA is not bound by the recommendation of an advisory committee, it considers such recommendations carefully when making decisions.

Even if we receive approval for veverimer under the Accelerated Approval Program, we will be subject to rigorous postmarketing requirements, including the completion of our ongoing confirmatory postmarketing trial,

35

VALOR-CKD, or such other confirmatory postmarketing trials as the FDA may require, to verify the clinical benefit of the product, and submission to the FDA of all promotional materials prior to their dissemination. The FDA could seek to withdraw the approval for multiple reasons, including if we fail to conduct any required confirmatory postmarketing trial with due diligence, a confirmatory postmarketing trial does not confirm the predicted clinical benefit, other evidence shows that the product is not safe or effective under the conditions of use, or we disseminate promotional materials that are found by the FDA to be false and misleading.

Any delay in obtaining, or inability to obtain, approval under the Accelerated Approval Program would delay or prevent commercialization of veverimer and would materially adversely affect our business, financial condition, results of operations, cash flows and prospects.

### *We may be unable to obtain regulatory approval for veverimer under applicable regulatory requirements.*

To gain approval to market a drug product, regardless of whether it is through the Accelerated Approval Program or the conventional pathway, we must provide the FDA and foreign regulatory agencies with clinical data that adequately demonstrates the safety and efficacy of the product for the intended indication applied for in the NDA or other respective regulatory filing. Drug development is a long, expensive and uncertain process, and delay or failure can occur at any stage of any of our clinical trials. A number of companies in the pharmaceutical industry have suffered significant setbacks in clinical trials even after promising results in earlier nonclinical or clinical studies and trials. These setbacks have been caused by, among other things, nonclinical findings made while clinical trials were underway and safety or efficacy observations made in clinical trials, including previously unreported adverse events. Success in nonclinical testing and early clinical trials does not ensure that later clinical trials will be successful, and the results of clinical trials by other parties may not be indicative of the results in trials we may conduct.

Our business currently depends entirely on the successful development, regulatory approval and commercialization of our sole product candidate, veverimer. Our NDA to market veverimer is currently under review by the FDA under the Accelerated Approval Program. Veverimer may not receive marketing approval even though we believe we achieved the primary and secondary endpoints in our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial, TRCA-301E. The FDA and other foreign regulatory agencies have substantial discretion in evaluating the results of our pivotal Phase 3 clinical trial, TRCA-301, our 40-week extension trial, TRCA-301E, and our earlier Phase 1/2 trial, TRCA-101. For example, notwithstanding our view to the contrary, the FDA may determine that the efficacy data and/or safety data from our Phase 1/2 trial, TRCA-101, our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial, TRCA-301E, do not support approval of our NDA for veverimer. Clinical data often are susceptible to varying interpretations and many companies that have believed that their products performed satisfactorily in clinical trials have nonetheless failed to obtain FDA approval for their products. The FDA or foreign regulatory agencies may disagree with our trial design and our interpretation of data from our Phase 1/2 trial, TRCA-101, our pivotal Phase 3 clinical trial, TRCA-301, our 40-week extension trial, TRCA-301E, or our nonclinical studies. Even though we submitted our NDA, upon the FDA's review of the data from our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial, TRCA-301E, the FDA may request additional information from us, including data from additional clinical trials, and, ultimately, may not grant marketing approval for veverimer.

While there are comparable approval pathways outside the United States that are similar to the Accelerated Approval Program, we have not yet explored whether veverimer might qualify for such a program. Foreign regulatory authorities may determine that the results of our pivotal Phase 3 clinical trial, TRCA-301, and our 40-week extension trial, TRCA-301E, and our earlier Phase 1/2 trial, TRCA-101, are not sufficient to support regulatory approval and may require us to complete additional clinical trials or other studies prior to submitting an application for approval.

