**Exhibit 8**

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549
# FORM 10-K

(Mark One)

☒   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2019
or

☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period From To
Commission File Number: 001-38558



**TRICIDA, INC.**

(Exact name of registrant as specified in its charter)

| **Delaware** | **46-3372526** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**7000 Shoreline Court, Suite 201**
**South San Francisco, California 94080**
**(415) 429-7800**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.001 per share | TCDA | The Nasdaq Global Select Market |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ | Non-accelerated filer | ☐ |
|---|---|---|---|---|---|
| Smaller reporting company | ☐ | Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of June 28, 2019 (the last business day of the registrant's most recently completed second fiscal quarter), the aggregate market value of the common stock held by non-affiliates of the registrant was approximately $1.1 billion, based on the closing price of the common stock as reported on the Nasdaq Global Select Market on that date. Shares of common stock held by each person who is known to own 10% or more of the outstanding common stock have been excluded in that such persons may be deemed to be affiliates of the Company. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

On February 27, 2020, the registrant had 49,855,335 shares of common stock, par value $0.001 per share, outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Certain portions of the registrant's definitive proxy statement relating to the Company's Annual Meeting of Stockholders, to be filed with the Securities and Exchange Commission within 120 days of the registrant's fiscal year ended December 31, 2019, are incorporated by reference into Part III of this Annual Report on Form 10-K where indicated.

**TABLE OF CONTENTS**

|  |  | Page Number |
| --- | --- | --- |
| Note Regarding Forward-Looking Statements |  | 1 |
| PART I |  |  |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 42 |
| Item 1B. | Unresolved Staff Comments | 85 |
| Item 2. | Properties | 85 |
| Item 3. | Legal Proceedings | 85 |
| Item 4. | Mine Safety Disclosures | 85 |
| PART II |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 86 |
| Item 6. | Selected Financial Data | 88 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 89 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 99 |
| Item 8. | Financial Statements | 100 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 127 |
| Item 9A. | Controls and Procedures | 127 |
| Item 9B. | Other Information | 128 |
| PART III |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | 129 |
| Item 11. | Executive Compensation | 129 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 129 |
| Item 13. | Certain Relationships and Related Party Transactions | 129 |
| Item 14. | Principal Accountant Fees and Services | 129 |
| PART IV |  |  |
| Item 15. | Exhibits and Financial Statement Schedules | 130 |
| Item 16. | Form 10-K Summary | 133 |
| Signatures |  | 134 |

**NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K contains forward-looking statements concerning our business, operations and financial performance and condition, as well as our plans, objectives and expectations for our business operations and financial performance and condition. Any statements contained herein that are not statements of historical facts may be deemed to be forward-looking statements. Forward-looking statements generally can be identified by words such as "aim," "anticipate," "assume," "believe," "contemplate," "continue," "could," "due," "estimate," "expect," "goal," "intend," "may," "objective," "plan," "predict," "potential," "seek," "should," "target," "will," "would" and other similar expressions that are predictions of or indicate future events and future trends, or the negative of these terms or other comparable terminology. These forward-looking statements include, but are not limited to, statements about:

- estimates of our expenses, capital requirements and our needs for additional financing;

- the prospects of veverimer (also known as TRC101), our only product candidate, which is still in development;

- our ability to obtain approval of our New Drug Application, or NDA, for veverimer from the U.S. Food and Drug Administration, or FDA, through the Accelerated Approval Program;

- the market acceptance or commercial success of veverimer, if approved, and the degree of acceptance among physicians, patients, patient advocacy groups, third-party payers and the medical community;

- our ability to obtain approval and reimbursement for veverimer in markets outside the United States;

- the design of our confirmatory postmarketing trial, VALOR-CKD (also known as TRCA-303), including the sample size, trial duration, endpoint definition, event rate assumptions and eligibility criteria;

- our expectations regarding the timing of the enrollment, completion and reporting of our confirmatory postmarketing trial, VALOR-CKD;

- the outcome and results of our VALOR-CKD trial;

- our expectations regarding competition, potential market size and the size of the patient population for veverimer, if approved for commercial use;

- our expectations regarding our ability to draw under our credit facility with Hercules Capital, Inc.;

- our expectations regarding the safety, efficacy and clinical benefit of veverimer;

- our ability to achieve and maintain regulatory approval of veverimer, and any related restrictions, limitations and/or warnings in the label of veverimer;

- our sales, marketing or distribution capabilities and our ability to commercialize veverimer, if we obtain regulatory approval;

- our current and future agreements with third parties in connection with the manufacturing, commercialization, packaging and distribution of veverimer;

- our expectations regarding the ability of our contract manufacturing partners to produce veverimer in the quantities and timeframe that we will require;

- our expectations regarding our future costs of goods;

- our ability to attract, retain and motivate key personnel and increase the size of our organization;

- the scope of protection we are able to establish and maintain for intellectual property rights covering veverimer;

- potential claims relating to our intellectual property and third-party intellectual property;

- the duration of our intellectual property estate that will provide protection for veverimer;

1

- our ability to establish collaborations in lieu of obtaining additional financing; and

- our financial performance.

These forward-looking statements are based on management's current expectations, estimates, forecasts, and projections about our business and the industry in which we operate and management's beliefs and assumptions and are not guarantees of future performance or development and involve known and unknown risks, uncertainties, and other factors that are in some cases beyond our control. As a result, any or all of our forward-looking statements in this Annual Report on Form 10-K may turn out to be inaccurate. Factors that may cause actual results to differ materially from current expectations include, among other things, those listed under Item 1A. "Risk Factors" and elsewhere in this Annual Report on Form 10-K. Investors in our securities are urged to consider these factors carefully in evaluating the forward-looking statements. These forward-looking statements speak only as of the date of this Annual Report on Form 10-K. Except as required by law, we assume no obligation to update or revise these forward-looking statements for any reason, even if new information becomes available in the future. Investors in our securities should, however, review the factors and risks we describe in the reports we will file from time to time with the Securities and Exchange Commission after the date of this Annual Report on Form 10-K.

