# Exhibit 16

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL PARDI, individually )
and On Behalf of All Others )
Similarly Situated,         )
                            )
            Plaintiff,      )
                            )
        vs.                 )   No. 4:21-cv-00076-HSG
                            )
TRICIDA, INC., and GERRIT   )
KLAERNER,                   )
                            )
            Defendants.     )
_____)

DEPOSITION OF JEFFREY M. FIORE

Via Zoom Videoconference

Monday, June 24, 2024

Reported Stenographically by:
LAURIE HELD-BIEHL
CA CSR No. 6781
IL CSR No. 084002860
NJ CCR No. 30XI00239100
TX CSR No. 8555
WA CCR No. 21020748
RPR/CRR/RMR No. 32836
JOB No. 6764413

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL PARDI, individually )
and On Behalf of All Others )
Similarly Situated,          )
                             )
                Plaintiff,   )
                             )
        vs.                  )  No. 4:21-cv-00076-HSG
                             )
TRICIDA, INC., and GERRIT    )
KLAERNER,                    )
                             )
                Defendants.  )
_____)

        Oral Deposition of JEFFREY M. FIORE, pages 1 through 155, taken on behalf of Defendants, via Zoom videoconference beginning at 9:02 a.m. Pacific Standard Time and ending at 12:56 p.m. Pacific Standard Time, on Monday, June 24, 2024, reported stenographically by LAURIE HELD-BIEHL, California Certified Shorthand Reporter No. 6781, Illinois Certified Shorthand Reporter No. 084002860, New Jersey Certified Court Reporter

Page 2

No. 30XI00239100, Texas Certified Shorthand Reporter No. 8555, Washington Certified Court Reporter No. 21020748 and Registered Professional Reporter, Certified Realtime Reporter, Registered Merit Reporter No. 32836.

Page 3

APPEARANCES:

    For Plaintiff:
        BLOCK & LEVITON, LLP
        Attorneys at Law
        BY:  JACOB A. WALKER, ESQ.
        260 Franklin Street
        Suite 1860
        Boston, Massachusetts 02110
        617.398.5600
        jake@blockleviton.com
        (Via Zoom Videoconference.)

    For Defendants:
        SIDLEY AUSTIN LLP
        Attorneys at Law
        BY:  SARAH E. GALLO, ESQ.
        BY:  SARAH A. HEMMENDINGER, ESQ.
        555 California Street
        Suite 2000
        San Francisco, California  94104
        415.772.1279
        sgallo@sidley.com
        shemmendinger@sidley.com
        (Via Zoom Videoconference.)
        BY:  ROBIN W. WECHKIN, ESQ.
        8426 316th Place Southeast
        Issaquah, Washington  98027
        415.439.1799
        rwechkin@sidley.com
        (Via Zoom Videoconference.)

    Also Present:
        BRIAN SACK, Veritext Concierge
        (Via Zoom Videoconference.)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

INDEX

WITNESS                                      EXAMINATION

JEFFREY M. FIORE

    BY MS. GALLO                                  9

    BY MR. WALKER                               150

DEPOSITION TIME LOG                          152

EXHIBITS

DEFENDANTS'                                      PAGE

Exhibit 1    Defendant Gerrit Klaerner's          19
             Notice of Deposition to Lead
             Plaintiff Jeffrey Fiore, 2 pages

Exhibit 2    Class Action Complaint for           35
             Violations of the Federal
             Securities Laws, Demand for
             Jury Trial, 26 pages

Exhibit 3    Amended Complaint for Violations     37
             of the Federal Securities Law,
             79 pages

Exhibit 4    Second Amended Complaint for         42
             Violations of the Federal
             Securities Laws, Unredacted
             Version of Document(s) Sought
             to be Sealed, 77 pages

Page 5

INDEX (Continued):

EXHIBITS

DEFENDANTS'                                                    PAGE

Exhibit 5      Notice of Motion and Motion for              48
               Appointment as Lead Plaintiff and
               Approval of Selection of Counsel;
               Memorandum of Law in Support Thereof,
               11 pages

Exhibit 6      Jeffery M. Fiore Tricida                     51
               Transactions, 1 page

Exhibit 7      Plaintiff's Certification,                   53
               1 page

Exhibit 8      Declaration of Jeffrey M. Fiore,             55
               4 pages

