**Pages 1 - 20**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable H.S. Gilliam, Jr., Judge

MICHAEL PARDI, et al.,           )
                                 )
            Plaintiffs,          )
                                 )
   VS.                           )      **NO. 4:21-CV-00076-HSG**
                                 )
TRICIDA, INC., et al.,           )
                                 )
            Defendants.          )
_____  )

                         Oakland, California
                         Thursday, May 1, 2025

                  **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
                  BLOCK & LEVITON, LLP
                  260 Franklin Street, Suite 1860
                  Boston, MA 02110
            BY:   **JEFFREY C. BLOCK**
                  **ATTORNEY AT LAW**

For Defendants:
                  SIDLEY AUSTIN, LLP
                  555 California Street - Suite 2000
                  San Francisco, California 94104
            BY:   **SARAH A. HEMMENDINGER**
                  **ATTORNEY AT LAW**

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
                       Official United States Reporter

**Thursday - May 1, 2025**                                    **2:29 p.m.**

                                   **P R O C E E D I N G S**

                                        ---o0o---

          **THE COURTROOM DEPUTY:**  Calling CV 21-00076, Pardi versus Tricida, Inc., et al.  Please state your appearances for the record.

          **MR. BLOCK:**  Good afternoon, Your Honor.  Jeffrey Block, Block & Leviton, for the plaintiff Jeffrey Fiore.

          **THE COURT:**  Good afternoon.

          **MS. HEMMENDINGER:**  Hi, good afternoon.  Sarah Hemmendinger for defendant Gerrit Klaerner.

          **THE COURT:**  Good afternoon.

     All right.  So we're here for a hearing on the motion for preliminary approval, and I had a number of questions I just wanted to tick through to make sure I understand the proposal. And really the first question is the release is framed in terms of also including Tricida, which is no longer a defendant. It's was -- it's the entity that went through bankruptcy.  I understand it's come out the other side of bankruptcy at this point, but I was curious.

     What's the basis for including a release as to a nonparty?

          **MR. BLOCK:**  I think, Your Honor, it's I would say probably a belt and suspenders request by defense side just to make sure that nobody can sue Tricida.  I don't think they can since they've gone through bankruptcy, and any of those claims

would probably be extinguished through the bankruptcy.

THE COURT:  I get why they would want it.  I'm wondering what the legal authority for it is.

MR. BLOCK:  I mean, we can look.  I mean, our thought process was that we're not really giving them anything that is really going to affect the class in any way, since nobody can probably bring that claim.  So we just agreed to it, but I don't think it's necessary, but I think that was just a negotiating point, and we felt we're not giving up anything.  So if you really want that, that's fine.

THE COURT:  I mean, from the defense perspective what's the legal basis for requiring class members to release someone that's not a party to the case?

MS. HEMMENDINGER:  So I don't have specific legal authority, Your Honor.  I think it was, you know, as Mr. Block went through, it was a negotiating point.  Tricida was voluntarily dismissed as you mentioned, but it was without prejudice.  And so the negotiating point is just to, you know, make sure that nobody could possibly bring claims against the entity and to -- all of this, um, as completely as we can.

THE COURT:  So I'll ask the parties to do a supplemental brief of, shouldn't need to be more than five pages, and give me some preferably Ninth Circuit or Supreme Court authority.  If not, other authority that supports the idea that a settlement can include a release as to a nonparty.

How long will you need to prepare that?

**MR. BLOCK:**  A week.

**MS. HEMMENDINGER:**  That's fine with us.

**THE COURT:**  A week sounds good.  So that's A on the release.

In terms of the scope, it did seem to me that basically what you were trying to describe is the identical factual predicate requirement in terms of the way that it's framed. And so I think setting aside this question of whether Tricida can be included, it struck me as probably appropriately scoped in that regard.

But then the other thing is there was -- and this has come up in another case recently.  In the settlement agreement there's a provision that seems reasonable.  It says you can't sue the -- well, you can't sue the lawyers, you can't sue any of the defendants based on distributions that are in accordance with the settlement agreement plan of allocation.  And the way that I saw it come up in a recent matter was once I got the final requested distribution order, there was a paragraph that was inserted that said basically you can't sue the claims administrator, but that was nowhere in the notice or any -- that was the first time that concept had come out, and I required the parties to cut it.  And so I'm wondering what this adds.

