Jeffrey C. Block, *pro hac vice*
Michael D. Gaines, *pro hac vice*
**Block & Leviton LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jeff@blockleviton.com
michael@blockleviton.com

Jacob A. Walker (SBN 271217)
**Block & Leviton LLP**
400 Concar Drive
San Mateo, CA 94402
(650) 781-0025 phone
jake@blockleviton.com

*Attorneys for Lead Plaintiff
Jeffrey M. Fiore and the Class*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| MICHAEL PARDI, *Individually and on Behalf of All Others Similarly Situated,*<br><br>Plaintiff,<br><br>v.<br><br>TRICIDA, INC. and GERRITT KLAERNER,<br><br>Defendants. | Case No.: 4:21-cv-00076-HSG<br><br>**Declaration of Jacob A. Walker In Support Of: (1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement; (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses; and (3) Lead Plaintiff's Motion for an Award of Reasonable Costs and Award to Class Representative in Accordance with 15 U.S.C. §78u-4(a)(4)**<br><br>Date:          October 16, 2025<br>Time:          2:00 p.m.<br>Courtroom:   Courtroom 2, 4th Floor<br><br>Hon. Haywood S. Gilliam, Jr. |

I, JACOB A. WALKER, declare as follows:

1.      I am an attorney admitted to practice before this Court. I am a partner in Block & Leviton LLP, counsel for Lead Plaintiff Jeffrey M. Fiore ("Lead Plaintiff") and Lead Counsel for the certified Class in the above-captioned action. I make this declaration in support of Lead Plaintiff's and Lead Counsel's motions for: (1) Final Approval of Class Action Settlement and Plan of Allocation (the "Final Approval Motion"), which provides for a cash payment of $14,250,000 (the "Settlement"); and (2) an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee Motion"), and reimbursement to Jeffrey M. Fiore in accordance with 15 U.S.C. §78u-4(a)(4). I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

## I.      PRELIMINARY STATEMENT

2.      Lead Plaintiff has reached a substantial Settlement of this Action after about four years of hard-fought litigation, extensive motion practice, and vigorous arm's-length settlement negotiations that took place over the course of several months and were mediated by an experienced private mediator (Michelle Yoshida of Phillips ADR). This Court preliminarily approved the Settlement and the proposed method of providing notice to the Class (the "Preliminary Approval Order") on May 16, 2025. Dkt. 220.

3.      The Settlement was achieved only after vigorous litigation. Lead Counsel, among other things: (i) conducted a comprehensive investigation into the alleged misstatements and omissions; (ii) drafted a detailed Consolidated Amended Class Action Complaint (the "FAC"); (iii) briefed an opposition to Defendant and Tricida's motion to dismiss the FAC; (iv) navigated Tricida's bankruptcy filing including successfully defeating Tricida's attempts to extinguish the Class's claims via the bankruptcy process and negotiating to insure that Tricida preserved all relevant documents for production in this case; (v) drafted a Second Amended Class Action Complaint ("SAC") and briefed a motion to file the SAC; (vi) briefed an opposition to Defendant's motion to dismiss the SAC; (vii) researched and briefed Lead Plaintiff's motion in support of class certification; (viii) worked with expert to establish that Tricida's stock traded in an efficient market to support class certification and to respond to Defendant's arguments regarding price impact; (ix)

engaged in comprehensive discovery, including the review and analysis of over 64,000 pages of documents produced by Defendant and various third-parties; (x) and briefed two discovery letter disputes; (xi) worked closely with experts to analyze damages issues; (xii) engaged in thorough mediation efforts, which included the exchange of comprehensive mediation statements and two full-day mediations sessions; and (xiii) engaged in extensive negotiations regarding the terms of the Settlement. At the time the Parties agreed to the Settlement, Lead Counsel had a thorough understanding of the strengths and weaknesses of their relative positions.

4.      As discussed more fully below, there were substantial obstacles remaining in this case. These challenges included, in particular, loss causation and damages issues that could have considerably reduced, or eliminated, the Class's recovery at summary judgment or trial. In deciding to settle, Lead Plaintiff and Lead Counsel took into consideration the significant risks associated with establishing liability, as well as the duration and complexity of the remaining proceedings. Defendant raised serious arguments over the course of this litigation concerning, among other things, the size and scope of damages, whether Defendant made material misstatements, and the adequacy of Tricida's disclosures. In the absence of a settlement, there was a substantial risk that the Class could have recovered an amount significantly less than the Settlement Amount or received no recovery at all.

5.      Lead Plaintiff also seeks approval of the proposed Plan of Allocation, which Lead Counsel submits is fair and reasonable. Lead Counsel drafted the Plan of Allocation with the assistance of Lead Plaintiff's damages and loss causation expert. As further described below and in the Notice, the Plan of Allocation provides formulas for calculating the recognized claim of each Class Member, based on such information as when the person purchased and sold their Tricida common stock on the open market. Each Authorized Claimant, including Lead Plaintiff, will receive a *pro rata* distribution pursuant to the Plan of Allocation, and Lead Plaintiff will be subject to the same formula for distribution of the Net Settlement Fund. Importantly, the Plan of Allocation does not treat Lead Plaintiff or any other Class Member preferentially.

6.      Lead Counsel prosecuted this Litigation on a wholly contingent basis, advancing and incurring substantial litigation expenses and charges over the years. Lead Counsel shouldered

substantial risk in doing so, and, to this date, has not received any compensation for its efforts. Accordingly, in consideration of its extensive efforts on behalf of the Class, Lead Counsel is applying for an award of attorneys' fees in the amount of 27.5% of the Settlement Amount, plus interest.

7. The requested fee is within the range of fees awarded in similar Private Securities Litigation Reform Act of 1995 ("PSLRA") securities class action settlements, and is fully justified in light of the substantial benefits conferred on the Class, the significant risks overcome in achieving the Settlement, the quality of representation, and the nature and extent of the legal services Lead Counsel performed in this complex litigation. To date, no Class Members have objected, which suggests Class-wide approval of both the Settlement and the requested fees. Lead Counsel submits that the fee application is fair to the Class under all applicable standards and warrants the Court's approval. As discussed in the fee memorandum, the requested 27.5% of the Settlement Fund for Lead Counsel is in line with, if not below, such awards in this District in similar complex securities class actions. In addition, the requested fee results in a multiplier of 1.41 on Lead Counsel and Lowenstein Sandler LLP's ("Bankruptcy Counsel") lodestar, which is well within the range of multiples routinely awarded by courts in the Ninth Circuit.

8. Lead Counsel also seeks an award in the amount of $337,645.15, plus interest, for expenses and charges reasonably and necessarily committed to the prosecution of the litigation over the last four years. These expenses include: (a) fees and expenses of investigators whose services were required for a fulsome investigation and analysis of the case; (b) fees of Lead Plaintiff's market efficiency and loss causation expert; (c) online factual and legal research; (d) administrative expenses; (e) document management expenses; (f) transcript charges; (g) travel charges; (h) specialized Bankruptcy Counsel; and (i) mediation expenses.

9. In addition, Class Representative Jeffrey M. Fiore seeks reimbursement of his expenses in the amount of $1,700, or in the alternative $680, pursuant to 15 U.S.C. §78u-4(a)(4), directly relating to his representation of the Class. Jeffrey M. Fiore actively monitored the litigation and supervised Lead Counsel. He also dedicated time and resources to discovery, which included

gathering documents and information responsive to Defendant's discovery requests, and sitting for a deposition. After detailed discussions with Lead Counsel, he approved the Settlement.