### *The denial of regulatory approval for veverimer could mean that we need to cease operations, and a delay in obtaining such approval could delay commercialization of veverimer and adversely impact our ability to generate revenue, our business and our results of operations.*

If we are not successful in commercializing veverimer, or are significantly delayed in doing so, our business will be materially harmed, and we may need to curtail or cease operations. We currently have no drug products approved for sale, and we may never obtain regulatory approval to commercialize veverimer, either under FDA's Accelerated Approval Program or the conventional pathway. The research, testing, manufacturing, labeling, approval, sale, marketing and distribution of drug products are subject to extensive regulation by the FDA and other regulatory agencies in the United States and other countries, and such regulations differ from country to country. We are not permitted to market veverimer in the United States until we receive approval of our NDA from the FDA.

The FDA or any foreign regulatory agency can delay, limit or deny approval to market veverimer for many reasons, including:

- our inability to demonstrate to the satisfaction of the FDA or the applicable foreign regulatory agency that veverimer is safe and effective for the requested indication;

- our inability to gain agreement from the FDA that veverimer is appropriate for approval under FDA's Accelerated Approval Program;

- our inability to gain agreement from applicable foreign regulatory authorities that veverimer is appropriate for approval under applicable regulatory pathways;

- the FDA's or the applicable foreign regulatory agency's disagreement with the interpretation of data from nonclinical and clinical studies and trials;

- our inability to demonstrate that the clinical and other benefits of veverimer outweigh any safety or other perceived risks;

- our ability to enroll an adequate number of patients in our confirmatory postmarketing trial, VALOR-CKD, in a timely manner;

- the FDA's or the applicable foreign regulatory agency's requirement for additional nonclinical or clinical studies or trials;

- the FDA's or the applicable foreign regulatory agency's having differing requirements for the trial protocols used in our clinical trials;

- the FDA's or the applicable foreign regulatory agency's non-approval of the formulation, labeling and/or the specifications of veverimer;

- the anticipated advisory committee meeting resulting in a recommendation against approval for veverimer or a recommendation that the FDA require, as a condition of approval, modifications to existing, or additional, non-clinical studies or clinical trials, limitations on approved labeling or distribution and use restrictions;

- the FDA's or the applicable foreign regulatory agency's failure to accept the manufacturing processes or third-party manufacturers with which we contract; or

- the potential for approval policies or regulations of the FDA or the applicable foreign regulatory agencies to significantly change in a manner rendering our clinical data insufficient for approval.

Of the large number of drugs in development, only a small percentage successfully complete the FDA or other regulatory approval processes and are commercialized.

Even if we eventually complete clinical testing and receive approval of our NDA or foreign marketing authorization for veverimer, the FDA or the applicable foreign regulatory agency may grant approval contingent on the performance of costly additional clinical trials, which may be required after approval. The FDA or the applicable foreign regulatory agency may also approve veverimer for a more limited indication and/or a narrower patient population than we originally request, and the FDA or applicable foreign regulatory agency may not approve the labeling that we believe is necessary or desirable for the successful commercialization of veverimer. Any delay in obtaining, or inability to obtain, applicable regulatory approval would delay or prevent commercialization of veverimer and would materially adversely impact our business and prospects.

***Clinical drug development involves a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results. Failure can occur at any stage of clinical development. While our NDA for veverimer has been filed with the FDA, we have not submitted similar marketing approval applications to comparable foreign authorities.***

Clinical testing is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure can occur at any time during the clinical trial process. The results of nonclinical and clinical studies and trials of our product candidate may not be predictive of the results of later-stage clinical trials. For example, the positive results generated to date in our Phase 1/2 trial, TRCA-101, our pivotal Phase 3 trial, TRCA-301, and our 40-week

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: November 14, 2019

TRICIDA, INC.

By:   /s/ Gerrit Klaerner, Ph.D.
      _____
      Gerrit Klaerner, Ph.D.
      Chief Executive Officer and President
      *(Principal Executive Officer)*

By:   /s/ Geoffrey M. Parker
      _____
      Geoffrey M. Parker
      Chief Financial Officer and Senior Vice President
      *(Principal Financial Officer)*

By:   /s/ Steffen Pietzke
      _____
      Steffen Pietzke
      Vice President of Finance and Chief Accounting Officer
      *(Principal Accounting Officer)*

76