2

**PART I**

**ITEM 1. BUSINESS**

**Overview**

Our goal is to slow the progression of chronic kidney disease, or CKD, through the treatment of metabolic acidosis. We are a pharmaceutical company focused on the development and commercialization of our drug candidate, veverimer (also known as TRC101), a non-absorbed, orally-administered polymer designed to treat metabolic acidosis by binding and removing acid from the gastrointestinal, or GI, tract. Metabolic acidosis is a serious condition commonly caused by CKD and is believed to accelerate the progression of kidney deterioration. It can also lead to bone loss, muscle wasting and impaired physical function. Metabolic acidosis in patients with CKD is typically a chronic disease and, as such, requires long-term treatment to mitigate its deleterious consequences.

There are currently no FDA-approved therapies for treating chronic metabolic acidosis. We estimate that metabolic acidosis affects approximately 3 million patients with CKD in the United States, and we believe that treating metabolic acidosis and slowing the progression of CKD in patients with metabolic acidosis and CKD represents a significant unmet medical need and market opportunity.

Veverimer is an in-house discovered, new chemical entity. We have a broad intellectual property estate that we believe will provide patent protection for veverimer until at least 2034 in the United States, the European Union, Japan, China, India and certain other markets.

Tricida is led by a seasoned management team that includes the founder of Ilypsa, Inc. and Relypsa, Inc. Our management team has extensive experience in the development and commercialization of therapeutics, with deep expertise in developing polymers for the treatment of kidney-related diseases.

Metabolic acidosis observed in patients with CKD is most often caused by an imbalance in acid production relative to acid excretion. The human body generates acid every day through normal food intake and metabolism. Sources of acid include amino acids and nucleic acids from daily dietary intake and digestion of proteins. The daily load of nonvolatile acids from metabolic processes amounts to approximately 1 milliequivalent, or mEq, per kilogram, or kg, of body weight, or 50 to 100 mEq per day for adults. A healthy kidney excretes this acid daily, but in patients with CKD acid excretion is compromised, and as a result, acid accumulates in the body. Over time, a vicious cycle of worsening metabolic acidosis and accelerated progression of kidney disease can result.

Acid binding is a novel approach to treating metabolic acidosis without introducing deleterious counterions or metals. This approach mimics the physiologic response to acid removal seen with persistent vomiting or nasogastric suction that results in an elevated serum bicarbonate level. To achieve the desired effect of increasing serum bicarbonate with a convenient daily dose of less than 10 grams per day, an acid binding polymer should have an amine capacity to bind at least 5 mEq of proton/gram. Once protonated, the acid binding polymer needs to preserve the effect of the proton binding by not removing anions such as fatty and bile acids that represent precursors metabolized to bicarbonate in the blood. The complementary anion to be bound that ensures net acid removal from the GI tract is chloride, the smallest anion present in the GI tract.

Veverimer is a low-swelling, spherical polymer bead that is approximately 100 micrometers in diameter. It is a single, high molecular weight, crosslinked polyamine molecule. The size of veverimer prevents systemic absorption from the GI tract. The high degree of cross-linking within veverimer limits swelling and the overall volume in the GI tract, with the goal of facilitating good GI tolerability. The high amine content of veverimer provides proton binding capacity of approximately 10 mEq/gram of polymer. The size exclusion built into the three-dimensional structure of the polymer enables preferential binding of chloride versus larger inorganic and organic anions, including phosphate, citrate, fatty acids and bile acids. This size exclusion mechanism allows a majority of the binding capacity to be used for hydrochloric acid binding.

Our New Drug Application, or NDA, for veverimer as a chronic treatment for metabolic acidosis in patients with CKD, is currently under review by the U.S. Food and Drug Administration, or FDA, through the Accelerated Approval Program. The FDA has indicated that it is currently planning to hold a Cardiovascular and Renal Drugs Advisory Committee, or CRDAC, meeting to discuss the application. The FDA has assigned a Prescription Drug User Fee Act, or PDUFA, goal date of August 22, 2020 for the potential approval to market veverimer in the United States. We are currently conducting a confirmatory postmarketing trial, VALOR-CKD (also known as TRCA-303), as part of the Accelerated Approval Program.

3

Results from our positive Phase 3, 12-week efficacy trial, TRCA-301, and a follow-on 40-week extension trial, TRCA-301E, formed the primary clinical basis of our NDA submission. The Lancet published the results of the TRCA-301 trial in March 2019 and the results of the TRCA-301E trial in June 2019.

The TRCA-301 trial was a double-blind, placebo-controlled trial that randomized 217 patients with non-dialysis dependent CKD and metabolic acidosis. The trial met both its primary and secondary endpoints in a highly statistically significant manner (p<0.0001 for both the primary and secondary endpoints). Veverimer was well tolerated in our TRCA-301 trial. The primary endpoint of the trial measured improvements in serum bicarbonate levels in veverimer-treated patients versus placebo. Serum bicarbonate is a surrogate measure of metabolic acidosis and a persistent serum bicarbonate level below 22 mEq/L indicates metabolic acidosis. After 12 weeks of treatment, 59.2% of subjects in the veverimer-treated group, compared with 22.5% of subjects in the placebo group, had an increase in serum bicarbonate level of at least 4 mEq/L or achieved a serum bicarbonate level in the normal range of 22 to 29 mEq/L, which was the primary endpoint of the trial. The secondary endpoint of the trial, the least squares, or LS, mean change from baseline to week 12 in serum bicarbonate, was 4.42 mEq/L in the veverimer-treated group, compared with 1.78 mEq/L in the placebo group. The mean change in serum bicarbonate from baseline to week 12 was 4.5 mEq/L in the veverimer-treated group, compared with 1.7 mEq/L in the placebo group.

The TRCA-301E trial was a blinded, 40-week extension of the 12-week TRCA-301 trial. One hundred ninety-six subjects, consisting of 114 subjects in the veverimer group and 82 subjects in the placebo group, elected and were qualified to continue in the extension trial. The primary endpoint of the TRCA-301E trial was an assessment of the long-term safety profile of veverimer versus placebo. We observed fewer discontinuations, fewer serious adverse events and a comparable rate of GI adverse events on veverimer versus placebo. The trial further demonstrated that the effect of veverimer on increasing serum bicarbonate was sustained over one year. The differences between veverimer and placebo on the two endpoints related to serum bicarbonate increase were highly statistically significant compared to placebo in both the TRCA-301 trial and the TRCA-301E trial.