Exhibit 9      Block & Leviton LLP Retainer                 59
               Agreement, 2 pages
               Bates Numbers TRICIDA_FIORE_
               000128 and 000129
               CONFIDENTIAL

Exhibit 10     Plaintiff's Responses and                    66
               Objections to Defendant Gerrit
               Klaerner's First Set of Requests
               For Production, 21 pages

Exhibit 11     Plaintiff's Responses and                    79
               Objections to Defendant Gerrit
               Klaerner's First Set of
               Interrogatories, 11 pages

Exhibit 12     E-Trade Securities Investment               105
               Account Statement, dated 4-30-20,
               8 pages
               Bates Numbers TRICIDA_FIORE_
               000130 through 000137
               CONFIDENTIAL

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

INDEX (Continued):

                         EXHIBITS

DEFENDANTS'                                              PAGE

Exhibit 13    S&P Global Market Intelligence       123
              Article, "Tricida, Inc., NasdaqGS:
              TCDA FW1 2020 Earnings Call
              Transcripts," dated 5-7-20,
              14 pages

Exhibit 14    E-Trade Securities Investment        127
              Account Statement, dated 7-31-20,
              8 pages
              Bates Numbers TRICIDA_FIORE_
              000138 through 000145
              CONFIDENTIAL

Exhibit 15    Document, "Tricida Provides          139
              Regulatory Update on Veverimer,"
              dated 7-15-20, 1 page

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Via Zoom Videoconference

Monday, June 24, 2024

9:02 a.m.  -  12:56 p.m.

THE REPORTER:  This is the remote deposition of Jeff Fiore in the matter of Parti v Tricida, I hope I pronounced that correctly, taken on behalf of the Defendants.

Today's date is Monday, June 24, 2024, and the time is approximately 9:2 a.m.

Counsel, would you please identify yourselves for the record, state whom you represent, and agree on the record that there is no objection to me swearing in the witness via videoconference.

MR. WALKER:  On behalf of Mr. Fiore, it's          09:02
Jake Walker at Block & Leviton in Boston.

And I have no objection.

MS. GALLO:  On behalf of defendant Gerrit Klaerner, this is Sarah Gallo, and I'm joined by my colleagues Sarah Hemmendinger and Robin Wechkin.          09:02

And no objection.

(Witness sworn.)

THE WITNESS:  Yes, it is (sic).

THE REPORTER:  Thank you very much.  You can put your hand down.          09:03

Page 8

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Counsel, you can begin.

JEFFREY M. FIORE,

having been first duly sworn

and administered an oath

pursuant to California CCP 2094,

was examined and testified as follows:

EXAMINATION

BY MS. GALLO:

Q   Good morning, Mr. Fiore.  My name is Sarah Gallo and I represent defendant Dr. Gerrit Klaerner.

Could you please state and spell your full name for the record?

A   Yeah.  My first name is Jeffrey,            09:03 J-E-F-F-R-E-Y, middle name M-I-C-H-A-E-L, M-I-C-H-A-E-L, last name Fiore, F-I-O-R-E.

Q   Could you please state your home address for the record?

A   My home address is 4617 Rocky Ridge Trail,  09:03 that's three separate words, and that's Little Elm, Texas 75068.

Q   Could you please state your current occupation and title?

A   Yeah.  Product -- senior product engineer    09:03

Page 9

for Toyota Motor North America.

Q   Have you ever been deposed before?

A   No, I have not.

Q   All right.  I'll go over a few ground rules before we get started.                                    09:04

Do you understand that you are under oath today, just as if you were testifying in a courtroom?

A   I do.

Q   I'm going to ask you a series of questions; please answer them as truthfully and completely as     09:04 you can.  If there's anything that you do not understand, please let me know before providing your answer and I will try to clarify the question.

If you need me to repeat a question, please ask, otherwise I will assume you understand the     09:04 question.

Your testimony today may be used in any relevant proceeding, including a jury trial.

The court reporter will be taking down everything we both say and the deposition is being     09:04 recorded (sic).

You'll need to answer each question audibly rather than with shakes or nods of your head, and to say "yes" or "no," rather than "uh-huh" or "oh, no."

I will try not to interrupt you or talk over   09:04

Page 10

your answers and I will ask that you let me finish asking my questions completely before you begin answering, this will allow the court reporter to hear us more clearly.

I will show you documents during the course 09:05 of your testimony.  Please take as much time as you need to review those documents before you answer any questions about them.