You know, I guess what's interesting about it is the

released claims are obviously described in a way that we just talked about, which is they're tied to the allegations, and this is a reasonable, but I think additional release in essence saying that you also can't sue us complaining about how we administered the settlement.  And I wonder, shouldn't that be part of the notice if it's something that's provided for in the settlement agreement?  That's the -- that's part of what class members are giving up.

**MR. BLOCK:**  Uh-huh.  I would look -- let me look, Your Honor, to see if it's in the notice.  I'm not sure if it is, because I haven't thought about that.

The rationale behind that is that, you know, we are setting out in the notice how we're going to calculate your losses.  You, as a class member, have a right to contest that, and you can go through and they could come to Your Honor and say, I don't think that was correct.  And what we're trying to do is eliminate somebody saying, well, you know, unless you give me my, you know, claim, I'm now going to sue you for $3000, and it, you know, just takes away that incentive of bringing those kinds of claims where it's, you know, more economical to resolve it than it is to fight it.  So there's a process that they can contest it through the Court.  And if it's not in the notice, Your Honor, we can certainly add that.

**THE COURT:**  That was the thought.

The logic of it is clear.  It makes substantive sense.

It's just that I didn't see it in there.  Maybe I missed it. But if it is not in there, I would propose that the notice be revised to just include that as an additional proviso that the class members ought to know about at the time they're considering what to do.

And so why don't we -- should we say that -- either you can just say, it is in there and here's where it is, or it isn't, and here's the proposed revised form of notice that includes that?

**MR. BLOCK:**  Yes.

**THE COURT:**  All right.  So those are the release-related issues.

In terms of the notice, I'm interested.  How did the class administrator identify class members?  I'm assuming that there was some sort of records that the defendant produced.  Is there anything in the record about how that identification was made?

**MR. BLOCK:**  We don't have the records yet.  We will get them once we get preliminary approval.  But as part of the bankruptcy process equity holders have been provided notice throughout the bankruptcy, so we're going to use -- basically piggyback on that and make sure that we send the notice out directly to the equity holders who had been receiving notices about the bankruptcy to date.

**THE COURT:**  I see.  So you haven't gotten it yet, but that's the plan for how you will get it?

MR. BLOCK:  Yes.

THE COURT:  I see.  And I assume everyone's comfortable that that will capture the university people that we are looking for?

MR. BLOCK:  Yes, we certainly hope so.  That's what we expect.

THE COURT:  All right.  Fair enough.

And then was there anything in the declaration or the papers about just the details of the notice plan, you know, how it's going to be sent out, where, those types of things?  I, again, may have overlooked it, but I didn't see that.

MR. BLOCK:  I believe, Your Honor -- I'm not sure if it's in the declaration, but I believe the plan is that there will be a mailing, a first-class mailing to everyone that we get on, you know, the list who are identified as equity holders, and it will go out that way.

THE COURT:  All right.  Normally in these -- and you've done this.  Normally there's a details explanation. Here's the first thing we'll do, and if those bounce back here's what we'll do, and just the entire train of proposed notice.  Is that somewhere?

MR. BLOCK:  We usually do that at final approval. We'll -- right now we'll just send out the notice to the collapses saying, here's the notice, and then usually what we'll do is we'll say -- I think we usually do that when people

submit claims.  So if you submit a claim and it's rejected, here's what we'll do.  We'll go back to you, we'll let you fix it and we'll do all those types of things.

**THE COURT:**  But different question.  You know, so you send postcards; five percent of them bounce back.  What are you going to do at that point?  Sometimes it's skip tracing.  I'm not talking about the mechanics of dealing with the claims, I'm talking about the notice plan.  Because I would be preliminarily approving the notice plan because at final approval will be, you know, that will already have occurred.

So why don't you include that as your -- as part of your in-a-week submission, just I don't know if it's from you or from the notice, the claims administrator or who.  But just here is the five or 10 whatever steps that we're planning to take in sequence to ensure that the notice is distributed in a way that meets the requirements the Ninth Circuit has laid out. And that way we'll have that as part of the record, too, and I can say that the notice -- you know, at this stage I would say that the notice plan appears adequate, and then at final approval I would be finding that it either was or wasn't executed as represented.