10. For the reasons set forth below and in the Final Approval Motion, Lead Counsel believes that the Court should grant final approval of the Settlement and Plan of Allocation. The following summarizes the principal events during the litigation and the legal services Lead Counsel provided to Lead Plaintiff and the Class.

## II.    SUMMARY OF LEAD PLAINTIFF'S CLAIMS

11. Lead Plaintiff's claims center on Defendant's alleged misleading statements about the accelerated Food and Drug Administration ("FDA") approval process for veverimer, former defendant Tricida, Inc.'s ("Tricida") lead investigational drug candidate. Tricida was seeking approval for veverimer to treat chronic kidney disease.

12. Lead Plaintiff alleges that Defendant misled investors on Tricida's May 7, 2020 earnings by: (1) disclosing only one outstanding review issue discussed at May 1, 2020 late-cycle meeting with the FDA regarding Tricida's new drug application ("NDA") for veverimer—the magnitude and durability of the treatment effect—while concealing the FDA's other "significant" concerns about the applicability of the clinical data from the clinical trials to the U.S. population; and (2) stating that the FDA was not planning on holding an Advisory Committee ("AdCom") meeting due in part to the logistical challenges posed by COVID-19.

13. The truth was revealed in a series of disclosures starting on July 15, 2020, when Tricida announced that the FDA identified deficiencies that precluded discussion of labeling and postmarketing requirements/commitments at that time. Tricida's stock price fell $10.56 per share in response to this news. Tricida reported that the notification did not specify the deficiencies identified by the FDA, but Lead Plaintiff alleged that Defendant knew those deficiencies were the same "significant issues" discussed during prior meetings with the FDA.

14. On August 24, 2020, Tricida announced that the FDA issued a Complete Response Letter denying its NDA for veverimer. Tricida's stock price fell by $3.13 per share, or 24% on this news, and would continue to decrease throughout the remainder of 2020.

15.    On October 29, 2020, before markets opened, Tricida announced that the FDA said it would not approve veverimer without evidence of the drug's effect, evidence that Tricida could not provide without compromising the integrity of an ongoing trial post-marketing trial, thus requiring additional trials. In response to this news, Tricida's stock price fell 47% from its closing price of $8.27 per share on October 28, 2020, to close at $4.37 per share on October 29, 2020.

16.    On December 8, 2020, Tricida issued a press release announcing that it failed to come to a resolution with the FDA on the resubmission of the NDA during their Type A meeting, and submitted a Formal Dispute Resolution Request regarding the NDA. ¶32. On this news, Tricida's stock price fell 17.73%, from a close of $8.12 per share on December 8, 2020, to close at $6.68 per share on December 9, 2020.

17.    Finally, on February 25, 2021, Tricida issued a press release announcing the Company had received an Appeal Denied Letter from the FDA which specified the reasons why the FDA rejected Tricida's NDA for veverimer. On this news, Tricida's stock price fell 30.57%, from a closing price of $7.36 per share on February 25, 2021, to $5.11 per share at market close on February 26, 2021. ¶¶185-86.

### III.    PROCEDURAL HISTORY

18.    The initial complaint in this case was filed on January 6, 2021, alleging that Defendant Klaerner and former defendants Tricida, Inc. and Geoffrey M. Parker violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Dkt No. 1.

19.    On April 2, 2021, the Court appointed Jeffrey M. Fiore as lead plaintiff and Block & Leviton LLP as lead counsel. Dkt. 65.

20.    On June 1, 2021, Lead Plaintiff filed his FAC, alleging that Defendant and Tricida violated the Exchange Act by making material misrepresentations or omitting to disclose material facts concerning: 1) the location of foreign trial sites as being in "Europe"; 2) the FDA's acceptance of clinical data from foreign trial sites; 3) the "multicenter" nature of the TRCA-301/TRCA 301E trial; 4) veverimer's prospects for FDA approval; 5) the anticipated sample size for the VALOR-CKD

trial; and 6) the state of FDA review and the FDA's reasons for declining to convene an AdCom meeting. Dkt. 72.

21.    On July 16, 2021, Defendant and Tricida filed a motion to dismiss the FAC, Dkt. 76, which Lead Plaintiff opposed on August 16, 2021. Dkt. 79. Defendant Klaerner and Tricida filed their reply on September 15, 2021. Dkt. 80.

22.    On July 29, 2022, the Court granted in part and denied in part Defendant and Tricida's motion to dismiss, partially upholding Lead Plaintiff's allegations with respect to Defendants' May 7, 2020 statement about outstanding review issues discussed at a late-cycle meeting with the FDA on May 1, 2020. Dkt. 107 at 31. The Court otherwise granted the motion and dismissed the remaining statements with leave to amend.

23.    Defendant and Tricida filed their Answer and Affirmative Defenses to the Amended Complaint on October 7, 2022. Dkt. 107.

***The Second Amended Complaint***

24.    On November 23, 2022, Lead Plaintiff filed a motion for leave to file a Second Amended Complaint ("SAC"). Dkt. 109. The Parties thereafter stipulated to the filing of the Second Amended Complaint, and Lead Plaintiff filed the SAC on December 15, 2022. Dkt. 115.

25.    On January 11, 2023, Tricida filed a voluntary petition for reorganization under Chapter 11 of the bankruptcy code in the United States Bankruptcy Court for the District of Delaware, and Lead Plaintiff subsequently moved to voluntarily dismiss Tricida from this case without prejudice. Dkt. 125. The motion was granted on March 23, 2023. Dkt. 132.

26.    Defendant filed a motion to dismiss the Second Amended Complaint on February 6, 2023, Dkt. 128, which the Court granted in part and denied in part on March 11, 2024. Dkt. 145. The Court addressed only the statements it previously found inadequately pled, *id.* at 8, and denied the motion to dismiss with respect to a statement made by Defendant on the May 7, 2020 earnings call that an AdCom meeting would not be scheduled due in part to logistical challenges posed by COVID-19. *Id.* at 18, 24. The Court dismissed the remaining alleged misstatements without leave to amend. *Id.* at 25.

27.     Defendant Klaerner filed his Answer and Affirmative Defenses to the Second Amended Complaint on May 9, 2024. Dkt. 155.

28.     On June 6, 2024, Lead Plaintiff filed a Motion to Clarify the SAC Order. Dkt. 158. The Court ruled on this Motion on July 1, 2024, holding that the "we remain confident" statement, which was the subject of the clarification motion, was dismissed by the SAC Order, leaving in the case two challenged statements from Tricida's May 7, 2020 earnings call: Defendant's statements (1) discussing outstanding review issues addressed at the May 1, 2020 late-cycle meeting and (2) that an AdCom meeting would not be scheduled due in part to the logistical challenges posed by COVID-19. Dkt. 161 at 2-3.

### The Bankruptcy Proceedings

29.     On January 11, 2023, Tricida filed a voluntary chapter 11 petition in the United States Bankruptcy Court for the District of Delaware. *In re: Tricida, Inc.*, No 1:23-bk-10024-JTD (Bankr. D. Del.).

30.     On February 3, 2023, Tricida filed a Notice of Filing of Proposed Sale Order that did not expressly require Tricida or its future purchaser to retain copies of books and records that would be relevant to this litigation. *In re: Tricida*, Dkt. 125.