The statistical analysis plan for the TRCA-301E trial included a pre-specified comparison of the veverimer and placebo groups for the time to first occurrence of any event in the composite clinical endpoint of all-cause mortality, dialysis/renal replacement therapy or a confirmed ≥50% decline in eGFR, or DD50. Although the trial was not designed or powered to assess all-cause mortality or the progression of CKD outcomes, we nevertheless observed a 65% reduction in the annualized DD50 event rate for veverimer-treated subjects compared with subjects on placebo. Over the combined 52-week treatment period, the annualized DD50 incidence rate was 12.0% in the placebo group versus 4.2% in the veverimer group (p=0.0224). There were 7 confirmed eGFR reductions ≥50%, 4 deaths and 1 dialysis initiation that occurred in 10 of the 82 subjects on placebo versus 5 confirmed eGFR reductions of greater than or equal to 50%, 0 deaths and 1 dialysis initiation that occurred in 5 of the 124 subjects on veverimer.

Patients with CKD are often frail and have impaired physical function, and metabolic acidosis is one factor that has been implicated as a potential contributor. Metabolic acidosis has direct effects on skeletal muscle catabolism and bone demineralization. Two large retrospective cohort analyses found that low serum bicarbonate level was independently associated with adverse health outcomes related to physical functioning, such as gait speed, quadriceps strength, failure to thrive and fractures/falls (Abramowitz et al., 2011; Reaven et al., 2019). Prospective studies of patients with metabolic acidosis and CKD have shown that treatment of metabolic acidosis increased muscle mass (de Brito-Ashurst et al., 2009; Dubey et al., 2018) and improved muscle function (Abramowitz et al., 2013), and physical function related quality of life (de Brito-Ashurst et al., 2015).

We also assessed physical functioning both subjectively and objectively in our TRCA-301 and TRCA-301E studies. The subjective physical function endpoint examined the effect of treatment with veverimer on self-reported responses to the physical function subpart of the Kidney Disease and Quality of Life Short Form, or the KDQOL-SF, survey. This survey is a validated questionnaire for patients with kidney disease designed to assess health-related quality of life; the physical function subpart is based on activities of daily living. Subjects in the trial responded to 10 questions, each with a value of 10 points, resulting in a maximum score of 100 total points. After one year of treatment, there was no improvement in the placebo group, whose mean score decreased from a baseline score of 56 points to 55 points. However, subjects on veverimer had an 11-point improvement, on average, moving from a mean score of 53 points to 64 points (p<0.0001). The objective physical function endpoint examined the effect of treatment with veverimer on results of the Repeated Chair Stand Test. In this test, subjects were asked to stand up and sit down five times as quickly as possible, and the time for these five repetitions was recorded. At the end of one year of treatment, the average time for performing the Repeated Chair Stand Test decreased by 4.3 seconds on veverimer compared to 1.4 seconds on placebo compared to a baseline of 22 seconds and 21 seconds, on average, for the veverimer and placebo groups, respectively (p<0.0001).

4

An interesting concept has emerged in the academic literature that describes CKD as a clinical model of premature aging, indicating that patients with CKD often experience many of the complications of aging, but at younger ages than the general population. This includes elevated rates of aging-related disorders, including markedly reduced physical function compared to adult populations of the same age. This is a major problem because impaired physical function leads to significant morbidity, including high rates of falls and fractures, and is also a risk factor for death. Therefore, preserving physical function is critical in patients with CKD. Dr. Matthew Abramowitz, Associate Professor of Medicine at the Albert Einstein College of Medicine, has conducted a post-hoc analysis of age-related physical function improvements that were observed with veverimer in our TRCA-301E long-term extension trial. First, the analysis showed that at baseline, 45% of our study population was slower in performing the Repeated Chair Stand Test than the average 80- to 89-year old, despite an average age of 62 years. Second, the mean improvement of 4.3 seconds in the Repeated Chair Stand Test time observed in veverimer-treated subjects in the TRCA-301E study was greater than the difference in mean expected test-time performance between individuals in their 80s and those in their 60s, suggesting that the 4.3 second improvement in test time observed in veverimer-treated subjects is equivalent to an approximately 20-year reduction in aging-related physical functioning. Dr. Abramowitz concluded that interventions that improve physical function in patients with CKD have the potential to restore a substantial proportion of age-predicted loss of performance.

We believe the data from our TRCA-301 and TRCA-301E trials provide strong evidence that veverimer can effectively raise serum bicarbonate levels in patients with metabolic acidosis and CKD, and potentially slow progression of CKD as well as provide a clinically meaningful difference in physical function related quality of life and daily physical functioning.

Given the high unmet medical need for an FDA-approved chronic treatment for metabolic acidosis in patients with CKD, the broad understanding among nephrologists that treatment of metabolic acidosis can slow CKD progression, the favorable response from nephrologists to veverimer's target product profile, and the potential health and economic benefits from treating metabolic acidosis, we believe that there is a significant opportunity for veverimer in the U.S. market, if approved, as the first and only FDA-approved therapy for the treatment of metabolic acidosis and slowing of kidney disease progression in patients with metabolic acidosis associated with CKD.

**Our Strategy**

Our strategy is to develop and commercialize veverimer as the first and only FDA-approved therapy for the treatment of metabolic acidosis and slowing of kidney disease progression in patients with metabolic acidosis associated with CKD for the large population of patients with metabolic acidosis and CKD. Key elements of our strategy are to:

- Obtain FDA approval of veverimer. The veverimer NDA is currently under review through the FDA's Accelerated Approval Program. The FDA has assigned a PDUFA goal date of August 22, 2020 for the potential approval to market veverimer in the United States.

- Expand awareness of, and educate nephrologists on, the consequences of untreated metabolic acidosis in patients with CKD. We are building a team of 15 to 20 Medical Science Liaisons, or MSLs, to facilitate education and answer questions from nephrologists about metabolic acidosis and veverimer.

- Commercialize veverimer in the United States. If veverimer is approved by the FDA, we plan to initially commercialize it in the United States by deploying an 80- to 90-person specialty sales force targeting that subset of nephrologists most focused on treating patients with CKD. With this approach, we believe we can reach a majority of the approximately 600,000 patients with metabolic acidosis and Stage 3 to 5 CKD that are cared for by nephrologists.

- Commercialize veverimer outside of the United States with one or more partners. We believe there is a significant commercial opportunity for veverimer in markets outside the United States. To address these markets, we plan to seek one or more partners with international sales expertise who can commercialize veverimer in target markets, if approved.