Please answer each question truthfully and fully. 09:05

Your counsel may make objections to preserve them for the record.  Unless your counsel instructs you not to answer, please answer the question if you are able.

If there is a question you do not 09:05 understand, let me know and I will do my best to rephrase it.

If you need to take a break, please let me know and if there is a question pending, please answer the question before we break. 09:05

Is there any reason you cannot truthfully and fully answer my questions today?

A    No, there is no reason.

Q    Okay.  For the record, can you please tell me where you are today? 09:06

Page 11

A   I'm at my house.

Q   Okay.  Is there anyone in the room with you?

A   No, there is not.

Q   Are you on a computer or on another device?

A   I am on a computer.                          09:06

Q   Are there any documents in front of you, notes?

A   Not to deal with this case.

Q   Are there any other programs open on your computer?                                          09:06

A   Yes.

Q   Any other --

What programs are open on your computer?

A   Work stuff.  Teams, my work email, stuff like that.                                          09:06

Q   Okay.  Any chat message systems open on your computer?  Teams?

A   Teams for work, yeah.  Nothing to do with this case.

Q   Okay.  Are there any other programs that    09:06 allow someone to send you information?

A   Not --

No.  I mean, I have nothing open to do with this case or this deposition.

Q   I'm going to be showing you exhibits via the  09:07

Page 12

Exhibit Share platform; you should have gotten instructions on how to log into the Exhibit Share.  I know that we have Brian, who will be sharing those on the screen, but please let me me know if you are not able to see the exhibits I'm referencing at any time,  09:07 and, again, take as much time as you need to review those exhibits.

A    Understood.

Q    All right.  Now turning to some of your personal background, what education have you    09:07 received, starting with high school?

A    High school diploma and some college.  I do not have a degree.

Q    Where did you go to college?

A    Long Beach City College in California.    09:07

Q    And you said you did not graduate, correct?

A    I have not.

Q    Have you earned any other degrees?

A    I didn't graduate; so no.

Q    Did you complete any other training or    09:08 certificate programs?

A    Sure.  Over the years --

I've been working for Toyota for 28 years; so I've taken numerous certifications and classes.  I couldn't remember to list them all.    09:08

Page 13

I do not.  It's four years ago, I think we talked about that, where the stuff came from and specifically who wrote it and --

Yeah, I don't recall.

BY MS. GALLO:                                        12:01

Q   For your purchase of Tricida stock on April 9th did you rely on the market price?

A   Rely on it for what?

MR. WALKER:  Objection.

BY MS. GALLO:                                        12:01

Q   Did you believe that the price at which you purchased the stock incorporated all of the news about Tricida that was publicly available?

MR. WALKER:  Object to form.

THE WITNESS:  Yeah.                                  12:01

I'm not in the business of pricing stock or coming up with a formula on -- on what the value of the company or stock is; so I can't answer that.  I don't know.

BY MS. GALLO:                                        12:01

Q   Besides the positive results or the positive statements that the company had made prior to your investment, were there any other factors you took into account in purchasing Tricida stock in April 2020?                                          12:01

Page 118

MR. WALKER:  Object to form.

THE WITNESS:  Again, multiple criteria for deciding to invest in the stock.  I don't recall four years ago all of my criteria for making the decision to purchase.  What you mentioned was one of them.    12:01

Obviously, the positive feedback from the trials.

The price of the stock versus what the price of a drug like this could possibly warrant if it was successful.                                                     12:02

Yeah, multiple factors going into the reason why I decided to purchase.

BY MS. GALLO:

Q   Yeah.

Any -- any other factors that you took into   12:02 account when you first purchased your Tricida stock?

MR. WALKER:  Object to form.

THE WITNESS:  Not that -- not that I can remember specifically.

BY MS. GALLO:                                        12:02

Q   Did you discuss your decision to purchase Tricida stock on April 9, 2020 with anyone?

MR. WALKER:  Object to form.  Asked and answered.

You can answer.                                      12:02

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

THE WITNESS:  Yeah.  Possibly my wife.  I -- I don't remember.

BY MS. GALLO:

Q   Okay.

A   Sometimes it depends on whether the cash is     12:02 coming out of, like, together funds or whether I kind of have my own funds that I play with for other -- you know, whether it's stock or other things that I do.