**MR. BLOCK:**  Okay.  We will do that, Your Honor.

**THE COURT:**  All right.  So let's do that.

I had a question about the opt-out process which seemed unusual.  You know, why would someone need to give, you know,

the sort of granular detail about the number of shares and when they bought them and the price if they're just saying, I want to opt out of the settlement?  Why can't -- why shouldn't they just be able to say, I'm simply opting out?

**MR. BLOCK:**  The reason for that, Your Honor, is if a sufficient number of shareholders decide to opt out, the defendants would have the right -- the defendant would have the right to terminate the settlement.  So knowing how many shares and when they bought so we know that they're actually in the class period ...

**THE COURT:**  But is it shares or shareholders?

**MR. BLOCK:**  Well, it would be the number of shares.  So this is --

**THE COURT:**  And I don't want -- I don't want to disclose the detail.  Part of one of the other things on my list is I want you to give me that.

I get what you're saying, but it also seems like it makes it cumbersome for people to just decide, I don't -- I just don't want to be part of it.  I mean, maybe, you know, I could see then, you know, you getting the information on who they are and then doing the math on the back end to match all this up to see if the withdrawal threshold is triggered.  But my main concern is that it shouldn't be a project.  It shouldn't feel cumbersome to opt out, and it shouldn't -- somebody shouldn't have to do some sort of reconstruction project.  If they just

don't want to be part of it, they should just say that.  And then doing the math is something that is between you and the defendants, and if, aggregating those the threshold is hit, then you can determine that on the back end.  That would be my presence.

MR. BLOCK:  Okay.  The only thing I would say to that, Your Honor, is we won't know how many shares somebody purchased or held unless they tell us, because that's not otherwise public information.

So normally when somebody buys stock, they'll buy it in a street name.  So the company, it's not going to be on their record holder list.  And even if they're getting notice through the bankruptcy court, the bankruptcy court isn't necessarily going to know how many shares somebody purchased and held or sold.  That's the real reason why we just ask for that information.  We're not trying to make it cumbersome.  We could just limit it to say, please tell us how many shares you purchased and when you purchased them, so we know if they bought within the class period and how many shares.

THE COURT:  But you're saying you have none of that information?

MR. BLOCK:  Until we get the claim forms, we don't know exactly how many shares a person purchased.  So if John Smith purchased Tricida stock, we might know that John Smith purchased, but I don't know if he purchased a hundred shares or

if he purchased 20,000 shares.  That's his information.  And unless we went to the brokerage houses and said, you have to give that information to us, which they probably won't disclose absent a subpoena, we wouldn't know it.

THE COURT:  Although I've never seen it framed quite this way.  I know these trigger provisions are pretty common.  And I'd have to go back and look.  I just don't remember it being this much of an outsourcing of the work to the claim filer.  I mean, ultimately, you know, in thinking about it, what I don't sent somebody to say, jeez, this is a big pain, so I guess I just want to opt out.

MR. BLOCK:  Yeah, I understand that, and I think we're trying to make it as minimal as possible because we don't want to burden people, but I think we just want to try to get the necessary information that we would or the defendant would need to see if they would trigger that provision.

MS. HEMMENDINGER:  Yeah, and I can speak a little bit to, you know, the framing it in terms of the number of shares as opposed to percentage, you know, we've seen before, and the reason for that is to try to avoid ambiguity, you know, on the back end about percentages.  You know, there can be ambiguity about how that's calculated, and so the reason for framing it this way is to try to make it clearer down the line in terms of if that would be, you know, triggered or not.

THE COURT:  Right.

I assume from your client's perspective obviously you want the settlement to remain.

**MS. HEMMENDINGER:** Of course.

**THE COURT:** You want it to go through.

But what I'm hearing is you have no way of even crosschecking? I don't understand. So someone says, I bought a thousand shares, or somebody says, I bought 10 million shares and that hits your threshold. Are you saying you're having to totally take their word for it? I'm not sure I get it.

**MS. HEMMENDINGER:** Well, so we representative Dr. Klaerner at this point, and so because we don't represent the company and we don't have the company shareholder records in this context, we don't have any, you know, way of knowing more about the shareholders. I think it would be, you know, as Mr. Block explained, the records are going to have to come from the bankruptcy process, and that's who sort of holds the shareholder records at this point.