31.     In response to the bankruptcy proceedings, Lead Plaintiff promptly retained Lowenstein Sandler LLP as Bankruptcy Counsel to protect the Class's rights and preserve relevant evidence. Dkt. 124.

32.     On February 17, 2023, Lead Plaintiff filed a Limited Objection and Reservation of Rights, with the assistance of Bankruptcy Counsel, requesting that any final sale approval orders should require the purchasers to preserve books, records, and other evidence potentially relevant to this litigation for the duration of the case. *In re: Tricida*, Dkt. 209 at 4.

33.     On the same date, Lead Plaintiff also filed an objection to the approval of the proposed disclosure statement and Tricida's proposed solicitation procedures. *In re: Tricida*, Dkt. 210. In his objection, Lead Plaintiff explained how the disclosure statement's third party release would improperly bind the Class and negatively impact the claims in this case. *Id.* at 2. As a result, Lead

Plaintiff requested that the plan and solicitation procedures be modified to acknowledge his authority to opt-out of the third party release on behalf of the Class. *Id.* at 20.

34.    Lead Plaintiff's bankruptcy counsel then attended Tricida's sale hearing on February 21, 2023 and further argued his objections on behalf of the Class. *In re: Tricida*, Dkt. 225. On February 22, 2023, the bankruptcy court held that Tricida and any purchaser or transferee of Tricida's books, records, documents, files, electronic data, or any other object potentially relevant to this litigation, shall preserve and maintain the books and records and cannot render them unavailable without providing Lead Plaintiff at least sixty days' notice and an opportunity to object. *In re: Tricida*, Dkt. 230 at 31. As a result of Lead Plaintiff's efforts, Tricida's relevant evidence was preserved and available in discovery.

35.    On March 2, 2023, Lead Plaintiff filed a supplemental objection informing the bankruptcy court that since the hearing, Tricida made no efforts to resolve Lead Plaintiff's issues with the solicitation procedures and reserving all prior objections to the disclosure statement and proposed plan. *In re: Tricida*, Dkt. 264. Lead Plaintiff filed claims on behalf of himself and the Class in the bankruptcy proceeding on March 8, 2023. *See In re: Tricida*, Dkt. 590.

36.    On April 10, 2023, Lead Plaintiff filed another statement with respect to the Official Committee of Unsecured Creditors' objection to Tricida's motion to allow the advancement and payment of defense costs of insureds pursuant to the D&O policies. *In re: Tricida*, Dkt. 353. Lead Plaintiff explained that it would be inappropriate to conclude that the proceeds of D&O policies are not property of the estate and requested that the Court enter a modified order "(i) limiting Directors and Officers access to coverage under the D&O Policies for payment of defense costs, but not for payment of any settlement or judgment in the Securities Litigation, to an aggregate of two million dollars ($2,000,000); (ii) requiring the Directors and Officers to submit quarterly reports to parties entitled to such notice, including Lead Plaintiff, summarizing the funds disbursed under the D&O Policies and the remaining coverage available under such policies; (iii) granting the Motion without prejudice to the rights of the Insureds to move for payment of additional defense costs under the Policies in excess of such cap[.]" *Id.* at 5.

37.     In response, the Court ordered that subject to the terms of the D&O policies, "all rights of any party in interest are reserved with respect to the proceeds of the D&O Policies that remain after the payments authorized pursuant to this order." *In re: Tricida*, Dkt. 353 at 2. The Court also ordered that Tricida and Insured Executives shall submit quarterly reports to Lead Plaintiff summarizing the funds disbursed and sought to be disbursed for Defense Expenses under the D&O Policies and the remaining coverage limits under such policies. *Id.* at 2-3.

38.     On May 5, 2023, Lead Plaintiff submitted a limited objection to confirmation of the chapter 11 plan to further protect the interests of the Class and ensure their claims were preserved against Tricida to the extent of available insurance. *In re: Tricida*, Dkt. 433. Lead Plaintiff requested that the confirmation order should provide that the Class's claims in this case "shall not be cancelled, released, or extinguished under the Plan and shall survive confirmation of the Plan and the occurrence of the Effective Date, provided that any recovery on account of such Claims shall be limited to proceeds of available insurance, if any." *Id.* at 3. Lead Plaintiff's Bankruptcy Counsel appeared in the confirmation hearing to explain why the Class's claims should not be extinguished. *In re: Tricida*, Dkt. 500.

### *Class Certification*

39.     On April 30, 2024, Lead Plaintiff filed a Motion to Certify a Class, Appoint Class Representative, and Appoint Class Counsel. Dkt. 152. Defendant filed an opposition to Lead Plaintiff's motion on July 1, 2024. Dkt. 162. Lead Plaintiff filed a reply on August 15, 2024, Dkt. 175, and Defendant filed a sur-reply on August 27, 2024. Dkt. 181.

40.     On September 27, 2024, the Court granted the Motion, appointed Lead Plaintiff and Lead Counsel as class representative and class counsel, respectively, and certified a class consisting of:

> All persons or entities who purchased or otherwise acquired common stock of Tricida, Inc. during the period from May 8, 2020 to February 25, 2021, inclusive (the "Class Period"). Excluded from the Class are defendant and Tricida, Inc. and their families, the officers, directors, and affiliates of Defendant and Tricida, Inc., at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendant or Tricida, Inc. have or had a controlling interest.

Dkt. 188 at 21-22.

***Discovery***

41.     On July 29, 2022, when the Court issued an order denying in part Defendant and Tricida's motion to dismiss, the automatic discovery stay imposed by 15 U.S.C. § 78u-4(b)(3)(B) lifted.

42.     On September 7, 2022, counsel for the Parties conducted a Rule 26(f) conference telephonically, and the Parties filed their Joint Rule 26(f) Report and [Proposed] Case Management Order with the Court on September 13, 2022. Dkt. 98. The Parties filed additional Joint Case Management Statements on March 19, 2024 and October 15, 2024. Dkt. 148, 190.

43.     On October 7, 2022, the Parties exchanged Initial Disclosures pursuant to Fed. R. Civ. P. 26(a). Dkt. 98 at 4.

44.     Lead Plaintiff served his First Set of Requests for Production of Documents on Defendant and Tricida on September 21, 2022. Defendant and Tricida served their responses and objections on October 24, 2022.

45.     Lead Plaintiff served Defendant Klaerner with a Second Set of Requests for Production of Documents on April 9, 2024, and Defendant served Responses and Objections on May 9, 2024.

46.     On April 15, 2024, Defendant served his First Set of Requests for Production of Documents on Lead Plaintiff. On May, 15, 2024, Lead Plaintiff served his responses and objections and produced documents to Defendant on the same date.

47.     On June 24, 2024, counsel for Defendant took the deposition of Lead Plaintiff.

48.     Defendant's first production of documents to Lead Plaintiff was made on October 18, 2024 and his second production on November 1, 2024.

49.     In all, Defendant produced 52,434 documents in response to Lead Plaintiff's Requests for Production.

***Third-Party Discovery***

50.     Lead Plaintiff served subpoenas for the production of documents on the following third-parties:

| Third-Party | Subpoena Notice Date |
|---|---|
| U.S. Food and Drug Administration | September 12, 2022 |
| Amgen, Inc. | April 22, 2024 |
| Vifor Pharma, Inc. | April 22, 2024 |
| Wilhelm Stahl | May 10, 2024 |
| Sarah McNulty | May 10, 2024 |
| Yuri Stasiv | May 10, 2024 |
| Robert McKague | May 10, 2024 |
| Geoffrey M. Parker | May 10, 2024 |
| Claire Lockey | May 10, 2024 |
| Tricida, Inc. | May 29, 2024 |

51.    Lead Plaintiff served a subpoena for production of documents on the FDA on September 12, 2022, with a production date of October 14, 2022. The FDA sent its first production of records on September 28, 2022, the second production on October 7, 2022, and the third production on October 18, 2022. Lead Plaintiff's new allegations in the SAC were largely based on these documents produced by the FDA. In total, the FDA produced 11,718 pages of documents.