**Chronic Kidney Disease and Metabolic Acidosis Represent a Major Health Crisis**

5

Our commercial success will also depend in part on not infringing the proprietary rights of third parties. It is uncertain whether the issuance of any third-party patent would require us to alter our development or commercial strategies, alter our drugs or processes, obtain licenses or cease certain activities. Our breach of any license agreements or failure to obtain a license to proprietary rights that we may require to develop or commercialize our future drugs may have a material adverse impact on us.

### Research and Development

We are conducting development activities to support our NDA for veverimer and manufacturing of commercial supply of veverimer. We invested $133.0 million, $85.6 million and $35.9 million in research and development for the years ended December 31, 2019, 2018 and 2017, respectively.

### Competition

Our industry is highly competitive and subject to rapid and significant technological change. While we believe that our development experience, commercialization expertise and scientific knowledge provide us with competitive advantages, we may face competition from large pharmaceutical and biotechnology companies, smaller pharmaceutical and biotechnology companies, specialty pharmaceutical companies, academic institutions, government agencies and research institutions and others.

Many of our competitors may have significantly greater financial, technical and human resources than we have. Mergers and acquisitions in the pharmaceutical and biotechnology industries may result in even more resources being concentrated among a smaller number of our competitors. Our commercial opportunity could be reduced or eliminated if competitors develop or market products or other novel technologies that are more effective, safer or less costly than veverimer, or they may obtain regulatory approval for their products more rapidly than we may obtain approval for ours.

There are no therapies approved by the FDA for the chronic treatment of metabolic acidosis, and we are not aware of any active clinical development programs other than ours for a treatment in the United States. The FDA has approved generic intravenous sodium bicarbonate solutions for the treatment of acute metabolic acidosis which may occur in severe renal disease, uncontrolled diabetes, and certain other disorders accompanied by a significant loss of bicarbonate; however, those therapies are used for short-term, hospital-based treatments and are not used in clinical practice to treat chronic metabolic acidosis. For many nephrologists, first-line management of metabolic acidosis in patients with CKD is to recommend a protein-restrictive diet. Retrospective analyses show that 3% to 15.0% of patients with metabolic acidosis and CKD use oral alkali supplementation, such as sodium bicarbonate, sodium citrate or, less frequently, potassium citrate. These supplements have not been approved by the FDA for the treatment of metabolic acidosis.

### Government Regulation

#### *Government Regulation and Product Approval*

Government authorities in the United States, at the federal, state and local level, and in other countries and jurisdictions, including the European Union, extensively regulate, among other things, the research, development, testing, manufacture, quality control, approval, packaging, storage, recordkeeping, labeling, advertising, promotion, distribution, marketing, postmarketing monitoring and reporting, and import and export of drug products. The processes for obtaining regulatory approvals in the United States and in foreign countries and jurisdictions, along with subsequent compliance with applicable statutes and regulations and other regulatory authorities, require the expenditure of substantial time and financial resources.

#### *FDA Approval Process*

In the United States, the Food and Drug Administration, or FDA, regulates drugs under the Federal Food, Drug, and Cosmetic Act, or FFDCA, and implementing regulations. These laws and other federal and state statutes and regulations, govern, among other things, the research, development, testing, manufacture, storage, recordkeeping, approval, labeling, promotion and marketing, distribution, postmarketing monitoring and reporting, sampling, and import and export of drug products. The process of obtaining regulatory approvals and the subsequent compliance with applicable federal, state, local and foreign statutes and regulations require the expenditure of substantial time and financial resources. Failure to comply with applicable U.S. requirements may subject a company to a variety of administrative or judicial sanctions, such as clinical hold, FDA refusal to approve pending regulatory applications,

27

warning or untitled letters, product recalls, product seizures, total or partial suspension of production or distribution, injunctions, fines, civil penalties, and criminal prosecution.

The process required by the FDA before a drug may be marketed in the United States generally includes the following:

- completion of nonclinical laboratory tests, animal studies and formulation studies according to Good Laboratory Practices, or GLP, or other applicable regulations;

- submission to the FDA of an investigational new drug application, or IND, which must become effective before human clinical trials may begin in the United States;

- performance of adequate and well-controlled human clinical trials according to Good Clinical Practices, or GCP, to establish the safety and efficacy of the product candidate for its intended use;

- submission to the FDA of a New Drug Application, or NDA, for a new product;

- satisfactory completion of an FDA inspection, if conducted, of the facility or facilities where the product candidate is manufactured to assess compliance with the FDA's current Good Manufacturing Practices, or cGMP, to assure that the facilities, methods and controls are adequate to preserve the drug product candidate's identity, strength, quality, purity, and potency;

- potential FDA inspection of the nonclinical and clinical trial sites;

- potential FDA inspection of us and vendors involved in the generation of the data in support of the NDA; and

- FDA review and approval of the NDA.

Satisfaction of FDA pre-market approval requirements typically takes many years and the actual time required may vary substantially based upon the type, complexity, and novelty of the product candidate or disease. A clinical hold may occur at any time during the life of an IND and may affect one or more specific trials or all trials conducted under the IND.

Nonclinical tests include laboratory evaluation of the product candidate's chemistry, formulation, and toxicity, as well as animal studies to assess the characteristics and potential safety and efficacy of the product candidate. The conduct of the nonclinical tests must comply with federal regulations and requirements, including GLP. The results of nonclinical testing are submitted to the FDA as part of an IND along with other information, including information about product candidate's chemistry, manufacturing and controls, and a proposed clinical trial protocol. Long-term nonclinical tests, such as animal tests of reproductive toxicity and carcinogenicity, may continue after the IND is submitted. A 30-day waiting period after the submission of each IND is required prior to the commencement of clinical testing in humans. If the FDA has neither commented on nor questioned the IND within this 30-day period, the clinical trial proposed in the IND may begin. Clinical trials involve the administration of the investigational product to healthy volunteers or subjects under the supervision of a qualified investigator. Clinical trials must be conducted: (i) in compliance with federal regulations; (ii) in compliance with GCP, an international standard meant to protect the rights and health of subjects and to define the roles of clinical trial sponsors, administrators, and monitors; as well as (iii) under protocols detailing the objectives of the trial, the parameters to be used in monitoring safety, and the effectiveness criteria to be evaluated. Each protocol involving testing on U.S. subjects and subsequent protocol amendments must be submitted to the FDA as part of the IND.