Q   Okay.  So aside from potentially discussing     12:03 moving funds with your wife, was anyone else involved in your decision to purchase Tricida stock on April 9, 2020?

A   Yeah.  I believe I answered that.  Nobody else.                                                           12:03

MS. GALLO:  Okay.  Why don't we take another short break and come back at 10 after.

MR. WALKER:  Sarah, do you have -- not to hold you to it, but do you have a sense of how much you've got left?                                                          12:03

MS. GALLO:  This will be the last break.

MR. WALKER:  Okay.

(Off the record.)

MS. GALLO:  Brian, could we quickly pull up what we stamped as Exhibit 6?                                      12:12

Page 120

Okay.

Q   So earlier you -- I want to return to your total losses just because earlier you mentioned that there were around $5,000.

Is the $2,200 represented on this                    12:12
transaction sheet correct?

MR. WALKER:  Object to form.

THE WITNESS:  I believe that is a snapshot of moment in time based on the price of the shares at that time; so I don't know that that is accurate          12:12
overall.

BY MS. GALLO:

Q   Okay.  I guess what do you mean by "a snapshot in time"?

A   So at that moment certain stocks are worth a   12:13
certain price, right?  Right?

Do you get that?

So when this was taken, when this transaction was taken, these stocks were sold at -- purchased at 26- --                                      12:13

I can't see the whole thing, let me refresh this, pull it up on my screen.

This is Exhibit 12, is that what we're --

MR. WALKER:  6.

BY MS. GALLO:                                        12:13

Page 121

Q   We're looking at Exhibit 6.

A   Right, but it's not shared in the Veritext or no?

Q   It should be in there from before.

A   Oh, okay.  Back to Exhibit 6.  Gotcha.   12:13
Okay.

Yeah.  So at the time of purchase, the total was 3,454, right at this particular moment in time when this was taken there was a total loss of 2,218 based on the fact that some of the stock was still   12:14 worth something at that time.  Currently, that stock is not worth anything; so obviously a total loss of 3,454 but at some point I think the stock -- like, I purchased at $26 a share, it went up a little bit, I don't remember to exactly what; so that 1,496 was   12:14 worth, I don't know, say 2,100 or something.

And, obviously, since then it -- it went down, I purchased some additional and then at some point it was worth zero; so there was more of a total loss than 2,200.  That was just specifically on   12:14 9-4 -- or on -- whenever this was taken, this snapshot was taken, that's what the loss was was $2,200 at that moment in time.

MS. GALLO:  Okay.  Brian, can you stamp the next exhibit, Exhibit 13, the May 7, 2020 earnings call   12:15

Page 122

transcript.

EXHIBIT TECHNICIAN:  So I'm going to mark what you marked as 13 as the next exhibit?

MS. GALLO:  What we marked as 12 will be 13; everything is one off.                                    12:15

EXHIBIT TECHNICIAN:  Thank you.

(Defendants' Exhibit 13 was marked

for identification and is attached

hereto.)

MS. GALLO:  And Mr. Fiore, let me know when you   12:15 can view this in Exhibit Share.

EXHIBIT TECHNICIAN:  The exhibit should be there.

THE WITNESS:  Yep, I've got it.

BY MS. GALLO:                                          12:16

Q   Mr. Fiore, do you recognize this document?

A   Not specifically.  I don't know that I've seen this before.

Q   Did you listen to Tricida's May 7, 2020 earnings call?                                           12:16

A   I don't believe so.

Q   Did you read any press releases or other news coverage or analysts' coverage of Tricida's May 7, 2020 earnings call?

A   I don't specifically remember but as I      12:16

Page 123

mentioned, I received notifications of sales.  I don't know how this correlates in time to the other information that I was given or provided with, or researched.

Q   Okay.  Do you recall if anything you read    12:16 about Tricida in May or June of 2020 influenced your belief about the company's prospects?

MR. WALKER:  Object to form.

THE WITNESS:  I don't recall that specific time period.                                              12:17

BY MS. GALLO:

Q   Were you actively monitoring Tricida's stock after making your purchases on April 9th?

A   I believe I was actively researching Tricida's stock prices before I purchased it and     12:17 after I purchased it as part of the criteria for investing.

Q   Do you recall making an active decision to hold the stock you purchased on April 9th shortly after purchasing it?                                      12:17

MR. WALKER:  Object to form.

THE WITNESS:  I'm sorry, repeat the question again.