**THE COURT:** Right; but you're going to look at them, right? Let's take my example.

**MS. HEMMENDINGER:** Yeah.

**THE COURT:** Joe Shmoe says, I bought 10 million shares of Tricida, and that alone hits the threshold. You're just gonna say, oh, okay, I guess the settlement's blown up, or are you going to do something to try to verify that? I'm assuming it's the latter. It seems to me that as a practical matter you

probably will have access to the records by then.  I'm just trying to understand what's being proposed.  It's hard to imagine that for something like this you're just going to accept the representations of the claimant, and it seems to me that whether -- however you get them, it seems to me that there is -- it's likely to be the case that you have access to materials that would allow you to do what you would do as a competent lawyer, which is check that.

MS. HEMMENDINGER:  Yeah.  So I believe so, Your Honor, and we certainly would check it.

Having not seen the records, and given that we don't have them, I just can't say here, you know, what we would or wouldn't be able to check in them.  And so if there was a way, you know, without providing -- we certainly don't want to provide additional burden on, you know, people who want to opt out, but if they could at least identify the number of shares, that would give us the opportunity to then check it against the records so that we're not just sort of starting, particularly given that standing here today, I don't know what the records are going to look like.

THE COURT:  But why is it that you're going to have access to the records after preliminary approval, but you don't have access now?

MS. HEMMENDINGER:  I think that's -- you know, so we don't have access at all.  I think the process will have to be

that plaintiffs will, you know, obtain those records and then I assume would share them with us, you know, for these purposes. But we hadn't taken that step since it's not -- you know, it sort of falls within plaintiff's ambit.

THE COURT:  How would you get them?

MR. BLOCK:  Well, Your Honor, I think what we would just get is essentially the mailing list of the shareholders, but I don't think -- I don't know, but I don't think that would include the number of shares people owned.  That I think is where sort of the -- this gray area comes in, so to speak, because just because you're on the mailing list, we don't know when you bought your shares.  They would have to have purchased them after May 7, 2021, to be in the class.  So if they're on the list we might not know that.  We wouldn't be how many shares.

I think if it's somebody who's got -- you know, if it's Joe Shmoe who says he has 10 million shares, probably a little easier to figure out if somebody owned a block of 10 million shares, because there are a lot of reporting requirements when you own that much of this company, and we could verify that probably through what should be SEC files.

THE COURT:  Although what I'm still not understanding is ultimately -- are you saying you will not have the ability to confirm with objective records the representations that these opt-outs make about their purchasing?

**MR. BLOCK:** I'm not sure that we can. We may -- I mean, if somebody came to us and said, you know, I owned 2 million shares of Tricida and I want to opt out, I think there are ways that we -- steps we could take to verify that. We could find out from whom they purchased the stock or where they purchased it, and we could try and track it down that way to verify it.

But again, ordinarily when somebody buys stock, if they buy it in the street name there's no record at the company of who the holder is unless you are a record holder and you register your shares so that the company knows it. And that oftentimes is, you know, what happens in these cases is we may not specifically know who all the individual investors are. We're going to know who the institutions are because they have to file forms with the SEC and they disclose their positions. So that's pretty easy to track, and that we can verify. But for an individual it becomes a little -- a little different.

**THE COURT:** Right. And realistically, stepping back from the somewhat hypothetical world, I mean, this is about institutional investors. I can't see the threshold being hit by some very large number of small investors opting out.

**MR. BLOCK:** I agree. I would -- in reality, I would be shocked if we came anywhere even close to what that number is in a case like this. You have a bankrupt entity and you just have one individual defendant, so ...

THE COURT:  All right.  Well, let's start with this. Please submit the opt-out threshold agreement so that I can review it in camera.  You can send it to the proposed order e-mail box.  And then I'll look at it and I'll look at ones that I've seen, you know, involving a similar situation in other securities cases, and then I may come back to you with some further thoughts.  But let me look at the agreement first and then proceed from there.

So that will be part of the one-week deadline materials.

Next question.  In terms of the recovery, the estimate's approximately 40 cents a share.  And I know it's hard to know until we actually get the submissions what it will actually turn out to be.  But what's the basis even for that guesstimate?

MR. BLOCK:  The 40 cents a share is assuming every eligible shareholder submits a claim, and that assumes that we would recover the maximum amount that we have alleged of $215 million.  So if we were to recover $215 million and every single class member submitted a claim, that would work out to the 40 cents a share.