52.    Lead Plaintiff conducted meet and confers for the six former employee (Wilhelm Stahl, Sarah McNulty, Yuri Stasiv, Robert McKague, Geoffrey Parker, and Claire Lockey) subpoenas and received one production of documents on June 3, 2024.

53.    Lead Plaintiff provided Defendant with notice of his third-party subpoenas to Amgen, Inc. and Vifor Pharma, Inc. on April 26, 2024, and, after months of meet and confer negotiations with counsel for both companies, received document productions in June and October 2024.

54.    Lead Plaintiff provided Defendant with notice of his third-party subpoena to Tricida on May 29, 2024, and the date of production listed for Tricida was July 15, 2024.

*Discovery Disputes and Negotiations*

55.    The Parties met and conferred regarding Lead Plaintiff's second set of document requests on May 17, 2024 and May 29, 2024, and exchanged letters on June 7, 2024, June 13, 2024 and June 26, 2024. The parties further met and conferred regarding Lead Plaintiff's document requests to both Klaerner and Tricida on June 12, July 2, September 12, September 16, October 11, and October 21, 2024. On July 17, 2024, the Parties filed a joint discovery letter brief regarding Lead Plaintiff's document requests to Klaerner. *See* Dkt. 166.

56.     In the Parties' joint letter, Lead Plaintiff argued that Klaerner was seeking to unfairly limit discovery to "documents related to the reasons the FDA gave for holding or not holding an AdCom, beginning in January 2020." *Id.* at 2. Lead Plaintiff argued that his requests should not be narrowed to that extent, and that communications and documents between Tricida and the FDA beginning in January 2020 concerning the FDA's review of veverimer's NDA were reasonable requests. *Id.* Lead Plaintiff also argued that the Class was entitled to discovery into whether the FDA was "concern[ed] that there were too many problems with the NDA to even warrant convening an" an AdCom and the "significant issues" the FDA identified with the NDA. *Id.* Because the "magnitude and durability of the treatment effect" was one of the "significant issues" flagged by the FDA, Lead Plaintiff likewise requested reasonable discovery of relevant documents. *Id.* Lead Plaintiff also maintained the relevance of discovery regarding Defendant Klaerner's stock sales. *Id.* at 3.

57.     Lead Plaintiff met and conferred with Tricida's Liquidating Trustee shortly after service of the document subpoena and agreed on a production schedule. But on August 22, 2024, days before Tricida's document production was to begin, Defendant Klaerner objected to the forthcoming production. After numerous meet and confer negotiations (documented above), the Settling Parties filed a second joint letter brief, on September 23, 2024, addressing Defendant's request for a protective order to prevent Tricida's Liquidating Trustee from producing documents. *See* Dkt. 185.

58.     In the second joint letter brief, Lead Plaintiff argued that Defendant's requested privilege review was untimely and improper. *Id.* at 3. Lead Plaintiff also reiterated that his discovery requests to both Klaerner and Tricida were plainly relevant to the facts of the case – veverimer's FDA approval process and Klaerner's scienter. *Id.* At that time, Defendant still had not produced a single document. *Id.* at 5. Lead Plaintiff provided strong arguments for the Court to deny Defendant's requested protective order and instead facilitate the start of document productions. *Id.* at 3-5.

59.     Magistrate Judge Cisneros ruled on both letter disputes on October 10, 2024. Dkt. 189. Judge Cisneros largely rejected Defendant's view on the scope of the Class's claims and granted Lead Plaintiff's motion to compel various key requests to Klaerner, including requests about the FDA proceedings and Klaerner's stock sales. *Id.* at 4. In particular, Judge Cisneros found "Klaerner's proposed productions overly constrained" in restricting production to documents that

relate to the May 1, 2020 late-cycle meeting or disclosures related to the late cycle meeting. *Id.* at 7. Instead, Klaerner was ordered "to produce all documents responsive to [Requests 11-12, 15-17, 21, 27] that relate to FDA proceedings regarding Tricida's application for approval of veverimer from January 2020 through May 7, 2020, in addition to any scope of production to which Klaerner has already agreed." *Id.* at 5-7. Judge Cisneros also credited Lead Plaintiff's argument that Klaerner's stock sales were relevant, stating that, "[t]his Court does not read Judge Gilliam's order on an early motion to dismiss as foreclosing the possibility that Klaerner's stock sales might be relevant to scienter in conjunction with other evidence." *Id.* at 9.

60.     In addition, Judge Cisneros rejected Defendant's efforts to prevent Plaintiff from obtaining relevant discovery from Tricida, holding in part that Klaerner's "vague assertion of unspecified 'severe prejudice' is not a persuasive reason to limit discovery." *Id.* at 16-17.

61.     As shown in Judge Cisneros's Order, Lead Plaintiff successfully challenged Defendant's efforts to restrict discovery on numerous fronts. These efforts over the course of months of meet and confers and letter exchanges resulted in a much larger scope of discovery for the Class.

62.     Lead Plaintiff continued pushing discovery forward in this case. The Parties held a meet and confer to discuss Judge Cisneros's Order on October 11, 2024. The Order provided the Parties with an October 17, 2024 deadline to file a stipulation or joint letter addressing a process for screening privileged documents.

63.     On October 15, 2024, Defendant sent proposed search terms and a proposed clawback stipulation.  On October 17, 2024, Lead Plaintiff sent Defendant a draft stipulation regarding the privilege screening process for Tricida's production. Defendant returned comments and revisions on the same day, but Lead Plaintiff was unable to agree to certain revisions that would unfairly restrict the Class's rights to relevant discovery.

64.     On October 17, 2024, the Parties filed a Joint Motion requesting an extension of their deadline to provide a process for screening privileged documents to October 24, 2024.

65.     On October 18, 2024, Defendant made his first production of over 20,000 documents to Lead Plaintiff.

66.    The Parties also individually met and conferred with Tricida's Liquidating Trustee on October 22, 2024, and then met as a group on October 23, 2024. Also on October 23, 2024, Lead Plaintiff sent Defendant an updated draft stipulation regarding the privilege screening process for Tricida's production. Defendant returned with redline edits on the same day. The Parties filed the Stipulation on October 24, 2024. Dkt. 198.

67.    On November 1, 2024, Defendant made a second production of documents to Lead Plaintiff. These productions would have been substantially limited without the efforts of Lead Plaintiff and Lead Counsel to broaden the scope of discovery.

68.    As of November 4, 2024, the Parties remained at odds on a number of discovery issues and were still negotiating additional search terms and the scope and timing of depositions.

## IV.    THE SETTLEMENT

### *Settlement Negotiations*

69.    Lead Plaintiff retained Chad Coffman of Peregrine Economics in August 2022 to perform a damages analysis. Mr. Coffman performed substantive analyses in August 2022, March 2024, April 2024, and October 2024. In October 2024, he calculated a maximum of $215 million in total possible statutory damages.