The FDA may order the temporary or permanent discontinuation of a clinical trial at any time or impose other sanctions if it believes that the clinical trial either is not being conducted in accordance with FDA requirements or presents an unacceptable risk to the clinical trial subjects. The trial protocol and informed consent information for subjects in clinical trials must also be submitted to an ethics committee/institutional review board, or IRB, for approval. An ethics committee/IRB may also require the clinical trial at the site to be halted, either temporarily or permanently, for failure to comply with the ethics committee/IRB's requirements, or may impose other conditions. The study sponsor may also suspend a clinical trial at any time on various grounds, including a determination that the subjects are being exposed to an unacceptable health risk.

Clinical trials to support NDAs for marketing approval are typically conducted in three sequential phases, but the phases may overlap. In Phase 1, the initial introduction of the product candidate is usually into healthy human subjects, and the product candidate is tested to assess metabolism, pharmacokinetics, pharmacological actions, side effects

28

associated with increasing doses, and, if possible, early evidence on effectiveness. Phase 2 usually involves trials in a limited patient population to determine the effectiveness of the product candidate for a particular indication, dosage tolerance, and optimal dosage, and to identify common adverse effects and safety risks. If a product candidate demonstrates evidence of effectiveness and an acceptable safety profile in Phase 2 evaluations, Phase 3 trials are undertaken to obtain additional information about clinical efficacy and safety in a larger number of subjects, typically at geographically dispersed clinical trial sites, to permit the FDA to evaluate the overall benefit-risk relationship of the product candidate and to provide adequate information for the labeling of the product candidate. In most cases, the FDA requires two adequate and well-controlled Phase 3 clinical trials to demonstrate the efficacy of the product candidate. A single Phase 3 trial may be sufficient in certain circumstances.

A drug product candidate being studied in clinical trials may be made available for treatment of individual patients, in certain circumstances. Pursuant to the 21st Century Cures Act, or Cures Act, which was signed into law in December 2016, the manufacturer of an investigational product for a serious disease or condition is required to make available, such as by posting on its website, its policy on evaluating and responding to requests for individual patient access to such investigational product.

During the development of a new product candidate, sponsors are given opportunities to meet with the FDA at certain points; specifically, prior to the submission of an IND, at the end of Phase 2 and before an NDA is submitted. Meetings at other times may be requested. These meetings can provide an opportunity for the sponsor to share information about the data gathered to date and for the FDA to provide advice on the next phase of development. Sponsors typically use the meeting at the end of Phase 2 to discuss their Phase 2 clinical results and present their plans for the pivotal Phase 3 clinical trials that they believe will support the approval of the new product candidate.

Concurrent with clinical trials, sponsors usually complete additional animal safety studies and also develop additional information about the chemistry and physical characteristics of the product candidate and finalize a process for manufacturing commercial quantities of the product candidate in accordance with cGMP requirements. The manufacturing process must be capable of consistently producing quality batches of the product candidate and the manufacturer must develop methods for testing the quality, purity and potency of the product candidate. Additionally, appropriate packaging must be selected and tested and stability studies must be conducted to demonstrate that the product candidate does not undergo unacceptable deterioration over its proposed shelf life. After completion of the required clinical testing, an NDA is prepared and submitted to the FDA. FDA approval of the NDA is required before marketing of the product may begin in the United States. The NDA must include the results of all nonclinical, clinical, and other testing and a compilation of data relating to the product candidate's pharmacology, chemistry, manufacture, and controls. The cost of preparing and submitting an NDA is substantial. The submission of most NDAs is additionally subject to a substantial application user fee, and the applicant under an approved NDA is also subject to annual prescription drug program fees. These fees are typically increased annually. On August 3, 2017, Congress passed the FDA Reauthorization Act of 2017, or FDARA, which reauthorizes the various user fees to facilitate the FDA's product review and oversight.

The FDA has 60 days from its receipt of an NDA to determine whether the application will be accepted for filing based on the agency's threshold determination that it is sufficiently complete to permit substantive review. The FDA may refuse to file any NDA that it deems incomplete or not properly reviewable at the time of submission and may request additional information. In this event, the NDA must be resubmitted with the additional information and the resubmitted application also is subject to review before the FDA accepts it for filing. Once the submission is accepted for filing, the FDA begins an in-depth review. The FDA has agreed to certain performance goals in the review of NDAs. Most such applications for standard review product candidates are reviewed within ten months of the date the FDA files the NDA; most applications for priority review product candidates are reviewed within six months of the date the FDA files the NDA. Priority review can be applied to a product candidate that the FDA determines has the potential to treat a serious or life-threatening condition and, if approved, would be a significant improvement in safety or effectiveness compared to available therapies. The review process for both standard and priority review may be extended by the FDA for three additional months to consider certain late-submitted information, or information intended to clarify information already provided in the submission. This late-submitted information is typically requested by FDA.

Among other things, the FDA reviews an NDA to determine whether the product is safe and effective for its intended use and whether the product candidate is being manufactured in accordance with cGMP. The FDA may also refer applications for novel product candidates, or product candidates that present difficult questions of safety or efficacy, to an advisory committee, typically a panel that includes clinicians and other experts for review, evaluation, and a recommendation as to whether the application should be approved. The FDA is not bound by the recommendation of an advisory committee, but it generally follows such recommendations.

29

Before approving an NDA, the FDA will typically inspect one or more clinical sites to assure compliance with GCP. Additionally, the FDA may inspect the facility or the facilities at which the product candidate is manufactured. The FDA will not approve the product candidate unless it determines that the manufacturing processes and facilities are in compliance with cGMP requirements and adequate to assure consistent production of the product within required specifications. To assure GCP and cGMP compliance, an applicant must incur significant expenditures of time, money and effort in the areas of training, record keeping, production, and quality control.

Notwithstanding the submission of relevant data and information, the FDA may ultimately decide that the NDA does not satisfy the criteria for approval and deny approval. Data obtained from clinical trials are not always conclusive. The FDA may disagree with our trial design or interpret data from nonclinical studies and clinical trials differently than we interpret the same data. If the agency decides not to approve the NDA in its present form, the FDA will issue a complete response letter that describes all of the specific deficiencies in the application identified by the FDA. The deficiencies identified may be minor, for example, requiring labeling changes, or major, for example, requiring additional clinical trials. If a complete response letter is issued, the applicant may either resubmit the NDA, addressing the deficiencies identified in the letter, or withdraw the application. If, or when, those deficiencies have been addressed to the FDA's satisfaction in a resubmission of the NDA, the FDA will issue an approval letter. The FDA has committed to reviewing such resubmissions in two or six months depending on the type of information included. An approval letter authorizes commercial marketing of the drug in the United States with specific prescribing information for specific indications.