BY MS. GALLO:

Q   After you purchased stock on April 9th, do    12:18

Page 124

you recall making a conscious decision to hold that stock in the near term versus sell it?

MR. WALKER:  Object to form.

THE WITNESS:  Yes.  I do recall, yes.

BY MS. GALLO:                                          12:18

Q   What informed that decision?

A   The main -- the main reason was because of the press releases and information that Tricida put out regarding their positive feedback from their testing.  And while they did have some setbacks, they were still very confident that they were going to be able to get it put through and -- and to market.            12:18

Q   Do you recall any specific press releases?

A   I'm not sure what criteria you're looking for.                                                    12:18

Q   I guess I'm thinking about specific press releases during that time period shortly after you invested in Tricida where Tricida was reporting positive results that influenced your decision to hold the stock or sell the stock.                     12:19

MR. WALKER:  Object to form.

THE WITNESS:  Well, yeah.  If you're referring to a large dip in the stock price, I believe --

If I remember correctly, and obviously this was four years ago, so I may be a little bit off, but  12:19

Page 125

they had a setback with the FDA and that news was
announced and so the stock took a dip and Tricida
then came out, I don't remember if it's the same day,
a day later, a week later, I'm not sure of the
timing, but they came out and they basically said,      12:19
hey, even though we had this setback with the FDA,
we're confident in our testing, we're confident in
our trials, we're confident that we're going to be
able to move forward.

And then at some point, I think you       12:19
mentioned already that they -- they talked about fast
tracking because they kind of got set back in their
timeline of what they originally anticipated; so they
were applying for a fast track which you would -- as
an investor or anybody looking, you would think, hey,   12:20
they wouldn't be asking to fast track this thing if
they didn't have good reason to -- to do that, right,
thinking that they're -- you know, putting it out
there that, hey, we're going to be successful so
let's get this thing put through, so --                 12:20

But the timing of those -- those (sic)
information are -- and in relation to my investment,
I don't -- I don't particularly recall.  I do know
that large dip -- the large dips that occurred in the
stock occurred when they came out with bad news that    12:20

Page 126

the trials weren't going as expected, or the FDA

announced, I should say, that the trials weren't

going successfully.

MS. GALLO:  I think you sort of anticipated some

of my next questions but before we dig into what I          12:20

believe you're talking about, Brian, can you pull up

what we sent over as Exhibit 13 and stamp it as

Exhibit 14?

(Defendants' Exhibit 14 was marked

for identification and is attached                          12:20

hereto.)

MS. GALLO:  And if we could scroll to page 6 of

this exhibit.

EXHIBIT TECHNICIAN:  Let me get it into

Exhibit Share.  One second.                                 12:21

MS. GALLO:  Okay.

EXHIBIT TECHNICIAN:  The exhibit is available.

THE WITNESS:  Where would you like me to go?

BY MS. GALLO:

Q    Page 6.  All right.                                    12:21

Mr. Fiore, you purchased shares of Tricida

stock on July 16, 2020, correct?

A    That is correct.

Q    You purchased at $16.98 and $16.38,

according to your submissions; is that correct?            12:22

Page 127

A    That looks to be correct.

Q    Why did you make these purchases of Tricida stock on July 16, 2020?

MR. WALKER:  Object to form.

THE WITNESS:  Again, kind of the same thing    12:22 we've just talked about, right, is that the price dropped from my original purchase price of 20 -- $28, I think it was down to 16 based on a setback from the FDA, which caused the stock to tumble.

And based on everything that I was reading,    12:22 and what the company was putting out, was that it was just a short-term setback.  And so I thought it was a good opportunity to -- to purchase some additional stock at a lower price based on the fact that they were putting it out there that it was just going to    12:22 be a matter of time before they were able to move forward.

BY MS. GALLO:

Q    Based on what you read, did you believe the market overreacted to the news from the FDA?    12:23

MR. WALKER:  Object to form.

THE WITNESS:  Yeah.

Not my area of expertise.  I don't know if they acted correctly or -- or overreacted, I couldn't tell you.    12:23

Page 128

BY MS. GALLO:

Q   Okay.  Did you believe the low price of Tricida stock -- the lower price of Tricida stock on July 16, 2020 was representative of the company's prospects and value?                                    12:23

MR. WALKER:  Object to form.