THE COURT:  I see.  But the actual -- what's the actual rule?  It's not the full -- when you say the 215 million --

MR. BLOCK:  So --

THE COURT:  Is that -- is that your theoretical

maximum?  What's the actual ...

**MR. BLOCK:**  That's our theoretical maximum.

So if we go to trial and we win on everything and we get every corrective disclosure that we allege, the maximum damages would be the 215 million.

**THE COURT:**  But that's -- the actual settlement pool is $14 million, right?

**MR. BLOCK:**  Correct; it's 14 and a quarter.

**THE COURT:**  And so wouldn't the average actual recovery be based on that as opposed to the hypothetical $215 million maximum?

**MR. BLOCK:**  Sorry, Your Honor.  Yes, it's if every single claim -- claimant submitted -- I apologize -- submitted, they would get 40 cents a share.

**THE COURT:**  Okay.  And so it's essentially the number of shares ...

**MR. BLOCK:**  Divided by the --

(Simultaneous crosstalk.)

**THE COURT:**  Right.  Okay.  Got it.

Okay.  Then a couple sort of basic things.

In terms of the notice and administration expenses, I think the way it was framed in the settlement agreement is you can get up to $500,000 without court approval.  That's not -- it's not quite that.  I would be giving you approval.  I think what's being requested is to spend up to that, and if those

expenses ended up being lower, then that's just money that would redound to the benefit of the class?

**MR. BLOCK:**  Correct.

**THE COURT:**  All right.  I see.

So you're saying if you're going to exceed that, you would come back for approval, further approval?

**MR. BLOCK:**  Yes.

**THE COURT:**  Okay.  And then with respect to the cy pres piece of it, the Blum Legal Center for Litigation Investor Protection is the identified recipient.  I think I've seen them before.  Obviously under *Dennis* in the Ninth Circuit I have to find that there's a nexus.  Is there anything in the record where anyone who's just put in two sentences about what they actually do so that I can make that finding that I need to make?

**MR. BLOCK:**  We can.

Your Honor, we had a case that you approved a couple years ago against Lyft, and that's who we chose.  And we chose them again, but we, as part of the supplemental, will put in a couple of sentences about who they are.

**THE COURT:**  All right.  Let's do that.

**MR. BLOCK:**  Okay.

**THE COURT:**  And then I think the cy pres period was framed essentially as a reasonable period of time.  You know, I -- and this might be part of what gets ... well, what is the

plan for, you know, we talked about notice before now, the plan for initial effort to get people paid. Is the thought that it's going to be checks that will get sent out, or is it electronic? What is the thought?

MR. BLOCK: I think the preference now for the claims administrator, and I think Kroll is in this group, is to electronically pay people rather than checks. It's more secure. It's faster. Hopefully that's how we do it, but, you know, there are a lot of people who want their checks.

THE COURT: Right.

MR. BLOCK: And then it just becomes if somebody doesn't cash the check or there's, you know, a small amount of money left over, we'll, as we said, we'll make the first distribution. If it's economically feasible, we'll make a second distribution. When it gets to a point where it becomes de minimis so that it would cost more to try to send it out, that's when we would go to the cy pres.

THE COURT: Right. And along the lines of what I was talking about before, is that process laid out somewhere in the materials?

MR. BLOCK: It is. That is, Your Honor. It's in the stipulation, I believe. If not, I'll add that to the supplemental filing.

THE COURT: Why don't you do that. I mean, obviously it may be in the settlement agreement in some form, but just,

yeah, it's the same sort of thing.  Here's the plan.  We're going to do this.  We're going to identify a basis for sending electronic payment.  Just the nuts and bolts so that I have that.

**MR. BLOCK:**  I think it's in the settlement agreement.  If it is we'll point you to that.  And if it's not, we'll supplement the record and provide that.

**THE COURT:**  Okay.  Fair enough.  So those are the questions I had.  So we'll -- I'll be on the lookout for those additional items, and then we'll either issue an order, or we'll let you know that I need more or set a follow-up hearing.

**MR. BLOCK:**  Okay.  Thank you, Your Honor.

**MS. HEMMENDINGER:**  Thank you.

**THE COURT:**  Thanks.

(Proceedings concluded at 2:54 p.m.)

**---oOo---**

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Thursday, May 8, 2025

_____

Stephen W. Franklin, RMR, CRR, CPE
Official Reporter, U.S. District Court