70.    On September 20, 2022, the Court held a Case Management Conference. The Court discussed private mediation with the parties. In a minute entry following the Case Management Conference, the Court directed the parties to meet and confer and file a stipulation and proposed order "selecting an ADR process and deadline" by September 27, 2022. Dkt. 101.

71.    On September 27, 2022, in compliance with the Court's instructions, the parties filed their Stipulation and [Proposed] Order Selecting ADR Process. The parties selected "Private ADR," specifying that they would undergo private mediation and select their provider by January 15, 2023. The parties agreed to hold their mediation session by April 15, 2023. Dkt. 103.

72.    On December 9, 2022, the Court vacated all case deadlines in light of the filing of the SAC and motion to dismiss briefing schedule. Dkt. 112.

73.     On March 19, 2024, the Parties filed their Joint Case Management Statement and informed the Court they scheduled a private mediation to take place on April 9, 2024, with Michelle Yoshida of Phillips ADR to serve as mediator. Dkt. 148.

74.     On March 22 and 29, 2024, the parties exchanged mediation statements outlining the strengths and challenges of their respective litigating positions and accompanied by evidentiary exhibits.

75.     On April 9, 2024, the parties participated in a mediation with Ms. Yoshida. The parties were not able to reach an agreement to settle the case at that time.

76.     The parties again engaged Ms. Yoshida in October 2024 and attended a formal mediation session with Ms. Yoshida on November 4, 2024. At the mediation, and at the recommendation of the mediator, the parties reached an agreement in principle to settle the litigation for $14.25 million, subject to the negotiation of the terms of a Stipulation and Agreement of Settlement, and approval by this Court.

***The Stipulation and Preliminary Approval***

77.     On November 13, 2024, the parties filed a joint notice of pending settlement with the Court indicating that the parties had reached an agreement in principle to settle this action. *See* Dkt. 201.

78.     On March 3, 2025, Lead Plaintiff filed his Notice of Motion, Unopposed Motion for Preliminary Approval of Settlement, and Memorandum of Points and Authorities in Support Thereof ("Preliminary Approval Motion"). Dkt. 211.

79.     On May 1, 2025, the Court held a hearing on the Preliminary Approval Motion.

80.     Following the hearing, also on May 1, 2025, the Court entered a minute entry stating:

> Unopposed motion for preliminary approval of settlement (docket no. [211]) is argued by the parties. Counsel are directed to e-file the following within one week from today (May 8, 2025): 1) a supplemental brief addressing what authority permits the settlement to include a release of a non-party (5-pages maximum); 2) revised notice if it does not already include all relevant release language; 3) supplemental declaration outlining how notice will be sent to Class Members and how claims will be processed; and 4) e-mail the opt-out threshold agreement to the Judges proposed order inbox for in camera review. The motion will be deemed submitted on the papers once the parties submit the above information. Written order to issue.

DECLARATION OF JACOB A. WALKER                                                    15
CASE NO. 4:21-cv-00076-HSG

81.     On May 8, 2025, the Parties filed their Joint Supplemental Submission in Support of Plaintiff's Motion for Preliminary Approval of Settlement. Dkt. 218. In their submission, the Parties explained that the Ninth Circuit authorizes class action settlement agreements to release claims against parties not named as defendants, particularly where, as here, the claims released against the non-party arise from the same facts as those against the party to the action. *Id.* Lead Plaintiff also submitted the Declaration of Jeffrey C. Block in Response to the Court's May 1, 2025 Order and in Further Support of Lead Plaintiff's Unopposed Motion for Preliminary Approval of Settlement (Dkt. 219), which attached the Declaration of Robert Cormio of Kroll Settlement Administration LLC in Connection with Preliminary Approval (Dkt. 219-1), and the revised Notice (Dkt. 219-2). A version of the Notice with the changes in redline is available at Dkt. 291-3.

82.     On May 16, 2025, the Court granted Lead Plaintiff's Preliminary Approval Motion. Dkt. 220.

***Compliance With the Preliminary Approval Order and Settlement Administration***

83.     Lead Plaintiff and Lead Counsel selected Kroll Settlement Administration LLC ("Kroll") for Court approval to serve as Claims Administrator. Kroll provided notice of the pendency of the class action to members of the Class and has familiarity with the action having already properly provided notice to the Class. Kroll was selected among numerous administrators to serve as Notice Administrator to the Class after providing a competitive quote for notice and administrative services.

84.     **The Declaration of Robert Cormio of Kroll Settlement Administration LLC Concerning (A) Mailing and Emailing of the Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections ("Cormio Declaration") is attached hereto as Exhibit 1**.

85.     Pursuant to the Court's Preliminary Approval Order, Lead Counsel, through the Claims Administrator, implemented a comprehensive notice program whereby, by July 3, 2025, Kroll caused the Notice and Claim Form (together the "Notice Packet") to be mailed to potential Class Members. *See* Cormio Declaration at ¶9.

86.     As of July 23, 2025, Kroll has mailed a total of 5,664 Notice Packets to Class Members and Nominee Account Holders and emailed 581 Summary Notices to Class Members or nominees. Broadridge Financial Services also represented to Kroll that they sent 5,950 email notifications containing links to the Notice to customers that had previously elected to receive notification of potential settlements via email. *See id.* at ¶10.

87.     In accordance with the Court's Preliminary Approval Order, the Notice Packet was also posted to www.TricidaSecuritiesSettlement.com (the "Settlement Website"). *Id.* at ¶13.

88.     On June 20, 2025, the Summary Notice was published online in *PR Newswire*. *Id.* at ¶11.

89.     The Notice describes, among other things, the claims asserted in the Action, the contentions of the Parties, the terms of the Settlement, the Settlement Amount, the maximum amounts that would be sought in attorneys' fees and Litigation Expenses, the Plan of Allocation, and the procedures for objecting to or opting out of the Settlement. The Notice and Claim Form as mailed to Class Members in its final form is attached to the Cormio Declaration as Exhibit A.

90.     The Summary Notice clearly and concisely provided information concerning the Settlement and explained how to obtain a copy of the Notice. The Summary Notice as it appeared in PR Newswire is attached to the Cormio Declaration as Exhibit B.

91.     In addition to the Notice and Claim Form, the Claims Administrator posted other relevant documents to the Settlement Website, provided a summary of the Settlement, important dates and deadlines, answers to frequently asked questions, downloadable copies of other relevant documents, including the Stipulation and Preliminary Approval Order, and provides. *Id.* at ¶13. The Settlement Website also provides Class Members an opportunity to file a Claim Form online, a phone number for Class Members to call with questions, and established a dedicated email address for inquiries about the Settlement. *Id.*

92.     As set forth in the Court's Scheduling Order, the deadline for Class Members to opt-out or object to the Settlement and/or Lead Counsel's application for attorneys' fees and costs is September 11, 2025. Dkt. 222. While these deadlines have not yet passed, to date, no Class Members have objected to the Settlement, and no Class Members have requested exclusion. *Id.* at ¶¶14-15. Should any objections or requests for exclusion be received, Lead Plaintiff will address

them in his reply papers, due October 9, 2025. Lead Plaintiff will also provide the number of undeliverable notices and claim packets and the number of valid claims. Currently, 41 Notices remain deliverable and are being processed to find a current address for mailing. *Id.* at ¶10.

*The Risks of Continued Litigation*

93.    Lead Plaintiff and Lead Counsel believe they and the Class have viable claims against Defendant. However, Lead Plaintiff and Lead Counsel also recognize that continued litigation would be costly, risky, and drawn out. Lead Plaintiff and Lead Counsel carefully considered these risks during the period leading up to and during the settlement negotiations with Defendant.