Even if a product candidate receives regulatory approval, the approval may be significantly limited to specific indications and dosages or the indications for use may otherwise be limited, which could restrict the commercial value of the product. Further, the FDA may require that certain contraindications, warnings or precautions be included in the product labeling. The FDA may impose restrictions and conditions on product distribution, prescribing, or dispensing in the form of a risk evaluation and mitigation strategy, or REMS, or otherwise limit the scope of any approval. REMS can include medication guides, communication plans for healthcare professionals, and elements to assure safe use, or ETASU. ETASU can include, but are not limited to, special training or certification for prescribing or dispensing, dispensing only under certain circumstances, special monitoring, and the use of patient registries. The requirement for a REMS can materially affect the potential market and profitability of the product. In addition, the FDA may require confirmatory postmarketing trials, sometimes referred to as "Phase 4" clinical trials, designed to further assess a product's safety and effectiveness, and testing and surveillance programs to monitor the safety of approved products that have been commercialized.

### Foreign Clinical Studies to Support an IND or NDA

The FDA will accept as support for an IND or NDA a well-designed, well-conducted, non-IND foreign clinical trial if it was conducted in accordance with GCP and the FDA is able to validate the data from the trial through an on-site inspection, if necessary. A sponsor or applicant who wishes to rely on a non-IND foreign clinical trial must submit supporting information to the FDA to demonstrate that the trial conformed to GCP.

Regulatory applications based solely on foreign clinical data meeting these criteria may be approved if the foreign data are applicable to the U.S. population and U.S. medical practice, the trials have been performed by clinical investigators of recognized competence, and the data may be considered valid without the need for an on-site inspection by FDA or, if FDA considers such an inspection to be necessary, FDA is able to validate the data through an on-site inspection or other appropriate means. Failure of an application to meet any of these criteria may result in the application not being approvable based on the foreign data alone.

### Disclosure of Clinical Trial Information

Sponsors of clinical trials of FDA-regulated products are required to register and disclose certain clinical trial information. Information related to the product, patient population, phase of investigation, trial sites and investigators, and other aspects of the clinical trial is then made public as part of the registration. Sponsors are also obligated to disclose the results of their clinical trials after completion. Disclosure of the results of these trials can be delayed in certain circumstances for up to two years after the date of completion of the trial. Competitors may use this publicly available information to gain knowledge regarding the progress of development programs.

### Expedited Development and Review Programs

The FDA has various programs, including Fast Track Designation, Priority Review Designation, Accelerated Approval Program and Breakthrough Therapy Designation, which are intended to expedite or simplify the process for reviewing product candidates. Even if a product candidate qualifies for one or more of these programs, the FDA may

later decide that the product candidate no longer meets the conditions for qualification or that the time period for FDA review or approval will be lengthened. Generally, product candidates that are eligible for these programs are those for serious or life-threatening conditions, those with the potential to address unmet medical needs and those that offer meaningful benefits over existing treatments. For example, Fast Track Designation is a process designed to facilitate the development and expedite the review of product candidates to treat serious or life-threatening diseases or conditions and fill unmet medical needs. Priority Review Designation is designed to give a product candidate that treats a serious condition and, if approved, would provide a significant improvement in safety or effectiveness, an initial review within six months as compared to a standard review time of within ten months of the date the FDA files the NDA.

Although Fast Track Designation and Priority Review Designation do not affect the standards for approval, the FDA will attempt to facilitate early and frequent meetings with a sponsor of a Fast Track Designation product candidate and expedite review of the application for a Priority Review Designation product candidate.

In the Food and Drug Administration Safety and Innovation Act, or FDASIA, which was signed into law in July 2012, the U.S. Congress encouraged the FDA to utilize innovative and flexible approaches to the assessment of product candidates under the Accelerated Approval Program. The law required the FDA to issue related guidance and also promulgate confirming regulatory changes. In May 2014, the FDA published a final Guidance for Industry titled "Expedited Programs for Serious Conditions-Drugs and Biologics," which provides guidance on the FDA programs that are intended to facilitate and expedite development and review of new product candidates as well as threshold criteria generally applicable to concluding that a product candidate is a candidate for these expedited development and review programs.

In addition to the Fast Track Designation and Priority Review Designation Programs discussed above, the FDA also provided guidance on a new program for Breakthrough Therapy Designation, established by FDASIA to subject a new category of product candidates to expedited approval. A sponsor may seek Breakthrough Therapy Designation of a product candidate if the product candidate is intended, alone or in combination with one or more other therapeutics, to treat a serious or life-threatening disease or condition, and preliminary clinical evidence indicates that the product candidate may demonstrate substantial improvement over existing therapies on one or more clinically significant endpoints, such as substantial treatment effects observed early in clinical development. A request for Breakthrough Therapy Designation should be submitted concurrently with, or as an amendment to, an IND, but ideally no later than the End-of-Phase 2 meeting.

### *Accelerated Approval Program*

Under the accelerated approval provisions of the FFDCA and the FDA's implementing regulations, the FDA may grant accelerated approval to a product for a serious or life-threatening disease or condition that provides meaningful therapeutic advantage to patients over existing treatments based upon a determination that the product has an effect on a surrogate endpoint that is reasonably likely to predict clinical benefit. Products approved through the Accelerated Approval Program must meet the same statutory standards for safety and effectiveness as those granted traditional approval.

The Accelerated Approval Program is most often used in settings in which the course of a disease is long and an extended period of time is required to measure the intended clinical benefit of a product, while the effect on the surrogate endpoint occurs more rapidly. The FDA will not grant approval through the Accelerated Approval Program to products that meet standards for traditional approval.

The evidence to support the determination that an endpoint is reasonably likely to predict clinical benefit may include epidemiological, pathophysiological, therapeutic, pharmacologic, or other evidence developed using biomarkers, for example, or other scientific methods or tools. The FDA considers all relevant evidence and may consult external experts, as needed. Important factors for the agency's consideration include the disease process and the relationship between the drug's effect and the disease process.