THE WITNESS:  I --

Based on what they were saying -- based on what Tricida announced afterwards, I don't believe at the time I thought anything had to do with it as far   12:23 as the -- the ability to at some point put the drug to market.  I thought the reason for the dip in price was because of the timing because the setback from the FDA, not getting approved at that point or --

I can't remember exactly what it was, it       12:24 wasn't the end of it, it was just like, oh, instead of being on to the next step, we had to go back and do something and it was going to take six months longer.  And so the reaction was, you know, the price drop was due to that reaction, not the fact that, you   12:24 know, they weren't going to go to market at all.

BY MS. GALLO:

Q   Was this purchase in line with your strategy of trying to buy low and sell high?

A   That's always --                              12:24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

MR. WALKER:  Objection.

THE WITNESS:  Yeah.

Go ahead.

MR. WALKER:  You can answer.

THE WITNESS:  I mean, that's always the goal is   12:24
to -- is to purchase as low as possible and sell as
high as possible; so, yes, that would fit the
criteria.

Like I said, the main reason was the setback
from the FDA caused the price to fall and the company  12:24
specifically came out -- I don't know, like I said, I
don't know if it was the same day or the next day or
a couple days later after the FDA announcement and --
and basically said there's no issues on their side,
it's just like red tape, they're going to get through  12:25
it, it's just a matter of time was kind of the
overall message that they were putting out.

BY MS. GALLO:

Q   So you knew of the news from the FDA before
you made these purchases, correct?                     12:25

MR. WALKER:  Object to form.

THE WITNESS:  I believe so, yes.

Again, it's hard to remember the exact
timing of everything but I believe the FDA
announcement came out, the stock fell, then a couple   12:25

Page 130

days later Tricida mentioned -- or put out a press

release saying that everything was fine and

everything was great, it was just a delay.

And then, I believe if you look at the

timing of those announcements compared to my          12:25

purchase, it would be -- my purchase would be after

the Tricida -- after the FDA announcement and after

the Tricida announcement that they were confident in

their findings and their research and that it was

just a timing issue; so I would imagine you'd see    12:25

that those two announcements happened sometime

before -- shortly before 7/16.

BY MS. GALLO:

    Q   Okay.  So if I'm understanding correctly,

you -- you heard an announcement from the FDA and     12:26

then you also reviewed an announcement from the

company about the FDA announcement?

    A   Yes.  Correct.

    Q   How did you -- how did you find out about

these announcements?                                  12:26

    MR. WALKER:  Object to form.

    THE WITNESS:  I don't recall.  It's possible

it's because I'm a stockholder -- I was a stockholder

at the time that I got something sent to me.

Or it could have been that I was doing my     12:26

Page 131

normal, you know, checkup on my investments and noticed the price dip and started to do some research.  I can't recall exactly what triggered me to -- to go and find those -- those articles or those announcements.                                              12:26

BY MS. GALLO:

Q   And what did the FDA's announcements --

What did the company's announcements say?

MR. WALKER:  Object to form.

THE WITNESS:  Yeah.                              12:27

I mean, you -- I think I kind of covered it.  Basically that it was a -- a delay in their process but not an issue.  I don't know the exact wording.

Obviously, I don't know the exact wording but I'm just going off of my memory is the message   12:27 from the company was, hey, yes, we had this problem with the FDA, it's not really a problem, it's just a delay, and we'll continue -- you know, we'll do whatever it is that they're asking us to do and then we'll move forward was the general gist of their   12:27 announcement.  But nothing negative, just all positive other than -- than the timing delay.

BY MS. GALLO:

Q   And when did you review that announcement from the company?                                     12:27

Page 132

A   As I mentioned, I'm not sure what day they put it out.  I'm also not sure what day I read it, but I would assume that it was prior to my purchase; somewhere between the dip of the stock and the purchase of the stock was when I read that stuff.   12:27

Q   Okay.  Kind of turning back to your E-Trade document from July 2020, you purchased a total of about $2,000 in Tricida stock on July 16th; is that correct?

A   That's correct.   12:28

Q   And that was made in two purchases and the second purchase was about $800, correct?

A   Yeah, it looks like one was at 10:57 for 1,154 and then the second was at 11:48, that's correct; so the second purchase was 802.   12:28

Q   You might have to go back to the full page of page 6 but you also deposited $800 into your E-Trade account on July 16, 2020; is that correct?