94.    In agreeing to settle, Lead Plaintiff and Lead Counsel weighed, among other things, the substantial and immediate cash benefit to the Class against: (i) the uncertainties associated with trying a complex securities case; (ii) the difficulties and challenges involved in establishing materiality misleading statements and in countering Defendant's loss causation and damages arguments, including the unpredictable outcome of a "battle of the experts;" (iii) the concern that, even if Lead Plaintiff prevailed at summary judgment or trial, any monetary recovery could have been substantially less than, or not meaningfully more than, the Settlement Amount; (iv) the concern regarding collectability as while Klaerner had Directors and Officers ("D&O") insurance coverage, the policy was limited in its coverage amount and is a wasting asset as it provides for the payment of defense costs and expenses, meaning the longer the case went on, the less insurance coverage would be available for a recovery; and (v) the inevitable delays that would follow even a favorable final judgment, including appeals.

95.    Securities class actions face serious risks of dismissal and non-recovery at all stages, and many of these risks were heightened in this action. Regarding a decision on the merits, Lead Plaintiff must meet its burden of proof for all elements of its claims, while Defendant need only succeed on one defense to defeat the entire action. While Lead Plaintiff believes he had strong arguments in response, it is clear that if the Court or a jury were to have credited such arguments at summary judgment or trial, any class recovery could have been eliminated outright.

96.    Although Lead Plaintiff succeeded, in part, in defeating Defendant's motions to dismiss and in successfully certifying the Class, some of the arguments Defendant raised in these motions

involved disputed issues of material facts and would have arisen again at a later stage in the litigation, such as summary judgment or trial.

97.     Defendant's arguments about price impact in his opposition to class certification highlight such risks. Defendant argued that the relevant "truth" entered the market no later than August 6, 2020, the day that Tricida published its Form 10-Q, which Defendant claimed "provided investors with exactly the information Plaintiff complains was concealed on May 7." Dkt. 162 at 5. The 10-Q revealed that Tricida addressed "two substantive review issues that the FDA had raised in advance" – the concerns related to the magnitude and durability of the treatment effect, and the applicability of the Phase 3 trial data to the U.S. population – and "at this time we do not believe we will receive approval to market veverimer in the United States by our PDUFA goal date of August 22, 2020, if at all." *Id.* at 4-5. Based on his expert's analysis, Defendant argued that the alleged false statements "could not have impacted Tricida's stock price" after August 6, 2020. *Id.* at 10.

98.     In its class certification order, this Court rejected Defendant's argument that price impact could not be proven beyond August 6, 2020. Dkt. 188 at 18, and also held that four out of the five alleged disclosures were not fully corrective. *Id.* at 17-10. Although the Court held that the February 25, 2021 press release was "corrective," "new," and "value-relevant," *id.* at 20, it specifically cautioned that "[a]ny findings of fact in this decision are cabined to the class certification analysis." *Id.* at 13. While the inquiry into price impact at the class certification stage is distinct from proving loss causation or materiality at trial, this Court also recognized that "[i]n key ways, proving a lack of price impact under *Halliburton II* implicates arguments and evidence required to prove merits issues . . ." *Id.* at 10. Defendant's challenges to Lead Plaintiff's alleged corrective disclosures would inevitably resurface at trial to implicate loss causation, and, consequently, recoverable damages.

99.     At trial, Lead Plaintiff's claims would be the subject of complex expert testimony, including testimony offered by Defendant's experts that would conflict with Lead Plaintiff's expert analysis. Such a "battle of the experts" would necessarily involve substantial expenses and risks. Although Lead Counsel remains confident in his position in response to these arguments, they pose

undeniable risks. Any one of these arguments, if successful, could have resulted in the claims at issue being severely curtailed or even eliminated.

100.    In addition, Lead Plaintiff faces the inevitable certainty that there could be substantial delay in its recovery by proceeding with the litigation, or that any recovery could be diminished by the remaining available insurance. Even if the Class prevailed at summary judgment and trial, Defendant would be entitled to appeal and recovery could be years away.

101.    In contrast to these risks, the Settlement now guarantees a prompt and sizeable recovery for the Class without the risks of lesser or no recovery associated with further litigation. Lead Plaintiff and Lead Counsel have assessed and weighed the risks and the potential for significant delay against the benefit of substantial recovery now, and have determined that the Settlement represents an exceptional result for the Class.

***The Proposed Plan of Allocation***

102.    Lead Plaintiff has proposed a Plan of Allocation to govern the method by which Class Members' claims will be calculated, *i.e.*, how the proceeds of the Settlement will be allocated among Class Members who suffered economic losses as a result of the alleged fraud. The Plan of Allocation provides that the Net Settlement Fund will be distributed to Class Members who submit timely, valid Proofs of Claim and whose claims for recovery have been permitted under the terms of the Settlement Agreement ("Authorized Claimants"). The Plan of Allocation provides that Class Members will only be eligible to participate in the distribution of the Net Settlement Fund if they purchased or otherwise acquired Tricida common stock during the Class Period and have a Recognized Loss Amount as described in the Notice.

103.    Lead Counsel developed the Plan of Allocation in conjunction with its loss causation and damages consultant who calculated the estimated alleged artificial inflation in Tricida common stock proximately caused by Defendant's alleged false and misleading statements and material omissions. *See* Cormio Decl. Ex. A at 9-13.

104.    The Plan of Allocation provides for distribution of the Net Settlement Fund to Authorized Claimants who submit timely and valid Claim Forms demonstrating a loss on their Tricida securities transactions during the Class Period. Under the Plan of Allocation, for each Class Period purchase

of Tricida common stock that is properly documented, a "Recognized Loss Amount" will be calculated according to the formulas described in the Notice. In simple terms, the calculation of a Claimant's Recognized Loss Amount is based on a formula that takes into account such information as: (a) when a Claimant's share was purchased and sold; (b) the amount of the alleged artificial inflation per share at the time of purchase and sale; and (c) the purchase price of the share. Because the alleged corrective disclosures reduced the artificial inflation in stages over the course of the Class Period, the Recognized Loss Amounts of Claimants may vary.

105.    In sum, the Plan of Allocation represents a reliable and time-tested method by which to weigh, in a fair and equitable manner, the claims of Authorized Claimants against one another for the purpose of making *pro rata* allocations of the Net Settlement Fund. Because the proposed Plan of Allocation does not unjustly favor any Class Member, segment of the Class, or Lead Plaintiff, Lead Counsel believes that the plan is fair, reasonable, and adequate and should be approved.

## V.    LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES IS FAIR AND REASONABLE

106.    Lead Counsel prosecuted this case on a wholly-contingent basis and advanced all expenses on behalf of the Class without any guarantee of repayment. To compensate Lead Counsel for the substantial risk that they undertook, Lead Counsel is applying to the Court for an award of attorneys' fees of 27.5% ($3,918,750) to be paid from the Settlement Fund. The percentage method is the standard and appropriate method of fee recovery in a common fund case such as this action because it aligns the lawyers' interests with those of the Class in achieving the maximum recovery with as little delay as possible under the circumstances. Use of the percentage method has been endorsed by the Ninth Circuit.

107.    Based on the quality of the result achieved, the extent and quality of the work performed, and the significant risks of this litigation which Lead Counsel undertook on a fully contingent basis, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved.