Approval through the Accelerated Approval Program is subject, however, to the requirement that the applicant conduct additional postmarketing clinical trials to verify and describe the drug's clinical benefit, where there is uncertainty as to the relationship of the surrogate endpoint to the clinical benefit, or of the observed clinical endpoint to ultimate outcome. Typically, clinical benefit is verified when postmarketing clinical trials show that the drug provides a clinically meaningful positive therapeutic effect, that is, an effect on how a patient feels, functions, or survives. The FDA may require that any confirmatory postmarketing trial be initiated or substantially underway prior to the submission of an application through the Accelerated Approval Program. And, if such confirmatory postmarketing trial fails to confirm the drug's clinical profile or risks and benefits, the FDA may withdraw its approval of the drug. The FDA may also withdraw

31

- the FDA might not accept or deem acceptable a third-party manufacturers' processes or facilities; or

- the FDA may change its approval policies or adopt new regulations.

If veverimer fails to demonstrate safety and efficacy in clinical trials or does not gain regulatory approval, our business and results of operations will be materially and adversely harmed. Additionally, if the FDA requires that we conduct additional clinical trials, places limitations on veverimer in our label, delays approval to market veverimer or limits the use of veverimer, our business and results of operations may be harmed.

***We have initiated and are enrolling subjects in our confirmatory postmarketing trial, VALOR-CKD. The VALOR-CKD trial design may be impacted by clinical data generated while the VALOR-CKD trial is ongoing, including data that may affect key assumptions regarding sample size, endpoints, duration or the underlying standard of care, in which case we may be required to modify our planned clinical trials, or conduct additional clinical trials.***

If clinical data generated while the VALOR-CKD trial is ongoing, including data that may affect key assumptions regarding sample size, endpoints, duration or the underlying standard of care, impacts the VALOR-CKD trial design, we may be required to modify our planned clinical trials, or conduct additional clinical trials, before we can obtain regulatory approval from the FDA or comparable foreign authorities, and any such modification or additional trial could have a material adverse effect on our expected clinical and regulatory timelines, business, prospects, financial condition and results of operations.

***Because we are developing a product candidate for the treatment of a disease or condition on the basis of an unvalidated surrogate endpoint, there are increased risks that the FDA or other regulatory authorities may find that our clinical program provides insufficient evidence of clinical benefit, may have difficulty analyzing and interpreting the results of our clinical program, and may delay or refuse to approve veverimer.***

There are no FDA-approved therapies for the chronic treatment of patients with metabolic acidosis and CKD. In addition, we are not aware of any chronic therapeutic agent that has previously been approved by the FDA on the basis of a clinical trial that used serum bicarbonate level as the primary endpoint. We have engaged in discussions with the FDA regarding the design of our pivotal Phase 3 clinical trial, TRCA-301, and whether the use of serum bicarbonate as a surrogate endpoint is reasonably likely to predict clinical benefit. However, the FDA has discretion at any time, including during our NDA review, to determine whether there is support for the use of serum bicarbonate as a surrogate endpoint.

Key issues with our endpoint include uncertainty about the degree of change from baseline serum bicarbonate that will translate into improved clinical outcomes, the population in which such change is expected to translate into improved clinical outcomes, and the need for data supporting a causal relationship between serum bicarbonate concentration and clinical outcomes. As a result, we cannot be certain that FDA will ultimately conclude that the design and results of our pivotal Phase 3 clinical trial, TRCA-301, which uses changes from baseline in serum bicarbonate level as the primary endpoint, and our 40-week extension study, TRCA-301E, or that the design of the VALOR-CKD trial, will be sufficient for approval of veverimer.

Moreover, even if the FDA does find that changes from baseline in serum bicarbonate are sufficiently likely to predict clinical benefit for patients, the FDA may not agree that we have achieved the primary endpoint in our pivotal Phase 3 clinical trial, TRCA-301, to the magnitude or to the degree of statistical significance required by the FDA. Further, even if those requirements are satisfied, the FDA also could give overriding weight to inconsistent or otherwise confounding results on other efficacy endpoints or other results of the trial, including results on secondary and exploratory endpoints. The FDA also weighs the benefits of a product against its risks and the FDA may view the efficacy results in the context of safety as not being supportive of regulatory approval. Regulatory authorities in other countries may take similar positions.

***We are conducting and may in the future conduct clinical trials for our product candidate, veverimer, outside the United States and the FDA may not accept data from such trials.***

Although the FDA may accept data from clinical trials conducted outside the United States in support of safety and efficacy claims for veverimer, this is subject to certain conditions. For example, such foreign clinical trials should be conducted in accordance with GCPs, including review and approval by an independent ethics committee and obtaining the informed consent from subjects of the clinical trials. The foreign clinical data should also be applicable to the U.S. population and U.S. medical practice. Other factors that may affect the acceptance of foreign clinical

data include differences in clinical conditions, study populations or regulatory requirements between the United States and the foreign country.

We conducted the TRCA-101, TRCA-301 and TRCA-301E trials, and are conducting the VALOR-CKD trial with majority enrollment outside the United States and may, in the future, conduct clinical trials of our product candidates outside the United States. The FDA may not accept such foreign clinical data, and in such event, we may be required to re-conduct the relevant clinical trials within the United States, which would be costly and time-consuming, and which could have a material and adverse effect on our ability to carry out our business plans.

***Even if we receive regulatory approval for veverimer, we will be subject to ongoing regulatory obligations and continued regulatory review, which may result in significant additional expense. Additionally, veverimer, if approved, could be subject to labeling and other restrictions and market withdrawal, and we may be subject to penalties if we fail to comply with regulatory requirements or experience unanticipated problems with veverimer.***

Even if a drug is approved by the FDA and/or foreign regulatory agencies, regulatory agencies may still impose significant restrictions on a product's indicated uses or marketing or impose various ongoing requirements. Furthermore, any new legislation addressing drug safety issues could result in delays or increased costs to assure compliance. In addition, if a drug receives approval through the FDA's Accelerated Approval Program, it will be subject to special postmarketing requirements, including the completion of confirmatory postmarketing clinical trials to verify the clinical benefit of the product, and submission to the FDA of all promotional materials prior to their dissemination. The FDA could seek to withdraw the approval for multiple reasons, including if we fail to conduct any required confirmatory postmarketing trial with due diligence, a confirmatory postmarketing trial does not confirm the predicted clinical benefit, other evidence shows that the product is not safe or effective under the conditions of use, or we disseminate promotional materials that are found by the FDA to be false and misleading.