A   It looks that way, yeah.  It looks like I probably had 1,200 in there and then added another   12:28 800 to cover a $2,000 purchase is what it looks like. Again, just going off of what I see in front of me.

Q   Was there a reason you wanted to invest $2,000 specifically?

A   Again, it's -- I'm not specific to a certain   12:29

Page 133

amount, it's what money I have left over -- you know,
left to play with obviously; so at the time I had
$2,000 that I could afford to invest and so I decided
to invest it.  Why I had $2,000 at that time, I
couldn't tell you.                                    12:29

Q   Was there a reason you wanted to invest
additional funds on July 16, 2020?

MR. WALKER:  Object to form.

THE WITNESS:  Specifically, I -- I can't recall.

I think, again, when the announcements came    12:29
out and I saw the stock price dip, you know,
$12, and the news from Tricida was positive about
moving forward with what they were doing, that gave
me the confidence to invest additional resources
based on -- on them saying that there was no issue    12:29
and it was just a timing delay.

That's what I would imagine, if I remember
correctly, gave me the confidence to go ahead and
invest more money.

BY MS. GALLO:                                         12:30

Q   Okay.  So your understanding was that,
again, the FDA made an announcement, the company
issued a press release or some sort of announcement
that you reviewed which gave you confidence and
factored into your decision to invest $2,000 in      12:30

Page 134

Tricida stock on July 16, 2020; is that correct?

MR. WALKER:  Object to form.

THE WITNESS:  Yeah.

To the best of my recollection, that is correct.                                                            12:30

BY MS. GALLO:

Q   Okay.  And do you recall the date that you reviewed the press release or announcement from the company?

MR. WALKER:  Asked and answered.  Objection.    12:30

You can answer if you're able.

THE WITNESS:  Yeah.  I mean, I would say the same thing.  I --

You asked that like three minutes ago and I answered it.                                                            12:31

BY MS. GALLO:

Q   Okay.  Did you review the press release on July 15, 2020?

MR. WALKER:  Object to form.

THE WITNESS:  I don't recall the exact date.    12:31

You can put a timeline together pretty easily if you look at the price dip on the stock because it -- the price dip happened I believe the day after the FDA announcement, or maybe the same day, and then Tricida shortly thereafter put out a    12:31

Page 135

statement, and I would imagine that's prior to 7-16, right?  Maybe.  And then from there I made -- I took some time to decide to invest more and then made the investment after those things happened.

BY MS. GALLO:                                          12:31

Q   Would you agree that you reviewed the press release prior to the morning of July 16, 2020?

MR. WALKER:  Object to form.

THE WITNESS:  I am 100 percent certain I reviewed the press release from Tricida stating the    12:32 fact that they have positive results and this was nothing more than a timing delay before I decided to purchase the stock.

BY MS. GALLO:

Q   In addition to the press release that you    12:32 reviewed, what other sources did you consider in deciding to make these purchases of Tricida stock?

A   I think the --

Yeah.  Go ahead, object to form.

MR. WALKER:  No.  It's repetitive but --    12:32

THE WITNESS:  I just -- I start too quickly; I have to give you a second.

So same criteria as my original investment. This additional investment included the fact that the price dipped, obviously due to the FDA announcement.    12:32

Page 136

And -- and the continued positivity of the Tricida press release is what helped to make the decision; so nothing additional other than my original criteria as far as Tricida as a whole.

This specific secondary purchase was based    12:33 on all that information that I gathered the first time; in addition to that was the fact that the price dropped and the fact that Tricida came out and reported that this was nothing more than a delay and that they were still very much on track to take this    12:33 to market.

BY MS. GALLO:

Q    Do you know what time of day you purchased your shares on July 16, 2020?

MR. WALKER:  Object to form.    12:33

THE WITNESS:  Same thing.  I don't know when the criteria was -- was added into the website or the application.  And once it hit the desired price, then it executes the trade; so like that one on top, it says 11:48.  I don't know if I put that in at    12:33 9:00 a.m. and it took two hours and 48 minutes to -- to hit the price and the parameters that I entered in or if it was instant.  I don't know.