108.    To date, there have been no objections to the request for attorneys' fees and reimbursement of litigation expenses previewed in the Notice and Summary Notice.

*The Result Achieved*

109.    Courts in this Circuit have consistently recognized that the result achieved is a significant factor to be considered in assessing a fee award. Here, the $14,250,000 Settlement is an excellent result especially considering that Tricida filed for bankruptcy and the only real available source of recovery was the D&O insurance, which is a wasting asset. Under the circumstances, a $14.25 million all cash recovery is an excellent result.

110.    NERA Economic Consulting releases an annual report on trends in securities litigation. **A true and correct copy of NERA's report for 2024 is attached hereto as Exhibit 2** (Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review*, NERA (Jan. 22, 2025)) ("NERA 2024"). According to NERA, median settlement value in a securities class action, excluding settlements over $1 billion, was $14 million from 2022 through 2024. *See id.* at 23. The Settlement achieved here is higher than the overwhelming majority of settlements obtained in securities class action cases in the past 3 years.

111.    The median ratio of settlement to investor losses was 1.8% from 2021 through 2023, and only 1.2% in 2024. *Id.* at 27. In contrast, the Settlement here provides at least 6.6% of the Class's estimated damages, according to Lead Plaintiff's damages estimate. If Defendant prevailed on his argument, and the Class could only recover damages through August 6, 202, damages would only amount to $44 million and the Settlement would yield 32% of estimated damages—an exceptional result.

112.    In addition, the median percentage of attorneys' fees for settlements between $10 million and $25 million from 2015 through 2024 was 27.5%, which is exactly what Lead Counsel requests here. *Id.* at 30. This further underscores the reasonableness of the requested fee.

113.    The Settlement is even more favorable when considering the loss causation defenses Defendants would present at trial which could dramatically reduce the amount of recoverable damages. Lead Counsel believes the Settlement provides an immediate and substantial benefit to the Class and supports Lead Counsel's baseline fee request.

*The Risks of the Litigation*

114. As detailed above, this litigation carried substantial risk. This was a challenging case. Even at the outset, there was a risk that the action would not proceed past the motion to dismiss stage, as evidenced by the Court's decision dismissing several of Lead Plaintiff's alleged misstatements in two separate motion to dismiss decisions.

115. Convincing a jury that Defendant made material misrepresentations or omitted to disclose material facts was far from guaranteed. Many of the arguments Defendant sought to raise were fact-based and would have come into play at summary judgment and at trial. Defendant likely would have argued that the omitted information was either adequately disclosed or not required to be disclosed, was immaterial, and did not cause the declines in Tricida's share price. Resolving the last of these arguments would have come down to an expensive, unpredictable "battle of the experts."

116. Although Lead Counsel believed in the merits of this action, there would be many challenges in establishing the requisite elements of the Class's claims. Defendant would have had several opportunities to foreclose recovery altogether or greatly reduce the Class's recovery.

117. Lead Counsel undertook and prosecuted this Litigation on a wholly contingent basis. At the outset in 2021, Lead Counsel knew they were embarking on complex and expensive litigation with no guarantee of compensation for the time, resources, and effort they poured into this case over its about four-year lifespan. Accordingly, Lead Counsel fully assumed the risk of an unsuccessful result and has received no compensation to date for services rendered or the significant expenses incurred in litigating this action.

118. In undertaking the responsibility for prosecuting the case, Lead Counsel assured that at all times, sufficient attorney resources were dedicated to advancing the Class's claims over the years, and that sufficient funds were available to advance the expenses required to zealously pursue such complex litigation. Class Counsel received no compensation and, in total, incurred $337,645.15 in litigation expenses in prosecuting this Litigation for the benefit of the Class.

119. Courts have repeatedly found that having experienced and able counsel to privately enforce the securities laws promotes the public interest. Private enforcement of the federal securities laws can occur only if private plaintiffs can obtain some parity in representation to that which is available

to large corporate defendants. If this important public policy is to be carried out, courts should award fees that will adequately compensate private plaintiffs' counsel, while accounting for the enormous risks inherent in prosecuting securities class actions on a contingent-fee basis to the degree of success shown here.

120.    Lead Counsel shouldered the risk that no recovery would be achieved after years of hard fought litigation. Lead Counsel knows from experience that success in contingent fee litigation is never assured, and that the commencement of a securities class action in no way guarantees a recovery. Instead, it takes diligence, commitment, and years of tireless work by skilled counsel to develop the facts, theories, and evidence necessary to prevail on the merits. The Class's claims could have been dismissed at the pleadings stage. Instead, their claims survived two motions to dismiss and Defendant's opposition to class certification prior to the Settlement. Each step forward for the Class was a result of Lead Counsel's vigorous and unwavering efforts and litigation expertise.

### The Skill Required and Quality of Work

121.    The requested fee is also warranted in light of the extensive efforts on the part of Lead Counsel, as outlined above, required to produce this result.

122.    Lead Counsel is highly experienced in securities litigation and has a long and successful track record of representing investors in such cases. Lead Counsel has successfully prosecuted securities class actions and complex litigation in federal and state courts throughout the country, including in this Circuit. **A true and correct copy of Block & Leviton LLP's Firm Resume is attached hereto as Exhibit 3.**

123.    Lead Counsel believes its experience and skill was critical to getting the case through the motions to dismiss and to successfully achieving class certification.

124.    Additionally, Lead Counsel's reputation as experienced counsel in complex cases, successful litigation, and discovery efforts greatly enhanced Lead Counsel's ability to negotiate the Settlement in an efficient manner to the benefit of the Class.

125.    The quality and vigor of opposing counsel also supports Lead Counsel's fee request. Defendant is represented by Sidley Austin LLP, highly experienced counsel who vigorously represented their client.

126.    Lead Counsel spent over 3,106 hours of time on this case. By the time the Settlement was reached, Lead Counsel had, among other things: (i) reviewed and analyzed publicly available documents such as Tricida's SEC filings, news article, press releases, complaints and other legal filings against the Company, and reports prepared by securities and financial analysts; (ii) drafted the factually detailed FAC; (iii) successfully argued against Defendant and Tricida's motion to dismiss the FAC; (iv) engaged in comprehensive document and written discovery involving tens of thousands of pages of documents from Defendant and third-parties, including the FDA; (v) conducted numerous meet and confers with Defendant and third parties, and briefed two discovery disputes; (vi) drafted the SAC after thoroughly reviewing and analyzing documents produced by the FDA; (vii) researched, drafted, and filed a motion for leave to file the SAC, and successfully argued against Defendant's motion to dismiss the SAC; (vii) worked closely with experts to analyze price impact and damages issues; (viii) won class certification; (ix) drafted and exchanged detailed mediation statements; (x) attended two full-day mediation sessions; (xi) engaged in protracted, extensive negotiations about the precise terms of the Settlement; and (xii) persuaded the Court to grant preliminary approval.

127.    Lead Counsel expended a total of 3,106.3 hours prosecuting this action. The billing rates for partners range from $970 to $1,290, associates' rates range from $535 to $640.

128.    I believe that the time reflected in the firm's lodestar calculation and the expenses for which payment is sought as stated herein are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of the litigation. These expenses are all of a type that courts have routinely approved in similar class action cases.

129.    The information regarding my firm's time was prepared from time records regularly maintained by my firm in the ordinary course of business. I oversaw and participated in the day-to-day activities in the litigation and I, together with my partners, reviewed the daily time records to confirm their accuracy. In some cases, I wrote off time billed to this case. In addition, time for

attorney timekeepers who had worked only a de minimus total amount of time on this case was removed from the time report. As a result of this review and the adjustments made, I believe the time reflected in the firm's lodestar calculation is reasonable in amount and was necessary for the effective and efficient prosecution and resolution of the litigation.