If veverimer receives approval through the Accelerated Approval Program, it will be subject to ongoing regulatory requirements for conducting postmarketing clinical studies and trials, labeling, packaging, storage, advertising, promotion, sampling, record-keeping and submission of safety and other post-market information, including both federal and state requirements in the United States. In addition, manufacturers and manufacturers' facilities are required to comply with extensive FDA requirements, including ensuring that quality control and manufacturing procedures conform to cGMP. As such, we and our contract manufacturers are subject to continual review and periodic inspections to assess compliance with cGMP. Accordingly, we must conduct the confirmatory postmarketing trial in a diligent manner and we and others with whom we work must continue to expend time, money, and effort in all areas of regulatory compliance, including manufacturing, production, and quality control. We will also be required to report certain adverse reactions and production problems, if any, to the FDA, and to comply with requirements concerning advertising and promotion for veverimer. Promotional communications with respect to prescription drugs are subject to a variety of legal and regulatory restrictions and must be consistent with the information in the product's approved label. As such, we may not promote veverimer for indications or uses for which it does not have FDA approval.

If veverimer receives approval through the Accelerated Approval Program but we fail to conduct the required confirmatory postmarketing trials with due diligence or such postmarketing trials fail to confirm veverimer's clinical profile or risks and benefits, the FDA may withdraw its approval. If a regulatory agency discovers previously unknown problems with veverimer, such as adverse events of unanticipated severity or frequency, or problems with the facility where the product is manufactured, or disagrees with the promotion, marketing, or labeling of a product, the regulatory agency may impose restrictions on the product or us, including requiring withdrawal of the product from the market. If we fail to comply with applicable regulatory requirements, a regulatory agency or enforcement authority may:

- issue warning letters;

- impose civil or criminal penalties;

- suspend regulatory approval;

- suspend any of our ongoing clinical trials;

- refuse to approve pending applications or supplements to approved applications submitted by us;

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

TRICIDA, INC.

Dated: March 2, 2020

<div style="margin-left:55%">

TRICIDA, INC.

By:   /s/ Gerrit Klaerner

Name: Gerrit Klaerner, Ph.D.
Title: Chief Executive Officer and President

</div>

134

**SIGNATURES AND POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Gerrit Klaerner and Geoffrey M. Parker, jointly and severally, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite or necessary to be done in and about the premises hereby ratifying and confirming all that said attorneys-in-fact and agents, or his or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| SIGNATURE | | DATE |
|---|---|---|
| /s/ Gerrit Klaerner<br>Gerrit Klaerner, Ph.D. | Chief Executive Officer,<br>President and Director<br>(Principal Executive Officer) | March 2, 2020 |
| /s/ Geoffrey M. Parker<br>Geoffrey M. Parker | Chief Financial Officer and Executive Vice President<br>(Principal Financial Officer) | March 2, 2020 |
| /s/ Steffen Pietzke<br>Steffen Pietzke | Senior Vice President of Finance<br>and Chief Accounting Officer<br>(Principal Accounting Officer) | March 2, 2020 |
| /s/ Klaus Veitinger<br>Klaus Veitinger, M.D., Ph.D., M.B.A. | Chairman of the Board of Directors | March 2, 2020 |
| /s/ Robert J. Alpern<br>Robert J. Alpern, M.D. | Director | March 2, 2020 |
| /s/ David Bonita<br>David Bonita, M.D. | Director | March 2, 2020 |
| /s/ Sandra I. Coufal<br>Sandra I. Coufal, M.D. | Director | March 2, 2020 |
| /s/ Kathryn Falberg<br>Kathryn Falberg | Director | March 2, 2020 |
| /s/ David Hirsch<br>David Hirsch, M.D., Ph.D. | Director | March 2, 2020 |

135

**Exhibit 23.1**

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in the following Registration Statements:

1. Registration Statement (Form S-3ASR No. 333-233189) of Tricida, Inc.,
2. Registration Statement (Form S-8 No. 333-233187) pertaining to 2018 Equity Incentive Plan and the Employee Stock Purchase Plan of Tricida, Inc., and
3. Registration Statement (Form S-8 No. 333-226058) pertaining to the 2013 Equity Incentive Plan, the 2018 Equity Incentive Plan and the Employee Stock Purchase Plan of Tricida, Inc.;

of our reports dated March 2, 2020, with respect to the financial statements of Tricida, Inc., and the effectiveness of internal control over financial reporting of Tricida, Inc. included in this Annual Report (Form 10-K) for the year ended December 31, 2019.

/s/ Ernst & Young LLP

Redwood City, California
March 2, 2020

**Exhibit 31.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER
PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Gerrit Klaerner, Ph.D., certify that:

1. I have reviewed this Annual Report on Form 10-K of Tricida, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 2, 2020

/s/ Gerrit Klaerner, Ph.D.

Gerrit Klaerner, Ph.D.

Chief Executive Officer and President

(Principal Executive Officer)

**Exhibit 31.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Geoffrey M. Parker, certify that:

1. I have reviewed this Annual Report on Form 10-K of Tricida, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 2, 2020

/s/ Geoffrey M. Parker

Geoffrey M. Parker
Chief Financial Officer and Senior Vice President
(Principal Financial Officer)

**Exhibit 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Tricida, Inc. (the "Company"), on Form 10-K for the fiscal year ended December 31, 2019, as filed with the Securities and Exchange Commission (the "Report"), Gerrit Klaerner, Ph.D., Chief Executive Officer and President of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

- The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
- The information contained in the Report fairly presents, in all material aspects, the financial condition and results of operations of the Company.

Dated: March 2, 2020


/s/ Gerrit Klaerner, Ph.D.
Gerrit Klaerner, Ph.D.
Chief Executive Officer and President
*(Principal Executive Officer)*


**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Tricida, Inc. (the "Company"), on Form 10-K for the fiscal year ended December 31, 2019, as filed with the Securities and Exchange Commission (the "Report"), Geoffrey M. Parker, Chief Financial Officer and Senior Vice President of the Company, hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

- The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
- The information contained in the Report fairly presents, in all material aspects, the financial condition and results of operations of the Company.

Dated: March 2, 2020


/s/ Geoffrey M. Parker
Geoffrey M. Parker
Chief Financial Officer and Senior Vice President
*(Principal Financial Officer)*