BY MS. GALLO:

Q    Is there any reason --    12:33

Page 137

REPORTER'S DEPOSITION TIME LOG:


REPORTER - LAURIE HELD-BIEHL

DATE - Monday, June 24, 2024


WITNESS - JEFFREY M. FIORE


| ATTORNEY | ON RECORD | OFF RECORD | TOTAL |
|---|---|---|---|
| GALLO | 9:02 A.M. | 9:39 A.M. | 0:37 |
| | 9:53 A.M. | 10:46 A.M. | 0:53 |
| | 11:11 A.M. | 12:03 P.M. | 0:52 |
| | 12:12 P.M. | 12:46 P.M. | 0:32 |
| | 12:52 P.M. | 12:56 P.M. | 0:04 |
| | | TOTAL USED: | 2:58 |

Page 152

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

I, LAURIE HELD-BIEHL, Registered Professional Reporter, Certified Realtime Reporter, Registered Merit Reporter, a Certified Shorthand Reporter of the State of California, the State of Illinois and the State of Texas, a Certified Court Reporter for the State of New Jersey and the State of Washington, do hereby certify:

That the foregoing deposition was taken before me at the time and place herein set forth;

That prior to testifying the witness was placed under oath by me;

That a verbatim record of the proceedings was made by me using machine shorthand and thereafter transcribed under my direction and supervision;

That the foregoing deposition is a full, true and correct transcript of my shorthand notes so taken and transcribed;

That any dismantling of this transcript will void my certification as a Certified Shorthand Reporter, Registered Professional Reporter;

Page 153

That I am not financially interested in the action, nor a relative or employee of any attorney or any of the parties, nor am I in any way interested in the outcome of the pending litigation;

I further certify that Pursuant to Rule 30(f)(1) of the Federal Rules of Civil Procedure, prior to the completion of the deposition the deponent DID request to read and sign said deposition transcript and that further certification requirements pursuant to Rule 30(f)(1) will be certified after they have occurred.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 6/25/24

LAURIE HELD-BIEHL, RPR, CRR, RMR, CSR, CCR
RPR/CRR/RMR No. 32836
CA CSR No. 6781
IL CSR No. 084002860
NJ CRR No. 30XI00239100
TX CSR No. 8555
WA CRR No. 20210748

Page 154

FURTHER CERTIFICATION PURSUANT TO RULE 30(f)(1)

Notification of changes in form or substance, as well as the reasons for same, above signature of the witness, was/was not received within the 30-day period prescribed by Rule 30(e)(1);

If received within the 30-day period prescribed by Rule 30(e)(1) the Changes and Signature pages attached hereto contain any and all changes as made by the witness and the reasons therefore;

That pursuant to Rule 30(f)(1), following the 30-day period for review of the deposition transcript for changes in form or substance, as well as signature, the original deposition transcript was sealed and delivered to _____, as noticing party of same, and that a copy of this certificate was served on all parties shown herein.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 6/25/24

LAURIE HELD-BIEHL, RPR, CRR, RMR, CSR, CCR
RPR/CRR/RMR No. 32836
CA CSR No. 6781
IL CSR No. 084002860
NJ CRR No. 30XI00239100
TX CSR No. 8555
WA CRR No. 20210748 I

Page 155

I declare under penalty of perjury under the laws that the foregoing is true and correct.

Executed on _____ , 20___, at _____, _____.

_____
SIGNATURE OF THE WITNESS

Page 156

JACOB A. WALKER, ESQ.

jake@blockleviton.com

June 25, 2024

RE: Pardi, Michael v. Tricida, Inc.

6/24/2024, Jeffrey M. Fiore, (#6764413).

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

    to schedule a time to review the original transcript at

    a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

    Transcript - The witness should review the transcript and

    make any necessary corrections on the errata pages included

    below, notating the page and line number of the corrections.

    The witness should then sign and date the errata and penalty

    of perjury pages and return the completed pages to all

    appearing counsel within the period of time determined at

    the deposition or provided by the Code of Civil Procedure.

    Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of

    Counsel - Original transcript to be released for signature

    as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

    time of the deposition.

Page 157

_X_Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
Transcript - The witness should review the transcript and
make any necessary corrections on the errata pages included
below, notating the page and line number of the corrections.
The witness should then sign and date the errata and penalty
of perjury pages and return the completed pages to all
appearing counsel within the period of time determined at
the deposition or provided by the Federal Rules.
__ Federal R&S Not Requested - Reading & Signature was not
requested before the completion of the deposition.

Page 158

Pardi, Michael v. Tricida, Inc.

Jeffrey M. Fiore (#6764413)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____   _____

(Jeffrey M. Fiore)                    Date

Page 159

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.