130.    The hourly rates for our attorneys and professional support staff are their standard rates and are the same as, or comparable to, the rates submitted by my firm and accepted by courts for lodestar cross-checks in other class action fee applications. My firm's rates are set based on periodic analysis of rates used by firms performing comparable work and that have been approved by courts.

131.    As set forth below, and as **broken down by categories of activities by each biller in Exhibit 4** attached hereto, attorneys and professional support staff at Block & Leviton LLP billed the following aggregate hours to this matter as of the date of filing, with fees applied at the firm's current billing rates, equating to a lodestar of $2,494,599:

| Timekeeper | Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Block, Jeff (P) | 512.8 | $1,290 | $661,512 |
| Byrne, Mark (A) | 165.4 | $565 | $93,451 |
| Delaney, Sarah (A) | 1002.9 | $620 | $621,798 |
| Gaines, Michael (A) | 689.0 | $640 | $440,960 |
| Kotz, Shira (A) | 53.8 | $535 | $28,783 |
| Van Vlaanderen, Zoe (A) | 31.8 | $535 | $17,013 |
| Walker, Jacob (P) | 650.6 | $970 | $631,082 |
| **Total** | **3106.3** | **$803.08** | **$2,494,599** |

P = Partner; A = Associate; PL = Paralegal

132.    The requested fee of 27.5% ($3,918,750) represents a lodestar multiplier of 1.41, which is well within the range of one to four frequently used as a cross-check by courts in this Circuit. Given the excellent result achieved in this action, Lead Counsel's 3,106.3 hours valued at $2,494,599, plus Bankruptcy Counsel's 219.70 hours valued at $277,275, support the reasonableness of the fee request.

### The Contingent Nature and Financial Burden

133.   This Declaration, the Final Approval Motion, and the Fee Motion describe the substantial risks of the litigation. Those same difficulties also constituted risks that Lead Counsel might never be paid for their efforts. Indeed, Lead Counsel has not been compensated for any time or expense since this case began in January 2021.

134.   Courts consistently recognize that the risk of receiving little or no recovery is a major factor in considering an award for attorneys' fees. This risk is even more pronounced in securities class actions where the PSLRA makes surviving past the motion to dismiss stage particularly challenging.

135.   Lead Counsel knows from experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation such as this is never assured. Even plaintiffs who get past summary judgment and succeed at trial may find a judgment in their favor overturned on appeal or on a post-trial motion. Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result and that such a result would be realized only after a lengthy and difficult effort. As discussed in greater detail above, this case was fraught with significant risk factors concerning liability and damages.

### The Awards in Similar Cases

136.   Courts also look at awards in similar cases in determining whether the requested fee is reasonable.

137.   In the Ninth Circuit, courts routinely permit awards of attorneys' fees ranging from 20-30% of settlement funds. According to NERA, from 1996 to 2014 and from 2015 to 2024, the median fees granted in securities settlements of $10-25 million were 30% and 27.5% respectively. *See* Ex. 2 at 30.

### Bankruptcy Counsel

138.   With the permission of the Court, Dkt. 132, Lead Counsel engaged Bankruptcy Counsel to assist in protecting the interests of the Class, as described in detail above, in Bankruptcy Court in Delaware. Lead Counsel paid a $25,000 cash retainer to Bankruptcy Counsel, and agreed to reimburse Bankruptcy Counsel for its attorney fees consistent with the fee paid to Lead Counsel.

Lead Counsel does not seek reimbursement for the advanced retainer or for the fees that will be paid to Bankruptcy Counsel beyond the 27.5% attorneys' fees it is requesting.

## VI.    REIMBURSEMENT OF THE REQUESTED LITIGATION EXPENSES IS FAIR AND REASONABLE

139.    Lead Counsel is also moving for reimbursement of Litigation Expenses that were reasonably and necessarily incurred in prosecuting this action.

140.    As detailed below, Lead Counsel is seeking reimbursement of a total of $329,071.46 in out-of-pocket costs and expenses, plus an additional $8,573.69 to cover the cost of specialized Bankruptcy Counsel (as described in the **Declaration of Michael S. Etkin on Behalf of Lowenstein Sandler LLP, attached hereto as Exhibit 5**), all of which were advanced by Lead Counsel from the inception of this action through July 23, 2025. Lead Counsel's expenses are summarized below:

| Category | Amount expended |
|---|---|
| **Court Fees** (filing fees and PHV fees in United States District Court) | $634.00 |
| **Court reporters, deposition, and court transcript fees** | $1,859.85 |
| **Electronic discovery** (fees paid to third-party vendors for hosting and processing documents and review platform; reimbursement to liquidating trustee for hosting and processing of documents) | $43,885.65 |
| **Expert fees** | $214,698.13 |
| **Investigation Fees** (payment to third-party investigator) | $16,613.63 |
| **Legal research charges** (Westlaw, Pacer, Alpha-Sense) | $7,005.16 |
| **Mediation fees** | $20,000.00 |
| **Postage, shipping, and courier fees** | $1,672.29 |
| **Travel** (airfare, lodging, transportation, parking; includes travel to final approval hearing) | $21,415.31 |
| **Meals** (while traveling) | $1,287.44 |
| **Total Expenses** | $329,071.46 |

DECLARATION OF JACOB A. WALKER                                              28
CASE NO. 4:21-CV-00076-HSG

141.    The expenses and charges pertaining to this case are reflected in the books and records of my firm. These books and records are prepared from receipts, expense vouchers, check records, and other documents, and are an accurate record of the expenses.

142.    From the beginning of the case, Lead Counsel was aware that it might never recover any of its expenses, and, at the very least, would not recover anything until the action was successfully resolved. Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate it for the lost use of funds advanced by Lead Counsel to prosecute this action. Thus, Lead Counsel was motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

143.    In view of the complex nature and length of this action, Lead Counsel believes the litigation expenses were reasonable and necessary to pursue and protect the interests of the Class.

144.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that a fee award of 27.5%, resulting in a lodestar multiplier of 1.41, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

## VII.    LEAD PLAINTIFF'S REASONABLE COSTS AND EXPENSES SHOULD BE REIMBURSED

145.    The PSLRA authorizes courts to award class representatives their "reasonable costs and expenses (including lost wages) directly relating to the[ir] representation of the class." 15 U.S.C. §78u-4(a)(4).

146.    Here, Lead Plaintiff Jeffrey M. Fiore was an exemplary representative of the Class. He spent at least 20 hours in his role as Lead Plaintiff, time he spent, among other things: (i) reviewing relevant documents, including filings, (ii) providing Lead Counsel with documents and information in response to Defendant's discovery requests, (iii) sitting for a deposition, (iv) conferring with Lead Counsel, and (v) evaluating and approving the Settlement. Further details of Lead Plaintiff's

litigation-related activities are detailed in the **Declaration of Jeffrey M. Fiore, attached hereto as Exhibit 6**.

147.    As explained in his separate Motion, Lead Plaintiff seeks reimbursement in the amount of $1,700, or $680 in the alternative, for his reasonable costs and expenses incurred in his representation of the Class.


I declare under penalty of perjury that the foregoing is true and correct. Executed on July 28, 2025.


/s/ Jacob A Walker
Jacob A. Walker